# United States Court of Appeals

*for the*

# Third Circuit

---

Case No. 25-1374

---

RYANAIR DAC,

*Plaintiff-Appellant,*

– v. –

BOOKING HOLDINGS INC., KAYAK SOFTWARE CORPORATION,
PRICELINE.COM LLC, and AGODA COMPANY PTE. LTD.,

*Defendants,*

BOOKING.COM B.V.,

*Defendant-Appellee.*

---

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE IN NO. 1:20-CV-01191,
HONORABLE WILLIAM C. BRYSON, CIRCUIT JUDGE

---

## REDACTED BRIEF AND JOINT APPENDIX
## ON BEHALF OF PLAINTIFF-APPELLANT
### Volume 1 of 4 (Pages Appx1 – Appx444)

---

CYNTHIA A. GIERHART
HOLLAND & KNIGHT LLP
800 17th Street, NW, Suite 1100
Washington, DC 20006
(202) 955-3000

JI MAO
HOLLAND & KNIGHT LLP
787 Seventh Avenue, 31st Floor
New York, New York 10019
(212) 513-3200

WILLIAM OLIVER
HOLLAND & KNIGHT LLP
10 St. James Avenue, 11th Floor
Boston, Massachusetts 02116
(617) 573-5863

R. DAVID DONOGHUE
ANTHONY J. FUGA
HOLLAND & KNIGHT LLP
150 North Riverside Plaza, Suite 2700
Chicago, Illinois 60606
(312) 263-3600

R. TOUHEY MYER
KRATZ & BARRY
800 North West Street
Wilmington, Delaware 19801
(302) 527-9378

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit LAR 26.1 Plaintiff-Appellant Ryanair DAC makes the following disclosures:

1)    Ryanair DAC's parent company is Ryanair Holdings PLC, a publicly listed company, which has no parent company of its own.

2)    Ryanair DAC is wholly owned by Ryanair Holdings PLC.

3)    Ryanair DAC is not aware of any publicly held corporation that is not a party to this case that has a financial interest in the outcome of this proceeding.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................ iv

I.  INTRODUCTION ........................................................................1

II.  JURISDICTIONAL STATEMENT ................................................5

III.  STATEMENT OF THE ISSUES ..................................................5

IV.  STATEMENT OF RELATED CASES OR PROCEEDINGS .......................6

V.  STATEMENT OF THE CASE ......................................................6

VI.  SUMMARY OF THE ARGUMENT ............................................14

VII.  ARGUMENT ..........................................................................16

A.  Standard of Review..........................................................16

B.  The district court erred in reversing the jury's determination that Ryanair had suffered at least $5,000 in loss during any one-year period due to Booking's actions. ........................................................................18

    1.  It was reasonable for the jury to find that Ryanair suffered $5,000 in loss due to Shield hosting costs alone. ......................................................20

    2.  It was reasonable for the jury to find that Ryanair suffered $5,000 in loss due to Navitaire costs alone. ..........................................................38

    3.  A reasonable jury could have relied on evidence of any number of costs to reach the $5,000 threshold. ..........................................................42

C.  The district court erred in ruling that Booking did not defraud Ryanair. .....43

D.   The district court erroneously held at summary judgment that no portion of Shield or business intelligence employee salaries could count as loss. ...............48

E.   The district court erred by ruling that Booking did not obtain information from a protected computer....................................................................................51

VIII.  CONCLUSION...............................................................................................54

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
    561 F.3d 199 (3d Cir. 2009) ..............................................................16

*Afilias PLC v. Architelos, Inc.*,
    No. 1:15-CV-14, 2016 U.S. Dist. LEXIS 38258, 2016 WL
    1245006 (E.D. Va. Mar. 23, 2016) ....................................................31

*Agrizap, Inc. v. Woodstream Corp.*,
    520 F.3d 1337 (Fed. Cir. 2008) ..........................................................26

*Bagic v. Univ. of Pittsburgh*,
    No. 2:18-cv-511-NR, 2022 U.S. Dist. LEXIS 15318, 2022 WL
    267356 (W.D. Pa. Jan. 27, 2022) ........................................................36

*Bd. of Trs. of Pierce Twp., Ohio v. Hartman*,
    No. 1:08-CV-37, 2008 U.S. Dist. LEXIS 137553, 2008 WL
    11351291 (S.D. Ohio June 18, 2008) ..................................................53

*Bernardsville Bd. of Educ. v. J.H.*,
    42 F.3d 149 (3d Cir. 1994) ..................................................................37

*Bitmanagement Software GmBH v. United States*,
    124 F.4th 1368 (Fed. Cir. 2025) ..........................................................28

*Brooks v. AM Resorts, LLC*,
    954 F. Supp. 2d 331 (E.D. Pa. 2013) ..................................................18

*Burch v. Reading Co.*,
    240 F.2d 574 (3d Cir. 1957) ................................................................31

*Decus, Inc. v. Heenan*,
    No. CV 16-5849, 2018 U.S. Dist. LEXIS 55569, 2018 WL
    1596880 (E.D. Pa. Apr. 2, 2018) ........................................................43

*Elias Indus. v. Kissler & Co.*,
    No. 2:20-CV-01011-CCW, 2021 U.S. Dist. LEXIS 99449, 2021
    WL 2141509 (W.D. Pa. May 26, 2021) ..............................................18

iv

*Est. of Lieberman v. Vida*,
   No. 22-2542, 2024 U.S. App. LEXIS 1156, 2024 WL 194168 (3d
   Cir. Jan. 18, 2024)........................................................................17, 41

*Facebook, Inc. v. Power Ventures, Inc.*,
   252 F. Supp. 3d 765 (N.D. Cal. 2017)..................................................53

*Facebook, Inc. v. Power Ventures, Inc.*,
   844 F.3d 1058 (9th Cir. 2016) ..............................................................50

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ...............................................................53

*Homoki v. Conversion Servs., Inc.*,
   717 F.3d 388 (5th Cir. 2013) .................................................................28

*Intell. Ventures I LLC v. Symantec Corp.*,
   No. CV 10-1067-LPS, 2015 U.S. Dist. LEXIS 7739, 2015 WL
   307572 (D. Del. Jan. 23, 2015) .............................................................26

*Jester v. Hutt*,
   937 F.3d 233 (3d Cir. 2019) ............................................................27, 34

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
   745 F. App'x 452 (3d Cir. 2018) ...........................................................17

*Malley-Duff & Associates, Inc. v. Crown Life Ins. Co.*,
   734 F.2d 133 (3d Cir. 1984) ..................................................................26

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)...............................................................................16

*McDaniels v. Flick*,
   59 F.3d 446 (3d Cir. 1995) ..............................................................17, 33

*Rickett v. Smith*,
   No. 1:14-CV-70-GNS-HBB, 2015 U.S. Dist. LEXIS 72959, 2015
   WL 3580500 (W.D. Ky. June 5, 2015)..................................................53

*Romero v. Allstate Ins. Co.*,
   No. 01-3894, 2016 U.S. Dist. LEXIS 60721, 2016 WL 2619853
   (E.D. Pa. May 4, 2016) .........................................................................31

*United States v. Czubinski,*
    106 F.3d 1069 (1st Cir. 1997)................................................................46

*United States v. Davis,*
    41 F. App'x 493 (2d Cir. 2002) ...........................................................28

*United States v. Hearst,*
    No. 21-50428, 2022 U.S. App. LEXIS 12299, 2022 WL 1421830,
    at *1-2 (5th Cir. May 5, 2022)....................................................27, 34

*United States v. Middleton,*
    231 F.3d 1207 (9th Cir. 2000) .......................................................22, 51

*United States v. Nosal,*
    No. CR-08-0237 EMC, 2014 U.S. Dist. LEXIS 4021, 2014 WL
    121519 (N.D. Cal. Jan. 13, 2014)........................................................22

*Univ. Sports Publ'ns Co. v. Playmakers Media Co.,*
    725 F. Supp. 2d 378 (S.D.N.Y. 2010) ..........................................19, 23

*Van Buren v. United States,*
    593 U.S. 374 (2021)............................................................................19

*Vanguard Ins. Co. v. Connett,*
    270 F.2d 868 (10th Cir. 1959) ............................................................26

*Viatech Techs., Inc. v. Adobe Inc.,*
    No. 20-358-RGA, 2024 U.S. Dist. LEXIS 126563, 2024 WL
    3444634 (D. Del. July 17, 2024) .........................................................16

*Waldorf v. Shuta,*
    142 F.3d 601 (3d Cir. 1998) ...............................................................36

*Zap Cellular, Inc. v. Weintraub,*
    No. 15-CV-6723, 2022 U.S. Dist. LEXIS 168735, 2022 WL
    4325746 (E.D.N.Y. Sept. 19, 2022) ...................................................22

**Statutes**

18 U.S.C. § 1030......................................................................................5

18 U.S.C. § 1030(a)(2)......................................................................51, 53

18 U.S.C. § 1030(a)(2)(C) ....................................................................*passim*

18 U.S.C. § 1030(a)(4) ........................................................................*passim*

18 U.S.C. § 1030(a)(5)(A) ........................................................................10

18 U.S.C. § 1030(a)(5)(B) ........................................................................10

18 U.S.C. § 1030(a)(5)(C) .....................................................................*passim*

18 U.S.C. § 1030(b) .....................................................................................11

18 U.S.C. § 1030(c)(4)(A)(i)(I)-(V) ..........................................18, 37, 42

18 U.S.C. § 1030(e)(8) ..............................................................................23

18 U.S.C. § 1030(e)(11).........................................................18, 22, 23, 50

18 U.S.C. § 1030(g) ...................................................................................18

28 U.S.C. § 1291 ...........................................................................................5

28 U.S.C. § 1330 ...........................................................................................5

28 U.S.C. § 1331 ...........................................................................................5

**Other Authorities**

Fed. R. Civ. P. 50 ..........................................................................16, 32, 41

Fed. R. Civ. P. 50(a)...................................................................................16

Fed. R. Civ. P. 50(b) ...................................................................16, 17, 31, 41

Fed. R. Civ. P. 56 ..........................................................................................4

Fed. R. Civ. P. 56(a)...................................................................................17

## I.    INTRODUCTION

At the start of the COVID pandemic, a problem for Appellant Ryanair DAC ("Ryanair") suddenly became overwhelming: online travel agents ("OTA(s)") were using bots to access the Ryanair website without authorization to sell Ryanair flights to OTA customers. Unauthorized OTAs often provide Ryanair with "dummy" email addresses and virtual credit card numbers, rather than their customers' actual email addresses and payment information. These anti-consumer practices have at times prevented Ryanair from being able to contact its own passengers to provide important safety and flight information or issue refunds directly. The pandemic amplified this problem a thousandfold when Ryanair had to send COVID notifications and issue refunds to millions of passengers. Ryanair was often unable to comply with COVID contact-tracing legal and regulatory requirements or provide information to customers about flight delays and cancellations, because Ryanair did not have the customers' correct contact information. And often, Ryanair issued refunds only to receive complaints that the passenger never received the money from the OTA and, in many cases, had to issue the refunds twice.

With this backdrop, Ryanair filed suit on September 4, 2020, against Appellee Booking.com B.V. ("Booking") and related entities, alleging that Booking's unauthorized access of Ryanair's computers to sell Ryanair flights to Booking's customers violated the Computer Fraud and Abuse Act ("CFAA").

1

The CFAA prohibits accessing computers without authorization to cause damage, obtain information, or further an intended fraud. After a four-day trial in July 2024, the jury returned a verdict that Booking violated Section 1030(a)(5)(C) of the CFAA by accessing Ryanair's computers without authorization and causing damage to those computers.

Despite Booking's now adjudicated wrongdoing, the district court allowed Booking to escape liability for its actions by overturning the jury verdict on a threshold issue for civil causes of action under the statute. The CFAA allows parties to bring an action only if they can show that they suffered at least $5,000 in "loss," as that term is defined in the CFAA, during any one-year period. The jury decided that Ryanair *did* suffer at least $5,000 in loss in a one-year period after being presented with evidence to support that determination. Nevertheless, the district court overturned the jury's verdict on this finding of fact.

The jury made the correct decision – or at a minimum, made a reasonable decision – and the district court should be reversed for four reasons.

*First*, Ryanair presented evidence of software hosting costs for a program called Shield from March 1, 2022 to February 28, 2023 that satisfy the $5,000 requirement. While the evidence was not perfect for this time period, the jury is permitted to fill in the gaps through just and reasonable inferences based on the data and testimony that Ryanair provided. The court impermissibly usurped the role of

2

the jury as the ultimate finder of fact when it found that no reasonable jury could conclude that Ryanair's costs due to Booking's conduct from March 1, 2022 to February 28, 2023 would have exceeded $5,000.

*Second*, Ryanair presented evidence of its relevant Shield hosting costs from August 30, 2022 to August 29, 2023 sufficient to satisfy the $5,000 requirement. While the jury would need to rely slightly on projections to determine Booking's share of Ryanair's total cost, it is well within the jury's right and ability to do so.

*Third*, Ryanair presented evidence that Booking's conduct increased the costs of Ryanair's flight reservation system, Navitaire, by over $5,000. This increase meets the threshold itself. But in finding that no reasonable jury could conclude that Ryanair had met the $5,000 requirement, the district court made the improper assumption that Ryanair's Navitaire costs did not increase and would have been the same even if Booking had not acted.

*Fourth*, Ryanair presented evidence of more than $100,000 in costs in a one-year period spread over numerous different cost categories. The district court simply could not conclude that the jury was unreasonable to find that some *combination* of those costs could have reached the modest $5,000 threshold. The jury weighed the evidence and was reasonable in its decision.

Ryanair also appeals the district court's decision to overturn the jury and grant judgment as a matter of law that Booking did not violate Section 1030(a)(4) of the CFAA. This section requires Booking to access Ryanair's computer (a) knowingly without authorization, (b) with intent to defraud, and (c) gain at least $5,000 in value from using the accessed computer in any one-year period. The district court did not disturb the jury verdict that Booking acted with an intent to defraud; instead, the district court held that Booking did not receive at least $5,000 in value from its unauthorized access. In so holding, the district court incorrectly focused on whether Booking made a *profit* of at least $5,000, ignoring the fact that Booking obtained at least $5,000 of *value* in the form of Ryanair flight reservations ███████████ ████████, let alone over the course of a one-year period.

Finally, Ryanair appeals two Rule 56 rulings. The district court erroneously ruled that certain Ryanair Shield and business intelligence employee costs cannot count as loss under the CFAA. This was wrong. Such costs do count as loss, because those employees were responsible for responding to Booking's unauthorized conduct. Had the district court ruled correctly on this issue, Ryanair would have presented this evidence to the jury, and those costs would have additionally and separately met the $5,000 loss requirement.

The district court also erroneously ruled that Booking did not violate Section 1030(a)(2)(C) because it did not obtain information from Ryanair's computers. But

the record showed that Booking obtained flight confirmation codes for each flight booked by accessing Ryanair's computer, and Booking, through its intermediaries, also obtained information concerning whether the booking attempt was successful, failed, or pending.

## II.     JURISDICTIONAL STATEMENT

The district court has jurisdiction over this case under 28 U.S.C. §§ 1330 and 1331, and because Ryanair's CFAA claims under 18 U.S.C. § 1030 raised a federal question. This Court has jurisdiction under 28 U.S.C. § 1291. The amended final judgment was entered on January 31, 2025. Appx441-442. Ryanair filed a notice of appeal on February 28, 2025. Appx443-444.

## III.     STATEMENT OF THE ISSUES

1.     Whether the district court erred by granting judgment as a matter of law that Ryanair had not suffered $5,000 in loss during a one-year period, after the jury had already decided Ryanair did suffer $5,000 in loss. Appx410-429.

2.     Whether the district court erred in overturning the jury verdict on Section 1030(a)(4) of the CFAA by finding that no reasonable jury could find that Booking obtained at least $5,000 in value from the unauthorized use of Ryanair's protected computer. Appx436-439.

3.     To the extent the district court's ruling on Kayak's Motion to Preclude New Kayak "Loss" Calculation is applicable to Ryanair's presentation of evidence for  Booking, whether the district court erred by holding that Ryanair was limited to

presenting evidence of loss for a specific one-year period rather than any one-year period. Appx133-138.

4.    Whether the district court erred by holding that Shield employee costs and business intelligence employee costs related to developing and improving Shield could not be counted as loss. Appx56.

5.    Whether the district court erred by holding Booking did not obtain information from a protected computer in relation to Ryanair's CFAA claim under Section 1030(a)(2)(C). Appx41-47; Appx69.

## IV.    STATEMENT OF RELATED CASES OR PROCEEDINGS

There are no related cases or proceedings.

## V.    STATEMENT OF THE CASE

Ryanair is the largest airline in Europe and operates low-fare flights in Europe, Northern Africa, and the Middle East. Ryanair sells flight reservations to its customers, including United States customers, primarily through its website and mobile app.[1] Ryanair operates an exclusive online distribution model with all online sales of Ryanair flights exclusively taking place on the Ryanair Website, which is the only authorized online channel to sell Ryanair flights. Appx281-282, 151:15-152:18. Ryanair also operates a non-exclusive offline channel, meaning that Ryanair

---

[1] The website www.Ryanair.com, Ryanair mobile app, and the servers hosting them are collectively referred to as the "Ryanair Website."

authorizes the sale of its tickets by Global Distribution System (GDS) providers strictly provided that the sales occur offline. Appx665-667, 298:15-300:9.

Booking is an OTA that provides booking services for flights, car rentals, hotels, and ancillaries such as travel insurance. Appx1160-1161, 752:19-753:1; Appx1164, 756:7-15.[2] Booking offers flights from a variety of airlines for sale on its website. Appx843-844, 476:18-477:20. Booking sold Ryanair's flights without Ryanair's consent. *See* Appx821-823, 454:8-456:11; Appx826-827, 459:15-460:15; Appx856, 489:2-8; Appx1305 (PTX-011, screen scraping email); Appx1306-1337 (PTX-034, Booking's Ryanair flight bookings). When Booking customers attempted to purchase Ryanair flights on Booking's website, Booking accepted the customers' payments, sent requests to its third-party vendor, Etraveli, to purchase the specific Ryanair flights requested by those customers, and paid Etraveli for the purchases. *See* Appx807-812, 440:19-445:16; Appx814-815, 447:10-448:6; Appx1003-1004, 595:24-596:11. Based on Booking's requests, Etraveli would then use automated computer programs, *i.e.*, "bots," to purchase flights from Ryanair's website and forward the flights to Booking. *Id.*; Appx802-803, 435:22-436:4.

Ryanair does not permit Booking or other unauthorized OTAs to purchase Ryanair flights, either directly or through intermediaries such as Etraveli, because

---

[2] Citations to the joint appendix refer to trial testimony unless otherwise noted or apparent from context.

their anti-consumer practices cause significant harm for Ryanair and its customers. Appx266-268, 136:20-138:11; Appx270-271, 140:12-141:19. First, OTAs often provide intentionally incorrect passenger contact information (such as email addresses), which prevents Ryanair from contacting its passengers to notify them of a schedule change or otherwise comply with its legal and regulatory obligations. Appx257-258, 127:3-128:11; Appx270-272, 140:12-142:16; Appx273, 143:17-23; Appx1023-1025, 615:13-617:14. OTAs also often use payment methods that are not associated with their customers so Ryanair is unable to refund its passengers directly. *Id.* These issues do not arise when customers purchase Ryanair flights through the two Ryanair approved purchase methods. *Id.*; *see* Appx665-666, 298:11-299:25. Ryanair had no way of knowing when OTA bots were providing correct versus incorrect passenger and payment information. Appx270-272, 140:12-142:8. Therefore, even when the OTA bots purchased Ryanair flights using correct passenger and payment information, Ryanair had to invest their time and monetary resources to implement processes to obtain accurate contact and payment information from passengers. Appx270-272, 140:12-142:16; Appx289, 159:5-21; Appx295-299, 165:9-169:4; Appx1133-1135, 725:22-727:12.

Ryanair created myRyanair—a password-protected section of the Ryanair Website—in part to combat the harmful effects of OTA bots. Appx261-262, 131:15-132:13; Appx277, 147:3-15. Users cannot purchase a flight from the Ryanair

Website without first logging in to myRyanair. *Id.* To obtain log-in credentials, users must agree to the Ryanair Website Terms of Use and by providing and verifying a valid e-mail address. Appx261-262, 131:15-132:13; Appx267, 137:10-13; Appx277, 147:3-15. Ryanair has a blacklist of e-mail domains that cannot create myRyanair accounts because the accounts using those domains have been identified as OTA accounts, but OTAs have evaded the blacklist by using randomly generated e-mail addresses. Appx261-262, 131:15-132:13; Appx277-278, 147:3-148:14.

Ryanair has also developed an in-house software program called Shield that detects bots trying to access the Ryanair website. Appx278, 148:20-24. Shield allows Ryanair to (1) detect bots that have logged in to myRyanair and prevent them from purchasing Ryanair flights; and (2) if bots manage to purchase Ryanair flights, identify unauthorized bookings so Ryanair can correct passenger information directly with the customers via a verification process. Appx694-702, 327:14-335:25; Appx752-753, 385:13-386:10.

Ryanair has also served Booking with multiple cease-and-desist letters informing Booking that Ryanair has implemented technological barriers to stop Booking—whether directly or through Etraveli—from obtaining Ryanair flight reservations, and Booking's continued attempts to bypass those technological barriers and gain access to the Ryanair Website were not authorized by Ryanair. Appx1298-1301 (PTX-001, letter); Appx1302-1304 (PTX-002, letter); Appx1338-

1341 (PTX-090, letter); Appx281-288, 151:1-158:2. Even after Ryanair explicitly revoked authorization this way, Booking continued unauthorized access and purchase of Ryanair flights. *Id.* From late 2019 (when Booking first started selling flights) through August 31, 2023, Booking sold more than 1 million Ryanair flights. Appx826-827, 459:15-460:15; Appx1306-1337 (PTX-034, Booking's Ryanair flight bookings).

Ryanair filed the district court lawsuit against Booking and four related entities, Booking Holdings Inc. ("Booking Holdings"), Priceline.com LLC ("Priceline"), Kayak Software Corporation ("Kayak"), and Agoda Company Pte. Ltd. ("Agoda") (collectively, the "Defendants") in September 2020. Ryanair's Complaint, as amended, alleged five distinct CFAA violations by the Defendants:

- Count I: violation of Section 1030(a)(2)(C) for intentionally accessing a protected computer without authorization and obtaining information from it;

- Count II: violation of Section 1030(a)(4) for knowingly and with intent to defraud, accessing a protected computer without authorization to further the intended fraud and obtain something of value;

- Count III: violation of Section 1030(a)(5)(A) for intentionally causing damage to a protected computer without authorization by transmitting a

computer program, command, code, or information;[3]

- Count IV: violation of Section 1030(a)(5)(B) and/or (C) for intentionally accessing a protected computer without authorization and as a result of such conduct, causing damage and loss, or recklessly causing damage; and

- Count V: violation of Section 1030(b) for conspiring to commit or attempting to commit any of the above offenses.

*See* Appx508.

In December 2023, the parties filed cross-motions for summary judgment. The district court held, contrary to the Defendants' arguments, that "the term 'loss' is best understood to include the cost of an investigation following a CFAA violation, even in instances in which the violation has not resulted in actual impairment of the protected computer or loss of data." Appx53. The district court further held that "a plaintiff may include the cost of resecuring its systems after an offense as a loss, but not the cost of measures that make its system more secure than it was before." *Id.*

Subject to these principles, the district court held: (1) "To the extent that the facts at trial show that Shield prevents unauthorized bookings at the payment page after account creation, any portion of those costs allocable to each defendant may

---

[3] Count III was dismissed pursuant to Defendants' motion to dismiss and is not the subject of this appeal. Appx27.

qualify as losses under the CFAA for purposes of satisfying the $5,000 threshold requirement for that defendant." *Id.* (2) Ryanair may count its Navitaire costs as losses if "the facts developed at trial show that the bot traffic attributable to the defendants has materially increased the cost of Ryanair's server infrastructure." Appx57. And (3) the costs of Ryanair's verification procedures may count as losses if the unauthorized bookings affect Ryanair's data integrity, and the verification procedures are directed at data integrity instead of simply being a business practice designed to discourage the use of OTAs. Appx58-59. The district court declined to grant summary judgment for Defendants because they failed to show that "Ryanair will be unable to establish a loss of at least $5,000 attributable to each defendant." Appx61. And the district court declined to grant summary judgment for Ryanair because "Ryanair's loss calculations include some costs that are excluded by the CFAA and some of its listed costs are disputed." *Id.*

The district court granted Defendants' motion for summary judgment with respect to Count I because it found that Booking had not obtained information from the Ryanair website. Appx47, Appx69.

The district court declined to grant summary judgment on Ryanair's fraud claim (Count II) because it held "Ryanair may still be able to show that the defendants have acted with the intent to deceive Ryanair by using false information

to obtain something of value: to wit, profitable flight bookings that the defendants would not be able to obtain otherwise." Appx72.

On June 26, 2024, the parties mutually agreed to dismiss the claims against Booking Holdings, Priceline, and Agoda. Appx595. On July 11, 2024, days before the start of trial, Kayak filed a motion to prevent Ryanair from presenting evidence that it had suffered loss due to Kayak's actions for any period other than a particular one-year period. Appx2214-2217 (Doc 432). On the first morning of trial, the district court granted Kayak's motion. Appx138, 8:16-23. The parties thereafter filed a stipulation to dismiss all claims against Kayak, leaving Booking as the sole defendant. Appx1261. A four-day jury trial commenced on July 15, 2024.

After Ryanair had presented its case, Booking moved for judgment as a matter of law ("JMOL") in its favor on the CFAA claims. *See* Appx1290, 812:1-7; Appx1296, 839:4-13. The district court did not grant Booking's motion. *Id*.

The jury returned a verdict on July 18, 2024, finding that Ryanair proved by a preponderance of the evidence that Booking's violation of the CFAA caused loss to Ryanair totaling at least $5,000 during a one-year period. Appx1282-1285. The jury also returned a verdict in Ryanair's favor on Count II (Section 1030(a)(4)) and Count IV (Section 1030(a)(5)(C)) of the Amended Complaint. *Id.* The jury awarded $5,000 to Ryanair as the amount of "actual economic harm caused by Booking.com violating the [CFAA]." *Id.*

After trial, Booking renewed its motion for JMOL on Ryanair's CFAA Section 1030(a)(5)(C) (Count IV) and 1030(a)(4) (Count II) claims. Appx502 (docket sheet). Despite the trial evidence being materially identical to the summary judgment record, where the district court declined to grant summary judgment on the $5,000 loss issue, the district court overturned the jury's verdict that Ryanair had met the $5,000 statutory threshold needed to bring a civil action under the CFAA. *See* Appx410-440. Since the $5,000 statutory threshold is a prerequisite for both of Ryanair's CFAA claims, the district court also overturned the jury's verdict on Ryanair's CFAA Section 1030(a)(5)(C) and 1030(a)(4) claims. *See id.*; Appx441-442.

## VI.    SUMMARY OF THE ARGUMENT

The CFAA allows any party to bring an action as long as the party can show that it suffered at least $5,000 in "loss" during any one-year period. "Loss" is statutorily defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

The district court erred by granting judgment as a matter of law that Ryanair has not suffered at least $5,000 in loss during any one-year period. Ryanair presented

evidence of its Shield hosting costs that satisfy the $5,000 requirement in the March 1, 2022 to February 28, 2023 period, and separately for the August 30, 2022 to August 29, 2023 period. While there was a gap in the evidence of certain Shield costs due to lost data, Ryanair presented means for estimating a full year's costs based on a partial year's data, allowing the jury to reasonably extrapolate Ryanair's costs.

Ryanair also presented evidence that Booking's conduct increased its Navitaire costs by over $5,000, and these Navitaire costs alone were also sufficient the $5,000 threshold. The district court's only rationale for discounting these Navitaire costs is based on the improper assumption that Ryanair's Navitaire costs would have been the same even if Booking had not acted. Finally, Ryanair presented evidence of data verification and customer service costs that exceed $100,000. Any combination of costs presented by Ryanair could have reached the $5,000 threshold, and the district court simply could not rule out every combination.

The district court also erroneously ruled that no jury could reasonably find that Booking gained at least $5,000 in *value* from using Ryanair's computers, reversing the jury's finding in Ryanair's favor on Count II. Ryanair presented evidence that Booking obtained Ryanair flight reservations, and that the value of those reservations far exceeded $5,000 in value.

15

The district court also erred by granting partial summary judgment that Ryanair's Shield and business intelligence employee costs cannot count as loss under the CFAA. Such costs are loss, because they are necessary to respond to Booking's unauthorized conduct.

Finally, the district court erroneously ruled that Booking did not violate Section 1030(a)(2)(C) because it did not obtain information from Ryanair's computers. The summary judgment record shows that Booking obtains, for each flight booked, at least the unique booking confirmation codes – *i.e.*, information – without which the passenger would not be able to access their booking.

## VII.  ARGUMENT

### A.    Standard of Review

An appeal court reviews *de novo* the district court's grant of JMOL. *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009). JMOL is appropriate only if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue." Fed. R. Civ. P. 50(a). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, 'granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Viatech Techs., Inc. v. Adobe Inc.*, No. 20-358-RGA, 2024 U.S. Dist. LEXIS 126563, at *2-4, 2024 WL 3444634,

at *1-2 (D. Del. July 17, 2024) (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)).

"A Rule 50(b) motion should not be granted unless 'the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.'" *Est. of Lieberman v. Vida*, No. 22-2542, 2024 U.S. App. LEXIS 1156, at *11 n.6, 2024 WL 194168, at *4 n.6 (3d Cir. Jan. 18, 2024)) (quoting *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015)). When deciding a Rule 50 motion, the Court must view the evidence in the light most favorable to the non-moving party, and "every fair and reasonable inference" must be drawn in that party's favor. *McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir. 1995); *Lieberman*, 2024 U.S. App. LEXIS 1156, at *11 n.6 ("In considering a Rule 50(b) motion, a court 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'").

An appeal court also reviews *de novo* the district court's grant of partial summary judgment. *Kasilag v. Hartford Inv. Fin. Servs., LLC*, 745 F. App'x 452, 455 (3d Cir. 2018). A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is

no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

**B.    The district court erred in reversing the jury's determination that Ryanair had suffered at least $5,000 in loss during any one-year period due to Booking's actions.**

The district court erred by finding that Booking's unauthorized access did not cause Ryanair to suffer at least $5,000 in loss during any one-year period. *See* Appx410-429.

Any person may sustain a civil claim under the CFAA as long as they are able to show that they have "suffer[ed] damage or loss by reason of a violation" of the CFAA and "the defendant's conduct satisfies one of the factors set forth in § 1030(c)(4)(A)(i)(I)-(V)." 18 U.S.C. § 1030(g); *Elias Indus. v. Kissler & Co.*, No. 2:20-CV-01011-CCW, 2021 U.S. Dist. LEXIS 99449, at *7-8, 2021 WL 2141509, at *3 (W.D. Pa. May 26, 2021).[4] The parties agree that the only factor relevant in this case is Section 1030(c)(4)(A)(i)(I), which is satisfied by showing that a CFAA offense caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I); Appx48 (Doc 399, summary judgment order).

---

[4] As mentioned above, the jury returned a verdict that Booking violated Section 1030(a)(5)(C) of the CFAA, and Booking has not appealed that verdict. Appx1282-1285. Thus the issue is not one of liability, but whether Ryanair was permitted to bring an action under Section 1030(a)(5)(C).

"Loss" in this context means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Loss may include the "cost of remedial measures taken to investigate or repair the damage to the computer[.]" *See, e.g.*, *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (citations omitted). "[T]he costs of investigating security breaches constitute recoverable 'losses,' even if it turns out that no actual data damage or interruption of service resulted from the breach." *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 387 (S.D.N.Y. 2010); *see also* Appx50-53 (Doc 399, summary judgment order). The Supreme Court has clarified that "loss" must result from "technological harms" such as the corruption of files, of the type that unauthorized users can cause to a computer system or its data. *Van Buren v. United States*, 593 U.S. 374, 391-92 (2021); *see also* Appx52-53 (Doc 399).

At trial, Ryanair presented evidence of loss in the form of various costs it incurred due to Booking's unauthorized conduct. The jury was instructed to determine whether "Booking.com's violation of the CFAA caused Ryanair to suffer a loss totaling at least $5,000 in a one-year period." Appx1266. The jury returned a verdict that Ryanair had suffered at least $5,000 in loss. Appx1282-1285. Since the

jury was instructed to determine only if Ryanair suffered "***at least*** $5,000 in loss during a one-year period" and did not render a verdict on the exact amount of loss, how the jury ultimately calculated Ryanair's loss is unknown. *Id.* However, the jury's verdict was proper because the jury could reasonably conclude that Ryanair suffered at least $5,000 in loss in a number of ways, such as: (1) the evidence of Ryanair's responsive Shield hosting costs during the one-year period from March 1, 2022 to February 28, 2023 ***or*** during the one-year period from August 30, 2022 to August 29, 2023; (2) the evidence of Ryanair's Navitaire costs during the period from March 1, 2022 to February 28, 2023; and/or (3) any combination of these costs and other costs Ryanair presented at trial. Thus, the district court's decision to overturn the jury's verdict was erroneous.

      **1.**    **It was reasonable for the jury to find that Ryanair suffered $5,000 in loss due to Shield hosting costs alone.**

Ryanair's Shield hosting costs related to Booking's unauthorized access alone exceeded $5,000 during any one-year period. Lukasz Stocki, the Ryanair data scientist responsible for creating and maintaining Shield, provided unrebutted testimony that Shield is an in-house computer program that Ryanair developed specifically for the purpose of addressing OTAs, such as Booking, that attempt to access the Ryanair Website. Appx694-699, 327:18-332:2. He explained that Shield's main goal is to "detect and block the bot[s] [used by Booking] from try [sic] using the Ryanair website." Appx694-695, 327:25-328:2. Shield does so by

"monitoring every activity [from OTA bots] during the daytime and analyzing the activity on the website." Appx695, 328:3-7; Appx711-716, 344:25-349:23.

Shield has two responsive functions that occur after a user has accessed the password-protected myRyanair portion of the Ryanair website.[5] First, at the payments endpoint, before payment is processed, Shield runs a "very fast" algorithm to determine if an OTA bot is attempting to make a payment, and Shield then works with other programs to stop this unauthorized intrusion. Appx696, 329:9-23; Appx701-702, 334:19-335:2; Appx705, 338:6-16; Appx716, 349:13-23. Second, Shield runs a more complex algorithm after payment is processed to further analyze the data and determine which purchases were made via unauthorized access by an OTA but were not caught by the payment endpoint. Appx694-695, 327:22-328:7; Appx701-702, 334:9-335:8. If this post-booking analysis shows that a purchase was made by an OTA bot, Ryanair would flag these purchases as requiring additional verification to remedy incorrect data created by the unauthorized OTAs – namely, to obtain the customers' correct email addresses and payment information. Appx733, 366:6-17; Appx751-753, 384:18-386:10.

---

[5] Shield also blocks OTAs from obtaining Ryanair flight information at three endpoints prior to the myRyanair login page. Appx695, 328:3-7; Appx711-716, 344:25-349:23. But because these endpoints operate in the public portion of the website where the district court found the CFAA did not prohibit access, Ryanair did *not* present costs associated with these first three endpoints to the jury. *See* Appx55; *see generally* Appx598 (Doc 501).

The district court erred by finding that Ryanair had not met the $5,000 loss requirement because (1) responsive Shield costs must be counted as loss, and (2) even disregarding other evidence of loss, a jury could reasonably conclude that Ryanair suffered at least $5,000 from responsive Shield costs alone during two different one-year periods.

a.    Ryanair's responsive Shield costs count as loss.

The costs of operating Shield's responsive functions – *i.e.*, what Shield does after an unauthorized access and payment – count as loss because they are the necessary costs of responding to Booking's unauthorized access and investigating and remediating the damage done. *See* Appx52-55 (Doc 399, summary judgment order); *see also* 18 U.S.C. § 1030(e)(11); *United States v. Nosal*, No. CR-08-0237 EMC, 2014 U.S. Dist. LEXIS 4021, at *16, 2014 WL 121519, at *5 (N.D. Cal. Jan. 13, 2014) ("'[A]ctual loss' includes those costs incurred as part of an internal investigation reasonably necessary to respond to the offense, for example by identifying the perpetrator or the method by which the offender accessed the protected information."); *United States v. Middleton*, 231 F.3d 1207, 1213-14 (9th Cir. 2000) (losses include cost of "measures [that] were reasonably necessary to resecure the data, program, system, or information from further damage."); *Zap Cellular, Inc. v. Weintraub*, No. 15-CV-6723, 2022 U.S. Dist. LEXIS 168735, at

*31, 2022 WL 4325746, at *12 (E.D.N.Y. Sept. 19, 2022) ("[L]osses associated with investigations [should not be read] too narrowly.").

As discussed above, the payments endpoint performs the responsive function of reviewing and blocking payments by bots that have already accessed myRyanair without authorization. *See supra* pp. 20-21. It was thus reasonable for the jury to conclude that the costs of operating these algorithms count as loss. *See* Appx53-55 (Doc 399); *see also* 18 U.S.C. § 1030(e)(11); *Univ. Sports*, 725 F. Supp. 2d at 387; *Nosal*, 2014 U.S. Dist. LEXIS 4021, at *16. Indeed, the district court held at summary judgment that the portion of Shield hosting costs incurred to prevent unauthorized bookings at the payment page, *i.e.*, the payments endpoint algorithm, counts as loss. Appx55 ("To the extent that the facts at trial show that Shield prevents unauthorized bookings at the payment page after account creation, any portion of those costs allocable to each defendant may qualify as losses under the CFAA for purposes of satisfying the $5,000 threshold requirement for that defendant.").

The cost of running the second post-myRyanair algorithm also counts as loss because it is the cost of conducting a damage assessment. The term "loss" under the CFAA specifically includes the costs of "conducting a damage assessment," and courts have clarified that these costs count as loss regardless of whether actual damage occurred. 18 U.S.C. § 1030(e)(11); *Univ. Sports*, 725 F. Supp. 2d at 387; Appx53 (Doc 399) ("Because a 'loss' under the CFAA is defined to include 'any

reasonable cost to any victim, including the cost of responding to an offense,' 18 U.S.C. § 1030(e)(8), the term 'loss' is best understood to include the cost of an investigation following a CFAA violation, even in instances in which the violation has not resulted in actual impairment of the protected computer or loss of data."). Since the evidence shows that the second post-myRyanair algorithm is meant to analyze successful OTA purchases so that Ryanair can address any issues with incorrect data, all post-myRyanair Shield costs count as loss. *Id.*; Appx701-702, 334:9-335:25; Appx751-753, 384:18-386:10.

> b.   Ryanair's responsive Shield hosting costs exceeded $5,000 in a one-year period.

Having correctly categorized the two post-myRyanair Shield algorithms as "loss," it was reasonable for the jury to conclude that the cost of operating those two algorithms equaled at least $5,000 in a one-year period due to Booking's unauthorized access.

Because the jury was not asked to show its work, it is impossible to know how the jury determined that Ryanair suffered at least $5,000 in loss during a one-year period. Appx1266 (Doc 453, jury instructions); Appx1283 (Doc 457, verdict form). Regardless, the jury's verdict should not have been overturned as long as there was at least one reasonable way to calculate Booking's share of responsive Shield costs that would exceed $5,000 in loss over a one-year period. One such way would be to (1) determine the total Shield hosting cost during a one-year period, (2) determine

24

what portion of that total cost can be attributed to maintaining the responsive functions of Shield, and (3) determine what percentage of the responsive functions' cost could be attributed to Booking.

At trial, the jury heard testimony describing Ryanair's Shield costs. Based on that testimony, the jury could reasonably conclude, as described in more detail below, that Ryanair suffered at least $5,000 in loss both in the one-year period from March 1, 2022 to February 28, 2023, and the one-year period from August 30, 2022 to August 29, 2023.

(1)     Ryanair's responsive Shield hosting costs exceeded $5,000 from March 1, 2022 to February 28, 2023.[6]

The jury could reasonably conclude from the trial evidence that because of Booking's unauthorized access, Ryanair incurred at least $5,000 in costs to operate Shield's responsive functions during the one-year period from March 1, 2022 to February 28, 2023 by following the three steps discussed above.

*First*, it was reasonable for the jury to find that Ryanair's total Shield hosting costs from March 1, 2022 to February 28, 2023 totaled $239,360. *See* Appx708-710, 341:10-343:4. Mr. Stocki testified that Shield is hosted on Amazon Web Services, and the cost to Ryanair is the amount Ryanair pays Amazon Web Services to host

---

[6] Ryanair focused on this period at trial because Ryanair's expert based his opinion on this period, and this period thereafter became the predominant timeframe on which Ryanair based its loss calculation.

Shield. Appx704, 337:5-20; Appx706-709, 339:15-340:4, 341:10-342:24. Specifically, from August 30, 2022 to August 29, 2023, Amazon Web Services charged Ryanair $239,360 to keep Shield operating. Appx708-710, 341:10-343:4. While Ryanair was not able to present direct evidence of its Shield hosting costs from March 1, 2022 to August 29, 2022, it would be entirely reasonable for the jury to infer those costs based on the August 30, 2022 to August 29, 2023 costs that were presented. *See*, *e.g.*, *Malley-Duff & Associates, Inc. v. Crown Life Ins. Co.*, 734 F.2d 133, 148 (3d Cir. 1984) (estimates may be based on assumptions, provided these assumptions rest on adequate data); *Vanguard Ins. Co. v. Connett*, 270 F.2d 868, 870 (10th Cir. 1959) ("While the damages may not be determined by mere speculation or guess, it is enough if the evidence shows the extent of the damages as a matter of just and reasonable inference. A reasonable basis of computation and the best evidence which is obtainable under the circumstances of the case and which will enable the jury to arrive at an approximate estimate of the loss is sufficient."); *Agrizap, Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1342 (Fed. Cir. 2008) ("It is true that . . . Agrizap never propounded a specific dollar amount for its fraud damages and instead left it up to the jury to extrapolate an amount from the various pieces of evidence submitted at trial. Nonetheless, Agrizap introduced sufficient facts for the jury to fairly estimate an amount of damages . . . ."); *Intell. Ventures I LLC v. Symantec Corp.*, No. CV 10-1067-LPS, 2015 U.S. Dist. LEXIS 7739, at *4, 2015

WL 307572, at *2 (D. Del. Jan. 23, 2015) (adopting jury instructions for proving damages under the preponderance of the evidence standard to require "reasonable certainty" and defining reasonable certainty as "not requir[ing] proof of damages with mathematical precision" but requiring more than speculation).

For instance, in *Jester v. Hutt*, this Court affirmed a jury verdict awarding ten months' worth of costs where the jury extrapolated those costs from six months of actual costs. 937 F.3d 233, 240-41 (3d Cir. 2019) ("The jury's award of $110,000 was not, as Fantasy Lane contends, based on conjecture about the costs of the four additional months of boarding costs. The record supports the inference that the jury extrapolated the monthly boarding fees (about $11,000) from the invoices in evidence to cover the entire ten-month period at issue."). Likewise, in *United States v. Hearst*, the Court of Appeals for the Fifth Circuit ruled it was proper for the jury to determine that the defendant possessed at least five grams of a prohibited substance by extrapolating the purity rate of the substance from samples that did not belong to the defendant, and multiplying the extrapolated purity rate by the weight of the substance in the defendant's possession. No. 21-50428, 2022 U.S. App. LEXIS 12299, at *3-4, 2022 WL 1421830, at *1-2 (5th Cir. May 5, 2022) ("Hearst admitted to obtaining at least 35 grams of methamphetamine from his supplier to give to his co-defendant . . . Testimony from law enforcement officials revealed that . . . the tested purity rates of two samples of methamphetamine seized from [the

supplier] were 93 and 97 percent. . . . the evidence was sufficient for the jury to find that Hearst conspired to possess with the intent to distribute at least five grams of actual methamphetamine").[7]

Here, there were many ways that a jury could have reasonably projected Ryanair's total Shield hosting costs for the March 1, 2022 to February 28, 2023 period based on the evidence that was presented. For instance, it would have been reasonable to infer that the total Shield hosting cost for March 1, 2022 to February 28, 2023 would be roughly the same as the cost from August 30, 2022 to August 29, 2023, and thus determined that the March 1, 2022 to February 28, 2023 cost was also roughly equal to $239,360. The jury could have also (1) determined the average daily cost from August 30, 2022 to August 29, 2023 was $653.99 per day by dividing the total cost of $239,360 by the number of days (365) to arrive at $653.99 per day, (2) assumed that the average daily cost would have been the same from March 1, 2022 to August 29, 2023, and (3) inferred the total cost from the March 1, 2022 to

---

[7] *See also Bitmanagement Software GmBH v. United States*, 124 F.4th 1368, 1378 (Fed. Cir. 2025) (holding the district court "plugged in [in] a reasonable manner" the missing user data required for a copyright infringement reasonable royalty damage calculation); *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 399-00 (5th Cir. 2013) (holding that the jury could rely on a business owner's experiences to extrapolate past profits to arrive at future lost profits and "[a]ny doubt as to the reliability of this evidence goes to its weight rather than its competency"); *United States v. Davis*, 41 F. App'x 493, 496 (2d Cir. 2002) (holding that two years of data related to their victims' losses could be extrapolated to cover participation in the conspiracy over nine and a half years).

February 28, 2023 was $239,360 by multiplying the daily cost by the number of days.

*Second*, it would be reasonable for the jury to find that 80% of the $239,360 total Shield hosting costs from March 1, 2022 to February 28, 2023 could be attributed to operating the responsive, post-myRyanair functions of Shield. Mr. Stocki explained to the jury that the payments endpoint and post-booking analysis disproportionately contributed to the total cost of running Shield because the computations performed at those two algorithms were more complex. Appx719-720, 352:8-353:13. Thus, Mr. Stocki estimated that 80% of Shield's total hosting costs were attributable to the two algorithms run post-myRyanair, *i.e.*, the payments endpoint and post-booking analysis. Appx707-708, 340:8-341:6; Appx719-720, 352:8-353:13. Based on Mr. Stocki's 80% estimation, the jury had sufficient evidence to conclude that $191,488 of the total Shield hosting cost from March 1, 2022 to February 28, 2023 could be attributed to maintaining the two post-myRyanair algorithms.

*Finally*, it would also be reasonable for the jury to find that 2.8% of Shield post-myRyanair costs could be attributed to Booking, because Booking reservations made up 2.8% of all Ryanair flights sold. Appx274-276, 144:5-146:20; Appx710, 343:21-24. Mr. Stocki and Ryanair's Chief Technology Officer, Mr. Hurley, presented this to the jury. When asked what percentage of the Shield hosting costs

associated with post-myRyanair functions was attributable to Booking, Mr. Stocki replied "[d]epends how many bookings they made. It's the same percent of the [total OTA] bookings they made." Appx710, 343:21-24; *see also* Appx706-707, 339:15-340:4 ("[M]ore users on the [Ryanair] website" would lead to "more data and more activity," which in turn would increase the hosting costs at a rate linear to the number of bookings made on the website.). And Mr. Hurley testified that (1) Ryanair sold 78,300,879 flights between the beginning of March 2022 and the end of February 2023; (2) 23% of those flights were booked through OTAs (*i.e.*, 18,416,864 flights); and (3) 2.8% of those OTA bookings were made by Booking (*i.e.*, 518,826 flights). Appx274-276, 144:5-146:20. Based on the unrebutted testimony of Mr. Stocki and Mr. Hurley, the jury could have multiplied Booking's 2.8% share of bookings by the $191,488 estimated post-myRyanair Shield functions' cost for the March 1, 2022 to February 28, 2023 period to determine that Ryanair suffered roughly $5,361.67 in loss due to Booking's unauthorized access through Shield costs alone.

The district court had two justifications for finding that no reasonable jury could find $5,000 in loss from Ryanair's Shield costs, but neither stands up to scrutiny. First, the district court improperly weighed the evidence and ruled that the jury could not use cost data from after February 28, 2023 to infer total Shield hosting costs from March 1, 2022 to February 28, 2023 because the daily cost of Shield increased after February 28, 2023. Appx425, n.21 (Doc 516, JMOL order).

According to the district court, any method used to calculate costs must look only at the average daily cost from August 30, 2022 to February 28, 2023. Appx424-425 (Doc 516). But even if costs did rise after February 28, 2023, it would still be reasonable for the jury to use a methodology that relies on cost data over an entire year to infer Ryanair's costs from March 1, 2022 to February 28, 2023. As a matter of common sense, using such a methodology better accounts for seasonal variations in travel volume[8] and could yield a more accurate result. *See* Appx1638 (DTX-429, Ryanair annual report) (explaining seasonal fluctuation in travel). While the district court may have a preferred method for estimating loss, it was improper for the district court to supplant the jury's estimation for its own when other methodologies are just as reasonable. *See*, *e.g.*, *Romero v. Allstate Ins. Co.*, No. 01-3894, 2016 U.S. Dist. LEXIS 60721, at *216-17, 2016 WL 2619853, at *6 (E.D. Pa. May 4, 2016) ("Allstate's Motion asks us to do precisely what Rule 50 prohibits: weighing the evidence, determining the credibility of witnesses, and substituting the Court's version of facts for the jury's version."); *Afilias PLC v. Architelos, Inc.*, No. 1:15-CV-14 (LMB/JFA), 2016 U.S. Dist. LEXIS 38258, at *24, 2016 WL 1245006, at *7 (E.D. Va. Mar. 23, 2016) ("Because the Court cannot reweigh that evidence on a

---

[8] For example, families are much more likely to go on vacation in the summer when children are not in school. This is especially so in certain European countries where Ryanair flies most often. *See Burch v. Reading Co.*, 240 F.2d 574, 577 (3d Cir. 1957).

Rule 50(b) motion, the jury's award will not be overturned on defendant's motion for judgment as a matter of law, and such motion has been denied in total.").

Second, the district court claimed that "unrebutted evidence at trial established that the daily number of Ryanair flights sold by Booking increased significantly from 2022 to 2023," and thus the jury could not infer that the total cost of hosting Shield from March 1, 2022 to February 28, 2023 would be the same ($239,360) as the cost from August 30, 2022 to August 29, 2023. Appx424-425 (Doc 516). But the district court is conflating two data points. Just because Booking's sales of Ryanair flights increased from 2022 to 2023, that does not meant *all* OTA flight sales increased from 2022 to 2023. For the court to conclude that Shield hosting costs were higher in 2023 than 2022, it would have to know that all OTA flight sales were higher in 2023, and that evidence simply is not in the record. It is a leap for the district court to assume that Booking's flight sales kept pace with all other OTA flight sales. As evidenced at trial, Booking's flight sales were extremely low starting in 2020 because it only just launched its first flight sales in late 2019, selling only a handful of Ryanair flights a day. Appx1159, 751:20-21; Appx1306-1337 (PTX-034, Booking's Ryanair flight bookings). Booking's flight sales increased exponentially over time as it built its business in flight sales. Appx1306-1337 (PTX-034). There is no basis for the Court to conclude that all OTA flight sales would have been higher in 2023 over 2022 simply because Booking's flight sales were higher, especially

when there is evidence in the record explaining why Booking's flight sales grew at an exponential pace. *Id.* Any attempts by the district court to infer such a conclusion or extrapolate that overall Shield hosting costs were lower in 2022 than 2023 were improper on a Rule 50 motion. *McDaniels*, 59 F.3d at 453 (the district court must view the evidence in the light most favorable to the non-moving party and "every fair and reasonable inference" must be drawn in that party's favor).

The jury could have reasonably concluded from the trial evidence that Ryanair suffered over $5,000 in loss during the one-year period from March 1, 2022 to February 28, 2023, and the district court's JMOL decision should be reversed.

> (2)    Ryanair's responsive Shield hosting costs exceeded $5,000 from August 30, 2022 to August 29, 2023.

The jury also could have found that Ryanair suffered at least $5,000 in loss due to post-myRyanair Shield functions' costs from August 30, 2022 to August 29, 2023 by using the same method: (1) first determine the total Shield hosting cost during a one-year period, (2) then determine what portion of that total cost was attributable to maintaining the post-myRyanair functions of Shield, and (3) finally determine what percentage of the post-myRyanair functions' cost was attributable to Booking.

Mr. Stocki offered unrebutted testimony that Ryanair's cost to operate Shield from August 30, 2022 to August 29, 2023 was $239,360. Appx708-710, 341:10-343:4. There was no need for the jury to infer or approximate this cost, because this

was Ryanair's actual cost. *Id.* Mr. Stocki also offered unrebutted testimony that 80% of that cost, or $191,488, could be attributed to the post-myRyanair functions of Shield. Appx707-708, 340:8-341:6; Appx719-720, 352:8-353:13. Finally, the jury could determine Booking's share of Ryanair's post-myRyanair Shield functions' cost was $5,361.67 by multiplying $191,488 by Booking's share of total OTA bookings.

While Mr. Hurley did not testify as to what Booking's share of OTA bookings would have been from August 30, 2022 to August 29, 2023, he did testify that Booking's share of total OTA bookings was 2.8% from March 1, 2022 to February 28, 2023. Appx276, 146:8-20. Based on that testimony, the jury could find by a matter of just and reasonable inference that Booking's share of OTA bookings was at least that amount from August 30, 2022 to August 29, 2023. *See Hutt*, 937 F.3d at 240-41; *Hearst*, 2022 U.S. App. LEXIS 12299, at *3-4. And unlike asking the jury to approximate the total Shield hosting cost from March 1, 2022 to February 28, 2023, there is absolutely no reason to assume that Booking's share of OTA bookings decreased after August 30, 2022. The opposite is actually true. As the district court noted, "unrebutted evidence at trial established that the daily number of Ryanair flights sold by Booking.com increased significantly from 2022 to 2023." Appx424-425 (Doc 516, JMOL order). In other words, it was not only reasonable for the jury to have found that Ryanair suffered at least $5,000 during this time period, it was

the straightforward conclusion.

The district court's JMOL decision should be reversed because the trial evidence establishes Ryanair suffered more than $5,000 in loss during the one-year period from August 30, 2022 to August 29, 2023.

> (3)    The district court's order on Kayak's Motion to Preclude New "Loss" Calculation does not bind Ryanair with respect to Booking.

Ryanair was not limited to what timeframe it could present evidence of loss. However, just four days before trial, Kayak filed an emergency "Motion to Preclude New Kayak 'Loss' Calculation" ("Kayak Motion") to preclude Ryanair from presenting evidence of loss from Kayak for any period other than March 1, 2019 to February 29, 2020. Appx2214-2217. In its motion, Kayak argued that Ryanair should be limited to presenting evidence of loss for the March 1, 2019 to February 29, 2020 period only with respect to Kayak because Ryanair had previously disclosed that time period to Kayak. *Id.* On July 15, 2024, the district court granted Kayak's motion. Appx138, 8:16-23.

Regardless of how the district court ruled with respect to Kayak, the Kayak Motion did not affect what evidence Ryanair could present with respect to Booking. Booking was not a party to the Kayak Motion, and the Kayak Motion only sought to limit Ryanair's evidence with respect to Kayak. *See generally* Appx2214-2217 (D.I.

432) ("KAYAK respectfully requests an order precluding Ryanair from relying on a new one-year period for its ***KAYAK*** Loss calculation.") (emphasis added).

In any event, Booking waived any argument with respect to the August 29, 2022 to August 28, 2023 loss period because it did not object when Ryanair presented it. Appx708-710, 341:10-343:4; *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial."); *Bagic v. Univ. of Pittsburgh*, No. 2:18-cv-511-NR, 2022 U.S. Dist. LEXIS 15318, at *3, 2022 WL 267356, at *1 (W.D. Pa. Jan. 27, 2022) ("As a general rule, a party who fails to either cogently raise a specific objection or state the grounds of the objection at trial waives related arguments on appeal."). As discussed above, Ryanair *did* present evidence of loss for the period from August 30, 2022 to August 29, 2023, and the jury may have reasonably relied upon it. *See supra* pp. 33-34.

> (4)   To the extent Ryanair was barred from presenting evidence of loss from August 30, 2022 to August 29, 2023, the court erred in barring Ryanair.

Should Booking argue that the Kayak Motion ruling precluded Ryanair from presenting evidence of loss due to Booking, the district court's ruling on the Kayak Motion should be reversed.[9]

---

[9] As noted above, Ryanair *did* present this evidence, and Booking never objected to such presentation. Ryanair makes this argument now in case Booking argues, for the first time, that Ryanair's presentation of this evidence was improper.

This Court reviews a district court's decision to grant motions *in limine* for abuse of discretion. *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3d Cir. 1994).[10] The district court abused its discretion in granting the Kayak Motion because evidence of loss during the August 30, 2022 to August 29, 2023 is clearly relevant, Kayak should not have been surprised by the evidence, and allowing Ryanair to present such evidence would not mislead the jury or prejudice Kayak.

Kayak complained that Ryanair should be limited to presenting evidence of loss during the March 1, 2019 to February 20, 2020 time period for two reasons: (1) that was the time period presented in Ryanair's expert reports, and (2) Ryanair presented that time period in its opposition to Defendants' Motion for Summary Judgment. Appx2215-2216. But the CFAA plainly allows a plaintiff to show evidence of "loss to 1 or more persons during **any** 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I) (emphasis added). There is also no limiting principle that would prevent Ryanair from presenting evidence of any one-year period.

All of the evidence Ryanair planned to present for August 30, 2022 to August 29, 2023 had been disclosed to all Defendants well in advance of trial. *See* Appx1912-1919 (Doc 348, Ryanair's summary judgment opening brief);

---

[10] While not titled a motion *in limine*, Kayak's late-filed motion to exclude Ryanair from presenting evidence was effectively an end run around both the deadline to file motions *in limine* and the agreed upon limit of five motions *in limine* per party.

Appx2145-2162, ¶¶ 38-125 (Doc 350, Ryanair's expert declaration). Ryanair's methodology for calculating loss for any one-year period was also disclosed to Defendants. *See id.* Ryanair presenting (1) data that had previously been disclosed, (2) a methodology that had previously been disclosed, and (3) simply adjusting the year range from which it ran its calculations would not have been prejudicial.

To the extent the district court's ruling on the Kayak Motion prevented Ryanair from appropriately presenting evidence of two different time periods at trial, the district court's ruling was erroneous and should be reversed.

> **2.    It was reasonable for the jury to find that Ryanair suffered $5,000 in loss due to Navitaire costs alone.**

Even if the jury completely discounted Shield costs, the jury could still reasonably and separately conclude that Ryanair suffered more than $5,000 in loss in any one-year period from the Navitaire costs incurred by Ryanair as a result of Booking's unauthorized access. The trial evidence established that (1) Ryanair's Navitaire costs due to Booking's unauthorized access can be classified as loss; and (2) Ryanair incurred more than $5,000 in such costs during a one-year period due to Booking's unauthorized access.

At trial, Mr. Hurley testified unrebutted that Navitaire is the passenger service system partner that allows Ryanair to track which flight reservations belong to which customers. Appx306, 176:3-12. In exchange, Ryanair must pay Navitaire a fee per flight segment purchased by each customer. *Id.*; Appx1346, Appx1348, Appx1408,

Appx1596 (DTX-202, Navitaire agreement). This Navitaire fee ranges from 9.5 to 11.5 cents per segment, depending on how many segments Ryanair has already sold within a specified period. Appx306-307, 176:16-177:19; Appx1346, Appx1348, Appx1408, Appx1596 (DTX-202).

A segment is defined roughly as a leg of a flight. Appx307-309, 177:20-179:15. For example, a flight from Philadelphia to Sacramento with a layover in Dallas would comprise two segments, while a direct flight from Philadelphia to Sacramento would comprise just one segment. Roundtrip reservations always comprise at least two segments. *See id.* The jury also heard evidence that Booking purchased 518,826 Ryanair flight reservations during the period from March 1, 2022 to February 28, 2023, and that Ryanair did not authorize Booking to access its website to make those purchases. Appx250-251, 120:23-121:20; Appx276, 146:8-14; *see* Appx1324-1333 (PTX-034). Finally, Mr. Hurley offered unrebutted testimony that, assuming each Booking flight reservation contained the minimum of one segment, and Ryanair was required to pay the minimum cost of 9.5 cents per segment for those segments (Appx306-307, 176:16-177:19), Booking's unauthorized access imposed a minimum of $49,234 in Navitaire costs on Ryanair.[11]

---

[11] By Mr. Hurley's estimation, this would actually be a very conservative estimate because a flight reservation is usually at least two segments (for roundtrips) instead of just one. Appx308-309, 178:5-179:15.

Based on the evidence presented, it would be reasonable for the jury to conclude that the $49,234 of Navitaire costs Booking imposed on Ryanair caused well over $5,000 in loss. In fact, at summary judgment, the district court ruled that Ryanair may count Navitaire costs as loss if those costs materially increased the cost of Ryanair's server infrastructure. Appx57. Ryanair established through Mr. Hurley's unrebutted testimony that Booking's unauthorized access materially increased the cost of Ryanair's server infrastructure by adding 518,826 flight reservations worth of unauthorized data, for which Ryanair then had to pay Navitaire. Appx274-276, 144:5-146:20; Appx306, 176:3-12. It was eminently reasonable for the jury to conclude that Booking's unauthorized access caused at least $5,000 in a one-year period because Mr. Hurley offered unrebutted testimony that Ryanair paid Navitaire $49,234 as a result of the unauthorized Booking flight reservations made during a one-year period.

The district court's only justification for ruling that Navitaire costs did not count as loss was the improper assumption that Ryanair would have sold those flight segments even if Booking had not purchased them without authorization. Appx428 (Doc 516, JMOL order) ("[N]o reasonable jury could find that any part of the Navitaire costs was directed at technological harm. Rather, Navitaire costs are costs that exist simply because a flight has been purchased, independent of the manner in which that flight has been purchased or the technological harm caused by that

process."). While Ryanair is required to pay the Navitaire fee regardless of whether a flight is purchased by an OTA or an authorized customer who purchased directly from the Ryanair website (Appx306, 176:3-12; Appx1346, Appx1348, Appx1408, Appx1596 (DTX-202, Navitaire agreement)), there was no trial evidence to suggest that customers would have purchased those 518,826 additional flight segments if Booking had not acted. At most, Mr. Hurley testified that Ryanair "hope[d]" such flights would have been purchased even without Booking's involvement. Appx639, 272:10-23. To the extent Mr. Hurley testified that those flights would have been sold if Booking did not exist, such testimony is pure speculation that the district court must disregard on a Rule 50 motion. However, "[i]n considering a Rule 50(b) motion, a court 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Lieberman*, 2024 U.S. App. LEXIS 1156, at *11 n.6 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). Thus, the district court's assumption that Ryanair would have had to pay those costs was improper and should have been disregarded when evaluating the evidence. Again, it was unrebutted that Ryanair paid Navitaire at least $49,234 as a result of specific Booking flight reservations made during a one-year period – *i.e.*, Booking materially increased the cost of Ryanair's Navitaire server infrastructure costs by $49,234 over the one-year period.

When improper assumptions are excluded and the evidence is viewed in the light most favorable to Ryanair, the evidence was more than sufficient for the jury to conclude that Booking imposed more than $5,000 in loss on Ryanair within a one-year period through Navitaire costs. The district court thus erred in finding that Ryanair did not suffer at least $5,000 in loss during a one-year period, and its decision to grant JMOL to Booking should be reversed.

### 3. A reasonable jury could have relied on evidence of any number of costs to reach the $5,000 threshold.

At summary judgment, the district court ruled that Ryanair's Shield hosting costs, Navitaire costs, data verification costs, and customer service-related costs could count as loss. Appx55; Appx57-59. Ryanair presented trial evidence that it suffered loss in each of those categories. Appx295-305, 165:9-175:6, 176:3-179:15; Appx706-711, 339:12-344:6. In addition to the Shield and Navitaire losses discussed above, data verification and customer service costs added another roughly $120,000 of potential costs the jury could have used to conclude that Ryanair met the $5,000 threshold. Appx295-305, 165:9-175:6. The CFAA permits aggregating costs to equal a total of $5,000, 18 U.S.C. § 1030(c)(4)(A)(i)(I), so the jury easily could have calculated, say, $4,000 in loss due to Shield, and another $1,000 in loss from any of the other costs presented at trial.

There were simply too many combinations of costs that could meet the $5,000 threshold for the district court to rule them all out. Without knowing how the jury

reached its verdict, the only possible conclusion is that the jury weighed the credibility of all of Ryanair's evidence and reasonably concluded that Ryanair suffered at least $5,000 in loss. It was improper for the district court to reweigh the evidence and overturn the jury's verdict, and the district court's decision to grant JMOL should be reversed. *See*, *e.g.*, *Decus, Inc. v. Heenan*, No. CV 16-5849, 2018 U.S. Dist. LEXIS 55569, at *19, 2018 WL 1596880, at *6 (E.D. Pa. Apr. 2, 2018) ("We must not substitute our own 'judgment of the facts and the credibility of the witnesses for that of the jury.'" (quoting *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 391-92 (3d Cir. 2016)).

## C.    The district court erred in ruling that Booking did not defraud Ryanair.

Count II of Ryanair's complaint alleged a violation of 18 U.S.C. § 1030(a)(4), which prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." The jury found that Booking knowingly and with an intent to defraud accessed the protected myRyanair portion of the Ryanair website without authorization (through Etraveli) and obtained something of value. *See* Appx1284 (Doc 457, verdict form).

The district court does not disturb this portion of the jury's finding.[12] However, there is an exception to the CFAA's fraud provision stating that, if the "object of the fraud and the thing of value obtained" is *only* the use of the computer, and the value of that use is less than $5,000, then a violation of the fraud provision has not occurred. *See* 18 U.S.C. § 1030(a)(4). The jury found the object of the fraud and thing of value obtained was only the use of the myRyanair portion of the Ryanair website, triggering the first step of the exception. Appx1284 (Doc 457). But the jury also found that the value of the use of the myRyanair website was $5,000 or more in a one-year period. *Id.* Therefore, the exception did not apply, and the jury found that Booking was liable under the fraud section of the CFAA.

The district court reversed the jury again, holding that the value of Booking's use of the myRyanair website was not at least $5,000. *See* Appx438-439 (Doc 516, JMOL order). The district court found there was "no evidence to support an inference that Booking.com made the same profits [on the Ryanair flights it sold] as Ryanair." Appx438 (Doc 516). But in so holding, the Court conflates *value* with *profit*. The CFAA does not say the unauthorized party must *profit* in an amount that exceeds $5,000 in a one-year period; it simply states the *value* of the use of the computer must exceed $5,000 in a one-year period. Assuming, as the Court did, that

---

[12] Because the district court held Booking did not obtain $5,000 in value from the use of the website, the district court did not address whether Booking had the intent to defraud Ryanair. *See* Appx439 (Doc 516).

the jury considered the flights Booking obtained as the "thing of value," then the jury need only find that Booking obtained more than $5,000 worth of flights from Ryanair in a one-year period.

From September 1, 2022 through August 31, 2023 (a one-year period), Booking sold ████ Ryanair flights. *See* Appx1328-1337 (PTX-034); Appx250-251, 120:23–121:22. An average one-way Ryanair flight costs about $46. *See* Appx217, 87:8-9; Appx640-642, 273:15-275:1 (explaining costs and revenue per flight segment); Appx1637, (DTX-429, Ryanair Annual Report) (stating the average booked passenger fare is €41.12, approximately $46). That means Booking obtained more than ████ of *value* from its unauthorized use of the Ryanair website in that one-year period. The $5,000 threshold would have been met ████████, let alone one year. Whether Booking succeeded in making a profit on those flight sales is irrelevant to determining the *value* of the use.

Black's Law Dictionary defines "value," in relevant part, as "[t]he monetary worth or price of something; the amount of goods, services, or money that something commands in an exchange." VALUE, Black's Law Dictionary (12th ed. 2024). By this definition, the "value" of the flights obtained by Booking is the price of the flights.

Courts interpreting the CFAA are often confronted with a defendant who obtained only *information* from an unauthorized use of a protected computer; thus,

the valuation of that information can sometimes be difficult to ascertain and has led courts to analyze the value of the information to the defendant. *See, e.g.*, *United States v. Czubinski*, 106 F.3d 1069, 1078 (1st Cir. 1997) ("The value of information is relative to one's needs and objectives . . . ."). But this case is far simpler in that the thing of value obtained is a sellable asset with a price tag – the value is the price of the airline ticket. And even the district court noted in its summary judgment order, citing *Czubinski* as a comparison between the CFAA and mail fraud analyses, that in determining "deprivation" in the mail fraud context, "some gainful use must be intended by the person accessing the information, **whether or not this use is profitable in the economic sense**." Appx72 (citing *Czubinski*, 106 F.3d at 1074) (emphasis added). The district court recognized at summary judgment that the use need not be profitable to the defendant. But after trial, the district court changed course, holding for the first time that Ryanair needed to prove that Booking made a *profit* of more than $5,000 from its unauthorized use of the myRyanair website, which is found nowhere in the text of the CFAA or in case law.

While the Court need not look further than the price of the flights to discern their value, nonetheless, Booking has admitted that providing a broad selection of flight itinerary options to its customers is itself of substantial value to Booking. Appx843-844, 476:18-477:20; Appx1012-1013, 604:11-605:18; Appx1165-1166, 757:11-758:2. Booking, as a whole, *is* profitable, and it draws customers to its

website by offering as many flight options as possible, so that customers might also book hotel and car rentals in combination with their flight purchases, providing a deeper profit to Booking. Appx1011, 603:1-24; Appx1160-1161, 752:3-753:1. Additionally, Booking has admitted that Ryanair flights and ancillaries – such as travel insurance, baggage fees, and seat selection – may be marked up. *See* Appx794-795, 427:3-428:1; Appx1187, 779:10-17. Ryanair observed instances where Ryanair fares and ancillaries cost substantially more on Booking than on Ryanair for the same flights and ancillaries. Appx1058-1059, 650:14-651:13. Therefore, having Ryanair flights available to its customers has substantial value to Booking in multiple respects. A reasonable jury could have found that value to be worth more than $5,000, even if required to disregard the value of the flights. And Booking cannot sell marked-up travel insurance, seat selections, and baggage fees – *i.e.*, obtain that value – without selling Ryanair flights by accessing myRyanair without authorization.

Regardless, the jury was not instructed, and had no need, to estimate the profits of Booking. The *value* of Booking's use of the myRyanair website to purchase and sell flights to its customers is as simple as identifying the value of the tickets sold. The jury was provided the average cost of a Ryanair flight, and it was provided a chart showing thousands of Ryanair flights that Booking sold each day, each one obtained by accessing myRyanair without authorization. Appx217, 87:8-9;

Appx1637 (DTX-429, average booked passenger fare); Appx1306-1337 (PTX-034, Booking's Ryanair flight bookings). At a glance, the jury could see the value of those flights was more than $5,000 in a single day, let alone a year. The jury's determination that Booking's use of the Ryanair Website had a value of at least $5,000 in a one-year period was supported by substantial evidence and should not have been disturbed by the district court.

**D.    The district court erroneously held at summary judgment that no portion of Shield or business intelligence employee salaries could count as loss.**

The district court erroneously held at summary judgment that no portion of Ryanair's Shield or business intelligence employees' salaries could count as loss, which prevented Ryanair from presenting evidence at trial that could have fulfilled the $5,000 loss requirement. Appx56.

As discussed above, Shield is a computer program specifically developed by Ryanair to address the harmful effects of OTAs on Ryanair's website. *See supra* p. 9. Shield has two primary functions: (1) preventing OTAs from accessing myRyanair via the availability, flights, and seats endpoints; and (2) preventing OTAs that manage to bypass the first three endpoints from completing purchases and then flagging suspected OTA purchases via the post-booking analysis. *See supra* pp. 20-21. Recognizing that the algorithms that run at the payment endpoint respond to Booking's unauthorized access and perform a damage assessment after unauthorized

48

access, the district court correctly ruled that Shield hosting costs attributable to maintaining the payment endpoint could count as loss. Appx55 ("To the extent that the facts at trial show that Shield prevents unauthorized bookings at the payment page after account creation, any portion of [Ryanair's Shield hosting] costs allocable to each defendant may qualify as losses under the CFAA for purposes of satisfying the $5,000 threshold requirement for that defendant.").

Ryanair's server hosting costs are but one of many costs necessary to maintain Shield's post-myRyanair functions. Shield is a custom solution developed in-house by Ryanair, and Ryanair employees Lukasz Stocki and Marcelina Ginalska's sole responsibility is to develop and maintain Shield, including its post-myRyanair functions. Appx2016, 34:23-35:11 (Doc 349, Ex. 14, Hurley deposition 09/29/2023); *see* Appx1940-1941 (Doc 349, Ex. 6, Ryanair's interrogatory responses); Appx1996, 53:5-17 (Doc 349, Ex. 13, O'Callaghan deposition 08/15/2023); Appx2012-2014, 20:3-29:24 (Doc 349, Ex. 14); Appx2209-2210 (Doc 377, Ex. 8, Ryanair's responses to written questions). Further, Ryanair employees from the business intelligence division spent a portion of their time analyzing data to support the continuous improvement of Shield. Appx2013, 22:18-23:2 (Doc 349, Ex. 14); Appx2042, 235:6-15 (Doc 349, Ex. 15, Lopata deposition 10/11/2023). Since certain of Lukasz Stocki, Marcelina Ginalska, and Ryanair's business intelligence employees' responsibilities can be attributed to maintaining Shield's

post-myRyanair functions, which respond to Booking's unauthorized access, the portion of those employees' salaries attributable to these responsibilities should count as loss. *See* 18 U.S.C. § 1030(e)(11) (defining "loss" as "any reasonable cost to any victim, *including the cost of responding to an offense*, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." (emphasis added)).

According to the district court, no portion of Ryanair's Shield or business intelligence employees' salaries could count as loss because "a plaintiff cannot claim the cost of measures to make a system more secure than it was before as a loss." Appx56 (Doc 399, summary judgment order). However, the district court's reasoning was based on an incorrect assessment of the facts. Booking's access is unauthorized if Booking evades technological barriers after Ryanair has affirmatively revoked authorization. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016); *see also* Appx47 (Doc 399). Ryanair revoked Booking's access to log in to myRyanair and purchase Ryanair flights in 2020 by sending a cease-and-desist letter to Booking. Appx572-578 (Doc 76, Ex. C, D); Appx1991 (Doc 348 (citing Doc 76 at Ex. B, C, and E)). Beginning from when Ryanair revoked Booking's access through the end of August 2023, Booking continuously accessed myRyanair without authorization, and Ryanair was never able

to completely cut off Booking's unauthorized access. Appx2057-2118 (Doc 349, Ex. 32, Booking's interrogatory responses). Thus, any time spent by Ryanair's Shield and business intelligence employees in 2022 and 2023 improving Shield was not to make myRyanair more secure in preparation for *future* unauthorized access, which would not count as loss, but to resecure myRyanair as a result of past and continuous unauthorized access, which would count as loss. *Middleton*, 231 F.3d at 1213-14 (losses include cost of "measures [that] were reasonably necessary to resecure the data, program, system, or information from further damage.").

The district court's erroneous decision to categorically exclude all time spent by Ryanair's Shield and business intelligence employees from Ryanair's loss calculation barred Ryanair from presenting relevant evidence at trial. Thus, to the extent this Court declines to reverse the district court's grant of JMOL on the grounds that Ryanair has not proven $5,000 in loss in any one-year period, this case should be remanded for a new trial so that Ryanair may show it suffered $5,000 in loss by presenting evidence of its Shield and business intelligence employee costs.

### E.    The district court erred by ruling that Booking did not obtain information from a protected computer.

Ryanair's Count I alleged a violation of 18 U.S.C. § 1030(a)(2), which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer." The primary difference between this section and other sections of the

CFAA is that Section 1030(a)(2)(C) requires a showing that Booking obtained information from a protected computer. At summary judgment, the district court dismissed Count I on the grounds that Booking did not obtain information from Ryanair. Appx47; Appx69. The court's only reasoning for its holding was to state, without citation to the record, that "there is no information on [the myRyanair] page other than the information input by the user, such as credit card numbers or the like." *Id.*

But evidence in the record shows Booking obtained at least two pieces of information from the protected myRyanair website each time it made a booking. First, Booking would receive a passenger name record (PNR) – a unique six-digit flight confirmation code that operates as a digital ticket – for each successful booking, indicating the flight had been booked. Appx1974-1975 (Doc 349, Ex. 6, Ryanair's interrogatory responses). Second, OTAs book flights through the myRyanair website via Ryanair's application programming interface (API), whereby the OTA computer sends a "call," and the Ryanair computer responds. When an OTA sends an API call to book a specific Ryanair ticket, Ryanair's API will send back information about whether the booking was successful or failed. Appx1933-1935 (Doc 349, Ex. 2, Booking's interrogatory responses). Thus, Booking obtains information, through a third party, each time it books a flight, or attempts to book a flight, through the myRyanair website. Without flight

confirmation codes (PNRs), Booking could not resell Ryanair flights at all. The PNR represents the ticket itself.

Courts have found that scraping Facebook and LinkedIn users' information from the respective websites may constitute obtaining information from a protected computer under Section 1030(a)(2) of the CFAA. *See Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 768–69 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1187 (9th Cir. 2022). In contrast, courts have found a defendant did not "obtain information" when a defendant accessed a computer solely to destroy information or manipulate data.[13] *See Bd. of Trs. of Pierce Twp., Ohio v. Hartman*, No. 1:08-CV-37, 2008 U.S. Dist. LEXIS 137553, at *11-12, 2008 WL 11351291, at *4 (S.D. Ohio June 18, 2008); *Rickett v. Smith*, No. 1:14-CV-70-GNS-HBB, 2015 U.S. Dist. LEXIS 72959, at *21-22, 2015 WL 3580500, at *8 (W.D. Ky. June 5, 2015).

This is not a case where Booking's sole intent was to access Ryanair's protected computers to destroy or manipulate data. It is undisputed that Booking, through a third party, accessed Ryanair's protected computers to purchase flights,

---

[13] Note, however, that the CFAA's legislative history indicates Congress's intent that "'obtaining information' . . . includes mere observation of the data. Actual asportation, in the sense of physically removing the data from its original location or transcribing the data, need not be proved in order to establish a violation of this subsection [(a)(2)]." S. REP. 99-432, 6-7, 1986 U.S.C.C.A.N. 2479, 2484. Thus, if a defendant observed data prior to destroying or manipulating it, the defendant still would have "obtained information" under the Senate committee's interpretation.

which necessarily includes obtaining information in the form of, at least, PNRs and transaction confirmation (or rejection, if the purchase is blocked or fails for any other reason). *See* Appx1974-1975 (Doc 349, Ex. 6, Ryanair's interrogatory responses). There is no dispute that Booking received this information. Booking produced, in the course of discovery, a spreadsheet containing more than one million PNRs that it obtained from Ryanair's protected computers. *See* Appx67 (Doc 399, summary judgment order); Appx1306-1337 (PTX-034, Booking's Ryanair flight booking). Booking thus "obtained information" from Ryanair's protected computers, at least in the form of a PNR code for each flight booked.

## VIII. CONCLUSION

The district court erred in granting judgment as a matter of law on the grounds that Ryanair had not suffered $5,000 in loss during any one-year period and that Booking did not receive $5,000 in value from its authorized access to support the jury's finding on Count II (intent to defraud). The district court also erred in finding at summary judgment that Shield and business intelligence employee costs should be excluded and that Booking did not obtain information when it, through a third party, accesses the myRyanair website. The district court's rulings should be reversed, and Booking should be found liable, as it was at trial, for violating at least Sections 1030(a)(5)(C) and 1030(a)(4) of the CFAA.

If this Court finds that the district court properly granted judgment as a matter of law, this case should still be remanded for a new trial because the district court erred by granting partial summary judgment that prevented Ryanair from presenting evidence that could have satisfied the $5,000 loss requirement at trial.

Dated: May 28, 2025

Respectfully submitted,

/s/ Anthony J. Fuga
Anthony J. Fuga

**KRATZ & BARRY**
R. Touhey Myer
800 North West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

**HOLLAND & KNIGHT LLP**
R. David Donoghue
Anthony J. Fuga
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cynthia A. Gierhart
800 17th Street NW, Suite 1100
Washington, DC 20011
(202) 569-5416
cindy.gierhart@hklaw.com

Ji Mao
787 Seventh Avenue, 31st Floor
New York, NY 10019
(212) 513-3200
ji.mao@hklaw.com

William Oliver
10 St. James Avenue, 11th Floor
Boston, MA 02116
(617) 523-2700
william.oliver@hklaw.com

*Attorneys for Plaintiff-Appellant,*
*Ryanair DAC*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rules 28.3(d) and 46.1(e). I, Anthony J. Fuga, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.


Dated: May 28, 2025
                      */s/ Anthony J. Fuga*_____
                      Anthony J. Fuga
                      HOLLAND & KNIGHT LLP
                      150 N. Riverside Plaza, Suite 2700
                      Chicago, IL 60606
                      (312) 263-3600
                      anthony.fuga@hklaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,970 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using Microsoft Word for Microsoft 365.

3.     This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief filed with the Court via CM/ECF is identical to the text in the paper copies and because Windows Defender Antivirus Version 1.429.212.0 was run on the file containing the electronic version of this brief and no viruses were detected.

Dated: May 28, 2025                    */s/ Anthony J. Fuga*_____
                                       Anthony J. Fuga
                                       HOLLAND & KNIGHT LLP
                                       150 N. Riverside Plaza, Suite 2700
                                       Chicago, IL 60606
                                       (312) 263-3600
                                       anthony.fuga@hklaw.com

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 3, 2025

/s/ Melissa Pickett

Counsel Press

**Appendix – Volume 1**

# TABLE OF CONTENTS

**Page**

**Volume 1:**

Memorandum Opinion and Order, dated October 24, 2022 (Doc 105) .    Appx1

Memorandum Opinion and Order, dated June 17, 2024 (Doc 399)
(*Sealed and Redacted Versions*) ......................................................    Appx28

Transcript of Jury Trial, dated July 15, 2024 (Doc 500) ........................    Appx131

Memorandum Opinion and Order, dated January 22, 2025 (Doc 516)..    Appx396

Amended Judgment, dated January 31, 2025 (Doc 518)........................    Appx441

Notice of Appeal, dated February 28, 2025 (Doc 521) ..........................    Appx443

**Volume 2:**

Docket Sheet ........................................................................................    Appx445

First Amended Complaint for Violation of the Computer Fraud and
Abuse Act, dated July 22, 2022 (Doc 76) ....................................    Appx508

Joint Stipulation and Order of Dismissal with Prejudice, dated
June 24, 2024 (Doc 403)................................................................    Appx595

Transcript of Jury Trial, dated July 16, 2024 (Doc 501) ........................    Appx598

Transcript of Jury Trial, dated July 17, 2024 (Doc 502) ........................    Appx922

**Volume 3:**

Transcript of Jury Trial, dated July 17, 2024 (Doc 502) (Continued)....    Appx1041

Joint Stipulation and Order of Dismissal with Prejudice, filed
July 18, 2024 (Doc 451) ................................................................    Appx1261

Final Jury Instructions, filed July 18, 2024 (Doc 453)...........................    Appx1263

Verdict Form, filed July 18, 2024 (Doc 457) ........................................    Appx1282

Excerpts of Transcript of Jury Trial, dated July 18, 2024 (Doc 503).....    Appx1288

i

Plaintiff's Exhibits:

PTX-001 -
Letter from R. David Donoghue to Peter John Millones, Jr.,
dated July 30, 2020 ........................................................... Appx1298

PTX-002 -
Letter from Teresa H. Michaud to R. David Donoghue, dated
August 20, 2020 ................................................................. Appx1302

PTX-011 -
Email, dated July 5, 2019 ................................................. Appx1305

PTX-034 -
Chart .................................................................................. Appx1306

PTX-090 -
Letter from Philip Lee to Booking.com Directors, dated
November 15, 2019 ........................................................... Appx1338

Defendant's Exhibits:

DTX-202 -
Amendment No. 19 to Navitaire Hosted Services Agreement ..... Appx1342

DTX-216 -
OTAs – COMMS Plan ...................................................... Appx1630

DTX-240 -
Email, dated May 8, 2021 ................................................. Appx1632

DTX-245 -
Email, dated July 11, 2021 ............................................... Appx1634

DTX-429 -
Excerpts of Ryanair Group Annual Report 2023 ............. Appx1636

**Volume 4 – Filed Under Seal:**

Declaration of Marcos Guerrero in Support of Defendants' Motion for
Summary Judgment, dated December 19, 2023 (Doc 337) ......... Appx1639

Excerpts of Declaration of John Hemann in Support of Defendants
    Booking Holdings Inc., Booking.com B.V., Kayak Software
    Corporation, Priceline.com LLC, and Agoda Company Pte.
    Ltd.'s Motion for Summary Judgment, dated
    December 19, 2023 (Volume 1) (Doc 343) .................................. Appx1645

Excerpts of Declaration of John Hemann in Support of Defendants
    Booking Holdings Inc., Booking.com B.V., Kayak Software
    Corporation, Priceline.com LLC, and Agoda Company Pte.
    Ltd.'s Motion for Summary Judgment, dated
    December 19, 2023 (Volume 4) (Doc 346) .................................. Appx1823

Excerpts of Ryanair's Opening Brief in Support of its Motion for
    Summary Judgment and to Preclude Expert Testimony of
    Timothy James O'Neil-Dunne, Jordan Rae Kelly, and Basil
    Imburgia, dated December 20, 2023 (Doc 348) ........................... Appx1909

Excerpts of Declaration of Anthony J. Fuga in Support of Plaintiff
    Ryanair's Motion for Summary Judgment and to Preclude
    Expert Testimony of Timothy James O'Neil-Dunne, Jordan Rae
    Kelly, and Basil Imburgia, dated December 20, 2023 (Doc 349)   Appx1921

Declaration of Iain D. Lopata in Support of Ryanair Dac's Motion for
    Summary Judgment, dated December 20, 2023 (Doc 350) ......... Appx2119

Excerpts of Declaration of Ji Mao in Support of Plaintiff Ryanair
    Dac's Brief in Opposition to Defendants' Motion for Summary
    Judgment and to Preclude Expert Testimony of Iain Lopata and
    Anthony Vance, dated January 22, 2024 (Doc 377) .................... Appx2201

Motion to Preclude New Kayak "Loss" Calculation, dated
    July 11, 2024 (Doc 432) .............................................................. Appx2214

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RYANAIR DAC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 20-1191-WCB |
| | § | |
| BOOKING HOLDINGS INC., | § | |
| BOOKING.COM B.V., KAYAK | § | |
| SOFTWARE CORPORATION, | § | |
| PRICELINE.COM LLC, and AGODA | § | |
| COMPANY PTE. LTD., | § | |
| | § | |
| *Defendants*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

On September 4, 2020, plaintiff Ryanair DAC ("Ryanair") filed its original complaint against the defendants. Dkt. No. 1. The defendants moved to dismiss the original complaint on the grounds of forum non conveniens and failure to state a claim, Dkt. No. 16, and Judge Stark denied that motion, Dkt. No. 43. The case was then transferred to me, after which the defendants filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Dkt. No. 64. Ryanair then moved to amend its complaint to address matters raised in the defendants' motion, Dkt. No. 66, and I allowed the amendment, Dkt. No. 75.

On July 22, 2022, Ryanair filed its first amended complaint. Dkt. No. 76. The defendants then filed a motion to dismiss the first amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 80. In support of their motion to dismiss, the defendants have also moved for the court to take judicial notice of the contents of several documents. Dkt. No. 82. At the defendants' request, I held a telephonic oral argument on those

two motions on October 18, 2022.  For the reasons set forth below, the request for judicial notice is DENIED and the motion to dismiss is GRANTED IN PART and DENIED IN PART.

### I.    **Background**

Ryanair is a low-fare airline based in Ireland that offers flights in Europe and North Africa. Defendants Booking.com B.V. ("Booking.com"), KAYAK Software Corporation ("KAYAK"), Priceline.com LLC ("Priceline"), and Agoda Company Pte. Ltd. ("Agoda") are travel companies that allow consumers to purchase flights, hotel reservations, rental cars, and other travel services.[1] Defendant Booking Holdings, Inc., ("BHI") is a holding company whose wholly owned subsidiaries include Booking.com, Priceline, Agoda, and KAYAK.

Ryanair sells flight reservations to the public on its website.[2]  In order to book a flight on the Ryanair website, a user must create an account by selecting a username and password.  After creating an account, a user may view and purchase flights in the "myRyanair" section of the Ryanair website.  Ryanair alleges that the myRyanair section of the website is not public, and that there are various contractual and technical mechanisms in place to ensure that unauthorized users are not able to access the myRyanair section of the Ryanair website or make unauthorized use of materials found in that section of the website.

Ryanair's complaint alleges five claims under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030.  The key allegation underlying Ryanair's claims is that the defendants or their agents (referred to as "aggregators") engage in "screen scraping," i.e.,

---

[1]    The defendants assert that KAYAK is merely a "metasearch engine" that is not a "reservation service."  Dkt. No. 81 at 4.  Ryanair disputes that assertion, arguing that "a user of Kayak.com is able to book [a] Ryanair flight without leaving the Kayak.com website."  Dkt. No. 92 at 2 (quoting Dkt. No. 76 at ¶ 192) (emphasis omitted).  I need not resolve that dispute for purposes of the present motions.

[2]   Ryanair's website is accessible at https://www.ryanair.com.

Appx2

automatically collecting data from the myRyanair section of the Ryanair website. Ryanair alleges that the defendants then use the data they obtain to allow users to book Ryanair flights on the defendants' websites, often at higher fares than those flights are priced on the Ryanair website. Ryanair further alleges that such conduct violates the terms of use for the Ryanair website and that in conducting their screen scraping activities the defendants circumvent technology that Ryanair employs to prevent unauthorized users from accessing the myRyanair portion of the website.

One example of the technology that is referenced in Ryanair's complaint is a program called "Shield." Dkt. No. 76 at ¶¶ 98–102. Ryanair alleges that Shield "has blocked unauthorized users such as the Defendants . . . from scraping the Ryanair Website and selling Ryanair inventory." *Id.* at ¶ 99. Specifically, Ryanair alleges that Shield employs "a machine learning blocking algorithm" that "determine[s] whether a user accessing the Ryanair website is an unauthorized party"; if the user is unauthorized, Shield "block[s] that user from accessing the Ryanair Website." *Id.* at ¶¶ 100–01. Ryanair further alleges that the defendants or their agents "circumvent Shield and Ryanair's other technological and non-technological limitations on access to the Ryanair Website." *Id.* at ¶ 253.

## II.    <u>Legal Standards</u>

Under Federal Rule of Civil Procedure 12(b)(6), a complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted." The Third Circuit has instructed district courts to conduct a "two-part analysis" in evaluating a motion to dismiss for failure to state a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the district court must separate the factual and legal elements of the claims. *Id.* That is, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Second, the court "must then determine whether the facts alleged in the complaint are sufficient to

show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Requests for judicial notice are governed by Federal Rule of Evidence 201. Under Rule 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known throughout the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Moreover, if a party requests judicial notice and "the court is supplied with the necessary information," the court "must take judicial notice." Fed. R. Evid. 201(c).

In deciding a motion to dismiss, "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint[,] and matters of public record." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). However, "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.*

### III.    <u>Request for Judicial Notice</u>

I begin by addressing the defendants' request for judicial notice. The defendants ask that the court take judicial notice of ten documents: seven agreements between the defendants and various third parties; two documents from the Irish High Court; and the 2021 Form 10-K that BHI filed with the Securities and Exchange Commission.

<u>Third-Party Agreements.</u> As for the seven agreements between the defendants and various third parties, I disagree with the defendants' assertion that Ryanair's claims are "based on" those documents. *See Pension Ben.*, 998 F.2d at 1196. The Third Circuit has generally permitted district courts to consider a document that a defendant attaches to a motion to dismiss only if the plaintiff relied on that document in the complaint. *See Levins v. Healthcare Revenue Recovery Grp. LLC*,

902 F.3d 274, 279 (3d Cir. 2018). That is because "the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated where the plaintiff has actual notice and has relied upon those documents in framing the complaint." *Id.* (cleaned up). There is no indication, however, that Ryanair relied on the specific contents of the agreements offered by the defendants when it drafted either its original complaint or its first amended complaint. *See* Dkt. No. 92 at 7. Moreover, there are disputes regarding the authenticity of at least some of the third-party agreements. *See id.* at 8; *Silverman v. Crown Cork & Seal Co. Pension Plan*, No. 06-CV-5438, 2007 WL 9812749, at *1 n.1 (E.D. Pa. Aug. 24, 2007) ("Because at least some dispute exists as to the authenticity and completeness of the documents, the Court is unwilling to consider their substance for the purpose of ruling on Defendant's Motion to Dismiss."). Accordingly, the defendants' request for judicial notice is denied with respect to the seven third-party agreements.

Documents from the Irish High Court. The records of another court may generally be noticed, but "only to establish the fact of the litigation and [the] actions of that court." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521 (D. Del. 2008) (quoting 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 201.12[3] (2d ed. 2008)). In this case, the defendants seek to use two documents from the Irish High Court to establish a judicial admission on the part of Ryanair. Specifically, the defendants point to a declaration that Ryanair filed with the Irish High Court, which they argue establishes that Ryanair is capable of ascertaining who visits its website. *See* Dkt. No. 81 at 9; Dkt. No. 83-1, Exh. 10, at ¶¶ 39–45. Ryanair disputes that it is capable of doing so, in particular given its allegation that the defendants mask their IP addresses when accessing the Ryanair website. Dkt. No. 92 at 4. Accordingly, I find that the defendants' intended use of these two documents goes beyond the proper scope of judicial notice for documents from

5

Appx5

other courts.  The request for judicial notice of the two documents from the Irish High Court is denied.

BHI's 10-K Filing.  It is true, as the defendants argue, that SEC filings are public records and therefore are typically subject to judicial notice.  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).  However, for a document to be subject to judicial notice, it must not be "reasonably subject to dispute."  *Victaulic Co. v. Tieman*, 499 F.3d 227, 236 (3d Cir. 2007), *as amended* (Nov. 20, 2007).  Concerns regarding the authenticity or completeness of a document are the types of concerns that render a document reasonably subject to dispute.  *Silverman*, 2007 WL 9812749, at *1 n.1; *In re New Century TRS Holdings, Inc.*, 502 B.R. 416, 424 (Bankr. D. Del. 2013) (declining to take judicial notice of an SEC filing that was missing six pages).  Ryanair points out that the 10-K filing attached to the defendants' motion appears to be missing more than 200 pages from the original version of the document.  *Compare* Dkt. No. 83-1, Exh. 2, *with* Booking Holdings Inc., Annual Report (Form 10-K) (Feb. 23, 2022), https://www.sec.gov/Archives/edgar/data/ 1075531/000107553122000008/bkng-20211231.htm.  Accordingly, the defendants' request for judicial notice of BHI's 2021 Form 10-K is denied.

## IV.  **Motion to Dismiss**

The defendants argue that Ryanair's complaint must be dismissed for several reasons. First, they argue that the CFAA does not permit claims to be brought on a vicarious liability theory, and therefore the defendants are not liable under the CFAA.  Second, they argue that Ryanair has not alleged that the defendants have caused any harm that would trigger a civil cause of action under the CFAA.  Third, the defendants argue that each of Ryanair's five CFAA counts fails on the merits.  For the reasons set forth below, the defendants' motion is granted as to Count III but denied as to Counts I, II, IV, and V.

### A.   Indirect or Vicarious Liability

The defendants argue that Ryanair may not rely on a theory of indirect or vicarious liability in bringing a civil claim under section 1030(g) of the CFAA.  The defendants' argument is that section 1030(g) permits a civil action "against the violator," and that liability under that statute is limited to "hackers," i.e., the persons who actually take the actions that harm computer systems. Dkt. No. 81 at 10-12.  In order to extend liability to a third party, the defendants argue, Ryanair must allege and prove a formal agency relationship between the defendants and the aggregators, i.e., a master-servant relationship under which the defendants control or have the right to control the activities of the aggregators.  According to the defendants, in the absence of allegations of such an agency relationship or that the aggregators were alter egos of the defendants, the complaint must be dismissed.  Ryanair, on the other hand, contends that liability under section 1030(g) extends beyond those who directly access a computer unlawfully and extends to those direct, encourage, or induce such violation, regardless of whether there is a formal agency or master-servant relationship between the parties.

Numerous courts have recognized that vicarious or indirect liability under section 1030(g) extends to parties who direct, encourage, or induce others to commit acts that violate the statute. *See, e.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) ("Once permission [to access a computer] has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability" under the CFAA.); *Alchem Inc. v. Cage*, No. 2:20-cv-3142, 2021 WL 4902331, at *7 (E.D. Pa. Oct. 21, 2021), *vacated and remanded on other grounds*, No. 21-2994, 2022 WL 3043153 (3d Cir. Aug. 2, 2022) ("For an indirect access claim, Alchem must prove that NAN directed, encouraged, or induced Ms. Cage to access one of Alchem's protected computers that NAN was unauthorized to access."); *Teva Pharms. USA, Inc.*

7

*v. Sandhu*, 291 F. Supp. 3d 659, 671 (E.D. Pa. 2018) (denying motion to dismiss a section 1030(g) claim against parties who indirectly accessed plaintiff's computers through plaintiff's employees, stating that "[a] person who did not directly access the computer may still be liable under the CFAA if he 'directs, encourages, or induces' someone else to access a computer that he himself is unauthorized to access" (citation omitted)); *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. 16-2499, 2017 WL 1105648, at *15 (E.D. Pa. Mar. 24, 2017) ("Unlike claims of direct authorized access, a person may be liable if he directs, encourages, or induces someone else to access a computer that he himself is not authorized to access."); *Cloudpath Networks, Inc. v. SecureW2 B.V.*, 157 F. Supp. 3d 961, 985 (D. Colo. 2016) ("If SecureW2-USA encouraged Grimm's post-resignation access, which is a reasonable inference from the [complaint], then SecureW2-USA may be vicariously liable for the alleged CFAA violation."); *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 327 (M.D. Pa. 2014) ("The court joins those before it which have held that the act of inducing another to access a protected computer that he or she is otherwise not authorized to use constitutes 'access' within the meaning of the CFAA."); *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4205476, at *17 (E.D. Pa. Sept. 19, 2012) ("[M]any courts have found that one's act of inducing another to access a computer that he or she is otherwise not authorized to use constitutes 'access' for purposes of CFAA liability.") (citing cases); *PLC Trenching Co., LLC v. Newton*, No. 11-cv-0515, 2011 WL 13135653, at *7 (N.D.N.Y. Dec. 12, 2011) ("To state a claim for vicarious liability under the CFAA, a plaintiff must allege facts that would plausibly suggest that (1) the defendant affirmatively urged or encouraged its employee to violate the CFAA, and (2) the employee committed such a violation."); *Ipreo Holdings LLC v. Thomson Reuters Corp.*, No. 09-cv-8099, 2011 WL 855872, at *8 (S.D.N.Y. Mar. 8, 2011) ("[T]he CFAA allows for vicarious liability only

8

when its violation was affirmatively urged or otherwise directed by the employer."); *Se. Mech. Servs., Inc. v. Brody*, No. 8:08-cv-1151, 2008 WL 4613046, at *14 (M.D. Fla. Oct. 15, 2008) (evidence that defendants "induced and/or encouraged" others to access computers unlawfully sufficient to establish a likely violation of section 1030(a)(4)); *Binary Semantics, Ltd. v. Minitab, Inc.*, No. 07-1750, 2008 WL 763575, at *5 (M.D. Pa. Mar. 20, 2008) (allegations that employee of plaintiff accessed a protected computer at the direction of defendant was sufficient to state a claim under section 1030(a)(4)); *Charles Schwab & Co. v. Carter*, No. 04-cv-7071, 2005 WL 2369815, at *6–7 (N.D. Ill. Sept. 27, 2005) (plaintiff's complaint under section 1030(g) sufficient to survive a motion to dismiss because it alleged that the employer "affirmatively urged the employee to access the plaintiffs' computer beyond his authorization for [the employer's] benefit"); *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 472 (S.D.N.Y. 2004) (same).

Although several of the above-cited cases involved extending liability to employers who directed their employees to access the victims' computers, several of them did not, and the principle set forth in those cases is not limited to employer-employee or other master-servant relationships. The defendants cite authority for the proposition that vicarious liability can extend to cases in which the inducer and the induced party were in a master-servant relationship. *See* Dkt. No. 81 at 13.[3] However, the defendants have cited no authority for the proposition that liability

---

[3] The defendants are somewhat coy about whether they are embracing the position they describe at page 13 of their brief or merely describing certain of the cases. If they are arguing that inducement is permitted only when the person being induced is an employee of the inducer or is otherwise in a master-servant relationship with the inducer, it seems highly unlikely that Congress would have meant to draw such a distinction, which would make a party liable for inducing an employee to unlawfully access a computer but shield that party from liability if the inducer used an independent contractor to do the same thing. On the other hand, if the defendants' position is that inducement is not a basis for liability regardless of whether the inducer is in a master-servant relationship with the party being induced, it is hard to see how a corporate entity could ever be civilly liable for a violation of section 1030, since corporate entities by their nature act through

9

for inducement is limited to parties in a master-servant relationship, and that proposition is contrary to the analysis in several of the cases cited above.[4]

The defendants cite two district court cases in support of their argument that the CFAA does not permit vicarious liability claims. In the first case, *Doe v. Dartmouth-Hitchcock Medical Center*, the court held that a hospital could not be held liable under the CFAA for the actions of one of its doctors, who accessed a patient's computerized medical records without authorization. No. 00-cv-100, 2001 WL 873063, at *4–6 (D.N.H. July 19, 2001). In so holding, the court observed that "[e]xpanding the private cause of action created by Congress to include one for vicarious liability against persons who did not act with criminal intent and cannot be said to have violated the statute . . . would be entirely inconsistent with the plain language of the statute." *Id.* at *5. The court focused in particular on the fact that in violating the CFAA, the doctor actually "exceeded the limitations placed on her access" by the hospital itself. *Id.*

---

their officers and employees. A construction that would immunize all corporate entities from liability under section 1030(g) is even more unlikely to have been intended by Congress.

[4] Only a few district courts (and no appellate courts) have addressed the question whether aiding and abetting liability applies generally to civil actions based on violations of section 1030. Those courts that have addressed the issue are divided. *Compare Podium Corp. v. Chekkit Geolocation Servs., Inc.*, No. 2:20-cv-352, 2021 WL 5772269, at *8–9 (D. Utah Dec. 6, 2021); *Mifflinburg Telegraph, Inc. v. Criswell*, 277 F. Supp. 3d 750, 794 & n.245 (M.D. Pa. 2017); *Clinmicro Immunology Ctr., LLC v. Primemed, P.C.*, No. 3:11-CV-2213, 2016 WL 4107710, at *9 (M.D. Pa. July 7, 2016); *Huber*, 28 F. Supp. 3d at 328; *Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP*, No. 3:09-CV-422, 2011 WL 2847712, at *2–3 (D. Nev. July 15, 2011) (civil action under section 1030(g) does not include liability for aiding and abetting), *with COR Secs. Holdings Inc. v. Banc of Cal.*, No. 17-CV-1403, 2018 WL 4860032, at *7 (C.D. Cal. Feb. 12, 2018); *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1296–97 (S.D. Fla. 2017) (civil action under section 1030(g) includes liability for aiding and abetting); *Charles Schwab*, 2005 WL 2369815, at *6 ("Congress drafted the CFAA with an intent to permit vicarious liability"). Even if aiding and abetting liability is inapplicable in such cases, however, liability may still be predicated on an inducement theory. *See Huber*, 28 F. Supp. 3d at 328 (even though claim for aiding and abetting pursuant to section 1030 is dismissed, court denies motion to dismiss for defendant's conduct in instigating and conspiring with the party who accessed the plaintiff's protected computer).

The defendants also cite *SolarCity Corp. v. Pure Solar Co.*, in which the court dismissed the CFAA claim against one defendant who did not participate in the conduct that the plaintiff alleged violated the CFAA.  No. 16-cv-1814, 2016 WL 11019989, at *9 (C.D. Cal. Dec. 27, 2016). In that case, the court noted that the CFAA "makes no mention of vicarious liability," and that the plaintiff had not "pleaded facts indicating that [the defendant] was individually involved in or specifically aware of any of [the] underlying conduct."  *Id.*  The court added that "an employer may be liable for CFAA violations if the employee was acting within the scope of his employment."  *Id.*

The *Dartmouth-Hitchcock* and *SolarCity* cases do not stand for the proposition that a vicarious liability claim may never be brought under the CFAA.  Those cases stand for the more limited proposition that a principal is not vicariously liable for an agent's CFAA violation if the principal had no knowledge of or involvement in the agent's conduct.[5]  In this case, Ryanair alleges that the defendants directed third parties to access the myRyanair portion of the Ryanair website, and therefore would have had knowledge of those third parties' conduct.  In such a situation, a vicarious liability claim under the CFAA is proper.  *See Charles Schwab*, 2005 WL 2369815, at *7 (distinguishing *Dartmouth* on facts similar to those in this case and stating that to refuse to apply vicarious liability in that setting "would exempt a principal from liability when its agent improperly accessed a computer at the direction of the principal."); *Nexans Wires,* 319 F. Supp. 2d at 472 (also distinguishing the *Dartmouth* case on the ground that the employee there acted in violation of his employer's policy, while in the case before the court, the parties who were alleged

---

[5]  Even that proposition is subject to dispute, as some courts have held that an employer can be vicariously liable for an employee's violations of the CFAA "if those transgressions occur in the scope of employment."  *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835 (N.D. Cal. 2014) (citing cases).

11

to have committed the CFAA violations were alleged to have acted at the direction of the defendants).

For the same reasons, the decisions in *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 589–91 (E.D. Pa. 2016), and *Compagnie des Grands Hotels D'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*, No. 18-654, 2019 WL 148454, at *3–7 (D. Del. Jan. 19, 2019), on which the defendants rely, are inapposite. In those cases, the plaintiffs sought to impose liability on defendants on agency or alter ego theories, which the courts found inapplicable. In this case, Ryanair is seeking to hold the defendants liable for actually causing the CFAA violations by purposely inducing others to commit those violations. As noted, the defendants appear to acknowledge that liability can be based on "the principal's active role in the CFAA violator's conduct" by directing, encouraging, or inducing a CFAA violation. *See* Dkt. No. 81 at 13 (citing *Alchem Inc. v. Cage*, *supra,* and *Charles Schwab & Co. v. Carter*, *supra*). Those were not the allegations in the *QVC* and *Grands Hotels* cases. Thus, neither those cases nor any of the other vicarious liability case cases relied upon by the defendants involved a civil action against a party charged with directly inducing another party to violate section 1030.

The defendants further argue that, even if the CFAA permits vicarious liability claims, Ryanair has not adequately alleged any theory of vicarious liability. Dkt. No. 81 at 12–17. To the contrary, Ryanair's complaint adequately pleads vicarious, or indirect, liability on a "direct, encourage, or induce" theory. For example, Ryanair alleges that the defendants "direct, encourage, induce, and/or affirmatively act in support of their agents and certain third parties who access the Ryanair Website on behalf of the Defendants in violation of the CFAA." Dkt. No. 76 at ¶ 219. Ryanair adds that the defendants have "entered into written agreements with their agents and certain third parties who access the Ryanair Website without authorization (or alternatively, in

12

Appx12

excess of their authorized access) on behalf of the Defendants," and alleges that the specific third

parties with whom the defendants have contracted include "Travelfusion, Mystifly, Kiwi.com, and

PKFare," as well as "Etraveli."  *Id.* at ¶¶ 215, 220.

The complaint contains extensive allegations regarding the arrangement between the

defendants and the aggregators, and the conduct of the aggregators in accessing Ryanair's website.

*Id.* at ¶¶ 117–18, 188–89, 208–255.  In particular, the complaint alleges that the Defendants

specifically direct one or more of those third parties to access the myRyanair portion of the Ryanair

website when a user purchases a particular Ryanair flight itinerary on one of the defendants'

websites.  *Id.* at ¶¶ 220–26, 245–47.[6]  Finally, Ryanair alleges that various interests are shared

between the defendants and some of the third parties with whom they contract.  *Id.* at ¶¶ 230–42.

Those allegations are sufficient to support Ryanair's claims that are premised on a vicarious

liability theory.

In sum, to the extent the defendants argue that the complaint was insufficient because it

failed to allege the existence of a formal agency relationship between the defendants and the

aggregators, the short answer is that the existence of an agency (or master-servant) relationship is

not a necessary predicate for liability on a "direct, encourage, or induce" theory.  As indicated in

the cases cited above, even if the aggregators are independent contractors and not agents of the

---

[6] While it is true that the complaint does not recite the details of the directions given to the aggregators regarding how they go about obtaining access to the Ryanair website, it is not surprising that such details were not available to Ryanair before discovery in the case.  Ryanair has therefore adequately pleaded the elements of a CFAA violation in light of the information in its possession at the time the complaint was filed.  *See Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element") (cleaned up); *Reid-Ashman Mfg., Inc. v. Swanson Semiconductor Serv., LLC*, No. C-0604693, 2007 WL 1394427, at *10 (N.D. Cal. May 10, 2007).  Moreover, the complaint alleges that Ryanair advised the defendants of the aggregators' activities, Dkt. No. 76 at ¶¶ 72–90, so the defendants were plainly on notice of the aggregators' conduct and Ryanair's belief that that conduct was unlawful.

defendants, the defendants can be held liable simply based on evidence that the defendants induced the aggregators to commit violations of the CFAA. [7]

## B.    Damage or Loss

The defendants next argue that Ryanair has not alleged any actionable harm under the CFAA.  To sustain a civil claim under the CFAA, a plaintiff must allege that it has "suffer[ed] damage or loss by reason of a violation" of the CFAA.  18 U.S.C. § 1030(g).  The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information."  *Id.* § 1030(e)(8).  Likewise, the CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  *Id.* § 1030(e)(11).  As the Supreme Court has observed, those terms "focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data."  *Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021).

Ryanair alleges that it has "suffered significant technological harms due to Defendants' unauthorized access to the Ryanair Website."  Dkt. No. 76 at ¶ 269.  For example, Ryanair alleges that the actions of the defendants and/or their agents "greatly increase[] the quantities of queries on the Ryanair Website," "impair[] the . . . availability and/or usability" of the Ryanair website,

---

[7]    The defendants argue that their agreements with several third parties affirmatively disclaim an agency relationship between the defendants and those third parties. Dkt. No. 81 at 14–15.  However, because I have denied the request for judicial notice, consideration of the contents of those agreements would be improper at this stage of the case.  In any event, as noted above, the existence of an agency relationship is not a prerequisite to liability on a "direct, encourage, or induce" theory.  Beyond that, the fact that an agreement between two parties "denies the existence of an agency relationship is not in itself determinative of the matter."  *Drexel v. Union Prescription Ctrs.*, 582 F.2d 781, 786 (3d Cir. 1978).

and cause the website's response times to deteriorate. *Id.* at ¶¶ 270–72. In its complaint, Ryanair provided several examples of the errors that it alleges are caused by the defendants' screen scraping activities. *See, e.g.*, *id.* at ¶¶ 273–280. Those allegations are sufficient to overcome the defendants' dismissal motion based on inadequate allegations of damage or loss.

The defendants further complain that Ryanair has not alleged any such harm that is specifically attributable to the defendants. However, Ryanair has alleged that the harm it has suffered is attributable to the activities of the defendants and/or their agents. *See, e.g.*, *id.* at ¶¶ 269–80. As noted, Ryanair will not be prohibited from establishing a CFAA violation on a vicarious liability theory, so it is sufficient for Ryanair to allege that the harm it suffered was caused either directly or indirectly by the defendants. Accordingly, Ryanair's claims will not be dismissed on the ground that Ryanair has not alleged actionable harm under the CFAA.

### C.   Count III: 18 U.S.C. § 1030(a)(5)(A)

Count III of Ryanair's complaint alleges a violation of 18 U.S.C. § 1030(a)(5)(A). Section 1030(a)(5)(A) prohibits "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." The defendants argue that Ryanair has not alleged that any defendant intended to cause damage to Ryanair's website or computer systems.

In order for a claim to lie under section 1030(a)(5)(A), the defendant must specifically intend to cause damage to the plaintiff's computer systems. *See, e.g.*, *Kalow & Springnut, LLP v. Commence Corp.*, No. 07-cv-3442, 2008 WL 2557506, at *4 (D.N.J. June 23, 2008); *Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 964 (N.D. Cal. 2010). It is insufficient for a plaintiff to allege that the defendant intended to access the computer system, and that such access caused damage, absent a showing that the defendant intended to cause the resulting damage. *See Kalow*, 2008 WL

15

2557506, at *4; *Oracle*, 734 F. Supp. 2d at 964.  The harm or damage contemplated by the CFAA includes "slowdowns, disruptions in service, crashes, or other impairments to the availability or accessibility of the systems or data," as well as changing, altering, deleting, or destroying "any data, programs, systems, or other information" on the plaintiff's computer systems.  *Oracle*, 734 F. Supp. 2d at 964; *see also* 18 U.S.C. § 1030(e)(8).

Ryanair alleges that the defendants' screen scraping resulted in interruptions of service to its website.  *See, e.g.*, Dkt. No. 76 at ¶¶ 270–80.  Even assuming that allegation is true, however, Ryanair's complaint does not allege that the defendants specifically intended to cause any interruptions to Ryanair's website or any other damage to Ryanair's computer systems.[8]  Ryanair's complaint alleges that the defendants intended to obtain information (e.g., flight itineraries) from Ryanair's website, but that allegation is insufficient to establish that the defendants intended to cause damage to Ryanair's computer systems.  *See Kalow*, 2008 WL 2557506, at *4; *Oracle*, 734 F. Supp. 2d at 964.

Because Ryanair has not plausibly alleged that the defendants intended to cause damage to Ryanair's computer systems, Count III of its First Amended Complaint is dismissed.

---

[8]  Ryanair alleges in its discussion of Count III in the First Amended Complaint that the defendants "intentionally caus[e] damage" and "intentionally cause[] harm" to the Ryanair website.  Dkt. No. 76 at ¶¶ 332–33.  Those unelaborated recitations of the elements of a section 1030(a)(5)(A) violation are insufficient to allege that the defendants specifically intended to cause the sort of damage that is contemplated by the CFAA.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, such an allegation appears to be inconsistent with Ryanair's general theory of this case.  As the defendants point out, causing harm to Ryanair's website would actually hinder the defendants' efforts to obtain data from the Ryanair website via screen scraping.

16

### D.   Count II: 18 U.S.C. § 1030(a)(4)

Count II of Ryanair's complaint alleges a violation of 18 U.S.C. § 1030(a)(4).  Section 1030(a)(4) prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value."  The defendants argue that the heightened pleading standard for fraud claims set forth in Federal Rule of Civil Procedure 9(b) applies to the "intent to defraud" and "intended fraud" elements of section 1030(a)(4).

Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  That is, in cases subject to Rule 9(b), the plaintiff must articulate the "who, what, when, where, and how of the events at issue."  *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 176 (3d Cir. 2019) (citation omitted).

A number of district courts have addressed the question whether Rule 9(b) applies to CFAA claims based on section 1030(a)(4) and, if so, the extent to which it does.[9]  But the law on this issue is a mess.  Most of the courts that have addressed the issue have held that the special pleading requirements of Rule 9(b) do not apply to claims based on section 1030(a)(4), even though that statute requires proof of "intent to defraud" and "conduct that furthers the intended fraud."  *See, e.g.*, *Elias Indus., Inc. v. Kissler & Co.*, No. 20-CV-1011, 2021 WL 2141509, at *5 (W.D. Pa. May 26, 2021); *Coll Builders Supply, Inc. v. Velez*, No 6:17-cv-933, 2017 WL 4158661, at *9 (M.D. Fla. Aug. 31, 2017); *DHI Group, Inc. v. Kent*, No. 4:16-cv-1670, 2017 WL 9939568, at *10 (S.D.

---

[9]  No appellate court has directly addressed whether Rule 9(b) applies to CFAA claims brought under section 1030(a)(4) in a precedential opinion.  In *Miller v. Int'l Bus. Machs. Corp.*, 138 F. Appx. 12, 17 (9th Cir. 2005), the Ninth Circuit, in a non-precedential opinion, referred to a section 1030(a)(4) claim as "a fraud claim" and upheld a district court decision dismissing that claim for failure to plead that claim with sufficient particularity to satisfy Rule 9(b).

Tex. Apr. 27, 2017); *MetroPCS v. SD Phone Trader*, 187 F. Supp. 3d 1147, 1150 (S.D. Cal. May 17, 2016); *Rickett v. Smith*, No. 1:14-CV-70, 2015 WL 3580500, at *6 (W.D. Ky. June 5, 2015); *Sprint Nextel Corp. v. Simple Cell, Inc.*, No. 13-cv-617, 2013 WL 3776933, at *6 (D. Md. July 17, 2013) ("The balance of authority . . . appears to support the view that Rule 9(b) does not apply to § 1030(a)(4)."); *Cornerstone Staffing Sols., Inc. v. James*, No. 3:12-cv-1527, 2013 WL 12124381, at *4 (N.D. Cal. Jan. 15, 2013); *Gridiron Mgmt. Grp. LLC v. Wranglers*, No. 12-cv-3128, 2012 WL 5187839, at *10 & n.7 (D. Neb. Oct. 18, 2012) ("Although some of the particular substantive offenses involve 'fraud,' the heightened pleading standards of Rule 9(b) do not apply to claims brought under § 1030(g).") (cleaned up); *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 284 (N.D. Cal. 2011) (same); *SFK USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 719 n.13 (N.D. Ill. 2009) ("The heightened pleading standards of Rule 9(b) do not apply to the Computer Fraud and Abuse Act."); *Dental Health Prods., Inc. v. Ringo*, No. 08-cv-1039, 2009 WL 1076883, at *8 (E.D. Wis. Apr. 20, 2009); *eBay, Inc. v. Digital Point Sols., Inc.*, 608 F. Supp. 2d 1156, 1164 (N.D. Cal. 2009); *Joe N. Pratt Ins. v. Doane*, No. 6:07-cv-07, 2008 WL 819011, at *9 (S.D. Tex. Mar. 20, 2008); *Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1125–26 (W.D. Wash. 2000); *see also Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008) ("The term 'defraud' for purposes of § 1030(a)(4) simply means wrongdoing and does not require proof of common law fraud.").

Some of the cases dealing with this issue focus on the "intent to defraud" element of section 1030(a)(4) and hold that the special pleading requirements do not apply to that element, while remaining silent as to whether the "further the intended fraud" element is subject to those requirements. *See, e.g.*, *El Omari v. Buchanan*, 20-cv-2601, 2021 WL 5889341, at *13 (S.D.N.Y. Dec. 10, 2021) ("Rule 9(b) does not apply to Section 1030(a)(4) because 'intent to defraud' is best

18

understood as requiring wrongdoing, but not the elements of common law fraud."); *PNY Techs., Inc. v. Salhi*, No. 2:12-cv-4916, 2013 WL 4039030, at *6 (D.N.J. Aug. 5, 2013); *In re Maxim Integrated Prods., Inc.*, MDL No. 2354, 2013 WL 12141373, at *10 (W.D. Pa. Mar. 19, 2013); *Sealord Holdings, Inc. v. Radler*, No. 11-6125, 2012 WL 707075, at *6–7 (E.D. Pa. 2012); *TEKsystems, Inc. v. Modis, Inc.*, No. 1:08-cv-5476, 2008 WL 5155720, at *5 (N.D. Ill. Dec. 5, 2008); *P.C. of Yonkers*, *Inc. v. Celebrations! The Party and Seasonal Superstore, L.L.C.*, No. 04-cv-4554, 2007 WL 708978, at *6–7 (D.N.J. Mar. 5, 2007); *C.H. Robinson Worldwide, Inc. v. Command Transp., LLC*, No. 05-cv-3401, 2005 WL 3077998, at *4 (N.D. Ill. Nov. 16, 2005) (Rule 9(b)'s "particularity requirements do not apply to intent allegations."); Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

Other courts have held that the Rule 9(b) pleading standard applies to the "furthers the intended fraud" element, but not to the "intent to defraud" element. *Nowak v. Xapo, Inc.*, No. 5:20-cv-3643, 2020 WL 6822888, at *3 (N.D. Cal. Nov. 20, 2020); *Property Rights Law Grp., P.C. v. Lynch*, No. 13-273, 2013 WL 4791485, at *4 (D. Haw. Sept. 6, 2013); *Oracle Am., Inc. v. Service Key, LLC*, No. 4:12-cv-790, 2012 WL 6019580, at *6 (N.D. Cal. Dec. 3, 2012); *Motorola, Inc. v. Lemko Corp.*, 609 F. Supp. 2d 760, 765 (N.D. Ill. 2009) (Rule 9(b) "quite plainly applies to section 1030(a)(4)'s requirement that the defendant's acts further the intended fraud.").

Yet other courts have held that CFAA claims must be pleaded with specificity "only when fraudulent conduct is specifically alleged as the basis for the wrongdoing." *E.D.C. Techs., Inc. v. Seidel*, No. 16-cv-3316, 2016 WL 4549132, at *4 (N.D. Cal. Sept. 1, 2016); *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 834 (N.D. Cal. 2014); *Oracle Am., Inc. v. TERiX Comput. Co.*, No. 5:13-cv-3385, 2014 WL 31344, at *4–5 (N.D. Cal. Jan. 14, 2014); *see also NLRK, LLC v. Indoor Ag-Con, LLC*, No. 3:21-cv-73, 2022 WL 293252, at *7 (D. Nev. Jan. 31, 2022) (CFAA

claims must be pleaded with particularity when they are "based on a unified course of fraudulent conduct" because such claims are "grounded in fraud" (citation omitted)); *Banc of Cal., NA v. McDonnell*, No. 18-cv-1194, 2018 WL 8693922, at *4 (C.D. Cal. Nov. 9, 2018) (same); *Ewiz Corp v. Ma Labs., Inc.*, No. 15-CV-1213, 2015 WL 5680904, at *5–6 (N.D. Cal. Sept. 28, 2015).

A few courts have held to the contrary, requiring that section 1030(a)(4) allegations in civil cases brought under section 1030(g) satisfy the Rule 9(b) pleading standard, seemingly with respect to each of the elements of section 1030(a)(4) that refer to "fraud" or "intent to defraud." *See, e.g., United Fed'n of Churches, LLC v. Johnson*, No. 2:20-cv-509, 2022 WL 1128919, at *4 n.5 (W.D. Wash. Apr. 15, 2022); *Villareal v. Saenz*, No. 5:20-CV-571, 2021 WL 1986831, at *7 (W.D. Tex. May 18, 2021); *SMH Enterprises, L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. 20-cv-2970, 2021 WL 1226411, at *5 (E.D. La. Apr. 1, 2021); *Symphony Diagnostic Servs. No. 1, LLC v. Kingrey*, No. 4:18-cv-463, 2019 WL 7821416, at *1 (E.D. Ark. Jan. 29, 2019); *Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1072 (N.D. Cal. 2018); *Saunders v. Davis*, No. 15-cv-2026, 2016 WL 4921418, at *13 n.18 (D.D.C. Sept. 15, 2016).

For purposes of this case, I need not decide whether the heightened pleading standard of Rule 9(b) applies to Ryanair's claim based on section 1030(a)(4), because the complaint's allegations are sufficient to satisfy that heightened pleading standard in any event. Ryanair alleges that the defendants and/or the aggregators have engaged in fraudulent conduct by misrepresenting themselves, for example by "lying about [their] email address[es] or anonymizing [their] IP address[es]," when creating accounts on the Ryanair website. Dkt. No. 76 at ¶ 325.

As noted, Rule 9(b) requires that Ryanair establish the "who, what, where, when, and how" of the fraudulent conduct Ryanair is alleging. *See UPMC*, 946 F.3d at 176 (citation omitted). Ryanair has alleged the "who" (the defendants and/or the aggregators), the "what"

20

(misrepresenting themselves), the "where" (on the Ryanair website), the "when" (when attempting to access the myRyanair section of the Ryanair website), and the "how" (using false email addresses or IP addresses). *See id.* Specific details regarding the defendants' alleged conduct, such as the specific technologies used to generate the false email and IP addresses, and any communications between the defendants and the aggregators regarding those efforts, are likely to be "peculiarly within the defendant[s'] knowledge or control" and obtainable only in discovery. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). Moreover, the purposes of Rule 9(b) have been satisfied, as the defendants have been able to answer the complaint and appear to have "understood what was being pleaded." *See Illinois Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 233 (3d Cir. 2011). Accordingly, I will not dismiss Count II of Ryanair's complaint on the ground that it fails to meet Rule 9(b)'s heightened pleading standard.[10]

### E.    Counts I and IV: 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(5)(B)–(C).

Count I of Ryanair's complaint alleges a violation of 18 U.S.C. § 1030(a)(2)(C), which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer." Similarly, Count IV of Ryanair's complaint alleges a violation of 18 U.S.C. § 1030(a)(5)(B)–(C), which prohibits

---

[10]    At oral argument on the present motion, the defendants suggested that Ryanair's amended complaint fails to allege adequately that Ryanair has had been "defrauded," i.e., that Ryanair has been deprived of something of value as a result of the defendants' conduct. That argument is forfeited by not having been raised in the defendants' opening brief on the motion. In any event, it is unpersuasive in view of Ryanair's allegation that the defendants use the information they obtain via their conduct in a manner that "causes damage to Ryanair's goodwill and reputation." *See* Dkt. No. 76 at ¶¶ 259–63. Although goodwill is an intangible asset, it is one to which corporations attribute value and which they include on their financial statements. Therefore, even if a deprivation of something of value is required by section 1030(a)(4), Ryanair has adequately alleged that such a deprivation occurred.

"intentionally access[ing] a protected computer without authorization," and either "recklessly caus[ing] damage" or actually "caus[ing] damage and loss."

The issue with respect to those two counts is whether Ryanair has plausibly alleged that the defendants have accessed Ryanair's website without authorization or, if they had some level of authorization, whether the defendants exceeded their authorized access to Ryanair's website. The defendants argue that the Ryanair website is a public website, to which the CFAA's concept of "authorization" or "authorized access" does not apply.  Ryanair alleges that the myRyanair portion of its website is not public and that, in any event, the defendants are not authorized to access the that portion of the Ryanair website.

Recent case law interpreting the CFAA makes clear that the CFAA's concept of authorization focuses heavily on technological barriers to access.  For example, in *Van Buren v. United States*, the Supreme Court held that an individual "exceeds authorized access" when he "accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him."  141 S. Ct. at 1662. Although the Court declined to expressly decide whether that inquiry "turns only on technological (or 'code-based' limitations) on access, or instead also looks to limits contained in contracts or policies," the Court's ultimate holding—that a police officer did not violate the CFAA when he accessed police records for an improper purpose—strongly suggests that the operative question is whether a technological or code-based limitation exists to prevent access to a computer by those who do not have proper authorization.  *See id.* at 1658–59 & n.8, 1662.

The Ninth Circuit's opinion in *hiQ Labs, Inc. v. LinkedIn Corp.* is similarly instructive.  31 F.4th 1180 (9th Cir. 2022).  In that case, the court noted that a user accesses a computer system "without authorization" when the user "circumvents a computer's generally applicable rules

regarding access permissions, such as username and password requirements, to gain access to a computer." *Id.* at 1201.  As a result, the court held that accessing "publicly available data" did not "constitute access without authorization under the CFAA," even when that access was in violation of the website's terms of use and was the subject of a cease-and-desist letter. *Id.* at 1195, 1199, 1201.  The court suggested that had the data in question been "protected by [a] username and password authentication system," such as that used by Facebook, rather than being "available to anyone with a web browser," the user's accessing of that data might have been without authorization. *See id.* at 1199.

Other district court decisions are in accord.  *See, e.g.*, *Greenburg v. Wray*, No. 22-cv-122, 2022 WL 2176499, at *2 (D. Ariz. June 16, 2022) ("[I]f 'anyone with a browser' could access the website, it had no limitations on access."); *Salinas v. Cornwell Quality Tools Co.*, No. 19-cv-2275, 2022 WL 3130875, at *8–9 (C.D. Cal. June 10, 2022) (holding that accessing a database, which did not require a password to access, was not conduct that violated the CFAA); *Meta Platforms, Inc. v. BrandTotal Ltd.*, No. 20-CV-07182, 2022 WL 1990225, at *24 (N.D. Cal. June 6, 2022) ("Where a website is made available to the public without any authentication requirement at least in the first instance, the concept of 'without authorization' does not apply, even if the owner employs technological measures to block specific users, suspicious activity, or—as here—repeated access beyond a particular threshold." (cleaned up)).

The above cases make clear that in order for the CFAA's "without authorization" and "exceeds authorized access" elements to apply, some sort of authentication mechanism (e.g., the use of usernames and passwords) must be employed to limit access to the website.  If the information on the website is publicly available without requiring users to authenticate themselves,

a violation of the terms of use or the defiance of a cease-and-desist letter will not give rise to liability under the CFAA.

In this case, Ryanair alleges that users must log in to the myRyanair portion of the Ryanair website using a username and password. Dkt. No. 76 at ¶ 95. Ryanair further alleges that it has blocked accounts associated with persons that Ryanair believes have engaged in screen scraping of the myRyanair portion of the site. *Id.* at ¶ 111. And beyond the login mechanism, Ryanair also alleges that it uses the Shield program to limit unauthorized access to its website, and that the defendants have sought to circumvent the Shield program in order to access information about Ryanair itineraries. *Id.* at ¶¶ 252–53. In short, Ryanair has alleged that the defendants circumvent code-based authentication mechanisms that are designed to limit access to the myRyanair portion of the website.

Ryanair also alleges that the defendants engaged in screen scraping in violation of the terms of use of the Ryanair website and that the defendants continued to do so even after Ryanair sent each defendant a cease-and-desist letter. *Id.* at ¶¶ 70–85. Although those allegations would be insufficient to establish liability under the CFAA if the contents of the myRyanair portion of the website were accessible to the public without authentication, courts have found cease-and-desist letters to withdraw authorization to access a protected portion of a website when an authentication mechanism protected access to that portion of the website. *Facebook*, 844 F.3d at 1067–69 (holding that a defendant who used the login information of other users to access the Facebook website, in defiance of a cease-and-desist letter, violated the CFAA); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558, 570 (N.D. Ill. 2019). In the context of a system that requires a user name and password to obtain access to a particular portion of a party's website, and where the defendants are alleged to have obtained such access in violation of the terms of use of the

24

Ryanair website and the cease-and-desist letters that Ryanair sent to the defendants, the allegations in the First Amended Complaint are sufficient to withstand a motion to dismiss for failure to state a claim on which relief can be granted.[11]

The question before the court is whether the steps Ryanair has taken to protect the myRyanair portion of its website from unwanted incursions such as those allegedly sponsored by the defendants are sufficient to render that portion of the website non-public, and thus the defendants' access to that website unauthorized for purposes of section 1030. The resolution of that question will depend on the facts developed in the further course of this litigation. I therefore find that Ryanair has stated a plausible claim for relief in Counts I and IV, and that the motion to dismiss must be DENIED with respect to those two counts.

### F.    Count V: 18 U.S.C. § 1030(b)

Count V of Ryanair's complaint alleges a violation of 18 U.S.C. § 1030(b). Section 1030(b) provides that "[w]hoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section." Put simply, section 1030(b) prohibits any conspiracy to violate the CFAA.

Courts have routinely entertained claims under section 1030(b) in civil cases.[12] *See, e.g.*, *In re Lenovo Adware Litig.*, No. 15-MD-02624, 2016 WL 6277245, at *6 (N.D. Cal. Oct. 27,

---

[11]  It is worth noting that the *Facebook* case pre-dates the Supreme Court's decision in *Van Buren*, and it is not entirely clear to what extent that case—and in particular the discussion of cease-and-desist letters in that case—remains good law in light of *Van Buren*. In the *hiQ* decision, which was issued after *Van Buren*, the Ninth Circuit relied on the *Facebook* case, so that case likely has some persuasive force even in light of *Van Buren*. *See hiQ*, 31 F.4th at 1199. In any event, I find that the various factors alleged by Ryanair, including the myRyanair login mechanism, the Shield program, and Ryanair's use of cease-and-desist letters, support Ryanair's claims and thus allow Counts I and IV to survive the defendants' motion to dismiss.

[12]  The defendants argue that the CFAA does not permit a civil claim for conspiracy under section 1030(b). They point to the language of section 1030(g), which provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action

2016); *Cloudpath Networks, Inc. v. SecureW2 B.V.*, 157 F. Supp. 3d 961, 984–85 (D. Colo. 2016);

*Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 328 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168

(3d Cir. 2020).  A claim under section 1030(b) requires "specific allegations of an agreement and

common activities."  *Lenovo Adware*, 2016 WL 6277245, at *6 (citation omitted).

      Ryanair's complaint contains sufficient allegations of conspiracy to survive a motion to

dismiss.  Among other things, the complaint alleges that the defendants "have entered into written

agreements with their agents and certain third parties who access the Ryanair Website without

authorization . . . on behalf of the Defendants."  Dkt. No. 76 at ¶ 220.  Ryanair alleges that the

defendants have entered into such agreements with specific third parties, including "Travelfusion,"

"Mystifly," "Kiwi.com," "PKFare," and "Etraveli."  *Id.* at ¶ 215.  Moreover, Ryanair alleges that

the defendants "know that neither the Defendants nor th[o]se agents and third parties are authorized

to access the Ryanair website," and that the defendants and third parties "work in concert to access

the Ryanair Website, including the myRyanair portion of the Ryanair Website."  *Id.* at ¶¶ 221, 223.

Ryanair further alleges that the defendants share common interests with some of the third parties

with whom they contract.  *Id.* at ¶¶ 230–42.[13]

      As discussed above, Ryanair has alleged a plausible claim for relief in Counts I and IV of

its complaint.  Because Ryanair has alleged an underlying violation of the CFAA along with an

---

against *the violator*." 18 U.S.C. § 1030(g) (emphasis added).  That argument fails to recognize,
however, that a defendant who conspires to commit a CFAA violation is itself a violator of section
1030(b), which falls within the scope of the cause of action provided in section 1030(g).

[13]  The defendants argue (Dkt. No. 81 at 27) that the First Amended Complaint does not
allege that any of the agreements between the defendants and third parties contain any agreement
to violate the law, and in fact that the agreements represent that the parties will not violate the law
in performing their contractual obligations.  Setting aside the fact that the agreements are not part
of the record on the motion to dismiss, the fact that parties may have signed an agreement stating
that they will not violate the law obviously does not immunize them from liability if the allegations
assert, and the evidence shows, that they engaged in unlawful conduct.

Appx26

agreement and common activities with third parties, the defendants' motion to dismiss Count V of the First Amended Complaint must be denied as well.

**V.    Conclusion**

In summary, Count III of Ryanair's First Amended Complaint is dismissed.  Counts I, II, IV, and V all state a plausible claim for relief and therefore will not be dismissed at this time.

The stay of discovery issued on July 8, 2022, Dkt. No. 74, is hereby lifted.  The deadlines set forth in the Scheduling Order, Dkt. No. 46, remain in effect.

IT IS SO ORDERED.

SIGNED this 24th day of October, 2022.

WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

27

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RYANAIR DAC, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. 20-1191-WCB |
| | § | |
| BOOKING HOLDINGS INC., | § | **FILED UNDER SEAL** |
| BOOKING.COM B.V., KAYAK | § | |
| SOFTWARE CORPORATION, | § | |
| PRICELINE.COM LLC, and AGODA | § | |
| COMPANY PTE. LTD., | § | |
| | § | |
| *Defendants*. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

The parties have filed motions for summary judgment and motions to exclude expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Plaintiff Ryanair DAC ("Ryanair") has moved for summary judgment that defendants Booking.com BV ("Booking.com") and KAYAK Software Corporation ("KAYAK") have violated sections 1030(a)(2)(C) and (a)(5)(C) of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; for summary judgment on all of Booking.com's counterclaims; and for the exclusion of the testimony of the defendants' experts Timothy O'Neil-Dunne, Jordan Rae Kelly, and Basil Imburgia. Dkt. No. 347. The defendants have moved for summary judgment on all of Ryanair's CFAA claims, Dkt. No. 332, and for the exclusion of the testimony of Ryanair's experts Iain Lopata, Dkt. No. 333, and Anthony Vance, Dkt. No. 334.

**I.    Background**

Ryanair is a low-fare airline based in Ireland that offers flights in Europe and North Africa. Defendants Booking.com, Priceline.com LLC ("Priceline"), and Agoda Company Pte. Ltd.

Appx28

("Agoda") are online travel companies—also referred to as "Online Travel Agencies," or "OTAs"—that allow consumers to purchase flights, hotel reservations, rental cars, and other travel services.  Defendant KAYAK is also an online travel company, but the parties characterize it differently: the defendants characterize KAYAK as a metasearch engine rather than an OTA; Ryanair characterizes KAYAK as an OTA because its users can purchase flights on the KAYAK website, creating bookings referred to by the parties as "facilitated bookings," or via link-out bookings, under which KAYAK customers are offered various third parties, including OTAs, to use to book their flights.  Defendant Booking Holdings, Inc., ("BHI") is a holding company whose subsidiaries include Booking.com, Priceline, Agoda, and KAYAK.

Ryanair sells tickets through an online site that lists the flights Ryanair offers and the prices for those flights and ancillary services.  That site is freely accessible to the public.  Ryanair has implemented a password-protected portion of the website, entitled "myRyanair."  To create a myRyanair account, a customer can either sign up with an email and select a password, or sign up with an existing Google, Facebook, or PayPal account.  Accounts are generally freely available unless the email domain used for registration is associated with a "blacklist" of domains maintained by Ryanair, in which case the request to create a myRyanair account is denied.

To purchase a ticket on a particular flight, a customer is directed either to create a myRyanair account or to log in to an existing myRyanair account.  A customer can select a flight and various ancillary products and services (e.g., a checked bag, trip insurance, etc.) without logging into myRyanair; however, a customer cannot reach the payment page and check out without having a myRyanair account.

During the period at issue in this case, the defendants offered customers the opportunity to purchase Ryanair flights from the defendants' websites.  The defendants contracted with vendors

who obtained Ryanair's flight information from Ryanair's website and provided that information to the defendants. The defendants would then display the available Ryanair flights on their websites. If a customer elected to purchase a ticket on one of those flights, the defendants would direct the customer's request to one of the vendors, which would then purchase the ticket and provide the necessary information regarding the booked flight to the customer.

The defendants' information about the available Ryanair flights was obtained mainly through what is referred to as "screen scraping," that is, using programs, often referred to as "bots," that are designed to copy data from the web page's visual interface. Ryanair has accused the defendants of obtaining data from Ryanair's website, either directly or through their vendors, and using that data to sell Ryanair tickets to customers.

Ryanair has objected to the practice of screen scraping and has taken measures to try to prevent it. First, Ryanair has sent cease-and-desist letters to the defendants demanding that they stop the practice. Second, Ryanair has used a program known as "Shield" in an effort to block the defendants and their vendors from obtaining access to Ryanair's websites and from obtaining data from those websites to use in selling Ryanair tickets. Shield uses several strategies to block inquiries from IP addresses that it associates with OTA bot activity. However, Ryanair's efforts to prevent OTAs from accessing the Ryanair website have proved only partially successful.

In 2020, Ryanair filed this action in an effort to prevent further screen-scraping activities by the defendants and parties acting in concert with the defendants. In its complaint, Ryanair premised its claim of liability on the CFAA and sought damages and injunctive relief based on the defendants' alleged violations of that statute. The defendants moved for judgment on the pleadings, and in October 2022 I denied that motion. *See* Dkt. No. 105. The defendants then filed an amended answer and counterclaims charging Ryanair with tortious interference with business

relations, unfair competition, defamation, trade libel, and deceptive trade practices, all related to the disputes over the defendants' activities in accessing the Ryanair website and obtaining flight information from that website.

Following discovery, both sides have filed summary judgment motions directed to various of the claims and counterclaims.

## II.    Legal Standard

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

On an issue as to which the nonmoving party bears the burden of proof at trial, the party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c) as of 1986). The burden on the nonmoving party in that situation can be satisfied by "showing," that is, by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the moving party carries its burden, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).

On an issue as to which the moving party bears the burden of proof at trial, the party seeking summary judgment must "establish the absence of a genuine factual issue." *Resol. Tr. Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992). If the motion does not persuasively establish that no factual

issue exists, summary judgment should be denied "even if no opposing evidentiary matter is presented." *Id.* Once the moving party with the burden of proof makes a showing that there is no genuine factual issue, that party is entitled to summary judgment "unless the non-moving party comes forward with probative evidence that would demonstrate the existence of a triable issue of fact." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003); *see Celotex*, 477 U.S. at 322–23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### III.    Motions for Summary Judgment on the CFAA Claims

Ryanair has four pending claims under the CFAA:

Count I alleges that all defendants violated section 1030(a)(2)(C), which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected computer."

Count II alleges that all defendants violated section 1030(a)(4), which prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."

Count IV alleges that all defendants violated section 1030(a)(5)(B) and (C): section 1030(a)(5)(B) prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage"; and section 1030(a)(5)(C) prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage and loss."

Count V alleges that all defendants violated section 1030(b), which prohibits conspiring or attempting to commit a violation of any of the other provisions of section 1030(a).

Appx32

Ryanair argues that the court should enter summary judgment against defendants Booking.com and KAYAK on counts I and IV on the ground that the evidence conclusively establishes each element of those violations.

For their part, the defendants contend that the court should enter summary judgment against Ryanair on all four counts, for several reasons. With respect to all four counts, the defendants argue: (1) that they have not accessed Ryanair's website in violation of the CFAA; (2) that they are not vicariously liable for the acts of the third-party vendors who have accessed Ryanair's website; (3) that Ryanair cannot establish that the defendants' third-party vendors have accessed Ryanair's website "without authorization," or "in excess of authorization," as required by various paragraphs of subsection 1030(a) of the CFAA; and (4) that Ryanair cannot establish that the defendants have caused $5,000 or more of "loss" to Ryanair in any one-year period, as required by subsection 1030(g) of the CFAA. Regarding Count V, the defendants argue that there is no evidence to support Ryanair's allegation that the defendants are parties to a conspiracy to violate the CFAA, in violation of subsection 1030(b) of the CFAA. And with regard to Count II, the defendants argue that there is no evidence that they had knowing access to information protected by the CFAA or that they acted any point with the intent to defraud in violation of paragraph (4) of subsection 1030(a) of the CFAA.

### A. Without Authorization

A critical question regarding the scope of liability under the CFAA is the meaning of the term "without authorization," which appears in several provisions of the statute, including the provisions asserted against the defendants in this case. While determining the meaning of that term might appear to be straightforward, that turns out not to be the case. The Supreme Court addressed the meaning of "authorization" in *Van Buren v. United States*, 593 U.S. 374 (2021), but

even with the benefit of the Supreme Court's guidance in that case, the lower courts have continued to wrestle with the issue.

I addressed the CFAA's conception of authorization in some detail in my order on the defendants' motion to dismiss. *See* Dkt. No. 105 at 21–25. As I explained there, *Van Buren* and its progeny make clear that for an intrusion into a website to be deemed "without authorization," some sort of authentication mechanism (such as the use of a username and password) must be employed to limit access to the website or to a pertinent portion of the website. If the information on the website is publicly available, i.e., if it is not protected by some such authentication mechanism, accessing the website does not violate the statute, even if the access is contrary to the website owner's terms of use governing access to the website or in defiance of a specific directive from the website owner, such as a cease-and-desist letter. *Id.* at 23–24.

Even with that much settled, the parties disagree about how those principles apply to the facts of this case. Ryanair argues that the defendants are not authorized to access any portion of the Ryanair website because Ryanair has erected barriers to access such that the defendants' activities on the Ryanair website are "without authorization" within the meaning of the CFAA. In the alternative, Ryanair argues that the defendants have either acted without authorization or have exceeded the scope of their authorized access to the Ryanair website by accessing the myRyanair portion of the website, which requires the user to open an account and select a password in order to gain access. Dkt. No. 348 at 21–25. The defendants respond that the Ryanair website in its entirety, including the myRyanair portion of the website, is open to the public and that by accessing the website, even against Ryanair's wishes, they are not acting "without authorization" or by "exceed[ing] authorized access." For that reason, the defendants contend that they cannot be held liable for violating any provision of the CFAA. Dkt. No. 335 at 24–27.

### i. The Ryanair Website

Ryanair first argues that the defendants are not authorized to access any portion of the Ryanair website because Ryanair has sent cease-and-desist letters to the defendants directing them to stop their screen-scraping activities, and because Ryanair's "Shield" program is designed to block the defendants' bots from gaining access to the website.[1]   Ryanair points to five "endpoints" at which Shield prevents access by unauthorized users.  First, when a user initially accesses the website, Shield determines whether the user's IP address is on Shield's blacklist; if it is, Shield blocks the user's access.  Second, if a user makes too many requests during a certain time period, Shield will determine that the user is likely a bot and will terminate the user's access to the website.  Third and fourth, if a user consistently follows the same pattern of behavior during a timeframe as it relates to accessing a flight or selecting a seat (including retrieving data about seat information), Shield will cease providing the user with full website access.  Fifth, at the point of payment, Shield analyzes the user's activity and IP address, and either permits or terminates the user's access to the website based on that analysis.   *See* Dkt. No. 348 at 22–23.  Ryanair argues that by circumventing these authentication mechanisms, the defendants have accessed the website without authorization.

The defendants do not dispute Ryanair's characterization of how Shield operates.  Rather, they argue that Ryanair's website is open to the public and that access to the website does not require authorization.  Because no authorization is required to access a public website, the defendants contend that any efforts by the website owner to prevent particular users from accessing

---

[1]  The defendants note that for the most part they do not directly access the Ryanair website. Because access to the website is principally done by their contracting partners and others, the defendants contend that they are not liable under the CFAA, either directly or vicariously.  I address that argument below. For the purpose of the "without authorization" argument, however, I will assume that the contractors' acts are attributable to the defendants.

Appx35

such a website "are *bans* of particular users, not authentication mechanisms required to create an authorization framework subject to the CFAA."  Dkt. No. 371 at 18.  As such, the defendants contend, employing technological measures to block specific users or suspicious activity "does not create an 'authorization' framework absent authentication in the first place."  *Id.* at 22.  Instead, the defendants argue, there must be an affirmative "code-based authorization framework" to trigger CFAA liability; if a website is open to the public, it is not enough that the website owner purports to create an access restriction through a contractual agreement or term of service.  *Id.* at 23.

It is undisputed that any member of the public can freely access the general Ryanair website unless the user's IP address is on Shield's blacklist or the user fails at a Shield endpoint based on the user's behavior, i.e., if Shield identifies the user's behavior as "bot-like."  For that reason, whether the user's access is "without authorization" turns on whether Shield's endpoint tests and its blacklist are properly viewed as authentication mechanisms that grant qualifying users access to a private website, as opposed to devices that selectively ban users from a website that is generally open to the public.

The Supreme Court in *Van Buren* used a "gates-up-or-down" metaphor in its analysis of the terms "without authorization" and "exceeds authorized access" in the CFAA.  593 U.S. at 390.  As the Court explained, "one either can or cannot access a computer system, and one either can or cannot access certain areas within the system."  *Id.*  As such, the Court rejected the dissent's contention that "authorization" within the meaning of the CFAA requires "a circumstance-specific analysis."  *Id.* at 391 n.10.

Applying the "gates-up-or-down" metaphor used by the Court in *Van Buren*, the Ninth Circuit in *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), held that a publicly

available webpage has "no gates to lift or lower in the first place," so the concept of access that is without authorization "does not apply to public websites." *Id.* at 1199. The court explained that "[a]uthorization is an affirmative notion, indicating that access is restricted to those specially recognized or admitted." *Id.* at 1195–96. On a publicly available website where "the default is free access without authorization," the court noted, the selective denial of access to some users is best characterized as a ban, not the absence of authorization. *Id.* at 1196.

The facts of *hiQ* are similar to the facts of this case, as applied to the general Ryanair website. The issue in *hiQ* was whether LinkedIn, the professional networking website, could prevent a competitor, hiQ Labs, from collecting and using information that LinkedIn users had shared on their public profiles displayed on LinkedIn's website. Like Ryanair, LinkedIn sent a cease-and-desist letter to hiQ and used anti-bot measures to prevent hiQ from scraping data from LinkedIn's website. The dispute ultimately resulted in litigation. Among the issues before the court was whether hiQ's further scraping and use of LinkedIn's data was "without authorization" within the meaning of the CFAA.

The court viewed the relevant statutory phrase "accesses a computer without authorization" to suggest "a baseline in which access is not generally available and so permission is ordinarily required." *Id.* at 1195. By contrast, the court explained, "[w]here the default is free access without authorization, in ordinary parlance one would characterize selective denial of access as a ban, not as a lack of 'authorization.'" *Id.* at 1196. Again invoking the "gates-up-or-down" metaphor from *Van Buren*, the *hiQ Labs* court concluded that in the case of computers that are not open to the general public, the gates are either up or down depending on whether authorization for access has been given to a particular user. In the case of a computer hosting publicly available webpages,

10

Appx37

however, the court concluded that the "computer has erected no gates to lift or lower in the first place," so that "the concept of 'without authorization' does not apply." *Id.* at 1199.

Based on that analysis, the court in *hiQ Labs* rejected LinkedIn's argument that its anti-bot technological measures meant that its websites were not open to the general public. Instead, the court stated that it was likely that "when a computer network generally permits public access to its data, a user's accessing that publicly available data will not constitute access without authorization under the CFAA." *Id.* at 1201. The court therefore found that LinkedIn's public profiles (i.e., profiles that are visible to a user without the need for the user to be logged in to LinkedIn) do not fall within the reach of the CFAA. *Id.*; *see also Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1262 (N.D. Cal. 2022) ("Where a website is made available to the public without any authentication requirement at least in the first instance, the concept of 'without authorization' does not apply, even if the owner employs technological measures to block specific users, suspicious activity, or—as here—repeated access beyond a particular threshold.") (cleaned up)).

Ryanair urges this court not to adopt the Ninth Circuit's approach in *hiQ Labs*, arguing that the court in *hiQ Labs* construed the CFAA too narrowly and that *hiQ Labs* can be disregarded as an "out-of-circuit" case. Dkt. No. 380 at 8. But the Ninth Circuit's thorough analysis in *hiQ Labs* is convincing, and it is consistent the Supreme Court's treatment of the CFAA in *Van Buren*. Ryanair points to no contrary appellate authority, and instead relies on a district court decision, *CouponCabin LLC v. Savings.com, Inc.*, No. 2:14-CV-39, 2016 WL 3181826 (N.D. Ind. June 8, 2016), which predated both *Van Buren* and *hiQ Labs*. The court in *CouponCabin* defined "without authorization" to mean acting "without formal permission or approval." *Id.* at *3. That court's analysis diverged from the Ninth Circuit's by concluding that a plaintiff can render a user's access

11

to a public website "without authorization" by notification or by implementing technological measures to block the user. *Id.* at *4.

The legislative history of the CFAA favors the Ninth Circuit's narrower interpretation of the term "authorization." The Ninth Circuit helpfully summarized that history:

> We . . . look to whether the conduct at issue is analogous to "breaking and entering." H.R. Rep. No. 98-894, at 20. Significantly, the version of the CFAA initially enacted in 1984 was limited to a narrow range of computers—namely, those containing national security information or financial data and those operated by or on behalf of the government. *See* Counterfeit Access Device and Computer Fraud and Abuse Act of 1984, Pub. L. No. 98-473, § 2102, 98 Stat. 2190, 2190–91. None of the computers to which the CFAA initially applied were accessible to the general public; affirmative authorization of some kind was presumptively required.
>
> When section 1030(a)(2)(C) was added in 1996 to extend the prohibition on unauthorized access to any "protected computer," the Senate Judiciary Committee explained that the amendment was designed "to increase protection for the privacy and confidentiality of computer information." S. Rep. No. 104-357, at 7. The legislative history of section 1030 thus makes clear that the prohibition on unauthorized access is properly understood to apply only to private information— information delineated as private through use of a permission requirement of some sort.

*hiQ Labs*, 31 F. 4th at 1197 (footnote omitted).

At the end of the day, the Ninth Circuit concluded that a business cannot transform a public website into a private one for purposes of the CFAA by implementing a ban on some users based on their perceived use of the website for commercial gain. The court added that the rule of lenity that applies in interpreting criminal statutes favors a narrower interpretation of the term "without authorization," considering that "[t]he statutory prohibition on unauthorized access [applies] both to civil actions and to criminal prosecutions." *Id.* at 1200; *see also Meta Platforms*, 605 F. Supp. 3d at 1260.

Ryanair argues that the Ninth Circuit's interpretation of the CFAA in *hiQ Labs* is inconsistent with other provisions of the statute. In particular, Ryanair argues that the suggestion that authorization means that "access is restricted to those specially recognized or admitted" is at

12

odds with the proposition that attacks designed to disrupt another computer violate section 1030(a)(5)(A) because "the perpetrators of [such] attacks are never specially recognized or admitted to carry them out, yet they access a protected computer nonetheless." Dkt. No. 380 at 9.

Those propositions are not incompatible. A defendant violates section 1030(a)(5)(A) when he "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." That offense can be committed regardless of whether the defendant was authorized to access the targeted computer. What matters for purposes of section 1030(a)(5)(A) is whether the defendant was authorized to commit one of the specified acts that damaged the protected computer.

Ryanair contends that its Shield program is an affirmative authorization mechanism because Shield monitors every user of Ryanair's website to determine whether the user is authorized based on the user's "Shield score." Dkt. No. 380 at 9 (citing Declaration of John Hemann ("Hemann Decl."), Dkt. No. 343, Exh. 5 at 33:18-35:19; Hemann Decl. Ex. 26 at 83, 91-92; Declaration of Anthony J. Fuga ("Fuga Decl."), Dkt. No. 349, Exh. 5 at 74:27-79:2). That evidence, however, merely confirms that the Ryanair website is open to the public, and that Shield functions not to authenticate qualified users, but to selectively ban users that are perceived as not complying with the terms of use for the Ryanair website.

A decision revoking access to the website for noncompliance with the website's terms of use does not transform the website into a private page under the *hiQ Labs* framework. The defendants are therefore correct that any user can access any page on Ryanair's website without any prior authorization (except for the final payment page of the myRyanair portion of the website). In sum, the defendants' access to the Ryanair website is not "without authorization" as that term is used in the CFAA.

In the following section, I address the authentication argument as it relates to the myRyanair portion of Ryanair's website.

### ii.   The MyRyanair Portion of the Ryanair Website

Ryanair argues that even if the defendants were not guilty of accessing a protected computer without authorization when they accessed the public Ryanair website, they were guilty of accessing a protected computer without authorization when they gained entry to myRyanair, the private, password-protected portion of the Ryanair website.[2]

Access to myRyanair is required to book a Ryanair flight. *See* Declaration of Iain Lopata ("Lopata Decl."), Dkt No. 350 ¶ 16(c)(iii).  Unlike the rest of the Ryanair website, access to the payment page of the myRyanair portion of the website is limited to those who create an account, select a password, and confirm that they have access to the email address associated with their account.[3]  In contending that users must be authorized to gain access to the myRyanair website, Ryanair points to what it refers to as two CFAA "gates" that authenticate a user entering the myRyanair portion of the Ryanair website: (1) the requirement to create an account and (2) the requirement that the user log in with a user-selected password.  Dkt. No. 348 at 24–25.  Account creation involves two hurdles: Ryanair blacklists email domains associated with OTAs and requires verification of the email address used to register, in order to confirm that the user has

---

[2]  Ryanair argues that the defendants' obtaining access to the myRyanair portion of the Ryanair website constitutes "exceed[ing] authorized access" as well as acting "without authorization."  Because myRyanair is effectively a separate website, access to the myRyanair portion of the Ryanair website is best analyzed under the "without authorization" provision of the CFAA.  In addition, the statute's definition of "exceeds authorized access" requires that the access be used "to obtain or alter information in the computer," 18 U.S.C. § 1030(6), a requirement that is not clearly met in this case.

[3]  If the user creates an account through Facebook, Google, or PayPal, as is permitted by the myRyanair website, the email and password associated with the user's account with one of those sources will provide the email and password required to enter the myRyanair payment page.

access to that account.  *See* Dkt. No. 348 at 24.  Ryanair argues that the account creation, e-mail confirmation, and login requirements are all affirmative methods of authenticating authorized human users and allowing only human users to access the myRyanair portion of the website.[4]

The defendants do not dispute that Ryanair employs those means of enforcing its policy against allowing access to the myRyanair payment page by OTA bots.  Instead, they argue that none of those steps qualify as authentication or authorization measures.  Dkt. No. 372 at 26–29.  The defendants point out that access to a myRyanair account is generally available, in that any user can register by supplying an email address and password, or can bypass the process of providing an email and password by logging in with Facebook, Google, or PayPal credentials.  For that reason, the defendants contend, myRyanair, like the rest of the Ryanair website, is public and thus the concepts of "without authorization" or "exceeding authorized access" under the CFAA do not apply.  The defendants recognize Ryanair's email domain blacklist as a barrier to account creation but argue that the blacklist is only a ban rather than an authorization scheme.  Dkt. No. 372 at 29.

For purposes of the CFAA, the defendants argue that authentication "typically involves a pre-approved list of users that must confirm their identity to access a network."  Dkt. No. 335 at 26.  The defendants contrast myRyanair, for which a user registers by supplying an email address and password, with Ryanair's company intranet, which requires a username and password issued

---

[4]  Ryanair represents that it recently added a new account verification procedure, which requires customers to provide personal identification to verify that the account holder is who he says he is.  Ryanair argued in its briefing that its new account verification procedure is an affirmative method of authenticating human users.  In support of its description of the new procedure, Ryanair cited a press release from December 2023.  At the hearing on the summary judgment motions, Ryanair conceded that this measure was not in force during the relevant period of this lawsuit.  The legal effect of that new verification mechanism is therefore not at issue in this proceeding.

by Ryanair to its employees, who can access the system only with Ryanair's express approval. The defendants argue that only the latter type of authentication mechanism is sufficient to convert what would otherwise be a public website into a private one that would be covered by the "without authorization" or "exceeds authorized access" provisions of the CFAA.

The defendants' characterization of what is required to render a portion of a website "private" is too restrictive. Password-protected systems in which users are free to gain access by signing up for an account and selecting their own passwords could be characterized as quasi-private, in contrast to fully private password-protected systems in which users are assigned a password only after being individually vetted by the website owner. The defendants argue that if a member of the public can create an account and select a password without prior vetting by the website owner, that scenario is not meaningfully different from one in which the member of the public is granted access to the website without creating an account or selecting a password at all.

In fact, however, there is a significant difference between those two scenarios, and the difference bears on whether the access in the second scenario is regarded as unauthorized. When a party is required to create an account and select a password, the website owner potentially has more control over whether to admit the party, particularly if the website owner conditions creation of the account on some kind of verification process, such as Ryanair's requirement of email confirmation. It may be that the verification process is not infallible, but that is merely to say that the party seeking access may be able to obtain unauthorized access by some form of dissembling regarding its identity.

Professor Orin S. Kerr, in his insightful article *Norms of Computer Trespass*, notes that there is a "subtle distinction" between circumventing an IP address ban, which in his view does not violate the CFAA, and a regime in which the computer owner requires an account to access a

16

Appx43

computer and then bans that account. In that setting, he argues, circumventing the ban might not be authorized if the context can be interpreted as a complete ban. He explains the difference: "By creating the access control of an account regime, the computer owner takes control of who can access it by making individualized decisions about specific accounts." 116 COLUM. L. REV. 1143, 1177 (2016).

That analysis is consistent with the way courts have interpreted the CFAA. For instance, the court in *Meta Platforms v. BrandTotal Ltd.* granted summary judgment to plaintiff Meta that defendant BrandTotal violated the CFAA when it accessed password-protected areas of Meta's platforms by purchasing or creating Facebook accounts. 605 F. Supp. 3d at 1268. Meta's platforms, like myRyanair's, are not like private intranet pages limited to employees or other designated groups of users. Instead, they are generally open to members of the public, allowing users to register with their own email addresses and passwords.

Similarly, in *hiQ Labs*, the court distinguished hiQ's scraping of public profiles on LinkedIn from the procedure at issue in *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), in which the defendant gathered information from pages that required a Facebook username and password to obtain access. 31 F.4th at 1199. The court viewed the scraping of public profiles as outside of the "authorization" framework of the CFAA. But the court regarded the username and password requirements as constituting authorization and thus triggering liability under the CFAA when Facebook explicitly revoked authorization.

Reading the Ninth Circuit's decisions in *hiQ Labs* and *Power Ventures* together suggests that the Ninth Circuit regards fully private and quasi-private websites as both being protected by the "without authorization" and "exceeds authorized access" provisions of the CFAA, as opposed to websites that are fully open to the public, which are not subject to those protections. In *hiQ*

Appx44

*Labs*, the court characterized *Power Ventures* as a case in which "Power Ventures was gathering user data that was protected by Facebook's username and password authentication system," whereas "the data hiQ was scraping was available to anyone with a web browser." 31 F.4th at 1199. On those facts, the court characterized *Power Ventures* as a case in which "authorization is generally required and has either never been given or has been revoked," whereas in *hiQ Labs*, the information at issue was "presumptively open to all comers." *Id.* Applying that distinction, the password and account creation mechanism used for allowing access to the myRyanair portion of the Ryanair website falls on the *Power Ventures* side of the line.

In another case involving Meta, the court again differentiated between screen scraping data that was publicly available (i.e., that did not require being logged into a Meta platform) and "data behind a log-in screen that is, e.g., password protected." *Meta Platforms, Inc. v. Bright Data Ltd.*, No. 23-CV-00077, 2024 WL 251406, at *5 (N.D. Cal. Jan. 23, 2024).[5] As in the present case, both platforms—Facebook and Instagram—allowed users to register by providing their own emails and passwords. *Id.* at *1. The court specifically differentiated programs designed to defeat screen-scraping mechanisms, such as a CAPTCHA,[6] on an otherwise publicly available website (i.e., where no log-in was required) from a password barrier to a portion of the website. The court concluded that there was a "pivotal" difference between "using CAPTCHA to block automated scraping of public information" and "scraping behind a log-in screen." *Id.* at *7. There, as here, bot-prevention mechanisms on a public website did not transform the public website into a private one. However, by putting a portion of the website (here, the option to check out) behind a log-in

---

[5] *Bright Data* involved a breach of contract action, not a CFAA action, but it applied a similar "gates-up-or-down" analysis, relying on CFAA case law. *Id.* at *7.

[6] CAPTCHA stands for "Completely Automated Public Turing test to tell Computers and Humans Apart." As the name suggests, such mechanisms are used to differentiate human users from "bots."

mechanism, the website owner limits that portion of its website to those users that it allows to log in.

The defendants are also incorrect in contending that the myRyanair portion of the Ryanair website cannot be private because it does not contain confidential information other than the credit card information that a user inputs. The CFAA is not limited to the protection of private information. While section 1030(a)(2) of the CFAA protects against unauthorized access that results in the intruder obtaining information from a protected computer, other paragraphs of section 1030(a) prohibit unauthorized access without regard to whether the access results in obtaining information.[7]  For example, section 1030(a)(4) prohibits unauthorized access with intent to defraud, where the intruder "obtains anything of value," and section 1030(a)(5) prohibits unauthorized access resulting in damage or loss.

Accessing the payment page of the myRyanair portion of the Ryanair website requires authorization. That is, the myRyanair portion of the website uses an authorization scheme that permits some users to create accounts but blocks others. Accessing that portion of the myRyanair website depends on the user being permitted to create an account and then passing a password gate based on having an account. As I noted in my order denying the defendants' motion to dismiss, cease-and-desist letters can withdraw authorization to access a protected portion of a website when an authentication mechanism protects access to that portion of the website. Dkt. No. 105 at 24–

---

[7] The defendants rely on a statement from the Ninth Circuit's decision in *hiQ Labs* to support their contention that unauthorized access applies only to "private information." *See* Dkt. No. 372 at 21. However, the Ninth Circuit made that statement—that "the prohibition on unauthorized access is properly understood to apply only to private information"—in the context of a discussion of section 1030(a)(2)(c), which requires obtaining information from a protected computer. *See hiQ Labs*, 31 F.3d at 1197. Moreover, the *hiQ Labs* court made clear that information is made private "through use of a permission requirement of some sort." *Id.*  In this case, Ryanair makes the checkout process private through use of a permission requirement, and it is the access to a private portion of the website (not private information) that is at issue.

25; *see Facebook*, 844 F.3d at 1199.  Accordingly, if the defendants accessed the password-protected portion of the myRyanair website after Ryanair issued cease-and-desist letters to them, they could be found liable for accessing myRyanair "without authorization" within the meaning of 18 U.S.C. § 1030(a).[8]  Summary judgment cannot be granted to Ryanair on that issue, however, because factual issues remain as to whether the defendants have accessed the password-protected portion of Ryanair's website, either directly or vicariously, issues that are separately addressed below.

With respect to the defendants' motion for summary judgment, the above discussion leads to the conclusion that any violation of section 1030 would be limited to the unauthorized access to the portion of the myRyanair website that is password protected and requires a user account to access, that is, the payment page of the myRyanair website.  As noted, there is no information on that page other than the information input by the user, such as credit card numbers or the like.  Therefore, the defendants cannot be held liable for a violation of section 1030(a)(2), which requires not only a showing of unlawful access, but also a showing that the unlawful access resulted in obtaining information from a protected computer.  *See* 18 U.S.C. § 1030(a)(2)(C).  For that reason, summary judgment is granted to the defendants on Count I of the complaint.  In addition, summary judgment is granted to the defendants on Ryanair's conspiracy claim, Count V of the complaint,

---

[8] That outcome would follow even when the defendants successfully created accounts by using emails that were not on the Ryanair's email domain blacklist.  Accounts that are successfully created using email addresses that are not on Ryanair's email domain blacklist and successfully verified through Ryanair's email verification systems are initially made with authorization, in that they are authenticated by Ryanair's two authentication mechanisms.  However, after the defendants received cease-and-desist letters, they no longer had authorization to make or use accounts even with emails that are not on the email domain blacklist, because Ryanair could properly revoke authorization to make any account.  *See* Kerr, *Norms of Computer Trespass*, 116 COLUM. L. REV. at 1177 ("[I]f the computer owner requires an account to access a computer and then bans the account, circumventing that ban might not be authorized if the context can be interpreted as a complete ban."); *see also hiQ Labs*, 31 F.4th at 1199.

to the extent that Ryanair relies on the offense set forth in Count I as the offense underlying the conspiracy.

### B. Loss

Proof of unauthorized access alone is not enough to support a claim for relief in a private civil action under section 1030. Instead, to sustain any civil claim under the CFAA, a plaintiff must also show that it has "suffer[ed] damage or loss by reason of a violation" of the CFAA. 18 U.S.C. § 1030(g).[9] The nature of qualifying damage or loss is further confined to the types of losses set forth in subclauses I through V of section 1030(c)(4)(A)(i). *Id.* The parties agree that the only relevant factor among those subclauses is the first factor, which requires a showing that the CFAA offense caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."

A "loss" within the meaning of the CFAA is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." *Id.* § 1030(e)(11).

In the portion of its motion for summary judgment directed to the issue of loss, Ryanair argues that it has established that both Booking.com and KAYAK have caused Ryanair to suffer losses of more than $5,000 from their screen-scraping activities on the Ryanair website. Dkt No. 348 at 8–16.[10] Ryanair claims a number of expenses as "losses" within the meaning of the CFAA.

---

[9] Only Ryanair's section 1030(a)(5)(B) and (C) claim (Count IV) requires a showing of both damage *and* loss.

[10] Ryanair does not argue it has suffered more than $5,000 in a single year as a result of the activities of the other defendants.

21

Appx48

Those claimed losses include the costs associated with a number of measures Ryanair has employed to try to prevent the defendants and other OTAs from obtaining flight and fare information from Ryanair's website and using it to sell Ryanair tickets to customers. Those expenses include the costs of creating and maintaining technological measures to identify and respond to the defendants' use of automated programs. Such costs, according to Ryanair, include the costs of creating and maintaining the Shield program to detect and blacklist the bots that are used to obtain information and book tickets on Ryanair's website; the costs associated with employing persons to minimize the use of screen-scraping; and the costs of other programs designed to discourage or prevent OTAs from using bots to obtain information from Ryanair's website.

In addition, Ryanair has listed as losses the costs of scaling up its website infrastructure to prevent slowdowns that would otherwise result from the large amount of bot traffic experienced by the Ryanair website. Those costs, according to Ryanair, include the costs of additional servers for making and storing bookings and the costs of creating and maintaining the password-protected portion of myRyanair.

Finally, Ryanair points to the costs of customer verification procedures designed to ensure data integrity relating to customer email and payment methods. Those costs include the costs associated with retaining customer service agents and conducting online customer certification and in-person customer verification.

Ryanair allocates a percentage of the costs of the above measures to Booking.com and KAYAK based on the percentage of bot activity or bookings that Ryanair attributes to each defendant.

In their motion for summary judgment, the defendants argue that for three reasons, Ryanair cannot establish that any violation of section 1030 by any defendant has caused at least $5,000 in losses in any single year. First, the defendants argue that the losses Ryanair cites are attributable to standard website security measures and do not qualify as losses under the CFAA. According to the defendants, a "loss" within the meaning of the CFAA does not include preemptive measures taken to avoid perceived or anticipated problems. Second, the defendants argue that Ryanair has not shown that the defendants have caused any technological harms of the sort that qualify as "losses" under the CFAA. Third, the defendants argue that Ryanair cannot attribute its claimed losses to any one defendant, because it has no reliable allocation methodology. Dkt. No. 335 at 28–35.

### i.  Losses from investigating and responding to offenses

The parties dispute whether Ryanair can include the costs of securing its websites from the defendants' bots as "losses" under the CFAA. Ryanair argues that measures taken to investigate bot activity, assess damages caused by such bots, and respond to detected bot activity are properly included as losses under the CFAA as part of the reasonable costs of responding to an offense. Dkt. No. 348 at 9–11 (citing *United States v. Nosal*, No. CR-08-0237, 2014 WL 121519, at *5 (N.D. Cal. Jan. 13, 2014); *United States v. Middleton*, 231 F.3d 1207, 1213-14 (9th Cir. 2000); *Zap Cellular, Inc. v. Weintraub*, No. 15-CV-6723, 2022 WL 4325746, at *12 (E.D.N.Y. Sept. 19, 2022)).

The defendants respond that a qualifying "loss" must result from technological harm and that Ryanair has not shown any such harm. Dkt. No. 335 at 27 (citing *Van Buren,* 593 U.S. at 391–92). Rather, the defendants argue, Ryanair's claims of loss focus on preemptive measures designed to prevent technological harm, such as measures to prevent the Ryanair website from

23

Appx50

crashing. According to the defendants, those measures cannot be counted as "losses" for purposes of the CFAA, because such measures are prophylactic in nature and are not the results of technical harm to a computer, such as the costs of replacing computer components or reconstituting a database. Dkt. No. 335 at 27–28 (citing *Middleton*, 231 F.3d at 1213; *Univ. Sports Publ'ns Co. v. Playmakers Media Co.*, 725 F. Supp. 2d 378, 388 (S.D.N.Y. 2010); *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013); *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 641 (S.D.N.Y. 2011), *on reconsideration*, 2011 WL 5121068 (S.D.N.Y. Oct. 28, 2011); *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 474 (S.D.N.Y. 2004), *aff'd*, 166 F. App'x 559 (2d Cir. 2006)).

Prior to *Van Buren*, courts were divided over whether the "cost of responding to an offense" includes the cost of investigating a violation of the CFAA in which a plaintiff does not show that a computer was damaged or that service was interrupted. *Compare Harley Auto. Grp., Inc. v. AP Supply, Inc.*, No. CIV. 12-1110, 2013 WL 6801221, at *6 (D. Minn. Dec. 23, 2013) (CFAA loss requirement is restricted to "actual computer impairment.") (collecting cases); *Jarosch v. Am. Fam. Mut. Ins. Co.*, 837 F. Supp. 2d 980, 1022 (E.D. Wis. 2011) ("costs that are not related to the impairment or damage to a computer or computer system are not cognizable losses under the CFAA"); *Civic Ctr. Motors, Ltd. v. Mason St. Imp. Cars, Ltd.*, 387 F. Supp. 2d 378, 382 (S.D.N.Y. 2005) ("[C]osts not related to computer impairment or computer damages are not compensable under the CFAA."); *Fink*, 810 F. Supp. 2d at 641 (same); *and Nexans Wires S.A.*, 319 F. Supp. 2d at 474–75 (same), *with Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073–74 (6th Cir. 2014) (treating the costs of investigating unauthorized access to a private website as "loss" under the CFAA); *A.V. ex rel. Vanderhye v. iParadigms*, LLC, 562 F.3d 630, 646 (4th Cir. 2009) (finding the reasonable cost of responding to an offense includes "the

24

Case 1:20-cv-01191-WCB    Document 399 *SEALED*    Filed 06/17/24    Page 25 of 103 PageID #: 14350

investigation of an offense"); *Nosal*, 2014 WL 121519, at *5–6 (concluding loss does not require "actual damage to a computer system or data"); *and Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) ("Costs associated with investigating intrusions into a computer network and taking subsequent remedial measures are losses within the meaning of the statute.").

In *Van Buren v. United States*, the Supreme Court did not squarely address this issue. However, the Court stated that "[t]he statutory definitions of 'damage' and 'loss' . . . focus on technological harms—such as the corruption of files—of the type that unauthorized users can cause to computer systems and data. Limiting 'damage' and 'loss' in this way makes sense in a scheme 'aimed at preventing the typical consequences of hacking.'" 593 U.S. at 391–92 (citation omitted).

Several courts that have addressed the scope of the phrase "cost of responding to an offense" since *Van Buren* have held, based on that language, that a plaintiff cannot rely on the costs of investigating a CFAA violation as constituting a statutory "loss" without showing actual damage to a protected computer or database. *See hiQ Labs*, 31 F.4th at 1195 n.12 (interpreting *Van Buren* as having concluded that the civil remedies section of the CFAA "requires a showing" of technological harm); *Pinebrook Holdings, LLC v. Narup*, No. 4:19-CV-1562, 2022 WL 1773057, at *11 n.17 (E.D. Mo. June 1, 2022); *see also ACI Payments, Inc. v. Conservice, LLC*, No. 121CV00084, 2022 WL 622214, at *12 & n.135 (D. Utah Mar. 3, 2022) (noting a trend towards a restrictive reading of the CFAA, but not deciding which approach applies in that case).

In *Better Holdco, Inc. v. Beeline Loans, Inc.*, for example, the plaintiff alleged that the defendant's employee improperly accessed and downloaded information from the plaintiff's protected computer in violation of the CFAA. No. 20-CV-8686, 2021 WL 3173736, at *3 (S.D.N.Y. July 26, 2021). The plaintiff alleged that it had spent more than $5,000 "responding to"

the CFAA violation. The court, however, interpreted the passage from *Van Buren* discussing the term "loss" to mean that the "cost of responding to an offense" is limited to cases "involving damage to or impairment of the protected computer." *Id.* at *3–4. Because the plaintiff had not alleged that the computer "was damaged or required remediation," the court held that the plaintiff had not stated a claim under the civil remedy provision of the CFAA. *Id.* at *3–4. Other courts in the Southern District of New York have followed *Better Holdco* in that respect. *See William Gottlieb Mgmt. Co., LLC v. Carlin*, No. 20-CIV-08907, 2024 WL 1311854, at *3 (S.D.N.Y. Mar. 26, 2024); *Socialedge, Inc. d/b/a CreatorIQ, v. Traackr, Inc.*, No. 23-CIV-6860, 2024 WL 1533624, at *6 (S.D.N.Y. Apr. 9, 2024).

District courts in other jurisdictions have adopted a broader interpretation of "loss" in the aftermath of *Van Buren*. *See Meta Platforms*, 605 F. Supp. 3d at 1265 (holding that *Van Buren* does not foreclose losses based on "investigative costs" where there has been a violation of the CFAA); *Vox Mktg. Grp. v. Prodigy Promos*, 556 F. Supp. 3d 1280, 1289 (D. Utah 2021) (treating the cost of auditing computers "to determine how Defendants obtained access to them and whether they were compromised in anyway by Defendants" as a "loss" under the CFAA).

Because a "loss" under the CFAA is defined to include "any reasonable cost to any victim, including the cost of responding to an offense," 18 U.S.C. § 1030(e)(8), the term "loss" is best understood to include the cost of an investigation following a CFAA violation, even in instances in which the violation has not resulted in actual impairment of the protected computer or loss of data. Not only is that interpretation faithful to the definition of "loss," but it is consistent with the statutory scheme as a whole, as illustrated by two examples.

First, the offense defined in section 1030(a)(2)(C) covers cases in which a defendant "intentionally accesses a computer without authorization or exceeds authorized access, and thereby

obtains . . . information from any protected computer." That offense does not require proof of actual harm to the protected computer or loss of data. Therefore, if the "cost of responding to" a violation of that provision applies to violations in which there has been no harm to a computer and no loss of data, the cost of responding would have to include incidental costs, such as the cost of investigating the intrusion.

Second, the CFAA contains a separate offense that requires proof that a defendant has "intentionally accesse[d] a protected computer without authorization, and as a result of such conduct, cause[d] damage and loss." 18 U.S.C. § 1030(a)(5)(C). Interpreting the term "loss" to require a plaintiff to show damage to the computer would make the reference to "damage" in the phrase "damage and loss" in that section superfluous.

In *Van Buren*, the Supreme Court drew a contrast between technological harms that are the "typical consequences of hacking" and the "misuse of sensitive information that employees may permissibly access using their computers." *Van Buren*, 593 U.S. at 392 (quotations omitted). The Court pointed to the corruption of computer files as an example of technological harm, but it did not suggest that other harms resulting from unlawful access to protected information would not qualify as "losses" within the meaning of the statute. *See Meta Platforms*, 605 F. Supp. 3d at 1265 ("There is no indication that the *Van Buren* Court would place investigative costs as falling outside the scope of 'the cost of responding to an offense' that the statute specifically incorporates."). Ryanair therefore may include the reasonable costs of investigating and responding to bot traffic by unauthorized users on non-public portions of its website as losses under the CFAA.[11]

---

[11] The defendants invoke *hiQ Labs* in support of their argument that measures designed to prevent screen scraping do not constitute technological harm and therefore cannot qualify as "losses" for purpose of the CFAA. But *hiQ Labs* held only that screen scraping public information does not qualify as a technological harm. The defendants argue that in that case the plaintiff had alleged that it employed various technological measures to prevent screen scraping and that the

To be sure, there are limits on what a plaintiff may include as the costs of responding to an offense. Because loss must be focused on technological harm, as the Supreme Court said in *Van Buren*, 593 U.S. at 392, the plaintiff may include investigative costs that are "reasonably necessary to respond to the offense, for example by identifying the perpetrator or the method by which the offender accessed the protected information." *Nosal*, 2014 WL 121519, at *5. However, a plaintiff may not include the costs of an investigation that is directed at business harms, such as the costs of investigating how a competitor used protected information obtained as a result of the CFAA violation. Additionally, a plaintiff may include the cost of resecuring its systems after an offense as a loss, but not the cost of measures that make its system more secure than it was before. *See Middleton*, 231 F.3d at 1213.

Applying those standards to Ryanair's various categories of claimed losses, the court concludes as follows:

**1. Shield Hosting Costs.** Shield is essentially a prophylactic measure designed to prevent screen scraping. Costs of such prophylactic measures are not remedial in nature and therefore do not qualify as "losses" within the meaning of the CFAA. To the extent that the facts at trial show that Shield prevents unauthorized bookings at the payment page after account creation, any portion of those costs allocable to each defendant may qualify as losses under the CFAA for purposes of satisfying the $5,000 threshold requirement for that defendant.

---

Ninth Circuit did not find the costs of such measures to constitute "losses" under the CFAA. However, the court did not hold that expenses attributable to an unauthorized invasion of a secured website or a secured portion of a website, as alleged in this case, could not constitute "losses" within the meaning of the CFAA.

28

**2. Shield Software Development Costs.**  Because a plaintiff cannot claim the cost of measures to make a system more secure than it was before as a loss, Ryanair may not include the costs of "developing and updating" Shield, *see* Dkt. 348 at 10, as a "loss" under the CFAA.

**3. Business Intelligence Employees.**  Ryanair attributes two primary roles to its business intelligence employees as related to this action: improving Shield and remedying the harms of bot activity.  *See* Fuga Decl. Exh. 15 at 235:6–235:11, 235:22–237:14.  For the same reason that it may not include software development costs as a "loss," Ryanair may not include as a "loss" the costs of its business intelligence employees related to developing and improving Shield.  However, contingent on proving that bot activity damages the integrity of its data, Ryanair may include the costs entailed in its business intelligence employees' activities relating to remedying the harms of bot activity.[12]

**4. New Relic.**  Ryanair may not include the costs associated with the New Relic software, because that software is used to monitor Ryanair's website, not specifically to respond to or investigate a violation of the CFAA.  *See* Fuga Decl. Exh. 5 at 135:4–16.

---

[12] The defendants argue in a footnote that Ryanair cannot substantiate the costs attributable to its business intelligence and customer service employees.  *See* Dkt. No. 335 at 33 n.21 (citing *Glob. Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 651–52 (E.D. Va. 2010).  In *Global Policy Partners*, the court held that employee time spent responding to an offense falls within the CFAA's definition of loss.  *Id.* at 651.  However, the court determined that there was no evidence supporting the assertion that an employee spent 50 hours investigating the alleged CFAA violation beyond conclusory statements that were "so vague that no reasonable jury could conclude that the expended time was reasonably necessary to restore or resecure the system."  *Id.* at 651–52.  By contrast, in the present case, Ryanair has produced evidence of the functions that the relevant employees perform and an explanation of how the amount of time spent addressing OTA issues was calculated.  *See* Declaration of Ji Mao ("Mao Decl."), Dkt. No. 377, Exh. 8 at 3–5; Fuga Decl. Exh. 6 at 28–30, 34–35, 37–38; Fuga Decl. Exh. 14 [Dkt. No. 349-6] at 16:14-19:2, 29:4-33:10.  The defendants may, of course, challenge the accuracy of Ryanair's calculations, but at this stage in the proceedings, they have not shown that there is an absence of evidence for those elements of Ryanair's costs.

**5. Cloudfront and Amazon Web Application Firewall ("AWS-WAF").** Ryanair may include the costs of Cloudfront and AWS-WAF to the extent that Ryanair can attribute those costs to denying unauthorized booking requests by the defendants. Because both Cloudfront and AWS-WAF have multiple purposes, Ryanair must be able to attribute costs specifically to unauthorized bot activity that violates the CFAA. *See* Fuga Decl. Exh. 5 at 132:6–20 and Fuga Decl. Exh. 15 at 100:10–17 (Cloudfront); Hemann Decl. Exh. 1 at 69:23–29 (Cloudfront); Fuga Decl. Exh. 15 at 38:20–39:11 (AWS-WAF); Hemann Decl. Exh. 1 at 66:13–14, 68:6–10 (AWS-WAF).

**6. Navitaire and myRyanair.** Ryanair may not include the costs of Navitaire, which provides servers for storing Ryanair bookings, nor the costs of maintaining myRyanair's infrastructure, because those costs are not related to responding to violations, unless the facts developed at trial show that the bot traffic attributable to the defendants has materially increased the cost of Ryanair's server infrastructure.

The defendants argue that the only possible technological harm in this case is the "Monex attack," an event that occurred in 2023 and which Ryanair blames on the defendants. *See* Dkt. No. 335 at 34–35. I address below the question whether the defendants are entitled to summary judgment that they are not liable for the Monex attack. Assuming that Ryanair has made a sufficient showing that the defendants are responsible, at least in part, for the Monex attack, the costs attached to that event would clearly qualify as a "loss" within the meaning of the CFAA, as the loss would be "technological" even under the narrowest interpretation of that term. Ultimately, for the reasons discussed below I conclude that whether a portion of the Monex attack can be attributed to the defendants and whether the Monex attack damaged Ryanair's systems are factual questions that are not suitable for resolution on summary judgment.

### ii.  Losses attributable to customer verification procedures

Ryanair argues that several costs of verifying customer information are compensable losses related to restoring data under the CFAA.  According to Ryanair, the defendants' bots use "fabricated payment methods, passenger personal information, and e-mail addresses when booking flights," resulting in what Ryanair characterizes as "corrupted data."  Dkt. No. 348 at 12.  Ryanair argues that in order to restore its data integrity it has implemented a variety of costly customer verification procedures.  Those measures include the use of customer service agents, an online customer verification procedure, an in-person customer verification procedure, and so-called "digital employees," who communicate with customers who book through OTAs, verify their information for the purpose of issuing refunds, and devise methods of limiting access to the Ryanair website by OTA bots.  Ryanair further argues that even if the information was not "fake," the costs to investigate its data integrity would be recognizable as a loss.  *Id.* at 13 (citing *Univ. Sports Publ'ns*, 725 F. Supp. 2d at 387).

The defendants argue that none of the costs of Ryanair's online or in-person verification processes constitute losses under the CFAA because they are not actions taken in response to any technological harm, but rather are "self-inflicted business processes" to deter the use of OTAs.  Dkt. No. 335 at 33.  In particular, the defendants dispute Ryanair's use of the term "corrupted" to refer to the data affected by OTA bookings, arguing that the term is misleading because the customer information is not corrupted, fake, or incorrect.  *Id.* at 33 n.23.  The defendants further dispute that any "fake" information is given to Ryanair, and that the even for bookings arranged by their vendors, Ryanair ultimately receives the passengers' correct email addresses.  Dkt. No. 372 at 33–34.  And even if the information was "incorrect," the defendants assert that the data was

not "corrupted" in the technical sense of that term, but rather is, at most, "lacking from a business analytics perspective." *Id.* at 6.

Genuine issues of material fact preclude summary judgment for either side on this issue. First, the question whether the OTA bookings affect the integrity of Ryanair's data turns on whether the bookings were unauthorized. If Ryanair is correct in its theory of the case, the unauthorized bookings affect Ryanair's data integrity because such bookings input information into Ryanair's database that never should have been there in the first place. Second, there is a question whether Ryanair's verification measures are directed at data integrity or were simply a business practice designed to discourage the use of OTAs is a contested factual issue. Third, whether the OTAs' customer details and payment methods are in fact "fake" is also contested. In fact, it is the basis of the counterclaims addressed *infra* section IV.A.

### iii. Ryanair's allocation method

The defendants argue that even if Ryanair's alleged losses are compensable under the CFAA, the court must enter summary judgment for the defendants because Ryanair cannot attribute $5,000 or more of loss in a single year to any defendant. Dkt. No. 335 at 35; Dkt. No. 372 at 8–9**.**

The defendants argue that Ryanair conceded this issue as it applies to defendants Agoda, Priceline, and BHI based on the report of Ryanair's expert, Iain Lopata. *See* Hemann Decl. Exh. 40 ¶¶ 161, 176–182. Ryanair responds that Mr. Lopata merely stated he could not calculate the percentage of OTA bookings attributed to those defendants. *See* Dkt. No. 376 at 31.

The defendants mischaracterize the report as a concession. In paragraph 161 of his report, Mr. Lopata concluded that if BHI is found liable for conspiring with the other defendants, BHI would be liable for at least the costs attributable to Booking.com. In paragraphs 176 through 182,

Mr. Lopata explained that he could not calculate the percentage of total OTA bookings attributable to either Agoda or Priceline because at that point he had not received information as to how many bookings had been made via the link-out method. That does not establish that, if Ryanair introduces evidence as to the number of bookings attributable to those defendants, Ryanair cannot allocate a pro-rata share of costs to those bookings.[13]

The defendants next argue that Ryanair cannot meet the $5,000 threshold even for defendants Booking.com and KAYAK because Ryanair includes costs associated with basic web security and business costs. This issue is addressed in the discussion of which costs Ryanair may include as losses above: Ryanair may include only the costs above and the defendants have not shown definitively that those costs will not add up to at least $5,000.

Finally, the defendants argue that Ryanair's expert Mr. Lopata used an unreliable method to attribute costs to the defendants because he failed to follow appropriate principles for calculating damages and failed to provide sufficient support for the calculation of percentages of OTA bookings attributable to each defendant. The defendants rely largely on their motion for the exclusion of Mr. Lopata's testimony to support this argument. In responding, Ryanair similarly relies on its response to that *Daubert* motion. This issue is addressed in greater detail, in section VI.A, *infra*. For the purposes of summary judgment on the issue of loss, however, it suffices to say that the defendants have not met their burden of showing that Ryanair will be unable to allocate permissible costs, as defined by the court, to each of the defendants by introducing evidence at trial as to the bookings that are attributable to each defendant.

---

[13] Ryanair argues in its response that all annual costs of Shield are attributable to each defendant individually. *See* Dkt. No. 376 at 31. This is incorrect; Ryanair must be able to apportion the chargeable costs of Shield to each defendant individually.

33

Appx60

In sum, while some of the costs that Ryanair describes as losses under the CFAA are beyond the statutory definition of "loss," other costs fall within that definition. Based on the record at present, the defendants have not shown that Ryanair will be unable to establish a loss of at least $5,000 attributable to each defendant. However, because Ryanair's loss calculations include some costs that are excluded by the CFAA and some of its listed costs are disputed, it is also the case that Ryanair has not established conclusively that defendants Booking.com and Kayak have each caused Ryanair at least $5,000 in losses in any one-year period. Accordingly, both parties' motions for summary judgment on the issue of loss are denied.

### C. Direct Liability

The defendants argue that none of the defendants are directly liable for any of the claimed CFAA violations because no defendant directly accesses Ryanair's website to obtain Ryanair flight information or to book Ryanair flights. Dkt. No. 335 at 17–18. Ryanair responds that at least KAYAK has admitted to accessing the Ryanair website without authorization to confirm the accuracy of flight information that its third-party vendors scrape from the website. Dkt. No. 376 at 7 (citing Mao Decl. Exh. 5 at 225:2-25). The defendants reply that KAYAK's "accuracy checks" do not violate the CFAA. Dkt. No. 378 at 2 n.2, 19 (citing Dkt. No. 343-16, Hemann Decl. Exh. 16 at 222:25- 223:25).

The parties agree that KAYAK accesses the Ryanair website to check the accuracy of flight information provided by its vendors. Accordingly, the resolution of this argument turns on the legal question of whether such access is "without authorization." Because KAYAK accesses only the Ryanair website, which the court finds is public, and not the myRyanair site, the court agrees with the defendants that Ryanair has not produced any evidence that the defendants, including

KAYAK, violate the CFAA through direct access to Ryanair's webpage.  The defendants are therefore entitled to summary judgment on the issue of direct liability.

### D.  Indirect Liability

The parties are in agreement as to many of the central facts underlying this issue.  The defendants do not dispute that they received cease-and-desist letters from Ryanair stating that Ryanair did not authorize the OTAs to sell Ryanair flights online.  *See* Dkt. No. 335 at 15–16.  The parties also agree that the defendants offer Ryanair flights on their platforms, and that the lists of flights are  provided to the defendants by the defendants' third-party vendors.  The defendants (other than BHI) also acknowledge that they contract with vendors to populate the defendants' websites with flight information that is ultimately used to book customers' flight itineraries.

In the case of Booking.com, the process of booking a flight is as follows:  When a customer searches for a flight itinerary on Booking.com, Booking.com passes the request automatically to its vendor, Etraveli.  Etraveli then automatically sends information back to Booking.com listing the flights that meet the customer's search criteria, including any Ryanair flights that may be applicable.  The customer then selects a flight and enters the payment details on the Booking.com site.  Booking.com then sends the customer's request and payment to Etraveli.  Etraveli then books the flight.  The customer never leaves Booking.com's website.  Declaration of Marcos Guerrero ("Guerrero Decl."), Dkt. No. 337, ¶¶ 5–7.  The process is similar for the other defendants and their vendors.

Based on those facts, Ryanair argues that the record conclusively establishes that Booking.com and KAYAK induce, direct, and encourage their vendors—and, for KAYAK only,

commercial partners[14]—to violate the CFAA by sending requests to their vendors to obtain flight information regarding Ryanair flights and to book the flights chosen by their customers. Ryanair argues that those requests can be fulfilled only by circumventing Ryanair's security measures, thereby violating the CFAA. Ryanair also points the court to one of its interrogatory responses in which Ryanair stated that it confirmed that the reservation numbers (referred to as passenger name records or PNRs) provided by the defendants were booked through the Ryanair website. Fuga Decl. Exh. 6 at 83.

The defendants, on the other hand, argue that the facts regarding the process by which information is gathered and flights are booked do not show that any defendant induces, directs, or encourages a third-party vendor to violate the CFAA. First, the defendants argue that the contracts between the defendants and their vendors foreclose indirect liability under the CFAA because those contracts either disclaim an agency relationship explicitly or have terms that specify that the vendor has the discretion to offer and book flights, a process that creates a contract between the customer and the vendor. *See* Hemann Decl. Exh. 49 at 2; Hemann Decl. Exh. 52 § 11.8; Hemann Decl. Exh. 51 at § 14.6, Schedule 2; Hemann Decl. Exh. 54 § 6.1.3; Hemann Decl. Exh. 55 § 6.1(g); Hemann Decl. Exh. 57 §§ 3.6, 10.4; Hemann Decl. Exhs. 56–65. Second, the defendants argue that there is no evidence that the defendants tell their vendors whether to obtain information or to book flights from the Ryanair website, let alone direct their vendors to access the website in a way that violates the CFAA. Third, the defendants argue that there is no evidence that their vendors actually access the Ryanair website.

---

[14] KAYAK enables both "facilitated bookings," which operate like the other defendants' bookings, and "Link-Out bookings," which are completed entirely on a third-party vendor's page. *See* Fuga Decl. Exh. 4 at 8–11. Thus, for Link-Out bookings, Ryanair argues that KAYAK induces, directs, and encourages its partners, not its vendors.

In their motion to dismiss on the pleadings, the defendants argued that there must be a formal agency relationship between the parties in order to create vicarious liability. In my order on that motion, I rejected that argument and held that the indirect or vicarious liability under section 1030(g) extends to parties who direct, encourage, or induce others to commit acts that violate the CFAA, regardless of whether the parties are in an agency relationship, or whether the defendants' vendors have explicitly agreed to obtain flight information by screen scraping Ryanair's website. *See* Dkt. No. 105 at 7–14. I continue to regard that formulation as stating the proper test for indirect or vicarious liability.

The defendants now argue that indirect liability attaches only if there is "purposeful, active influence by the defendant aimed at the specific computer access at issue—akin to, if not identical to, an agency relationship." Dkt. No. 335 at 19. In support of that standard, the defendants cite *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042 (N.D. Ill. 2019), and *Alchem Inc. v. Cage*, No. 2:20-CV-03142, 2021 WL 4902331 (E.D. Pa. Oct. 21, 2021), *vacated and remanded on other grounds*, 2022 WL 3043153 (3d Cir. Aug. 2, 2022)).

Neither of those cases requires such proof. In *Svanaco*, the court rejected a theory of secondary liability where the defendant's contractor launched a distributed-denial-of-service ("DDoS") attack against the plaintiff, and there was no evidence the contractor informed the defendant that he planned to take such action, let alone that he acted on direction from the defendant. 417 F. Supp. 3d at 1060. In *Alchem*, the court found that the defendant did not direct, encourage, or induce its employee to access the plaintiff's computer system without authorization. 2021 WL 4902331, at *7. The plaintiff in that case argued that the defendant induced one of its employees to violate the CFAA by paying her a commission on sales to new customers, but the

court found it unreasonable to infer that the defendant had induced a violation of the CFAA based solely on the evidence of the employee's pay structure. *Id.*

The defendants' argument that their contracts with their vendors foreclose liability fails under the proper standard for indirect liability. Because indirect liability does not require agency, it is not dispositive that those agreements disclaim an agency relationship: the defendants can be held liable based on evidence that the defendants induced the vendors to violate the CFAA. Additionally, as Ryanair argues in its response to the defendants' motion, it is not relevant under those contracts that a vendor could choose not to display or book Ryanair flights. The defendants' liability does not turn on what the vendors could have done but rather on whether the defendants induced, directed, or encouraged their vendors to obtain flight information from and book flights on Ryanair's website.

Moreover, the defendants are incorrect in asserting that Ryanair can establish liability only if they can show that they specifically directed their vendors to include Ryanair flights and advised them how to access the Ryanair website in a manner that would violate the CFAA, such as by directing their vendors to use bots, to make myRyanair accounts, or to bypass Shield. The defendants' argument on this issue is based on its interpretation of the *Svanaco* and *Alchem* cases. As discussed, however, those cases do not establish that such active direction is required. In those cases, moreover, the defendants never contemplated (let alone directed or encouraged) that third parties would access protected computers. Here, however, even if the defendants were previously unaware of how their vendors were obtaining Ryanair flight information, Ryanair put the defendants on notice of their vendors' conduct through its cease-and-desist letters and stated that Ryanair does not authorize OTAs to sell its flights or scrape its website. *See* Dkt. No. 76, Exhs. B, C, D, & E.

The defendants cannot now avoid liability simply because third parties access the Ryanair website to obtain the relevant information and make bookings for the defendants' customers. *See Power Ventures*, 844 F.3d at 1067 ("Once permission [to access a computer] has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability" under the CFAA.). The evidence is sufficient to create a jury question as to whether the defendants induce, direct, or encourage their vendors to obtain Ryanair flight information and book Ryanair flights by sending requests for these actions from their websites to the vendor websites.[15] The fact that the defendants automated such requests has no bearing on whether there is such direction. If the vendors' actions are in violation of the CFAA, then the defendants can be held liable.

Finally, the defendants' assertion that there is no evidence that their vendors actually access the Ryanair website is incorrect. The parties agree that Ryanair is paid for flights booked on behalf of the defendants' customers by the defendants' vendors. Ryanair points to its interrogatory response stating that Ryanair confirmed that the reservation codes provided by the defendants were purchased through the website, Fuga Decl. Exh. 6 at 83, and argues that any flights booked on the Ryanair website would have to have circumvented Shield. Dkt. No. 348 at 17 (citing Fuga Decl. Exh. 2 at 7-12; Fuga Decl. Exh. 4 at 6-8, 11-14, 17; Fuga Decl. Exh. 19 at 35:12-37:18). The defendants raise issues with Ryanair's interrogatory response, including that it does not explain who at Ryanair made this determination or how that person made the determination. The defendants may raise these issues at trial. For present purposes, Ryanair's summary judgment

---

[15]    Because Ryanair moved for summary judgment only against Booking.com and KAYAK, its motion was directed only to the evidence that those defendants induce, direct, or encourage vendors to access the Ryanair website in violation of the CFAA. Accordingly, Ryanair will need to make the same showing for the other defendants to sustain its charge of indirect liability against them.

Appx66

Case 1:20-cv-01191-WCB    Document 399 *SEALED*    Filed 06/17/24    Page 40 of 103 PageID #: 14365

motion on this issue is precluded since there is a factual dispute as to whether the defendants' have induced their vendors to access the Ryanair website.

### E.  The Monex Attack

Monex is Ryanair's payment processor.  Whenever a customer tries to make a payment, Ryanair sends Monex a token with the customer's payment information.  If the token has no payment information, it is considered a null token.  Ryanair keeps an error log of instances in which Monex receives a null token.  On October 5, 2023, Ryanair recorded the transmission of more than 60,000 null tokens to Monex in one hour, which adversely affected the functionality of Ryanair's website.  *See* Fuga Decl. Exh. 6 at 85–87.  Ryanair characterizes that event as the "Monex Attack," and seeks to hold Booking.com liable for that attack.

In their motion for summary judgment, the defendants contend that Booking.com cannot be held liable for the "Monex Attack" for several reasons.  Dkt. No. 335 at 22–24.  The defendants argue that Booking.com does not access the Ryanair website for customer booking and that any bookings attributable to Booking.com through its vendors could not be responsible for Monex's failure based on the low volume of those bookings during the relevant period.  Booking.com also contends that there is no evidence that it directed any of its vendors to launch an attack.  Ryanair does not address the "Monex Attack" in its motion for summary judgment.

In response to the defendants' summary judgment motion, Ryanair points to factual disputes that it contends require denial of summary judgment for the defendants on this issue.  During discovery, Booking.com produced its PNR codes to Ryanair.  Ryanair matched 26 of Booking.com's PNRs from October 5, 2023, to the error log.  *See* Fuga Decl. Exh. 6 at 84–86.  Ryanair argues that each PNR is likely responsible for thousands of efforts to reach Ryanair's website, which likely contributed to overwhelming Monex.  *Id.* at 87.  The defendants dispute that

40

Appx67

their bookings could have contributed to Monex's failure based on testimony that it is likely that a single source was responsible for the attack. *See* Hemann Decl. Exh. 3 at 79:15–80:14. The defendants also point to statements that a third party could have been entirely responsible for the incident. *See id.* at 63:14-64:3, 79:23-80:24. In addition, the defendants argue that in the case of the specific PNR code connected to 5000 payments attempts, it was the computer's IP address that was associated with those attempts, but not the specific session connected with Booking.com's PNR code. *See* Dkt. No. 378 at 5–6 n.6. Ryanair will need to prove at trial that the attempts associated with Booking.com could be responsible for all or part of the breakdown of its website functionality, but that issue cannot be resolved at this juncture.

The defendants' first argument—that Booking.com does not directly access the Ryanair website—is beside the point, because both parties agree that access to the website happens through third parties. As noted above, in order for any liability to attach to Booking.com, Ryanair must prove that Booking.com is vicariously liable for violations of the CFAA.

The defendants' second argument—that Booking.com was unaware of the attack and thus could not have directed, induced, or encouraged it—is similarly unavailing. The defendants compare this case to *Svanaco*, in which the defendant did not know its contractor was launching an attack on the plaintiff's website and was therefore held not to be liable for the consequences of the attack. 417 F. Supp. 3d at 1060. The defendants point in particular to evidence that Booking.com did not know why its vendors had issues accessing the Ryanair website on October 5 and 6, 2023, and they contend there is no evidence that Booking.com directed the attack or intended to cause the outage. *See* Hemann Decl. Exh. 13 at 22:8–24:15; Guerrero Decl. [Dkt. No. 337] ¶¶ 13–14; Housseau Decl. [Dkt. No. 338] ¶¶ 4–6 and Exh. A.

Ryanair's theory, however, is not that Booking.com specifically directed its vendors to act so as to overwhelm Monex, but rather that Booking.com is liable because it directed, induced, or encouraged accessing the website in violation of the CFAA by sending customer requests to third-party vendors who necessarily had to overcome Ryanair's security measures. Accordingly, even if Booking.com did not direct its vendors on how to overcome those measures, such as by disabling Shield by submitting multiple payment attempts to Monex, Booking.com could be held liable for inducing, directing, or encouraging such action if the defendants had the intent to induce their vendors to obtain information from the Ryanair website by circumventing Ryanair's attempts to prevent them from doing so.

### F.  Count I: 18 U.S.C. § 1030(a)(2)(C)

A defendant violates Section 1030(a)(2)(C) when it accesses a computer intentionally without authority or exceeding authorized access and thereby obtains information from a protected computer. As noted earlier, all the information that is obtained from the Ryanair website by screen scraping is obtained from the public portion of the website, not from the password-protected payment page of myRyanair. Therefore, the defendants do not obtain information by accessing a computer without authorization or by exceeding their authorized access. For that reason, summary judgment must be granted to the defendants with regard to Count I of the complaint.

### G.  Count IV: 18 U.S.C. § 1030(a)(5)(B)–(C).

Ryanair argues for summary judgment against Booking.com and KAYAK under sections 1030(a)(5)(B) and (C) of the CFAA, which prohibit knowingly causing a transmission that intentionally accesses a protected computer without authorization and either recklessly causes damage (subparagraph (B)) or causes damage and loss (subparagraph (C)). Ryanair argues that it has suffered damage based on the "Monex Attack" as well as other injury to its data integrity. The

Case 1:20-cv-01191-WCB   Document 399 *SEALED*   Filed 06/17/24   Page 43 of 103 PageID #: 14368

defendants argue that Ryanair's damages claim fails because no evidence links any defendant to the Monex attack and because adding passenger data does not denigrate data integrity as contemplated under the CFAA but rather is simply data that Ryanair does not find optimal from a business standpoint. For the reasons discussed in sections II.B.ii and II.G, issues of fact preclude summary judgment on this count.

### H. Count II: Fraud under 18 U.S.C. § 1030(a)4).

The defendants have moved for summary judgment on Ryanair's fraud claim under section 1030(a)(4), contending that there is no evidence the defendants knowingly accessed the Ryanair's website with the intent to defraud Ryanair. Their argument about knowing access revisits their arguments about vicarious liability addressed above, and will not be addressed again here. The defendants also argue there is no evidence of intent to defraud because there is no proof that the defendants had the intent to "deceive or to cheat," *see Fidlar Techs. V. LPS Real Estate Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016), or that the defendants "contemplated some actual harm or injury to their victims," *see United States v. Starr,* 816 F.2d 94, 98 (2d Cir. 1987). The defendants point to the legislative history of the CFAA to support their contention that proof of an "intent to defraud" for purpose of the CFAA must meet an exacting standard. *See United States v. Czubinski*, 106 F.3d 1069, 1078-79 (1st Cir. 1997) (citing S. Rep. No. 432, 99th Cong., 2d Sess., reprinted in 1986 U.S.C.C.A.N. 2479, 2488) (the CFAA's legislative history distinguishes "between computer theft . . . and computer trespass" and that requiring a showing of an intent to defraud for purposes of section 1030(a)(4), "is meant to preserve that distinction").

Ryanair argues that this court should not apply that restrictive standard for fraud under the CFAA. Rather, according to Ryanair, the court should follow the definition of fraud set forth in *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D.

Wash. 2000), which was adopted by a district court in this circuit. *See Volpe v. Abacus Software Sys. Corp.,* No. CV2010108*, 2021 WL 2451968, at \*5 (D.N.J. June 16, 2021); *see also Hanger Prosthetics & Orthotics, Inc. v. Capstone Orthopedic, Inc.*, 556 F. Supp. 2d 1122, 1131 (E.D. Cal. 2008). The *Shurgard* court held that under the CFAA, "fraud simply means wrongdoing and not proof of the common law elements of fraud." 119 F. Supp. 2d at 1126. Under that standard, Ryanair argues, there is evidence that the defendants acted with the intent to defraud by working with their vendors to facilitate unauthorized access to the Ryanair website. In any event, Ryanair argues that even under the stricter standard, it has shown that the defendants engaged in fraud because they knew their actions were harming Ryanair but continued their course of action nonetheless.

Although the parties focus their briefing on a dispute over the meaning of the phrase "intent to defraud," the cases the parties cite are largely in agreement regarding the proper standard. In *Fidlar Technologies*, the Seventh Circuit held that the phrase "intent to defraud" in the CFAA requires a specific intent to "deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another." 810 F.3d at 1079.[16] In *Shurgard*, the court held that fraud requires the defendant employ "dishonest methods" to carry out a violation of the CFAA. 119 F. Supp. 2d at 1125–26. Courts applying *Shurgard* look for evidence of deceit. *See, e.g., Volpe*, 2021 WL 2451968, at \*4–5 (plaintiff sufficiently pleaded fraud under the CFAA by alleging that the defendant deceived Apple Inc. into believing the plaintiff, rather than the defendant, was accessing the plaintiff's account); *SMH Enterprises, L.L.C. v. Krispy Krunchy Foods, L.L.C*, No.

---

[16] The defendants appear to focus on the latter half of the pertinent sentence in the *Fidlar* case to support their argument that they have not caused financial loss to Ryanair because Ryanair is paid for its flights. However, in the present case, Ryanair argues that the defendants gain something of value through selling Ryanair flights, which invokes the first half of the pertinent sentence in *Fidlar*.

44

CV 20-2970, 2021 WL 1226411, at *5–6 (E.D. La. Apr. 1, 2021) (explaining that the *Shurgard* definition "usually signifies the deprivation of something of value by trick, deceit, chicane, or overreaching") (citation omitted).

Because section 1030(a)(4) itself requires the defendant to have obtained something of value, the element of financial gain is often discussed separately from the element of "intent to defraud." However, the *Czubinski* court, which both sides cite to as supporting their respective proposed standards, explained that the requirement in section 1030(a)(4) that the defendant obtain something of value operates like the requirement that there be a deprivation of property for federal mail fraud violations. *See* 106 F.3d at 1079. The court explained that to constitute deprivation, "some articulable harm must befall the holder of the information as a result of the defendant's activities, or some gainful use must be intended by the person accessing the information, whether or not this use is profitable in the economic sense." *Id.* at 1074. That characterization is entirely consistent with standard articulated by the court in *Fidlar Technologies*.

A genuine issue of material fact precludes summary judgment on this claim. Ryanair has produced evidence that the defendants access the Ryanair website by dishonest means, that is, by using "false" contact and payment information. Whether or not Ryanair ultimately receives payment for the flights booked through the defendant OTAs, Ryanair may still be able to show that the defendants have acted act with the intent to deceive Ryanair by using false information to obtain something of value: to wit, profitable flight bookings that the defendants would not be able to obtain otherwise.

### I. Count V: Conspiracy under 18 U.S.C. § 1030(b).

The defendants argue that there is no evidence to sustain Ryanair's conspiracy claim under 18 U.S.C. § 1030(b), because the defendants' vendor contracts do not establish a CFAA

conspiracy. The defendants argue that because the contracts do not reference Ryanair at all, let alone constitute an agreement about how to access Ryanair's website in violation of the CFAA, Ryanair cannot show that the defendants had the specific intent to "further the substantive offense" under the CFAA. *See United States v. Carbo*, 572 F.3d 112, 116 n.2 (3d Cir. 2009). The defendants further argue, as they did regarding indirect liability, that they lack control over which airlines and flights their vendors source and how their vendors source those flights. Regarding BHI and Agoda specifically, the defendants argue there is no agreement with any vendor to source Ryanair flights at all.

Ryanair responds that there is sufficient evidence of conspiracy to justify submitting that issue to the jury at trial. Ryanair contends that a conspiracy claim under the CFAA requires "evidence of an agreement and common activities in furtherance of the unlawful act," *see Welenco Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1176 (E.D. Cal. 2015), and that the defendants' websites and vendor agreements provide that evidence. Ryanair's theory of conspiracy is similar to its theory of indirect liability—that the defendants pass specific requests for flight information and flight bookings to their vendors via Application Programming Interface ("API") connections.[17] This, Ryanair argues, is evidence that the defendants have agreed to violate the CFAA. With regard to Agoda, Ryanair argues that Agoda procures its bookings through Priceline and Priceline's vendors. Ryanair also argues that the agreements between the defendants and their vendors (or, for Agoda, an agreement between two defendants) constitute evidence of agreement to engage in conduct that violates the CFAA. Moreover, Ryanair argues that because the defendants can control what airlines are displayed on their websites, the defendants necessarily

---

[17] An API connection allows two systems to exchange data. API connections may integrate two or more applications running on the same website or, as the case is here, applications running across different websites.

make a conscious decision to include Ryanair flights and thus to participate in the conspiracy to violate the CFAA as it relates to those flights.

I addressed the conspiracy claim at the motion to dismiss phase and found that Ryanair had plausibly alleged a claim under section 1030(b) on the ground that the defendants had entered into agreements with vendors to access the Ryanair website without authorization, despite knowing that neither the defendants nor their agents had authorization to do so. *See* Dkt. No. 105 at 25–27; *see also In re Lenovo Adware Litig.*, No. 15-MD-02624, 2016 WL 6277245, at *6 (N.D. Cal. Oct. 27, 2016) (A claim under section 1030(b) requires "specific allegations of an agreement and common activities").

Ryanair has now produced sufficient evidence to support those allegations so that summary judgment on the conspiracy claim would be inappropriate. The defendants have produced contracts with their vendors, as discussed above, demonstrating an agreement to book flights on behalf of the defendants. Pursuant to those agreements, the defendants send requests to their vendors, which are automated via API connection, to purchase Ryanair flights. Ryanair argues that those purchases require circumventing the myRyanair password gate, which could qualify as unlawful conduct under the CFAA. Ryanair also points to evidence that the defendants knew or should have known that its vendors were accessing protected portions of the Ryanair website without authorization, evidence that includes the allegations in the complaint, allegations made in Ryanair's cease-and-desist letters, and, in the case of Booking.com, an inquiry into its vendors' screen-scraping practices. *See* Fuga Decl. Exhs. 24 & 25.

Ryanair responds to the defendants' contentions that they do not control which airlines' flights are displayed on their websites. Ryanair cites testimony from the defendants' witnesses that they can stop displaying Ryanair flights. *See* Mao Decl. Exh. 9 at 191:12–193:1 (testimony

on how Agoda blocks Ryanair flights); Mao Decl. Exh. 10 at 30:15–22 (testimony that Priceline can turn off specific airlines); Hemann Decl. Exh. 12 at 25:1–26:14 (testimony that Booking.com can instruct Etraveli to remove certain airlines from the flight information it shares with Booking.com).

Contingent on Ryanair's ability to prove the alleged unlawful access, a reasonable juror could find a knowing "agreement and common activities in furtherance of the unlawful act." *See Welenco*, 126 F. Supp. 3d at 1176 (citing *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816 (N.D. Cal. 2014); *Vacation Club Servs., Inc. v. Rodriguez*, No. 6:10–cv–247, 2010 WL 1645129, at *1–2, (M.D. Fla. Apr. 22, 2010); *see also United States v. Koshkin*, No. 21-3085, 2024 WL 1927855 (2d Cir. May 2, 2024) (holding that there was "sufficient evidence from which a jury could reasonably" find a conspiracy to commit a violation of the CFAA where the government presented evidence that the defendant knew his coconspirator was operating an illegal botnet and the defendant provided crypting services for his coconspirator).[18]

Regarding Agoda, the defendants argue for summary judgment on the ground that Agoda does not have agreements with vendor. However, Agoda has an agreement with Priceline, under which Agoda facilitates bookings of Ryanair flights for its customers via an API connection with either Priceline or Priceline's vendors. *See* Hemann Decl. Exh. 34 at 9. That is enough to avoid summary judgment on the conspiracy count as applied to Agoda.

Regarding BHI, Ryanair does not dispute that BHI is not party to any vendor agreement— which is unsurprising given that BHI is a holding company—nor did it advance any other basis in

---

[18] A botnet is a group of computers that can be used for criminal activity, including infecting other computers with malware and launching DDoS attacks. Crypting is a service that modifies malware so that it cannot be detected by antivirus programs.

its briefing for finding BHI liable for conspiracy in for BHI.[19]  Because this issue was not addressed in the parties' briefs, I will postpone any ruling on the issue until trial.  Accordingly, for present purposes, summary judgment is denied as to each of the defendants on Count V.

### J.  Ryanair's Request for a Permanent Injunction

The defendants seek summary judgment against Ryanair on its request for a permanent injunction on the ground that Ryanair has not shown that it is faced with irreparable harm and has not shown that it lacks an adequate remedy at law.  *See* Dkt. No. 335 at 37–38 (citing *TD Bank N.A. v. Hill*, 928 F.3d 259, 278 (3d Cir. 2019).  Because Ryanair does not dispute that it is paid for the tickets that the defendants purchase from Ryanair on behalf of their customers, the defendants argue Ryanair cannot show that it is faced with any irreparable harm.

The question whether an injunction (or any other form of relief) should be granted is premature at this juncture.  Entitlement to either legal or equitable relief can be decided by the court in the event that there is a finding of liability on any of Ryanair's CFAA claims.

### IV.  Ryanair's Motion for Summary Judgment on Booking.com's State Law Counterclaims

Booking.com has asserted five state law counterclaims against Ryanair: (1) tortious interference with business relations, (2) unfair competition, (3) trade libel, (4) defamation based on Ryanair's statements to customers,[20] and (5) deceptive trade practices.  Ryanair argues that for

---

[19] During the argument on the motions for summary judgment, Ryanair suggested that BHI could be held liable for conspiring with its wholly owned subsidiary, Booking.com.  That proposition is questionable in light of the principle that, at least in the antitrust context, a corporation cannot conspire with its wholly owned subsidiary.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).  The parties should be prepared to address this issue at trial in the event that Ryanair seeks to press its claim of conspiracy against BHI.

[20] In my order on Ryanair's motion to dismiss, I dismissed those portions of Booking.com's defamation counterclaim that were based on Ryanair's public statements but denied the motion to dismiss as it related to those portions of Booking.com's defamation counterclaim that were based on Ryanair's statements to customers.  Dkt. No. 134 at 11–17.

three reasons summary judgment should be granted in its favor on some or all of the five counterclaims. First, Ryanair argues that Booking.com's counterclaims for defamation, trade libel, and deceptive trade practices must fail because Ryanair's statements underlying those counterclaims are true. Second, Ryanair argues that Booking.com cannot prove that Ryanair acted wrongfully and thus cannot prevail on its tortious interference and unfair competition claims. Third, Ryanair argues that Booking.com cannot prove damages, a required element of tortious interference, unfair competition, and trade libel. In its response, Booking.com argues that material issues of genuine fact foreclose summary judgment as to any of the defendants' counterclaims.

### A. Falsity: Booking.com's defamation, trade libel, and DTPA claims

In its brief in opposition to Ryanair's motion for summary judgment, Booking.com points to three Ryanair statements that form the bases for Booking.com's counterclaims of defamation, trade libel, and violations of Delaware's Deceptive Trade Practice Act ("DTPA"), 6 Del C. § 2531 *et seq*.[21] Those statements are:

> 1. "Unauthorized OTAs . . . use 'screen scraper' software to mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website."
>
> 2. "Screen scraper OTAs provide Ryanair with false customer details which prevents us from notifying passengers" and the "false payment and contact details screen scraper OTAs provide Ryanair for customers inhibits Ryanair from providing our post-contractual obligations."
>
> 3. "Screen scraper OTAs provide Ryanair with false customer details which prevents us from notifying passengers of important safety, security and public health requirements."

Dkt. No. 372 at 30, 33, 34. Booking.com argues that there is a genuine issue of material fact as to the truth of each of those statements.

---

[21] The parties agree that the tort claims set forth in Booking.com's counterclaims are governed by Delaware law.

### i. **Burden of Proof**

The parties disagree about which party has the burden of proof with respect to the issue of falsity.  In a defamation case, when statements are directed to a matter of public concern, the plaintiff bears the burden of proving the statements are false.[22]  *See Cousins v. Goodier*, 283 A.3d 1140, 1148 n.40 (Del. 2022).  Ryanair argues that its emails addressed a matter of public concern because "they communicate steps customers must take so that Ryanair can notify them of important safety, security and public health requirements, and they inform customers about the effects of booking with unauthorized OTAs."  *See* Dkt. No. 348 at 27 n.14 (quotations omitted).  Booking.com argues that the emails were merely part of Ryanair's effort to encourage customers to use Ryanair's website instead of using an OTA to book flights.  For that reason, Booking.com argues, the emails do not address a matter of public concern, and therefore Ryanair, not Booking.com, has the burden of proof on the issue of falsity.  *See* Dkt. No. 372 at 30 n.12.

"Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"  *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations omitted).  "To determine whether speech is of public or private concern, [the court] must independently examine the 'content, form, and context' of that speech" in light of the whole record.  *Id.*

---

[22] Falsehood is an element of Booking.com's trade libel and deceptive practices claim, and Booking.com therefore has the burden of proof to show that Ryanair's statements were false.  *See In re Nat'l Collegiate Student Loan Trs. Litig.*, No. CV 12111, 2020 WL 3960334, at *4 (Del. Ch. July 13, 2020) (explaining that "trade libel" is "predicated on 'the knowing publication of false material that *is derogatory* to the plaintiff's business.'"); 6 Del. C. § 2532(a)(8) (defining one deceptive practice as "[d]isparag[ing] the goods, services, or business of another by false or misleading representation of fact"); *see also* Dkt. No. 111 at 72–73 (alleging a deceptive trade practice claim based on Ryanair's assertedly false or misleading statements).

Ryanair's emails to passengers who booked flights through OTAs address a matter of private concern.  While safety, security, and public health requirements are often matters of public concern, the content, form, and context of Ryanair's emails make clear that Ryanair was addressing a matter of private concern.  The content of the speech did not directly address issues of safety, security, and public health, but rather informed customers who booked Ryanair flights through an OTA that Ryanair may not have their correct contact information, which could prevent Ryanair from disseminating information to them about "safety, security, and public health protocols."  *See* Dkt. No. 111 at 60–61.  Essentially, the email addressed Ryanair's business practice regarding the dissemination of relevant information to its customers by email.

The form and context of the Ryanair emails also indicate that the subject of the emails was a matter of private concern.  While not dispositive, *see Cousins*, 283 A.3d at 1152, Ryanair's use of private emails sent to a subset of its customers on a specific subject pertinent to those customers supports the conclusion that the emails addressed a matter of private concern.  *Compare Synder*, 562 U.S. at 454–55 (protest on public land next to a public street was of public concern), *and Cousins*, 283 A.3d at 1152 (an email relating to a local political issue that was widely shared on Facebook with members of the plaintiff's professional and geographic community was a matter of public concern), *with Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 762 (1985) (an individual's credit report shared by a business with a limited number of subscribers was a matter of private concern).  Because the Ryanair emails do not address a matter of public concern, Ryanair bears the burden of proof on the issue of falsity.

> **ii.  Statement 1: "Unauthorized OTAs . . . use 'screen scraper' software to mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website."**

Ryanair argues that Statement 1 is true in its entirety.  First, Ryanair contends that it is accurate to say that the OTAs use "screen scraper" software because Booking.com sells its flights

exclusively through Etraveli, and Booking.com is aware that Etraveli uses screen scraping. *See* Fuga Decl. Exh. 3 at 40:5–8, 43:9–16; Fuga Decl. Exh. 24 at BOOKING.COM00002386; Fuga Decl. Exh. 25.  Second, Ryanair argues that in this context the term "mis-sell" means to sell flights without authorization and in violation of Ryanair's terms of use.  In support, Ryanair cites my order on Ryanair's motion to dismiss the counterclaims, in which I stated that "the assertion that Booking.com is 'unauthorized' is true, as it is undisputed that Ryanair has not authorized Booking.com to sell tickets for Ryanair flights."  Dkt. No. 134 at 13.

In its response, Booking.com argues (1) that the evidence clearly shows that Booking.com itself does not access Ryanair's website, nor has it agreed to Ryanair's terms of use such that Booking.com has breached any obligation to Ryanair; (2) that Booking.com does not "mis-sell" Ryanair flights, as mis-selling refers to the act of misleading customers in order to make a sale; and (3) that Booking.com does not "mis-sell" Ryanair flights by selling tickets contrary to Ryanair's terms of use, because Booking.com does not go onto the Ryanair website.

There is a genuine dispute as to the truth of the first half of Statement 1.  Whether Etraveli uses screen scraping is contested.  Ryanair's own evidence is not conclusive on this issue:  It shows that Booking.com asked Etraveli about screen scraping, *see* Fuga Decl. Exh. 24, and that Booking.com received a response that explained how Etraveli uses a screen-scraping process, *see* Fuga Decl. Exh. 25.  However, Etraveli's response makes clear that Etraveli does not always use screen scraping, and it does not confirm what process Etraveli uses on the Ryanair website specifically.  *See* Fuga Decl. Exh. 25.  Booking.com disputes that Ryanair can show that any of the defendants' vendors, including Etraveli, access the Ryanair website by the use of screen-scraping bots, *see supra* section III.D.

There is, however, no dispute as to the truth of the second half of the sentence. Ryanair argues that the sentence, read in full, defines mis-selling flights by reference to the Ryanair website's terms of use ("OTAs . . . mis-sell Ryanair flights in breach of the Terms of Use of the Ryanair website.") *See* Dkt. No. 111 at 61. Booking.com argues that Ryanair itself is not consistent as to what "mis-selling flights" means, as Ryanair's CEO used the term "mis-sell" to refer to inflating the costs of Ryanair flights and selling outside of the Ryanair website. *See* Declaration of Kathleen Hartnett ("Hartnett Decl."), Dkt. No. 374, Exh. D at 8:8–12, 20:8–18. In addition, Booking.com points out that the term "mis-sell" refers to a crime in the United Kingdom (perhaps forgetting for the moment that the Republic of Ireland is decidedly not a part of the U.K.).[23]

In the context of the statement at issue, however, it is evident that the use of the term "mis-sell" is cabined by the phrase "in breach of the Terms of Use of the Ryanair website." No reasonable reader would assume that the term "mis-sell" in Statement 1 refers to a criminal act, even if the term "mis-sell" standing alone would be open to multiple meanings.[24]

Booking.com also focuses heavily on the undisputed fact that Booking.com itself does not access Ryanair's website. However, Ryanair is correct that its statement is still "substantially true" if Etraveli, rather than Booking.com, scrapes the Ryanair website and does so at Booking.com's behest. *See Riley v. Moyed*, 529 A.2d 248, 253 (Del. 1987) ("[T]here is no liability for defamation

---

[23] *See Financial services mis-selling: regulation and redress*, National Audit Office (Feb. 24, 2016), https://www.nao.org.uk/reports/financial-services-mis-selling-regulation-and-redress (defining mis-selling as "providing customers with misleading information or recommending that they purchase unsuitable products").

[24] Ryanair argues in its reply brief that the "innocent construction rule" applies here. *See* Dkt. No. 380 at 12 (arguing that a statement that can reasonably be given an innocent interpretation is not actionable). However, the "innocent construction rule" is a minority rule not followed by Delaware. *See* Rodney A. Smolla, LAW OF DEFAMATION § 4:21 (2d ed. 2024).

when a statement is determined to be substantially true.")  Under Delaware law, "[i]f the alleged libel was no more damaging to the plaintiff's reputation in the mind of the average reader than a truthful statement would have been, then the statement is substantially true." *Id*.  In this case, it would be no more damaging to say Booking.com uses third party vendors to screen scrape the Ryanair website than to say that Booking.com does the screen scraping itself.  Accordingly, Booking.com's argument that it does not itself access the Ryanair website to screen-scrape the website in violation of Ryanair's terms of use does not negate the truth of Ryanair's statement if Ryanair can prove that Booking.com's vendors take that action at the behest of Booking.com.

      iii.  **Statement 2: "Screen scraper OTAs provide Ryanair with false customer details which prevents us from notifying passengers" and "false payment and contact details screen scraper OTAs provide Ryanair for customers inhibits Ryanair from providing our post-contractual obligations."**

This statement is part of an email that Ryanair is alleged to have sent to customers who appeared to Ryanair to have purchased tickets through an OTA.  The email in question added that the false customer details prevented Ryanair from notifying passengers "of important safety, security, and public health requirements."  Dkt. No. 111 at 60.  Ryanair argues that there is no genuine issue of material fact as to the truth of its statements that OTAs provide "false" customer information because (1) Booking.com admitted it does not share customer credit card information with Etraveli; (2) Booking.com is not aware of whether Etraveli provides the customer's correct email address to Ryanair, and (3) according to Ryanair expert Iain Lopata, Booking.com uses disposable email addresses and virtual credit card numbers to create myRyanair accounts.  *See* Fuga Decl. Exh. 3 at 87:18–88:8, 102:3–20; Lopata Decl. ¶¶ 10(d), 20–37.

Booking.com argues that there is a genuine dispute regarding the truth of this statement for three reasons.  First, Booking.com again argues that it does not directly access the Ryanair

website.[25]  Second, Booking.com argues that the term "false" in the statement suggests that the customer's information in question is "illegitimate" or "fraudulent" rather than simply not the passenger's actual contact information, since there is no dispute that Ryanair gets paid for the OTA bookings.  *See* Hemann Decl. Exh. 7 at 30:20–23; Hemann Decl. Exh. 6 at 175:25–176:4.  Third, Booking.com argues that the evidence shows that Ryanair receives the passenger's own contact information for bookings.  *See* Lopata Decl. ¶ 34(n); Hemann Decl. Exh. 41 at 78–86; Hartnett Decl. Exh. L at 15, Row 2 (customer email was correct); Hartnett Ex. N at 1 of 10, Row 3 (customer's "own email and credit card"), 3 of 10, Row 2 ("email correct"); 8 of 10, Row 18 ("mail ok").

There is a genuine dispute as to the truth of Ryanair's statement.  First, the parties dispute whether a reader of the email would interpret the email to mean that Booking.com provided information other than the customers' information or whether Booking.com provided fraudulent information.  Ryanair argues that, in context, the reference to "false" details means "incorrect" details, because Ryanair states that receiving such "false" information prevents Ryanair from "notifying passengers" and "providing its post-contractual obligations."  *See* Dkt. No. 111 at 60.  Booking.com argues that the term "false" implies that Booking.com engaged in fraudulent payment methods.  Here, it is not clear in context whether Ryanair's alleged inability to notify customers and satisfy its contractual obligations is due to its receipt of incorrect or fraudulent information.  Because the email is open to multiple meanings, "it is for 'the trier of fact [to] determine whether the language used was actually understood in its defamatory sense.'"  *See*

---

[25] For the reasons addressed in the discussion of Statement 1, if it is true that Etraveli provides Ryanair with "false" payment information and customer emails at Booking.com's behest, then Ryanair's statement would still be substantially true because Booking.com makes its bookings through Etraveli.

*Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, No. N17C-06-170, 2019 WL 1877400, at *17 (Del. Super. Ct. Apr. 26, 2019) (quoting *NITV, L.L.C. v. Baker*, 61 So. 3d 1249, 1252 (Fla. Dist. Ct. App. 2011)).[26]

Second, there is a genuine dispute as to whether Booking.com provides incorrect customer information to Ryanair. Regarding customer payment information, Ryanair's own evidence is not conclusive. The cited deposition testimony states that under one model, Booking.com provides the customer's credit card information to Etraveli, but under a second model, it does not. Fuga Decl. Exh. 3 at 87:18–88:8. Booking.com points to evidence that at least one Ryanair booking made through Booking.com is associated with the passenger's "own email and credit card." Declaration of Kathleen Hartnett ("Hartnett Decl."), Dkt. No. 374, Exh. N. at RYANAIR-BOOKING_0040319 1 of 10, row 3. Ryanair relies on its expert's testimony to support its contention that Ryanair does not receive the correct customer email addresses from purchases made through Booking.com, *see* Lopata Decl. ¶¶ 20–37. Booking.com, however, responds that in most cases "the Defendants provided the correct customer email address to Ryanair, even though it was not used to create the myRyanair account." *Id.* at ¶ 34(n); *see* Hartnett Decl. Exh. L at 15 of 24, row 2 ("Email was correct" for a Ryanair booking); Hartnett Decl. Exh. M at 2. In short, there is a factual dispute as to whether Ryanair's statement is true or substantially true.

---

[26] While the Superior Court of Delaware in the *Bobcat* case was applying Florida law, the elements of defamation under Florida law are the same as the elements of defamation under Delaware law. *Compare id.* ("Florida law provides, [t]o establish a cause of action for defamation, a plaintiff must show that (1) the defendant published a false statement about the plaintiff, (2) to a third party, and (3) the falsity of the statement caused injury to the plaintiff") (internal quotation marks omitted), *with Grubbs v. Univ. of Del. Police Dep't*, 174 F. Supp. 3d 839, 861 (D. Del. 2016) ("To state a cause of action for defamation under Delaware law, a plaintiff must plead . . . (1) the defamatory character of the communication; (2) publication; (3) that the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury.").

57

### iv. Statement 3: "Screen scraper OTAs provide Ryanair with false customer details which prevents us from notifying passengers of important safety, security and public health requirements."

Booking.com's Statement 3 substantially overlaps with Statement 2, adding only the portion of the statement asserting that the false customer details provided by the OTAs prevent Ryanair from notifying its passengers "of important safety, security and public health requirements." In its counterclaims, Booking.com characterized Ryanair's third statement as an assertion that "OTAs, including Booking.com, fail to 'confirm compliance with required safety, security and public health protocols' or 'requirements.'" *See* Dkt. No. 111 at 71. From both sides' briefing, however, it is apparent that the latter statement does not appear in any of the Ryanair emails that Booking.com has pointed to as actionable. Statement 3, as Booking.com has now framed it, cannot be treated as a separate defamatory statement.

### v. Actual Malice

Ryanair argues that Booking.com cannot prove its trade libel claim or request punitive damages for its defamation claim, because both require Booking.com to prove that Ryanair acted with actual malice. Ryanair asserts that Booking.com has not made such a showing because the evidence shows that Ryanair did not make the challenged statements with knowledge of their falsity or with reckless disregard for their truth or falsity. Dkt. No. 348 at 31.

Booking.com argues that Ryanair has not shown that the "actual malice" standard applies to this case. Even if it does, Booking.com argues, there is evidence that Ryanair acted with actual malice because Ryanair's internal records show (1) that Booking.com provided Ryanair with correct customer email addresses and (2) that Ryanair knew it did. Additionally, Booking.com argues that the actual malice standard does not apply to its defamation claim because Ryanair's speech constitutes commercial speech to which the actual malice standard does not apply. Dkt. No. 372 at 35–36.

As Ryanair points out, I have already addressed this issue and have held that a claim for trade libel requires a plaintiff to show that the defendant acted with actual malice. *See* D.I. 134 at 17 (citing *Nat'l Collegiate Student Loan Trs. Litig.*, 2020 WL 3960334, at *4; Restatement (Second) of Torts § 623A cmts. d, g.). Thus, Booking.com is incorrect in asserting that Ryanair has failed to show that the "actual malice" standard applies in this case.[27] In addition, a plaintiff ordinarily must show actual malice to be awarded punitive damages. *See Cousins*, 283 A.3d at 1149 n.42. However, if Booking.com is correct that Ryanair's emails are properly characterized as commercial speech, then the heightened standard of actual malice does not apply to Booking.com's defamation claim. *See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 937 (3d Cir. 1990).

For purposes of Booking.com's trade libel claim, there is a genuine factual dispute as to whether Ryanair made its statements that OTAs have provided Ryanair with false customer information, knowing that the statements were false or, alternatively, whether Ryanair made those statements in reckless disregard of their truth or falsity. As discussed previously, there is a genuine dispute as to whether Ryanair receives incorrect information from bookings made by OTAs. Booking.com relies on Ryanair's own records to show that Ryanair often received correct

---

[27] To the extent Booking.com is referring to Ryanair's argument at the motion to dismiss stage that actual malice applies to Booking.com's defamation claims because Booking.com is a public figure, Booking.com is correct that Ryanair has not substantiated that claim for purposes of summary judgment. In its opening summary judgment brief, Ryanair argued that Booking.com must show actual malice as it relates to Booking.com's trade libel claim and punitive damages for defamation. *See* Dkt. No. 348 at 31. In its reply brief, Ryanair additionally argued that Booking.com is a limited purpose public figure but its only analysis on that argument appeared in a parenthetical stating "Booking is a public figure because its use of the Ryanair logo suggests to the public that it has authorization to sell Ryanair flights." *See* Dkt. No. 380 at 15. That argument falls far short of showing that Booking.com has thrust itself into a public controversy and thus "effectively assumed the risk of potentially unfair criticism." *See Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 536–537 (E.D. Pa. 1999).

customer email addresses, even if the customer's myRyanair account was initially opened with a temporary email address that was not the customer's real email address. *See, e.g.,* Lopata Decl. ¶ 34(n); Hemann Decl. Exh. 41 at 73–86. At trial, Booking.com will need to demonstrate that such knowledge is attributable to "the individuals actually involved in approving the publication" of the accused statement, not merely to Ryanair as an institution. *Page v. Oath Inc.*, 270 A.3d 833, 850 (Del. 2022). For present purposes, however, Booking.com has produced sufficient evidence to show that there is a genuine factual dispute on that issue and thus to avoid summary judgment.

Regarding Ryanair's statement that the OTAs use screen-scraper software to mis-sell flights, Booking.com relies heavily on its understanding of the term "mis-sell." *See* Dkt. No. 372 at 35–36. Having already determined that "mis-sell" is best understood to refer to violations of the Ryanair website's terms of use, there is no evidence that Ryanair made that statement with knowledge that the statement was false or was made in reckless disregard of its truth or falsity. In fact, there is no dispute that OTAs violate the terms of use of Ryanair's website, which explicitly state that Ryanair's website is the only website authorized to sell Ryanair flights and explicitly prohibit screen scraping. Dkt. No. 76-1. Regarding the first half of the subject statement— that "Unauthorized OTAs . . . use 'screen scraper' software"—there is also no evidence that Ryanair acted with actual malice. Even if Ryanair cannot show that, as applied to Booking.com, Booking.com's vendor did not use screen scraping software, there is nothing to suggest that Ryanair knew that statement was false or acted with reckless disregard to its truth as it relates to OTAs generally.

For purposes of Booking.com's defamation claim, there is a genuine factual dispute as to whether Ryanair's statements are properly characterized as commercial speech, and thus whether the actual malice standard applies. In determining whether speech is commercial, courts consider factors such as whether the speech is an advertisement, whether the speech refers to a specific product

or service, and whether the speaker had an economic motivation for making the statements in question. *U.S. Healthcare*, 898 F.2d at 933. Neither party has developed this argument at this stage, but it is evident that the parties continue to dispute whether Ryanair's speech was economically motivated. Booking.com argues that Ryanair's emails are part of its anti-OTA business strategy, whereas Ryanair argues that its emails are motivated by its need to comply with relevant regulations.[28]

### B. Booking.com's Tortious Interference and Unfair Competition Claims

The elements of tortious interference with prospective business relations under Delaware law are (1) a reasonable probability of a business opportunity; (2) intentional interference by the defendant with that opportunity; (3) proximate causation; and (4) damages. *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 98 n.19 (Del. 2006) (citation omitted); *see also Mondero v. Lewes Surgical & Med. Assocs., P.A.*, No. 14-588, 2018 WL 1532429, at *4 (D. Del. Mar. 29, 2018). The tort of unfair competition overlaps substantially with tortious interference with prospective business relations. The elements of unfair competition are: (1) that the plaintiff has a reasonable expectancy of entering a valid business relationship; (2) that the defendant wrongfully interferes with that relationship; and (3) that the defendant thereby defeats the plaintiff's legitimate expectancy and causes him harm. *Ethypharm S.A. France v. Abbott Lab'ys*, 598 F. Supp. 2d 611, 618 (D. Del. 2009), *vacated on other grounds*, 707 F.3d 223 (3d Cir. 2013) (quoting *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1057 (Del. Super. Ct. 2001)).

---

[28] Although it was not developed as part of the briefing on defamation, Booking.com elsewhere in its brief points to sufficient evidence to raise a genuine question for trial as to whether this speech was economically motivated. *See* Dkt. No. 372 at 37. In particular, Booking.com points to evidence that Ryanair's marketing strategy is to decrease the number of Ryanair flights booked via OTAs. *See* Hemann Decl. Exh. 18 (summarizing the communications plan to address OTA bookings); Hartnett Decl. Exh. P (listing digital customer verification as part of its strategy to "[g]et customers to make direct bookings on the Ryanair [sic] and not use OTAs"); Hartnett Decl. Exh. Q (describing Ryanair's anti-OTA strategy); Hartnett Decl. Exh. R (listing emails to customers who book through OTAs as one item "for the next round of OTA disruption.").

61

Ryanair argues that Booking.com cannot prevail on its tortious interference and unfair competition claims because Booking.com cannot demonstrate either that Ryanair acted wrongfully by sending the relevant emails to its customers or that Ryanair knowingly interfered with Booking.com's business relationships by addressing customers who booked through OTAs generally. Booking.com argues that genuine disputes of material fact preclude summary judgment on both elements.

### i. Wrongful Conduct

Under Delaware law, tortious interference claims are limited by the defendant's right "to compete or protect his business interests in a fair and lawful manner." *Lipson v. Anesthesia Services, P.A.*, 790 A.2d 1261, 1285 (Del. Super. 2001) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942 (Del. Ch. 1980), *aff'd*, 428 A.2d 1151 (Del. 1981)). The plaintiff has the burden to prove that the alleged tortious interference constituted wrongful interference, as opposed to permissible competition. *Id.* at 1287. Whether the competitor used "wrongful means" turns on whether the competitor used tactics that are independently actionable. *See CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 388 (3d Cir. 2004); *Com. Nat. Ins. Servs., Inc. v. Buchler*, 120 F. App'x 414, 419 (3d Cir. 2004).[29]

Ryanair argues that because it has a financial interest in having its customers book their flights directly through Ryanair, and because Ryanair risks violations of law if it cannot provide the legally required notifications to its customers who booked Ryanair flights on Booking.com, Ryanair's statements to customers were necessarily permissible for the purposes of its tortious interference claim. Booking.com responds that a genuine dispute of material fact precludes

---

[29]    While the *CGB Occupational Therapy* court was applying Pennsylvania law, both Pennsylvania and Delaware follow the Second Restatement of Torts on this issue. *See Com Nat. Ins. Servs. Inc.*, 120 F. App'x at 419; *Lipson*, 790 A.2d at 1287.

summary judgment on this issue because Booking.com has adduced evidence that Ryanair's verification procedure, described in its emails to its customers, is part of an anti-OTA business strategy.

The relevant question is not whether Ryanair has an "anti-OTA business strategy," but whether Ryanair has used tactics that are unlawful. There is nothing inherently unlawful about Ryanair competing with OTAs or attempting to persuade passengers who book through OTAs to book with Ryanair directly instead. *See Buchler*, 120 F. App'x at 419 ("A competitor does not 'wrongfully interfere' with its competitor's at-will customers by simply competing for their business") (citing Restatement (Second) of Torts § 768). However, Ryanair's privilege does not authorize it to use unlawful tactics. Because I have held that Booking.com's defamation claim survives Ryanair's motion for summary judgment, there remains a factual dispute as to whether Ryanair implemented its strategy through improper means, in this case by defamatory statements. Whether Booking.com can ultimately carry its burden to establish wrongful means is a question of fact for the jury. *See Lipson*, 790 A.2d at 1287–88; *see also U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436–37 (D. Del. 2014).

### ii. Intentional Interference

Ryanair argues that it did not have the required degree of knowledge to intentionally interfere with Booking.com's prospective business relations by sending emails to suspected OTA customers. Dkt. No. 348 at 35–36 (citing *Shure Inc. v. ClearOne, Inc.*, No. CV 19-1343, 2021 WL 4894198, at *2 (D. Del. Oct. 20, 2021) ("It would be hard to 'intentionally interfere' with something that was not known.")). Ryanair argues that because OTAs conceal their identity to evade detection, Ryanair could not have known whether it was communicating with a

Booking.com customer when Ryanair sent emails to customers suspected of having used OTAs to book flights.

Ryanair determines based on various metrics (e.g., email addresses, payment details, and IP country of origin) that particular customers are likely to have used OTAs to book flights, but it does not know which OTA booked a particular customer's flights. *See* Fuga Decl. Exh. 26 at 32:15–34:22 ("[W]e don't know who each individual booking belongs to."); Fuga Decl. Exh. 29 at 42:18–43:9, 163:29–164:14 ("I don't know . . . who is the OTA behind that . . . they're all hiding now, and that's the challenge that we have."). Ryanair does not dispute that among the customers to whom it sends the "OTA emails" there are likely to be customers of Booking.com, but it argues that it sends those emails to particular customers because those customers have a booking that is flagged as an OTA booking, not because Ryanair knows that Booking.com is the OTA in a particular case.

Booking.com responds that there is sufficient evidence to show knowledge by Ryanair that some of the customers who receive its emails are likely to have booked their flights through Booking.com, or at least enough evidence to create a disputed question of fact on that issue. Booking.com cites Ryanair's internal records to show that Ryanair specifically targets Booking.com customers. *See* Hemann Decl. Exh. 18 (listing litigation against Booking.com as part Ryanair's "OTAs – Comms Plan"); Hartnett Decl. Exh. V (email and attachment listing Booking.com on Ryanair's "OTA Cheat Sheet"); Hartnett Decl. Exh. M (listing Booking.com as one of the OTAs selling Ryanair flights in Ryanair's OTA Review from August 2023); Hartnett Decl. Exh. CC (referring to Booking.com as an "OTA Pirate" on Ryanair's blog in January 2024).

Booking.com is correct that from those facts, a reasonable jury could infer that Ryanair knew Booking.com customers were among the OTA customers to whom it has sent emails. *See*

*Shure*, 2021 WL 4894198, at *3.  In response, Ryanair asserts that in order to prevail on its intentional interference charge, Booking.com must be able to show not only that Ryanair had such knowledge but that Ryanair's "primary intent" in sending those emails was to target Booking.com customers specifically.  *See* Dkt. No. 380 at 17 (citing *Buchler*, 120 F. App'x at 418–19).

That proposition misstates the applicable law.  The *Buchler* court did not apply a "primary intent" test.  Moreover, Delaware courts have explained that whether the defendant's motive was at least partly competitive is only one factor in determining whether an interference is improper and is not, by itself, dispositive.  *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 611 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *Lipson*, 790 A.2d at 1287–88 (whether an interference is improper is a multi-factor inquiry that is "typically a question of fact for the jury"); *see also* Restatement (Second) of Torts, § 767.  Ryanair is therefore not entitled to summary judgment of no intentional interference based on the absence of evidence of knowledge.

### C.  Damages

Ryanair argues that Booking.com's tortious interference, unfair competition, and trade libel claims fail because Booking.com cannot prove that it suffered a compensable injury as a result of Ryanair's emails to customers.

### i.  Admissibility of Customer Complaints

Booking.com seeks to rely on customer complaints about the emails its customers received from Ryanair, which led the customers to complain that Booking.com had acted improperly in the course of booking their flights. Ryanair responds that Booking.com's reliance on customer complaints is insufficient to establish that it has lost business and good will among customers. Ryanair first argues that Booking.com's customer complaints are inadmissible hearsay.  In addition, Ryanair points out that many of the comments relied upon by Booking.com are

unauthenticated translations from languages other than English. And even if the customer complaints are admissible, Ryanair argues, Booking.com has made no showing that it suffered any pecuniary loss as a result of those complaints. To the contrary, Ryanair points out, the evidence shows that Booking.com's sales of Ryanair flights increased during the period at issue in this case.

In its brief, Booking.com responds that its customer complaints are admissible as business records under Federal Rule of Evidence 803(6), as evidence of the customer's then existing state of mind or emotional condition under Rule 803(3), or as the customer's present sense impressions under Rule 803(1). Booking.com also argues that the complaints are offered for a purpose other than for the truth of the matters asserted in the complaints; in particular, Booking.com argues that the complaints are admissible to show that customers were unhappy with Booking.com, thus supporting Booking.com's theory of economic reputational harm. Booking.com further notes that while the number of its Ryanair bookings have increased over time, the growth rate for its sales of Ryanair flights has been low relative to the growth rate for other sales, which supports its theory that it has suffered damages attributable to Ryanair's alleged acts of tortious interference, unfair competition, and trade libel.

During the hearing on the summary judgment motions, Booking.com withdrew its argument that customer complaints are admissible as business records under Rule 803(6) because Booking.com collects and maintains those complaints. Wisely so, as that argument was plainly wrong. To qualify as a business record under Rule 803(6), the record of an event must be one made in "the course of a regularly conducted business activity." Fed. R. Evid. 803(6); *see United States v. Pelullo*, 964 F.2d 193, 200 (3d Cir. 1992) (Rule 803(6) requires that "the declarant made the record in the regular course of the business activity"); *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 194–95 (4th Cir. 2003) (same); *United States v. Baker*, 693 F.2d 183, 189 (D.C. Cir. 1982)

(Rule 803(6) only applies if "every . . . participant in the chain producing the record" is acting in the regular course of business). Customer complaints are not business records, because the customer typically is not acting in the regular course of business activity when making the complaint. *See, e.g., Rowland*, 340 F.3d at 195; *Kendall v. Bausch & Lomb Inc.*, No. CIV. 05-5066, 2011 WL 860447, at *5 (D.S.D. Mar. 9, 2011) (customer complaints received by a party are not business records); *ADT LLC v. Alarm Prot. LLC*, No. 9:15-CV-80073, 2017 WL 1881957, at *2 (S.D. Fla. May 9, 2017) (same).

Even if the log of customer complaints kept by Booking.com is itself is a business record, the complaints present a double hearsay problem: a record of the receipt of complaints may be business records, but the customers' complaints are not. And the complaints themselves must be independently admissible for the contents of the complaints to be allowed into evidence. *See Rowland*, 340 F.3d at 195; *Salas v. Toyota Motor Sales*, No. 2:15-CV-08629, 2024 WL 1083078, at *4 (C.D. Cal. Feb. 2, 2024); *QVC, Inc. v. MJC Am., Ltd.*, No. CIV.A. 08-3830, 2012 WL 33026, at *2 (E.D. Pa. Jan. 6, 2012).

There is considerably more force to Booking.com's argument that complaints that specifically state an intention not to book flights through Booking.com in the future are admissible under Rule 803(3) as "[a] statement of the declarant's then-existing state of mind." *See, e.g.,* Hartnett Decl. Exh. W ("I have been advised by Ryanair that they have NO commercial relationship with booking.com and that the booking I have paid for has been blocked. . . . I have been a Genius level customer for years but no more."); Hartnett Decl. Exh. X ("I will never use booking.com to make a reservation again after this experience [booking a Ryanair flight through Booking.com]").

67

Such evidence is admissible under Rule 803(3) to show a customer's then-existing state of mind, including the customer's intent or plan. *See GF Princeton, L.L.C. v. Herring Land Grp., L.L.C.*, 518 F. App'x 108, 113 (3d Cir. 2013) ("Testimony as to customer motivation is admissible as an exception to hearsay under Fed. R. Evid. 803(3)"); *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 251–52 (3d Cir. 1999) (same).[30]

Citing the Third Circuit's decision in *Callahan*, Ryanair argues that while the customers' complaints can be admitted to show the customers' intentions (such as the expressed intention to stop doing business with Booking.com), the complaints cannot be used to show that declarants acted in conformity with that expressed intent. That is a misreading of Rule 803(3) and Supreme Court and Third Circuit authority.

In *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285 (1892), the Supreme Court held that a statement of the declarant's intent is admissible not only to show the declarant's intention, but also as evidence that he acted on that intention. The Advisory Committee note on Federal Rule of Evidence 803(3) made clear that the current rule embraces that holding. As the Advisory Committee wrote, "The rule of [*Hillmon*], allowing evidence of intention as tending to prove the

---

[30] Booking.com also argued in its brief that the customers' complaints were admissible under Federal Rule of Evidence 803(1), the exception to the hearsay rule for present sense impressions. The problem with that argument is that Booking.com has not offered any evidence that the declarations described or explained "an event or condition, made while or immediately after the declarant perceived it," which is a necessary condition for admission of a statement under that exception.

To the extent that customer statements do not go to the customers' state of mind, they are not admissible under Rule 803(3). As Booking.com argues, however, such statements are still admissible for the non-hearsay purpose of showing that customers complained to Booking.com following their receipt of emails from Ryanair. *See Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704, 2022 WL 17403121, at *1–2 (D. Del. Aug. 9, 2022) (customer complaints are not hearsay when offered as evidence that complaints were made rather than for the truth of what was complained about).

Case 1:20-cv-01191-WCB    Document 399 *SEALED*    Filed 06/17/24    Page 69 of 103 PageID #: 14394

doing of the act intended, is, of course, left undisturbed." The Third Circuit has said the same thing. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004) ("To the extent such statements address the speaker's plans . . . , they create an inference that the declarant acted in accord with that plan."); *United States* v. *Donley*, 878 F.2d 735, 737–38 (3d Cir. 1989) (same)); *see also Janssen Pharms., Inc. v. Tolmar, Inc.*, No. 21-1784, 2024 WL 834762, at *14-15 (D. Del. Feb. 26, 2024) (same).[31]

In any event, it is not necessary to probe the extent to which the customer complaints admitted under Rule 803(3) can be used to prove that the customers acted consistently with their expressed intentions and that Booking.com lost business as a consequence. That is because at the hearing on the summary judgment motions, Booking.com expressly disclaimed reliance on the customers' complaints to show that the customers in fact stopped doing business with Booking.com and that Booking.com suffered financial injury as a result. The court will hold Booking.com to that disclaimer.

Ryanair argues that several of the customer comments are inadmissible because they appear in a spreadsheet column titled "comments translated," and it is unclear how they were translated, whether those translations are accurate, and whether the comments are verbatim or paraphrased. *See* Fuga Decl. Exh. 31. Ryanair argues that under Federal Rule of Civil Procedure

---

[31] The *Callahan* case, the sole authority on which Ryanair relies on this issue, does not support Ryanair's contention. In that case, the Third Circuit explained that the admission of a statement of the declarant's intent or motives may not be admitted "as evidence of the facts recited as furnishing the motives." 182 F.3d at 252. That is simply a restatement of the well-established principle that while an out-of-court statement admissible as a statement of intent can be used as evidence that the declarant acted in the future consistently with his expressed intent, it cannot be used to prove events the past events that may have given rise to the declarant's intent or motive. As Justice Cardozo put it in the famous case of *Shepard v. United States*, 290 U.S. 96, 105–06 (1933), "Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past."

56(e), Booking.com cannot rely on that evidence to survive the summary judgment motion because the translations were unauthenticated, and the comments were therefore inadmissible.  But in its response to the summary judgment motion, Booking.com relies primarily on English language customer complaints.  *See, e.g.,* Hartnett Decl. Exh. W; Hartnett Decl. Exh. X; *see also* Hartnett Decl. ¶¶ 33–34 (attesting that exhibits W and X are true and correct copies of customer service tickets); Second Guerrero Decl. ¶¶ 5–7 (certification of records, including customer emails).[32] Booking.com may rely on the English language emails for the purposes of responding to the summary judgment motion under Federal Rule of Civil Procedure 56(e); the translated complaints will not be taken into account in determining the disposition of Ryanair's summary judgment motion on this issue.

### ii.  Booking.com's Theory of Loss

In light of Booking.com's acknowledgement that it will rely on the customer complaints only for the limited purpose of proving the customers' state of mind, the question remains whether Booking.com has adduced sufficient evidence of damages to satisfy the damages element of its tortious interference, unfair competition, and trade libel claims.

Ryanair argues that Booking.com has not proved damages by showing that it has lost customers as a result of Ryanair's emails.  To the contrary, Ryanair argues, Booking.com's sales of Ryanair flights have increased over the last several years.  *See* Fuga Decl. Exh. 32 at 8, Exh. B. Moreover, Ryanair argues that Booking.com has provided no calculation of damages to sustain its burden.  Rather, Ryanair maintains that the evidence Booking.com has adduced relating to

---

[32] Booking.com also provided information on how customer feedback in the spreadsheet was translated.  *See* Second Guerrero Decl. ¶¶ 9–13.  It appears that translations were done by an automated program.  The court does not need to address whether this translation is sufficiently reliable because Booking.com relies primarily on English language customer complaints in its response to the motion for summary judgment.

damages is speculative and cannot sustain a finding that Booking.com has satisfied the damages requirements of the three economic torts. *See Beard Rsch*, 8 A.3d at 613.

Because Booking.com is not relying on customer complaints as evidence that any repeat customers stopped using the company's services, Booking.com relies on a theory of economic reputational harm. It argues that the complaints show harm to its reputation, and that such harm is pecuniary in nature. Booking.com points to the testimony of Mr. Guerrero, who testified that Ryanair's emails have adversely affected flight sales, and that Booking.com has suffered pecuniary harm as a result of that reputational harm. *See* Hartnett Decl. Exh. K at 248:8–260:14. In his deposition, Mr. Guerrero admitted it is "difficult to identify what is the real impact" of the emails, but he maintained that "reputation equals money." *See id.* at 249:19–251:4. In support of his contention that Booking.com has suffered a monetary loss due to that reputational injury, Mr. Guerrero also testified that Ryanair bookings on Booking.com have not increased at the same pace as air travel bookings on Booking.com generally. *Id.* at 252:14–260:17.

Based on the Guerrero testimony and a calculation provided in Ms. Hartnett's declaration, *see* Hartnett. Decl. ¶¶ 4–8, Booking.com argues that it can prove injury and causation to the jury.[33] Booking.com argues its evidence is sufficient to create a genuine issue of fact as to damages because at this stage of the proceedings it need only establish that it suffered some damages, and is not required to show the quantum of damages. Dkt. No. 372 at 41 & n.18 (citing *Callahan*, 182

---

[33] In its reply brief, Ryanair asserts that those figures have never been produced before and that the calculation in Ms. Hartnett's declaration is incorrect. Regarding the former, Mr. Guerrero clearly referenced the difference in growth rates in his deposition testimony as evidence of lost profits or pecuniary harm. *See* Hartnett Decl. Exh. K at 252:14–260:17. Thus, Booking.com's theory of harm is not new. Whether the specific calculation in Ms. Hartnett's declaration is correct is an issue for cross-examination, assuming Booking.com introduces admissible evidence of the underlying figures as part of its case for damages.

F.3d at 247; *Beard Rsch.*, 8 A.3d at 612 (to establish liability, plaintiffs "need show only that they suffered some damage, not the precise amount of damage.").

Although the evidence on damages is thin, Booking.com has produced sufficient evidence to show that there is a genuine issue of fact as to whether it has suffered damages; the quantum of damages is appropriately addressed at a later stage of the case. Booking.com is correct that the fact that its Ryanair flight sales have increased over all does not preclude its damages case: ███████████████████████████████████████████████████████████

███████████████████████████. Ryanair is, of course, also correct that ████████

████████ may be attributable to other causes, such as its improved technological barriers. *See* Dkt. No. 380 at 19–20. However, whether Booking.com has shown that ████████████

███████████ is due to Ryanair's emails is an issue for the jury. *See Lipson*, 790 A.2d at 1291 ("Generally, the issues of causation and damages are left for the jury.").

Ryanair relies primarily on *Beard Research* for its argument that Booking.com's evidence of damages is too speculative, and that Booking.com will be unable to provide a "responsible estimate of damages." 8 A.3d at 613. The court in that case explained that a court "may not set damages based on mere 'speculation or conjecture.'" *Id*. However, the procedural posture of that case was different from the procedural posture of this one: the court in that case was making post-trial findings of fact and conclusions of law. Thus, while it is true that Booking.com needs to provide an evidentiary basis from which the jury could make a responsible estimate of damages at trial, it would be premature to rule that Booking.com has not provided such a basis at this stage, when it has provided enough evidence to show that the fact of damage is in dispute. *Id*. ("The quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage.") (citation omitted). Ryanair's motion for summary judgment is

therefore denied as it relates to Booking.com's tortious interference, unfair competition, and trade libel counterclaims.

### iii. Defamation

In a footnote, Ryanair argues that Booking.com can, at most, seek only nominal damages for its defamation claim because it cannot show injury to its reputation in light of the inadmissibility of customer complaints. *See* Dkt. No. 348 at 36 n. 18 (citing *Preston Hollow Cap. LLC v. Nuveen LLC*, No. N19C-10-107, 2022 WL 2276599, at *4 (Del. Super. Ct. June 14, 2022)). Booking.com argues that because this is a defamation per se case, harm to reputation is presumed. In support, Booking.com cites *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1078 (3d Cir. 1985). That case is not instructive, however, because it applied Pennsylvania law.

Under Delaware law, "statements which 'malign one in a trade, business, or profession' are '. . . slander *per se*.'" *See Preston Hollow Capital*, 2022 WL 2276599, at *3 (citation omitted). In such cases, Delaware law still requires that a plaintiff show injury to reputation. *Id.* at *4 (citing *Gannett Co. v. Kanaga*, 750 A.2d 1174, 1184 (Del. 2000). However, Ryanair is incorrect in asserting that Booking.com has no evidence of damage to its reputation. Booking.com's assertion relies on the assumption that the customer complaints are inadmissible in their entirety, when they are in fact admissible to show both that complaints occurred and that the complaining customers intended to stop using Booking.com. That evidence is sufficient to show injury to reputation. Ryanair's motion for summary judgment will therefore be denied, and Booking.com will be allowed to present evidence of defamation at trial.

## V.   Ryanair's Daubert Motions

### A.  Opinions of Jordan Rae Kelly

Jordan Rae Kelly, the defendants' cybersecurity expert, presents three opinions in her report: (1) that the Ryanair website is publicly available in that there is no barrier to accessing the website; (2) that Ryanair necessarily granted access to its website in order for on-line flight purchases to be made; and (3) that there is no evidence that the defendants caused harm to the Ryanair website.  *See* Hemann Decl. Exh. 38.  Ryanair argues that all three opinions should be excluded.

### i.  Ms. Kelly's Opinions on Access to the Ryanair Website

Regarding Ms. Kelly's opinion that the Ryanair website is public, Ryanair argues that (1) Ms. Kelly's definition of "public" should be excluded because it would confuse the jury; (2) Ms. Kelly ignored crucial information regarding how Shield functions; and (3) the methodology that Ms. Kelly used in testing how Shield operates is unreliable because her test used humans instead of automated software (i.e., bots), and Shield was not designed to be a barrier to humans.  The defendants respond that Ms. Kelly's definition of what constitutes a "public website" is admissible because she relies on industry-recognized standards to support her conclusion.  The defendants also dispute Ryanair's contention that Ms. Kelly ignored critical information about the Shield system.

Regarding Ms. Kelly's opinion that Ryanair "necessarily granted access to its website" for flight purchases, Ryanair argues that Ms. Kelly's opinion is unreliable because she relied on a self-serving distinction between "good bots" and "bad bots" [34] and, instead of addressing Ryanair's

---

[34] Ms. Kelly offered the opinion in her report that cybersecurity professionals often distinguish between "good" and "bad" bots because the term "bots" itself is a broad term that covers software that automates certain functions on a website.  She explained that the distinction

internally developed Shield Software, she repeatedly referenced a different, external Shield program owned by a Singaporean company having no relationship to this case. The defendants dispute Ryanair's characterization of Ms. Kelly's report, arguing that she had adequate support for her good-bot/bad-bot distinction and that, while it is true that Ms. Kelly mistakenly referred to the external Shield software from a Singaporean company, she admitted that mistake in her deposition and analyzed Ryanair's internal Shield program as well.

While the parties focus on the merits of Ms. Kelly's analysis, the fundamental issue with Ms. Kelly's first two opinions is that both address the legal issue of whether defendants (by way of their vendors) access the Ryanair website or the myRyanair portion of that website without authorization. In light of the court's legal conclusions regarding whether the alleged access to the Ryanair website in this case would be without authorization, which will govern the jury's consideration of those issues, Ms. Kelly's first and second opinions would not satisfy the requirement under Federal Rule of Evidence 702 that an expert's specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue." *See* Fed. R. Evid. 702(a).

### ii.  Ms. Kelly's Opinion on Harm to the Ryanair Website

Ryanair argues that Ms. Kelly's opinion that there is no evidence of harm to the Ryanair website is unreliable because Ms. Kelly characterizes harm more restrictively than the CFAA does and, in doing so, may mislead the jury. *See* Dkt. No. 348 at 46–47 (citing Fed. R. Evid. 702; *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("Rule 702 requires that the expert testimony must fit the issues in the case . . . and assist the trier of fact"); Dkt. No.

---

is useful to explain how Ryanair attempts to prevent the use of bots on its websites. *See* Hemann Decl. Exh. 38 at 22–32.

380 at 23–24.  The defendants respond that Ryanair's real concern is not with Ms. Kelly's methods but with her conclusion, which is a basis for cross-examination, not for exclusion. *See* Dkt. No. 372 at 47–48 (citing *Allscripts Healthcare, LLC v. Andor Health*, *LLC*, No. 21-704, 2022 WL 3021560, at *26 (D. Del. July 29, 2022)).  The defendants also argue that the fact that Ms. Kelly did not address the full range of possible losses under the CFAA is not a basis for exclusion, but rather merely reflects that she did not anticipate all of Ryanair's theories of loss, including the theory of loss that Mr. Lopata set forth in his contemporaneously filed expert report for Ryanair. *See id.*

Ms. Kelly's opinion that Ryanair cannot attribute website slowdowns or website disruption to any particular OTA is relevant to the case as it goes to the central issue of loss and damage. Based on the deposition testimony of Ryanair's witnesses and Ms. Kelly's own analysis of Ryanair flights sold by the defendants, Ms. Kelly concluded that the defendants' actions could not have caused the harm that Ryanair claims.  *See* Hemann Decl. Exh. 38 at 32–41.  Her opinion on that issue is directly responsive to a theory of harm that Ryanair has advanced throughout this case: that the defendants' access to the website harms the "availability and/or usability" of the Ryanair website.  *See* Dkt. No. 76 at ¶¶ 270–72.  Ryanair is thus incorrect in asserting that Ms. Kelly's opinion is not relevant to any issues in this case.

Ryanair's argument that Ms. Kelly's opinion is misleading or unreliable because other harms are cognizable under the CFAA, such as loss from Ryanair's investigation into bot activity, fails to recognize that Ms. Kelly's testimony is directed to whether there was any harm *to the Ryanair website*, not to the scope of all losses cognizable under the CFAA.  To the extent that Ryanair's argument is that Ms. Kelly should have considered additional sources or additional context surrounding the depositions that she relied upon, such arguments are best addressed

through cross-examination, not exclusion.  *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination"); *see also Allscripts Healthcare*, 2022 WL 3021560, at *26.  However, in light of my rulings that only the myRyanair portion of the website is private, Ms. Kelly will be limited to testifying as to the harm or lack thereof related to requests on the myRyanair portion of the website.

### B. Timothy O'Neil-Dunne

Timothy O'Neil-Dunne is the defendants' travel industry expert.  His report provides background on the development of the travel industry, methods of booking consumer travel, a comparison of full-service and low-cost carriers, and a discussion of Ryanair's business model and the benefits provided by OTAs.  *See generally* Hemann Decl. Exh. 39.

Ryanair argues that Mr. O'Neil-Dunne's testimony should be excluded for three reasons.  First, Ryanair characterizes Mr. O'Neil-Dunne's report as providing only general background on (1) the direct and indirect purchasing of airline tickets, (2) the post-internet travel industry, (3) modern methods of booking travel, (4) the preferences of airlines, and (5) the purposes of OTAs and their benefits to customers.  Dkt. No. 348 at 39.  None of that background information, Ryanair argues, is relevant to either the CFAA claims or Booking.com's counterclaims, and it should therefore be excluded.  Second, Ryanair argues that Mr. O'Neil-Dunne's discussion of Ryanair does not constitute expert evidence because Mr. O-Neil-Dunne is not qualified to address the nature of Ryanair's business.  Third, Ryanair argues that Mr. O'Neil-Dunne's opinions are unreliable because he provides no supporting methodology or analysis.

The defendants respond, first, that Mr. O'Neil-Dunne's testimony is relevant to the interpretation of "authorization" in the CFAA because he will testify that conduct such as screen scraping is a "commonplace computer activity" for OTAs of the sort that Congress did not intend to criminalize under the CFAA. *See Van Buren*, 593 U.S. at 393. Second, the defendants argue that Mr. O'Neil-Dunne's opinion regarding the value of agent-supplied information in the travel industry goes to Ryanair's argument that OTAs provide "false" information. Third, the defendants argue that Mr. O'Neil-Dunne's opinion that myRyanair's login process serves a business purpose rather than a cybersecurity purpose is relevant to the case. Under the liberal standard of admissibility under Rule 702, the defendants argue that the whole of Mr. O'Neil-Dunne's testimony, as reflected in his report, should be admitted. *See Orbital Eng'g, Inc. v. Buchko*, 578 F. Supp. 3d 736, 740 (W.D. Pa. 2022) (citation omitted); *see also United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010); *United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007).

For the same reason that Ms. Kelly's opinions going to authorization and authentication will not assist the jury in deciding issues of fact, the defendants cannot rely on Mr. O'Neil's opinion on screen scraping in section 7.2.1 of his report to address authorization. To the extent his opinion about the purpose of myRyanair is intended to address whether myRyanair is an authentication mechanism, his opinion will also be excluded.

However, Ryanair has not shown that the remainder of Mr. O'Neil-Dunne's report is irrelevant or unreliable. Ryanair does not contest that Mr. O'Neil-Dunne is an expert in the travel industry nor does it suggest that his opinions are irrelevant to the counterclaims. Even after the defendants argued that his testimony was relevant to the counterclaims, Ryanair continued to address only whether Mr. O'Neil-Dunne's testimony was relevant to its CFAA claims. *See* Dkt. No. 380 at 20–21. Mr. O'Neil-Dunne's discussion of Ryanair's model, the commercial purposes

78

of myRyanair, and the use of OTA-supplied information are all relevant to the counterclaims. In particular, his testimony regarding the use of non-traveler-supplied information, i.e., information supplied by an OTA, *see* Hemann Decl. Exh. 39 § 8.2.2, and the commercial purposes of myRyanair, *see id.* § 8.2.3, has the "potential to assist the trier of fact" in deciding the defendants' defamation claim. *See supra* section IV.A.

### C. Basil Imburgia

Basil Imburgia is the defendants' rebuttal expert, whose reports are directed to responding to Mr. Lopata's testimony concerning loss under the CFAA. *See* Hemann Decl. Exhs. 44 (Rebuttal Report) & 45 (Supplemental Rebuttal Report). Mr. Imburgia asserts in his report (1) that the methodology Mr. Lopata used to calculate loss in his opening damages report is unreliable; (2) that it is unlikely that the defendants could be the cause of slowdowns and shutdowns on the Ryanair website given the relative volume of their bookings compared to all OTA bookings of Ryanair flights; and (3) that Mr. Lopata failed to properly allocate costs to the individual defendants. *See* Hemann Decl. Exh. 44 at ¶ 12.

Ryanair seeks to exclude Mr. Imburgia's report on three grounds: (1) Mr. Imburgia is not qualified to testify on matters related to the CFAA; (2) Mr. Imburgia's analysis is unreliable; and (3) Mr. Imburgia's conflation of "loss" and "damage" will mislead the jury.

### i. Mr. Imburgia's Qualifications

Ryanair argues that while Mr. Imburgia is qualified as an accountant, he is not qualified on matters related to the CFAA because he has no experience with CFAA claims and no technical expertise in cybersecurity. *See* Dkt. No. 348 at 47–48. Ryanair argues that Mr. Imburgia's lack of experience affected his report because Mr. Imburgia applied general damages principles such

as the duty to mitigate costs and to prevent windfalls, principles that do not apply to the calculation of loss under the CFAA.

The defendants respond that this argument is baseless because Mr. Imburgia is not offered as an expert on the CFAA, and he therefore does not need prior experience in CFAA litigation to testify in this case. *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550-51 (C.D. Cal. 2014). In addition, the defendants argue that it is permissible for Mr. Imburgia to criticize Mr. Lopata's calculations without offering a theory of his own regarding how to calculate costs under the CFAA, *see Complaint of Borghese Lane, LLC*, No. 2:18-CV-00533, 2023 WL 3114851, at *3 (W.D. Pa. Apr. 27, 2023).

Mr. Imburgia is qualified to testify regarding Mr. Lopata's calculations of loss and damages. Mr. Imburgia's opinions are based on his expertise as an accountant, which is not challenged, not as a technical expert on the CFAA. Mr. Imburgia therefore may properly critique the methodology Mr. Lopata used to calculate Ryanair's costs and to allocate those costs to the defendants. *See Complaint of Borghese Lane, LLC*, 2023 WL 3114851, at *3 ("Courts have held that it is the proper role of rebuttal experts to critique [an] expert's methodologies and point out potential flaws in the . . . experts' reports.") (cleaned up) (collecting cases). The permissibility of Mr. Lopata's opinion on loss is addressed below, *infra* section IV.A.i, and a significant portion of that opinion is excluded. To the extent that Ryanair relies on the evidence underlying Mr. Lopata's report to make its case on loss and that evidence has the same problems that Mr. Imburgia raised in his criticism of Mr. Lopata's opinion on loss, Mr. Imburgia may testify to his rebuttal opinions. Mr. Imburgia need not have addressed loss under the CFAA in a prior trial in order to critique Mr. Lopata's analysis, or the underlying evidence, in the present case.

However, Ryanair is correct that to the extent Mr. Imburgia's criticisms are based on principles that do not apply to the calculation of loss for the CFAA, they are not proper rebuttals of Mr. Lopata's report. Accordingly, Mr. Imburgia may not testify that Mr. Lopata erred by failing to consider Ryanair's duty to mitigate, *see* Hemann Decl. Exh. 44 at ¶¶ 21–22, 70,[35] or that Mr. Lopata erred by failing to consider that Mr. Lopata's calculation method would result in a windfall for Ryanair, *id.* at ¶¶ 12 bullet point 3, 78.[36]

In addition, Mr. Imburgia is not qualified to testify about whether the defendants' actions are likely to have caused website slowdowns, because that question goes to a technical issue on which he is not qualified to testify. *See id.* at ¶¶ 12 bullet point 2, 76. Accordingly, his testimony corresponding to those paragraphs of his report will be excluded. However, Mr. Imburgia may testify in accordance with the portion of his report criticizing Mr. Lopata for not properly attributing an amount of harm from slowdowns or shutdowns to the defendants based on the facts in Mr. Lopata's report. *See, e.g.*, *id.* at ¶¶ 74–75.

### ii. Reliability of Mr. Imburgia's Reports

Ryanair argues that Mr. Imburgia's reports and testimony are unreliable for two reasons. First, Ryanair argues that Mr. Imburgia's report is unreliable because he delegated much of the

---

[35] The defendants interpret Ryanair's argument on this issue as a criticism of Mr. Imburgia's analysis of Mr. Lopata's testimony regarding the costs of customer verification. *See id.* at ¶¶ 61–70; Hemann Decl. Exh. 45 at ¶¶ 19–24. Ryanair's criticism appears to be limited to paragraph 70 of Mr. Imburgia's report, which addresses the duty to mitigate, not Mr. Imburgia's criticism of how Mr. Lopata calculated the cost of customer verification. In any event, the latter criticism by Mr. Imburgia is admissible because it goes to Mr. Lopata's methodology and calculations rather than to an inapplicable concept such as the duty to mitigate, which is not relevant to the CFAA's loss provision.

[36] In the same sentence, Mr. Imburgia states that Mr. Lopata's contention that the defendants are liable for the total costs related all to OTA activities, despite the defendants being responsible for less than 3 percent of all OTA bookings is unreasonable. Mr. Imburgia may testify to this opinion, as it goes to his criticism of Mr. Lopata's failure to properly allocate costs to the defendants.

work on the report to other individuals. *See* Fuga Decl. Exh. 37 at 106:21–107:12, 108:17–109:3. As a result, Ryanair argues, Mr. Imburgia made the error of using revenue figures for the Ryanair Group, a holding group, in a calculation meant for Ryanair DAC, which operates the airline and website and is the plaintiff in the present case. *See* Hemann Decl. Exh. 45 at ¶¶ 30–32; Fuga Decl. Exh. 37 at 300:12–303:20. Second, Ryanair argues that Mr. Imburgia stopped his analysis at the "surface level of citations" in the Lopata Report. *See* Dkt. No. 348 at 49.

The defendants respond that Mr. Imburgia's opinions are reliable because an expert witness is permitted to use assistants in formulating his expert opinions, and Mr. Imburgia was sufficiently involved in preparing the report for him to testify to its contents, *see* Hartnett Decl. Exh. BB at 108:1–16. Regarding Mr. Imburgia's use of the holding group data and his analysis of Mr. Lopata's sources, the defendants argue that such criticism is best addressed through cross-examination. *See UGI Sunbury LLC v. A Permanent Easement for 0.4308 Acres*, No. 3:16-CV-794, 2021 WL 5140050, at *9 (M.D. Pa. Nov. 4, 2021); *Allscripts Healthcare*, 2022 WL 3021560, at *26.

"It is well recognized that an expert witness is permitted to use assistants in formulating his expert opinion." *See Shire Viropharma Inc. v. CSL Behring LLC*, No. CV 17-414, 2021 WL 1227097, at *21 n.13 (D. Del. Mar. 31, 2021) (cleaned up). So long as the expert was "directly involved in the research, analysis or drafting of the report, even with substantial assistance from a colleague or associate, his involvement in and knowledge of the report are matters of weight, not admissibility." *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013). Ryanair has not shown that Mr. Imburgia was not directly involved in the analysis and drafting of the report, and the defendants point to Mr. Imburgia's testimony that his process was to outline the

report, share the outline with his colleagues, and then provide edits and rewrites.  *See* Hartnett Decl. Exh. BB at 108:1–16.

Ryanair's best argument on this issue is that, based on his deposition testimony, it appears that Mr. Imburgia did not understand that the plaintiff is Ryanair DAC, not Ryanair Group.  *See* Fuga Decl. Exh. 37 at 137:9–140:3; 303:17–20.  It is unclear from his deposition testimony, however, whether Mr. Imburgia was confused about the relevant entity or merely misremembered the name of the plaintiff.  *See id.*  The defendants are correct that the error can be explored through cross-examination and is not a sufficient ground for excluding Mr. Imburgia's testimony altogether.  In addition, the error is not an adequate basis for concluding that Mr. Imburgia was not sufficiently involved in drafting the expert report to require that his testimony be excluded on that ground.

Ryanair's criticism that Mr. Lopata's analysis stopped at the surface level of the Lopata Report's citations is also based on Mr. Imburgia's deposition testimony.  *See id.* at 147:12–150:24.  That testimony rebuts Ryanair's assertion that Mr. Imburgia looked only at surface level citations in the Lopata report, as Mr. Imburgia testified that he looked at the underlying documents that Mr. Lopata relied upon.  *Id.* at 148:10–18.  The fact that during his deposition Mr. Imburgia did not remember which particular documents Mr. Lopata examined does not suggest that Mr. Imburgia's report is unreliable.  To the extent Ryanair believes that Mr. Imburgia misrepresented what documents Mr. Lopata reviewed, that criticism would also be best explored during cross-examination.

### iii.  The conflation of "loss" and "damages"

Ryanair's final argument regarding Mr. Imburgia is that Mr. Imburgia's opinion will not "help the trier of fact to understand the evidence or to determine a fact in issue" because Mr.

Imburgia confused the terms "loss" and "damage" under the CFAA.  Fed. R. Evid. 702.  Ryanair argues that this lack of precision will confuse the jury in its effort to determine whether the loss requirement for the CFAA is met.  *See United States v. Merrill*, No. 08-20574, 2010 WL 3981158, at *8 (S.D. Fla. Oct. 8, 2010) (finding expert testimony that defined and applied terms in a way that conflicted with the relevant regulations was inadmissible).  The defendants do not appear to have addressed this issue beyond making the general point that Mr. Imburgia's testimony would be "helpful to the finder of fact."  *See* Dkt. No. 372 at 48.

Mr. Imburgia's report addresses the definition of loss in the Lopata Report and the CFAA. *See* Hemann Decl. Exh. 44 at ¶ 16.[37]  Nonetheless, he uses the terms "damages" and "loss" interchangeably.  That loose use of the terms creates the potential for confusion given the specific definition of loss in the CFAA.  Nonetheless, any such confusion can be cured short of exclusion by requiring that Mr. Imburgia refer to "loss" in non-ambiguous terms and by excluding testimony that addresses theories that are relevant only to a damages analysis, such as the duty to mitigate, as discussed above.  Although Mr. Imburgia improperly used the word "damages" in his report, the substance of his criticisms of how Mr. Lopata calculated loss (e.g., Mr. Lopata's inability to allocate costs to particular defendants) has the potential to assist the trier of fact in determining the crucial issue of whether the CFAA requirement that a plaintiff in a civil case show loss of at least $5,000 in a one-year period.

---

[37]  Mr. Imbruglia does not address "damage" as defined in the CFAA, nor would it be appropriate given that damage is a technical term under the CFAA, specifically defined in the statute.  *See* 18 U.S.C. § 1030(e)(8) ("[T]he term "damage" means any impairment to the integrity or availability of data, a program, a system, or information.").

## VI.   Booking.com's Daubert Motions

### A.   Opinions of Iain Lopata

Mr. Lopata is a technical expert for the defendants. Mr. Lopata submitted three reports in this case, all of which are at issue in the defendants' motion to exclude his testimony: (1) Mr. Lopata's Opening Report, Hemann Decl. Exh. 40; (2) Mr. Lopata's Amended and Supplemental Report, Hemann Decl. Exh. 41; and (3) Mr. Lopata's Rebuttal Report, Hemann Decl. Exh. 42. His opening report, as amended, provides opinions from a cybersecurity perspective regarding the barriers to access on the Ryanair website and how the defendants access that website. His reports also address the total amount of the loss to Ryanair caused by the defendants' online booking activities. Mr. Lopata's rebuttal report was offered in response to Jordan Rae Kelly's opening cybersecurity report.

The defendants argue that Mr. Lopata's loss and damages opinions should be excluded in full. They also argue that Mr. Lopata's cybersecurity opinions based on one of the tests he conducted should be excluded, as well as certain portions of his rebuttal report.

### i.   Mr. Lopata's Opinions on Loss under the CFAA

Section F of Mr. Lopata's Amended and Supplemental Report addresses his opinions on loss under the CFAA. In that section of his report, Mr. Lopata describes those categories of costs that he believes qualify as "losses" within the meaning of the CFAA, and he estimates the amount of those qualifying costs that Ryanair has spent on blocking OTA activity or repairing harm from OTA activity. He also allocates that amount to each defendant based on the percentage of OTA activity he attributes to that defendant. *See* Hemann Decl. Exh. 41 at ¶¶ 69–182.

The defendants urge that Mr. Lopata's opinion on "damages and loss" be excluded on the grounds that Mr. Lopata is not an expert on damages and that his methods are unreliable.

Regarding his expertise, the defendants first argue that Mr. Lopata's opinions on damages and loss should be excluded in full because Mr. Lopata admitted that he is not a damages expert, see Hemann Decl. Exh. 41 ¶ 28, and because he lacks the sort of expertise in accounting, finance, or economics that would be required for him to offer an expert opinion on this topic. *See Trs. of Univ. of Pa. v. Eli Lilly & Co.*, No. 15-6133, 2022 WL 3973276, at *3 (E.D. Pa. Jan. 14, 2022). They also argue that Mr. Lopata's opinion is a damages opinion in substance if not in name. *See Travelers Prop. Cas. Co. of Am. v. Hallam Eng'g & Constr. Corp.*, No. 08-0444, 2012 WL 13029519, at *3-4 (D.N.J. Aug. 16, 2012). As examples of his "damages" analysis, the defendants refer generally to Mr. Lopata's discussion of (1) joint and several liability, (2) allocation, and (3) whether Ryanair's losses exceed the statutory threshold.

In the alternative, the defendants argue that if Mr. Lopata is just doing simple math rather than conducting a damages analysis, he is not serving as an expert witness at all, because such calculations "are within the ken of a lay person." *Depalma v. Scotts Co.*, No. 13-7740, 2019 WL 2417706, at *7 (D.N.J. June 10, 2019); *Allscripts Healthcare*, 2022 WL 3021560, at *19 ("multiplication is not a specialized form of knowledge") (cleaned up).

Ryanair responds that Mr. Lopata is not offered as a damages expert but rather as a technical expert in cybersecurity who can properly provide an opinion as to which of Ryanair's costs should be classified as losses under the CFAA. Ryanair argues that the defendants' motion should be denied because it conflates two concepts: loss under the CFAA and legal damages. Mr. Lopata, Ryanair argues, has limited his testimony to the former category, based on his experience and expertise in information technology and cybersecurity. Additionally, Ryanair argues that Mr. Lopata is not simply performing basic arithmetic that a jury could perform but is using his

Appx113

specialized knowledge to inform his opinion as to what constitutes a "reasonable cost" to a victim under the CFAA.

Section F of Mr. Lopata's report is directed to loss under the CFAA, not legal damages. He stated as much in his report. *See* Hemann Decl. Exh. 41 at ¶ 28. In addition, he clarified at his deposition that he is not offering an opinion on damages but instead is addressing "[t]he costs incurred by Ryanair in responding to unauthorized access to their website" based on his experience with "the financials of an [Information Technology] project." *See* Hemann Decl. Exh. 9 at 56:8–57:24. That Mr. Lopata is not a damages expert is thus irrelevant. The confusion about Mr. Lopata's report arises from the same problem that Ryanair pointed out in Mr. Imburgia's report: Mr. Lopata uses the term "damages" interchangeably with the statutory term "loss." *See, e.g.,* Hemann Decl. Exh. 41 at ¶¶ 25 ("I understand that whether the damages caused exceed $5,000 in a single year is an important threshold [issue]").[38] While Mr. Lopata use of those terms is imprecise, that imprecision can be cured.

The defendants are correct, however, that Mr. Lopata's expertise in information technology is not relevant to Mr. Lopata's ultimate calculations of loss. To the extent that Mr. Lopata is offering an opinion on what constitutes "loss" under the CFAA, Mr. Lopata's opinion would be an improper legal conclusion because it goes to the meaning of that term in the CFAA. *See Vox*

---

[38] The defendants' argument that in his discussion of joint and several liability and allocation Mr. Lopata's report addresses "damages" in all but name is incorrect. Mr. Lopata clearly disclaimed that he was offering an opinion as to the appropriate legal approach in this case. Instead, he summarized two approaches so that he could offer an opinion on loss under the CFAA under either approach. *See* Hemann Decl. Exh. 41 at ¶¶ 27(i)–(k), 153–155. His opinions thus do not run afoul of the problem in *Travelers Property Casualty Co.*, 2012 WL 13029519, at *3–4, cited by the defendants. The court in that case rejected an expert's opinion on the allocation of damages because the expert did not follow industry standards and could not articulate how he reached the apportionment figures that he did. *Id.*; *cf.* Hemann Decl. Exh. 41 at F.3 (describing Mr. Lopata's method for allocating costs to each defendant).

*Mktg. Grp., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1149 (D. Utah 2021) (excluding an expert report that offered "legal conclusions on terms contained in the [CFAA]").  Because the meaning of "loss" is a legal question, the question of which of Ryanair's costs may be considered a "loss" under the CFAA is addressed in the summary judgment opinion, *see supra* section III.B.  In light of those rulings, Mr. Lopata may testify only on opinions he offered in his report as to which portions of certain systems can be allocated to preventing OTA activity.

For example, this court ruled that Ryanair may include the costs of CloudFront and AWS-WAF to the extent those costs are attributable to denying unauthorized bot requests by the defendants on the protected portion of the website.  Accordingly, Mr. Lopata may offer his opinion as to which portion of the monthly cost for CloudFront and AWS-WAF is attributable to preventing OTA activity, based on his technical expertise.  *See* Hemann Decl. Exh. 41 ¶¶ 98–103 (stating that CloudFront is multi-purpose, and that to the extent it serves purposes not used by OTAs, that portion of CloudFront costs cannot be allocated to OTAs).[39]  Ryanair will still need to provide a way to allocate that portion of the costs to the defendants' activity on only the protected portion of the Ryanair website.

The bulk of Mr. Lopata's opinion on loss is directed to allocating the costs of Ryanair's various anti-bot measures to the defendants based on how much OTA activity goes through the

---

[39]  At the hearing on the summary judgment motions, Ryanair's counsel argued that Mr. Lopata is doing more than simple math because he has brought his expertise to bear on what portions of certain costs are attributable to anti-bot activity.  That is true with regard to this section of Mr. Lopata's report.  It is also true with regard to his discussion of myRyanair costs, *id.* at ¶¶ 113–17, if Ryanair can show at trial that bot traffic attributable to the defendants has materially increased the cost of Ryanair's server infrastructure for the myRyanair portion of its website, *see supra* section III.B.i.  The only other place where this appears to apply is Mr. Lopata's discussion of New Relic.  Hemann Decl. Exh. 41 ¶¶ 104–112.  Because of the ruling that the costs of New Relic are not losses under the CFAA, *supra* section III.B.i, Mr. Lopata's opinions based on those paragraphs will be excluded.  The remainder of Mr. Lopata's estimates are unrelated to his technical expertise.

website and what percentage of OTA bookings are attributed to each defendant. This is simple math: Mr. Lopata uses Ryanair's estimate of the costs of a particular measure and multiplies that number by the percentage of a particular defendant's activity compared to all OTA activity on the website. To determine that amount, Mr. Lopata estimates what percentage of Ryanair's OTA bookings are attributable to each defendant based on the number of bookings each defendant reported. See, e.g., id. at ¶¶ 160–163 (calculation for Booking.com).

Such calculations are not based on Mr. Lopata's specialized knowledge. They represent the kind of chalkboard estimates based on other evidence in the case that Ryanair's counsel could equally well present in closing arguments. Courts in this district frequently reject exactly this kind of "calculation evidence" from experts because expert knowledge is not required to do simple arithmetic. *See Allscripts Healthcare*, 2022 WL 3021560, at *19 (excluding an expert's damages estimate created by merely multiplying values provided by the plaintiff, because no specialized knowledge was required to gather the input data and perform the calculation); *Cavi v. Evolving Sys. NC, Inc.*, No. CV 15-1211, 2018 WL 2317594, at *2 (D. Del. May 21, 2018) (excluding analysis that "amounts to nothing more than a simple math equation"); *CareDx, Inc. v. Natera, Inc.*, No. CV 19-662, 2021 WL 1840646, at *3 (D. Del. May 7, 2021) (same). Ryanair asserts that the calculation should be permitted because it is just a final step in Mr. Lopata's analysis. But if the rest of his proposed testimony is excluded, the calculation stands alone and must be excluded as well.

In sum, Mr. Lopata's opinions on the loss attributable to all OTA activity generally and to each defendant specifically is excluded because that evidence does not require specialized knowledge. In light of this ruling, there is no need to address the defendants' remaining arguments about the reliability of Mr. Lopata's method of calculating loss. Ryanair may attempt to introduce

89

the underlying evidence during the trial to make its argument that the CFAA's loss threshold is met. *See Cavi*, 2018 WL 2317594, at *2. But Mr. Lopata's testimony adds nothing to that evidence other than an exercise in arithmetic, and his testimony on that subject will therefore be excluded.

### ii.   Mr. Lopata's Opening Cybersecurity Opinions

Section E of Mr. Lopata's report contains his cybersecurity opinions, including a report of the testing Mr. Lopata performed to confirm whether the defendants accessed the Ryanair website to book flights and whether they circumvented protections on the Ryanair website to do so. *See* Hemann Decl. Exh. 41 ¶¶ 30–68. In the course of preparing his report, Mr. Lopata performed two tests. The first, Test A, was directed at determining whether Ryanair can accurately and reliably determine how a specific booking was made and whether the defendants use a Global Distribution System ("GDS")[40] or the Ryanair website to place bookings for Ryanair flights. *Id.* ¶¶ 39–40, 42. The second, Test B, was directed at determining, for bookings made through the Ryanair website, "whether these bookings are made through end-user interface or by direct access to the API." *Id.* ¶¶ 41–42. Direct access to the website's API is also referred to as "programmatic access."[41]

The defendants argue that the court should exclude Mr. Lopata's opinions related to Test B because Mr. Lopata conceded that his test failed, *see* Mao Decl. Exh. 7 at 201:2–5, 204:10–12, 207:2-21. In particular, the defendants seek to exclude Mr. Lopata's opinions regarding Test B set forth in paragraphs 27(c)-(e), 29, 31, 38–68, and 70 of his report, *see* Hemann Decl. Exh. 41,

---

[40]   A GDS is a centralized booking tools for travel bookers, such as travel agents. *See* Hemann Decl. Exh. 39 at 7. Ryanair enters agreements with certain GDS companies to make its flights available on that company's GDS. *See* Fuga Decl. Exh. 1 at 74.

[41]   An API connection allows two applications to communicate with one another. In this case, Test B was directed at determining whether the defendants' booking applications send requests directly to Ryanair's booking application, bypassing the typical user interface.

on the ground that they are not supported by a reliable methodology. *See In re TMI Litig.*, 193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) (upholding the exclusion of expert opinion based on a flawed methodology); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994). The defendants also argue that Mr. Lopata has not shown that his testing methodology is a valid, industry-accepted means for determining programmatic access, and that his opinions should be excluded for that reason as well.

Ryanair responds that the defendants have mischaracterized Mr. Lopata's deposition testimony by describing it as a concession that Test B failed. At most, Ryanair argues, the cited testimony establishes that a single test booking did not conclusively show programmatic access, even though Mr. Lopata maintained that the access in that instance was mostly likely programmatic. *See* Mao Decl. Exh. 7 at 192:17–207:21. In addition, Ryanair argues that analysis of the defendants' PNR codes confirms Mr. Lopata's hypothesis that the defendants' bookings were made through programmatic access. *See* Fuga Decl. Exh. 6 at 83–84. And even if this court finds Test B unreliable, Ryanair argues, the defendants' request to exclude Mr. Lopata's testing evidence completely is too broad because it would result in excluding his testimony regarding Test A, which was not affected by the problems with Test B.

Test B involved Ryanair removing a certain flight from the Ryanair website while allowing that same flight to be booked via API. Hemann Decl. Exh. 41 ¶¶ 63–68. Mr. Lopata then attempted to book that flight through the defendants' platforms. *Id.* Mr. Lopata stated that "[i]f a booking for the removed flight cannot be successfully completed while the flight is not listed on the Ryanair website or Ryanair app it would confirm that the booking was being attempted through the end-user interface." *Id.* ¶ 64. At his deposition, Mr. Lopata was asked about one Test B test booking. For that booking, Mr. Lopata testified that he successfully submitted a booking

on the Booking.com website while the Ryanair flight was removed from the Ryanair website, but that he did not receive a confirmation that his flight was booked until the flight listing was back on the Ryanair website. *See* Mao Decl. Exh. 7 at 192:17–209:1. When questioned, Mr. Lopata conceded that in light of those details, he could not conclude with confidence whether that booking request was submitted programmatically through an API connection or was submitted through the user interface. *Id.* at 201:2–21. He went on to testify that even in light of the delayed confirmation, the booking was still most likely done through API. *Id.* at 202:21–204:24. He conceded, however, that counsel's questioning at the deposition would require him to clarify the opinion he set forth in paragraph 64 of his report. *Id.* at 207:2–21.

The full context of Mr. Lopata's testimony provides support for Ryanair's position that Mr. Lopata did not concede that Test B failed, but rather maintained his opinion that the defendants obtain access to the Ryanair website through API. The deposition testimony demonstrates that there are limits to Mr. Lopata's testing methodology, limits that can be explored during cross-examination. However, the challenges to Mr. Lopata's testimony do not rise to the level of showing that Mr. Lopata lacks "good grounds" for his conclusion. *See In Re Paoli R.R. Litig.*, 35 F.3d at 746 ("[T]he judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."). However, Mr. Lopata's opinion will be limited to reflect the clarification he made at his deposition regarding the last sentence of paragraph 64 (i.e., that Test B is not definitive on this point, although he maintains his opinion that the defendants most likely used API on the Ryanair site to complete bookings).

This case is unlike the Third Circuit case cited by the defendants, *TMI Litigation*, in which an expert did not modify his hypothesis after his own testing undermined that hypothesis. 193 F.3d at 675–76. Unlike in that case, Mr. Lopata's testing did not undermine his hypothesis; it merely showed that his conclusion was not as definitive as he had initially represented, because he had not considered a possible alternative explanation for the results of the test, an explanation that was explored at his deposition. *See* Mao Decl. Exh. 7 at 205:1–207:1. Mr. Lopata went on to say he would modify his opinion based on that possibility. *Id.* at 207:2–21. Requiring Mr. Lopata to testify to that modification will resolve the issue in the present case without requiring the exclusion of testimony that could help the trier of fact determine the issue of access.

### iii.  Mr. Lopata's Rebuttal Report

The defendants argue that three portions of Mr. Lopata's Rebuttal Report should be excluded. Having determined that Ms. Kelly may testify only regarding her third opinion, *see supra* section V.A, only the portions of Mr. Lopata's rebuttal report regarding Ms. Kelly's third opinion will be admitted. The defendants' first argument, that Mr. Lopata's discussion of Test A in paragraph 42 of his rebuttal report should be excluded, is therefore moot.

The defendants' remaining objections relate to the portion of Mr. Lopata's report addressing Ms. Kelly's third opinion regarding harm to the Ryanair website. The defendants argue that paragraphs 9(c)(ii) and 112–24 of Mr. Lopata's report is improper rebuttal, as it impermissibly introduced new theories and evidence unresponsive to Ms. Kelly's opinion. *See* Dkt. No.335 at 45 (citing *Withrow v. Spears*, 967 F. Supp. 2d 982, 1001–02 (D. Del. 2013); *Boles v. United States*, No. 1:13CV489, 2015 WL 1508857, at *2 (M.D.N.C. Apr. 1, 2015); *Bradley v. Amazon.com, Inc.*, No. 17-1587, 2023 WL 2574572, at *5 (E.D. Pa. Mar. 17, 2023)). The defendants argue that any reference to KAYAK's referral or link-out bookings and retries (i.e., multiple efforts by a bot to

93

book a flight) is improper because Mr. Lopata did not mention those subjects in his opening report. In addition, they argue that Mr. Lopata's new availability testing at paragraphs 115–24 is unreliable because (1) the method underlying the testing is not explained, (2) Mr. Lopata was not involved in the execution of the test, and (3) in his deposition Mr. Lopata relied on what Booking.com characterizes as "Googling and guessing to come up with what should be precise numbers." Dkt. No. 335 at 46. Accordingly, the defendants argue, Mr. Lopata's conclusions are merely speculative and must be excluded. *See Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 159 (3d Cir 1999).

Ryanair responds that Mr. Lopata's references to KAYAK's link-out bookings and retries were proper, and that it would be unjust to hold that Mr. Lopata should have raised the issue earlier when he was precluded from doing so because KAYAK delayed producing the pertinent data. In any event, Ryanair argues that it was permissible for Mr. Lopata to introduce new theories or evidence since they were responsive to Ms. Kelly's report. *See Haskins v. First Am. Title Ins. Co.*, No. CIV.A. 10-5044, 2013 WL 5410531, at *4 (D.N.J. Sept. 26, 2013). Moreover, Ryanair contends that Mr. Lopata was merely pointing out flaws in Ms. Kelly's opinion, not introducing new theories. As for Mr. Lopata's testing summarized at paragraphs 115–24 of his report, Ryanair addresses the defendants' concerns with that material only briefly, arguing only that the jury should decide the credibility and weight of his testimony.

Mr. Lopata's testimony regarding KAYAK's link-out booking data and retries is admissible. As to the former, Mr. Lopata explained in his report that not all defendants included referrals in their initial responses, but that recent disclosures showed those numbers to be far higher than the figures on which Ms. Kelly relied. *See Hemann Decl. Exh. 42 ¶ 113.* As Ryanair argued, and the defendants do not dispute, the data Mr. Lopata relied on was not provided by the defendants

94

until after the close of discovery, and it was directly pertinent to Ms. Kelly's testimony.  It was therefore proper for Mr. Lopata to use that new evidence to critique Ms. Kelly's conclusions.  *See Withrow*, 967 F. Supp. 2d at 1001 ("[R]ebuttal . . . reports may cite new evidence and data so long as the new evidence and data is offered to directly contradict or rebut the opposing party's expert.") (quotation marks omitted).

Mr. Lopata's opinion that Ms. Kelly should have considered retries is similarly admissible. Mr. Lopata criticized Ms. Kelly's report for not considering that the defendants sometimes need to make multiple attempts in order for a booking to succeed, citing his own report for examples. Hemann Decl. Exh. 42 ¶ 114 (citing Hemann Decl. Exh. 41 at 36).  In his opening report, he stated that repeated attempts "place[] additional demands on Ryanair's systems."  Hemann Decl. Exh. 41 at 36 n.63.  The opinion in Mr. Lopata's rebuttal report is thus not new, and the expansion on his opening report is permissibly responsive to Ms. Kelly's report.

Mr. Lopata's availability testing addresses the frequency with which the defendants accessed the data on Ryanair's prices, flights, and timetables.  *See* Hemann Decl. Exh. 42 at 115–24.  There is no need to address the parties' dispute over whether Mr. Lopata's availability testing was new or unreliable because it was directed only to the issue of access to the general Ryanair website, not to bookings on myRyanair.  In light of my ruling that the Ryanair website is a public website, Mr. Lopata's availability testing is not relevant.  And in light of the limitations on Ms. Kelly's opinion, it will not be necessary.

## B.  Opinions of Anthony Vance

Anthony Vance is Ryanair's technical expert who was retained to rebut the testimony of the defendants' technical expert, Mr. O'Neil-Dunne.  Dr. Vance represented his background and expertise to be in the field of cybersecurity.  *See* Hemann Decl. Exh. 43 at 3.  Section VI of Dr.

Vance's report addresses what he regarded as the flaws in Mr. O'Neil-Dunne's opinions: (1) he criticized Mr. O'Neil-Dunne's failure to address the CFAA claims; (2) he criticized Mr. O'Neil-Dunne's failure to distinguish between authorized and unauthorized access by OTAs; (3) he discussed the technical measures employed by Ryanair to prevent OTAs from accessing the Ryanair website; (4) he criticized Mr. O'Neil-Dunne's failure to address harms or costs of OTAs; (5) he discussed those harms; (5) he discussed what he considered the "net costs" of OTAs; and (6) he criticized Mr. O'Neil-Dunne for not differentiating between licensed and unlicensed OTAs. *Id.* at 5–21. Sections VII–XII of Mr. Vance's report address particular sections of Mr. O'Neil-Dunne's report. *Id.* at 21–26.

The defendants argue that Dr. Vance's report should be excluded in full on the ground that it is unresponsive to Mr. O'Neil-Dunne's report and is therefore best characterized as an untimely opening expert report. In the alternative, the defendants argue that to the extent that Dr. Vance's report is in the form of rebuttal, the various opinions Dr. Vance sets forth in his rebuttal report are inadmissible under Federal Rule of Evidence 702 and the *Daubert* decision.

### i. Proper Rebuttal Testimony

The defendants contend that in his rebuttal report Dr. Vance improperly offered opinions on cybersecurity issues that should have been presented in an opening report and are not responsive to Mr. O'Neil-Dunne's opinions as a travel industry expert. *See* Dkt. No. 335 at 47–49 (citing *Withrow*, 967 F. Supp. 2d at 1001–02; *Bradley*, 2023 WL 2574572, at *5). The defendants take particular issue with Dr. Vance's discussion of authorized and unauthorized access in section VI.B of his report, his opinion on technical barriers and hacks in section VI.C of his report, and his discussion of "costs" and "net costs" to Ryanair in sections VI.D and VI.E of his report. As such,

the defendants argue that Dr. Vance's report should be rejected as an untimely opening expert report.  *See Bradley*, 2023 WL 2574572, at *14–15.

Ryanair responds that Dr. Vance's testimony is permissible rebuttal in that it will "explain, repel, counteract, or disprove the evidence of the adverse party."  *See Crowley v. Chait*, 322 F. Supp. 2d 530, 551 (D.N.J. 2004).  Ryanair argues that because Mr. O'Neil-Dunne addressed issues such as screen scraping and the impact of OTA activities, Dr. Vance was properly offered as a cybersecurity expert who could rebut Mr. O'Neil-Dunne's presentation of the "benefits" provided by OTAs.  *See* Dkt. No. 376 at 45–47.  In the alternative, Ryanair argues that if the court regards Dr. Vance's testimony as improper rebuttal, his testimony based on the report should be admitted even though the report may be viewed as untimely.  Ryanair's argument for admitting Dr. Vance's testimony even if his report is regarded as belatedly produced, is based on the Third Circuit's familiar five-factor test set forth in *Meyers v. Pennypack Woods Home Ownership Association*, 559 F.2d 894, 904–05 (3d Cir. 1977) ("*Pennypack*").

In light of the ruling that much of Mr. O'Neil-Dunne's report and proposed testimony is proper expert evidence regarding the defendants' counterclaims, Dr. Vance may testify to relevant opinions rebutting Mr. O'Neil-Dunne.  But the opinions in section VI.A of his report (that Mr. O'Neil-Dunne did not address the CFAA) and in section VI.C of the report (that the defendants use "technical hacks" to bypass various Shield endpoints and myRyanair), are not relevant rebuttal opinions, as they are not addressed to Mr. O'Neil-Dunne's testimony and go to the question of unauthorized access.  Those opinions are excluded, with the exception of Dr. Vance's opinion that myRyanair is intended to prevent OTA bookings.  That opinion may be introduced to rebut Mr. O'Neil-Dunne's testimony that myRyanair is used primarily for personalization of customers for business purposes.  Regarding Ryanair's argument that such opinions are permissible even though

they are untimely, there is no need to evaluate the *Pennypack* factors that might allow the opinions to be admitted despite the untimeliness of the reports on which they are based, because the excluded opinions go to the legal question of authorization rather than to a fact question for the jury and therefore would be inadmissible even if they had been timely presented.

Nonetheless, most of Dr. Vance's opinions set forth in sections VI.B, VI.D, VI.E, and VI.F of his report are admissible because they "repel, counteract, or disprove" evidence on the same subject by the defendants' expert. *See Withrow*, 967 F. Supp. 2d at 1001–02. To the extent that Mr. O'Neil-Dunne's testifies regarding the benefits of OTAs and their practices, Dr. Vance can testify as to his opinions that address the harms caused by OTAs that Mr. O'Neil-Dunne did not consider.

Section VI.B of Dr. Vance's report addresses unauthorized and authorized access to the Ryanair website. The bulk of Dr. Vance's criticisms rely on "authorization" as defined by a website's terms of use or terms of service. Dr. Vance can testify to his opinions that address Ryanair's terms of use to provide context for his opinions on the harms of OTAs. However, Dr. Vance must be clear that he is referring to a violation of the terms of use, not to the meaning of "authorization" under the CFAA. Dr. Vance may not testify regarding the opinion set forth in the paragraph of VI.B that discusses the CFAA, *see* Hemann Decl. Exh. 43 at 7.[42] To avoid confusion, Dr. Vance should testify regarding access contrary to the terms of use, rather than "unauthorized" access.

---

[42] Dr. Vance repeatedly testified in his deposition that he was not offering an opinion on whether access is authorized or unauthorized under the CFAA but rather that he was using those terms as they are used in his field. *See* Mao Decl. Exh. 13 at 39:25–40:7; 47:15–21; 69:17–21. Dr. Vance's reference to authorization creates the potential for confusion. That risk, however, is best addressed by requiring Dr. Vance to testify about access in violation of the terms of use or in violation of Ryanair's cease-and-desist letters, rather than by referring to "unauthorized access."

Sections VI.D, VI.E, and VI.F of Dr. Vance's report address harms or costs associated with access by OTAs in violation of Ryanair's terms of use. Testimony based on those sections of the report is admissible to rebut Mr. O'Neil-Dunne's discussion of the benefits of OTAs. As part of Dr. Vance's discussion of the harms caused by OTAs, his report discusses screen scraping and cites previous blog posts by Mr. O'Neil-Dunne that are critical of screen scraping. *See id.* at 14–19. The defendants argue that such testimony is not proper rebuttal because it does not respond to Mr. O'Neil-Dunne's report, but instead responds to Mr. O'Neil-Dunne's deposition, where he was asked about why he did not discuss the negative features of screen scraping despite having authored blog posts on that topic. *See* Dkt. No. 378 at 25 (citing *DOCA Co. v. Westinghouse Elec. Co., LLC*, No. 04-1951, 2011 WL 12896754, at *1 (W.D. Pa. Dec. 7, 2011) ("[T]he Federal Rules contemplate that the determination as to whether a rebuttal expert report is necessary be based on the opposing party's expert report – not the expert's deposition.")). However, Mr. O'Neil-Dunne's discussion of screen scraping appears in his opening report, not just in his deposition. *See* Hemann Decl. Exh. 39 § 7.2.1. For that reason, the discussion of screen scraping in Dr. Vance's report is proper, including his reference to Mr. O'Neil-Dunne's prior blog posts on that subject.

Dr. Vance's opinions discussed above are based on his cybersecurity experience. Given the overlap between the technical and business issues in this case (such as whether the purpose of myRyanair's restrictions on screen scraping is primarily competitive or primarily serves a security purpose), Dr. Vance's rebuttal is proper even though his expertise is not the same as Mr. O'Neil-Dunne's. Mr. O'Neil-Dunne similarly discussed technical issues, such as screen scraping, as they relate to the travel industry.

Sections VII–XII of Dr. Vance's report apply Dr. Vance's criticisms developed in section VI to particular sections of Mr. O'Neil-Dunne's report. Dr. Vance may testify based on the portions of his report that constitute permissible rebuttal testimony, as described above.

### ii. Rule 702 and *Daubert*

The defendants argue that Dr. Vance's report does not satisfy the requirements of Rule 702 and *Daubert* for three reasons. First, the defendants argue that Dr. Vance lacks specialized knowledge of the travel industry. As a result, they contend, the court should exclude Dr. Vance's opinions (1) that Ryanair offers licenses on reasonable terms; (2) that "Ryanair has a very different business model compared to that of OTAs;" and (3) that inviting customers to personalize their myRyanair accounts does not make Ryanair a competitor of the OTAs. *See* Hemann Decl. Exh. 43 at 5, 25. Ryanair responds that Dr. Vance's opinion on licensing and competition between Ryanair and the OTAs do not require an expert. Ryanair also contends that Dr. Vance has expert knowledge of the travel business because he teaches at a business school and offered his opinions as an expert on that subject. *See* Hemann Decl. Exh, 10 45:14–19.

Dr. Vance's opinions regarding Ryanair's licensing fee and whether Ryanair and the OTAs are competitors are excluded as falling outside the field of Dr. Vance's expertise. Ryanair's argument that such opinions do not require an expert cut against Ryanair, as they show that Dr. Vance's opinions in this area are not based on specialized knowledge that would help the trier of fact understand the evidence or determine an issue of fact. *See* Fed. R. Evid. 702(a). Nor has Ryanair shown that Dr. Vance is an expert in the relevant field.

Ryanair offered Dr. Vance as an expert in cybersecurity. In that capacity, he teaches at a business school and advises businesses on cybersecurity measures. *See* Hemann Decl. Exh. 43 at 3. The only representation regarding his "business" expertise is found in a single exchange with

Case 1:20-cv-01191-WCB    Document 399 *SEALED*    Filed 06/17/24    Page 101 of 103 PageID
#: 14426

counsel at his deposition.  Speaking about the harms of screen scraping, Dr. Vance testified that,

"As a business professional, it's incomplete to consider benefits without also considering costs."

He was then asked, "Are you opining in this case as a business professional expert?" to which he

responded, "I'm a business professor, and so yes, I am.  I'm a business professor and a

cybersecurity professor, and I think both views are relevant for my report."  Hemann Decl. Exh.

10 at 45:11–19.  That exchange is not sufficient to show that Dr. Vance has relevant expertise to

offer the business-related opinions that he offered.

 Second, the defendants argue that Dr. Vance improperly relied on Ryanair's allegations as

true.  *See id.* at 8 & n.16, 13 & n.35.  Ryanair responds that Dr. Vance did not simply rely on

Ryanair's allegations, but considered numerous documents including interrogatories, produced

documents, Mr. Lopata's report, third-party resources.  In addition, Dr. Vance relied on his own

expertise.  *See id.* at App'x B (listing documents Dr. Vance consulted).

 The defendants have not shown that Dr. Vance improperly relied on Ryanair's allegations

as true.  The only references the defendants offer in support of that contention are the portions of

Dr. Vance's report at footnotes 16 and 35, along with the accompanying text.  Footnote 16 is a

citation to Ryanair's cease-and-desist letters, which were attached to the complaint and which both

parties agree the defendants received.  Footnote 35 is a citation to a reference to myRyanair in the

complaint, which is followed by citations to interrogatory responses and deposition testimony.  As

is evident in that footnote, Ryanair is correct that Dr. Vance did not simply rely on allegations in

the complaint to form his opinions.

 Third, the defendants argue that Dr. Vance's proposed testimony is improperly directed to

(1) the meaning of authorization under the CFAA, *see id.* at 6–7, 21, 16 n.49; (2) the relevance of

Mr. O'Neil-Dunne's testimony, *id.* at 5–6, 21; and (3) the meaning of the contractual provision

setting forth Ryanair's terms of use, *id.* at 7, 12, 14, 24.[43]   Ryanair responds to only the first argument.  In that response, Ryanair disputes that Dr. Vance offers a legal conclusion regarding authorization under the CFAA based on Dr. Vance's representations in his deposition that he was referring to authorization as a security term, not a legal term.  *See* Mao Decl. Exh. 13 at 39:25–40:7; 47:15–21; 51:25–52:2; 69:17–21; 176:6–25.  As addressed previously, Dr. Vance's opinions on "authorization" under the CFAA as well as the relevance of Mr. O'Neil-Dunne's report will be excluded, which renders the first two issues moot.

The remaining issue is whether Dr. Vance may offer his opinions that relate to the terms of use on the Ryanair website.  At page 12 of his report, Dr. Vance stated that Ryanair is justified in taking action against OTAs that violate its terms of use.  The terms of use are clear and do not require interpretation.  The defendants' argument that they do not violate Ryanair's terms of use is based on their contention that they do not access the Ryanair website, either directly or vicariously.  Dr. Vance will be allowed to testify that an OTA that accesses the Ryanair website to sell Ryanair flights without a license or to extract data for commercial purposes would violate Ryanair's terms of use.  It will be up to the jury to decide whether the defendants do so, if the jury concludes that question is relevant to any issue in the case..

## CONCLUSION

In summary, the court's rulings are as follows:

1.  Ryanair's motion for summary judgment on Counts I and IV is denied.

2.  Ryanair's motion for summary judgment dismissing Booking.com's counterclaims is denied.

---

[43] The defendants also include a criticism of Dr. Vance based on an expert report of his that was excluded in a different case.  That criticism has no bearing on the motion to exclude his testimony in this case.

3.  Ryanair's motion to exclude the testimony of Mr. O'Neil-Dunne is denied.

4.  Ryanair's motion to exclude the testimony of Ms. Kelly is granted in part and denied in part.

5.  Ryanair's motion to exclude the testimony of Mr. Imburgia is granted in part and denied in part.

6.  The defendants' motion for summary judgment on Ryanair's claims under the CFAA is granted in part and denied in part.

7.  The defendants' motion to exclude certain opinions of Mr. Lopata is granted in part and denied in part.

8.  The defendants' motion to exclude the opinions of Mr. Vance is granted in part and denied in part.

* * *

The parties have filed all briefing on these motions and the supporting declarations under seal.  Out of an abundance of caution, I have filed this order under seal.  Within three days, the parties are directed to advise the court by jointly submitted letter if there are any portions of this order that should remain under seal and, if so, to explain why.  An unsealed version of this order will be docketed after counsel's letter is received.

IT IS SO ORDERED.

SIGNED this 17th day of June, 2024.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

103

Appx130

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3

RYANAIR DAC,                        )
4                                    )
--------------------Plaintiff,      )
5                                    ) Case No.
vs.                                 ) 20-CV-1191-WCB
6                                    )
BOOKING HOLDINGS INC., et al.,      )
7                                    ) Volume I
--------------------Defendants.     )
8

9              TRANSCRIPT OF JURY TRIAL

10

11     JURY TRIAL had before the Honorable William C.

12  Bryson, U.S.D.C.J., in Courtroom 6A on the 15th of

13  July, 2024.

14

15                     APPEARANCES

16     KRATZ & BARRY
            BY:  TOUHEY MYER, ESQ.
17
                       -and-
18
       HOLLAND & KNIGHT
19          BY:  R. DAVID DONOGHUE, ESQ.
                 ANTHONY FUGA, ESQ.
20               CYNTHIA GIERHART, ESQ.
                 JI MAO, ESQ.
21               WILLIAM HOWARD OLIVER, III, ESQ.

22                     Counsel for Plaintiff

23

24

25

1   (Appearances continued.)

2

3       RICHARDS, LAYTON & FINGER, P.A.
            BY:  JEFFREY MOYER, ESQ.

4                       -and-

5   COOLEY LLP
            BY:  ALEXANDRA EWING, ESQ.
6                JOHN HEMANN, ESQ.
                 KATHLEEN HARTNETT, ESQ.
7                KRISTINE FORDERER, ESQ.
                 ALEXANDER KASNER, ESQ.
8                JESSIE SIMPSON LAGOY, ESQ.
                 HANNAH POLLACK, ESQ.
9                ORIN KERR, ESQ.

10                      Counsel for Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good morning.  Okay.  We have two

2   matters that we need to address before going into the jury

3   selection.  Okay.  The first one is what we'll call the

4   KAYAK loss issue and this is changing the year that we're

5   looking at with respect to KAYAK.  Who's going to speak to

6   this for the defendants.

7          MS. HARTNETT:  I am, Your Honor.  Kathleen

8   Hartnett.

9          THE COURT:  Who is going to speak for

10  plaintiffs?

11         MR. MAO:  I am, Your Honor.  Ji Mao.

12         THE COURT:  Why don't we start with

13  Ms. Hartnett.  I think I understand your argument.  Well,

14  let's start with Mr. Mao.  Why don't you both approach the

15  lectern.  I like to do this so I can go back and forth

16  without having everybody get up and down.

17         Mr. Mao, looks like a switch, which is as far as

18  I can tell occurred just on Wednesday, of KAYAK's one-year

19  period of loss, why isn't that prejudicial to the other side

20  since they have been preparing since day one for the 2019

21  through '20 period as opposed to 2022 through 2023 period?

22         MR. MAO:  So the way we calculated our losses,

23  we did two things generally, we took a total pot of all loss

24  from OTAs and then we multiplied it by --

25         THE COURT:  I understand the mechanism.  But I

1   want to get right at the question of it seems to me if I

2   were in their position having prepared their defense to the

3   2019 to '20 period I would have been surprised to see that

4   what I had prepared is not at least completely adequate to

5   deal with the 2022 to 2023 period.

6           MR. MAO:  Well, I think it would be adequate.

7   The total pots that we're now using for KAYAK as opposed to

8   the old total pot is the exact same total pot we're using

9   for Booking.  So to the extent they already prepared a

10  defense to how we calculated that for Booking it would be

11  completely applicable to KAYAK.  Now the other part of it

12  is --

13          THE COURT:  Why are you changing the year if

14  it's exactly the same kind of process?

15          MR. MAO:  So we had calculated the KAYAK losses

16  at 2019 to 2020 based on the assumption that KAYAK's conduct

17  pre myRyanair violated the CFAA.  Obviously, your summary

18  judgement opinion made sure that's not the case anymore.  So

19  we just wanted to pick a period a bit later in time where we

20  are sure KAYAK's conduct violated the CFAA.

21          THE COURT:  You're saying, I take it, to put it

22  more bluntly, I guess, is that you can't prove your case

23  from the 2019 to 2020 but you think you can with the '22 to

24  '23.

25          MR. MAO:  I think we tried to prove our case in

1   the 2019 to 2020 period, but we are sure of our case in the

2   2022 to 2023 period.

3            THE COURT:  Is there a qualitative difference

4   between the two years?  Is anything other than the bottom

5   line numbers different?

6            MR. MAO:  In terms of how we calculated it, no.

7            THE COURT:  Are there any events that might have

8   affected the calculation?

9            MR. MAO:  So one, we calculated the total pot in

10  2019, 2020 there were two types of costs that were not

11  applicable.  Those were the online and in-person

12  verification.  We didn't have those at the time because they

13  were implemented because of COVID.

14           THE COURT:  That seems to me a significant

15  change in the situation.  What happened?

16           MR. MAO:  But we had already disclosed what

17  those numbers were in 2022, 2023 with respect to.

18           THE COURT:  Right.  But they were not presumably

19  prepared to address that whole issue of the pertinence or

20  importance of those -- that category of potential losses.

21           MR. MAO:  Well, to the extent those are losses

22  for Booking they would also be losses for KAYAK because the

23  exact same issues are at play here.  Whether these are

24  indeed issues to correct the integrity issue.

25           THE COURT:  Let me hear from Ms. Hartnett.

1   What's the answer, Ms. Hartnett, to the argument that this

2   is really just -- this isn't a change in kind, it's just a

3   change in the particular number that's being used as the

4   base for establishing loss that has no material effect on

5   your ability to challenge it?

6           MS. HARTNETT:  Thank you, Your Honor.  As you

7   pointed out I think that's a very good example, the colloquy

8   you were having about the COVID refunds, these were two

9   separate defendants with two separate structures and cost

10  structures and different concerns with each of them, so

11  we'll be presenting each of them as a separate defendant.

12  And so we would have different arguments potentially

13  challenging different types of costs for KAYAK that weren't

14  part of that earlier loss period.  So I do think -- you

15  know, this was the subject of expert testimony.  This wasn't

16  just, like, a passing topic.  This was each -- the expert,

17  their expert went through and had a period of loss of a

18  year, had done each of the categories.  There was an

19  extensive deposition on those categories with respect to

20  that year period and so to switch now to a whole new year

21  period prevents all the discovery and the deposition and

22  other work we would have done to try to push back on those

23  costs.

24          And I do think one other point I just wanted to

25  make is this was a strategic decision made by plaintiffs to

7

1    take what they thought was going to be the most favorable

2    period knowing there was going to be an issue in the case

3    about that and there was not a restriction on them picking

4    more than one period.  That was a choice they made, there's

5    nothing that would have precluded them from seeking to

6    establish loss in more than a one-year period, that was just

7    a choice they made.

8             THE COURT:  I have to say I think I was

9    surprised to see this come up only on July 10th for a trial

10   starting July 15th.  You had to know, presumably, before

11   June 7th, but for sure as of June 7th, that I had serious

12   issues with the whole question of pre myRyanair, let's call

13   it, versus myRyanair and that there was at least some

14   likelihood, which turned into actuality on the July 17th,

15   that you would be confined to the myRyanair category.  Now I

16   don't really understand why if you thought there was a

17   change that had to be made promptly and you're telling me

18   that the change was merely moving a number from one place to

19   another, I don't understand why it took three weeks to let

20   the other side know that this change was being made.  I

21   regard July 10th as being essentially -- in a complex case

22   like this essentially being the night before.  So it's not

23   much notice.  Why?

24             MR. MAO:  Sorry for interrupting, Your Honor.

25             THE COURT:  You didn't.  That's fine.

8

1          MR. MAO:  We had talked with defendants on this

2     over e-mail and eventually it settled on the July 10th date

3     to disclose our new loss calculations.

4          THE COURT:  You settled on a date.  I know they

5     wanted an earlier date, and you set it at July 10th if I

6     understand the party's positions.  So that sounded like a

7     unilateral contention.  Plus, I don't think -- did they

8     really understand you were going to change the period as

9     opposed to providing a new calculation of loss for the

10    previous period?  My understanding is they assumed the

11    latter, not the former.

12         MR. MAO:  So again, this is based on underlying

13    numbers that have been available to them for a year and if

14    the issue is with the online and in-person verification

15    costs perhaps we could cut those two costs out.

16         THE COURT:  This is too late to start tinkering.

17    That's really not fair to the other side.  They'd have to

18    scramble to try to come up with a response to that.  I'm

19    going to exclude the 2022, 2023 on the basis of late

20    disclosure.  You can proceed with the previous period to the

21    extent you believe you can make a case on that but I won't

22    accept the change.  So that disposes of the KAYAK loss

23    issue.

24         The other issue -- and you're welcome to sit

25    down unless you're going to be carrying the ball.

1          MS. HARTNETT:  I am.

2          THE COURT:  Who's arguing on the other issue?

3          MR. FUGA:  Anthony Fuga, Your Honor.

4          THE COURT:  This involves several different

5     issues.  This is what we'll call the Monex question.  The

6     first issue dealing with Mr. Hurley, I am completely -- let

7     me back up.  I think there are two issues here really with

8     respect to the legal question of whether Mr. Hurley's

9     testimony can be admitted notwithstanding that there's a

10    personal knowledge issue and the argument that's made is he

11    was a 30(b)(6) witness so he stands differently for purposes

12    of personal knowledge and hearsay than he would if he were

13    not a 30(b)(6) witness.  It seems to me there are two issues

14    embedded in that question and I'm open to being corrected if

15    you think I'm wrong.  The first issue is, is his status as a

16    30(b)(6) witness enough to get over the personal knowledge

17    requirement?  The second issue is does he have personal

18    knowledge by virtue of his position as a CTO, as a person in

19    authority, by virtue of his experience and so forth.  The

20    first question that, a 30(b)(6)/602 question, it seems to me

21    is fairly easy to answer.  And the answer is that you can't

22    give some witness a pass simply on personal knowledge,

23    simply because they were designated as a 30(b)(6) witness.

24    Now, you cited a few cases but I spent some time looking at

25    the cases and there's a huge amount of case law.  I don't

1    know whether you all have looked at it or not, but I have,

2    and the case law is very heavily weighted, there's some

3    outliers on the other side, but it's heavily weighted in

4    favor of the view that if you have a 30(b)(6) witness whose

5    testimony the proponent is attempting to use, that that

6    witness has to have personal knowledge within the 602 sense.

7            That -- perhaps the leading case is one from the

8    fifth circuit, *Union Pump* I think, and it puts it pretty

9    well.  It says, "Rule 32(a)(3) permits an adverse party to

10   use a 30(b)(6) witness's deposition testimony at trial."

11   And that's the *River Brazos Authority* case you cite.  But a

12   corporate representative may not the testify to matters

13   outside his own personal knowledge to the extent that

14   information is hearsay not falling within one of the

15   authorized exceptions.  So that case, and one of mine,

16   *IOENGINE*, which says essentially the same thing, and many

17   other cases which I won't read into the record but there are

18   a lot of them, one of the leading cases besides the *Union*

19   *Pump* case is Tedarea against Alaskan Airlines from this year

20   which says, "30(b)(6) designees may not offer testimony at

21   trial that consists of hearsay not falling within one of the

22   authorized exceptions.  And the exceptions provided by

23   801(d)(2) and FRC 332(a)(3) do not apply when an

24   organization wishes to elicit testimony from its own

25   corporate designee.  That's this case.  *IOENGINE* is another

1    case that cites a whole lot of cases.  There's *Kraft Foods*

2    *Global v. United Egg Producers*, 2023 Westlaw 5647204.  So to

3    me that's a straightforward question which I answer by

4    saying that Rule 30(b)(6) does not change your status, the

5    status of the witness for purposes of Rule of Evidence 602

6    unless it's -- certainly not limited if the witness is being

7    used by the proponent.

8              Now, the second question seems to me is harder

9    and that's the question of whether a person who is a

10   supervisor, executive and so forth can be deemed to have

11   personal knowledge even though that personal knowledge may

12   not have come from that person's observation through his own

13   eyes or ears of the events but, in fact, came ultimately

14   from other people.

15             There's -- that's the Afga-Gevaert, A-F-G-A

16   G-E-V-A-E-R-T, case that Judge Posner wrote, and there are a

17   lot of cases dealing also with that issue.  As I take that

18   issue, the way I view that is that it's one thing for an

19   executive to say, "I know how things are done in this

20   company."  In the case of the Agfa case, Judge Posner said,

21   I know how the -- I know that this product is considered to

22   be flawed because I know of a lot of customer complaints and

23   I know our engineers have complained about it.

24             That's the kind of knowledge that an executive

25   would have and doesn't have to actually go down on the

1    factory floor and look at the product in order to have that

2    kind of knowledge.  So that counts as personal knowledge.

3         The problem is in a case like this -- and there

4    are a number of cases that are like this -- if what you're

5    saying on a particular a day, a particular thing happened

6    and I know about it because I was told about it, that's not

7    personal knowledge of the sort that we're talking about.

8         So as I see it, your argument that there's

9    personal knowledge here is so broad that would cover a case

10   like this, suppose that I'm the chief executive officer of

11   Boeing Corporation and I'm questioned as to whether Boeing

12   was negligent in not putting the bolts in the side panel

13   that blew out of the Alaska Airlines plane and I testify,

14   "Well, I know that those bolts were put in."  How do you

15   know?  Because the floor manager of the factory where this

16   was bolted in said that he had spoken to the guy that put

17   the bolts in.  The guy that put the bolts in said it was

18   absolutely bolted when that panel left the line, and the

19   factory manager then told my assistant that that's what the

20   fellow on the floor did, and my assistant told me and

21   therefore because I am a 30(b)(6) witness, now I can testify

22   to that.

23         That can't possibly be right both of the

24   30(b)(6) reason and also just as a matter.  That's not

25   personal knowledge of the Agfa-Gevaert type.

1          So that's my take on that.  If you all have some

2     comments you want to make, that's where I am right now and

3     I'll hear from either of you.

4          MR. FUGA:  As an additional matter, I think we

5     are in agreement on your first point.  But I don't think a

6     30(b)(6) witness changes the standard.

7          THE COURT:  Right.  You argued to the contrary

8     in your brief.

9          MR. FUGA:  There was conflicting case law, and I

10    think our first point was Mr. Hurley had personal knowledge.

11         THE COURT:  I was a little taken aback that you

12    made the contrary argument.  But go ahead.

13         MR. FUGA:  I think the second point is our

14    argument is he has personal knowledge through what he's

15    done, which includes part of him as being an executive on

16    these supervisors or supervising these individuals --

17         THE COURT:  Right.  He has personal knowledge as

18    to certain features.  Not all of his testimony is subject to

19    this problem.  Where the rubber meets the road it seems to

20    me is where he comes in and says, "Here's what these

21    documents show and the reason I know that is because the

22    people that looked at the documents told someone else who

23    then told me."

24         MR. FUGA:  There may be a misunderstanding here

25    because he can look at all these documents and has looked at

1   all these documents and can speak to all these documents.

2   The only thing that he has not seen are, if we want to

3   rewind a little bit, is Booking.com provided its PNR

4   numbers.  He was not allowed to look at those.  The only

5   thing he could not do is look at these numbers to match them

6   up on a spreadsheet of PNRs that caused problems.

7            THE COURT:  I understand.  That's a pretty

8   critical step in the process.  If you don't have that step,

9   you can't prove the case.

10            MR. FUGA:  The only person who can prove this

11   case is an assistant who was provided this access in Dublin.

12   Our position is that it was essentially a Control F function

13   looking for these numbers on this spreadsheet.  That's been

14   done and that side can tell him we saw them, which makes all

15   of these documents relevant and explain it.

16            THE COURT:  Why can't they do that?  Why isn't

17   that hearsay?

18            MR. FUGA:  I think it's close enough where the

19   case law is talking about inferential, everything is

20   somewhat inferential.  I do think we have a circumstance

21   here where Mr. Hurley is not allowed to see that.

22            THE COURT:  I guess let me ask a question a

23   different way.  Why haven't you called one of those

24   witnesses who have personal knowledge?

25            MR. FUGA:  He would be flying from Dublin for

1    the single purpose of saying, "I have it."  If the

2    defendants would allow Mr. Hurley to see these numbers which

3    are now months old, he could do this at lunch.

4            THE COURT:  Let me hear from Ms. Hartnett on

5    this.

6            MS. HARTNETT:  Thank you, Your Honor.  I would

7    just say that we agree with your assessment of the case law

8    and the only thing I would add to the cases you pointed out

9    is that the authority within Ryanair's own brief supports

10   the point that in this situation, someone in Mr. Hurley's

11   position would have to look at the documents.  So you're

12   exactly right that the case is where it's about the general

13   knowledge of how the company works.  For example, they cited

14   the Third Circuit case of *Polisham* and that case was about

15   corporate documents like public filings.  There, that's

16   within the normal corporate knowledge.  Here, it's almost in

17   an expert witness kind of assessment project.  We haven't

18   moved to exclude it on those grounds, but the further we get

19   away from Mr. Hurley having a personal knowledge he's almost

20   serving as an expert witness assessing the PRN codes.

21           THE COURT:  As to Mr. Fuga's last point, what's

22   the -- help me with the significance of what's missing.

23           Mr. Hurley, Mr. Fuga is correct in saying

24   Mr. Hurley can testify to a lot of the steps leading up to

25   the final conclusion, but it does appear there was an

16

1    important feature that's missing.

2            Ms. Hartnett, if you could speak a little more

3    slowly.  The court reporter is very good, but there are

4    limits.

5            MS. HARTNETT:  Understood.

6            THE COURT:  What is your take on the fact that

7    there is only a quite limited piece of evidence that's

8    missing in that which Mr. Hurley can fairly be said to have

9    personal knowledge of?

10           MS. HARTNETT:  Your Honor, it's a crucial piece

11   of evidence.

12           THE COURT:  What exactly is it that renders it

13   crucial?  I think I understand, but I want to make sure I

14   have this down very clearly.  Walk me through the

15   significance of this.

16           MS. HARTNETT:  I will.  Just to take one step

17   back, this was the disclosure, as you know.

18           THE COURT:  Slowly, please.

19           MS. HARTNETT:  That was made on the last day of

20   the discovery period.  This was a disclosure of allegedly

21   60,000 errors on the error log of which allegedly 26 had PNR

22   codes related to Booking.com.  That was the allegation being

23   made by Ryanair.  They had a choice of putting it up for the

24   30(b)(6) deposition.  Among the three people that were able

25   to see the PNR codes was Mr. O'Callaghan.

1          THE COURT:  I know who they are.

2          MS. HARTNETT:  He's the head of Ryanair Labs, so

3     he was allowed to see it.  He could have been a deponent.

4     They chose to rely on Mr. Hurley instead, and as our brief

5     explained, there was a lot of deposition going on in that

6     deposition generally, but a key problem with the issue

7     before the Court is to link the 26 codes, PNR codes, to any

8     errors in Ryanair's log.  Mr. Hurley in turn relied on a

9     subordinate, Mr. Sheridan and Mr. Sheridan relied --

10         THE COURT:  I'm familiar with that.  What I want

11    to get at is what exactly is it that -- as to which a

12    mistake that may have been made at the point at which the

13    three people who viewed this log could affect the outcome of

14    this issue?  In other words --

15         MS. HARTNETT:  Fair question.

16         THE COURT:  Go ahead.

17         MS. HARTNETT:  At each point in the analysis,

18    Mr. Fuga testified that this was a Control F function.  We

19    don't know that.  We don't know what the two employees that

20    were able to see the codes did to determine that, assuming

21    they compared the booking code to the error log to see if

22    they were the same.  Their Excel spreadsheet could be off by

23    a line.  We don't know what that was.

24         So that's the bolt.  Thankfully, it's not a

25    plane that crashed, but that is the bolt, and we don't know

1  if what the two people that were looking to figure out was

2  this the bolt from this plane versus the bolt in the other

3  plane were doing.  Then that was translated by those two

4  employees who saw the PNR codes to Mr. Sheridan, an interim

5  employee who himself did not have the authority to view the

6  PNR codes, and from there Mr. Sheridan passed it on to their

7  witness, Mr. Hurley.  That is a great concern to us because

8  the only tenuous link to this entire Monex incident is

9  allegedly 26 codes.

10        THE COURT:  The 26 codes, as I understand it,

11  and if I also understand, one of them had a connection was

12  found in one way or another.  I'm not sure exactly what the

13  mechanics of this are, but one of them was connected to

14  5,000 communications.  26 were related in at least 21 of the

15  vendors of Booking; is that right?

16        MS. HARTNETT:  So 26 Booking passenger bookings

17  had PNR codes that allegedly were also on the error log.

18  The 5,000 issue is a separate issue that is actually not a

19  Booking-related concern.

20        THE COURT:  That's what I wanted to find out.

21  The way I had understood it -- and I'm not sure this is

22  right.  You may be telling me that it's not right -- was

23  that of the 26, there was one which is relatable to Booking

24  maybe because it's one of Booking's vendors, and that was

25  related to 5,000 communications.  Is that wrong?

1           MS. HARTNETT:  It is speculative.  So yes, that

2    is their theory.  Their theory is that an IP address, so not

3    a PNR code, there's not some PNR code they associated with

4    5,000 errors.  And, again, Booking doesn't do any of this

5    directly.  It does it all through a vendor to get the

6    flights.

7           But what they have said is some IP address out

8    there in the world was associated with both a Booking PNR

9    code and some other request, some other traveler whose

10   request was related to 5,000 errors.

11          So none of the 26 PNR codes for Booking have

12   been tied to 5,000 errors other than by the use of one IP

13   address which could well be the IP address of some third

14   party making other reservations or doing something that has

15   nothing to do with Booking.

16          THE COURT:  Let me go back to Mr. Fuga.

17          Mr. Fuga, response.

18          MR. FUGA:  I just want to note that Mr. Hurley

19   is the head of Ryanair Labs.  He's the 30(b)(6) witness

20   because he's literally the most knowledgeable on this.  He

21   just cannot see the 26 PNRs, and I think the factory

22   hypothetical or -- I guess, not hypothetical example is

23   relevant because it's not a situation where an executive is

24   up in his or her office, not going onto the factory floor.

25          Mr. Hurley, in this situation, was on the

1   factory floor.  They had a war room dealing with Monex,

2   trying to figure out who it was, and the only bit of

3   information he doesn't have are those 26 PNRs.

4          THE COURT:  My Boeing executive could have been

5   on the factory floor frequently, but if he wasn't standing

6   next to the guy who did or didn't put the bolts in, then he

7   can't testify as to whether the bolts are in.

8          MR. FUGA:  The only thing he couldn't see is

9   that specific bolt went in that hole.  If that is the

10  requirement I think we would have a residual hearsay

11  exception, especially in this instance.  I mean this

12  sincerely, if they would allow him to look at the 26 PNRs or

13  Mr. Stocki to look at the 26 PNRs who's also a witness here,

14  it could likely be done at lunch.  Or even just that one PNR

15  that resulted in the 5,000 air holes.

16         THE COURT:  I still don't really understand the

17  relationship between the one PNR and how that proves that

18  Booking is responsible for the Monex attack.  That's my -- I

19  read lots of stuff on this but it all gets kind of vague.

20  And give me, if you can, the most succinct direct

21  explanation, connection between the one PNR and Booking.

22         MR. FUGA:  Mr. Hurley is the most knowledgeable

23  on this so he could tell you.  The most succinct, I would

24  say, is that one PNR was connected to a myRyanair account

25  which was connected to the 5,000.  The one Booking PNR was

1    connected to one --

2              THE COURT:  We would say booking.  Unfortunately

3    we've got booking and Booking.com.

4              MR. FUGA:  Booking.com, I'm sorry, Your Honor.

5    We've been talking about it all week.  That one PNR is

6    attached to one Booking.com myRyanair account.  And that one

7    myRyanair account --

8              THE COURT:  How is that connected?

9              MR. FUGA:  From what I understand, the myRyanair

10   account holds the PNRs that are -- typically if I would

11   create a myRyanair account and book a flight on myRyanair or

12   five flights on myRyanair, all of my PNRs would be in there.

13             THE COURT:  So we have one booking that is

14   connected, is it connected to the booking's vendor or

15   directed to the booking.

16             MR. FUGA:  It's directed to the PNR that they

17   provide to us.

18             THE COURT:  They being?

19             MR. FUGA:  Booking.com.

20             THE COURT:  Okay.  And therefore you think that

21   was necessarily a Booking.com booking.

22             MR. FUGA:  It was a Booking.com booking and then

23   that same myRyanair can be connected to these 5,000 errors,

24   which is --

25             THE COURT:  How do you get from the 5,000 errors

1   to the conclusion that Booking.com is responsible for the

2   Monex breakdown?

3           MR. FUGA:  Because it was 5,000 attempts in -- I

4   mean, it could only be a bot.  5,000 attempts I believe it

5   was in an hour total.  Mr. Hurley would know better, but I

6   believe they said they have typically a few errors a day.

7           THE COURT:  But if you have -- are you assuming

8   that there were many other booking efforts that --

9   Booking.com efforts that resulted in similarly large numbers

10  of communications?

11          MR. FUGA:  There were other efforts.

12          THE COURT:  None of those were tied to

13  Booking.com or what?

14          MR. FUGA:  The -- as Mr. Hurley explains it is

15  that typically if things are done well from that type of

16  ordeal they're constantly changing PNRs, constantly changing

17  myRyanair accounts, and as he explained it, this was about,

18  frankly, getting sloppy or lazy so you can tie all of this

19  to one.

20          THE COURT:  Let me hear from Ms. Hartnett on

21  this.

22          MS. HARTNETT:  Thank you, Your Honor.  I'm

23  turning to Mr. Hurley's own deposition on this topic.

24          THE COURT:  I read the deposition.  There's a

25  lot of this is speculative.

1          MS. HARTNETT:  I asked him, "You don't know --

2          THE COURT:  What page are you on?

3          MS. HARTNETT:  Sorry.  120, line 14.  This is

4    about the allegedly connective IP address.  I said, "You

5    don't know that this IP address belongs to Booking; right?"

6          There's an objection.

7          He answered, "I know the IP address.  All I now

8    is the IP is linked to the PNR code that Booking provided.

9    We have that link.  Then that then is also linked to the

10   myRyanair account which is the e-mail address used for that

11   booking and from there we made those deductions."

12          And then I asked, "So it is entirely possible

13   that this is a third-party IP address and that Booking.com

14   has nothing to do with these other three e-mails; correct,

15   including the e-mail relating to the 5,000?"

16          And Mr. Hurley responded, "It is possible."

17          THE COURT:  Yeah, but that doesn't seem to me,

18   if I understood the exchange, to go to the question we've

19   been focusing on which is whether Mr. Hurley can testify

20   about the particular items that only the three people saw,

21   does it?

22          MS. HARTNETT:  I'm responding to the point that

23   there was a connection, and the connection Mr. Hurley

24   himself, even on his limited --

25          THE COURT:  I know that.  That's an issue we

1    talked about before.  What I'm interested in is, is there

2    something about the testimony that could have been given

3    presumably by one of the three individuals that actually

4    looked at the underlying materials, the PNRs, that he can't

5    testify to.  Is that -- why is that critical to the theory.

6    I understand you don't really agree with his theory because

7    you think it's speculative, whatever, but that's a different

8    question.  My question is:  What is the critical thing

9    that's missing and why is it critical?

10              MS. HARTNETT:  Whether that was even a Booking

11   PNR code related to that IP address.  Mr. Hurley does not

12   have personal knowledge.

13              THE COURT:  He doesn't know if that's a booking?

14              MS. HARTNETT:  He does not.

15              THE COURT:  Mr. Fuga, does he other than by

16   hearsay?

17              MR. FUGA:  He has not seen that Booking PNR

18   because he is not allowed to see that PNR, but he relies on

19   these individuals on a day-to-day basis and every single

20   other bit of this he is the most knowledgeable.

21              THE COURT:  When is he going to testify?

22              MR. FUGA:  Today, Your Honor.

23              THE COURT:  When is he going to testify today?

24              MR. FUGA:  He is our first witness.

25              THE COURT:  Well, if we're going to have a voir

1    dire of Mr. Hurley this is a little awkward.  We'll have the

2    jury coming in in another 25 minutes.  We will have a lunch

3    break.  What I'm wondering is, what it is that Mr. Hurley

4    can say that will solve the problem that Ms. Hartnett has

5    pointed out that he can't testify that this PNR is

6    Booking.com related.

7             MR. FUGA:  Your Honor, he has not seen that PNR

8    or the 26 PNRs because he's not allowed to.  If he were to

9    be allowed to this could be resolved immediately.  Those

10   PNRs as I understand it are old and would not help anyway or

11   would not -- they should not have a concern with those PNRs

12   going to him at this point.

13            THE COURT:  I understand that.  I thought the

14   PNRs were one of the critical steps to linking these

15   bookings.

16            MR. FUGA:  They are.  I'm saying their concern

17   about him seeing those PNRs, I think, has been resolved

18   because the PNRs from October.  Their concern, as I

19   understand it, was that Mr. Hurley or Mr. Stocki could see

20   the PNRs and then kind of reverse engineer how Booking or

21   its vendor is getting through our protections.  That's my

22   understanding.  Because these are Ryanair PNRs, they are

23   Ryanair's own PNR.  Someone from Ryanair just confirmed that

24   Ryanair cannot even use them since all the data is gone.

25   All the data is gone to use them usefully to block

1    Booking.com.

2              MS. HARTNETT:  Your Honor, if I may, I would say

3    from our view this is highly prejudicial to change the

4    witness or the facts about PNR codes today.  They've known

5    about this issue throughout.

6              THE COURT:  I'm confused about what I just

7    heard.

8              MS. HARTNETT:  This is highly confidential, Your

9    Honor.  We're accepting that you said we could have two of

10   their witnesses look.  We allowed three because of someone's

11   parental leave.  And they do have a more senior witness that

12   could have done all this, they chose to have it be

13   Mr. Hurley.  And the cases say, all the cases they cited say

14   that if he or someone wants to testify at trial they could

15   have had someone else at Ryanair come up to speed, review

16   the information, and come in here ad provide testimony that

17   we could cross-examine.  Their own cases make the point.

18             THE COURT:  Final word.

19             MR. FUGA:  There's not someone more senior, he's

20   the CTO.

21             THE COURT:  Senior is not the problem.  The

22   problem is we have someone at a junior level to Mr. Hurley

23   who was on the scene.

24             MR. FUGA:  I don't think senior is quite right,

25   but I think the one thing that is the potential hearsay

1    issue is seriously just connecting -- looking at this one

2    number and saying it's also on this list.  I think you can

3    rely upon that.

4              THE COURT:  Isn't that like saying I saw a

5    license plate number of the getaway car from a bank and the

6    person who ties the license number to me is not called as a

7    witness and there's no evidence.  That's pretty central to

8    the question of whether I was the bank robber.

9              MR. FUGA:  I think that maybe the answer here is

10    that's moving in to kind of the residual hearsay exception.

11              THE COURT:  I don't think residual hearsay is in

12    the picture, so I think we have to argue in terms of actual

13    hearsay.

14              MR. FUGA:  I will stop mentioning that, Your

15    Honor.

16              THE COURT:  All right.

17              MR. FUGA:  Again, I think he could confirm that

18    the confidentiality concerns that Booking.com had in October

19    are no longer alive or should no longer be alive and he

20    could look at them today or he could be recalled tomorrow on

21    this specific issue and look at it this evening if

22    Booking.com would provide one PNR number.

23              MS. HARTNETT:  Your Honor, I would add this is

24    prejudicial to us because we would never have had the

25    opportunity to test that by deposition or any other

1   opportunity.  We have trial by ambush.

2                 THE COURT:  You didn't depose the three people,

3   did you?

4                 MS. HARTNETT:  No, Your Honor.  We were allowed

5   one two-hour deposition.  We were given one 30(b)(6) of two

6   hours.

7                 THE COURT:  This is because of the link arising

8   issue, the Monex --

9                 MS. HARTNETT:  Correct.

10                THE COURT:  You chose to depose Hurley?

11                MS. HARTNETT:  No.  We noticed the 30(b)(6)

12  deposition and they put Mr. Hurley up.

13                THE COURT:  I see.  Okay.  All right.  I want to

14  think about this a bit.  What we'll do is take a break for

15  say five minutes while I think about it and I'll come back.

16                MS. HARTNETT:  Your Honor, we do -- you may know

17  this, but we have the prejudicial argument as well and the

18  lost profits as well.  Just the 403 argument.

19                THE COURT:  I understand that.  The lost profits

20  argument, what are you talking about there?

21                MS. HARTNETT:  Just to the extent that Monex

22  doesn't come in at trial we don't have an issue as to

23  whether they disclosed the lost profit damages, but if Monex

24  were to come in --

25                THE COURT:  This is the argument that the lost

1   profits are at a different time?

2              MS. HARTNETT:  No.  Just that they had it the

3   first time in the proposed pretrial order said that they

4   were claiming lost profits from Monex outages.

5              THE COURT:  I see.  Let me take five minutes.

6   I'll be back at 9:15.

7              (A recess was taken, after which the following

8   proceedings were had:)

9              MR. FUGA:  Your Honor, if I may.  I spoke with

10  the client and Mr. Davies could appear by video if it would

11  be helpful to Your Honor.

12             THE COURT:  Mr. Davies being?

13             MR. FUGA:  The person who reviewed the

14  declaration.

15             THE COURT:  We're doing all this by -- sorry,

16  off the cuff, and that happens at trials.  Ms. Hartnett?

17             MS. HARTNETT:  I was just approaching.

18             THE COURT:  A video of the witness that you

19  would like to hear from?

20             MS. HARTNETT:  No, thank you.

21             THE COURT:  No, thank you.

22             MS. HARTNETT:  I think one other -- just one of

23  the points about what this would involve is at the end of

24  the day there are 26 codes, but this was the comparison

25  project between a list of 60,000 errors and a long, long

1    list of Booking.com PNR codes.  So the project was not as

2    simple as just matching one license plate to one thing, it

3    was a project that included comparing a large spreadsheet.

4    So I do think this is something where there could be errors

5    and having a video testimony of someone we've never deposed

6    can't cure it.

7             THE COURT:  How about if I were to say he should

8    be allowed to look at this one PNR that we're focused on

9    between now and his testimony?

10            MS. HARTNETT:  We would say that's not fair to

11   us.  That doesn't allow us to test the rest of the whole

12   inquiry.  He's saying there's 26.  That could be wrong.

13   There could be none.  So all that's going to show is there's

14   one.  And if there's one then we have this IP address theory

15   which is actually quite speculative.

16            THE COURT:  One more time for Mr. Fuga, how

17   about that argument, just seeing the one isn't going to cut

18   it?

19            MR. FUGA:  That would be great, Your Honor.

20            THE COURT:  Ms. Hartnett is saying that having

21   him look at one doesn't really solve the problem because

22   that doesn't give him information about any of the others

23   that his subordinates had looked at.

24            MR. FUGA:  The theory that they're concerned

25   about is related to that one, and they're concerned that one

1    does not match up.  And if showing him that one would remedy

2    or presumably remedy that concern that it shows up on both

3    list A and list B and they could challenge the 60,000 or

4    whatever their other challenges are.  The one missing piece

5    is him not being able to look at that one PNR which they

6    found on both lists.

7              THE COURT:  Okay.  This is a very unsatisfactory

8    situation.  I will do the best I can with it.  I'm going to

9    because I think the confidentiality concerns are no longer

10   in place.  I am going to allow Mr. Hurley to look at that

11   one PNR and testify to the extent that he can.

12             Now, that does not necessarily bridge the gap

13   between what Ryanair has to do by way of proof and what the

14   testimony of Mr. Hurley will -- any gaps in Mr. Hurley's

15   testimony will potentially be a problem, but that more, I

16   think, goes to the inadequacy of proof.

17             So I will allow Mr. Hurley to testify.  I'll

18   allow him to look at the one PNR and draw any conclusions

19   that he can from that, and we'll see how his testimony goes.

20   I think that's the best we can do.

21             As far as lost profits, I think the disclosures,

22   although somewhat limited, are probably enough to at least

23   disclose that there was a claim for damages in the form of

24   lost revenue from the period that the Monex attack was in

25   place.  So that, I think, is it for this issue.

1          MS. HARTNETT:  Your Honor, could I just, for the

2 record, say we do object to that, that they never asked for

3 Mr. Hurley to view a PNR code before today.

4          THE COURT:  I understand.  Everything we're

5 doing today, we're doing on the fly.

6          MS. HARTNETT:  Understood.  I wanted to make

7 that clear.

8          THE COURT:  It's unfortunate and it's not the

9 way this should go, but I have to make an adjudication as to

10 whether it's fairer to them to keep him from seeing

11 something which he obviously at this point ought to be able

12 to see and -- or it would be fairer to you if we excluded

13 him altogether.  My judgment is it's the former.

14          MS. HARTNETT:  Your Honor, he wouldn't be

15 excluded from the trial.

16          THE COURT:  Altogether for purposes of Monex.

17          MS. HARTNETT:  Understood.  Does that mean he

18 will not be able to testify with respect to any PNR code

19 other than the one allegedly linked to 5,000?

20          THE COURT:  I don't see how he could testify to

21 anything else.

22          And you don't disagree with that, Mr. Fuga?

23          MR. FUGA:  I agree, Your Honor.

24          MS. HARTNETT:  Just because he didn't argue

25 that, I want to note for the record that Mr. Hurley, in his

1    deposition, aside from any disclosures, repeatedly testified

2    that any lost profits or revenue from Monex would be

3    speculative, and so we believe his testimony should also be

4    excluded on that basis.

5            THE COURT:  That is something that's going to be

6    subject to rigorous cross examination.

7            MR. HEMANN:  Just quickly on timing with

8    Mr. Hurley, I don't know what we're going to look like

9    today.  The plaintiffs told us they plan on calling

10   Mr. Hurley today.  We would like, given the nature of this

11   ruling, to make sure we've got a little bit of additional

12   time.  I don't know that we'll get to cross-examination of

13   Mr. Hurley today.

14           But I think we should be entitled being off the

15   cuff and on the fly here to have overnight to do some prep

16   on this new testimony from Mr. Hurley.  We may be in that

17   situation, but I wanted to raise that question.

18           THE COURT:  Who's going to be taking the first

19   witness?  I don't know how long his testimony is going to

20   be.  I suspect not that long, but maybe I'm wrong.  But if

21   his testimony does not go beyond the close of business

22   today, then the problem is solved.  If it doesn't go beyond

23   the close of business, then I won't put you in a position

24   that you have to cross immediately.  I will allow you to

25   suspend your cross-examination until tomorrow.

Appx163

1        What do you expect in terms of timing with

2   Mr. Hurley?

3        MR. DONOGHUE:  Depends a little bit on whether

4   there are objections, Your Honor, but I would expect about

5   two hours.

6        THE COURT:  What we'll do is if this is

7   satisfactory is we'll allow -- I'll tell the jury that the

8   cross-examination of Mr. Hurley will be postponed until

9   tomorrow and that we will go to the next witness, and then

10  you'll be allowed to cross-examine and redirect tomorrow if

11  we get through Mr. Hurley.

12       My guess is that we will get through the jury

13  selection and opening statements, I'm hopeful, by lunch.  So

14  you can figure that we'll have, say, in the nature of four

15  hours between the beginning of testimony and the end of the

16  day.  All right?

17       MR. DONOGHUE:  Just to make sure I understand,

18  Your Honor, Mr. Hurley will have his direct exam and

19  assuming he doesn't run until the end of this afternoon, he

20  won't be cross-examined at all until tomorrow morning?

21       THE COURT:  Correct.  So their cross-examination

22  won't be broken up.

23       MR. DONOGHUE:  That makes sense.  I wanted to

24  make sure I understood.

25       THE COURT:  That's my idea, and if nobody has a

1   problem with that, we'll go that way.  I think we should be

2   expecting to see the jury very soon.  I don't think that

3   there's a reason to adjourn again.  They should be here

4   around 9:30.

5            Okay.  I think we're all here.

6            Ladies and gentlemen of the jury panel, welcome

7   you again to the United States District Court for the

8   District of Delaware.  I want to emphasize how much we

9   appreciate your jury service and how important jury service

10  is.  Service on an American jury is one of the highest

11  privileges and responsibilities of citizenship in our

12  democracy.  It's something that I know is inconvenient in

13  some instances, but it is very important to make our system

14  of justice work.

15           My name is William Bryson.  I'll be the judge in

16  this case and Ms. Naima Drecker-Waxman, who is sitting here,

17  will be assisting me.  Mr. Michael Banenas, sitting there,

18  is the courtroom deputy.  And among his duties, he'll be

19  responsible for taking care of the jury during the trial

20  after the jury is selected.  Deanna Warner is the court

21  reporter and will be serving as such for the duration of

22  this trial.

23           Our first order of business will be to select

24  the panel of jurors who will sit for this case.  This is a

25  civil case, not a criminal case, and we will select eight

1    jurors, not 12 or more as would be the case if this were a

2    criminal trial.  Of course, there are many more of you here

3    than the eight, but that is part of the process of jury

4    selection.  We'll call more jurors than the bare minimum

5    needed in case some potential jurors cannot serve or have to

6    be excused for some reason.

7            Here's how the process will work.  Each of you

8    has been given a form with a number of questions on it.  Mr.

9    Banenas will call 14 of you who have been randomly selected

10   to sit in the jury box here.  I will then read aloud the

11   questions on the questionnaire one by one.  As I read the

12   questions, if your answer to any of the questions is yes,

13   please circle the number of that question.  After I finish

14   reading through all the questions, I will come back to those

15   of you who are sitting in the jury box to ask if any of you

16   had a yes answer to any of the questions.  If so, I will ask

17   you some follow-up questions on that subject.

18           It's important that everyone here, not just

19   those in the jury box, pay close attention to all the

20   questions and circle the number of any question to which

21   your answer is yes because I may need to question others

22   besides those initially seated in the jury box.

23           Now, I want to assure you that in asking these

24   questions, it is not our purpose to pry into your personal

25   affairs.  I don't know if it will happen today, but

1   sometimes it does happen that there's a question that comes

2   up as to which a juror does not want to respond in public.

3   You feel that way as to a particular question, all you have

4   to say is, "Judge Bryson, I'd like to speak with you

5   privately about that."  You will then come up here along

6   with a representative from each side in this case and we'll

7   discuss the matter confidentially.  You shouldn't have any

8   qualms about asking to handle a particular question in that

9   way.

10              Now, based on your answers to my questions, I

11   will then speak privately with the lawyers to determine

12   whether any of those seated in the jury box should be

13   excused.  If any of the original 14 are excused, Mr. Banenas

14   will call replacements from the gallery by juror number.  I

15   will then ask the replacement jurors which, if any,

16   questions they answered yes, and that's why it's important

17   for everyone in the gallery to follow the questions as I

18   read them and circle those to which the answer is yes.

19              After we have 14 persons in the juror box who

20   have not been excused, the lawyers for each side will have

21   an opportunity to make decisions regarding which juror

22   should be chosen, and after they've had their input, we will

23   have our jury of eight.

24              Let me emphasize that whether you are selected

25   or not does not in any way reflect on you.  This is just

1    part of the process.  If you are not selected, it doesn't

2    mean that anybody thinks you're not capable of being fair or

3    someone doesn't like you.  It's just the standard process by

4    which jurors are selected every day in every courtroom in

5    this country.

6              Now, before we go any further, let me give you a

7    very brief summary of this case so you will have some idea

8    of what this is all about as we go through the jury

9    selection process.  This is a commercial dispute involving

10   airline travel and, in particular, the process of booking

11   online tickets.  Ryanair, an airline based in Ireland, has

12   sued online travel agents, companies that book airline

13   tickets online.  Ryanair claims that the online travel

14   agents are booking tickets in a way that violates Ryanair's

15   rights.

16             Now, Booking.com, such an agent, has countersued

17   alleging that Ryanair has unlawfully defamed it and

18   unlawfully interfered with its business.  This case is

19   expected to take five days to try.  We will normally begin

20   at 9:00 a.m. each day and work until 5:30 in the afternoon.

21   We will have a lunch break at about midday and you will be

22   provided with lunches at that time.  We will also have short

23   breaks at midmorning and midafternoon.

24             We'll now begin the jury selection process.  The

25   first order of business is for Mr. Banenas to administer the

1   juror's oath to all of you collectively.

2            Mr. Banenas.

3            (The venire panel was sworn.)

4            THE COURT:  Very well.  Mr. Banenas, would you

5   summon the jurors to sit in the jury box.

6            THE CLERK:  Juror number 1, juror number 2,

7   juror number 3, juror number 4, juror number 5, juror

8   number 6, juror number 7, juror number 8, juror number 9,

9   juror number 10, juror number 11, juror number 12, juror

10  number 14 and juror number 13.

11           THE COURT:  Okay.  Now, I think you all have a

12  questionnaire before you and I will begin asking the

13  questions.  And, again, if your answer is yes to any of

14  these questions, circle that particular question.  We'll

15  come back to you.

16           First, is there a medical or other important

17  reason that you cannot be available for the duration of this

18  trial?  Again, the trial is expected to take five days.

19  Doesn't necessarily mean that we'll be done in five days but

20  the ordinary experience is that it will be done in five

21  days, conceivably less than five full days, but I think you

22  can count on five days.

23           Two, do you suffer from any condition or

24  situation that would make it difficult to give the parties

25  your full attention and fair consideration if you were

1    selected as a juror?

2              And three, do you have difficulty reading,

3    writing or understanding the English language so that it

4    would impair your ability to understand what you hear in

5    court or to read the documents that may be used as exhibits?

6              Four, other than what you have heard in the

7    brief description given today in the case, do you know

8    anything about this case?

9              Five, have you ever purchased products or

10   services from any of the parties in this case?

11             Six, do you believe there is something about the

12   kind of case that I described to you that would prevent you

13   from being fair and impartial to all the parties in this

14   case?

15             Seven, do you believe you would be able --

16   excuse me -- unable to follow the law as I explain it to

17   you, apply that law to the facts that you find in this case

18   and render the verdict required by the law as I explain it

19   to you?

20             Eight, have you ever sued anyone or been sued by

21   anyone?  Do you have a close friend or family member who's

22   been sued or has filed a lawsuit?

23             Nine, have you ever worked for an airline?

24             Ten, have you ever worked for a travel agent or

25   a travel-related company?

1    11, the evidence in this case may relate in part

2    to the following companies and individuals:  Ryanair,

3    Booking.com, KAYAK, Etraveli, Travelfusion, Navitaire,

4    Michael O'Leary.  Do you have negative views or opinions

5    about any of these individuals or entities or have you ever

6    had a negative experience with any of these entities or

7    individuals?

8    12, are you or a family member an Irish citizen

9    or resident?

10   13, have you ever worked in the cyber security

11   industry?

12   14, have you ever worked in a job that involved

13   web scraping?  If you don't know what web scraping is, you

14   probably haven't worked in a job that involves it.

15   Have you ever worked in computer programming?

16   16, have you ever worked for an online search or

17   metasearch engine?

18   17, do you have any legal training or

19   experience?

20   18, have you had any prior jury service?

21   19, have you had prior involvement as a party in

22   any legal proceeding personally as well as in connection

23   with any employment?

24   20, have you had prior experience as a witness

25   in court or a deposition?

1      21, have you ever booked a Ryanair flight or

2   flown on Ryanair?

3      22, have you ever booked a flight, reserved a

4   hotel room or rented a car using an online travel agent such

5   as Expedia, Priceline, Booking.com or KAYAK?

6      23, if so, how often do you use online travel

7   agent websites for booking flights?

8      24, have you ever booked a flight using

9   Booking.com or KAYAK?

10      And 25, is there anything else, whether covered

11   or not covered, that would affect your ability to be a fair

12   juror?

13      Okay.  Let's go one by one to the jurors and see

14   how many yes answers there were.

15      Juror number 1.

16      PROSPECTIVE JUROR:  I have one yes, number 22.

17      THE COURT:  22.  Okay.  And what was the company

18   with which you booked?

19      PROSPECTIVE JUROR:  I used Expedia.

20      THE COURT:  You used Expedia.  Was that for a

21   flight or hotel room?

22      PROSPECTIVE JUROR:  I believe it might have been

23   for a flight.  I don't know.  I'm not sure.  But I know I

24   used Expedia.

25      THE COURT:  Thank you.  And that was the only

1  one?

2         PROSPECTIVE JUROR:  Yes.

3         THE COURT:  Okay.  Juror number 2.

4         PROSPECTIVE JUROR:  Zero.

5         THE COURT:  No yeses.  Very good.  Juror number

6  3.

7         PROSPECTIVE JUROR:  Zero.

8         THE COURT:  Okay.  Juror number 4.

9         PROSPECTIVE JUROR:  Two.

10        THE COURT:  Did you say zero?

11        PROSPECTIVE JUROR:  No, I had two.

12        THE COURT:  Which are they?

13        PROSPECTIVE JUROR:  Question number 2.

14        THE COURT:  Yes.

15        PROSPECTIVE JUROR:  Frequent bathroom breaks

16 will be needed.

17        THE COURT:  I see.  Okay.  All right.  You had

18 another one.

19        PROSPECTIVE JUROR:  I have another one.

20        THE COURT:  Thank you.

21        PROSPECTIVE JUROR:  22.

22        THE COURT:  22, yes.

23        PROSPECTIVE JUROR:  Priceline.

24        THE COURT:  That's it; right?  Just the two.

25 All right.

1          PROSPECTIVE JUROR:  Right.

2          THE COURT:  Juror number 5.

3          PROSPECTIVE JUROR:  I had two of them.  Number 1

4    and 2.  I have a vacation planned for later in the week but

5    the main thing I wanted to say is I'm being treated for

6    possible Parkinson's right now and I don't know if I'm a

7    hundred percent.

8          THE COURT:  I understand.  Okay.  Juror

9    number 6.

10         PROSPECTIVE JUROR:  I have five yeses.

11         THE COURT:  Okay.

12         PROSPECTIVE JUROR:  It would be 1, 5, 22, 23

13   and 24.

14         THE COURT:  Okay.  Why don't we go down the

15   list.  Number 1.

16         I think the court reporter is having a little

17   bit of trouble hearing their responses.  Do we have a

18   microphone?  If everybody would try to speak up a bit.  I'm

19   the worst offender because I let my voice drop.  By the way,

20   if any of the jurors cannot hear me at any point just raise

21   your hand because it's something that I do subconsciously or

22   unconsciously.

23         Let's go through your list.  What number --

24   juror number 6, number 1.

25         PROSPECTIVE JUROR:  Yes.  That would be

1  financial hardship.

2         THE COURT:  Is this to do with your job?

3         PROSPECTIVE JUROR:  No.  My husband has not been

4  working so I'm the only one that's working.

5         THE COURT:  Okay.  And what, if I may say, is

6  your employment?

7         PROSPECTIVE JUROR:  I work at a hair salon.

8         THE COURT:  I see.  Okay.  And is this a

9  position that they would not compensate you for jury

10  service?

11        PROSPECTIVE JUROR:  No.

12        THE COURT:  I see.  Okay.  Now, you said

13  question 5.

14        PROSPECTIVE JUROR:  Yes.  I have used

15  Booking.com, KAYAK, and Expedia.

16        THE COURT:  Okay.  Have you had good

17  experiences, bad experiences or neither with any of those

18  companies?

19        PROSPECTIVE JUROR:  I guess with Expedia one not

20  so great one, but other than that the rest were fine.

21        THE COURT:  Okay.  Let's see, the next question

22  I think was 22, and I guess you answered that already

23  because you have bookings on -- what was the nature of your

24  booking, let's say, with Booking.com?

25        PROSPECTIVE JUROR:  I had not a terrible

1    experience with Expedia but just with --

2              THE COURT:  With Booking.com, did you book a

3    flight or hotel?

4              PROSPECTIVE JUROR:  Yes, flights.

5              THE COURT:  And that went smoothly?

6              PROSPECTIVE JUROR:  Mm-hmm.

7              THE CLERK:  Okay.  23.

8              PROSPECTIVE JUROR:  I would say two times a

9    year.

10             THE COURT:  Twice a year.  Okay.  And 24, I

11   guess that -- I have your answer.  You said you had booked

12   with Booking.com?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Very good.  Juror number 7.

15             PROSPECTIVE JUROR:  Seven yeses.

16             THE COURT:  Okay.  Why don't you give me the

17   numbers and we'll go through them one by one.

18             PROSPECTIVE JUROR:  Number 1, number 5,

19   number 8, 18, 19, 20, and 22.

20             THE COURT:  Okay.  First number 1.

21             PROSPECTIVE JUROR:  My wife is partially

22   disabled and has a number of appointments so if the case

23   were to go beyond this week I'd have a conflict getting her

24   to the appointments.

25             THE COURT:  I see.

1          PROSPECTIVE JUROR:  And some later conflicts at

2     the end of July.

3          THE COURT:  I think I can say with great

4     confidence that we won't go deep into July.  But there is

5     some chance that this would go, let's say, to Monday.  Is

6     one of our appointments Monday?

7          PROSPECTIVE JUROR:  One of her appointments is

8     Monday morning.

9          THE COURT:  Let me just make a note of that.

10    Number 5, the purchase of products or services.

11         PROSPECTIVE JUROR:  I believe I made hotel

12    reservations with Booking.

13         THE COURT:  Okay.  Number 8.

14         PROSPECTIVE JUROR:  I have a friend who filed a

15    lawsuit against the state of Delaware.

16         THE COURT:  Okay.  Did you -- as a result of

17    that did you have any impression of the process, favorable,

18    unfavorable or anything?

19         PROSPECTIVE JUROR:  Neutral.

20         THE COURT:  Okay.  Question 18.

21         PROSPECTIVE JUROR:  I was selected as the

22    foreman for second degree murder trial.

23         THE COURT:  In state court?

24         PROSPECTIVE JUROR:  State court.

25         THE COURT:  In Delaware?

1      PROSPECTIVE JUROR:  Yes.

2      THE COURT:  What was your experience as a juror

3   in this case, favorable, unfavorable, neutral or did you

4   have any special concerns about the process?

5      PROSPECTIVE JUROR:  I did have some great

6   concerns up until the point the gentleman pled out.  So we

7   never had to serve but we were -- I was selected.

8      THE COURT:  Yeah.  When you say you had some

9   concerns, what was the nature of your concerns?

10      PROSPECTIVE JUROR:  Just second-degree murder

11   things.

12      THE COURT:  Just sitting on a second-degree

13   murder case.  All right.  I can understand that.  There's no

14   murders at issue in this case.  Let's see.  The next one is

15   number 18, we did that.  Let's see after 18, 19.  Prior

16   involvement as a party in a lawsuit.

17      PROSPECTIVE JUROR:  19 and 20, I have been --

18   I'm a member of a volunteer ski patrol in the Poconos, and I

19   have been deposed and been a witness in several cases

20   against the ski area involving.

21      THE COURT:  Accidents?

22      PROSPECTIVE JUROR:  Involving injury to skiers.

23      THE COURT:  All right.  And in connection with

24   your depositions or testimony, again, any impressions that

25   you had any concerns that we had about the process?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  No, okay.  Let's see.  20 and 21.

3    You said 20.  How about 21, booked a Ryanair flight.

4          PROSPECTIVE JUROR:  22.

5          THE COURT:  22 it was.

6          PROSPECTIVE JUROR:  I used Booking and I think

7    Hotels.com for hotel reservations.

8          THE COURT:  Okay.  Thank you.  Let's move on to

9    juror number 8.

10          PROSPECTIVE JUROR:  18 and 22.

11          THE COURT:  Okay.  What was your prior jury

12    service?

13          PROSPECTIVE JUROR:  In California about 20 years

14    ago or so, a case between Bechtel Corporation and this

15    gentleman who had been using their scrap pile of metal and

16    basically scrapping for many years, a new owner came in and

17    I guess had him arrested right off the bat.

18          THE COURT:  I see.  And what was your -- the

19    nature of your experience on that jury, was it positive,

20    negative?

21          PROSPECTIVE JUROR:  Yeah, actually I do think it

22    was positive.

23          THE COURT:  All right.  And question 22, have

24    you ever booked a flight?

25          PROSPECTIVE JUROR:  Not a flight.  I've booked

1    hotel rooms before with Booking.

2              THE COURT:  Okay.  All right.  Very well.  Juror

3    number 9.

4              PROSPECTIVE JUROR:  I have two, number 9 and

5    number 18.

6              THE COURT:  9 and 18.  All right.  Number 9 is

7    ever worked for an airline.

8              PROSPECTIVE JUROR:  I worked for Federal Express

9    for 35 years.  I'm retired now.

10             THE COURT:  All right.  And 18.

11             PROSPECTIVE JUROR:  I was on a jury in New

12   Castle County, attempted murder about ten years ago.

13             THE COURT:  I missed the last thing you said.

14             PROSPECTIVE JUROR:  I was on a jury in New

15   Castle County about 10 years ago for attempted murder.

16             THE COURT:  What was your impression of the

17   process, favorable, unfavorable?

18             PROSPECTIVE JUROR:  It was good, very favorable.

19             THE COURT:  All right.  Juror number 10.

20             PROSPECTIVE JUROR:  I have four altogether.

21             THE COURT:  Okay.  And those are?

22             PROSPECTIVE JUROR:  5, 22, 23, 24.

23             THE COURT:  Okay.  Let's go down the list and 5?

24             PROSPECTIVE JUROR:  So I used -- my wife has

25   used Booking.com, Expedia, and KAYAK.

1           THE COURT:  I'm sorry, you said.

2           PROSPECTIVE JUROR:  Both my wife and I have

3   used.

4           THE COURT:  Expedia.

5           PROSPECTIVE JUROR:  Booking.com and KAYAK.

6           THE COURT:  And Booking.com and KAYAK.  Okay.

7   Any positive or negative experience with either of those any

8   of those times?

9           PROSPECTIVE JUROR:  Well, my wife had a bad

10  experience with Booking.com and KAYAK so we mainly use

11  Expedia now for our hotels and rental.

12          THE COURT:  Okay.  Number -- question number 22.

13          PROSPECTIVE JUROR:  And 22 we used Priceline and

14  Expedia.  23, we use online all the time to book our

15  flights.

16          THE COURT:  Okay.  And 24 I think you mentioned

17  that.

18          PROSPECTIVE JUROR:  Yeah.

19          THE COURT:  Okay.  Juror number 11.

20          PROSPECTIVE JUROR:  I have 5, 21, 22, 23,

21  and 24.

22          THE COURT:  Okay.  These are all largely related

23  so maybe the same answer will apply to all of them.

24          PROSPECTIVE JUROR:  Booking.com, Expedia, KAYAK,

25  and then I've booked a flight with Ryanair from Brussels,

1   Belgium, to Naples, Italy, when I was stationed in Europe.

2   And I've used Booking.com, Expedia, and KAYAK for flight

3   reservations, hotels, and bed and breakfast.  And let's see,

4   I probably used them five times maximum to use those type of

5   reservation.

6                  THE COURT:  Okay.

7                  PROSPECTIVE JUROR:  And I have used Booking.com

8   and KAYAK.

9                  THE COURT:  Let me ask you about your experience

10  with the Ryanair flight.  You booked and took that flight, I

11  take it.  Was it a pleasant experience, negative, neutral?

12                 PROSPECTIVE JUROR:  It was in Belgium.  It was

13  one of the cheapest flights you could get to Naples, and

14  it's not -- it wasn't a very glorious flight, but it was

15  good transportation, got us there, no problems.

16                 THE COURT:  Okay.  And how about your experience

17  with the online travel agents like Booking.com, KAYAK,

18  Expedia, and so forth?

19                 PROSPECTIVE JUROR:  All good experiences, never

20  had any problems.

21                 THE COURT:  All right.  Juror number 12.

22                 PROSPECTIVE JUROR:  5, 8, 19, 22, 23, 24.

23                 THE COURT:  Okay.  5.

24                 PROSPECTIVE JUROR:  So I'm not positive about

25  Booking.  I know I've looked at it.  I can't remember if I

1  used online services more than I would like to.  I have four

2  adult college-age kids that are always booking things and I

3  pay for, and I have to deal with the aftermath of changes,

4  and it's never pleasant.  I prefer to book through airlines,

5  but they often find better prices, and I have to deal with

6  it.  All those are probably every week or every other week

7  that I'm -- that's how often I do it.

8                 THE COURT:  Okay.

9                 PROSPECTIVE JUROR:  And then as far as number 8,

10  I sued someone to get money back that they owed me that --

11  and then they countersued.

12                 THE COURT:  How did that -- well, let me ask

13  first.  How did your experience in that strike you?

14                 PROSPECTIVE JUROR:  Not very good because they

15  owed a good amount of money and I won it and got it and

16  there was -- I can't remember, probably 20 years ago, but

17  then there was some sort of statute or something in there

18  that something was supposed to be done within a certain

19  amount of days and it wasn't.  They got it all back.  Very

20  negative on my own.  But the law is the law.

21                 THE COURT:  Okay.  Now let's see.  19, that's

22  what you just referred to?

23                 PROSPECTIVE JUROR:  Yes.

24                 THE COURT:  That's the same question.  I guess

25  same answer.

1    22, I think you talked about your experience in

2    booking.  And you also answered 23 that you do it fairly

3    frequently.  And some of those flights, I think you

4    mentioned would have been with Booking and KAYAK.

5         PROSPECTIVE JUROR:  I don't remember exactly if

6    I booked through Booking, but I looked through Booking.

7         THE COURT:  You looked at Booking.

8         PROSPECTIVE JUROR:  I know I've done Expedia.

9         THE COURT:  Let's then go to juror number 13.

10        PROSPECTIVE JUROR:  2 and 3.

11        THE COURT:  2 and 3, okay.  What are -- what is

12   your condition or situation?

13        PROSPECTIVE JUROR:  I don't have a problem

14   serving, but I do take medication for ADHD and I'm somewhat

15   dyslexic.

16        THE COURT:  Okay.  And do you have difficulty

17   because of the dyslexia, difficulty in reading?

18        PROSPECTIVE JUROR:  Yes, sir.

19        THE COURT:  Okay.  And finally, juror number 14.

20        PROSPECTIVE JUROR:  Number 8 and 20.

21        THE COURT:  8 and 20, okay.  Tell me about 8.

22        PROSPECTIVE JUROR:  My daughter was in a car

23   accident, and my husband was sued by the person that she

24   hit, but it was settled out of court.

25        THE COURT:  Did you have any impression of the

1   process of -- this was -- there was actually a lawsuit and

2   then it was settled.  Any impression of the process?

3            PROSPECTIVE JUROR:  It was stressful, but the

4   insurance company took care of it, so okay.

5            THE COURT:  Okay.  And question 20.

6            PROSPECTIVE JUROR:  I'm a Realtor and a buyer

7   sold -- the buyer sued the seller, so I was a witness.

8            THE COURT:  And how did that experience strike

9   you?

10           PROSPECTIVE JUROR:  It went well.

11           THE COURT:  Okay.  Let me see the lawyers up

12  here, and I don't need all of you, if there's one each from

13  each side, and we'll talk briefly and then get back to you

14  on who we will excuse for now, and then we'll move on with

15  the process.

16           (Thereupon, a discussion was held at sidebar.)

17           THE COURT:  All right.  I have three that I

18  think are two clear cases, maybe three.  Number 4, that's

19  the person taking the bathroom breaks.  Number 5, this is

20  the person with Parkinson's and has a vacation planned.

21  Number 13, ADHD and dyslexia.  Those are the ones I would

22  suggest.

23           I have a question about number 7.  He is the one

24  that cannot sit beyond a week.  Now, I don't think there's a

25  likelihood we'll go beyond a week, but that is a real

1    concern.  So that's -- that doesn't strike me as an

2    automatic excuse for cause, but that's one we want to think

3    about.

4              Any questions of others?

5              MR. HEMANN:  Others, I think that 6 was the

6    salon worker who had financial hardship.

7              MR. DONOGHUE:  That's the one I was going to

8    say.

9              THE COURT:  Given that we only have one

10   financial hardship, normally there will be, but given that

11   we only have one, I'm inclined to give her -- we don't want

12   to have a juror sit there and thinking about her family

13   assets are dripping away, so 6 will go out.

14             What about number 7?

15             MR. DONOGHUE:  That was my other question, was

16   number 7.  It seems to me that 7 should be excused.

17             MR. HEMANN:  7 was.

18             THE COURT:  7 was the fellow that has the wife

19   that's ailing, and he can't stay beyond Friday.

20             MR. HEMANN:  I have to say, Your Honor, with

21   KAYAK -- being we've reached an agreement regarding KAYAK,

22   so KAYAK will be out, I can't imagine we're going to go past

23   Friday.

24             THE COURT:  That depends more on the jury than

25   it does on us, unfortunately.  What do you say?

1      MR. DONOGHUE:  I was -- in terms of timing, I

2   agree with Mr. Hemann.  I doubt we're going to a point

3   that's going to stress the jury.  Having said that, the

4   juror is trying to care for his ailing wife.  Seems a little

5   harsh to make him not be here, not knowing how much help she

6   needs.

7      THE COURT:  I am inclined to excuse him just

8   because I don't want to have him thinking are we going to be

9   finished with this by Friday.  I don't want that kind of

10  weight on the juror.  So I'm looking at for cause for 4, 5,

11  6, 7, and 13.

12     MR. DONOGHUE:  We agree with that, Your Honor.

13     MR. HEMANN:  I don't have this question with

14  regard to 7 anymore since you'll be striking him.  You did

15  ask -- 7 and 8 did mention that they used Booking.com and

16  you didn't follow up with them on their experience, so I

17  would ask number 8, if Your Honor -- to follow up on that

18  experience.

19     I think that my only other one, Your Honor, is

20  10 did articulate that he had a very bad experience with

21  Booking -- or his wife had a bad experience with

22  Booking.com.  I think it's pretty close to being

23  cause-worthy.

24     THE COURT:  I think that's a peremptory-type

25  issue.

1          MR. HEMANN:  Give them to me again so I have

2     them.

3          THE COURT:  The ones I'm striking will be 4, 5,

4     6, 7, and 13.

5          MR. HEMANN:  And follow up with 8.  And, Your

6     Honor, do you have -- we don't have a list of the -- we have

7     the alphabetical list, but we don't have the --

8          THE COURT:  Mike has them and he'll give them to

9     both of you.

10          (The discussion at sidebar ended.)

11          THE COURT:  The lawyers pointed out to me, I

12     didn't follow up on one of the questions with one of the

13     jurors, juror number 8, I believe you said that you had an

14     experience with Booking that was not -- what was the nature

15     of your experience?

16          PROSPECTIVE JUROR:  Fine, got what I paid for.

17          THE COURT:  Here's what we're going to do.  The

18     following jurors will be excused and will be replaced in the

19     box by new jurors because -- Mr. Banenas will call their

20     numbers.  Those of you who are excused are numbers 4, 5, 6,

21     7, and 13.  And you can gather your things and you're free

22     to go.

23          I want to say thank you for participating in the

24     process even though you won't be sitting as jurors for the

25     full week.  It's very important that you come and

1    participate in the process to this extent.  This is, as you

2    probably can understand, a critical part of the whole jury

3    trial process, is selecting the jury.  I really appreciate

4    your participation, so thank you.

5              THE CLERK:  Juror number 15, juror number 16,

6    juror number 17, juror number 18, and juror number 19.

7              THE COURT:  Juror number 15, did you have any

8    questions?

9              PROSPECTIVE JUROR:  Yes.  I have three.

10             THE COURT:  Okay.

11             PROSPECTIVE JUROR:  Number two, number 8, and

12   number 18.

13             THE COURT:  2, 8, and 18.  Okay.  What is the

14   number 2?

15             PROSPECTIVE JUROR:  Number 2, I might need more

16   breaks than you're going to have.

17             THE COURT:  I'm sorry?

18             PROSPECTIVE JUROR:  I might need to take more

19   breaks than we're going to do.

20             THE COURT:  I see.  All right.  What about 8?

21             PROSPECTIVE JUROR:  Number 8, I have sued

22   somebody for a car -- involved in a car accident.

23             THE COURT:  Car accident.  What was the nature

24   of your experience in that event?

25             PROSPECTIVE JUROR:  Very negative.  It was very

1    negative.

2              THE COURT:  Very negative.

3              PROSPECTIVE JUROR:  It was a civil case.  There

4    was no real physical injury involved, but he didn't have to

5    do anything because he had a shortage of money flow.  I was

6    out a lot of money.

7              THE COURT:  Was it their idea of a negative

8    impression, were you in court?

9              PROSPECTIVE JUROR:  Not in court.  It never made

10   it to court.

11             THE COURT:  Never made it to trial.  All right.

12   And number 18.

13             PROSPECTIVE JUROR:  Number 18, yes, I have

14   served in Pennsylvania.

15             THE COURT:  In a civil case?

16             PROSPECTIVE JUROR:  Civil case.

17             THE COURT:  And what was your impression of the

18   process there?

19             PROSPECTIVE JUROR:  Also very negative.

20             THE COURT:  All right.  What was it about it

21   particularly that you found --

22             PROSPECTIVE JUROR:  After the case was finished,

23   the jurors were very -- we were intimidated.  We had to

24   sneak out the back door because there was people waiting

25   outside to heckle us and follow us home.

1          THE COURT:  Well, to reassure anyone here who

2    might be concerned about the same thing, that does not

3    happen here.  I can promise you that if you decide -- if

4    you're chosen as jurors and you decide you want to talk to

5    anyone about your experience, you're free to do so at the

6    end.  But you are also free to go about your business and

7    nobody will bother you.

8          I can promise you because there is a rule in the

9    Delaware District Court that lawyers and others will not

10   bother jurors.  They are in big trouble if they do.  So at

11   the end of a case, if you decide you never want to talk to

12   anybody about the experience, out you go and that's the end

13   of it.  I understand that concern, and that's why we have

14   that rule.

15          Very well.  Let's see juror number 16.

16          THE COURT:  Okay.  Juror number 17.

17          PROSPECTIVE JUROR:  I have five.

18          THE COURT:  Okay.

19          PROSPECTIVE JUROR:  5, 8, 12, 21, and 22.

20          THE COURT:  Okay.  Tell me then about -- I think

21   the 5, 21, and 22 are probably going to be related.  Give me

22   a description of what you've done with respect to the

23   parties.

24          PROSPECTIVE JUROR:  On Booking.com I've used it

25   to book hotels and everything, never flights.  I've booked

1   trips on Expedia also, but never flights.  And then I have

2   flown Ryanair commonly.  I lived in Europe for a year and

3   flew it almost every week.

4          THE COURT:  So you did -- you've flown Ryanair

5   on multiple occasions?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Any impression of Ryanair?

8          PROSPECTIVE JUROR:  I thought it was just like

9   Frontier which is a budget airline, which are cheap flights

10  that get you where you need to go, especially for early 20s.

11         THE COURT:  All right.  Very well.  Question 8,

12  sued or been sued.

13         PROSPECTIVE JUROR:  When I was a child, I was

14  attacked by a dog, and the owners were sued on my behalf by

15  my parents.

16         THE COURT:  So I guess if you were a child you

17  probably didn't have a lot of awareness of the process?

18         PROSPECTIVE JUROR:  So I was seven in the

19  hospital so I was never in the court.

20         THE COURT:  Oh, my.  Okay.  And did your parents

21  convey to you any of their satisfaction or frustration with

22  the way the process worked?

23         PROSPECTIVE JUROR:  That the Court handled it

24  well and those people went to jail, that's about it.

25         THE COURT:  All right.  Question number 12 I

1  think is the next.

2           PROSPECTIVE JUROR:  My grandmother is from

3  Ireland, I have family in Ireland and I'm in the process of

4  getting my dual citizenship with Ireland.

5           THE COURT:  Okay.  Question 21, you have

6  obviously booked a flight with Ryanair.  22, you also, I

7  take it from your earlier response, have booked a flight

8  with or at least a hotel room with Booking.  Any impression

9  of that experience or your experiences with Booking?

10          PROSPECTIVE JUROR:  I've had good experiences

11 with Booking and I've had one bad experience with Expedia.

12          THE COURT:  Okay.  Let's see.  I think that's

13 it.  Now juror number 18.

14          PROSPECTIVE JUROR:  I have three, number 1, 18,

15 and 22.

16          THE COURT:  Okay.  Let's go through them.

17          PROSPECTIVE JUROR:  The only thing I have is

18 this, understand my wife and I are both educators and

19 usually we are free but I have two children and my wife has

20 administrative training on that day and child care is an

21 issue on that day.  Other than that I'm fine.

22          THE COURT:  Okay.  Is there anyone that could

23 serve in your place, family member or something if you were

24 chosen?

25          PROSPECTIVE JUROR:  Potentially.  I haven't

1    reached out to anyone because I wasn't aware this was a

2    week-long case or one day so I haven't talked to anyone.  My

3    closest family is in Dover.  I live in Sussex county.

4                THE COURT:  What city?

5                PROSPECTIVE JUROR:  Milton.

6                THE COURT:  That's a pretty lengthy drive, hour

7    and a half?

8                PROSPECTIVE JUROR:  Hour and 20 today.

9                THE COURT:  You drive faster than I do.

10               PROSPECTIVE JUROR:  I won't comment.

11               THE COURT:  All right.  Okay.  Let's see.  Did

12   we go up to 19?  I can't remember.  Question 22 was it?

13               PROSPECTIVE JUROR:  I have 18 and 22.  I served

14   on a federal case some years ago between Johnson and Johnson

15   and another company, I think it was Boston electric.  It was

16   about heart stents.  I spent a week on that trial.

17               THE COURT:  Was that here in this court?

18               PROSPECTIVE JUROR:  I believe so.  It was in

19   Wilmington so I believe it was about 12 years ago.  Neutral

20   experience with that.

21               THE COURT:  Okay.  Do you recall if that was a

22   patent case?

23               PROSPECTIVE JUROR:  It was a patent case, yes,

24   regarding the heart stents.

25               THE COURT:  Yeah.  Johnson and Johnson, Boston

1   Scientific was the company.

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  22.

4          PROSPECTIVE JUROR:  22 is I used Expedia before

5   twice and the other once or twice.

6          THE COURT:  Okay.  Let me see the lawyers.  19,

7   we do have 19.  Yes, 19, sorry.

8          PROSPECTIVE JUROR:  I have 1 and 2.

9          THE COURT:  Okay.  What is 1?

10          PROSPECTIVE JUROR:  Well, it's family and child

11   care accommodation.  I won't have child care.  We were able

12   to secure child care today.  I don't have anyone to watch my

13   eight-year-old.  My husband was planning to be off work this

14   week; however, the work schedule changes and he can't be off

15   with her.  Additionally, my mother is ill and her health is

16   declining.  We found out yesterday that there is limited

17   oxygen and her regulator is about to die and she lives in a

18   house without air conditioning so she's going to be moving

19   in with me today so we have to get her situated.  And 22,

20   pretty sure we book through Expedia.  My husband did the

21   booking.  It was for flights a couple years ago.  Not the

22   best experience as they changed our flight without telling

23   us.  It ended up fine but it was rocky.

24          THE COURT:  Okay.  I think that completes our

25   list.  Let's meet with lawyers again briefly.

1          (Thereupon, a discussion was held at sidebar.)

2          THE COURT:  Okay.  We have two that I would cut

3  loose, 15 and 19.  15 was the needs frequent breaks and 19

4  is the woman that has a variety of child care and elder care

5  issues.  I just think both of those will be distracted

6  anyways.

7          MR. HEMANN:  No objection to those.

8          MR. DONOGHUE:  No objection to those.

9          THE COURT:  The others, we have the Irish lady

10  who flew on Ryanair.  I don't know which way that cuts but

11  seems to me it's not cause.

12          MR. HEMANN:  So I would have to strike her for

13  cause only because she seems to have a lot of direct

14  firsthand knowledge of the issues in the case.  She's a

15  weekly Ryanair flier, she described, when she lived there.

16  She's also a frequent Booking.com user so she's going to

17  have an unusual familiarity with the processes that we're

18  going to talk about and would have an unusual amount of sway

19  in the jury with that.  I also think when you add the

20  upcoming dual Irish citizenship, that together amounts to a

21  cause challenge.

22          THE COURT:  I gave it some thought.  I think

23  that falls on the peremptory side of the line.  I don't

24  think it's for cause.  It's a close call, but I don't think

25  that's something that goes far enough to send her away.  The

1   issues in this case are not something that someone who's

2   just a casual flier, casual booker, even numerous times is

3   going to be aware of, so I think that --

4            MR. HEMANN:  One follow-up question I would ask,

5   though, Your Honor, ask you to ask, is whether she is a

6   person who booked directly on Ryanair or booked tickets

7   through an OTA.

8            THE CLERK:  One also had child care issues.  He

9   was the one right before 18.  He needs child care on

10  Wednesday.

11           THE COURT:  I meant to cut him as well.  We're

12  talking about 15 and 18 and 19 now.  The Irish is 17.

13           MR. HEMANN:  Whether it's the direct booking

14  with Ryanair or through a travel agency.

15           THE COURT:  That's what I'm asking.

16           (The discussion at sidebar ended.)

17           THE COURT:  Okay.  I have one follow-up question

18  for juror number 17.  When you booked your flights with

19  Ryanair, did you book those directly with Ryanair or through

20  an online travel agent?

21           PROSPECTIVE JUROR:  I booked them directly

22  through Ryanair.

23           THE COURT:  What we're going to do is we are

24  going to excuse jurors number 15, 18, and 19.  So you are

25  free to go.  And again, I thank you for your participation

1    and Godspeed.  So Mr. Banenas, if you would summon three

2    substitute jurors.

3              THE CLERK:  Juror number 20, juror number 21,

4    and juror number 23.

5              THE COURT:  Okay.  Juror number 20, any yeses?

6              PROSPECTIVE JUROR:  Four yeses, 18, 22, 23, and

7    24.

8              THE COURT:  Okay.  Let's start with 18, prior

9    jury service.

10             PROSPECTIVE JUROR:  I was on a jury in Atlanta,

11   Georgia, 20 years ago.  Somebody got hit by a car and was

12   suing.

13             THE COURT:  Any impression of the process?

14             PROSPECTIVE JUROR:  It was fine.

15             THE COURT:  Okay.  22, booked a flight.

16             PROSPECTIVE JUROR:  Yeah.  I travel a lot for

17   work and pleasure and in the past I've used Expedia.  I

18   generally don't use the online bookings anymore.  I might

19   look at Skiplagged to see if flights are available but I

20   almost always book online directly.

21             THE COURT:  Okay.  You said you booked with

22   Expedia.  You haven't booked with Booking.com.

23             PROSPECTIVE JUROR:  It's been so long I might

24   have booked with KAYAK 10, 12 years ago.  I did book once

25   with Expedia.  It was fine.

1          THE COURT:  So I think you've answered 23.  And
2     you've answered 24.  So thank you.  Juror number 21.
3          PROSPECTIVE JUROR:  I have two, I had 8, my
4     husband was in a lawsuit with his former employee, a very
5     large local bank.
6          THE COURT:  I'm sorry, the last thing you said
7     was?
8          PROSPECTIVE JUROR:  His former employer was a
9     local bank WSFS.
10          THE COURT:  Did you have an impression of that?
11          PROSPECTIVE JUROR:  Not pleasant.
12          THE COURT:  What was it that was particularly
13     unpleasant?
14          PROSPECTIVE JUROR:  I don't care to comment on
15     it.  It was offensive.
16          THE COURT:  Let me ask the question this way:
17     Would your experience in connection with that case influence
18     your participation in this case?
19          PROSPECTIVE JUROR:  No, because it wasn't
20     against me, it was against him and it was between him and
21     his employer, not me.  But it did upset my family.
22          THE COURT:  Okay.
23          PROSPECTIVE JUROR:  And then 22 was I use
24     Expedia.
25          THE COURT:  You use Expedia.  Okay.  And any

1  positive or negative impressions of the online travel agent

2  experience?

3          PROSPECTIVE JUROR:  We've had good experiences

4  with them.

5          THE COURT:  Is that it?

6          PROSPECTIVE JUROR:  Yeah.

7          THE COURT:  And number 22, sorry 23.

8          PROSPECTIVE JUROR:  I have 1, 5, and 22.

9          THE COURT:  Okay.  Why don't you tell me

10  about 1.

11          PROSPECTIVE JUROR:  1 is my wife is a dialysis

12  patient, and I have take her every Tuesday and Thursday to

13  dialysis.  I also have two other doctor appointments this

14  week.

15          THE COURT:  Okay.

16          PROSPECTIVE JUROR:  Number 5 goes with 22, I

17  used Booking.com recently.

18          THE COURT:  How was your experience with it?

19          PROSPECTIVE JUROR:  Never had a bad experience

20  using it.

21          THE COURT:  And 22 I guess you've answered that,

22  you've booked through.

23          PROSPECTIVE JUROR:  Booking.com.

24          THE COURT:  Okay.  Let's see.  I think that's

25  everybody, right?  We've got all the ones, the new jurors.

1   Once again, sorry for all the interruptions but the process
2   is actually we're almost done.  Let me see the attorneys.
3                (Thereupon, a discussion was held at sidebar.)
4                THE COURT:  Okay.  I've cut 23, his wife needing
5   dialysis.
6                MR. HEMANN:  Defer to the Court on that.
7                MR. DONOGHUE:  No objection.
8                THE COURT:  He's got to take her to dialysis
9   tomorrow.  Okay.  Good.
10               (The discussion at sidebar ended.)
11               THE COURT:  Juror number 23, you will be
12   excused.  Thank you and, again, thank you for your service
13   participating in the process.
14               Mr. Banenas, one more juror.
15               THE CLERK:  Juror number 22.
16               THE COURT:  Did you have any answers --
17               PROSPECTIVE JUROR:  Just one number, 8.
18               THE COURT:  What is --
19               PROSPECTIVE JUROR:  It was a car accident a long
20   time ago and it was settled out of court many, many years
21   ago.  That's all I have.
22               THE COURT:  Any lingering impressions of the
23   experience --
24               PROSPECTIVE JUROR:  No.
25               THE COURT:  -- other than being in an accident?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Okay.  All right.  Let me check one

3    more time before we start.  I don't think we need to do --

4    you need to speak?

5          MR. HEMANN:  I have one request for a follow-up

6    on a couple of things.  I just ask one moment.

7          THE COURT:  Why don't we do that very quickly.

8          (Thereupon, a discussion was held at sidebar.)

9          MR. HEMANN:  On the form that we received from

10   the Court with the list that shows the occupations, three of

11   them simply list retired, and I wonder if the Court would

12   follow up on the former occupations of numbers 1, 8, and 22.

13         THE COURT:  Good.  Will do.

14         (The discussion at sidebar ended.)

15         THE COURT:  We have a couple of follow-up -- or

16   one follow-up question for three of the jurors.  There are

17   three of you that were listed as retired.  Can I ask jurors

18   number 1, 8, and 22 what your positions were prior to your

19   retirement?

20         PROSPECTIVE JUROR:  I was a preschool teacher

21   and my latest job was teaching teachers out of the

22   University of Delaware.

23         THE COURT:  Very good.  All right.  And

24   number 8?

25         PROSPECTIVE JUROR:  I was a lab supervisor for

1    water quality for a water district in California.

2              THE COURT:  Okay.  And juror 22?

3              PROSPECTIVE JUROR:  I was a gas and electric

4    serviceman for the power company for 40 years.

5              THE COURT:  Okay.  Any further follow-ups?  No?

6              MR. HEMANN:  No, Your Honor.  Thank you.

7              THE COURT:  Here's what we're going to do.

8    We're going to take a break and Mr. Banenas will take you

9    back to the jury room, and for the next 15 minutes, the

10   lawyers will make their decisions as to whom they wish to

11   excuse.  This is again part of the process.  They get to

12   narrow the jury down to eight, so each side will select

13   three people to excuse.  And once that's done, we'll have

14   our jury available.

15             So if you will go with Mr. Banenas, he'll show

16   you the jury room and we'll be back to you in 15 minutes.

17             (The venire panel exited the courtroom.)

18             THE COURT:  Now we need to do coin flips.

19             Mr. Banenas, do you happen to have a coin on

20   you?  The first coin flip will be whether to use blind or

21   sequential striking and the next is who goes first if you

22   get sequential.

23             The rest of you jurors are excused.  Thank you

24   for your service.  Thank you for coming in and good luck.  I

25   hope you enjoy the rest of the day.

1        Now sequential coin flip for who goes first.  So

2  15 minutes and we'll bring the jury back in.

3            (The venire panel entered the courtroom.)

4        THE COURT:  Very well.  You'll notice that when

5  the jury comes in the Court and everyone else stands,

6  there's a reason for that.  It's respect for the jury

7  system.  It's something that is unique in my experience to

8  our country and is how seriously we take the jury process

9  and you, as participants, in that process.

10        Now, the following jurors will be excused:

11  Juror number 3, juror number 10, juror number 16, juror

12  number 17, juror number 20, and juror number 21.  So you are

13  free to go.  Thank you again for your service.

14        Very well, we now have our jury.  What I am

15  going to do -- I'm going to give you some preliminary

16  instructions about your role as jurors.  Before that,

17  though, Mr. Banenas will swear you again, this time as -- in

18  your role as members of the jury.

19            (The jury was sworn.)

20        THE COURT:  Okay.  You may be seated.  Members

21  of the jury, now that you've been sworn, you're ready to

22  begin the trial in the case.

23        In this case, Ryanair claims that the defendant,

24  Booking.com, violated a law known as the Computer Fraud and

25  Abuse Act by using third parties to potentially access

1    Ryanair's protected computers without authorization and

2    cause damage and/or a loss and defrauded Ryanair as a

3    result.

4         The defendants -- the defendant, Booking.com,

5    denies those claims.  Booking.com also has brought its own

6    claims known as counterclaims against Ryanair contending

7    that Ryanair has engaged in defamation, unfair competition,

8    tortious interference.  These terms I will define later, but

9    you will hear them enough to become familiar with them

10   through the course of the trial.  Violation of the Delaware

11   Deceptive Trade Practices Act and trade liable because of

12   statements made by Booking.com's customers.  Ryanair denies

13   Booking.com's claims.

14        Your role in this trial will be to find from the

15   evidence what the facts are.  You will then apply those

16   facts to the law as I will give it to you, and you will be

17   responsible for reaching a verdict.  My role is not to

18   suggest to you what that verdict should be but simply to

19   rule on disputes between the parties that arise during the

20   course of the trial and to instruct you on legal principles

21   that you are to apply.  Nothing I say or do is intended to

22   indicate or should be taken by you as indicating what your

23   verdict should be.

24        I may ask my own questions of the witnesses from

25   time to time.  When I do it, it will be only to clarify

1   points in the way that I think may be helpful to you.  It is

2   not an indication that I have a view one way or another as

3   to any witness's testimony or more generally how the case

4   should come out.

5          The evidence from which you will find the facts

6   includes the testimony of witnesses in response to questions

7   asked by attorneys.  The evidence also includes documents

8   and other things received into the record as exhibits and

9   any facts that the lawyers agree to, but certain other

10  things are not evidence.  Statements and arguments by the

11  lawyers, for example, are not evidence but are merely

12  intended to guide your consideration of the evidence.

13         At various points, the lawyers may raise

14  objections to certain questions that are asked and I will

15  rule on those objections.  Those objections and my rulings

16  on them are not evidence and you should not be influenced by

17  any objection or my ruling on it.  If I tell you to

18  disregard a particular question or answer that comes up

19  during the trial, you must do so.

20         Finally, anything you may have seen or heard

21  outside the courtroom is not evidence and must be

22  disregarded.  You are to decide this case based solely on

23  the evidence presented here in the courtroom.  You are the

24  sole judges of each witness's credibility.  You should

25  consider each witness's knowledge and memory, whether the

1    witness's testimony is consistent or has been contradicted,

2    whether the witness has any bias in favor of one side, the

3    witness's manner on the witness stand and any other

4    circumstances that you would consider engaging a person's

5    credibility in everyday life.  You're not required to

6    believe any witness if you do not believe or find their

7    testimony believable.

8              Now, much of the evidence you will hear will be

9    in the form of testimony from live witnesses through direct

10   examination by one side and cross-examination by the other.

11   But you will also hear some evidence that will be presented

12   through what we call deposition testimony.  A deposition is

13   the sworn recorded testimony of a witness that is taken in

14   advance of the trial typically when a witness is not

15   available to testify in person at the trial.  You should

16   judge deposition testimony in the same way you judge live

17   testimony.  Do not place any significance on the quality of

18   the recording or the setting the witness is in or whether

19   the deposition was taken remotely or in person.

20             You will also hear testimony from witnesses

21   referred to as expert witnesses.  When knowledge of

22   technical subject matter may be helpful to the jury, a

23   person who has special training or experience in that

24   particular field is permitted to state his or her opinion on

25   those technical matters.  That person is referred to as an

1    expert witness, but you are not required to accept that

2    opinion simply because it comes from an expert.  As in the

3    case of any other witness, it is up to you to decide whether

4    to rely on it.

5            Let me talk a little bit about burdens of proof.

6    We use the word "burden" because the person that has the

7    burden of proof on the particular issue is the party that

8    must persuade you with respect to that issue.  If at the end

9    of the trial you're not persuaded by the party that has the

10   burden on a particular issue, then that party loses on that

11   issue.

12           Now, Ryanair has the burden of proving its

13   claims under the Computer Fraud and Abuse Act and

14   Booking.com has the burden of proving its counterclaims.  In

15   both instances, the party making the claim must prove its

16   case by what is called the preponderance of the evidence.

17   This is a term you'll hear again.  That means that the party

18   with the burden of proof has to produce evidence which,

19   considered in light of all the facts, leads you to believe

20   that what that party alleges is more likely true than not.

21           Those of you who may be familiar with the burden

22   of proof in criminal cases will have heard of the burden of

23   proof beyond a reasonable doubt, which is a very high

24   burden.  That burden does not apply in a civil case such as

25   this one, so you should put that burden of proof out of your

1    mind.

2            In this case, you will be asked to decide

3    several things according to the legal instructions I will

4    give you at the end of the trial.  Those instructions will

5    cover some of the same ground that I'll discuss today only

6    in more detail.

7            You will be required to decide several things

8    with respect to Ryanair's claims under the Computer Fraud

9    and Abuse Act.  You must decide whether Booking.com

10   directed, encouraged, and induced a third party to access a

11   Ryanair computer without authorization and as a result

12   recklessly caused damage, as I will define it, or caused

13   both damage and loss, as I will define it.

14           Whether Booking.com knowingly and with the

15   intent to defraud directed, encouraged, or induced a third

16   party to access Ryanair's computers without authorization

17   and by means of such conduct furthered the intended fraud

18   and obtained something of value for Booking.com.

19           Third, whether Booking.com conspired with third

20   parties to commit a violation of the Computer Fraud and

21   Abuse Act.  With respect to Booking.com's counterclaims, you

22   will be asked to decide, one, whether Ryanair published

23   false statements of fact about Booking.com that caused harm

24   to Booking.com's reputation, constituting defamation; two,

25   whether Ryanair harmed Booking.com's commercial relations by

1    competing with it unfairly or otherwise unlawfully; three,

2    whether Ryanair intentionally interfered with Booking.com's

3    prospective business relationships by wrongful means so as

4    to cause actual damage to Booking.com; four, whether Ryanair

5    violated the Deceptive Trade Practices Act by disparaging

6    the goods, services, or business of Booking.com through

7    false or misleading representations of fact and, five,

8    whether Ryanair knowingly or with reckless disregard for the

9    truth made a false statement disparaging Booking.com's goods

10   or services that it intended to and did result in economic

11   loss to Booking.com.

12          That is a lot to digest, and you don't have to

13   worry about trying to keep track of all those numbers and

14   claims at this point.  They will be developed for you in the

15   course of the trial, and when we get to the end, I will give

16   you instructions and details as to each of these.  But this

17   is my way of giving an outline of what's coming.

18          Now let me say a few words about your conduct as

19   jurors.  First, during the trial, you may find that people

20   will want to talk to you about the case.  This is very

21   natural and very common.  You go home, someone says, "What's

22   the case about?"  As much as you might want to talk about

23   the case, you need to tell that person that you cannot

24   discuss it until it's over.  You can tell them that you were

25   selected for a jury in a civil case, but it's not a criminal

1   case, but that's as much as you should say.

2          The reason is that if you start down the road of

3   talking about the case, you never know what will happen.

4   You might talk to someone and say -- who would say, "Yes, I

5   sat on a case like that and here's what happened," and

6   suddenly you have outside information coming in and

7   influencing the way you look at the case.  We don't want

8   that.  So if anyone starts to talk to you about the case,

9   just tell them politely that you can't discuss it until it's

10  over.

11         In particular, if a lawyer or other member of

12  one of the trial teams should encounter you in the hall or

13  in the elevator, they will not speak with you.  That's not

14  because they're unfriendly.  It's because they are not

15  supposed to talk to you during the trial.  If anyone does

16  try to talk to you about the case, please bring it to the

17  attention of Mr. Banenas or me.

18         After you returned a verdict and the case is at

19  an end, you will be free to discuss the case with others or

20  not to discuss it as you choose.  That is your decision.

21         Now, I know that many of you probably use cell

22  phones, tablets, e-mail, the internet or other technology to

23  communicate.  You must not use those tools to communicate

24  with anyone else about the case, that includes family and

25  friends.

1          Second, do not read or listen to anything

2     related to this case in any way.  By that I mean if there is

3     a newspaper article or internet post or social media post or

4     radio or television report about the case, do not read the

5     article or watch or listen to the report.

6          Third, do not do any research or investigation

7     about the case on your own.  That is you must not look up

8     any individuals or companies involved in the case or consult

9     dictionaries or reference materials including the internet

10    with regard to the case.  It's important that you try this

11    case based solely on the evidence presented in this

12    courtroom.

13         Finally, do not make up your mind about the case

14    until you have heard all the evidence.  Keep an open mind

15    until you start your deliberations with your fellow jurors.

16    It's best not to talk among yourselves about the merits of

17    the case before all the evidence is in and you've heard the

18    arguments of the lawyers because sometimes something that

19    looks clear to you at the beginning may look very different

20    after you've heard all the evidence and the arguments from

21    both sides.

22         All of you will be given notebooks containing

23    some helpful information.  The notebooks will also contain

24    blank pages on which you can keep notes if you choose to do

25    so.  During the trial you can use the notebook to take notes

1    about testimony or other aspects of trial but you're not
2    required to.  And I would caution that taking notes is not
3    for everybody, some people find that taking notes is helpful
4    to them and others find that it interferes with their
5    ability to concentrate or what's being said.  Do what works
6    for you.  Whether or not you use the notebooks for keeping
7    notes you should leave the notebook in the jury room at the
8    end of each day.
9              During the trial it may be necessary for me to
10   talk with the lawyers out of your hearing by having
11   conferences here at the bench as we did during jury
12   selections.  If that happens please be patient.  We're not
13   trying to keep important information from you.  These
14   conferences are necessary for me to fulfill my
15   responsibility to be sure that evidence is presented to you
16   consistent with the rules of evidence.  We will do our best
17   to keep those conferences to a minimum and keep them short.
18   If you would like to stand or stretch or walk around the
19   jury box during any of the conferences you should feel free
20   to do so.
21             Now, let me give you a brief notion of what the
22   sequence of events will be in this trial.  After I finish
23   with these preliminary remarks, the lawyers for each side
24   will make what are called opening statements.  These will be
25   brief statements that are not evidence in the case but will

1  give you a sort of roadmap for the case.  The lawyers will

2  tell you what they expect the evidence in this case to show.

3         Next, the evidence will be presented to you

4  through calling of witnesses and questioning them along with

5  the introduction of exhibits.  After each witness testifies

6  for one party, the other parties will of course be allowed

7  to cross-examine the witness.  Ryanair will go first, then

8  when Ryanair has presented its evidence regarding its CFAA

9  claims, that's the Computer Fraud and Abuse Act, we'll refer

10 to it as CFAA from now on, Booking.com will present its

11 evidence that it has not violated the CFAA and Booking.com

12 will also present the evidence regarding its claims.  After

13 that, Ryanair will be given an opportunity to introduce

14 rebuttal evidence on its CFAA claims and evidence responding

15 to Booking.com's claims.  And finally Booking.com will be

16 given the opportunity to introduce rebuttal evidence in

17 support of its claims.

18        At that point the evidence will be complete and

19 I will give you detailed instructions on the legal

20 principles you are to apply during your deliberations.

21 Following those instructions, the parties will present their

22 final arguments to you.  You will then be ready to retire to

23 the jury room to begin your deliberations.  I will give you

24 a few final instructions regarding how to conduct your

25 deliberations.  When you all agree on a verdict, and the

1  verdict has to be unanimous, you will return from the jury

2  room and deliver your verdict.

3          I have one final comment.  As I indicated

4  earlier, this case is expected to take five days to try.

5  But there is a lot to cover during those five days.  So if

6  we're going to get through everything we have to cover it is

7  critical that we start on time each day.  That means

8  everybody needs to be in the jury room and ready to go at

9  9:00 a.m.  Please make it a point to be on time each day.

10 If anyone is late the entire trial will be delayed and as a

11 result it's possible we will not be able to finish within

12 the five days we set aside for the trial.

13         That is all I have for now.  Momentarily I will

14 turn things over to the attorneys for the opening

15 statements.  Let me check with the attorneys and see if

16 anyone needs additional time before we begin with the

17 statements.  The two attorneys for the parties, are you

18 ready now or would you like -- each of you like a little

19 extra time?

20             MR. DONOGHUE:  Ryanair is ready, Your Honor.

21             MR. HEMANN:  I think we'll be ready, Your Honor,

22 yes.

23             THE COURT:  You're ready.

24             MR. DONOGHUE:  Yes.

25             THE COURT:  Okay.  Very well then, we will

1   proceed to opening statements.  After the opening statements

2   I think we'll be pretty close to time for lunch.  So we'll

3   take a break for lunch.  The lunch, as I indicated, will be

4   provided to you and we will after lunch start with the

5   testimony.  Ryanair.

6           MR. DONOGHUE:  Thank you, Your Honor.  Good

7   morning, ladies and gentlemen of the jury.  It's nice to

8   meet you.  Ryanair is here because Booking.com sells Ryanair

9   flights without permission.  You'll hear Ryanair witnesses

10  testify that it needs to stop Booking.com sales to protect

11  Ryanair's customers by protecting the integrity of Ryanair's

12  website and its data.

13          You'll hear throughout the trial that that's why

14  Ryanair filed its Computer Fraud and Abuse Act or CFAA

15  claims.  But the story really starts in 2020 with COVID.  A

16  number of flights were cancelled, you probably all remember

17  that.  And you'll hear that Ryanair had unexpected

18  widespread trouble in making the refunds to its customers it

19  was required to make when those cancellations happened.

20  That's when you'll hear that Ryanair realized the scope of

21  its online travel agent or OTA problem and began digging

22  into it.  And you'll learn that Ryanair found that as much

23  as or more than 20 percent as much as 23 percent or more of

24  its sales were purchased by OTAs, online travel agents, like

25  Booking.com.  That was all done without permission and in a

1    manner that harms Ryanair's relationship with and connection

2    to its customers.

3             Before I get into more of the testimony I'd like

4    to introduce you to Ryanair and its team.  Ryanair is the

5    largest airline in Europe.  It's widely known as a low cost

6    airline and you'll hear it made flying accessible for many

7    people across Europe.  It's also well-known for low, no

8    frills fairs.  An average one-way flight on Ryanair costs

9    about $46.

10            I'm David Donoghue and I'll introduce you to the

11   rest of the team.  With us today, we have Ruth Kaminski.

12   Ms. Kaminski is the Ryanair executive who will be with us

13   for the trial.  On Ryanair's Holland & Knight team we have

14   Anthony Fuga, Cynthia Gierhart, Bill Oliver, and Ji Mao.  We

15   also have Touhey Myer, a Wilmington Delaware lawyer here

16   with us as well.

17            They're not here in the courtroom yet, but

18   you're going to meet at least three Ryanair witnesses live.

19   First, you'll meet John Hurley.  Mr. Hurley is Ryanair's

20   chief technology officer or CTO.  Among other things, he's

21   in charge of Ryanair's computers and databases and its

22   website.  You'll also meet Lukasz Stocki.  Mr. Stocki is a

23   data scientist who works for Ryanair.  He's in charge of

24   maintaining and improving Ryanair's Shield program, which is

25   a homegrown software program designed to identify and block

1    online travel agent sales on the Ryanair website.  And

2    you'll meet Dara Brady.  Mr. Brady is the chief marketing

3    officer or CMO of Ryanair.  Mr. Brady is not in charge of

4    Ryanair's computers.  He's going to talk about Ryanair's

5    communications with its customers.  You will also hear from

6    Michael O'Leary by video.  Mr. O'Leary is the chief

7    executive officer of the Ryanair group, not Ryanair DAC, the

8    party in this case, the airline, but the parent company that

9    owned Ryanair, the plaintiff in this case.  Mr. O'Leary is a

10   bigger than life character who grew Ryanair into the largest

11   European airline following the model of Southwest Airlines

12   from Dallas, Texas, area.

13             Now, you're going to meet the Booking.com team

14   shortly, no doubt, but I'd like to make sure you understand

15   who the players are so the evidence has some context.

16   Booking.com is one of the largest travel agents and they're

17   not parties to this case, but Booking.com works with several

18   companies to sell Ryanair flights, the most notable and

19   important for this case is Etraveli.  Etraveli is a

20   middleman that facilitates purchasing Ryanair tickets

21   through the Booking.com website.

22             We also want to make sure you understand some

23   key terms.  You've heard me say, and I think you heard Judge

24   Bryson say, online travel agent or OTA a number of times.

25   That's a company that has a website that sells flight and

1   other travel services like Booking.com who, among other

2   things, has sold Ryanair flights.  You're also going to hear

3   about Shield, I mentioned that before, that's Ryanair's

4   software program that Ryanair created to identify likely OTA

5   customer purchases and stop them before they happen.  You're

6   going to hear about bots.  It makes you think of a robot,

7   that's not what it is.  It's a software application that can

8   perform tasks automatically.  In this case, you'll typically

9   hear that it refers to being used to purchase a flight on

10  the website and often used to mimic human behavior.  So

11  you'll hear that humans make spelling errors and have to

12  delete a bit and change it or they operate more slowly than

13  the computer and the bots can be created to do those things

14  to look human to avoid Shield.  You'll also hear about loss

15  or technological loss.  Judge Bryson will define it at the

16  end of the trial for you and it's really a term that only a

17  lawyer can love, but it's based on the language of the

18  Computer Fraud and Abuse Act.  And for our purposes it's

19  about Ryanair's reasonable costs to respond and react to

20  damage to its computers and data and then to assess that

21  data and correct bad data or corrupted data.

22          Now, Mr. Hurley is going to testify about the

23  background of Ryanair, about his corporate mission, about

24  why controlling access to Ryanair's flights from Ryanair's

25  website and the sale of those flights is so critical to its

1   mission for its customers, but he's mostly going to explain

2   Ryanair's computer system.  One of things he's going to do

3   is take you through how you select a flight.  After you go

4   to the website he'll explain that you select flights,

5   here we happen to have a flight from Dublin to Barcelona

6   this week.

7            Once you've selected the flights, importantly,

8   what you'll hear from Mr. Hurley is that you have to log

9   into the myRyanair website.  Here it shows you can sign up

10   or if you have login credentials you can just put them in.

11   This is what it looks like to log in.  A typical login or

12   creation of an account, we'll tell you, you put in your

13   e-mail address, you create a password or you can use a

14   preexisting account like a Google account if you already

15   have one.

16            And then he'll show that once you come into the

17   what we call the myRyanair portion of the website, that's

18   the password protection portion of the website, it asks for

19   your contact details and it pre populates that e-mail

20   address because what Ryanair does when you create a

21   myRyanair account, it sends an e-mail to the e-mail address

22   you inputted and you have to click on a link.  Again, that's

23   probably something everybody may have seen when creating an

24   account.  That way Ryanair knows the e-mail address is a

25   real address associated, Ryanair expects, with the passenger

1    or customer.  So Ryanair inputs that e-mail address in for

2    that purpose and also to avoid mistyping which creates

3    problems for Ryanair and its customers.  And only after

4    you've logged in to the myRyanair portion of the website are

5    you able to put in your payment information and purchase the

6    Ryanair flight.

7            Mr. Hurley will explain that OTAs like

8    Booking.com who ignore Ryanair's terms of use and sell

9    Ryanair's flights without permission harm Ryanair, causing

10   damage to Ryanair's computer system but also financial

11   losses.

12           The first of those losses you'll hear about is

13   data integrity.  Ryanair doesn't receive customer credit

14   card information when customers purchase flights from

15   Booking.com.  Instead you'll hear that Ryanair gets either

16   Booking.com or their middleman like Etraveli's credit card

17   information.

18           That means that Ryanair can ensure it gives a

19   refund back to its actual customer and then it can't be sure

20   that it gets made in the seven days that Ryanair is required

21   to make those refunds under law and Ryanair therefore is

22   forced to spend time and money checking and fixing the

23   incorrect data from Booking.com.  And, again, you'll hear

24   from Mr. Hurley how important it is to Ryanair to fulfill

25   those customer obligations.

1          You'll also hear about the Monex incident.

2    You'll hear from Mr. Hurley that online travel agents

3    overwhelmed the Ryanair website in early October, which

4    forced Ryanair to shut down its Monex currency conversion

5    system, which we'll explain is a system where if you go to

6    buy a Ryanair flight, it changes the flight price from Euros

7    that Ryanair typically have it in to dollars for the

8    American customer.

9          That was done because OTAs sent repeated

10   requests to book flights without the necessary credit card

11   information.  You'll hear Mr. Hurley refer to it as a null

12   token probably, "null" meaning nothing or zero.  There's no

13   credit card information in there.

14          And you'll hear that one IP address and

15   myRyanair account that was associated with Booking.com made

16   5,000 attempts to purchase one single flight segment during

17   that Monex incident.

18          Now, you heard that Ryanair needs to prove at

19   least $5,000 in technological loss in a one-year period from

20   Booking.com.  What you'll hear from Mr. Hurley and

21   Mr. Stocki is that Ryanair suffered a number of losses that

22   exceed a hundred thousand dollars in a single year.

23          There's lots of talk about websites, but you're

24   probably asking why does it matter enough to take a week of

25   your time.  First, on behalf of Ryanair, I want to thank you

1    for being here.  We realize how valuable your time is and

2    you're going to hear from Mr. Hurley why it's so important

3    that Ryanair asks for your time and takes the time of

4    Mr. Hurley and several of its executives and employees to be

5    here this week to address these issues.

6            He's going to explain again that this is a

7    critical customer issue for Ryanair, that Ryanair's

8    relationship with its customers is built on trust and

9    Ryanair's performance of its duties like corresponding with

10    its customers about delays and flight cancellations and

11    being able to refund its customers money.  We all probably

12    know what it feels like to not get a refund in a timely way.

13            And you're going the hear that Ryanair sent

14    Booking.com a series of letters.  First, in November of 2019

15    Ryanair sent Booking.com a letter informing Booking.com that

16    it was not authorized to sell Ryanair fights.  You'll hear

17    from Mr. Hurley that Booking.com continued selling Ryanair

18    flights.

19            And you'll hear that Ryanair sent another letter

20    in 2020 to Booking Holdings, Inc.  That's not Booking.com.

21    That's Booking.com's parent company.  But, again, that

22    letter explained to Booking Holdings that Booking.com and

23    Booking Holdings were not authorized to sell Ryanair

24    flights.

25            And you'll hear that Booking Holdings responded

1    to a letter, including telling Ryanair that it was sending a

2    letter to Booking.com but that Booking.com continued to sell

3    Ryanair flights, and only then did Ryanair file this

4    lawsuit.

5              You're also going to hear from Booking.com

6    witnesses.  You'll hear that Booking.com doesn't directly

7    access Ryanair's website to sell flights directly, and

8    that's true.  But it's not the issue here because Booking

9    hires partners like Etraveli to facilitate the sale of the

10   flights from Booking.com's website.  The law, the CFAA is

11   broad enough that indirect purchasing is addressed.

12             You'll hear Booking.com tell you that a customer

13   can go to the Booking.com website and purchase a Ryanair

14   flight, and you'll hear that Booking.com contracts with

15   partners like Etraveli to sell, among others, Ryanair

16   flights on the Booking.com website.

17             You'll also hear from Booking.com that Ryanair

18   has a campaign against online travel agents.  Mr. Hurley and

19   Mr. Brady are going to tell you that's not the case.

20   Ryanair will work with OTAs that respect Ryanair's business

21   and Ryanair's customer relationships.  Expedia is an example

22   of that, who has worked out an agreement with Ryanair to be

23   able to use Ryanair's flight information.

24             Now, Mr. Hurley and Mr. Brady will acknowledge

25   frustration with online travel agents that don't respect

1    Ryanair's business and customer relationships and they'll

2    acknowledge that frustration sometimes comes out or is

3    directed by Ryanair's marketing team by referring to

4    misbehaving online travel agents as pirates or OTA pirates.

5              And you'll also hear that Ryanair has worked to

6    stop online travel agents that disrupt Ryanair's business

7    and Ryanair's customer relationship and that Ryanair wants

8    customers to book directly with Ryanair because of how

9    important it is for the customer and Ryanair's relationship

10   to the customer.

11             And you'll hear that all of Ryanair's actions

12   are focused on protecting Ryanair's customers and the

13   integrity of Ryanair's website because of how important it

14   is to that customer relationship.  And we'll see through the

15   documents and the testimony that Ryanair's main focus in any

16   actions it takes with respect to online travel agents is how

17   those actions might impact Ryanair's customers because the

18   customer is Ryanair's focus.

19             You're also, as I mentioned, going to hear from

20   Dara Brady about Ryanair's communications with its

21   customers, specifically a series of e-mails that Ryanair

22   sent to customers that Ryanair identified through its Shield

23   software were likely customers that purchased through online

24   travel agents.

25             You'll hear that Booking.com takes issues with

1   these e-mails, claiming they're long and defamatory, but

2   Mr. Brady will explain they're necessary to communicate with

3   the suspected OTA customers because Ryanair needs the

4   correct e-mail addresses and payment information.

5   Otherwise, Ryanair can't meet its customers' expectations

6   and its obligation to the customer.

7           Importantly, you'll hear that Booking.com

8   doesn't disclose its identity when one of its customers

9   purchases a flight through Ryanair.  So Ryanair can't know

10  which OTA a customer used.  It's only able to identify that

11  the customer used an OTA site.  So what Ryanair does in the

12  e-mails that you'll see is use clear language that is

13  referring to the general group of online travel agents or

14  OTAs as opposed to any one specific OTA.  Mr. Brady will

15  tell you that the language is true as to the group of OTAs.

16  He'll also tell you that it's true as to Booking.com.

17          Now importantly, it's not the entire e-mail

18  that's at issue.  It's a couple of statements in some of the

19  e-mails.  Some of them say, as you see here, that OTAs

20  provide Ryanair with false customer details that includes

21  false payment and contact details.

22          What you'll hear in the course of the trial is

23  that Booking.com and its partners like Etraveli provide

24  Ryanair with incorrect e-mail addresses in myRyanair

25  accounts they create.  They create a series of myRyanair

1   accounts with fake or dummy e-mail addresses and they use

2   those for customers as customers purchase flights across the

3   day.  So the e-mail address on the myRyanair account doesn't

4   correspond to the actual customer's e-mail address, which

5   leaves Ryanair in a difficult position in terms of

6   contacting the customers.

7           You'll also hear that Booking.com and its

8   partners like Etraveli provide incorrect credit card

9   information.  They use virtual credit cards that are not the

10  credit cards of the customers.  So the customer would put in

11  their credit card information on the Booking.com like you

12  might expect, but then at some point, the customer is

13  charged by Booking.com or its partner like Etraveli, and

14  they switch to a different virtual credit card.

15          That creates the refund problem that you'll hear

16  about.  Ryanair can't use that credit card information to

17  get the refund directly back to the customer and Ryanair is

18  required to get the refund back to the customer you'll hear

19  both by government regulation but also by standard

20  principles of customer service and expectation.

21          You'll also see statements that OTAs use screen

22  scraper software, and you're going to hear that Booking.com,

23  at least through its partners like Etraveli, does use screen

24  scraper software.  I mentioned Lukasz Stocki before and how

25  he maintains and improves the Shield software.  You're going

1  to hear from him talking about how Shield works, how it

2  identifies online travel agent purchases and stops them

3  whenever it can.

4         You're going to hear how he continues to update

5  the Shield software because the OTAs are continually trying

6  new things to overcome it, and you're going to hear that the

7  cost of stopping authorized OTA flight purchases is a loss

8  for Ryanair and expense.

9         Finally, you're going to meet Iain Lopata.

10  Mr. Lopata is not a Ryanair employee.  He is an expert in

11  the field of computer systems and data security for almost

12  four years.  He analyzed Booking.com and concluded that

13  Booking.com sells Ryanair flights, that Booking.com obtains

14  Ryanair flights from the Ryanair website and that

15  Booking.com's vendors use bots to purchase flights on the

16  Ryanair website.  And finally, he'll tell you Booking.com

17  provides incorrect customer information to Ryanair as part

18  of the purchase process that Ryanair disclosed.

19         That gives you an overview of the testimony that

20  we expect to hear this week.  I'll be back to speak with you

21  at the end of the trial to wrap things up.  Until then,

22  thank you again for your time.

23         THE COURT:  Very well, Mr. Hemann.

24         MR. HEMANN:  Thank you, Your Honor.

25         May it please the Court.  This is a case, ladies

1    and gentlemen, about consumer choice and fair competition.

2    Booking.com, you will hear, is a company that provides and

3    is meant to provide and is designed to provide consumer

4    choice.  Booking.com is an online travel company.  Its job

5    is to facilitate travel by customers who use an online

6    platform to figure out where they're going and what they're

7    doing, where they want to go or they can go.  And it's meant

8    to give consumers the widest possible number of choices in

9    terms of flights and hotels and car rentals and all of the

10   things that one needs in order to travel in 2024.

11           This case is about giving customers the ability

12   to make those choices.  Ryanair doesn't like that

13   Booking.com is able to do this with flights.  It doesn't

14   like that Booking.com is able to provide a side-by-side

15   comparison of all available flights because it doesn't want

16   its flights to be shown next to its competitors.

17           That is why we're here, ladies and gentlemen.

18   It is not because of COVID and I'm going to talk to you a

19   little bit more about that in a few minutes.

20           This is also not a computer fraud case.  You

21   will not hear any evidence that computers were damaged.  And

22   you will not hear any evidence that Booking.com or its

23   employees or its vendors provided any false information or

24   fake information to Ryanair in the process of booking

25   tickets and that includes credit cards and that includes

1    e-mail addresses and it includes all of the other

2    information that need to be provided to an airline:  name,

3    date of birth, ID number, things like that that are

4    routinely provided.  None of the information was fake.  It

5    was simply information that Ryanair decided and said, chose

6    to not want.

7             There is also no evidence that Booking.com had

8    anything to do with the Monex incident that the plaintiff's

9    attorney mentioned to you a few minutes ago, zero evidence.

10   You saw that the reference was to OTAs overwhelming, OTAs

11   sending lots of these null session tokens, and it was

12   careful, careful mention of OTAs because it wasn't

13   Booking.com.  You will not hear evidence that Booking.com

14   did anything with regard to the Monex business that will be

15   at issue in this trial.

16            But there is evidence of one thing and the

17   evidence you will hear is that Ryanair made false statements

18   to consumers about Booking.com.  Ryanair said to consumers

19   through e-mails that Booking.com made -- provided fake

20   e-mail addresses and fake payment data.  That is not true.

21   The evidence will prove that it was a lie.  And the evidence

22   will prove that Ryanair intentionally sent that information

23   to online travel agencies generally knowing that Booking.com

24   customers would be amongst the group.

25            First of all, Booking.com.  Booking.com is

1   represented here at trial by Marcus Guerrero.  Mr. Guerrero

2   is the senior director of flights for Booking.com.  Thank

3   you.  He lives in Spain and he is here to both represent

4   Booking.com and to testify about the Booking.com flights

5   business.

6            Booking.com is a company that is owned by

7   Booking Holdings.  Booking Holdings is incorporated right

8   here in Delaware, which is why we are all right here in

9   Delaware.  Booking.com came into the Booking Holdings family

10  through a merger with Priceline, which you've all probably

11  heard something about, and is the sister company of a number

12  of other companies in the travel and hospitality business.

13  It is a travel company.  It facilitates travel by customers.

14  It is mostly hotels and the flight business, importantly, is

15  very recent at Booking Holdings -- or Booking.com.  It

16  started in September of 2019, which was shortly after

17  Mr. Guerrero started the company, and it hadn't existed as a

18  stand-alone business for Booking.com before then.  What

19  Booking.com, as I mentioned, does is it puts together

20  packages and it puts together flights and stays and car

21  rentals and cruises and attractions and other things.  This

22  is the Booking.com business model.  The typical Booking.com

23  customer that you'll hear about is someone who travels

24  frequently, usually families and couples that are going on

25  vacation and using a website to arrange travel maybe once or

1  twice a year.  The key demographic for Booking.com customers

2  is not sophisticated business travelers or frequent business

3  travelers who usually book directly with airlines.  It's the

4  type of customer who wants a package put together and

5  Booking.com's goal or Booking.com's purpose is to help

6  people put those things together.

7           I am representing Booking.com along with my

8  colleagues who are sitting at counsel table, Kristine

9  Forderer and Jeff Moyer.  We together will be presenting the

10 case to you regarding Booking.com as we go through the trial

11 together.  And as you gleaned from Mr. Donoghue's

12 presentation, Booking.com is being used by Ryanair.  Ryanair

13 is located in Ireland, and interestingly for this computer

14 fraud case, all of the computers at issue in this case are

15 in Ireland or in England or somewhere in Europe.  There are

16 no computers in our Delaware Computer Fraud and Abuse Act

17 case.

18           Ryanair is very large.  It is the largest

19 airline in Europe.  They fly over 3,000 flights a day to 36

20 different countries all in Europe and the tip of

21 northwestern Africa.  Ryanair Groups revenues in the last

22 fiscal year were over 10 billion Euros and its profits were

23 over 1 billion Euros.  About 90 percent of that is from the

24 Ryanair DAC, the Ryanair flights company located in Ireland.

25           But Ryanair wants to be something more than just

1   an airline and this probably will sound a little familiar to

2   you.  Ryanair also wants to be an online travel agent.

3   Ryanair wants to do the same things that Booking.com is

4   doing.  They want to offer flights and car hires and hotels

5   and events and activities.  It's the same business model

6   with one exception, and the one exception is that Ryanair

7   wants to offer only Ryanair flights on its website.  It

8   doesn't want to have the comparison that Booking.com offers.

9   That is frustrating to Ryanair.  And so Ryanair did launch a

10   campaign against the online travel agents and the online

11   travel agencies and the campaign was a campaign to disrupt

12   and interfere with the OTAs.

13          From the marketing department at Ryanair you

14   will see that they wanted to promote negative OTA sentiment.

15   They wanted to disrupt the OTA business model.  They wanted

16   to engage in OTA interference.  And they looked at various

17   ways and options to engage in OTA disruption.  These are

18   their documents from their files.

19          You'll see that OTA disruption included numerous

20   things, one of which, and an important one of which from

21   this trial, was to send dedicated e-mails to OTA bookings.

22   You'll hear that Mr. Brady, who I understand will testify

23   later in the trial, led this strategy.  It was a strategy

24   led by the marketing group.

25          The strategy, the business objective, was to get

1   customers the make direct bookings on Ryanair and not use

2   OTAs.  And there were four pillars of that.  One pillar is

3   benign sounding.  Build independent credibility, who

4   wouldn't want to do that.  The other four involve attacks.

5   Educate customers, OTA and owned, OTA interference, and

6   promote negative OTA sentiment.

7           As part of this the marketing group came up with

8   a plan in July of 2020 shortly before this lawsuit was

9   filed, and the marketing group determined that there were

10  four elements of this plan, a communication plan that had

11  the pillars we talked about earlier, legal action, and tech

12  initiatives.  This is page two of that document.  Part of

13  the digital and marketing group plan led by Mr. Brady was to

14  issue proceedings against Booking.com's parent in the

15  United States.

16          The evidence will show, ladies and gentlemen,

17  that this lawsuit, this lawsuit, was a part of the marketing

18  plan to disrupt OTAs.  That's why we're here.  We are not

19  here because of the Computer Fraud and Abuse Act.  The

20  Computer Fraud and Abuse Act is a fraud statute and a

21  computer abuse statute.  Following or as part of the

22  marketing plan lawyers came up with a plan to find a statute

23  in the United States to issue proceedings against Booking.

24  You heard a little bit about the cease and desist letters,

25  the letters Mr. Donoghue showed you a few moments ago, they

1 were part of this.  But the Computer Fraud and Abuse Act is

2 a Computer Fraud and Abuse Act statute.  The Computer Fraud

3 and Abuse Act requires proof of damage, proof of loss, proof

4 of fraudulent intent.  The evidence in this case will not

5 show anything in terms of damage to a computer or damage to

6 computer data.  It will not show loss resulting from

7 computer fraud or computer damage.  And it will not show any

8 intent to defraud.  But you will see that over and over and

9 over again Ryanair promoted these ideas.  They promoted them

10 in the media, they promoted them in cease and desist letters

11 from lawyers, they promoted them in lawsuits around the

12 world, and they promoted them in e-mails that were sent to

13 customers of Booking.com, because what they did was follow

14 their communications strategy and their communications

15 strategy is if you say something often enough people will

16 believe you.  That was the Ryanair's OTA disruption

17 strategy, say it again and again and again and somebody will

18 eventually believe you.

19    But the proof of CFAA loss, Computer Fraud and

20 Abuse Act loss and damage, isn't something you can come up

21 with simply by repeating it over and over and over again.

22 You will see in this trial that Booking.com does not provide

23 information to Ryanair at all.  It doesn't provide credit

24 card information, it doesn't provide e-mails.  It provides

25 it to a vendor and you're going to hear a lot about this

1    vendor, Etraveli, in a few minutes.  Ryanair is not directly

2    providing this information.  Ryanair does not -- Booking.com

3    is not providing this information.  Ryanair is not issuing

4    tickets based on fake e-mails, fake credit cards, or other

5    fake data.  When Ryanair issues a ticket, it has a real

6    e-mail address, it has a real credit card, and it has real

7    data about the customer that's going to get on the plane.

8             You will learn through the evidence in this

9    trial that Ryanair doesn't need passenger credit cards to

10   give refunds.  The passenger credit cards are that

11   passengers get refunds and they get them through Booking.com

12   and it's a system that works.  Passengers get refunds,

13   Ryanair doesn't need credit card numbers to give refunds.

14   And Ryanair doesn't in the log-in process ever require that

15   a passenger enter the passenger's e-mail and credit card.

16   What Ryanair requires is that the user, the person buying

17   the ticket, enters it.  So this will be a very practical

18   example you'll hear as the trial goes on.  If somebody wants

19   to -- if I wanted to buy a plane ticket for Ms. Forderer, I

20   would log on the Ryanair website, I would enter

21   Ms. Forderer's name as the passenger, and I would enter my

22   e-mail address and the credit card number.  And Ryanair's

23   own witnesses will tell you that's perfectly fine, there's

24   nothing wrong with that.  And that's what Etraveli does when

25   it buys Ryanair tickets.

1          Finally, in all of this Ryanair's biggest
2     complaint is they don't get passenger contact information.
3     But you're also going to learn that Etraveli always provides
4     the passenger's contact information to -- the person who
5     bought the ticket from Booking.com, their contact
6     information to Ryanair.  So Ryanair is, in fact, able to
7     contact customers.  Ryanair always, from Booking.com, maybe
8     not from other OTAs, but from Booking.com always gets
9     passenger e-mails.  And here's the thing, ladies and
10    gentlemen, they knew it.  They knew they were getting it.
11    They did studies, they went to airports, they interviewed
12    passengers, they said where did you get your tickets?  The
13    passengers would say I got it from Booking.com, I got it
14    from Kiwi, I got it from Expedia.  And if they said
15    Booking.com they also told Ryanair what e-mail address they
16    had and in every case that involved Booking.com, Ryanair got
17    the correct e-mail address.  And these studies were reported
18    to Mr. Brady and Mr. Brady was told that the following OTAs,
19    because they're not going to be all the OTAs, these OTAs
20    gave Ryanair the correct e-mail addresses and Ryanair or
21    Booking.com was one of those OTAs.
22         Saying it over and over again doesn't make it
23    true and saying it in e-mails over and over again to
24    customers doesn't make it true.  Mr. Donoghue talked about
25    this Monex business.  You're going to learn five things

1     about Monex.

2            Number one, and just to step back a little bit,

3     the allegation -- the accusation is that Booking.com flooded

4     a payment system that is used by Ryanair to process payments

5     and do a currency conversion, flooded them with something

6     called null session tokens which are basically empty

7     messages in order to allegedly take down the Monex system

8     which would then require Ryanair to take its protective

9     services offline.  That's the allegation.

10            First of all, you will hear no evidence that

11    Booking.com was involved in that in any way, shape, or form.

12    The evidence is, the speculation is that OTAs were involved,

13    never Booking.com.  Indeed there's no evidence there is

14    misconduct of any sort by anybody.  No evidence of

15    misconduct.

16            You'll also hear that Booking.com would have no

17    reason to do this, no logical reason to do this.

18    Mr. Guerrero will explain to you that Booking.com is in the

19    business of having the tickets go through.  They want to pay

20    for the tickets.  They want the tickets to be issued.  Any

21    effort to take the system down would be contrary to what

22    Booking.com actually would have wanted.

23            You'll also hear that Ryanair actually made no

24    effort to figure out who it was that did it.  This was

25    something that came up only in the context of this

1   litigation.  There was no effort internally at Ryanair to

2   figure out who actually was responsible for the Monex

3   incident.

4           And finally, they have a -- Mr. Hurley, we

5   believe, has an IP address theory where he says that he can

6   connect an IP address belonging to somebody or an e-mail

7   address belonging to somebody connected with a Booking.com

8   reservation ultimately to 5,000 of these null session

9   tokens.  Ladies and gentlemen, the e-mail that was

10  associated with the 5,000 null session tokens had nothing to

11  do with Booking.com.  Nothing to do with Booking.com at all.

12  The link that is attempted to be made here is pure

13  speculation and that is what the evidence will show.  We

14  know this in part because we've looked at it and you'll hear

15  evidence about it but we also know it because we believe

16  that Mr. Hurley will testify in fact that he doesn't know,

17  that it could have been anybody.

18          (A video was played.)

19          SPEAKER:  But you agree this could all be -- the

20  Monex issue could have been the responsibility of some third

21  party, not the defendants themselves; correct?

22          THE WITNESS:  Could just these have been Booking

23  or a third party, I don't know.

24          (The video ended.)

25          MR. HEMANN:  Nobody knows is what the evidence

1    will prove.

2              We talked a little bit about Etraveli earlier.

3    Etraveli is a vendor, it's not a partner, it's a vendor that

4    Booking.com uses to purchase flights from airlines.

5    Booking.com isn't a fly-by-night computer hacker.  Etraveli

6    is not a fly-by-night, Booking.com is not either.  Etraveli

7    is not a fly-by-night computer hacker.  Etraveli is a very

8    large Swedish company, again, all their computers are in

9    Europe, a very large Swedish company that does business not

10   just with Booking.com but with Singapore Airlines and

11   American Airlines and Lufthansa and Turkish Airlines and

12   Skyscanner, which is an OTA, and Travelfusion, which is a

13   ticket aggregator, all sorts of different companies that

14   Etraveli is routinely in business with.  Booking.com has a

15   commercial contract with Etraveli.  It is -- and you'll get

16   this contract, you'll be able to look at this contract, it

17   is a regular arm's-length commercial contract.  The contract

18   does not say to Etraveli go get tickets from Ryanair.  In

19   fact, the contract says nothing at all about Ryanair.  The

20   contract is for Etraveli to go out and pull down, pull in as

21   much inventory as it can, make that inventory available to

22   Booking.com so that Booking.com's customers can choose what

23   they want.

24              Etraveli gets inventory from hundreds of

25   airlines for Booking.com, over 500.  If Etraveli suddenly

1  stopped getting Ryanair tickets, getting Ryanair inventory,

2  Booking.com wouldn't have Ryanair inventory.  It's as simple

3  as that.  Etraveli can choose whether it's going to list

4  Ryanair or not.  Booking.com doesn't tell Etraveli to get

5  Ryanair.  And Booking.com doesn't tell Etraveli how to get

6  inventory from airlines, Etraveli gets inventory from

7  hundreds of airlines and it does it in its own way.

8           Mr. Donoghue showed you a timeline and he showed

9  you a timeline of Ryanair taking steps to try to get

10 Booking.com to stop listing on its website Ryanair

11 inventory, and the first thing he showed you in the timeline

12 was a letter from a lawyer, a cease and desist letter,

13 saying stop doing this, we're against it.  And you'll see

14 the letter is dated the 15th of November 2019.  This is just

15 a couple of months after Booking.com first started its

16 flights business.  Booking.com was barely offering any

17 Ryanair flights at all at this point in time.  But I'll tell

18 you what's most interesting about this letter, what's most

19 interesting about this letter is that it precedes COVID by,

20 I don't know, some months.  I don't know when COVID started.

21 But COVID wasn't a thing that anybody knew anything about in

22 November of 2019.  COVID was not a thing that was causing

23 flights to be cancelled or refunds to be delayed in 2019.

24 This is Ryanair saying you are new to this market, you are

25 competing with us, we want you out.

1          Now, this is no surprise, you will hear, to

2     Mr. Guerrero.  Mr. Guerrero knew this.  Mr. Guerrero has

3     been in the travel business for about 20 years at this point

4     in time, and he knew that Ryanair didn't want OTAs to be

5     doing this.  There had been a campaign by Ryanair going back

6     even before Booking.com to keep OTAs off the Ryanair

7     platform.  So this wasn't a surprise, Mr. Guerrero will tell

8     you, when he heard about it.

9          Mr. Guerrero will also testify he saw this

10    letter, but he heard about it.  And Booking.com looked into

11    it.  Booking.com acted responsibly.  Booking.com checked

12    with Etraveli.  They took it seriously, and they asked

13    Etraveli, "Is this okay?  Is what we're doing okay?"

14    Etraveli is the vendor.  We are the seller.  And Etraveli --

15    you'll see these e-mails.  Etraveli e-mailed somebody named

16    Anne Housseau and we'll see her video testimony, I believe,

17    and said, "Is this okay?"

18          Here's what Etraveli said.  The vast majority of

19    LCCs, low-cost carriers, welcome this setup, screen

20    scraping, as they don't have to pay the GDS or LCC

21    aggregator for distribution of the content.  Ryanair is the

22    exception and has filed several complaints against OTAs for

23    using content that has been screen-scraped.  To our

24    knowledge, there's no court decision in legal force in

25    Ryanair's favor as it relates screen scraping as such.

1        Finally, it is worth noting that Etraveli has

2   not been approached by any LCC objecting to the current

3   practice.  That's what the supplier said when Booking.com

4   asked, "Is this okay?"  That gave Mr. Guerrero

5   understandably some comfort, and he'll tell you that when he

6   decided that they would continue to list Ryanair, he didn't

7   feel like he was doing anything wrong because there were no

8   court decisions saying that it was wrong.

9        A couple years later when the issue came up

10  again, he looked into it again and he did some research.

11  And he provided one of his colleagues who will testify here,

12  Chris Humphries, links to cases he found in the media where

13  carriers, airlines, Ryanair have lost cases complaining

14  about screen scraping.

15       Again, Mr. Guerrero testified that he didn't

16  believe that he was doing anything wrong.  You may ask

17  yourself is this causing Ryanair any harm, this screen

18  scraping?  It's certainly not causing Ryanair any financial

19  harm.  It's not causing Ryanair to lose any money.  Ryanair

20  made, as we talked about earlier, about 1.3 billion euro

21  profit in the fiscal year ending 2023 profit.

22       A significant portion, a material portion, about

23  10 to 20 percent, and we'll figure out what that number is

24  later in the trial, is associated with flights booked by

25  OTAs.  So it's millions of Euros are coming in through

1   flights booked by OTAs.  They're not losing money.  They're

2   making money.

3          And when we asked in the context of this case

4   during the course of something called discovery, we asked

5   and Ryanair confirmed that it is not losing any money.

6   Ryanair denied losing money in this case.

7          So I'll ask the same question that the

8   plaintiff's lawyer asked:  Why are we here?  We're here

9   because Ryanair wants to own the customers.  There are OTA

10  customers and there are owned customers.  The owned

11  customers are the customers that Ryanair has, that Ryanair

12  has their data, Ryanair is able to guide them onto Ryanair

13  flights, and then there are the OTA customers.

14         And it is important what you're going to see in

15  terms of the various costs here are -- that it costs

16  something to get these customers over to Ryanair, to own

17  them, to get them into the Ryanair ecosystem and to get them

18  buying on Ryanair rather than buying on Booking.com, except

19  for only with Ryanair tickets as an option.

20         So the loss claims, these categories of loss

21  that you heard about, you're going to hear that Ryanair did,

22  in fact, spend money on trying to what they call verify

23  passengers, make them sign in separately early, make them go

24  to the airport early to supposedly verify who they were but

25  really was an effort to get their information so that

1   Ryanair could own them.  You'll hear that Ryanair spent

2   money on customer service and other employees also to own

3   them.  And you'll hear that Ryanair spent money on

4   technology also to own customers.

5          The loss claims don't flow in this case from

6   computer damage.  They flow from choices that Ryanair made

7   about how they wanted to conduct their business and how they

8   wanted to interfere with the OTAs.

9          They also want to allocate to Booking.com

10  enormous responsibility for all this, but it may shock you

11  to see that Booking.com is not only a tiny percentage of all

12  of the OTA bookings that Ryanair believes were being booked

13  on its flights but an infinitesimally small percentage of

14  all of Ryanair's total flights.

15         So Ryanair made choices and this case is about

16  choice and Ryanair chose to spend money in order to

17  interfere with the OTAs.  This had an impact -- this had an

18  impact on Ryanair.  Ryanair is a company that you're going

19  to hear has worked really hard to build up its reputation to

20  connect with its customers and to keep its customers,

21  particularly in an environment when you have people who are

22  not regular travelers who are traveling once or maybe twice

23  a year with their families to places that they don't go very

24  often, a lot of times in countries that they've never been

25  to.  And so Ryanair invests heavily in trust and heavily

1    in -- Booking.com invests heavily in trust and heavily in

2    reputation.

3           And you're going to see that these e-mails --

4    and I'll say I agree with Mr. Donoghue that not every word

5    in this is false, just the words about the OTAs.  And these

6    are e-mails that were directed to all of the OTAs that

7    Ryanair identified, which included Booking.com customers.

8    And they said to the e-mails -- to the customers, "You're

9    getting false customer details" or you're giving -- your

10   travel OTA is giving false customer details.  Ryanair is

11   getting false payment details and false contact details.

12          That is not true.  And you'll see that it hurt

13   Ryanair's reputation.  You'll see complaints over

14   Booking.com's reputation.  You'll see that Booking.com got

15   complaints, got complaints to its complaint service that

16   you'll hear about, and the customers, Booking.com customers,

17   said things like, "I will never use Booking.com to make a

18   reservation again after this experience, which is a shame

19   because I've been using you successfully for years.

20   Booking.com is committing fraud, selling a service you're

21   incapable of providing.  I've been a Genius level customer

22   for years but no more."

23          For a company like Booking.com that depends on

24   its reputation, this is very harmful.  Mr. Guerrero will

25   tell you for every one of these people who took the time to

1  send an e-mail, they know from their business that there are

2  many more that just walk away and go to Expedia or something

3  else the next time.

4          These statements are false and they are the

5  basis of the claims for defamation and interference with a

6  contract that we have brought in the other claims that Judge

7  Bryson mentioned a few minutes ago that Booking.com has

8  brought against Ryanair, and you will see this and other

9  evidence that shows that Ryanair knew that these statements

10  were false when they were made.

11          I want to say just a couple of things about

12  something called damages.  At the very end, you will be

13  asked not only to determine whether one or the other party

14  is liable but whether one or the other party is entitled to

15  damages.  Ryanair is not entitled to damages, economic

16  damages, because they were not left worse off by this

17  conduct in any way, shape or form.  Ryanair profited, you

18  will hear, something like -- and these numbers may change

19  slightly based on the evidence at trial, but approximately

20  $630 million in a one-year period of time from OTA sales.

21  They profited approximately $17 million, profited from the

22  Booking.com sales during that period of time.  Ryanair

23  wasn't hurt by this.  They profited from it.

24          We will ask you -- Booking.com will ask you for

25  something called punitive damages.  And you will be put in a

1   position at the end, you'll have the responsibility, the

2   obligation to make a determination as to whether Ryanair

3   should be punished for making false statements about

4   Booking.com, the false statements we talked about, and that

5   will be your decision.

6          Thank you very much for your time, for your

7   attention.  It takes a while to learn how to be jurors and

8   sit still and listen to people talk for a long time, but we

9   very much appreciate your service, your public service.

10         We're going to be back at the end.  We're going

11  to present evidence along the way, but we'll be back at the

12  end.  And when we get to the end, we're going to sum up and

13  we're going to ask you to return a verdict in Booking.com's

14  favor in all respects and against Ryanair, not to award any

15  damages for Ryanair, and to award punitive damages in favor

16  of Booking.com.  Thank you very much.

17         THE COURT:  Thank you, Mr. Hemann.

18         Now, members of the jury, it is lunch hour, so

19  let's take our lunch break now.  We'll come back -- let's

20  come back at 1:00.  Your lunch, as I indicated, should be

21  waiting for you.  So they will be waiting for you in the

22  jury room, and we will see you back here at 1:00 and the

23  evidence will begin.  Thank you.

24         (The jury exited the courtroom.)

25         THE COURT:  Do we have any business we need to

1    attend to over the lunch hour?  Are we ready to go with the

2    evidence?

3              MR. DONOGHUE:  Not that I'm aware of, Your

4    Honor.

5              MR. HEMANN:  Your Honor, we need to have one

6    more discussion with the Ryanair team on the topic of the

7    cease and desist letters.  It could be a short discussion,

8    but we can let Your Honor know whether we've got anything to

9    raise.

10             THE COURT:  Okay.  You should let us know by

11   e-mail to Ms. Waxman enough in advance of 1:00.

12             MR. HEMANN:  Yes, Your Honor.  Thank you.

13             (A luncheon recess was taken, after which the

14   following proceedings were had:)

15             THE COURT:  I don't know how many of you felt it

16   was a little cold in the courtroom, but the jurors said it

17   was.  We reached out to GSA to see if we could get it inched

18   up a bit.  Mr. Banenas is experienced and says that don't --

19   be careful what you wish for or it'll be 85 in here.  So

20   we'll see if they can adjust it a bit.  Okay.  Are we ready

21   to go?  All right.

22             MR. DONOGHUE:  Your Honor, we don't have

23   opposing counsel and we're having a technical issue.

24             THE COURT:  Oh, are we?  Okay.  Well, how soon

25   do you expect him, I guess is what I'm asking?

1           MR. DONOGHUE:  He's gone to the restroom.  I

2   would assume not long.

3           THE COURT:  Yeah, I'm thinking of the technical

4   issues.

5               (Thereupon, a discussion was held off the

6   record.)

7               (The jury entered the courtroom.)

8           THE COURT:  Several people complained that the

9   temperature is a little cold this morning so we asked them

10  to turn it up just a little bit.  I hope they don't overdo

11  it, but probably what would be wise is for you all to bring

12  something in the nature of a sweater or something, just in

13  case.  They're keeping these -- for some reason, these

14  courtrooms tend to be either a little too warm or a little

15  too cold.  So guard against that by bringing a sweater or

16  something else in case it gets a little chilly or

17  uncomfortable for you, you'll be okay.

18              All right.  First witness, Ms. Gierhart.

19          MS. GIERHART:  Your Honor, briefly I'm just

20  going to very briefly read from Booking.com's interrogatory,

21  an exhibit.  May I approach with the exhibit?

22          THE COURT:  Yes.

23          MS. GIERHART:  So this is Booking.com B.V.'s

24  Third Amended and Supplemental Responses and Objections to

25  Plaintiff Ryanair DAC's Interrogatory Number 4.

1    Interrogatory Number 4 states, "Identify each and every

2    Ryanair flight sold on or through your website from

3    January 2018 to present, including but not limited to when

4    the flight was sold, where the flight originated from, where

5    the flight was going to, the date and time of travel, the

6    passenger name record or PNR, and what technology or API was

7    used to facilitate the transaction."  And the response to

8    Interrogatory Number 4 included, Attached as Exhibit B is a

9    highly confidential, attorney's-eyes-only document showing

10   the number of flights sold through the Booking.com website

11   each day whereby Booking.com's system indicates that Ryanair

12   is the validating carrier.  And every flight in Exhibit A

13   and Exhibit B was sourced by Etraveli.  So, Your Honor, I

14   move to admit Exhibit PTX 34, which is the Exhibit B that I

15   just referenced in Booking.com's response.

16            THE COURT:  Very well.  In the absence of

17   objection that will be admitted.  No objection?

18            MR. HEMANN:  No objection, Your Honor.  I'm

19   sorry.

20            THE COURT:  It will be admitted.

21            (Thereupon, Plaintiffs' Exhibit 34 was

22   admitted.)

23            MS. GIERHART:  Thank you.

24            THE COURT:  Very well.  First witness.

25            MR. DONOGHUE:  Your Honor, we're going to call

1    John Hurley.  May I approach with a binder, Your Honor?

2                    THE COURT:  Yes, you may.

3                    THE CLERK:  Please state and spell your name for

4    the record.

5                    THE WITNESS:  John Hurley.  J-O-H-N H-U-R-L-E-Y.

6                         JOHN HURLEY,

7                called as a witness on behalf of the

8                Plaintiff, was sworn, and testified

9                as follows:

10                   DIRECT EXAMINATION

11   BY MR. DONOGHUE:

12   Q.    Good afternoon, Mr. Hurley.  Will you state and spell

13   your name for the record?

14   A.    John Hurley.  J-O-H-N H-U-R-L-E-Y.

15   Q.    Mr. Hurley, where do you work?

16   A.    I work for Ryanair.

17   Q.    What do you do for Ryanair?

18   A.    I'm their chief technology officer.

19   Q.    Before we get into some more detail about Ryanair,

20   Booking.com showed a video of you earlier this morning.  I'd

21   like to play it for you.

22                    (A video was played.)

23                    SPEAKER:  You'll agree this could all be the --

24   the Monex issue could have been the responsibility of some

25   third party, not defendants themselves; correct?

1          THE WITNESS:  Could just these have been Booking

2     or a third party, I don't know.

3          (The video ended.)

4     BY MR. DONOGHUE:

5     Q.    How do you feel about that video, Mr. Hurley?

6     A.    The state of my hair.  Sorry, it's awful.

7     Frustrated.  What was that about even?  That was about a

8     Monex attack and had me being a Booking economy response and

9     third party on behalf Booking economy response.

10    Q.    And what did you think about your answer?

11         THE COURT:  Mr. Hurley, could you proceed a

12    little more slowly because the court reporter has to take

13    down everything we say and some of us speak a lot more

14    quickly than others and I think you're on the faster side so

15    if you'd speak slowly it would help.

16         THE WITNESS:  My apologies.  I'm also a little

17    nervous.

18         THE COURT:  There's nothing wrong with that.

19         MR. DONOGHUE:  Mr. Hurley, maybe move the

20    microphone closer.

21    BY MR. DONOGHUE:

22    Q.    So what do you think about the answer?

23    A.    I think the -- sorry, it's hard to get ahold of them.

24    I was a bit surprised when I saw the sorry state of my hair

25    in the headphones.

1      So if I recall it was Booking -- it was to do

2   with at the time there was supposedly a Monex attack, I

3   believe, and the argument being made was that Booking.com --

4   sorry, Booking, or a third party working on behalf of

5   Booking.com, were behind the attack.

6   Q.     And how sure -- well, what do you think about the

7   answer, was it exactly how you would answer today?

8   A.     Well, You'd probably say and/or.  If Booking.com were

9   behind it, whether they did it themselves or they instructed

10  somebody else to do it, either way it was their attack.

11  Q.     Thank you.  Getting back to Ryanair, what's Ryanair's

12  business?

13  A.     We're an airline.  We're based in Europe.  We fly 200

14  million passengers this year.  We're number one on choice,

15  number one on price, and we get you there on time.

16         THE COURT:  Mr. Hurley, it would be really good

17  for you to slow down.  The court reporter has to -- she's

18  very good at what she does but there are limits.

19         THE WITNESS:  I will slow down.  Can we start

20  the question and answer again?

21  BY MR. DONOGHUE:

22  Q.     Sure.  Go ahead.

23  A.     We're an airline based in Europe.  This year we will

24  fly 200 million passengers.  And we're number one on choice

25  and price.  We'll get you there on time.  We fly to over 40

1    countries in Europe and north Africa, to 230 different

2    destinations.  And we fly to over 3,600 flights a day.

3    Q.    And how many, if any, U.S. customers does Ryanair

4    have in a year?

5    A.    Last year we had to about 5 million sectors sold to

6    U.S. sectors flight, apologies, flights sold.  And this year

7    heading towards 2 million flights.

8    Q.    And how many planes are in Ryanair's fleet?

9    A.    600.

10   Q.    When did you join Ryanair?

11   A.    2014, September 15th of 2014.

12   Q.    What was your position when you joined in 2014?

13   A.    I joined as a chief technology officer.

14   Q.    So that's been your role the whole time you've been

15   at Ryanair?

16   A.    Correct.  I'm actually the only chief technology

17   officer Ryanair has ever had.

18   Q.    Getting to your role as chief technology officer,

19   what are your responsibilities?

20   A.    I'm responsible for all IT with Ryanair.  That is

21   from cyber security, laptop maintenance, website E-commerce,

22   all of our operation systems to keep flight schedules on

23   time, flight paths for pilots, phones and EPOS devices.

24   Sorry, I'm using EPOS, these words are probably hard to

25   spell.  E-P-O-S.  Everything too I take basically.

1    Q.    How many employees do you manage?

2    A.    Roughly 600.

3    Q.    And what are those employees focused on?

4    A.    About 20 percent of my team are focused on the web

5    warn, which is security, maintenance, keeping laptops

6    working.  The other 40 percent are working on operation

7    efficiency, schedules, rosters for captain and crew, et

8    cetera.  And the last 40 percent are on E-commerce with is

9    our website.

10   Q.    Why are we here today from your perspective?

11   A.    We're here to stop Booking.com from scraping our

12   website.

13   Q.    And what issue, if any, do you see Ryanair having

14   with online travel agents like Booking.com?

15   A.    OTAs like Booking.com that --

16         THE COURT:  Excuse me, again, there's a --

17   Mr. Banenas, do you know what's causing the feedback we're

18   getting?  Is there a way to tamp that down without losing

19   the value of the microphone?  It's making static sounds.

20   Okay.  We'll try it again.

21   BY MR. DONOGHUE:

22   Q.    So Mr. Hurley, what, if any, issues does Ryanair have

23   with online travel agents like Booking.com?

24   A.    Ones that don't work with us and come in and take our

25   fares and resell our flights, they cause damage to our

1    website, they fill it full of fraud in our data.  They cause

2    a lot of problems.

3    Q.      And when did you realize the size of the problem

4    Ryanair has with online travel agents?

5    A.      From a website maintenance perspective I've been

6    aware of that since the day I joined.  Companywide awareness

7    we had when COVID hit.  During COVID we suddenly had to

8    cancel all the flights.  We had to refund 1.2 million

9    passengers to the tune of 1.5 billion.  It was a huge task.

10   We thought we had achieved it and then we started getting

11   complaints from passengers saying that they had not been

12   refunded the amount they were due.  It got to such a state

13   the Italian government actually wrote in to us warnings if

14   we did not refund we would be in trouble.  We believed we

15   had refunded.  It turns out the money we refunded, that

16   sometimes OTAs had not passed the money on to passengers,

17   they kept it themselves.  Incompetence or whatever was

18   raised, I don't know.  From our perspective we had a big,

19   big problem.

20          Then during COVID we were also hit with -- it's

21   hard to explain in the U.S. -- but in Europe we had many

22   governments changing the rules almost on a daily basis.  You

23   had to have a vaccination, you didn't have to, you had to

24   have a test, you have to be -- you know, all these different

25   rules.  We were always having to contact our passengers

1    about the new rules.  So if you were in the UK, for example,

2    you must have had tests.  We were always having to contact

3    our passengers about the rules.  If they're not getting

4    those e-mails, and it happened time and time again, we're

5    getting in trouble by the authorities.  We had a rule

6    challenge with governments.  We have a safety challenge

7    because we couldn't guarantee who was flying the flights.

8    We couldn't get confirmation that our passengers were aware

9    of the rules before entering the country with COVID.  We had

10   a big problem.  It went from being CTO complaining about

11   damage to the website to the company.

12   Q.     Have you ever heard anyone call OTAs pirates?

13   A.     Yes.

14   Q.     Is that a common term at Ryanair?

15   A.     It's a term that our marketing PR department would

16   use as well as to educate external customers, our

17   passengers, of the practices of some OTAs.

18   Q.     How about for you or your technology team?

19   A.     No, we don't use those words and terms.

20   Q.     Why not?

21   A.     They're not -- we were -- we have special words we

22   call them when the website goes down.  Apart from that

23   they're called scrapers always and that's the terminology.

24   Q.     What is a scraper?

25   A.     In my words it is somebody that would -- a bot

1   computer will come onto the website, they will acquire our

2   fares and availability and then will make bookings as a

3   computer pretending to be a user.

4   Q.     And which, if any, OTAs aren't pirates?

5   A.     Expedia, they're a good example.  We have a contract.

6   They have access to our data and they send passengers back

7   to our website.  Google would be the same.  They have an API

8   and feed and they work with us.

9   Q.     And why do you think Ryanair calls some OTAs pirates?

10  A.     Because we have examples of passengers getting

11  inflated fares.  For example, a bag for double the price, it

12  will be resold at a base fare and that's wrong.  It's

13  essentially, in my opinion, stealing and influencing --

14  fooling the passenger, the customer.  We have a problem with

15  that.

16  Q.     What does your technology team do to disrupt online

17  travel agents?

18  A.     Okay.  I don't care for travel agents until they come

19  to the website.  However, if they're on the website and

20  they're causing harm to the website we then have tools in

21  place to help protect.

22  Q.     Let's talk a little bit about the website and selling

23  flights.  How does Ryanair make money as a company?

24  A.     We sell flights to our passengers.

25  Q.     What else does Ryanair sell?

1    A.      We sell what people call ancillaries.  What that

2    means in layman's terms is if you want an extra bag, where

3    do you want to sit in the aircraft, those things.

4    Q.      How much does Ryanair make in profit per flight

5    segment per passenger going one way?

6    A.      A passenger, roughly $10 per passenger.

7    Q.      And how much of that would be ancillaries?

8    A.      It's 23 percent, so $2.30.

9    Q.      So how would not selling ancillaries impact Ryanair's

10   profitability?

11   A.      We'd be -- last year we'd have lost about half a

12   billion dollars.

13   Q.      But still would have been profitable?

14   A.      Correct, yes.

15   Q.      And how does Ryanair sell flights to its customers?

16   A.      We sell them two ways; one, on the website directly,

17   and the second, is we have mobile apps.  We have a mobile

18   app for Android customers and one for Apple customers.

19   Q.      Let's start with the website.  Who built the Ryanair

20   website?

21   A.      My team built the website.

22   Q.      And who maintains it?

23   A.      My team maintains the website.

24   Q.      And how does Ryanair sell flights to its customers on

25   the Ryanair website?

1   A.      A customer will come to our website, www.ryanair.com,

2   they would select a destination, they would select an

3   origin, and they would select when they would like to travel

4   and how many passengers.  They then hit the confirm button,

5   read the terms and conditions, and then they'll go to a page

6   which demonstrates or shows the selected flights.  That

7   page, yes.

8   Q.      What next?

9   A.      What next?  In the situation you choose, do you want

10  to go 6:00, 6:30 or 1610.  You can select that and go to the

11  next page.  This person selected 6:30 for a flight.

12  Q.      And then what happens?

13  A.      They go to the ancillary pages where they can add a

14  bag, they can choose a seat where they sit.

15  Q.      And then what's next?

16  A.      The next thing is -- would be the payment page.

17  Before you pay, you have to log in.

18  Q.      All right.  So that -- would this be the log-in page?

19  A.      Correct, that is the log-in page.

20  Q.      And how do you log in?

21  A.      If you have an existing Ryanair account, you would

22  use your e-mail address and your password to log in.

23  Q.      What if you don't?

24  A.      You could also log in via social media, which is

25  Google, Facebook, or Paypal.  If you have none of those set

1    up, you have to create an account.

2    Q.      And how do you do that?

3    A.      You enter an e-mail address.  We then send an e-mail

4    to that e-mail address to confirm you have access to the

5    e-mail address so we can communicate with you going forward.

6    You click on the link.  That tells us the e-mail address is

7    active.  You send in the password and then you have a

8    Ryanair account.

9    Q.      Then you're able to log in?

10   A.      Yes.

11   Q.      And what do you call this portion of the website

12   where the consumer has to log in?

13   A.      MyRyanair.

14   Q.      What comes next, if you want to purchase a flight?

15   A.      After you've logged in, you then come to a page where

16   you select -- you fill your details in, your name, who's

17   traveling, et cetera.  If you've put this information in

18   MyRyanair already, what you can do is pre populate it.

19   Q.      And it appears that the e-mail address is pre

20   populated.  Where is that from?

21   A.      That's from the myRyanair, the e-mail address you

22   submitted.

23   Q.      Why does Ryanair pre populate the e-mail address

24   field within the myRyanair password protected portion of the

25   website?

1    A.    We do -- people are human, they make mistakes, they

2    have typos.  The e-mail address we have from myRyanair no

3    longer works because you clicked on the link already, and so

4    it's the safe way to do it.

5    Q.    And when the user is here, within the myRyanair

6    portion of the website, what computers are they accessing to

7    operate the web pages?

8    A.    They're computers owned by Amazon which we rent off

9    them and are based in Ireland.

10   Q.    And what about for the graphics on the page?

11   A.    The graphics are located on the cloud form, which

12   again is another Amazon service, but that's different.

13   That's distributed around the world, so wherever you are it

14   would locate, so it's to speed up the web page.

15   Q.    So where would the computers be for the graphics if I

16   was booking a flight in the United States?

17   A.    It would be in the United States.

18   Q.    So if you're from Delaware, they'd be somewhere

19   nearby?

20   A.    Yes, probably New Jersey, if I was to guess.

21   Q.    And we both used the phrase myRyanair.  What is

22   myRyanair?

23   A.    It's your account.  It's where you store your

24   personal details and how to -- protects your details.  It

25   allows you to log in.  It allows you to check into your

1    flight much easier, and there's protections we have in

2    place.

3    Q.    How can a customer purchase a Ryanair flight without

4    a myRyanair log in?

5    A.    They can't.

6    Q.    Do you have a myRyanair account?

7    A.    I do.

8    Q.    Have you used it?

9    A.    Yes.

10   Q.    So what happens next in the flight purchase process?

11   A.    Okay.  You fill in your credit card details, or I'm

12   assuming they're accepted by the bank.  You will receive an

13   e-mail from us shortly afterwards with your confirmation

14   e-mail which contains what we call a PNR code, which is a

15   unique identifier which only you use to get your flight

16   afterwards.

17   Q.    And the PNR code, what is it again?

18   A.    Technically, it's a passenger name record or it's --

19   in reality, it's just -- it's a number.  It's an

20   alphanumeric six character digit that is unique to your

21   booking.  As long as you have that and an e-mail address,

22   you can always get your flight.

23   Q.    And once the credit card information is entered, does

24   Ryanair then issue a flight ticket?

25   A.    No, we don't.  We just issue the booking reference

1   number.  To actually get a ticket, you come back in and

2   check in at a later date.

3   Q.      How about the Ryanair app?  How is that different --

4   how is it different to purchase a flight on the Ryanair app

5   as opposed to the website?

6   A.      The flow is very similar.  The UI is different

7   because it's a smaller screen, so unfortunately there's more

8   screens to scroll through, less real estate on the page.

9   Technically, myRyanair is there, the same databases and

10  everything else is the same.

11  Q.      What's a UI?

12  A.      It's the user interface, it's the look and feel.

13  Q.      So that's what you see on the screen?

14  A.      Yes, it's graphics on the page.

15  Q.      It's different because it's smaller on the telephone

16  or the tablet, as opposed to the computer screen?

17  A.      That's correct.

18  Q.      Aside from the size, are there any differences

19  between the app and the website?

20  A.      In the booking process, no.

21  Q.      Anything else?

22  A.      Well, when you -- the mobile app, when you go to the

23  airport, we have a feature called Day of Travel, and that

24  will communicate to you where your baggage rotates, what

25  gate you're leaving from, is your flight on time, those kind

1   of features.

2   Q.      Where in the mobile app flow do you have to log into

3   the myRyanair account?

4   A.      When you open the app, it's the first screen you see.

5   Q.      So even before you pick a flight?

6   A.      Correct, yes.  Sorry, to be clear, it's not

7   mandatory.  You can still browse as a guest on the mobile

8   app first page.  The link at the bottom will then go to pay

9   after you log in.

10  Q.      How could a customer purchase a Ryanair flight

11  without logging into myRyanair?

12  A.      They can't.

13  Q.      Are you familiar with Ryanair's terms of use?

14  A.      I am indeed.

15  Q.      What are they?

16  A.      There's a series of rules we write saying if you're a

17  human being, you're welcome to the website to book a flight.

18  If you're a commercial entity, you're not welcome and don't

19  have the ability to do those things.

20  Q.      Okay.  I'm going to pull up an example.  Do you

21  recognize this document?

22  A.      Yes.

23  Q.      What is it?

24  A.      It's a copy of our terms of use.

25  Q.      And where do the Ryanair terms of use appear to the

1    customer?

2    A.    The customer, they would appear when you select your

3    destination origin and dates before your full return back to

4    you what flights are available and the pricing, you confirm

5    there you've read them.

6    Q.    Do you know where these particular terms of use are

7    from?

8    A.    Scroll to the bottom, please, there should be a

9    reference and date.  Thank you.  There you go.  2022.

10   Q.    How would you purchase a flight on the Ryanair

11   website without agreeing to the terms of use?

12   A.    You can't.  You can't see a flight to purchase unless

13   you accept them by checking the check box.

14   Q.    How about the app?

15   A.    Exact same.

16   Q.    Why does Ryanair do that?

17   A.    Well, for regular customers, it makes little

18   difference.  It's more of a warning to commercial entities

19   you're not supposed to do it.

20   Q.    If we could blow up paragraph 3.  It says in the

21   first sentence here, "You're not permitted to use this

22   website other than for private noncommercial purposes."  Do

23   you see that?

24   A.    Yes.

25   Q.    What does that mean to you?

1   A.     That means if you're a regular customer, you're very

2   welcome.  If you're not, you're not welcome.

3   Q.     And the second sentence says, "Use of any automated

4   system or software to extract data from this website for

5   commercial purposes, quote, screen scraping, unquote, is

6   prohibited."  Do you see that?

7   A.     I do.

8   Q.     What does that mean?

9   A.     Another way of saying if you're a bot or a computer

10  or a scraper, you're not allowed to enter data or search

11  flights.

12  Q.     And then the third sentence says, "Ryanair reserves

13  its right to take such action as it considers necessary,

14  including issuing legal proceedings without further notice

15  in relation to any unauthorized use of this website."  Did I

16  read that correctly?

17  A.     Right.

18  Q.     And what does that mean?

19  A.     It means we reserve the right to sue you if you break

20  these provisions.

21  Q.     We can take that down.  Who's in charge of security

22  for the Ryanair website?

23  A.     I am.

24  Q.     And who does Ryanair allow to purchase Ryanair

25  flights on the Ryanair website?

1   A.      Customers, by the term being a human being.

2   Q.      How about from the app?

3   A.      The exact same.

4   Q.      Other than a human customer, who would want to

5   purchase Ryanair flights from the website or the app?

6   A.      Online travel agents, also known as OTAs.

7   Q.      And how do OTAs purchase flights from Ryanair?

8   A.      They use -- well, we call them bots.  It's a computer

9   code written by servers to come in and essentially take our

10  flights, our flight data, our pricing, and then mimic a

11  human being by pretending to have mouse clicks, et cetera,

12  so it confuses our defenses to make a booking on the

13  website.

14  Q.      And who employs bots on the Ryanair website?

15  A.      OTAs.

16  Q.      How do you know that?

17  A.      Well, it's industry common knowledge.  Also, we do

18  test bookings and we can see them happening, the data being

19  copied.

20  Q.      What happens in a test booking?

21  A.      In a test booking, for example, we use booking as an

22  example here.  We go through the website.  We will search

23  for a flight that we would like.  A good one is usually

24  going to Poland, Ireland to Poland, nobody else does that

25  flight, and a Ryanair flight will appear.  Our flight will

1    appear.  We'll make the booking on our website and if it's

2    successful, we will then receive an e-mail from Booking.com

3    with a PNR confirming that's how.  At the exact same time,

4    we can go into your databases behind the scenes and confirm

5    the booking was made on our website not by a human being.

6    Q.    And do you believe that Booking.com scrapes Ryanair's

7    website?

8    A.    I do.

9    Q.    Why is that?

10   A.    With the test bookings, I can see Ryanair flights on

11   Booking.com's website.

12   Q.    And why doesn't Ryanair want OTAs like Booking.com

13   selling its flights?

14   A.    In my words, there's two reasons, ignoring the

15   commercial and the refunds.  One is technical harm as in

16   there's OTAs in general cause problems with the website, a

17   poorly written script can generate too much traffic.  The

18   other problem is data integrity, because they give us false

19   e-mail addresses, the wrong credit card details.  From

20   credit card e-mails we can't always read, which annoys the

21   finance department, and the details means we can't contact

22   passengers, which is a problem for flight safety.  It's a

23   problem for regulations.  For example, if a Ryanair flight

24   is delayed by three hours, we're mandated by EU to contact

25   the customer and tell them they're entitled to do a refund

1   and compensation.  We must get them out and can't forget to

2   send them those e-mails.  We have to have the correct e-mail

3   address.

4   Q.    Any other reason the data integrity matters to

5   Ryanair?

6   A.    Well, we've had to change our entire refund process

7   because we cannot refund through credit card.  When we

8   discover the credit card materials don't actually belong to

9   the customer, and it's -- another issue we have is it's

10  frustrating, as you can you imagine, we have to move

11  flights.  We do reschedule the flights.  It could be made a

12  year before, if the flights make it before the two hours, we

13  e-mail our customers to let them move forward the two hours.

14  If you don't get that e-mail and you arrive to the airport

15  two hours on time, you're two hours late.  And we get to

16  court in Germany and we've lost four cases on this topic

17  that we were counting because we have a relationship with

18  the customer, ignoring the fact we can't talk to the

19  customer.

20  Q.    What other ways does having accurate customer

21  information allow Ryanair to better serve its customers?

22  A.    Sorry.  We can begin in our refund process.  We could

23  communicate flight status.  We could communicate about

24  safety, flight safety regulations.  We can market them.  We

25  can give them offers to better reduce fares through the

1   sales we are planning.

2   Q.     How do you know that online travel agents like

3   Booking.com damage Ryanair's data integrity?

4   A.     We've done test books.

5   Q.     And that's the same process you talked about before?

6   A.     Yes.  And when testing is completed, we will see data

7   that we have in the database does not match the data we

8   submitted at the start.

9   Q.     Any other reasons?

10  A.     Sorry, reasons?

11  Q.     Any other reasons that you know that OTAs damage

12  Ryanair's website?

13  A.     Well, reasons are we've had -- sorry, four ways to

14  answer that.  The reason why we know that it's a bot is

15  because we deal with a monitor and track traffic and we can

16  identify -- you're asking about, sorry, I got confused.

17  Q.     If there are other ways, other harms that Ryanair

18  feels from OTA traffic on its website?

19  A.     Yes.  We've had experience in the past where if the

20  bot is too aggressive it has damaged the website and brought

21  it down.  We will call that slowdowns as opposed to outages,

22  which is too much traffic, too much activity, and our

23  servers can't handle it.

24          MR. HEMANN:  Your Honor, I object to this line

25  of questioning.  It was dealt with in connection with the

1    Court's motions in limine and by agreement of the parties.

2                    THE COURT:  On what was the specific subject

3    that was addressed in the motion in limine?

4                    MR. HEMANN:  The subject that was addressed in

5    the motion in limine had to do with the lack of evidence

6    regarding slowdowns or stoppages and this is going right

7    into that.

8                    MR. DONOGHUE:  We're stopping here, Your Honor.

9    This is just background to explain.

10                    THE COURT:  But I do think that this touches on

11   the subject so I'll strike the question and answer.  I'll

12   mention to the jury the last question and answer should be

13   disregarded.  So the objection is sustained.  You can move

14   on.

15                    MR. HEMANN:  Thank you, Your Honor.

16   BY MR. DONOGHUE:

17   Q.    Does Ryanair receive false e-mail information from

18   Booking.com?

19   A.    Yes.

20   Q.    How so?

21   A.    The myRyanair address that is used with that booking

22   is not an e-mail address that we received.  We noticed it in

23   the test books.

24   Q.    And why does that matter to Ryanair?

25   A.    If we don't have the correct e-mail address we can't

1    contact the customer with flight changes, et cetera.

2    Q.    Are you involved in monitoring how many flights

3    Ryanair sells on its website and mobile app?

4    A.    I am indeed.

5    Q.    Do you know how many flights Ryanair sold between the

6    beginning of March 2022 and the end of February 2023?

7    A.    About 78 million.

8    Q.    If I told you 78,300,879 would that sound right?

9    A.    It would sound right, yes.

10   Q.    Do you know how many flights are purchased by online

11   travel agents per day?

12   A.    It varies, roughly 20, 25 percent.

13   Q.    How does Ryanair get that information?

14   A.    We have tools, BI tools that monitor the traffic at

15   the booking.  We would like to do a joint booking but the

16   computer is not fast enough yet.  And we can tell this

17   booking is not being made by a human being.  By way of

18   example, we can see that with a device that the mobile phone

19   was registered in Japan, it was used in America, and the

20   credit card they were using is French.  Those kind of data

21   points after the fact point a very clear path.

22   Q.    Do you know what percentage of Ryanair flights were

23   purchased by online travel agents in the one-year period I

24   talked about, March 2022 to February 2023?

25   A.    Yes.  23 percent.

1    Q.    And how would you determine the number of online

2    travel agent bookings from March 2022 to February 2023?

3    A.    So the booking goes ahead.  Our intelligence team

4    runs reports every night and they will tag all the

5    reservations that were made by an OTA and they stay tagged

6    and we count the tags.

7    Q.    But in this case would it be 23 percent of the

8    78,300,000 number?

9    A.    Yes.

10   Q.    I don't want to put you on the spot doing math, but

11   do you know what 23 percent of 78 million is?  I can get you

12   a calculator if you want.

13   A.    Please.

14          MR. DONOGHUE:  Your Honor, may I approach?

15          THE COURT:  Yes, you may.

16   BY MR. DONOGHUE:

17   Q.    This may have been your high school nightmare,

18   Mr. Hurley, being asked to do math with an audience.

19   A.    If my teacher could see me now he'd die laughing.

20   You said 78,300,000?

21   Q.    78,300,879.

22   A.    Again, sorry, 3.4 million.  Do I have that right?

23   Q.    I don't think so.  I think it's going to be more like

24   18 million?

25   A.    I'll go again, sorry.  This is embarrassing.  I broke

1    the calculator.  This is really bad.

2    Q.    If I represented to you that it was 18,416,864

3    flights would that sound about right?

4    A.    A quarter of 80 million, yeah, that would be right.

5              MR. DONOGHUE:  If we could put up the

6    demonstratives again.

7    BY MR. DONOGHUE:

8    Q.    So before you came up on the stand we read in an

9    interrogatory response that showed Booking.com's flights and

10   I'm going to represent to you that up on the screen here you

11   see in that period of, March 1 to February 28th between 2022

12   and 2023, Booking.com sold 518,826 Ryanair flights.  So the

13   percentage -- how would you determine the percentage of

14   Booking.com flights compared to overall OTA flights?

15   A.    The last performance, what I should have done, I

16   should divide this number by 18 million and multiply by a

17   hundred for the answer.

18   Q.    If I told you it was about 2.8 percent, would that

19   look right to you?

20   A.    2.8.  Yeah, it would be correct.

21   Q.    We'll come back to those numbers.  We talked about

22   harm from online travel agents.  What tools has Ryanair

23   developed to prevent those harms?

24   A.    We have two tools we developed, one is myRyanair

25   previously disclosed, and the second tool is Shield.

1   Q.      How are you involved in developing or implementing

2   those systems?

3   A.      My team built those systems.

4   Q.      How does myRyanair help prevent harm from online

5   travel agents?

6   A.      Well, it protects it by using a password.  We have a

7   list, blacklist of OTAs where we will stop you from making a

8   booking if you have those e-mail addresses.

9   Q.      And how is the blacklist created and maintained?

10  A.      It's a collective created by business, my IT

11  department, to identify world e-mail addresses that keep

12  recurring in our logs that we analyze.  Our legal department

13  sometimes get involved, our marketing and commercial

14  department sometimes will give feedback.  It's a collective

15  list.  The actual list then is maintained by my team and all

16  changes will come through a change process.

17  Q.      When was myRyanair implemented?

18  A.      2015.

19  Q.      So that was a year or so after you became chief

20  technology officer?

21  A.      Yes.

22  Q.      Have OTAs been able to make bookings after myRyanair

23  was implemented?

24  A.      Yes.

25  Q.      How do you know that?

1   A.      From test bookings.

2   Q.      And how are OTAs able to get around needing a

3   myRyanair account that has to be verified?

4   A.      Unfortunately, it's not a very secure solution.  It

5   is very easy to create a dummy e-mail address.  Like, for

6   example, you can go to gmail and have an e-mail address

7   called pinkfluffyclothes@gmail.com and the process we have

8   in place will accept it as long as you have the ability to

9   access that e-mail address on your side.  So OTAs create

10  loads and loads of dummy accounts and that's what they do.

11  So we try to have a solution to that.  We have regular

12  meetings.  We're able to work.  The more you make it easier

13  for the banks, the easier it is for the computers.

14  Q.      And do you know whether Booking.com has sold Ryanair

15  flights after myRyanair was implemented?

16  A.      Yes.

17  Q.      How do you know?

18  A.      We're smart.  You'd show it on the screen.  We know

19  from test bookings.  But I saw 500,000 there.

20  Q.      You also mention Shield.  I want to focus on that a

21  little bit.  What is Shield?

22  A.      Shield is an inhouse tool we built that monitors all

23  the traffic coming into the website to try to determine if

24  the traffic is created by a human being or by a bot.

25  Q.      Who created Shield?

1    A.      Originally created by a gentleman called Paul Mooney,

2    M-O-O-N-E-Y, and a gentleman called Lukasz Stocki.  He

3    currently manages and maintains it.

4    Q.      Why did Ryanair create Shield?

5    A.      To protect the website.

6    Q.      Why make your own software instead of buying software

7    from someone who already had it?

8    A.      We looked at what was on the market and it wasn't

9    good enough, and the problem we had is if you buy from the

10   market, you buy a static solution, and OTAs are forever

11   changing their attach directives.  It's a game of cat and

12   mouse.  It's better to have a solution you own so you can

13   change.  It's essentially a game of cat and mouse, that's

14   what we do.  You put a defense in place, the OTAs figure it

15   out and get past it and we figure out the data and block it,

16   it goes on and on.

17   Q.      And how does Ryanair operate in terms of identifying

18   and stopping OTA bookings?

19   A.      Sorry, how does -- can I just, sorry.  Try again.

20   Q.      Maybe I said that wrong.  How does Shield operate in

21   terms of identifying and stopping OTA bookings?

22   A.      Shield monitors a lot of different parts of the

23   website and it's very comfortable with machine learning,

24   carries a lot of data and processes, and comes up with a

25   recommendation, do we believe physically it's a physical

1  human being or its a bot.  It's never a hundred percent.

2  It's a level of uncertainty.  But sometimes it is for

3  certain, and if that happens we will block that traffic

4  immediately.  It's very good at catching high school

5  students in the dorm who are amateurs and are trying to do

6  simple tasks.  Good OTAs it's a cat and mouse game.

7          THE COURT:  Did you say cat and mouse?

8          THE WITNESS:  Cat and mouse.

9  BY MR. DONOGHUE:

10  Q.     How often does Shield block a purchase of a flight

11  that is determined as through an OTA?

12  A.     It varies.  It's actually hard to answer that.  What

13  I mean is there is really a block attempt a hundred times,

14  if they get through the 101st time they get the booking.  So

15  there might be a 99 percent hit rate from an OTA

16  perspective, it's one for one.

17  Q.     How good do you think Shield is at blocking OTA

18  purchases?

19  A.     It's good.  It's getting better.  But it's not good

20  enough yet.

21  Q.     Has Booking.com managed to obtain Ryanair flights

22  since Shield was implemented?

23  A.     It has.

24  Q.     How do you know?

25  A.     The bookings.

1  Q.     And do you know whether Booking.com or its

2  intermediaries use bots to make those purchases?

3  A.     I do, yes.

4  Q.     How do you know that?

5  A.     Because when we do the test bookings and we get the

6  booking details afterwards, Shield does the analysis on that

7  booking and gives us back report and recommendation.  It's a

8  bit confusing, but Shield is very good with all the data

9  after the fact.  Shield struggles live because there's so

10 much information coming in and the computer is not fast

11 enough.  So after the fact we have very, very good insight.

12 What we're working on at the moment is to make the computer

13 faster to catch it and stop it live, but we're getting

14 better at that.

15 Q.     Did Ryanair ever send any warning letters to

16 Booking.com?

17 A.     Yes.

18 Q.     Do you know when the first one was sent?

19 A.     2019, November 2019.

20 Q.     I'd like to talk about those letters.  Do you

21 recognize this letter?

22 A.     I do.

23 Q.     What is it?

24 A.     It's a letter from Phillip Lee, which is a solicitor

25 based in Dublin, to Booking.com.

1   Q.     And solicitor is a lawyer?

2   A.     Sorry, yes.  It's an Irish lawyer.

3   Q.     Who is it addressed to?

4   A.     It's addressed to directors of Booking.com B.V.

5   Q.     And why did Ryanair send this letter?

6   A.     Because we wanted to remove all doubt that they were

7   not allowed to scrape our flights, et cetera.

8   Q.     So I'm going to read you the last sentence of the

9   first paragraph on the bottom of the page here and moving to

10  the top of the page.  "The Ryanair website is the exclusive

11  online distribution channel through which Ryanair sells

12  Ryanair group flights and our client does not authorize

13  third parties to sell its flights online."  Do you see that?

14  A.     Yes.

15  Q.     What does that mean to you?

16  A.     It means we're telling Booking.com, "You're not

17  allowed to use bots to scrape our website and sell our

18  flights."

19  Q.     Right.  And then if we go to the second paragraph --

20         THE COURT:  We have an objection.

21         MR. HEMANN:  Your Honor, I object to having

22  Mr. Hurley read -- or Mr. Donoghue read the letter and

23  just have Mr. Hurley interpret what it means to him without

24  any foundation.

25         THE COURT:  I think at this point, there isn't a

1  lot of interpretation going on.  I think he can read the

2  contents of the letter, and if he -- if his interpretation

3  is not fairly evident from the language of the letter, then

4  I would tend to not permit that, but this doesn't seem to

5  have gone to that point, so it's overruled.

6  BY MR. DONOGHUE:

7  Q.   So turning to the first sentence of the second

8  paragraph, I'll read that to you.  "It's recently come to

9  our client's attention that you're engaged in the sale of

10  Ryanair flights via the website https://Booking.com in

11  conjunction with Oy SRG Finland AB."  Do you see that?

12  A.   Yes.

13  Q.   The Booking.com, that refers to the Booking.com

14  website?

15  A.   Correct.

16  Q.   And do you know who Oy SRG Finland AB is?

17  A.   They're a subsidiary of Etraveli.

18  Q.   And then if we go down to the last paragraph above

19  the breach title, it says, "The purported scraping by you or

20  on your behalf of the Ryanair website or the sale by you of

21  Ryanair flights causes damage to us and breaches Ryanair's

22  rights."  Do you see that?

23  A.   Yes.

24  Q.   Let's scroll down towards the bottom.  Go ahead and

25  keep going.  Keep going.  So just -- we're going to look at

```
1   the bottom paragraph on page 3 which says, "In light of the
2   above, we call on you to cease offering for sale and selling
3   Ryanair flights from all websites operated and/or
4   facilitated and/or controlled by you, including on the
5   website Booking.com identified above."  Do you see that?
6   A.    Yes.
7   Q.    What do you understand that to mean?
8               MR. HEMANN:  Objection, Your Honor.  Foundation.
9               THE COURT:  What's the foundation?
10              MR. HEMANN:  I'm not -- there's no foundation
11  that Mr. Hurley participated in drafting or the sending or
12  knowledge of the letter at the time that it was sent.
13              THE COURT:  Well, I don't think that's necessary
14  in order for him to understand what the sentence means.
15  Let's see -- let's see what his answer is, but I don't think
16  this is a foundational problem that needs interpreting in
17  light of his having participated or not.
18              MR. HEMANN:  Thank you, Your Honor.
19              THE COURT:  So go ahead and re-ask the question,
20  please.  Overruled.
21  BY MR. DONOGHUE:
22  Q.    So, "In light -- " I'm going to save the court
23  reporter reading.  I can go ahead.  "In light of the
24  above -- " I'm reading this first sentence of the last
25  paragraph on page three.  "In light of the above, we call on
```

1    you to cease offering for sale and selling Ryanair flights

2    from all websites operated and/or facilitated and/or

3    controlled by you, including on the website Booking.com

4    identified above."  Do you see that?

5    A.    I do.

6    Q.    What does that mean to you?

7    A.    We're asking Booking.com to stop selling and scraping

8    the website.

9    Q.    And do you know whether this letter was delivered to

10   Booking.com's directors?

11   A.    It was.

12   Q.    How do you know that?

13   A.    Top of the letter says, "Deliver by courier and

14   e-mail."

15   Q.    So what happened after this letter was delivered to

16   Booking.com?

17   A.    Nothing.

18   Q.    They kept on selling Ryanair flights?

19   A.    Correct.

20   Q.    How do you know that?

21   A.    Test bookings.

22   Q.    All right.  If we could bring up the 2020 letter.  Do

23   you recognize this letter?

24   A.    I do.

25   Q.    You probably -- you may have seen it without all the

1   black.  That's special for our case.

2   A.     Okay.

3   Q.     What is it?

4   A.     Sorry.  It's a letter from Holland Knight to Booking.

5   Q.     To Booking or Booking Holdings?

6   A.     To Booking Holdings.

7   Q.     And do you know who Booking Holdings is?

8   A.     The parent company of Booking.com.

9   Q.     All right.  And do you see the first sentence says,

10  "We represent Ryanair DAC in certain legal matters,

11  including the current dispute between Ryanair and Booking

12  Holding and its subsidiaries, collectively Booking"?

13  A.     Yes.

14  Q.     All right.  And if we can scroll down.  And then if

15  we can highlight the bolded paragraph towards the bottom.

16  Do you see where it says, "Ryanair explicitly and

17  unequivocally states that Booking and its subsidiaries have

18  no authorization to access Ryanair's website or its content

19  for any reason"?

20  A.     I do.

21  Q.     "And to the extent Booking or its subsidiaries ever

22  believed it had authorization to access Ryanair's website,

23  Ryanair explicitly revokes such authorization which was

24  never provided in the first place"?

25  A.     I do.

1  Q.    And what do you understand that to mean?

2  A.    We're making absolutely clear to Booking that we have

3  revoked any access to the website.

4  Q.    All right.  I have one more letter for you and then

5  we'll move on.  If you could pull up PTX 2.  Do you know

6  whether Booking Holdings responded to that letter?

7  A.    To this letter or the last letter?

8  Q.    The last letter.

9  A.    Yes, this is the response here.

10 Q.    And if you pull up the first paragraph, do you see

11 that it says, "This responds to your letter dated July 30,

12 2022, to Booking Holdings, Inc."  That's the letter we

13 looked at?

14 A.    Yes.

15 Q.    And it says, "As an initial matter and courtesy we

16 provided a letter to Booking.com B.V., the entity for which

17 we believe you intended this letter"?

18 A.    I do.

19 Q.    And that's the Booking.com that's the defendant in

20 the lawsuit?

21 A.    Yes.

22 Q.    And then if we can scroll.  That's good.  What, if

23 any, changes did you see from Booking.com after this

24 August 20, 2020, response from Booking Holdings?

25 A.    I saw no change.

1    Q.    Meaning Booking.com kept selling Ryanair flights?

2    A.    Correct, yes.

3    Q.    And what did Ryanair do after this letter?

4    A.    We sued Booking.com.

5    Q.    That's the suit we're here for today?

6    A.    Correct, yes.

7    Q.    As chief technology officer, you can take that down,

8    are you involved in determining if the Ryanair computer

9    system is operating correctly?

10   A.    I am.

11   Q.    How are you involved?

12   A.    My team monitors the computer systems 24/7.

13   Q.    What effect, if any, do online travel agents like

14   Booking purchasing Ryanair flights have on operation, well,

15   of the website, excluding the answer that was stricken

16   before?

17   A.    Be careful.  The data that we have in the database is

18   not accurate.  That's probably the biggest issue, the --

19   yeah, the constant --

20         THE COURT:  I'm sorry, could you repeat the

21   beginning of your answer?

22         THE WITNESS:  Sorry.  I'm struggling with the

23   instruction before.

24         THE COURT:  I understand.

25         THE WITNESS:  The data integrity, so the false

1    e-mail addresses and the false credit card details, the data

2    we have in the database is not accurate.  That is the issue

3    we have.

4    BY MR. DONOGHUE:

5    Q.    And are you involved, as the CTO, in restoring

6    Ryanair's data integrity?

7    A.    I am indeed.

8    Q.    What does Ryanair do to restore the data integrity

9    issues you talked about?

10   A.    Yes.  So what we do now is, again as I spoke earlier

11   about the Holland Knight, to catch all the bookings that

12   were done by an OTA, we tag those, and then when a passenger

13   tries to come back to a website to check in, they're told

14   the booking was made by an OTA or words to that effect, and

15   then we ask them to verify it.  If you were to do it

16   recently, you would do it online, but a live passport

17   photograph is verified with the computer to match.  When we

18   first started, you had to go to the airport with your

19   passport to validate you are who you say you are.  Once

20   you're validated, then the passenger has the option to

21   update the password, the password and e-mail address.

22   Q.    So I think you mentioned in-person verification of

23   the contact information.  So let's talk about that.  I'm

24   going to read from Ryanair's interrogatory response on that

25   issue.  "It takes an average of at least ten minutes per OTA

1  passenger for Ryanair's desk agents to verify an OTA

2  customer's identity at the airport.  The average salary for

3  Ryanair's desk agents is 28,500 Euros per year, 16 Euros and

4  13 cents per hour, or two Euros, 68 cents per ten minutes

5  spent verifying an OTA customer.  Between March 1, 2022, and

6  February 28, 2023, 50,799 OTA passengers have verified with

7  Ryanair desk agents at the airport, therefore it's cost

8  Ryanair 136,141 Euros to verify the identities of OTA

9  customers at the airport during that time period."  Did you

10  attest to the truthfulness of that interrogatory response?

11  A.    I did.

12  Q.    And you believe it to be true?

13  A.    I spoke to my chief operations officer on that topic

14  and it was correct.

15          THE COURT:  I think it might be useful, at this

16  point, to raise, in case the jury doesn't know the

17  respective values of the Euro against the dollar, roughly --

18  if he knows roughly what the corresponding values are.

19          THE WITNESS:  It's usually 110 to 1, 107.

20          THE COURT:  So ten Euros would be about $10.70?

21          THE WITNESS:  Yes.

22          THE COURT:  So they're pretty close to equal?

23          THE WITNESS:  Yes.

24          MR. DONOGHUE:  So, Your Honor, our plan was just

25  to treat them as equal for ease.

1          THE COURT:  Sure.  Actually, we have an

2    objection, yes.

3          MR. HEMANN:  Yes.  I have an objection based on

4    hearsay, lack of firsthand knowledge to the question.  The

5    answer -- the question and answer that Mr. Donoghue just

6    elicited.  The question was, "Do you know this to be true?"

7    And I believe the answer was, "Somebody else told me, and on

8    that basis I believe it to be true."

9          THE COURT:  Yeah, what was the answer?  Because

10   unfortunately I was focused on the Euro problem, and I --

11   what was the answer, Ms. Warner?

12          (Whereupon, the record was read.)

13          MR. HEMANN:  So we object based on hearsay and

14   lack of firsthand knowledge.

15          THE COURT:  That does strike me as hearsay.

16          MR. DONOGHUE:  Let me ask Mr. Hurley a couple of

17   more questions and see if he has a basic.

18          THE COURT:  We'll see if he has foundation.

19   Strike it in the meantime.  Strike that question and answer

20   we're going to try to approach the issue in another

21   direction.

22   BY MR. DONOGHUE:

23   Q.    Mr. Hurley, do you have personal knowledge about the

24   cost of in-person verification?

25   A.    Yes.

1   Q.      What is that knowledge?

2   A.      Sorry.  We sat in meetings where we set this project

3   up how we're going to stop it and you had to dedicate people

4   for it.  It was discussed and was agreed the rate we pay our

5   staff is a common number.  It's unfortunately just above

6   minimum wage, not far above it, that's what we pay.  So I'm

7   happy with the salary number.  And the 50,000 on a weekend,

8   that came from my team who ran a report on the back-end

9   database that check for all the tags that we had before that

10  were untagged at the airport.

11                  THE COURT:  I have an objection.

12                  MR. HEMANN:  I object on the basis of hearsay

13  and lack of firsthand knowledge.

14                  THE COURT:  Is it fair to say rather than

15  getting into the specific numbers, which obviously seems to

16  me probably a hearsay problem, that he knows that this is an

17  issue that takes time and, therefore, given that these

18  people make wages that it costs money.

19                  MR. DONOGHUE:  Yes.  But I think the dollars go

20  to loss, Your Honor.  And whether he was handed the report

21  from the database or pulled the report from the database

22  that he has access to, I think it's the same result.  It's

23  Ryanair's database that he interacts with and maintains

24  every day.

25                  THE COURT:  What's troubling is that we have a

1   specific number that was put into the response in the

2   interrogatory and as to that they responded well, that's the

3   number that I was told.  And I'm not sure we departed enough

4   from that to get to things that he just knows by the nature

5   of his work.  So let's make another try at that.  Something

6   that is the product of, just not a specific statement that

7   was made to him by a specific person but something that's

8   more generally part of his experience as chief technology

9   officer.  The objection is sustained.  We're going to go

10  back to square one and try again on this and see if we can

11  get an answer that is not subject to hearsay.

12              MR. DONOGHUE:  Your Honor, is that as to the

13  50,000 OTA passenger number or the 268 per ten minutes?  He

14  said that was general knowledge.

15              THE COURT:  Which was the general knowledge?

16              MR. DONOGHUE:  The desk agent salary and hourly

17  rate.

18              THE COURT:  Now, he says that he knows that by

19  general knowledge.

20              MR. DONOGHUE:  Correct.

21              THE COURT:  And he knows that ten minutes that

22  it takes from general knowledge.

23              MR. DONOGHUE:  By participation in the process

24  of setting up the verification process that he played a

25  central role in.

1          THE COURT:  Mr. Hemann.

2          MR. HEMANN:  I think Mr. Donoghue is testifying

3     now.

4          THE COURT:  This is our discussion not part of

5     the --

6          MR. HEMANN:  I believe this is hearsay and that

7     the witness has not established that he has personal

8     knowledge of the issues that Mr. Donoghue is asking him

9     about and that is our objection.

10          THE COURT:  He certainly has personal knowledge

11     of the general subject matter.  How specific his knowledge

12     is with respect to the numbers that are in the interrogatory

13     response is what's bothering me.  If you can go at it at a

14     greater level of generality I think that is probably the

15     safer course.

16          MR. DONOGHUE:  All right, Your Honor.  Thank

17     you.

18          THE COURT:  Try it.  See if we can.

19     BY MR. DONOGHUE:

20     Q.    Mr. Hurley, putting aside what somebody may have

21     given you in a spreadsheet or a document, in terms of your

22     own personal knowledge, do you know how many online travel

23     agent passengers have verified in person for Ryanair over

24     that period March 1 to February?

25     A.    I do.  It's 50,000.  Slightly over 50,000.

1    Q.    How do you know that?

2    A.    Because my team ran the report for me, they asked me

3    to come in and I approved it.  I didn't run the query but my

4    team gives reports to me all the time.

5              MR. HEMANN:  Objection, Your Honor.

6              THE COURT:  We're running up against the same

7    problem.  I'm going to sustain the objection.

8    BY MR. DONOGHUE:

9    Q.    You also mentioned online verification.  What is

10   that?

11   A.    That was an upgrade where you give passengers the

12   option to do it themselves at the mobile phone or on a

13   desktop.  You would use the mobile phone camera to look at

14   the passport and look if they match.  If they match you can

15   verify yourself.

16   Q.    How were you involved in setting up or maintaining

17   the online verification program?

18   A.    Built it and designed it.

19   Q.    I want to read to you an interrogatory response from

20   Ryanair's interrogatory, a Ryanair interrogatory response.

21   "Ryanair has implemented a customer verification process

22   with the objective of collecting and confirming customer

23   data that is not provided by OTAs.  Ryanair customers can

24   complete this customer verification process either online

25   using GetID or with a desk agent at the airport.  OTA

1   bookings often use false customer data such as false payment

2   or contact information.  Ryanair's customer verification

3   process allows Ryanair to correct this false customer data.

4   GetID charges Ryanair between $0.25 and $0.30 per customer

5   verification attempt.  Many customers taking multiple

6   attempts to complete the verification process.  Ryanair

7   estimates it costs slightly more than $0.59 per customer to

8   complete verification on the GetID."

9           Do you recognize that interrogatory response?

10  A.    I do.

11  Q.    And you verified it?

12  A.    Yes.

13  Q.    What is GetID?

14  A.    GetID is a third party we contracted to provide

15  software to match your face with your passport image.

16  Q.    Did you work with GetID?

17  A.    I did indeed.

18  Q.    And are you aware of the $0.59 per customer average

19  charge?

20  A.    I was involved in the calculations, yes.

21  Q.    How were you involved?

22  A.    We had a problem because we initially assumed it

23  would start at $0.30 and we got a volume discount to $0.25.

24  And assumed one booking per passenger and one attempt per

25  passenger and we discovered they were taking multiple

1  attempts.  It was to do with the light was wrong in the room

2  or shining on the passport.  Multiple tries, we pay per try

3  so we calculate that, and we actually since then improved

4  the communications and we have a better clear message to the

5  passengers, like don't do it under a lamp if you don't want

6  to declare the passport.  It's now a challenge and we're

7  trying to do it.

8  Q.     Do you know how many online verification passengers

9  Ryanair had between our March 2022 and February 2023 period?

10 A.     Off the top of my head I'd have to -- I'd be

11 guessing.  If I could see the interrogatory I would know.

12 It's roughly going to say 600,000.

13 Q.     How do you know that?

14 A.     It's from memory.  So in sync with the number of

15 bookings we have in the year, 20 percent of that I was

16 trying to do calculations and talking.

17 Q.     And how would you determine the cost of 600,000

18 online verifications?

19 A.     Sorry.  I actually have to sign off the bill every

20 single month we get from GetID.  I sign off and I receive

21 the confirmation slip.  I'm very much aware of the costs.

22 Q.     How would you determine the cost of 600,000

23 verifications?

24 A.     You will to say this number by 25, it's actually more

25 because multiple retries, and working off it and the average

1   is what we spent per year divided.

2   Q.    So that would be the $0.59?

3   A.    Yes.

4   Q.    So would it be 600,000 times $0.59?

5   A.    Yes.

6   Q.    At the risk of asking you to use the calculator

7   again, could you try that?

8   A.    It should not be that hard.  59 and 600 what.

9   Q.    600,000?

10  A.    I checked twice this time.  354,000.

11  Q.    Okay.  And what would Booking.com's share of that

12  354,000 be?

13  A.    I believe it would be 2.8 percent.

14  Q.    With apologies, could you try multiplying the

15  2.8 percent.

16  A.    One more time we have 300 what, sorry, 600,000.

17  99,120.

18  Q.    9,000?

19  A.    99,000.

20  Q.    99 is it 9900 maybe?

21  A.    It is, sorry, yes.  One percent in my head of 340,000

22  is 3,400.  So 2 times that is 6.  2.8 times that is 9,000.

23          MR. HEMANN:  Your Honor, we'll stipulate it's

24  9,912.

25          THE COURT:  Thank you.

 1            THE WITNESS:  Thank you.

 2            THE COURT:  I think this is probably a good area

 3    in which stipulations would be welcome.  The arithmetic

 4    isn't something we should be spending a lot of time on.

 5            MR. DONOGHUE:  Thank you, Your Honor.

 6    BY MR. DONOGHUE:

 7    Q.    I think you also talked about customer service

 8    agents; is that right?

 9    A.    Yes.

10    Q.    How are customer service agents a cost for Ryanair

11    with respect to OTA bookings?

12    A.    When a regular customer rings into Ryanair or logs

13    into Ryanair, we know who they are because the e-mail

14    address matches.  When information comes in that's not

15    accurate or not correct, we have a problem and the first

16    thing customer service agents have to do is evaluate you are

17    who you say you are.  If we have the credit card details we

18    can check those, we can't with OTAs, they are rarely

19    accurate.  So you go to other questions like your

20    destination, origin, number of passengers flying, the

21    questions only the person booking would know, then we

22    determine and then we go ahead and help.  We've had several

23    times in the past issues where I was doing some purposely

24    poorly written scripts by the OTAs.  The bag may have been

25    purchased but not actually sent to us so the customer is

Hurley - Direct

1   paying for a bag but we don't see the bag at the booking.

2   It's those kind of issues that we have and we over index and

3   we have a lot more complaints from OTA customers than we do

4   with other customers.

5   Q.    What's your involvement with customer service

6   response to OTA questions?

7   A.    We field a customer service department.  I'm in those

8   meetings.  And they will see it as a list of complaints.  If

9   you could fix your website they would stop ringing me, so

10  we're always in the battle for content trying to improve the

11  website and help with warnings.  But it keeps coming back to

12  the passenger is not told the right information, or worse

13  they were not told about the flight change, modifications or

14  something, and they're frustrated and angry.  There's no way

15  around that.

16  Q.    I'm going to read you from another Ryanair

17  interrogatory response.  "Customer service groups within

18  Ryanair need additional staff to provide service to

19  customers who book through OTAs like Booking.com.  In total

20  the cost for customer service staff who have provided much

21  needed service to OTA bookings from August '22 to July 2023

22  is approximately 384,000 Euros per month or 4.6 million

23  Euros per year.  The graph below shows the volume of Ryanair

24  customer service inquiries by month via call, chat, e-mail

25  and forum related to OTAs as a percentage of total customer

1   service inquiries via call, chat, e-mail and phone."

2            Do you recognize this graph?

3   A.    I do.

4   Q.    What is it?

5   A.    It's a screenshot of a dashboard that we have that

6   counts these numbers on a daily basis.  That's a summary of

7   the numbers on a daily basis.

8   Q.    How do you know that?

9   A.    We review it.

10  Q.    And is this something you review on a daily or weekly

11  basis?

12  A.    It's reviewed monthly, at the monthly meeting.

13  Q.    So you're aware of the OTA booking percentage

14  personally?

15  A.    Yes.

16  Q.    I'm going to continue reading from the interrogatory

17  response.  "Ryanair also received a volume of tickets for

18  refunds, claims, and general support from OTA customers.

19  The graph below shows the numbers of such tickets from

20  August 2022 to July 2023."  Do you see that?

21  A.    I do.

22  Q.    And have you seen this graph before?

23  A.    Yes.

24  Q.    Where?

25  A.    I saw it in interrogatories.  We don't look at it

1    this way.  We look at an Excel spreadsheet format.  It's

2    more of the raw data and I know it very well, and it's being

3    presented to make it easier.

4    Q.    How do you use the raw data in your job as a chief

5    technology officer?

6    A.    We count the numbers.  These are -- sorry.  Going too

7    fast here.  We present those tickets, that's how we count it

8    behind the scene.  It gets counted up.  If it's got an OTA

9    tag in it, we look at it very, very carefully, and these are

10   things my colleagues can use to prove that we need to fix

11   the website and fix this problem.  So we don't consider it's

12   a rub, but there's a debate.

13   Q.    And this is data that you review personally?

14   A.    Yes.

15   Q.    What is Zen Desk?

16   A.    I'm sorry, Zen Desk is a ticket management system.

17             THE COURT:  Could you spell that?

18             THE WITNESS:  Z-E-N.

19             THE COURT:  Z-E-N?

20             THE WITNESS:  D-E-S-K.

21             THE COURT:  D-E-S-K.  Zen Desk.

22             THE WITNESS:  It's a ticket management system.

23   Customer rings in, customer needs it pulled up on the

24   screen.  We start typing in that John Hurley rang in, this

25   is his flight and this is his problem.  And we moderately

1    track those and then issue's resolved, we close it.

2    BY MR. DONOGHUE:

3    Q.    Did you attest to the truthfulness of this

4    interrogatory response?

5    A.    I did.

6    Q.    And this provides a date that the 4.6 million, we'll

7    just call it dollars because we're going to treat Euros and

8    dollars as the same, even though dollars would be a little

9    bit more.  The $4.6 million between August 2022 and

10   July 2023, that's different than our favorite period in our

11   conversation this afternoon of March 1, 2022, through

12   February, the end of February 2023.  How would the cost of

13   that period be different from this, if at all?

14   A.    Sorry, I was distracted.  So -- sorry.  Go again.

15   Apologies.

16   Q.    No problem.  So I read to you the $4.6 million Euros

17   per year.  We'll call it dollars --

18   A.    Sorry.

19   Q.    So I read to you the $4.6 million, we'll call it

20   dollars, for the period of August 2022 through July 2023.

21   That's not quite the same as the March 2022 through

22   February 2023 period.  How would that 4.6 million Euros be

23   different for the period of March 2022 through

24   February 2023?

25   A.    It would be slightly lower.

Hurley - Direct

1   Q.    Well, how much lower?

2   A.    I would be guessing.  I would say for three months we

3   grow our passenger numbers roughly, usually percentage of

4   the flights and our numbers were growing in that year.  It's

5   10, 12 percent.

6   Q.    So should that number be more like 4 million?

7   A.    I'm afraid.  That feels right, yes.

8   Q.    Ten percent would be 4.6, so I went a little more

9   than that to get to -- or 460,000 so I went a little more to

10  get to an even 4 million.  Would that be reasonable?

11  A.    That's fair, yes.

12  Q.    And what percentage of that 4 million is attributable

13  to online travel agents?

14  A.    All of them.  This is a ring fence team that was

15  dedicated to these issues.

16  Q.    And what percentage of the 4 million could be

17  attributable to Booking.com?

18  A.    I want to say 2.8 percent, and then I'm going to

19  panic.

20  Q.    Let me see if I can do the math for you.

21        THE COURT:  It's a little under 120,000.

22  Q.    Would you agree that it's about 120,000?

23  A.    Yes.

24        MR. DONOGHUE:  Thank you, Your Honor.

25        THE COURT:  I'm trying to get the stipulation.

1          MR. HEMANN:  We will stipulate to 112,000, Your

2    Honor.

3          THE COURT:  Thank you.

4    BY MR. DONOGHUE:

5    Q.    How about 112,000?

6    A.    I got that number too, actually.

7          MR. DONOGHUE:  All right.  Your Honor, would it

8    be possible to take a short break?

9          THE COURT:  Sure.

10         MR. DONOGHUE:  Thank you.

11         THE COURT:  How much time do you need?

12         MR. DONOGHUE:  Whatever.  I just felt like the

13   court reporter's fingers were smoking.

14         THE COURT:  I think that's probably right.  So

15   let's take ten minutes.

16         Ladies and gentlemen of the jury, we're going to

17   take a ten-minute break.

18              (The jury exited the courtroom.)

19              (A recess was taken, after which the following

20   proceedings were had:)

21         THE COURT:  You may proceed, Mr. Donoghue.

22         MR. DONOGHUE:  Thank you, Your Honor.

23   BY MR. DONOGHUE:

24   Q.    All right.  Mr. Hurley, we're only going to do one

25   more of these sets of costs.  Those are famous last words.

1    Don't trust a lawyer who says one more, right, but I'm going

2    to do my best.

3              So, what, if any, increased website cost does

4    Ryanair have from online travel agent flight sales?

5    A.     We have to pay our -- we have to pay our PSS partner,

6    Navitaire, for every single booking that we make.

7    Q.     And what is PSS?

8    A.     Passenger service system.  Essentially it's a backing

9    database that stores all of your flight bookings.  So when

10   you go to the airport and you have your QR code, that's the

11   piece that we match to confirm, in this case you're John

12   Hurley, and every airline has them.

13   Q.     And what is your involvement with Navitaire?

14   A.     I negotiate with them and have the contract and

15   co-manage.

16   Q.     All right.  I'm going to pull up DTX 202.  The title

17   is Navitaire Hosted Services Agreement.  Do you see that?

18   A.     I do.

19   Q.     Do you recognize this document?

20   A.     I certainly do.

21   Q.     What is it?

22   A.     It's a contract we have with Navitaire.  It exposes

23   our costs and fees, our service starter agreements, monthly

24   minimums, all the things we expect them to provide to us to

25   successfully run our business.

1    Q.    Let's move to page 239.  Could we blow that up a

2    little bit.  Do you recognize this table?

3    A.    I do.

4    Q.    What is it?

5    A.    It's a table of fees based on sector flow.  Sector

6    flow is when a person takes a flight from Boston to New

7    York.  That's one segment.  If there's a flight back, that's

8    two segments.

9    Q.    And this is a price per segment that Ryanair pays for

10   flights flown?

11   A.    Correct.

12   Q.    And if we're -- if we want to look at that March 1,

13   2022, to February 28, 2023, year, would we be looking at

14   years 11 and 12?

15   A.    Yes.

16   Q.    And what are the costs for those years?

17   A.    So to meet our minimums, it's 11 1/2 percent per

18   segment.  If we fly more than that, it reduces to

19   9.5 percent.  Time fee is all in dollars.

20   Q.    So how much do OTA flight purchases increase

21   Ryanair's Navitaire cost?

22   A.    It's extremely, so every segment, we pay.

23   Q.    So what would Booking.com's share of those Navitaire

24   costs be for -- or how would you calculate Booking.com's

25   share of Navitaire costs for the period March 1, 2022,

1   through February 28, 2023?

2   A.      I would use a number you showed me before, the

3   500,000 number, slightly bigger than that, and multiply that

4   by segment flown costs.

5   Q.      So if we multiplied the 518,249 flights by nine and a

6   half cents, would that be fair?

7   A.      It would be almost too fair.

8   Q.      Be a little bit low?

9   A.      It would be well low, because this is a segment.  A

10  flight is usually two legs.  But to be -- let's assume it's

11  just every flight is one leg only.

12  Q.      Why would you say a flight is -- a segment is two

13  legs?

14  A.      I'm sorry.  A segment is one leg.  A flight normally

15  is two legs.  And you fly from New York to Boston and you

16  fly from Boston to New York back, that would be two

17  segments.  We would pay, in this case, nine and a half cents

18  per leg flown.  The booking people usually book your legs.

19  If you do the booking for yourself and family on the four

20  points, that would be six of us, that would be 12 segments

21  in one booking, and we'd pay Navitaire a dollar for that.

22  Q.      So you're saying a booking would be -- if it's a

23  round trip, it would be two flights, one-way each?

24  A.      It would be two segments.  Yeah, sorry, for the

25  contract a segment is one leg.

1   Q.    A segment is a leg?

2   A.    One leg, yes.

3   Q.    And if I booked a trip for my family, roundtrip for

4   my family, I have a wife and three children, that would be

5   ten flights or ten segments?

6   A.    Ten segments, ten flights per booking.

7   Q.    Understood.  But if we just assume one flight per

8   booking here, with the 518,249 number, you would just

9   multiply that by the nine and a half cents, to be

10  conservative?

11  A.    Yes.

12  Q.    If I told you that that math -- we're going to stop

13  with the calculator -- was $49,234, would that sound right

14  to you?

15  A.    It would.

16  Q.    All right.  We talked a little bit at the beginning

17  of your testimony about Monex.

18  A.    Yes.

19  Q.    Can you tell me what the Monex -- what the Monex

20  incident was?

21  A.    Maybe we should explain Monex first?

22  Q.    Sure.

23  A.    So in our earlier website, we built the website and

24  we used third parties to help us provide services.  For

25  example, we will use a middle man for -- we'll use banks to

1   validate credit cards.  We use a company called Monex, and

2   they provide currency conversion for us.  So what would

3   happen is if you're an American flying to Europe and your

4   credit card is in dollars, we give you the option on the

5   website, do you want to pay in Euros or do you want to pay

6   in dollars.  And we will do the currency conversion for you.

7   That's what the Monex service is for us.

8           So during the attack -- so to explain, every

9   single time a person goes through the payment page, we go

10  through Monex services and we see the credit card, and

11  divide the cost, match the currency of the flight.  So if

12  you are a U.S. citizen with a dollar credit card flying from

13  Dublin to Barcelona, that would be a European flight in

14  Euros, we could offer you that fare in dollars instead.

15  That's the service that Monex provides to us.  Every single

16  booking goes through that page, so we can check the credit

17  card for use for every single flight.

18          THE COURT:  Let me ask a question.  You say

19  every single flight goes through that page, but how about

20  flights that are paid for in Euros, where you don't have a

21  currency conversion?

22          THE WITNESS:  Right.  We don't know until you

23  see the credit card details if that credit card is a

24  European credit card, it could be in Sterlings, it could be

25  in dollars, it could be in Euros.  We do not know.  All we

1    have is the digits on the credit card.

2              THE COURT:  So you send it to Monex and Monex

3    looks at it and says, "No conversion necessary or conversion

4    necessary, and here's the conversion rate," and gives it

5    back to you?

6              THE WITNESS:  Correct.

7              THE COURT:  Okay.

8              THE WITNESS:  So that is a service.

9    BY MR. DONOGHUE:

10   Q.    And what, if anything, happened to the Ryanair

11   website in early October of 2023?

12   A.    The Monex end point came under attack from robots.

13   Q.    What's an end point?

14   A.    Sorry, an end point, apologies, an IT term.  The

15   service Monex provides us a server, I would call that an end

16   point or API, so different names for a computer.  So the

17   computer Monex gave us to check all the credit card details

18   suddenly was overwhelmed with all the volumes of requests

19   coming in.  Obviously, we needed this time, was normally to

20   get in our credit card numbers, and it checks his time, what

21   we got was a null and void, so it was blank credit card

22   details, which in hindsight we could have fixed if we had

23   known this was an attack.  We have since fixed it.  At the

24   time, the computer did not know what to do.  We just got

25   flooded with all these null requests and the system stopped

1   working.

2   Q.      How were you involved personally in observing and

3   addressing the Monex incident?

4   A.      So with all incidences in Ryanair, we have a team

5   that's 24/7 monitoring every single happening in the

6   website.  If an issue happens, like bookings drop, or in

7   this case Monex issue was raised and a text message goes out

8   and we enter what we call a virtual warning, and we sit

9   there watch and monitor and call.  Sometimes when we have

10  some confusion better leaving the team investigate and

11  report back.  So I was in the first warning, observing

12  what's happening.

13  Q.      So you were involved throughout the Monex attack?

14  A.      Yes.

15  Q.      And what was your role?

16  A.      In this was trying to keep calm as this was

17  happening, and report to the CEO.  Generally if the website

18  goes down you immediately report.  That's the worst that can

19  happen, website goes down.  You can't book or check in.  The

20  website was locked down at this stage and was under pressure

21  so it was a verbal update for CEO, this is what's happening,

22  and I'll update you as it changes.  So I report that

23  direction and then try to give direction to the guys trying

24  to fix it and at the same time not distract them, which

25  you've seen my skill with a calculator, sometimes I'm better

1    off.

2    Q.    Make sure to speak slowly and loudly.  So the Ryanair

3    website didn't go down in the Monex attack?

4    A.    Correct.

5    Q.    What did happen?

6    A.    Well, the sorry -- first of all, the reason it did

7    not go down is we have a circuit breaker or trip switch so

8    when Monex got the pressure we disabled that service to

9    protect the website.  What that meant was that customers

10   were not getting the right currency for their credit cards,

11   they were getting Euro currency.  So if you were an American

12   with U.S. dollars you saw the Euro price and paid in Euros

13   and your local bank charged you.  That was the only option

14   we had.

15   Q.    What's the circuit breaker?

16   A.    I call it a trip switch.  So we have a key system, if

17   it's under pressure it's like a fuse on the plug, if the

18   pressure gets too high it turns itself off and removes Monex

19   from the flow.

20   Q.    It's a safety mechanism?

21   A.    Yeah.

22   Q.    Did Ryanair have to shut down any other computer

23   systems around the website to protect it?

24   A.    So in this actual instance, the website was under

25   pressure, we observed the pressure, we were starting to

1  worry about it, the safety valve kicked in and disabled it.

2  We observed what was happening was Shield was trying to

3  protect this attack and the more Shield sent in, the more

4  the attackers increased their calls.  We were we're hitting,

5  60,000 calls an hour at one stage.  It was a huge amount of

6  traffic.  We were expecting a lot less than that coming

7  through.  We actually ended up turning Shield off as well,

8  hoping if we turned the Shield off, the attackers would stop

9  trying to attack Shield in the cat and mouse and go away.

10  Q.    Why was Shield increasing its activity?

11  A.    The Shield was recognizing bot traffic and it was

12  coming so heavy and so fast, it was quite clear and obvious.

13  So Shield was stopping it and the more it stopped, the more

14  traffic that came in.  It was an arm's race for want of a

15  better description.

16  Q.    How, if at all, was Ryanair harmed by the Monex

17  attack?

18  A.    Well, we lost currency conversion for that time

19  period.

20  Q.    How long?

21  A.    It was a two-hour period where we had Monex turned

22  off.

23            THE COURT:  How long did you say?

24            THE WITNESS:  Two hours.  Reputational damage.

25  If you've ever been to a website and try to make a payment

1    and things start acting funny your first reaction is going

2    to be there is something wrong here.  At the height of the

3    attack there was so much traffic coming through that real

4    customers were caught in a slow response.  I'm not going to

5    say, but it was a really horrible experience.

6    BY MR. DONOGHUE:

7    Q.    Were there any other harms to Ryanair from the Monex

8    attack?

9    A.    Oh, yes.  The credit card company, which was very,

10   very good, they charged for credit card regardless if the

11   credit card is accurate or a null character, we got charged

12   regardless.  So it was a cost as well.

13   Q.    Do you know how much that was?

14   A.    $0.55 per check and we paid for every check, every

15   validation.

16   Q.    Do you know how many validations?

17   A.    35,000 in my head the number.

18   Q.    And it was $0.55?

19   A.    Yes.

20   Q.    So if I told you that was about $19,250, would that

21   be right?

22   A.    Sorry, I wasn't clear.  The bill we got from them was

23   35,000.

24   Q.    The bill you got from Monex was 35,000?

25   A.    No.  The bill we got from the credit card company was

1    35,000 in overages.  I know that because the CFO came down

2    and went off the handle.

3    Q.    And Booking.com's portion of that from Ryanair's

4    perspective would be 2.8 percent?

5    A.    Not in this case.

6    Q.    Why is that?

7    A.    Because we have evidence that Booking.com were

8    actually involved in this and of the 60,000 we had in the

9    time period, Booking.com was responsible for at least 5,000

10   of those attacks.

11   Q.    So you would say that Booking.com was responsible for

12   five-sixty thousandths or about 8 percent?

13   A.    Yeah, 8 to 12, yeah.

14   Q.    That would be about $2,800?

15   A.    Correct.

16   Q.    Why do you say that Booking.com was responsible for

17   5,000 of the 60,000 attempts?

18   A.    We have the PNR from Booking.com that we put through

19   our logs, and we saw in the logs it was linked to a

20   myRyanair account that created 5,000 of these requests.

21   Q.    And how do you know the PNR code was linked to

22   Booking.com?

23   A.    Because I saw a redacted, heavily redacted version of

24   the list of PNRs that Booking shared in this court case and

25   I asked for one PNR and that's the PNR I checked this

1    morning in the logs.

2    Q.    What did you find?

3    A.    I found the PNR inside the logs and found the traffic

4    associated with it and found that.

5    Q.    How do you know that that was from Booking.com?

6    A.    The PNR I was given was from Booking.com.  It was

7    from Booking.com.  That booking was a real booking from

8    Booking.com that was used and the booking was made in the

9    middle of the attack.

10              THE COURT:  The booking was made from?

11              THE WITNESS:  The booking was made in the middle

12   of the attack that we had.  When we were attacked the

13   booking was made in the process, the PNR in the process and

14   the account that made that booking is 5,000 null requests

15   through that time period.

16   BY MR. DONOGHUE:

17   Q.    By account, do you mean the myRyanair account?

18   A.    It's an e-mail address from a myRyanair account that

19   was showing in the e-mail address.

20              MR. HEMANN:  I object to this line of

21   questioning based on lack of firsthand knowledge, Your

22   Honor.  I don't believe that --

23              THE COURT:  He's talking about something that he

24   observed this morning.

25              MR. HEMANN:  We're moving to the 5,000 and the

1   e-mail address and the linkage.  I don't believe he has

2   personal knowledge of that.

3           MR. DONOGHUE:  I believe that he does, Your

4   Honor.  I'm happy to ask him.

5           THE COURT:  Let's develop how he, if at all, he

6   has personal knowledge.  That's a good question along that

7   line.  So I'll hold the objection in abeyance until we get

8   this resolved.

9           MR. HEMANN:  Thank, Your Honor.

10          MR. DONOGHUE:  Thank you, Your Honor.

11  BY MR. DONOGHUE:

12  Q.    So Mr. Hurley, how do you know that the e-mail

13  address is associated with the Booking.com PNR?

14  A.    How do I know?  When I looked at the files this

15  morning, I looked up the PNR.  The PNR was linked to a

16  myRyanair account that made it, so as you saw before when

17  you do the booking, you do it with myRyanair turned on and

18  get a booking reference number, I can link those two.  With

19  that I had the IP address, that we saw that in our Shield

20  logs and from there I could find the source.  It was -- if

21  memory serves correctly the e-mail address used was

22  foleymasey1227@gmail.com.

23  Q.    F-O-L-E-Y M-A-S-E-Y?  Is that correct, the e-mail

24  address?

25  A.    M-E-S-S or M-A-S-S?

1   Q.      I don't know.  I'm asking you.

2   A.      Sorry.  F-O-L-E-Y M-E-S-S-Y 1227 at gmail.com.

3   Q.      How do you personally know that the PNR is associated

4   with that e-mail?

5   A.      Because I was shown a redacted file this morning.

6   Q.      That had the PNR?

7   A.      Had one PNR on it and that one PNR is a PNR I

8   literally cut and paste, I put into our log files and I

9   searched for that PNR.  When I found that PNR, I found a

10  myRyanair account that was linked to the PNR.  When I had

11  the myRyanair account, I was able to look at the IP address

12  that that used.  Once I had the IP address, I could then

13  determine what the IP address was doing at that time.  I

14  also had a session token, but I'm probably confusing

15  conversation.  There are two points of reference, both point

16  to the same place.  Once I had that, I could go in and

17  there's a log file of the errors we received and this e-mail

18  address, maseyfoley, was doing 200 requests.

19              THE COURT:  I'm -- I don't know whether the jury

20  is -- I've lost the train here.  Could you take this step by

21  step rather than -- you're highly skilled in this area, I'm

22  not.  And at least some of the jury may not be, so we need

23  to be taken step by step through the process that you used.

24  BY MR. DONOGHUE:

25  Q.      I'll take it in more bite-sized chunks.  So first of

1  all, the PNR, that's a six number or letter code; is that

2  right?

3  A.    That is correct.  And that is unique to every single

4  booking.

5  Q.    It's unique to every single booking and you get it on

6  any airline; is that true?

7  A.    All airlines will use a similar code.

8  Q.    So anybody who buys a flight will see a six-digit

9  code on their ticket or on their purchase someplace?

10  A.    Correct.  You would see it in your boarding pass, if

11  you look for it, it would be there.  If you have to go to

12  check in and talk to the agent, the first thing they will do

13  is they'll need that number to put in their computer and

14  they'll then determine if it is legitimate or what the

15  problem is.

16  Q.    Today you saw one of the PNRs that Booking.com

17  provided as having purchased a flight from Booking.com -- a

18  Ryanair flight from Booking.com; is that correct?

19  A.    That is correct.

20  Q.    And then what did you do with that PNR to see if it

21  was in your records?

22  A.    Okay.  So I had a copy of the log files from Shield.

23  What a log file is, is every single thing that happens we

24  gather data and write it into a very large text files with

25  commas between every data point.  I then opened it in Excel,

1   Microsoft Excel, and it puts everything into columns for

2   you.  I did a very simple search.  I searched for that PNR

3   and I found the PNR in the Excel spreadsheet which was taken

4   from the time of attack.  I could easily see the e-mail

5   address linked to the PNR.

6   Q.     So the log file shows the PNR and the associated

7   myRyanair e-mail address?

8   A.     Yes.

9   Q.     What other information does the log file have?

10  A.     The log file actually, in this case, was reading it

11  had your IP address, your token session, that's the unique

12  cookie that authenticates when computers talk to each other.

13  Q.     Can we pause?  And what's a cookie?  I like cookies,

14  but I think we're talking about something else.

15  A.     Sorry.  A cookie is a file that we will drop in your

16  computer, so it's a file and it just saves things.  For

17  example, if you're using Netflix on a browser, Netflix will

18  put a cookie in your machine and will say, "This guy is

19  legitimate.  We've authenticated him.  He's allowed to use

20  Netflix."  So it doesn't ask you every single time you

21  change pages, are you still legitimate.  You log in once,

22  that's it.  The session's over, the cookie, from there the

23  computer is talking to computers.  This is a thing called a

24  token.  We talk to a PC with a cookie.  Why it's called a

25  cookie, I have no idea.  Lots of IT terms are silly.

1   Q.      Okay.  So you compared the PNRs and found the same

2   PNR in the logs.  And this was the log related to the Monex

3   attack?

4   A.      Correct.

5   Q.      It was during this period when Monex shut down?

6   A.      Yes.

7   Q.      And that PNR had a myRyanair account associated with

8   it?

9   A.      Correct.

10  Q.      And that's what you would normally see in your error

11  logs?

12  A.      Yes.  Sorry.  This gets very confusing.  You only

13  have the PNR if the PNR was successfully made.

14          THE COURT:  If the PNR was what?

15          THE WITNESS:  If it was successfully made.

16          THE COURT:  If it was successfully made.

17          THE WITNESS:  If it was blocked, like a

18  situation where we had null errors coming through, there was

19  no PNR associated with all the attacks.  It was only a PNR

20  if we only had an e-mail address for the one that was

21  successful.  So the attack looked like this.  You would come

22  in, you would do multiple, multiple, multiple attacks,

23  overwhelm the computer, and the second it was overwhelmed,

24  you would change the date and put the real booking details

25  in.  We were so overwhelmed, we couldn't tell the difference

1    and the booking got through.  So what you have these was --

2    that was how the attack worked.  So the e-mail address

3    that's associated with the PNR is actually not -- may not

4    theoretically by the one that caused the attack.  However,

5    you have the session booking and you have the IP address,

6    and they are linked to the attack.

7    BY MR. DONOGHUE:

8    Q.    So the IP address is linked to the attack?

9    A.    And the session token.

10   Q.    How do you know that?

11   A.    How do I know it?  I read it in the log files.

12   Q.    What did you read from the log files that told you

13   that the IP address was connected to the attack?

14   A.    How it works is every line of data in the Excel

15   spreadsheet, rows and columns, there's a row with the PNR,

16   and every piece of data on that row was linked to the PNR.

17   Q.    And so there was -- well, what is an IP address?

18   A.    You're in quiz mode.  An IP address, think of it as

19   an address of someone's house.  It's a specific location.

20   It comes in digital format.  It's 16 digits, I think, versus

21   12.  Four, four, four and four.  And it's unique to you.  It

22   will be your IP address or your computer's IP address.

23   Q.    So you said it's like a street address?

24        THE COURT:  It identifies, I take it, a

25   particular computer?

1          THE WITNESS:  Yes.

2          THE COURT:  A signal, it's as if this computer

3    right here had a number or name is what we're talking about.

4    It has a number and it's unique to this computer?

5          THE WITNESS:  I agree.

6    BY MR. DONOGHUE:

7    Q.    So just to make sure we're clear, I just want to make

8    sure I understand, and also, I apologize if I'm re-asking

9    your question, Judge, but can more than one computer be at

10   an IP address, a single IP address?

11   A.    No.

12   Q.    One computer per IP address?

13   A.    In the world of theory again, you could have multiple

14   computers sharing one end point.  I'm sorry, the computers

15   in here would have an IP address, and when it leaves the

16   building it might be one IP address.

17   Q.    So it's more like a house number or street -- or

18   house address, where it's possible there are multiple

19   computers with one IP address?

20   A.    Yes.  Think of rooms in the house as opposed to the

21   house.  Yes.

22   Q.    And then how did you connect the IP address

23   associated with the myRyanair account e-mail in the log

24   files with more attempts as part of the Monex attack?

25   A.    So the log file will record all the bookings that

1   worked, which is where the PNR is found.  The second log

2   file logged the errors that we received.  These errors have

3   no PNR in them, so you have to match.  So I looked up the IP

4   address and the session token ID that was used to see where

5   else that was getting used when I came across.  So the

6   actual Ryanair account that made the booking was not foley

7   masey.  It was a different name.  It was Quinn something.

8   It was different, but the masey foley has the exact same IP

9   address, the exact same session token, so it was the same

10  address.  What they were doing was from there, I had the

11  masey account, I could count up all the errors.  And the

12  whole count for the computer bot for masey was 200 attempts.

13  It would stop and wait a minute, and 200 attempts and stop,

14  200 attempts and whatever, and as you go longer this way, as

15  you ran down through the file, if you add all the numbers

16  up, it dropped to 150, and dropped down to 131 and

17  dropped down to 150.  I don't know why it did it that way,

18  but they must have worked out in their heads there was some

19  sort of algorithm that would fool the computer.  That's what

20  they were doing.

21  Q.    And the log files that you looked at, is that where

22  you would typically look to understand a problem with the

23  website?

24  A.    It's one of the key places, just two sources.  We

25  would have the New Relic, which is a third-party monitoring

1    software which tracks all the transactions.  Because we have

2    OTAs we use Shield as well.  So we have two sources, the

3    Shield data, a lot more risk and a lot more data was used.

4    In this situation, sorry, I'm overexplaining, New Relic told

5    us that Monex was under pressure, but didn't tell us much

6    more than that, whereas Shield had all the log files for

7    every single transaction.

8    Q.    So the log files we're talking about come from the

9    Shield software?

10   A.    Yes.

11   Q.    And after the Monex attack, you were able to get

12   Shield back up and working again?

13   A.    We turned it off, because we were afraid that if the

14   two had a roam again, we'd be back to the exact same and

15   we'd be gone for two days.

16   Q.    How did you fix the Monex attack ultimately?

17        THE COURT:  I think I need to address the

18   objection.  Everything I've heard since the objection, it

19   seems to me, he has personal knowledge of.  So I don't know

20   if you want to go further along this line of where he went

21   after getting the IP address and so forth.

22        MR. DONOGHUE:  I think that covers it.  I think

23   that explains what he did.

24        THE COURT:  All right.

25        MR. DONOGHUE:  I can check to see if there's

1    more, but I thought that was it.

2            THE COURT:  Okay.  Then in that case, the

3    objection is overruled.

4            MR. DONOGHUE:  Thank you, Your Honor.

5            I'm sorry, could you read back my question.

6            (Record read.)

7            THE WITNESS:  When we went to the log files, we

8    discovered the nature of the attack was the null characters

9    coming through and we upgraded Shield, so the next time this

10   happened, to be more pressed with the process just to kill

11   the source.  So the next time was an arms race to go to the

12   other side, we just got kills every single time.  So that's

13   how we did it.  We turned it back on again and we've had no

14   attacks from Monex ever since.

15           MR. DONOGHUE:  Thank you, Mr. Hurley.

16           Your Honor, subject to Redirect, I don't have

17   any more questions at this time.  I would like to ask for

18   entry of a couple of exhibits.

19           THE COURT:  Yes.

20           MR. DONOGHUE:  PTX 1, PTX 2, PTX 90, and DTX

21   202.

22           THE COURT:  Okay.  Any objection?

23           MR. HEMANN:  Beyond that earlier objection the

24   Court's ruled on, no.

25           THE COURT:  Fine.  They will be admitted.

1          (Thereupon, Plaintiff's Exhibits PTX 1, PTX 2,

2     PTX 90, and DTX 202 were admitted.)

3          MR. DONOGHUE:  Thank you, Your Honor, and we'll

4     get corrected ones for your binder.

5          THE COURT:  And then those corrections can be

6     made in the actual --

7          MR. DONOGHUE:  They're made in the actual

8     documents and they're made in what we used, but also if you

9     want them in the binder, they will be.

10          THE COURT:  Probably not.

11          MR. DONOGHUE:  All right.  Thank you.

12          MR. HEMANN:  Do you want to proceed now, Your

13     Honor, or take a break?  What's the Court's pleasure?

14          THE COURT:  Let's proceed.  We have like a half

15     hour, so let's go ahead and proceed, and when you get to a

16     point at which it's necessary to break, we'll probably go

17     early for the afternoon.  Probably we'll break a little

18     early today.  It's been a long day.  You had to sit outside

19     waiting to be admitted, so I don't want you sitting any more

20     than you have.  We'll go through some of the Cross

21     Examination foundation.  So go ahead, Mr. Hemann.

22          MR. HEMANN:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24     BY MR. HEMANN:

25     Q.    Hello, Mr. Hurley.  Nice to see you.  I'd like to

1    start with PTX 34, 034.  I believe that is the chart

2    listing, right, the Booking.com flights that you looked at.

3    You've seen this before, Mr. Hurley?

4    A.    I don't believe I have, no.

5    Q.    This is Plaintiff's Exhibit 34.  You said that you

6    were familiar earlier with the number of Booking.com flights

7    that were made or the flights made through Booking.com on

8    Ryanair.  Do you remember testifying you were familiar with

9    the number of those flights?

10   A.    I believe what I said was I saw the 500,000 number

11   total, which was displayed later on, and I was given one

12   PNR, one PNR scoring for all the PNRs.  That's all I had

13   with the booking.

14   Q.    So other than the PNR codes, you don't know, you

15   don't have any idea how many flights were made through

16   Booking.com on Ryanair?

17   A.    I do.  We discussed it a minute ago.  It's 500,000.

18   Q.    500,000 when?

19   A.    The time period that the lawyers mentioned.  I know

20   the answer.  That's March 22nd -- February 22nd through

21   March 23rd, it's that time period we were discussing.

22   Q.    So do you know how many flights were made on

23   Booking.com at any -- or through Booking.com on Ryanair at

24   any earlier period of time?

25   A.    I don't.

1   Q.      Do you agree that beginning in -- looking at the

2   exhibit that Ms. Gierhart showed earlier -- you know who Ms.

3   Gierhart is, right?

4   A.      Sorry.

5   Q.      Cindy Gierhart?

6   A.      Cindy, yes, yes.  I'm sorry.

7   Q.      Looking at the exhibit that Cindy Gierhart showed

8   earlier of Booking.com reservations on Ryanair, do you

9   disagree that the numbers that were shown are accurate?

10  A.      Sorry.  I'm completely lost.  Are you talking this or

11  the 500,000 or are you talking the year?

12  Q.      Do these numbers accurately reflect the number of

13  Ryanair flights booked through Booking.com beginning on

14  January 1st, 2020?

15  A.      I have no idea.  I'm sorry.

16  Q.      Who knows that?

17  A.      I would assume counsel knows.

18  Q.      Does anybody at Ryanair know that?

19  A.      I believe just two members of my team are given

20  access to the total number of PNRs, Lukasz and James Daley,

21  there's Sid Namo, I have it right here and not talked to

22  others.

23  Q.      So if it was represented to the jury that there were

24  17 flights made through Booking.com on January 1st, 2020,

25  would you believe that was an accurate number or an

1   inaccurate number?

2   A.      Just trying to think.  I'm thinking on my feet here.

3   I would believe you, no reason not to, 2.8 percent on --

4   that's the number we're going with at the moment.  On the

5   1st of January we probably did -- that was in COVID.  No, it

6   wasn't COVID.  It was before COVID.  We probably did a few

7   thousand flights that day.  So 2.8 percent would be a higher

8   number than that if we went off the averages we discussed

9   earlier.

10  Q.      So when did Booking.com start booking flights on

11  Ryanair?

12  A.      It began, to my personal knowledge, in 2019.

13  Q.      And how many flights was Booking.com booking on

14  Ryanair in those early stages?

15  A.      I have no idea.

16  Q.      Do you believe that that 17 number presented earlier

17  is an accurate or an inaccurate number, based on your

18  knowledge?

19  A.      I'm sorry, I don't have numbers on this.  I have only

20  OTA numbers, not specifics.

21  Q.      You testified that there were problems in the refund

22  process --

23  A.      Correct.

24  Q.      -- during COVID?

25  A.      Yes.

1   Q.      And that had to do with reservations that were made

2   during the COVID era that had to be cancelled because

3   flights were cancelled as a result of various COVID related

4   shutdowns?

5   A.      Slightly before that bookings were made before COVID

6   when the government bodies of New York shut down flights.

7   We have to refund passengers that were booked during COVID.

8          Mr. Hemann said also during COVID we cancelled

9   flights that were booked during COVID.  The flights were

10  booked before COVID and were cancelled because of COVID.

11  There was no rebooking flights during COVID.  It was a few.

12  It was very small numbers.

13  Q.      And the flights that had to be cancelled, how many of

14  those flights were Booking.com flights?

15  A.      I have no idea.

16  Q.      No idea?

17  A.      None.

18  Q.      Was it a large number or a small number?

19  A.      I have no idea.

20  Q.      So you have no way of attributing the number of or

21  allocating to Booking.com the number of flights that had to

22  be cancelled as a result of COVID, the number of bookings,

23  bookings is the right word?

24  A.      The only thing I can go off of is what we established

25  earlier on, 2.8 percent.  It's a number from a later year.

1  The year you're discussing I don't know.  I'm not going to

2  make stuff up.  I don't know.

3           MR. HEMANN:  Can you put that exhibit back up

4  again?  34, and the first page.

5  BY MR. HEMANN:

6  Q.    Can you see that, Mr. Hurley?

7  A.    With glasses on yes.

8  Q.    Now you can see it.  So if these numbers are accurate

9  what you're saying is Booking.com is not responsible for

10 2.8 percent; is that correct?

11 A.    To be fair, you're showing me a very small snippet of

12 three or four days in this time period.  It looks -- I trust

13 your numbers.  52, 29, 33, yeah.

14           MR. HEMANN:  Could you, Mr. White, expand it a

15 bit and scroll through.

16 BY MR. HEMANN:

17 Q.    And you'd agree with me, Mr. Hurley, that if these

18 numbers are accurate it is not 2.8 percent?

19 A.    Okay.  First of all, sorry, this -- you're showing me

20 numbers now that were in COVID.  We were doing very few

21 bookings during COVID, that's actually much bigger than

22 2.8 percent.  Could you show me, if you don't mind, numbers

23 that are before COVID or after COVID?

24           MR. HEMANN:  Sure.  Let's go to the very top,

25 Mr. Wyatt.  The very first page.  So it would be 34-02

1   probably.

2   BY MR. HEMANN:

3   Q.     So these are pre COVID, yes, Mr. Hurley?

4   A.     Yes.

5   Q.     And these are not 2.8 percent?

6   A.     Correct, they're not 2.8 percent.

7   Q.     They're not probably even .8 percent or .08 percent;

8   correct?

9   A.     After my previous performance on the calculator I'm

10  not going to guess that, but definitely below 2.8 percent, a

11  lot below.

12  Q.     Of these flights or of these bookings you don't know

13  what percentage of them were refunded and what percentage of

14  them were not refunded; correct?

15  A.     Correct.  For example, you might have booked a flight

16  for the first of January and fly the next day or you may

17  pick a flight in July and get the numbers the next time.

18  Q.     And for bookings that were cancelled as a result of

19  COVID, you don't know whether the refunds went through or

20  not for Booking.com; correct?

21  A.     Correct, yes.

22  Q.     You mentioned that there was an issue with the

23  Italian antitrust authority related to bookings that were

24  made prior to COVID but then cancelled as a result of COVID;

25  is that correct?

1   A.      I didn't say antitrust.  Just to be clear, I'm not

2   sure what the government agency is called, there's a number

3   of those in Italy.  It could even have been the government

4   of Crete, I'm not sure.  We got instructions we have to pay

5   from the Italians.

6   Q.      How did you refer to the Italian authority then?

7   A.      I said Italian government, I didn't say which one.  I

8   don't know which one.  AGCM, there's a number of Italian

9   authorities.

10  Q.      And it's a fact that the Italian authority fined

11  Ryanair 4.2 million Euro for failing to provide refunds;

12  isn't that correct?

13  A.      I believe that sounds right.

14  Q.      And isn't it a fact that the Italian authorities said

15  that Ryanair had seriously unfair conduct in cancelling

16  planned flights; is that correct?

17  A.      That's correct.

18  Q.      And that the Italian authority said Ryanair used the

19  pandemic as the reason and gave passengers vouchers rather

20  than pay them back for the price of their tickets; is that

21  correct?

22  A.      That is correct.

23  Q.      And it's the practice of Ryanair to give passengers

24  vouchers instead of paying them back for the cancelled

25  flights; correct?

1   A.      I wouldn't call it a practice, it's definitely

2   something we did and quickly changed our minds.  If you

3   recall back in COVID we were scrambling.  It was a very

4   special time period, decisions were made and mistakes were

5   made.  We definitely refunded 100 percent of the money

6   correctly.

7   Q.      The practice at that point in time, the voucher

8   practice, was the same whether it was a Ryanair booked

9   flight or an OTA booked flight; is that correct?

10  A.      Correct.  Once you -- once we have your PNR code you

11  were our passenger, we will treat every passenger the same.

12  Q.      You have no idea whether Booking.com had a problem

13  processing Ryanair refunds; is that correct?

14  A.      That is correct.

15  Q.      We went through what I'll describe, and tell me if

16  I'm describing it the wrong way, a purchase flow.  Is that a

17  fair way to describe, there was a PowerPoint?

18  A.      Yes.

19  Q.      Is purchase flow a fair way to describe that?

20  A.      It's as good as any.

21  Q.      Were any steps missing from the purchase flow that

22  you went through?

23  A.      Do you mean what I called out or what was on the

24  screen?

25  Q.      What was on the screen, were steps missing?

1    A.    It was shortened.

2    Q.    And what steps were missing from that?

3    A.    I'm trying to think.  There wasn't a screenshot there

4    of selecting of the terms and conditions, that form that was

5    there.  There wasn't a screen that showed you all the

6    options.  There was -- are you -- there was no car rental

7    offer there, there was no hotel offer there.  There was

8    differences in the screenshots we have a listed.  I think it

9    would be shortened for brevity.

10   Q.    Anything else that you can think of that was missing

11   from the -- from that order flow?  And we're going to go

12   back through some of it in a minute.

13   A.    I can't think, but I'm happy to see it.

14              MR. HEMANN:  Mr. Wyatt, could you put up Ryanair

15   screenshot number 3.  Our screenshot number 3.

16              We're working through technical difficulties.

17   My apologies, Your Honor.  I was saying the wrong numbers.

18   DDX 2.3.

19   BY MR. HEMANN:

20   Q.    Is this a screenshot of something that shows up in

21   the Ryanair order flow?

22   A.    It is, yes.

23   Q.    Was this screenshot included in the PowerPoint

24   presentation you went through with Mr. Donoghue?

25   A.    It was not.

1    Q.      The screenshot shows the place where you enter a
2    passenger name; correct?
3    A.      Yes.
4    Q.      And when the word passenger is used, who does that
5    refer to?
6    A.      A Ryanair passenger.
7    Q.      But in the case of the order flow, what passenger in
8    particular?
9    A.      So the data feature works only when asked a question.
10   So I'm John Hurley, I'm booking a flight with myRyanair
11   account, I want to add my wife and kids to this booking and
12   this is the field where I would say this flight and my wife
13   is traveling and two of my kids and I would select the
14   names, they're prepopulated from myRyanair, that's where you
15   see the button on the right, you can say add to myRyanair.
16   Q.      Let's say you've never booked a flight on Ryanair
17   before.  This screenshot is to show the passenger who will
18   actually be getting on the airplane and flying somewhere; is
19   that correct?
20   A.      The lead passenger, yes.
21   Q.      There's also screens if there are multiple
22   passengers?
23   A.      Correct, yes.
24   Q.      And this is the place where that passenger is
25   identified for Ryanair; is that correct?

1    A.    No.  I'm sorry.  I swear it's tied in the database we

2    identified, is that what you're saying?

3    Q.    I'm saying this is the place where the person making

4    the reservation identifies the passenger flying on the

5    airplane; is that correct?

6    A.    That's correct.

7    Q.    Why did you skip this screen in the PowerPoint

8    presentation?

9    A.    You need to ask counsel, I didn't do the screens.  Is

10   there something special about it, you think?

11   Q.    So it's the case that the person who is flying

12   doesn't have to be the person who is making the booking;

13   correct?

14   A.    That is correct, yes.

15   Q.    Okay.  So if I wanted to make a booking for

16   Mr. Donoghue I would put his name as the passenger and then

17   I would put my information elsewhere in the booking flow;

18   correct?

19   A.    Correct, yes.

20          MR. HEMANN:  Could you go to DDX 2.4, Mr. Wyatt,

21   the next one.

22   BY MR. HEMANN:

23   Q.    So after I, the person who's making the booking,

24   enters a passenger name, I'm prompted to at some point log

25   in with an e-mail address; correct?

1  A.      Correct.

2  Q.      And this does not have to be the passenger's e-mail

3  address, does it?

4  A.      No, it doesn't.

5  Q.      And it doesn't even have to be the passenger who is

6  making the reservation; is that correct?

7  A.      No, you're still making the reservation.  You could

8  be making the booking on behalf of someone else.  The person

9  making it owns the myRyanair account so in this example you

10  gave Mr. Donoghue would be a passenger on your booking.

11  Q.      Correct.  But here you were not asking for the

12  passenger's e-mail address, you are asking for the booker's

13  e-mail address?

14  A.      Correct, yes.

15  Q.      And it doesn't here say that the passenger's e-mail

16  address is required, does it?

17  A.      That is correct, yes.

18  Q.      And there's, in fact, nowhere on the -- in the whole

19  booking form, the whole system, that Ryanair requires that

20  the passenger's e-mail address be provided?

21  A.      It is not needed.  As long as we have the e-mail

22  address of the person making the booking and can contact

23  them and the understanding is if you're responsible for

24  Mr. Donoghue's you will get the booking notifications and

25  flight cancellations.  So the same logic if I have a

1  two-year-old child I will not be putting his e-mail address

2  on the booking because I'm responsible for him and I know

3  the person making the booking.

4  Q.    Can I ask somebody in my office to make a Ryanair

5  reservation for me?

6  A.    If they had a myRyanair account, yes, they can.

7  Q.    Could I ask a friend who is putting together a

8  booking for a large group to make a myRyanair flight

9  reservation for me as the passenger?

10  A.    You could, yes.

11  Q.    Can I ask a travel agent on Main Street to book me a

12  Ryanair flight and make me the passenger?

13  A.    Depends.

14  Q.    Could I ask them to do that?

15  A.    You can certainly ask, yes.

16  Q.    Can they do that?

17  A.    It will depend.

18  Q.    It will depend on?

19  A.    We have a GDS solution in place with bricks and

20  mortars on High Street.  If they have that contract in place

21  they can certainly make the booking.

22  Q.    If they do not have the contract in place, the GDS

23  contract, are they able to make a Ryanair flight for me as

24  their customer?

25  A.    If they log on to the website with the myRyanair

1  account they can.

2  Q.      And they're allowed to create the myRyanair account?

3  A.      Yes.

4  Q.      And then what Ryanair does in that situation is

5  Ryanair -- if there's a problem with the flight, Ryanair

6  sends an e-mail to the agent, the travel agent who made the

7  booking; correct?

8  A.      Correct.

9  Q.      And the travel agent's responsibility is to notify

10  the travel agent's customer that there is an issue with the

11  booking?

12  A.      Correct.

13  Q.      That is not a data integrity problem, is it?

14  A.      No, because we can contact.  We have a means to make

15  contact with a passenger.  If the bricks and mortars were

16  making random e-mail addresses that were going to a dead

17  end, that would be different.

18  Q.      And that depends on the nature of the brick and

19  mortar travel agency; correct?

20  A.      Yes.

21  Q.      So if it's a good travel agent who has good contact

22  with their customer, it should not be a problem; correct?

23  A.      Correct, yes.

24  Q.      If it is a poor travel agent who doesn't care about

25  their customer, then it might be a problem?

1    A.    Correct.

2    Q.    In either of those situations, it's not Ryanair's

3    data integrity problem, it is the travel agent's problem?

4    A.    It's our problem, because we will get in trouble for

5    not doing refunds, et cetera.  We have to have the passenger

6    information.

7    Q.    And what steps do you take to distinguish between a

8    good agent or secretary or friend or colleague or spouse and

9    a poor agent, secretary, colleague or spouse, in terms of

10   their fealty to informing somebody of problems?

11   A.    Steps, what would happen if we receive a complaint to

12   customer service if someone is not notified or not

13   contacted, they're frustrated, we kick off an investigation

14   and figure out how.

15   Q.    But in realtime, you don't take any steps to figure

16   out whether the person who made the booking or made the

17   reservation is going to do a good job of informing the

18   person who they're making the booking for of possible

19   changes or a poor job?

20   A.    Correct.  In that case, we trust the travel agent and

21   the booking agent.

22   Q.    Just like you trust the spouse or the secretary or

23   the anything?

24   A.    They would go out of business if that practice

25   happens, or friends and family, they know people and have a

1   reputation.

2   Q.     I'm sorry, you said they would go out of business?

3   A.     If word was on the local street, travel agent was

4   scamming all their passengers, they would be in trouble,

5   word of mouth, they would be shut down.

6   Q.     So a business -- if a business developed a reputation

7   for not providing refunds or not providing appropriate

8   communications, that business would not last long; correct?

9   A.     That would be my assumption, yes.

10  Q.     And if that business has a good reputation for doing

11  those things, not going to be a problem; correct?

12  A.     Sorry.  If they do -- correct, yes, good reputation,

13  yes.

14  Q.     There is a -- you don't have any evidence, do you,

15  that Booking.com customers do not receive updates through

16  Booking.com from Ryanair, do you?

17  A.     No.

18  Q.     Mr. White, could you please put up 2.6 which is the

19  two pages along here.  Similar to the issue regarding the

20  payments or the e-mail, you don't require a passenger's

21  e-mail or a credit card or a payment method in order to book

22  a flight, do you?

23  A.     No, we don't.

24  Q.     In fact, you'll take any payment method that is

25  submitted from the user, the person who's making the

1    booking; correct?

2    A.      Any payment method that exists on the website, yes.

3    Q.      I'm sorry?

4    A.      If it's listed on the website.  For example, we don't

5    take Bitcoin.  It has to be -- you see the icons there.

6    Q.      Right.  It has to be a credit card or -- I don't know

7    what -- what is UATP?

8    A.      I'm guessing myself.

9    Q.      But it's credit cards?

10   A.      Europe has a lot of different types of credit cards,

11   and people change depending on booking.

12   Q.      And a person, a user, in making a reservation for

13   another person, can use whatever sort of payment they wish

14   to make; correct?

15   A.      Correct, yes.

16   Q.      And then if you have to issue a refund, you issue it

17   to that user, correct, to that payment method?

18   A.      No, we don't anymore.  We had to stop that practice

19   after the COVID issue, because the OTAs you have to apply

20   online for the refund and you have to prove who you are and

21   we have to promise your full refund in seven days, and

22   that's how we work it now.  If I could turn around and tell

23   my CEO that every credit card inside the database is correct

24   and it belongs to the person who flew, we would not have to

25   deal with that process.

1   Q.      So let's go back to our travel agents in the High

2   Street example.  If the travel agent uses the travel agent's

3   credit card and pays for the flight and the flight is

4   thereafter cancelled, you would make a refund to that credit

5   card; correct?

6   A.      We will not, no.

7   Q.      Who would you make the refund to?

8   A.      The passenger who's impacted would contact us and

9   would say -- you have to prove you are who you say you are,

10  and that's online verification, the digital version of that

11  form has been activated there, and once it's authenticated,

12  it's their end choice and they will tell us how to refund

13  it.

14  Q.      So if the passenger can prove to you that the

15  passenger had a ticket --

16  A.      Yes.

17  Q.      -- you will refund the money to the passenger?

18  A.      That is correct, yes.

19  Q.      And that's a choice that you made, Ryanair, as to how

20  to handle refunds after COVID?

21  A.      I would say forced, because we had to fix the problem

22  we had, because we could no longer rely on the database.

23  Q.      Do all airlines in Europe handle this refund process

24  the same way that you do?

25  A.      I'm not sure.  There's a habit of airlines copying

1   what we do and it becomes common practice.

2   Q.     Do you know any or can you name an airline that

3   handles refunds differently than you do?

4   A.     I would imagine they all do.  Every company runs

5   their business differently.

6   Q.     So let's take Lufthansa, for example.  Has Lufthansa

7   been forced to take the same approach to passenger refunds

8   that you just testified that Ryanair was forced to take?

9   A.     I have no idea.

10  Q.     Was any other airline forced to take the same

11  approach to passenger refunds that Ryanair takes?

12  A.     I have no idea.

13  Q.     On the refund issue, do you know whether any

14  Booking.com customer ever failed to receive a refund through

15  Ryanair?

16  A.     We don't know who makes the booking, which OTA it is,

17  so I have no idea how to answer that question.  It could

18  very easily be Booking.com or not.  I don't know, because

19  Booking.com does not tell us this is the customer, so I'm

20  guessing.

21  Q.     So it sounds like your testimony is that because of

22  the post-COVID changes, what you're doing is requiring a

23  passenger to get in touch with you directly, say that they

24  had a flight cancelled, and give you a credit card so that

25  you can return -- so they can receive the money from you; is

1    that correct?

2    A.    Almost the only tweak is they can pay by bank draft,

3    we will set the payment bank to bank.  You don't have to do

4    a credit card.  It's the payment choice.

5    Q.    So it doesn't matter whether that passenger is a

6    passenger that is booked through an OTA or a passenger that

7    has booked directly through Ryanair, if the passenger calls

8    you and says, "My name is John Hemann and this is my PNR,"

9    which the passenger has, "My flight was cancelled and I

10   would like a refund," you're going to make that payment to

11   me; correct?

12   A.    If they're our passengers, we will refund our

13   passengers, yes.  In the situation where John Hemann booked

14   through an OTA, he might have been tagged in the system as

15   an OTA booking and we'll probably do additional steps to

16   make sure you are who you say you are and not somebody who's

17   working at Booking.com with the list of PNRs.

18   Q.    So when you say making sure that I say that I am who

19   I say I am --

20   A.    Yes.

21   Q.    If you go back, Mr. White, to 2.6 -- or 2.4, sorry.

22   Nope, one more.  Sorry.  2.3.  There we go.

23         The are who you say you are is that person;

24   correct?  The person who's the actual passenger on the

25   flight; right?

1    A.      Yes.

2    Q.      That's the person who's entitled to the refund;

3    right?

4    A.      Right.

5    Q.      Okay.  So if that person calls you and says, "My name

6    is Dana Miller, this is my PNR," you're going to send that

7    person a refund?

8    A.      Well, we will put them through an online

9    verification, because, you know, for example, if you had an

10   e-mail address to match myRyanair, you check all the check

11   boxes and no tag on the back end, you'll get a refund

12   quickly.  If you're someone who -- there's lots of

13   down-hillers in the world.  You have to check the board

14   number.  You have the passport verification process with

15   some checks.  When we're comfortable you are who you say you

16   are, you will get the refund.

17   Q.      And that's a choice that Ryanair has made about how

18   it approaches refunds?

19   A.      Yes.

20   Q.      The payment -- if you could go back to 2.6, please,

21   Mr. White.

22           The payment that is provided to Ryanair, first

23   of all, this could be a virtual credit card; right?  There's

24   not a problem with a -- somebody booking a ticket, paying

25   with a virtual credit card; is that correct?

1    A.      There shouldn't be, yeah.

2    Q.      And the payment that Ryanair receives is a real

3    payment; is that correct?  It's actual, real money; correct?

4    A.      Correct, yeah.

5    Q.      And Ryanair keeps the money, unless it is later

6    refunded for some reason; correct?

7    A.      Correct.

8    Q.      Are you aware of any instance in which Ryanair has

9    had a problem contacting a Booking.com customer?

10   A.      Again, I have no idea who the OTA is behind the

11   attack.  We just know that it's an OTA.  They don't come in

12   and say, "I'm Booking.com."

13   Q.      Well, you said attack just now.

14   A.      Yes, yeah.

15   Q.      So you view it a ticket purchase.  So if I buy a

16   ticket on Ryanair through Booking.com, you believe that that

17   is an attack on Ryanair by me?

18   A.      First of all, if you use Booking.com and make a

19   booking on Ryanair, you're no longer a token and you're now

20   a bot, and that bot has tried to circumvent our defenses and

21   fool our systems, so it's not John Hemann anymore.  Second,

22   that booking gets made, we then have an obligation to John

23   Hemann on the passenger flight and manifest, you're no

24   longer attacking the passenger.  The problem we have is

25   OTA's misuse by bots, they misuse the process and cause harm

1  to the website.  If they play by the rules, like Expedia or

2  Google, there's no issue, when they make --

3  Q.    When you say play by the rules, those are rules that

4  you have reached, and we'll talk about Expedia in a minute.

5  You've reached agreements with Google and Expedia; correct?

6  A.    Yes, and travel agents that use GSDs, we're open to

7  agreements.

8  Q.    So in terms of these attacks, you say that I'm no

9  longer John Hemann, I'm a bot; correct?

10  A.    As far as our website is concerned, yes.

11  Q.    As far as the name that's on the -- the passenger

12  name, I'm still John Hemann; right?

13  A.    If the bot attack, you want to call it, successfully

14  gets out the other side with a booking made, it is back to

15  being a human again, yes.

16  Q.    So I can come to the airport -- that bot somehow gets

17  me to the airport and I can get on an airplane; correct?

18  A.    No, sorry.  The second you make the booking, the

19  second Ryanair's website accepts the booking, or we give you

20  a PNR, you are now a Ryanair passenger.

21  Q.    So I'm back to being John Hemann?

22  A.    You're John Hemann, but you're not John Hemann.  When

23  you're booking through the website Booking.com, you're a bot

24  who can cause damage to the website and that's the concern.

25  Q.    And the damage to the website that you're focused on

1   here is the existence of an e-mail address for John Hemann

2   that is supplied by the person who made the booking?

3   A.    That's part of it.  Much bigger concerns I have is

4   this slowdown of the website, performance issues, website

5   slows down, you have performance issues.  I've had several,

6   several problems with it.

7           MR. HEMANN:  Your Honor, I ask the Court to

8   strike the answer there, because it was subject to an

9   agreement by the parties, because there is no evidence of

10  slow-downs or anything like that.

11          THE COURT:  -- why don't we -- you reframe your

12  question and avoid that problem.  But I -- when you asked

13  the question, I thought that you might get that answer.  I

14  think that was -- didn't come as a surprise.

15  BY MR. HEMANN:

16  Q.    So let me ask the question in a slightly different

17  way.  The e-mail that goes through the damage that you are

18  focused on here, the damage to the website involved in this

19  case is damage to the integrity of the data and by that you

20  mean the e-mail addresses; correct?

21  A.    In that narrow question, yes.

22  Q.    Okay.  And if the e-mail address that goes from me to

23  Booking.com to Etraveli to Ryanair is my e-mail address, the

24  data is not damaged, is it?

25  A.    Correct.  But I've no way of knowing if the OTA

1   involved gave the real e-mail address or a temporary.

2   Q.    You don't know whether it's Booking.com or Kiwi and

3   you don't know whether it's Booking.com providing my real

4   e-mail address or Kiwi not doing it?

5   A.    Correct.  So we have to put safety first.

6   Q.    So if Booking.com is providing my real e-mail address

7   through that process that I just described your website is

8   not being damaged?

9   A.    If Booking.com gave the real e-mail address, it's a

10  big if, anyways.  Sorry, to qualify that, if my CEO walked

11  in and said, Mr. Hurley, can you confirm the e-mail

12  addresses are correct, I can't because Booking.com gave me

13  the e-mail address or Kiwi.  So as far as I'm concerned all

14  that data is questionable.

15  Q.    Guilt by association?

16  A.    You have to be sure; correct?  You can't go to a

17  court case and say, Your Honor, we had the wrong e-mail

18  address and the customer lost their flight.

19  Q.    How do you control for the High Street travel agent

20  or the secretary or the spouse.  You don't know if those

21  e-mail addresses are correct either, do you?

22  A.    In theoretical somebody could be malicious or cause

23  damage but why would they want to?  Why would a partner do

24  that to a partner or secretary or boss?  Why would a travel

25  agent start putting wrong information in the database?  They

1  wouldn't.

2  Q.     Booking.com is not trying to maliciously harm their

3  passengers, are they?

4  A.     I would hope not.

5  Q.     Do you have any reason to believe that they are?

6  A.     Well, they gave us false e-mail addresses so that's

7  an issue.

8  Q.     Can you identify one instance in which Booking.com

9  gave you a false e-mail address?

10  A.     Yes.

11  Q.     When?

12  A.     I saw test bookings 2 weeks ago.

13  Q.     And the test bookings show that the e-mail that you

14  provided went through and went all the way to Ryanair and

15  allowed Ryanair to contact that passenger; isn't that

16  correct?

17  A.     I'm saying the e-mail address we had in the database,

18  the Ryanair database, did not match the e-mail address we

19  submitted to Booking.com when we were doing the test

20  booking.

21  Q.     But the e-mail that -- you had the e-mail address;

22  correct?  You possessed -- Ryanair possesses the e-mail

23  address that you entered onto Booking.com when you made the

24  test book?

25  A.     Not true, no.  The e-mail address did not match.

1    What we have today is not what we saw on the back end data.

2    Q.    And the work -- are you familiar with the work

3    Mr. Lopata did in this case?

4    A.    Yes.

5    Q.    And you're aware that Mr. Lopata entered an e-mail

6    address when he purchased a Booking.com ticket?

7    A.    Yes.

8    Q.    And that that e-mail address went all the way to

9    Ryanair; correct?

10   A.    Yes.

11   Q.    And Mr. Lopata got a confirmation e-mail from Ryanair

12   directly using the e-mail address that he entered?

13   A.    That is correct.

14   Q.    When was the last time Booking.com made a flight

15   reservation on Ryanair?

16   A.    I haven't tested this week.  If I was guessing, two

17   weeks.

18   Q.    Really?  So Booking.com is currently able to make

19   reservations on Ryanair?

20   A.    No.  What I said was I haven't tested it.  I haven't

21   tested for two weeks.  I don't believe they can.

22   Q.    Two weeks ago?

23             THE COURT:  You don't believe.

24             THE WITNESS:  Booking.com can make the booking.

25   I don't believe on the Booking.com website you can book a

1   Ryanair flight.

2   BY MR. HEMANN:

3   Q.    Two weeks ago could you?

4   A.    When I was checking it two weeks ago, yes.

5   Q.    Do you have that data with you right now?

6   A.    On me personally, no.  I could get it overnight no

7   problem.

8   Q.    Can you give me any information about that?

9   A.    We did two bookings.  We did a booking on the booking

10  direct tab, e-mail address was in correctly.  We did a

11  booking on the hotels and flight tab and the e-mail address

12  was wrong.

13  Q.    And the booking went through and a PNR code was

14  issued?

15  A.    Correct, to the wrong e-mail address.

16  Q.    You said a moment ago you were not aware of any

17  customer complaints regarding Booking.com; correct?

18  A.    Correct.

19  Q.    And you also talked about a facility called Zen Desk;

20  is that correct?

21  A.    That is correct.

22  Q.    And Zen Desk is like your customer -- your CRM,

23  customer management system; correct?

24  A.    Not really.  It's not a CRM.  We don't have that

25  level of sophistication.  It's a way of tracking customers.

1   Q.      And you have -- can you provide a rough estimate, you

2   had 518,000 Booking.com bookings in 2022, 2023; is that

3   correct?

4   A.      I believe so, yes.

5   Q.      In the four years prior to that, three years prior to

6   that, do you have any estimate how many per year?

7   A.      I have none.

8   Q.      Would it be fair to assume that the total number over

9   the past five years is over a million?

10  A.      I'm sorry, speculating.  I have no idea.

11  Q.      It could be zero before -- as far as you're concerned

12  before 2020?

13  A.      You just told me numbers for the first of January so

14  I can use those, but that's all I have.

15  Q.      And this is Zen Desk?

16  A.      To clarify, we do test bookings.

17  Q.      So this Zen Desk facility is used to track customer

18  complaints; correct?

19  A.      Yes.

20  Q.      And when a customer complains about a booking, the

21  Zen Desk people ask them where they made the booking or who

22  they made the booking through; is that correct?

23  A.      I can't testify to that.  It's -- a good customer

24  service agent probably would.  A lot of these are under

25  pressure, English second language, they're based in Romania

1  and trying to fix the issue as fast as possible.  And a lot

2  of customers don't even know the booking website.

3  Q.    And you're not aware through the Zen Desk facility

4  yourself whether there's ever any complaints about

5  Booking.com?

6  A.    I'm not aware, no.

7          MR. HEMANN:  This is where I would be going into

8  that other topic, Your Honor.  Probably be a good place to

9  stop.

10         THE COURT:  I think that's a good idea.  As

11 promised, members of the jury, we're leaving a little early

12 today.  If you could please -- hopefully we'll make good

13 progress tomorrow, and we still have our eyes on finishing

14 the end of the week.  That's a very likely prospect but,

15 again, appreciate your punctuality today.  Let's keep it up

16 and we'll be in good shape.  Thank you and have a good

17 evening.

18         (The jury exited the courtroom.)

19         THE COURT:  Now, Mr. Hurley, you're on

20 cross-examination which will continue tomorrow.  So in the

21 interim you may speak with your counsel or anyone else about

22 any subject except the subject of your testimony.  You can't

23 talk about your testimony with anyone.

24         THE WITNESS:  I understand.  Thank you.

25         THE COURT:  Thank you.  Very well.  Is there

1    anything by way of mechanics, substance, that anyone has?

2    Anything that you need me to address?

3            MR. HEMANN:  We're solving problems, Your Honor.

4    Thank you.

5            THE COURT:  Why don't you continue doing that.

6            MR. HEMANN:  We're doing our best.  We hope that

7    we're better than your last trial is all we have to say,

8    Your Honor.  Because we heard enough about it to scare us.

9            THE COURT:  I hope you didn't hear it from

10   others than me because I'd hate to become notorious in that

11   regard.

12           MR. HEMANN:  Heard about it from you.

13           THE COURT:  That was kind of a low point.  So

14   far I think this is going fine.  And if you have a problem

15   and you can't resolve it, I'm willing to deal with it, but

16   if it's solvable.

17           MR. HEMANN:  I might ask -- I might now test

18   your patience, Your Honor, and ask whether we might have a

19   little bit more time tonight.  It was quite a scramble last

20   night getting the disputes to you quickly.

21           THE COURT:  9:00.

22           MR. HEMANN:  And we're solving problems.

23           THE COURT:  9:00 is still -- I'm still -- I was

24   going to say coherent.  Just not 3:01 a.m.

25           MR. HEMANN:  I'm not coherent then.

1          THE COURT:  Thank you.  You may step down.

2          (Court was adjourned at 4:02 p.m.)

3

4

5                    **C E R T I F I C A T E**

6      I, Deanna L. Warner, a Registered Professional

7  Reporter, do hereby certify that as such Registered

8  Professional Reporter, I was present at and reported in

9  Stenotype shorthand the above and foregoing proceedings.

10

11  _____
    Deanna L. Warner, RPR, CSR
12  Official Court Reporter
    U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$0.25** [2] - 166:4, 166:23
**$0.30** [2] - 166:4, 166:23
**$0.55** [2] - 185:14, 185:18
**$0.59** [4] - 166:7, 166:18, 168:2, 168:4
**$10** [1] - 130:6
**$10.70** [1] - 160:20
**$17** [1] - 117:21
**$19,250** [1] - 185:20
**$2,800** [1] - 186:14
**$2.30** [1] - 130:8
**$46** [1] - 87:9
**$49,234** [1] - 179:13
**$5,000** [1] - 92:19
**$630** [1] - 117:20

## '

**'20** [2] - 3:21, 4:3
**'22** [2] - 4:23, 170:21
**'23** [1] - 4:24

## 0

**034** [1] - 199:1
**08** [1] - 204:7

## 1

**1** [26] - 39:6, 42:15, 44:3, 44:12, 44:15, 44:24, 46:18, 46:20, 63:14, 65:8, 65:9, 70:8, 70:10, 70:11, 72:12, 72:18, 102:23, 146:11, 160:5, 160:19, 164:24, 173:11, 177:12, 177:25, 197:20, 198:1
**1.2** [1] - 127:8
**1.3** [1] - 113:20
**1.5** [1] - 127:9
**1/2** [1] - 177:17
**10** [9] - 39:9, 50:15, 50:19, 57:20, 68:24, 74:11, 102:22, 113:23, 174:5
**100** [1] - 206:5
**101st** [1] - 150:14
**107** [1] - 160:19
**10th** [4] - 7:9, 7:21,
8:2, 8:5
**11** [5] - 39:9, 41:1, 51:19, 177:14, 177:17
**110** [1] - 160:19
**112,000** [2] - 175:1, 175:5
**12** [13] - 36:1, 39:9, 41:8, 52:21, 61:19, 62:25, 64:19, 68:24, 174:5, 177:14, 178:20, 186:13, 193:21
**120** [1] - 23:3
**120,000** [2] - 174:21, 174:22
**1227** [1] - 189:2
**13** [8] - 39:10, 41:10, 54:9, 55:21, 57:11, 58:4, 58:21, 160:4
**131** [1] - 195:16
**136,141** [1] - 160:8
**14** [7] - 23:3, 36:9, 37:13, 37:19, 39:10, 41:12, 54:19
**15** [9] - 59:5, 59:7, 66:3, 67:12, 67:24, 73:9, 73:16, 74:2
**150** [2] - 195:16, 195:17
**15th** [4] - 1:12, 7:10, 111:14, 125:11
**16** [6] - 41:16, 59:5, 61:15, 74:11, 160:3, 193:20
**1610** [1] - 131:10
**17** [8] - 41:18, 59:6, 61:16, 67:12, 67:18, 74:12, 200:24, 201:16
**17th** [1] - 7:14
**18** [24] - 41:20, 46:19, 47:20, 48:15, 49:10, 50:5, 50:6, 50:10, 59:6, 59:12, 59:13, 60:12, 60:13, 63:13, 63:14, 64:13, 67:9, 67:12, 67:24, 68:6, 68:8, 145:24, 146:16
**18,416,864** [1] - 146:2
**19** [15] - 41:21, 46:19, 48:15, 48:17, 52:22, 53:21, 59:6, 64:12, 65:6, 65:7, 66:3, 67:12, 67:24
**1:00** [3] - 118:20, 118:22, 119:11
**1st** [3] - 200:14, 200:24, 201:5

## 2

**2** [16] - 39:6, 43:3, 43:13, 44:4, 54:10, 54:11, 59:13, 59:14, 59:15, 65:8, 125:7, 157:5, 168:22, 197:20, 198:1, 224:12
**2.3** [2] - 207:18, 218:22
**2.4** [2] - 209:20, 218:21
**2.6** [3] - 214:18, 218:21, 219:20
**2.8** [16] - 146:18, 146:20, 168:13, 168:15, 168:22, 174:18, 186:4, 201:3, 201:7, 202:25, 203:10, 203:18, 203:22, 204:5, 204:6, 204:10
**20** [22] - 41:24, 46:19, 48:17, 49:2, 49:3, 49:13, 53:16, 54:20, 54:21, 55:5, 64:8, 68:3, 68:5, 68:11, 74:12, 86:23, 112:3, 113:23, 126:4, 144:12, 157:24, 167:15
**20-CV-1191-WCB** [1] - 1:5
**200** [6] - 124:13, 124:24, 189:18, 195:12, 195:13, 195:14
**2014** [3] - 125:11, 125:12
**2015** [1] - 147:18
**2018** [1] - 121:3
**2019** [14] - 3:20, 4:3, 4:16, 4:23, 5:1, 5:10, 93:14, 101:16, 111:14, 111:22, 111:23, 151:19, 201:12
**202** [3] - 176:16, 197:21, 198:2
**2020** [12] - 4:16, 4:23, 5:1, 5:10, 86:15, 93:20, 104:8, 155:22, 157:24, 200:14, 200:24, 227:12
**2022** [22] - 3:21, 4:5, 5:2, 5:17, 8:19, 137:9, 144:6,

144:24, 145:2, 146:11, 157:12, 160:5, 167:9, 171:20, 173:9, 173:11, 173:20, 173:21, 173:23, 177:13, 177:25, 227:2
**2023** [24] - 3:21, 4:5, 5:2, 5:17, 8:19, 11:2, 113:21, 144:6, 144:24, 145:2, 146:12, 160:6, 167:9, 170:21, 171:20, 173:10, 173:12, 173:20, 173:22, 173:24, 177:13, 178:1, 181:11, 227:2
**2024** [2] - 1:13, 99:10
**20s** [2] - 62:10
**21** [11] - 18:14, 42:1, 49:2, 49:3, 51:20, 61:19, 61:21, 63:5, 68:3, 69:2, 74:12
**22** [38] - 42:3, 42:16, 42:17, 43:21, 43:22, 44:12, 45:22, 46:19, 49:4, 49:5, 49:10, 49:23, 50:22, 51:12, 51:13, 51:20, 52:22, 54:1, 61:19, 61:21, 63:6, 63:15, 64:12, 64:13, 65:3, 65:4, 65:19, 68:6, 68:15, 69:23, 70:7, 70:8, 70:16, 70:21, 71:15, 72:12, 72:18, 73:2
**22nd** [2] - 199:20
**23** [19] - 42:6, 44:12, 46:7, 50:22, 51:14, 51:20, 52:22, 54:2, 68:4, 68:6, 69:1, 70:7, 71:4, 71:11, 86:23, 130:8, 144:25, 145:7, 145:11
**230** [1] - 125:1
**239** [1] - 177:1
**23rd** [2] - 199:21
**24** [9] - 42:8, 44:13, 46:10, 50:22, 51:16, 51:21, 52:22, 68:7, 69:2
**24/7** [2] - 158:12, 182:5
**25** [4] - 25:2, 42:10, 144:12, 167:24
**26** [15] - 16:21, 17:7, 18:9, 18:10, 18:14,

144:24, 145:2, 146:11, 157:12, 160:5, 167:9, 171:20, 173:9, 173:11, 173:20, 173:21, 173:23, 177:13, 177:25, 227:2

## 3

**3** [9] - 39:7, 43:6, 54:10, 54:11, 74:11, 137:20, 154:1, 207:15
**3,000** [1] - 102:19
**3,400** [1] - 168:22
**3,600** [1] - 125:2
**3.4** [1] - 145:22
**30** [1] - 157:11
**30(b)(6** [15] - 9:11, 9:13, 9:16, 9:23, 10:4, 10:10, 10:20, 11:4, 12:21, 12:24, 13:6, 16:24, 19:19, 28:5, 28:11
**30(b)(6)/602** [1] - 9:20
**300** [1] - 168:16
**32(a)(3** [1] - 10:9
**33** [1] - 203:13
**332(a)(3** [1] - 10:23
**34** [5] - 121:14, 121:21, 199:1, 199:5, 203:4
**34-02** [1] - 203:25
**340,000** [1] - 168:21
**35** [1] - 50:9
**35,000** [4] - 185:17, 185:23, 185:24, 186:1
**354,000** [2] - 168:10, 168:12
**36** [1] - 102:19
**384,000** [1] - 170:22
**3:01** [1] - 229:24

## 4

**4** [13] - 39:7, 43:8, 55:18, 57:10, 58:3, 58:20, 120:25, 121:1, 121:8, 174:6, 174:10, 174:12, 174:16
**4.2** [1] - 205:11
**4.6** [7] - 170:22, 173:6,

173:9, 173:16,
173:19, 173:22,
174:8
**40** [4] - 73:4, 124:25,
126:6, 126:8
**403** [1] - 28:18
**460,000** [1] - 174:9
**4:02** [1] - 230:2

---

**5**

**5** [20] - 39:7, 44:2,
44:12, 45:13, 46:18,
47:10, 50:22, 50:23,
51:20, 52:22, 52:23,
55:19, 57:10, 58:3,
58:20, 61:19, 61:21,
70:8, 70:16, 125:5
**5,000** [22] - 18:14,
18:18, 18:25, 19:4,
19:10, 19:12, 20:15,
20:25, 21:23, 21:25,
22:3, 22:4, 23:15,
32:19, 92:16, 109:8,
109:10, 186:9,
186:17, 186:20,
187:14, 187:25
**50,000** [4] - 162:7,
163:13, 164:25
**50,799** [1] - 160:6
**500** [1] - 110:25
**500,000** [6] - 148:19,
178:3, 199:10,
199:17, 199:18,
200:11
**518,000** [1] - 227:2
**518,249** [2] - 178:5,
179:8
**518,826** [1] - 146:12
**52** [1] - 203:13
**5647204** [1] - 11:2
**59** [1] - 168:8
**5:30** [1] - 38:20

---

**6**

**6** [9] - 39:8, 44:9,
44:24, 56:5, 56:13,
57:11, 58:4, 58:20,
168:22
**60,000** [6] - 16:21,
29:25, 31:3, 184:5,
186:8, 186:17
**600** [3] - 125:9, 126:2,
168:8
**600,000** [6] - 167:12,
167:17, 167:22,
168:4, 168:9, 168:16
**602** [2] - 10:6, 11:5

---

**68** [1] - 160:4
**6:00** [1] - 131:10
**6:30** [2] - 131:10,
131:11
**6A** [1] - 1:12

---

**7**

**7** [13] - 39:8, 46:14,
55:23, 56:14, 56:16,
56:17, 56:18, 57:11,
57:14, 57:15, 58:4,
58:21
**78** [2] - 144:7, 145:11
**78,300,000** [2] - 145:8,
145:20
**78,300,879** [2] - 144:8,
145:21
**7th** [2] - 7:11

---

**8**

**8** [27] - 39:8, 46:19,
47:13, 49:9, 52:22,
53:9, 54:20, 54:21,
57:15, 57:17, 58:5,
58:13, 59:11, 59:13,
59:20, 59:21, 61:19,
62:11, 69:3, 71:17,
72:12, 72:18, 72:24,
186:12, 186:13,
204:7
**80** [1] - 146:4
**801(d)(2** [1] - 10:23
**85** [1] - 119:19

---

**9**

**9** [5] - 39:8, 50:3, 50:4,
50:6
**9,000** [2] - 168:18,
168:22
**9,912** [1] - 168:24
**9.5** [1] - 177:19
**90** [3] - 102:23,
197:20, 198:2
**99** [2] - 150:15, 168:20
**99,000** [1] - 168:19
**99,120** [1] - 168:17
**9900** [1] - 168:20
**9:00** [4] - 38:20, 85:9,
229:21, 229:23
**9:15** [1] - 29:6
**9:30** [1] - 35:4

---

**A**

**a.m** [3] - 38:20, 85:9,
229:24
**AB** [2] - 153:11,
153:16
**aback** [1] - 13:11
**abeyance** [1] - 188:7
**ability** [7] - 6:5, 40:4,
42:11, 83:5, 99:11,
136:19, 148:8
**able** [25] - 16:24,
17:20, 31:5, 32:11,
32:18, 40:15, 65:11,
85:11, 91:5, 93:11,
94:23, 96:10, 99:13,
99:14, 107:6,
110:16, 114:12,
132:9, 147:22,
148:2, 148:12,
189:11, 196:11,
211:23, 225:18
**absence** [1] - 121:16
**absolutely** [2] - 12:18,
157:2
**abuse** [1] - 104:21
**Abuse** [14] - 74:25,
78:13, 79:9, 79:21,
84:9, 86:14, 89:18,
102:16, 104:19,
104:20, 105:1,
105:2, 105:3, 105:20
**accept** [4] - 8:22, 78:1,
137:13, 148:8
**accepted** [1] - 134:12
**accepting** [1] - 26:9
**accepts** [1] - 221:19
**access** [14] - 14:11,
74:25, 79:10, 79:16,
89:24, 94:7, 129:6,
132:4, 148:9,
156:18, 156:22,
157:3, 162:22,
200:20
**accessible** [1] - 87:6
**accessing** [1] - 133:6
**accident** [5] - 54:23,
59:22, 59:23, 71:19,
71:25
**accidents** [1] - 48:21
**accommodation** [1] -
65:11
**according** [1] - 79:3
**account** [37] - 20:24,
21:6, 21:7, 21:10,
21:11, 23:10, 90:12,
90:14, 90:21, 90:24,
92:15, 97:3, 131:21,
132:1, 132:8,

---

133:23, 134:6,
136:3, 148:3,
186:20, 187:14,
187:17, 187:18,
188:16, 189:10,
189:11, 192:7,
194:23, 195:6,
195:11, 208:11,
210:9, 211:6, 212:1,
212:2
**accounts** [4] - 22:17,
96:25, 97:1, 148:10
**accurate** [11] - 141:20,
158:18, 159:2,
169:15, 169:19,
185:11, 200:9,
200:25, 201:17,
203:8, 203:18
**accurately** [1] -
200:12
**accusation** [1] - 108:3
**achieved** [1] - 127:10
**acknowledge** [2] -
94:24, 95:2
**acquire** [1] - 129:1
**Act** [16] - 74:25, 75:11,
78:13, 79:9, 79:21,
80:5, 84:9, 86:14,
89:18, 102:16,
104:19, 104:20,
105:1, 105:2, 105:3,
105:20
**acted** [1] - 112:11
**acting** [1] - 185:1
**action** [2] - 104:11,
138:13
**actions** [3] - 95:11,
95:16, 95:17
**activated** [1] - 216:11
**active** [1] - 132:7
**activities** [1] - 103:5
**activity** [2] - 142:22,
184:10
**actual** [11] - 27:12,
80:4, 91:19, 97:4,
147:15, 183:24,
195:6, 198:6, 198:7,
218:24, 220:3
**actuality** [1] - 7:14
**ad** [1] - 26:16
**add** [7] - 15:8, 27:23,
66:19, 131:13,
195:15, 208:11,
208:15
**additional** [5] - 13:4,
33:11, 85:16,
170:18, 218:15
**additionally** [1] -
65:15
**address** [118] - 3:2,

---

5:19, 19:2, 19:7,
19:13, 23:4, 23:5,
23:7, 23:10, 23:13,
24:11, 30:14, 90:13,
90:20, 90:21, 90:24,
90:25, 91:1, 92:14,
93:5, 97:3, 97:4,
106:6, 106:22,
107:15, 107:17,
109:5, 109:6, 109:7,
131:22, 132:3,
132:4, 132:5, 132:6,
132:19, 132:21,
132:23, 133:2,
134:21, 141:3,
143:21, 143:22,
143:25, 148:5,
148:6, 148:9,
159:21, 169:14,
187:18, 187:19,
188:1, 188:13,
188:19, 188:21,
188:24, 189:11,
189:12, 189:13,
189:18, 191:5,
191:7, 191:11,
192:20, 193:2,
193:5, 193:8,
193:13, 193:17,
193:18, 193:19,
193:22, 193:23,
194:10, 194:12,
194:15, 194:16,
194:18, 194:19,
194:22, 195:4,
195:9, 195:10,
196:17, 196:21,
209:25, 210:3,
210:12, 210:13,
210:16, 210:20,
210:22, 211:1,
219:10, 222:1,
222:22, 222:23,
223:1, 223:4, 223:6,
223:9, 223:13,
223:18, 224:9,
224:17, 224:18,
224:21, 224:23,
224:25, 225:6,
225:8, 225:12,
226:10, 226:11,
226:15, 229:2
**addressed** [5] - 94:11,
143:3, 143:4, 152:3,
152:4
**addresses** [15] - 96:4,
96:24, 97:1, 100:1,
100:20, 107:20,
140:19, 147:8,
147:11, 159:1,
212:16, 222:20,

223:12, 223:21, 224:6
**addressing** [1] - 182:3
**adequate** [2] - 4:4, 4:6
**ADHD** [2] - 54:14, 55:21
**adjourn** [1] - 35:3
**adjourned** [1] - 230:2
**adjudication** [2] - 32:9
**adjust** [1] - 119:20
**administer** [1] - 38:25
**administrative** [1] - 63:20
**admit** [1] - 121:14
**admitted** [7] - 9:9, 121:17, 121:20, 121:22, 197:25, 198:2, 198:19
**adult** [1] - 53:2
**advance** [2] - 77:14, 119:11
**adverse** [1] - 10:9
**affairs** [1] - 36:25
**affect** [2] - 17:13, 42:11
**affected** [1] - 5:8
**Afga** [1] - 11:15
**AFGA** [1] - 11:15
**Afga-Gevaert** [1] - 11:15
**afraid** [2] - 174:7, 196:13
**Africa** [2] - 102:21, 125:1
**aftermath** [1] - 53:3
**afternoon** [5] - 34:19, 38:20, 122:12, 173:11, 198:17
**afterwards** [3] - 134:13, 134:16, 151:6
**AGCM** [1] - 205:8
**age** [1] - 53:2
**agencies** [2] - 100:23, 103:11
**agency** [3] - 67:14, 205:2, 212:19
**agent** [31] - 38:16, 40:24, 42:4, 42:7, 67:20, 70:1, 86:21, 88:1, 88:24, 98:2, 103:2, 145:2, 163:16, 164:23, 165:25, 176:4, 190:12, 211:11, 212:6, 212:21, 212:24, 213:8, 213:9, 213:20, 213:21, 214:3, 216:2, 223:19,

223:25, 227:24
**agent's** [4] - 212:9, 212:10, 213:3, 216:2
**agents** [35] - 38:12, 38:14, 52:17, 86:24, 88:16, 92:2, 94:18, 94:25, 95:4, 95:6, 95:16, 95:24, 96:13, 103:10, 126:14, 126:23, 127:4, 129:17, 129:18, 139:6, 142:2, 144:11, 144:23, 146:22, 147:5, 158:13, 160:1, 160:3, 160:7, 169:8, 169:10, 169:16, 174:13, 216:1, 221:6
**Agfa** [2] - 11:20, 12:25
**Agfa-Gevaert** [1] - 12:25
**aggregator** [2] - 110:13, 112:21
**aggressive** [1] - 142:20
**ago** [20] - 49:14, 50:12, 50:15, 53:16, 64:14, 64:19, 65:21, 68:11, 68:24, 71:20, 71:21, 100:9, 104:25, 117:7, 199:17, 224:12, 225:22, 226:3, 226:4, 226:16
**agree** [14] - 15:7, 24:6, 32:23, 57:2, 57:12, 76:9, 84:25, 109:19, 116:4, 122:23, 174:22, 194:5, 200:1, 203:17
**agreed** [1] - 162:4
**agreeing** [1] - 137:11
**Agreement** [1] - 176:17
**agreement** [5] - 13:5, 56:21, 94:22, 143:1, 222:9
**agreements** [3] - 176:23, 221:5, 221:7
**ahead** [10] - 13:12, 17:16, 124:22, 145:3, 153:24, 154:19, 154:23, 169:22, 198:15, 198:21
**ahold** [1] - 123:23
**ailing** [2] - 56:19, 57:4
**air** [2] - 20:15, 65:18
**aircraft** [1] - 130:3
**airline** [19] - 38:10,

38:11, 38:12, 40:23, 50:7, 62:9, 87:5, 87:6, 88:8, 88:11, 100:2, 102:19, 103:1, 124:13, 124:23, 176:12, 190:6, 217:2, 217:10
**Airlines** [6] - 10:19, 12:13, 88:11, 110:10, 110:11
**airlines** [10] - 53:4, 102:3, 110:4, 110:25, 111:6, 111:7, 113:13, 190:7, 216:23, 216:25
**airplane** [3] - 208:18, 209:5, 221:17
**airport** [12] - 114:24, 135:23, 141:14, 159:18, 160:2, 160:7, 160:9, 162:10, 165:25, 176:10, 221:16, 221:17
**airports** [1] - 107:11
**al** [1] - 1:6
**Alaska** [1] - 12:13
**Alaskan** [1] - 10:19
**ALEXANDER** [1] - 2:7
**ALEXANDRA** [1] - 2:5
**algorithm** [1] - 195:19
**alive** [1] - 27:19
**allegation** [3] - 16:22, 108:3, 108:9
**allegedly** [7] - 16:20, 16:21, 18:9, 18:17, 23:4, 32:19, 108:7
**alleges** [1] - 78:20
**alleging** [1] - 38:17
**allocate** [1] - 115:9
**allocating** [1] - 202:21
**allow** [10] - 15:2, 20:12, 30:11, 31:10, 31:17, 31:18, 33:24, 34:7, 138:24, 141:21
**allowed** [11] - 14:4, 14:21, 17:3, 24:18, 25:8, 25:9, 26:10, 28:4, 30:8, 34:10, 84:6, 138:10, 152:7, 152:17, 191:19, 212:2, 224:15
**allows** [3] - 133:25, 166:3
**almost** [9] - 15:16, 15:19, 62:3, 68:20, 71:2, 98:11, 127:22, 178:7, 218:2
**alone** [1] - 101:18

**aloud** [1] - 36:10
**alphabetical** [1] - 58:7
**alphanumeric** [1] - 134:20
**altogether** [3] - 32:13, 32:16, 50:20
**amateurs** [1] - 150:5
**Amazon** [2] - 133:8, 133:12
**ambush** [1] - 28:1
**Amended** [1] - 120:24
**America** [1] - 144:19
**American** [5] - 35:10, 92:8, 110:11, 180:3, 183:11
**amount** [6] - 9:25, 53:15, 53:19, 66:18, 127:12, 184:5
**amounts** [1] - 66:20
**analysis** [2] - 17:17, 151:6
**analyze** [1] - 147:12
**analyzed** [1] - 98:12
**ancillaries** [3] - 130:1, 130:7, 130:9
**ancillary** [1] - 131:13
**AND** [1] - 1:2
**Android** [1] - 130:18
**angry** [1] - 170:14
**Anne** [1] - 112:16
**annoys** [1] - 140:20
**answer** [38] - 6:1, 9:21, 11:3, 27:9, 36:12, 36:16, 36:21, 37:18, 39:13, 46:11, 51:23, 53:25, 76:18, 123:10, 123:22, 124:7, 124:20, 142:14, 143:11, 143:12, 146:17, 150:12, 154:15, 158:15, 158:21, 161:5, 161:7, 161:9, 161:11, 161:19, 163:11, 199:20, 217:17, 222:8, 222:13
**answered** [7] - 23:7, 37:16, 45:22, 54:2, 69:1, 69:2, 70:21
**answers** [2] - 37:10, 42:14, 71:16
**Anthony** [2] - 9:3, 87:14
**ANTHONY** [1] - 1:19
**antitrust** [2] - 204:23, 205:1
**anyway** [1] - 25:10
**anyways** [2] - 66:6, 223:10

**apart** [1] - 128:22
**API** [3] - 121:6, 129:7, 181:16
**apologies** [6] - 123:16, 125:6, 168:14, 173:15, 181:14, 207:17
**apologize** [1] - 194:8
**app** [12] - 130:18, 135:3, 135:4, 135:19, 135:22, 136:2, 136:4, 136:8, 137:14, 139:2, 139:5, 144:3
**appear** [6] - 15:25, 29:10, 136:25, 137:2, 139:25, 140:1
**APPEARANCES** [1] - 1:15
**Appearances** [1] - 2:1
**Apple** [1] - 130:18
**applicable** [2] - 4:11, 5:11
**application** [1] - 89:7
**apply** [8] - 10:23, 40:17, 51:23, 75:15, 75:21, 78:24, 84:20, 215:19
**appointments** [5] - 46:22, 46:24, 47:6, 47:7, 70:13
**appreciate** [4] - 35:9, 59:3, 118:9, 228:15
**approach** [7] - 3:14, 120:21, 122:1, 145:14, 161:20, 217:7, 217:11
**approached** [1] - 113:2
**approaches** [1] - 219:18
**approaching** [1] - 29:17
**appropriate** [1] - 214:7
**approved** [1] - 165:3
**apps** [1] - 130:17
**area** [4] - 48:20, 88:12, 169:2, 189:21
**argue** [2] - 27:12, 32:24
**argued** [1] - 13:7
**arguing** [1] - 9:2
**argument** [12] - 3:13, 6:1, 9:10, 12:8, 13:12, 13:14, 28:17, 28:18, 28:20, 28:25, 30:17, 124:3
**arguments** [5] - 6:12, 76:10, 82:18, 82:20,

84:22
**arise** [1] - 75:19
**arising** [1] - 28:7
**arithmetic** [1] - 169:3
**arm's** [2] - 110:17, 184:14
**arm's-length** [1] - 110:17
**arms** [1] - 197:11
**arrange** [1] - 101:25
**arrested** [1] - 49:17
**arrive** [1] - 141:14
**article** [2] - 82:3, 82:5
**articulate** [1] - 57:20
**aside** [3] - 33:1, 85:12, 164:20
**Aside** [1] - 135:18
**aspects** [1] - 83:1
**assess** [1] - 89:20
**assessing** [1] - 15:20
**assessment** [2] - 15:7, 15:17
**assets** [1] - 56:13
**assistant** [3] - 12:19, 12:20, 14:11
**assisting** [1] - 35:17
**associated** [14] - 19:3, 19:8, 90:25, 92:15, 109:10, 113:24, 187:4, 188:13, 189:3, 191:6, 192:7, 192:19, 193:3, 194:23
**association** [1] - 223:15
**assume** [5] - 120:2, 178:10, 179:7, 200:17, 227:8
**assumed** [3] - 8:10, 166:22, 166:24
**assuming** [4] - 17:20, 22:7, 34:19, 134:12
**assumption** [2] - 4:16, 214:9
**assure** [1] - 36:23
**Atlanta** [1] - 68:10
**attach** [1] - 149:11
**Attached** [1] - 121:8
**attached** [1] - 21:6
**attack** [34] - 20:18, 31:24, 123:8, 124:2, 124:5, 124:10, 180:8, 181:12, 181:23, 182:13, 183:3, 184:3, 184:9, 184:17, 185:3, 185:8, 187:9, 187:12, 191:4, 192:3, 192:21, 193:2, 193:4, 193:6,

193:8, 193:13, 194:24, 196:11, 196:16, 197:8, 220:11, 220:13, 220:17, 221:13
**attacked** [2] - 62:14, 187:12
**attackers** [2] - 184:4, 184:8
**attacking** [1] - 220:24
**attacks** [6] - 104:4, 186:10, 192:19, 192:22, 197:14, 221:8
**attempt** [3] - 150:13, 166:5, 166:24
**attempted** [3] - 50:12, 50:15, 109:12
**attempting** [1] - 10:5
**attempts** [10] - 22:3, 22:4, 92:16, 166:6, 167:1, 186:17, 194:24, 195:12, 195:13, 195:14
**attend** [1] - 119:1
**attention** [5] - 36:19, 39:25, 81:17, 118:7, 153:9
**attest** [2] - 160:10, 173:3
**attorney** [1] - 100:9
**attorney's** [1] - 121:9
**attorney's-eyes-only** [1] - 121:9
**attorneys** [5] - 71:2, 76:7, 85:14, 85:15, 85:17
**attractions** [1] - 101:21
**attributable** [2] - 174:12, 174:17
**attributing** [1] - 202:20
**audience** [1] - 145:18
**August** [5] - 157:24, 170:21, 171:20, 173:9, 173:20
**authenticated** [2] - 191:19, 216:11
**authenticates** [1] - 191:12
**authorities** [3] - 128:5, 205:9, 205:14
**Authority** [1] - 10:11
**authority** [7] - 9:19, 15:9, 18:5, 204:23, 205:6, 205:10, 205:18
**authorization** [6] - 75:1, 79:11, 79:16,

156:18, 156:22, 156:23
**authorize** [1] - 152:12
**authorized** [5] - 10:15, 10:22, 93:16, 93:23, 98:7
**automated** [1] - 138:3
**automatic** [1] - 56:2
**automatically** [1] - 89:8
**availability** [1] - 129:2
**available** [8] - 8:13, 39:17, 68:19, 73:14, 77:15, 99:15, 110:21, 137:4
**average** [5] - 87:8, 159:25, 160:2, 166:18, 167:25
**averages** [1] - 201:8
**avoid** [3] - 89:14, 91:2, 222:12
**award** [2] - 118:14, 118:15
**aware** [13] - 64:1, 67:3, 119:3, 127:6, 128:8, 166:18, 167:21, 171:13, 220:8, 225:5, 226:16, 228:3, 228:6
**awareness** [2] - 62:17, 127:6
**awful** [1] - 123:6
**awkward** [1] - 25:1

### B

**B.V** [2] - 152:4, 157:16
**B.V.'s** [1] - 120:23
**back-end** [1] - 162:8
**background** [2] - 89:23, 143:9
**backing** [1] - 176:8
**bad** [8] - 45:17, 51:9, 57:20, 57:21, 63:11, 70:19, 89:21, 146:1
**bag** [6] - 129:11, 130:2, 131:14, 169:24, 170:1
**baggage** [1] - 135:24
**ball** [1] - 8:25
**Bananas** [16] - 35:17, 36:9, 37:13, 38:25, 39:2, 39:4, 58:19, 68:1, 71:14, 73:8, 73:15, 73:19, 74:17, 81:17, 119:18, 126:17
**bank** [9] - 27:5, 27:8, 69:5, 69:9, 134:12,

183:13, 218:2, 218:3
**banks** [2] - 148:13, 179:25
**Barcelona** [2] - 90:5, 180:13
**bare** [1] - 36:4
**barely** [1] - 111:16
**BARRY** [1] - 1:16
**base** [2] - 6:4, 129:12
**based** [19] - 4:16, 8:12, 37:10, 38:11, 76:22, 82:11, 89:17, 106:4, 117:19, 124:13, 124:23, 133:9, 151:25, 161:3, 161:13, 177:5, 187:21, 201:17, 227:25
**basic** [1] - 161:17
**basis** [10] - 8:19, 24:19, 33:4, 117:5, 127:22, 161:8, 162:12, 171:6, 171:7, 171:11
**bat** [1] - 49:17
**bathroom** [2] - 43:15, 55:19
**battle** [1] - 170:10
**became** [1] - 147:19
**Bechtel** [1] - 49:14
**become** [2] - 75:9, 229:10
**becomes** [1] - 217:1
**bed** [1] - 52:3
**began** [2] - 86:21, 201:12
**begin** [8] - 38:19, 38:24, 39:12, 74:22, 84:23, 85:16, 118:23, 141:22
**beginning** [7] - 34:15, 82:19, 144:6, 158:21, 179:16, 200:1, 200:13
**behalf** [7] - 62:14, 92:25, 122:7, 123:9, 124:4, 153:20, 210:8
**behavior** [1] - 89:10
**behind** [5] - 124:5, 124:9, 140:4, 172:8, 220:10
**Belgium** [2] - 52:1, 52:12
**believable** [1] - 77:7
**believes** [1] - 115:12
**belong** [1] - 141:8
**belonging** [2] - 109:6, 109:7
**belongs** [2] - 23:5, 215:24

**below** [4] - 170:23, 171:19, 204:10, 204:11
**bench** [1] - 83:11
**benign** [1] - 104:3
**best** [7] - 31:8, 31:20, 65:22, 82:16, 83:16, 176:2, 229:6
**better** [12] - 22:5, 53:5, 141:21, 141:25, 149:12, 150:19, 151:14, 167:4, 182:10, 182:25, 184:15, 229:7
**between** [21] - 5:4, 20:17, 20:21, 29:25, 30:9, 31:13, 34:15, 49:14, 64:14, 69:20, 75:19, 135:19, 144:5, 146:11, 156:11, 160:5, 166:4, 167:9, 173:9, 190:25, 213:7
**beyond** [8] - 33:21, 33:22, 46:23, 55:24, 55:25, 56:19, 78:23, 197:23
**BI** [1] - 144:14
**bias** [1] - 77:2
**big** [5] - 61:10, 127:18, 127:19, 128:10, 223:10
**bigger** [4] - 88:10, 178:3, 203:21, 222:3
**biggest** [2] - 107:1, 158:18
**bill** [4] - 167:19, 185:22, 185:24, 185:25
**Bill** [1] - 87:14
**billion** [5] - 102:22, 102:23, 113:20, 127:9, 130:12
**binder** [3] - 122:1, 198:4, 198:9
**birth** [1] - 100:3
**bit** [28] - 4:19, 14:3, 20:2, 24:20, 28:14, 33:11, 34:3, 44:17, 44:18, 78:5, 89:12, 99:19, 104:24, 108:2, 110:2, 119:18, 119:20, 120:10, 123:24, 129:22, 148:21, 151:8, 173:9, 177:2, 178:8, 179:16, 203:15, 229:19
**Bitcoin** [1] - 215:5
**bite** [1] - 189:25

**bite-sized** [1] - 189:25
**black** [1] - 156:1
**blacklist** [2] - 147:7, 147:9
**blank** [2] - 82:24, 181:21
**blew** [1] - 12:13
**blind** [1] - 73:20
**block** [6] - 25:25, 87:25, 149:15, 150:3, 150:10, 150:13
**blocked** [1] - 192:17
**blocking** [1] - 150:17
**blow** [2] - 137:20, 177:1
**bluntly** [1] - 4:22
**board** [1] - 219:13
**boarding** [1] - 190:10
**bodies** [1] - 202:6
**Boeing** [3] - 12:11, 20:4
**bolded** [1] - 156:15
**bolt** [5] - 17:24, 17:25, 18:2, 20:9
**bolted** [2] - 12:16, 12:18
**bolts** [6] - 12:12, 12:14, 12:17, 20:6, 20:7
**book** [21] - 21:11, 38:12, 46:2, 51:14, 53:4, 61:25, 65:20, 67:19, 68:20, 68:24, 92:10, 95:8, 102:3, 136:17, 170:19, 178:18, 182:19, 211:11, 214:21, 224:24, 225:25
**booked** [38] - 42:1, 42:3, 42:8, 42:18, 46:11, 49:3, 49:24, 49:25, 51:25, 52:10, 54:6, 61:25, 63:6, 63:7, 67:6, 67:18, 67:21, 68:15, 68:21, 68:22, 68:24, 70:22, 113:24, 114:1, 115:12, 179:3, 200:13, 202:7, 202:9, 202:10, 204:15, 206:8, 206:9, 208:16, 218:6, 218:7, 218:13
**booker** [1] - 67:2
**booker's** [1] - 210:12
**booking** [112] - 17:21, 21:2, 21:3, 21:13, 21:15, 21:21, 21:22, 22:8, 23:11, 24:13,

38:10, 38:14, 42:7, 45:24, 53:2, 54:2, 65:21, 67:13, 99:24, 109:22, 133:16, 134:21, 134:25, 135:20, 139:12, 139:20, 139:21, 140:1, 140:5, 143:21, 144:15, 144:17, 145:3, 147:8, 150:14, 151:6, 151:7, 159:14, 166:24, 169:21, 170:1, 171:13, 176:6, 178:18, 178:19, 178:21, 178:22, 179:6, 179:8, 180:16, 187:7, 187:8, 187:10, 187:11, 187:13, 187:14, 188:17, 188:18, 190:4, 190:5, 192:24, 193:1, 193:5, 195:6, 199:13, 201:10, 201:13, 208:10, 208:11, 209:12, 209:15, 209:17, 209:23, 210:8, 210:10, 210:19, 210:22, 210:24, 211:2, 211:3, 211:8, 211:21, 212:7, 212:11, 213:16, 213:18, 213:21, 215:1, 215:11, 217:16, 218:15, 219:24, 220:19, 220:22, 221:14, 221:18, 221:19, 221:23, 222:2, 224:20, 225:24, 226:9, 226:11, 226:13, 227:20, 227:21, 227:22, 228:2
**BOOKING** [1] - 1:6
**Booking** [62] - 4:9, 4:10, 5:22, 18:15, 18:16, 18:19, 18:23, 19:4, 19:8, 19:11, 19:15, 20:18, 20:21, 20:25, 23:5, 23:8, 24:10, 24:17, 25:20, 47:12, 49:6, 50:1, 52:25, 54:4, 54:6, 54:7, 57:21, 58:14, 63:8, 63:9, 63:11, 93:20, 93:22, 93:23, 93:25, 94:8, 101:7,

101:9, 101:15, 104:23, 123:1, 123:8, 123:9, 124:1, 124:4, 156:4, 156:5, 156:6, 156:7, 156:11, 156:12, 156:17, 156:21, 157:2, 157:6, 157:12, 157:24, 158:14, 186:24
**booking's** [1] - 21:14
**Booking's** [1] - 18:24
**Booking-related** [1] - 18:19
**Booking.com** [275] - 14:3, 16:22, 21:3, 21:4, 21:6, 21:19, 21:21, 21:22, 22:1, 22:9, 22:13, 23:13, 25:6, 26:1, 27:18, 27:22, 30:1, 38:16, 41:3, 42:5, 42:9, 45:15, 45:24, 46:2, 46:12, 50:25, 51:5, 51:6, 51:10, 51:24, 52:2, 52:7, 52:17, 57:15, 57:22, 61:24, 66:16, 68:22, 70:17, 70:23, 74:24, 75:4, 75:5, 78:14, 79:9, 79:14, 79:18, 79:19, 79:23, 80:4, 80:6, 80:11, 84:10, 84:11, 84:15, 86:8, 86:10, 86:25, 88:13, 88:16, 88:17, 88:21, 89:1, 91:8, 91:15, 91:16, 91:23, 92:15, 92:20, 93:14, 93:15, 93:17, 93:20, 93:22, 94:2, 94:5, 94:6, 94:12, 94:13, 94:14, 94:16, 94:17, 95:25, 96:7, 96:16, 96:23, 97:7, 97:11, 97:13, 97:22, 98:12, 98:13, 98:16, 99:2, 99:4, 99:13, 99:14, 99:22, 100:7, 100:13, 100:18, 100:19, 100:23, 100:25, 101:2, 101:4, 101:6, 101:9, 101:15, 101:18, 101:19, 101:22, 102:1, 102:7, 102:10, 102:12, 103:3, 103:8, 105:13, 105:22, 106:2, 106:11, 107:5, 107:7, 107:8, 107:13, 107:15,

107:16, 107:21, 108:3, 108:11, 108:13, 108:16, 108:18, 108:22, 109:7, 109:11, 110:4, 110:5, 110:6, 110:10, 110:14, 110:22, 110:25, 111:2, 111:4, 111:5, 111:10, 111:15, 111:16, 112:6, 112:10, 112:11, 113:3, 114:18, 115:9, 115:11, 116:1, 116:7, 116:14, 116:16, 116:17, 116:20, 116:23, 117:7, 117:22, 117:24, 118:4, 118:16, 120:23, 121:10, 122:20, 124:3, 124:5, 124:8, 126:11, 126:14, 126:15, 126:23, 140:2, 140:6, 140:12, 142:3, 143:18, 146:12, 146:14, 148:14, 150:21, 151:1, 151:16, 151:25, 152:4, 152:16, 153:13, 154:5, 155:3, 155:7, 155:16, 156:8, 157:16, 157:19, 157:23, 158:1, 158:4, 170:19, 174:17, 186:7, 186:9, 186:11, 186:16, 186:18, 186:22, 187:5, 187:6, 187:7, 187:8, 188:13, 190:16, 190:17, 190:18, 199:2, 199:6, 199:7, 199:16, 199:23, 200:8, 200:13, 200:24, 201:10, 201:13, 202:14, 202:21, 203:9, 204:20, 206:12, 214:15, 214:16, 217:14, 217:18, 217:19, 218:17, 220:9, 220:12, 220:16, 220:18, 221:23, 222:23, 223:2, 223:3, 223:6, 223:9, 223:12, 224:2, 224:8,

224:19, 224:23, 225:6, 225:14, 225:18, 225:24, 225:25, 226:17, 227:2, 228:5
**Booking.com's** [27] - 75:12, 75:13, 79:21, 79:24, 79:25, 80:2, 80:9, 84:15, 93:21, 94:10, 98:15, 102:5, 104:14, 110:22, 116:14, 118:13, 120:20, 121:11, 121:15, 140:11, 146:9, 155:10, 168:11, 177:23, 177:24, 186:3
**bookings** [39] - 18:16, 25:15, 45:23, 68:18, 103:21, 104:1, 115:12, 129:2, 139:18, 140:10, 145:2, 147:22, 148:1, 148:19, 149:18, 149:21, 150:25, 151:5, 155:21, 159:11, 166:1, 167:15, 169:11, 170:21, 176:9, 182:6, 194:25, 202:5, 202:22, 202:23, 203:21, 204:12, 204:18, 204:23, 224:12, 224:13, 226:9, 227:2, 227:16
**books** [2] - 142:4, 143:23
**boss** [1] - 223:24
**Boston** [5] - 64:15, 64:25, 177:6, 178:15, 178:16
**bot** [15] - 22:4, 128:25, 138:9, 142:14, 142:20, 148:24, 150:1, 184:11, 195:12, 220:20, 221:9, 221:13, 221:16, 221:23
**bother** [2] - 61:7, 61:10
**bothering** [1] - 164:13
**bots** [8] - 89:6, 89:13, 98:15, 139:8, 139:14, 151:2, 152:17, 220:25
**bottom** [7] - 5:4, 136:8, 137:8, 152:9, 153:24, 154:1, 156:15

**bought** [1] - 107:5
**box** [10] - 36:10, 36:15, 36:19, 36:22, 37:12, 37:19, 39:5, 58:19, 83:19, 137:13
**boxes** [1] - 219:11
**Brady** [12] - 88:2, 88:3, 94:19, 94:24, 95:20, 96:2, 96:14, 103:22, 104:13, 107:18
**Brazos** [1] - 10:11
**breach** [1] - 153:19
**breaches** [1] - 153:21
**break** [12] - 25:3, 28:14, 38:21, 73:8, 86:3, 118:19, 138:19, 175:8, 175:17, 198:13, 198:16, 198:17
**breakdown** [1] - 22:2
**breaker** [2] - 183:7, 183:15
**breakfast** [1] - 52:3
**breaks** [6] - 38:23, 43:15, 55:19, 59:16, 59:19, 66:3
**brevity** [1] - 207:9
**brick** [1] - 212:18
**bricks** [2] - 211:19, 212:15
**bridge** [1] - 31:12
**brief** [7] - 13:8, 15:9, 17:4, 38:7, 40:7, 83:21, 83:25
**briefly** [4] - 55:13, 65:25, 120:19, 120:20
**bring** [4] - 74:2, 81:16, 120:11, 155:22
**bringing** [1] - 120:15
**broad** [2] - 12:9, 94:11
**broke** [1] - 145:25
**broken** [1] - 34:22
**brought** [4] - 75:5, 117:6, 117:8, 142:20
**browse** [1] - 136:7
**browser** [1] - 191:17
**Brussels** [1] - 51:25
**Bryson** [6] - 1:12, 35:15, 37:4, 88:24, 89:15, 117:7
**budget** [1] - 62:9
**build** [2] - 104:3, 115:19
**building** [1] - 194:16
**built** [7] - 93:8, 130:19, 130:21, 147:3, 148:22, 165:18, 179:23

**burden** [11] - 78:6, 78:7, 78:10, 78:12, 78:14, 78:18, 78:21, 78:22, 78:24, 78:25
**burdens** [1] - 78:5
**business** [41] - 33:21, 33:23, 35:23, 38:18, 38:25, 61:6, 80:3, 80:6, 94:20, 95:1, 95:6, 100:14, 101:5, 101:12, 101:14, 101:18, 101:22, 102:2, 103:5, 103:15, 103:25, 107:25, 108:19, 110:9, 110:14, 111:16, 112:3, 115:7, 117:1, 118:25, 124:12, 147:10, 176:25, 213:24, 214:2, 214:6, 214:8, 214:10, 217:5
**button** [2] - 131:4, 208:15
**buy** [5] - 92:6, 106:19, 149:9, 149:10, 220:15
**buyer** [2] - 55:6, 55:7
**buying** [4] - 106:16, 114:18, 149:6
**buys** [2] - 106:25, 190:8
**BY** [35] - 1:16, 122:11, 123:4, 123:21, 124:21, 126:21, 143:16, 145:16, 146:7, 150:9, 153:6, 154:21, 159:4, 161:22, 164:19, 165:8, 169:6, 173:2, 175:4, 175:23, 181:9, 185:6, 187:16, 188:11, 189:24, 193:7, 194:6, 198:24, 203:5, 203:16, 204:2, 207:19, 209:22, 222:15, 226:2

## C

**calculate** [2] - 167:3, 177:24
**calculated** [5] - 3:22, 4:10, 4:15, 5:6, 5:9
**calculation** [2] - 5:8, 8:9
**calculations** [3] - 8:3,

166:20, 167:16
**calculator** [6] - 145:12, 146:1, 168:6, 179:13, 182:25, 204:9
**California** [2] - 49:13, 73:1
**calm** [1] - 182:16
**camera** [1] - 165:13
**campaign** [5] - 94:18, 103:10, 103:11, 112:5
**cancel** [1] - 127:8
**cancellations** [3] - 86:19, 93:10, 210:25
**cancelled** [14] - 86:16, 111:23, 202:2, 202:3, 202:8, 202:10, 202:13, 202:22, 204:18, 204:24, 205:24, 216:4, 217:24, 218:9
**cancelling** [1] - 205:15
**cannot** [8] - 19:21, 25:24, 36:5, 39:17, 44:20, 55:24, 80:23, 141:7
**capable** [1] - 38:2
**captain** [1] - 126:7
**car** [12] - 27:5, 42:4, 54:22, 59:22, 59:23, 68:11, 71:19, 99:9, 101:20, 103:4, 207:6
**card** [46] - 91:14, 91:16, 92:10, 92:13, 97:8, 97:11, 97:14, 97:16, 105:24, 106:6, 106:13, 106:15, 106:22, 134:11, 134:23, 140:19, 140:20, 141:7, 141:8, 144:20, 159:1, 169:17, 180:4, 180:10, 180:12, 180:17, 180:23, 180:24, 181:1, 181:17, 181:20, 181:21, 185:9, 185:10, 185:11, 185:25, 214:21, 215:6, 215:23, 216:3, 216:5, 217:24, 218:4, 219:23, 219:25
**cards** [10] - 97:9, 97:10, 99:25, 106:4, 106:9, 106:10, 180:1, 183:10,

215:9, 215:10
**care** [14] - 35:19, 55:4, 57:4, 63:20, 65:11, 65:12, 66:4, 67:8, 67:9, 69:14, 129:18, 212:24
**careful** [4] - 100:12, 119:19, 158:17
**carefully** [1] - 172:9
**carrier** [1] - 121:12
**carriers** [2] - 112:19, 113:13
**carries** [1] - 149:24
**carrying** [1] - 8:25
**case** [132] - 4:18, 4:22, 4:25, 5:1, 7:2, 7:21, 8:21, 9:25, 10:2, 10:7, 10:11, 10:15, 10:19, 10:25, 11:1, 11:16, 11:20, 12:3, 12:9, 13:9, 14:9, 14:11, 14:19, 15:7, 15:12, 15:14, 35:16, 35:24, 35:25, 36:1, 36:5, 37:6, 38:7, 38:18, 40:7, 40:8, 40:10, 40:12, 40:14, 40:17, 41:1, 46:22, 48:3, 48:13, 48:14, 49:14, 60:3, 60:15, 60:16, 60:22, 61:11, 64:2, 64:14, 64:22, 64:23, 66:14, 67:1, 69:17, 69:18, 74:22, 74:23, 76:3, 76:22, 78:3, 78:16, 78:24, 79:2, 80:20, 80:22, 80:23, 80:25, 81:1, 81:3, 81:5, 81:7, 81:8, 81:16, 81:18, 81:19, 81:24, 82:2, 82:4, 82:7, 82:8, 82:10, 82:11, 82:13, 82:17, 83:25, 84:1, 84:2, 85:4, 88:8, 88:9, 88:17, 88:19, 89:8, 94:19, 98:25, 99:11, 99:20, 102:10, 102:14, 102:17, 105:4, 107:16, 114:3, 114:6, 115:5, 115:15, 120:13, 120:16, 145:7, 156:1, 160:16, 176:11, 178:17, 182:7, 186:5, 186:24, 191:10, 197:2, 208:7, 209:11, 213:20,

222:19, 223:17, 225:3
**Case** [1] - 1:5
**cases** [17] - 9:24, 9:25, 10:17, 10:18, 11:1, 11:17, 12:4, 15:8, 26:13, 26:17, 48:19, 55:18, 78:22, 113:12, 113:13, 141:16
**Castle** [2] - 50:12, 50:15
**casual** [2] - 67:2
**cat** [6] - 149:11, 149:13, 150:6, 150:7, 150:8, 184:9
**catch** [2] - 151:13, 159:11
**catching** [1] - 150:4
**categories** [3] - 6:18, 6:19, 114:20
**category** [2] - 5:20, 7:15
**caught** [1] - 185:4
**cause-worthy** [1] - 57:23
**caused** [5] - 14:6, 79:12, 79:23, 193:4
**causes** [1] - 153:21
**causing** [7] - 91:9, 111:22, 113:17, 113:18, 113:19, 126:17, 129:20
**caution** [1] - 83:2
**cease** [6] - 104:24, 105:10, 111:12, 119:7, 154:2, 155:1
**cell** [1] - 81:21
**central** [2] - 27:7, 163:25
**cents** [5] - 160:4, 178:6, 178:17, 179:9
**CEO** [4] - 182:17, 182:21, 215:23, 223:10
**certain** [6] - 13:18, 53:18, 76:9, 76:14, 150:3, 156:10
**certainly** [6] - 11:6, 113:18, 164:10, 176:20, 211:15, 211:21
**certify** [1] - 230:7
**cetera** [6] - 126:8, 132:17, 139:11, 144:1, 152:7, 213:5
**CFAA** [9] - 4:17, 4:20, 84:8, 84:10, 84:11, 84:14, 86:14, 94:10, 105:19

**CFO** [1] - 186:1
**challenge** [6] - 6:5, 31:3, 66:21, 128:6, 167:6
**challenges** [1] - 31:4
**challenging** [1] - 6:13
**chance** [1] - 47:5
**change** [20] - 5:15, 6:2, 6:3, 7:17, 7:18, 7:20, 8:8, 8:22, 11:4, 26:3, 89:12, 117:18, 141:6, 147:16, 149:13, 157:25, 170:13, 191:21, 192:24, 215:11
**changed** [2] - 65:22, 206:2
**changes** [10] - 13:6, 53:3, 65:14, 92:6, 144:1, 147:16, 157:23, 182:22, 213:19, 217:22
**changing** [8] - 3:4, 4:13, 22:16, 127:22, 149:11
**channel** [1] - 152:11
**character** [3] - 88:10, 134:20, 185:11
**characters** [1] - 197:8
**charge** [5] - 87:21, 87:23, 88:3, 138:21, 166:19
**charged** [4] - 97:13, 183:13, 185:10, 185:11
**charges** [1] - 166:4
**chart** [1] - 199:1
**chat** [2] - 170:24, 171:1
**cheap** [1] - 62:9
**cheapest** [1] - 52:13
**check** [18] - 72:2, 85:15, 133:25, 135:2, 137:13, 159:13, 162:9, 169:18, 180:16, 181:17, 182:19, 185:14, 190:12, 196:25, 219:10, 219:13
**checked** [3] - 112:11, 168:10, 186:25
**checking** [3] - 91:22, 137:13, 226:4
**checks** [2] - 181:20, 219:15
**chief** [13] - 12:10, 87:20, 88:2, 88:6, 122:18, 125:13, 125:16, 125:18,

147:19, 158:7, 160:13, 163:8, 172:4
**child** [10] - 62:13, 62:16, 63:20, 65:10, 65:11, 65:12, 66:4, 67:8, 67:9, 211:1
**children** [2] - 63:19, 179:4
**chilly** [1] - 120:16
**choice** [12] - 7:4, 7:7, 16:23, 99:1, 99:4, 115:16, 124:14, 124:24, 216:12, 216:19, 218:4, 219:17
**choices** [4] - 99:8, 99:12, 115:6, 115:15
**choose** [6] - 81:20, 82:24, 110:22, 111:3, 131:9, 131:14
**chose** [5] - 17:4, 26:12, 28:10, 100:5, 115:16
**chosen** [3] - 37:22, 61:4, 63:24
**Chris** [1] - 113:12
**chunks** [1] - 189:25
**Cindy** [3] - 200:5, 200:6, 200:7
**circle** [4] - 36:13, 36:20, 37:18, 39:14
**Circuit** [1] - 15:14
**circuit** [3] - 10:8, 183:7, 183:15
**circumstance** [1] - 14:20
**circumstances** [1] - 77:4
**circumvent** [1] - 220:20
**cite** [1] - 10:11
**cited** [3] - 9:24, 15:13, 26:13
**cites** [1] - 11:1
**citizen** [2] - 41:8, 180:12
**citizenship** [3] - 35:11, 63:4, 66:20
**city** [1] - 64:4
**civil** [6] - 35:25, 60:3, 60:15, 60:16, 78:24, 80:25
**claim** [2] - 31:23, 78:15
**claiming** [2] - 29:4, 96:1
**claims** [19] - 38:13, 74:23, 75:5, 75:6, 75:13, 78:13, 79:8, 80:14, 84:9, 84:12,

84:14, 84:15, 84:17, 86:15, 114:20, 115:5, 117:5, 117:6, 171:18
**clarify** [2] - 75:25, 227:16
**clear** [12] - 32:7, 55:18, 82:19, 96:12, 136:6, 144:21, 157:2, 167:4, 184:12, 185:22, 194:7, 205:1
**clearly** [1] - 16:14
**CLERK** [7] - 39:6, 46:7, 59:5, 67:8, 68:3, 71:15, 122:3
**click** [2] - 90:22, 132:6
**clicked** [1] - 133:3
**clicks** [1] - 139:11
**client** [2] - 29:10, 152:12
**client's** [1] - 153:9
**close** [10] - 14:18, 33:21, 33:23, 36:19, 40:21, 57:22, 66:24, 86:2, 160:22, 173:1
**closer** [1] - 123:20
**closest** [1] - 64:3
**cloud** [1] - 133:11
**CMO** [1] - 88:3
**co** [1] - 176:15
**co-manage** [1] - 176:15
**code** [18] - 17:21, 19:3, 19:9, 23:8, 24:11, 32:3, 32:18, 134:14, 134:17, 139:9, 176:10, 186:21, 190:1, 190:7, 190:9, 206:10, 226:13
**codes** [16] - 15:20, 16:22, 16:25, 17:7, 17:20, 18:4, 18:6, 18:9, 18:10, 18:17, 19:11, 26:4, 29:24, 30:1, 199:14
**coherent** [2] - 229:24, 229:25
**coin** [4] - 73:18, 73:19, 73:20, 74:1
**cold** [3] - 119:16, 120:9, 120:15
**colleague** [2] - 213:8, 213:9
**colleagues** [2] - 102:8, 113:11, 172:10
**collecting** [1] - 165:22
**collective** [2] - 147:10,

147:14
**collectively** [2] - 39:1, 156:12
**college** [1] - 53:2
**college-age** [1] - 53:2
**colloquy** [1] - 6:7
**columns** [2] - 191:1, 193:15
**comfort** [1] - 113:5
**comfortable** [2] - 149:23, 219:15
**coming** [14] - 25:2, 73:24, 80:17, 81:6, 113:25, 148:23, 151:10, 170:11, 181:19, 184:6, 184:12, 185:3, 192:18, 197:9
**commas** [1] - 190:25
**comment** [3] - 64:10, 69:14, 85:3
**comments** [1] - 13:2
**commerce** [2] - 125:21, 126:8
**commercial** [9] - 38:9, 79:25, 110:15, 110:17, 136:18, 137:18, 138:5, 140:15, 147:13
**commit** [1] - 79:20
**committing** [1] - 116:20
**common** [5] - 80:21, 128:14, 139:17, 162:5, 217:1
**commonly** [1] - 62:2
**communicate** [7] - 81:23, 96:2, 132:5, 135:24, 141:23
**communication** [1] - 104:10
**communications** [9] - 18:14, 18:25, 22:10, 88:5, 95:20, 105:14, 167:4, 214:8
**companies** [7] - 38:12, 41:2, 45:18, 82:8, 88:18, 101:12, 110:13
**company** [29] - 11:20, 15:13, 40:25, 42:17, 55:4, 64:15, 65:1, 73:4, 88:8, 88:25, 93:21, 99:2, 99:4, 101:6, 101:11, 101:13, 101:17, 102:24, 110:8, 110:9, 115:18, 116:23, 128:11, 129:23, 156:8,

180:1, 185:9, 185:25, 217:4
**companywide** [1] - 127:6
**compared** [3] - 17:21, 146:14, 192:1
**comparing** [1] - 30:3
**comparison** [3] - 29:24, 99:15, 103:8
**compensate** [1] - 45:9
**compensation** [1] - 141:1
**competing** [2] - 80:1, 111:25
**competition** [2] - 75:7, 99:1
**competitors** [1] - 99:16
**complained** [2] - 11:23, 120:8
**complaining** [2] - 113:13, 128:10
**complaint** [3] - 107:2, 116:15, 213:11
**complaints** [11] - 11:22, 112:22, 116:13, 116:15, 127:11, 170:3, 170:8, 226:17, 227:18, 228:4
**complete** [4] - 84:18, 165:24, 166:6, 166:8
**completed** [1] - 142:6
**completely** [4] - 4:4, 4:11, 9:6, 200:10
**completes** [1] - 65:24
**complex** [1] - 7:21
**computer** [42] - 41:15, 79:11, 89:13, 90:2, 91:10, 98:11, 99:20, 102:13, 104:21, 105:5, 105:6, 105:7, 110:5, 110:7, 115:6, 129:1, 129:3, 135:16, 138:9, 139:8, 144:16, 151:10, 151:12, 158:8, 158:12, 159:17, 181:16, 181:17, 181:24, 183:22, 190:13, 191:16, 191:23, 192:23, 193:25, 194:2, 194:4, 194:9, 194:12, 195:12, 195:19
**Computer** [14] - 74:24, 78:13, 79:8, 79:20,

84:9, 86:14, 89:18, 102:16, 104:19, 104:20, 105:1, 105:2, 105:19
**computer's** [1] - 193:22
**computers** [18] - 75:1, 79:16, 87:21, 88:4, 89:20, 99:21, 102:14, 102:16, 110:8, 133:6, 133:8, 133:15, 148:13, 191:12, 191:23, 194:14, 194:19
**conceivably** [1] - 39:21
**concentrate** [1] - 83:5
**concern** [9] - 18:7, 18:19, 25:11, 25:16, 25:18, 31:2, 56:1, 61:13, 221:24
**concerned** [6] - 30:24, 30:25, 61:2, 221:10, 223:13, 227:11
**concerns** [9] - 6:10, 27:18, 31:9, 48:4, 48:6, 48:9, 48:25, 222:3
**concluded** [1] - 98:12
**conclusion** [2] - 15:25, 22:1
**conclusions** [1] - 31:18
**condition** [2] - 39:23, 54:12
**conditioning** [1] - 65:18
**conditions** [2] - 131:5, 207:4
**conduct** [8] - 4:16, 4:20, 79:17, 80:18, 84:24, 115:7, 117:17, 205:15
**conferences** [4] - 83:11, 83:14, 83:17, 83:19
**confidence** [1] - 47:4
**confidential** [2] - 26:8, 121:9
**confidentiality** [2] - 27:18, 31:9
**confidentially** [1] - 37:7
**confined** [1] - 7:15
**confirm** [7] - 27:17, 131:4, 132:4, 137:4, 140:4, 176:11, 223:11
**confirmation** [4] - 128:8, 134:13,

167:21, 225:11
**confirmed** [2] - 25:23, 114:5
**confirming** [2] - 140:3, 165:22
**conflict** [1] - 46:23
**conflicting** [1] - 13:9
**conflicts** [1] - 47:1
**confused** [2] - 26:6, 142:16
**confuses** [1] - 139:12
**confusing** [3] - 151:8, 189:14, 192:12
**confusion** [1] - 182:10
**conjunction** [1] - 153:11
**connect** [3] - 109:6, 115:20, 194:22
**connected** [10] - 18:13, 20:24, 20:25, 21:1, 21:8, 21:14, 21:23, 109:7, 193:13
**connecting** [1] - 27:1
**connection** [9] - 18:11, 20:21, 23:23, 41:22, 48:23, 69:17, 87:1, 142:25
**connective** [1] - 23:4
**conservative** [1] - 179:10
**consider** [3] - 76:25, 77:4, 172:11
**consideration** [2] - 39:25, 76:12
**considered** [2] - 11:21, 78:19
**considers** [1] - 138:13
**consistent** [2] - 77:1, 83:16
**consists** [1] - 10:21
**conspired** [1] - 79:19
**constant** [1] - 158:19
**constantly** [2] - 22:16
**constituting** [1] - 79:24
**consult** [1] - 82:8
**consumer** [3] - 99:1, 99:3, 132:12
**consumers** [3] - 99:8, 100:18
**contact** [20] - 90:19, 96:21, 107:2, 107:4, 107:5, 107:7, 116:11, 127:25, 128:2, 140:21, 140:24, 144:1, 159:23, 166:2, 210:22, 212:14, 212:15, 212:21, 216:8, 224:15

**contacted** [1] - 213:13
**contacting** [2] - 97:6, 220:9
**contain** [1] - 82:23
**containing** [1] - 82:22
**contains** [1] - 134:14
**contending** [1] - 75:6
**content** [4] - 112:21, 112:23, 156:18, 170:10
**contention** [1] - 8:7
**contents** [1] - 153:2
**context** [3] - 88:15, 108:25, 114:3
**continually** [1] - 98:5
**continue** [4] - 113:6, 171:16, 228:20, 229:5
**continued** [3] - 2:1, 93:17, 94:2
**continues** [1] - 98:4
**contract** [15] - 110:15, 110:16, 110:17, 110:19, 110:20, 117:6, 129:5, 176:14, 176:22, 178:25, 211:20, 211:22, 211:23
**contracted** [1] - 166:14
**contracts** [1] - 94:14
**contradicted** [1] - 77:1
**contrary** [3] - 13:7, 13:12, 108:21
**control** [1] - 223:19
**Control** [2] - 14:12, 17:18
**controlled** [1] - 154:4, 155:3
**controlling** [1] - 89:24
**conversation** [2] - 173:11, 189:15
**conversion** [9] - 92:4, 108:5, 180:2, 180:6, 180:21, 181:3, 181:4, 184:18
**convey** [1] - 62:21
**cookie** [7] - 191:12, 191:13, 191:15, 191:18, 191:22, 191:24, 191:25
**cookies** [1] - 191:13
**COOLEY** [1] - 2:5
**copied** [1] - 139:19
**copy** [2] - 136:24, 190:22
**copying** [1] - 216:25
**corporate** [5] - 10:12, 10:25, 15:15, 15:16,

89:23
**Corporation** [2] - 12:11, 49:14
**Correct** [1] - 28:9
**correct** [121] - 5:24, 15:23, 23:14, 34:21, 89:21, 96:4, 107:17, 107:20, 109:21, 122:25, 125:16, 130:14, 131:19, 135:17, 136:6, 141:2, 143:25, 146:20, 153:15, 155:19, 158:2, 158:6, 160:14, 163:20, 166:3, 169:15, 177:11, 181:6, 183:4, 186:15, 188:23, 190:3, 190:10, 190:18, 190:19, 192:4, 192:9, 201:23, 203:10, 204:6, 204:8, 204:14, 204:15, 204:20, 204:21, 204:25, 205:16, 205:16, 205:17, 205:21, 205:22, 205:25, 206:9, 206:10, 206:13, 206:14, 208:2, 208:19, 208:23, 208:25, 209:5, 209:6, 209:13, 209:14, 209:18, 209:19, 209:25, 210:1, 210:6, 210:11, 210:14, 210:17, 212:7, 212:8, 212:12, 212:19, 212:22, 212:23, 213:1, 213:20, 214:8, 214:11, 214:12, 215:1, 215:14, 215:15, 215:17, 215:23, 216:5, 216:18, 218:1, 218:11, 218:24, 219:25, 220:3, 220:4, 220:6, 220:7, 221:5, 221:9, 221:17, 222:20, 222:25, 223:5, 223:12, 223:16, 223:21, 224:16, 224:22, 225:9, 225:13, 226:15, 226:17, 226:18, 226:20, 226:21,

226:23, 227:3, 227:18, 227:22
**corrected** [2] - 9:14, 198:4
**corrections** [1] - 198:5
**correctly** [5] - 138:16, 158:9, 188:21, 206:6, 226:10
**correspond** [1] - 97:4
**corresponding** [2] - 93:9, 160:18
**corrupted** [1] - 89:21
**cost** [15] - 6:9, 87:5, 98:7, 112:19, 160:7, 161:24, 167:17, 167:22, 169:10, 170:20, 173:12, 176:3, 177:21, 180:11, 185:12
**costs** [18] - 5:10, 6:13, 6:23, 8:15, 87:8, 89:19, 114:15, 162:18, 166:7, 167:21, 175:25, 176:23, 177:16, 177:24, 177:25, 178:4
**Counsel** [1] - 2:10
**counsel** [6] - 1:22, 102:8, 119:23, 200:17, 209:9, 228:21
**count** [6] - 39:22, 145:6, 172:6, 172:7, 195:11, 195:12
**counted** [1] - 172:8
**counterclaims** [3] - 75:6, 78:14, 79:21
**countersued** [2] - 38:16, 53:11
**counting** [1] - 141:17
**countries** [3] - 102:20, 115:24, 125:1
**country** [3] - 38:5, 74:8, 128:9
**counts** [2] - 12:2, 171:6
**county** [1] - 64:3
**County** [2] - 50:12, 50:15
**couple** [9] - 65:21, 72:6, 72:15, 96:18, 111:15, 113:9, 117:11, 161:16, 197:18
**couples** [1] - 101:24
**courier** [1] - 155:13
**course** [8] - 36:2, 75:10, 75:20, 80:15, 84:6, 96:22, 114:4,

164:15

court [23] - 16:3,
35:20, 40:5, 41:25,
44:16, 47:23, 47:24,
54:24, 60:8, 60:9,
60:10, 62:19, 64:17,
71:20, 112:24,
113:8, 123:12,
124:17, 141:16,
154:22, 175:13,
186:24, 223:17

COURT [353] - 1:1,
3:1, 3:9, 3:12, 3:25,
4:13, 4:21, 5:3, 5:7,
5:14, 5:18, 5:25, 7:8,
7:25, 8:4, 8:16, 9:2,
9:4, 13:7, 13:11,
13:17, 14:7, 14:16,
14:22, 15:4, 15:21,
16:6, 16:12, 16:18,
17:1, 17:10, 17:16,
18:10, 18:20, 19:16,
20:4, 20:16, 21:2,
21:8, 21:13, 21:18,
21:20, 21:25, 22:7,
22:12, 22:20, 22:24,
23:2, 23:17, 23:25,
24:13, 24:15, 24:21,
24:23, 24:25, 25:13,
26:6, 26:18, 26:21,
27:4, 27:11, 27:16,
28:2, 28:7, 28:10,
28:13, 28:19, 28:25,
29:5, 29:12, 29:15,
29:18, 29:21, 30:7,
30:16, 30:20, 31:7,
32:4, 32:8, 32:16,
32:20, 33:5, 33:18,
34:6, 34:21, 34:25,
39:4, 39:11, 42:17,
42:20, 42:25, 43:3,
43:5, 43:8, 43:10,
43:12, 43:14, 43:17,
43:20, 43:22, 43:24,
44:2, 44:8, 44:11,
44:14, 45:2, 45:5,
45:8, 45:12, 45:16,
45:21, 46:2, 46:5,
46:10, 46:14, 46:16,
46:20, 46:25, 47:3,
47:9, 47:13, 47:16,
47:20, 47:23, 47:25,
48:2, 48:8, 48:12,
48:21, 48:23, 49:2,
49:5, 49:8, 49:11,
49:18, 49:23, 50:2,
50:6, 50:10, 50:13,
50:16, 50:19, 50:21,
50:23, 51:1, 51:4,
51:6, 51:12, 51:16,
51:19, 51:22, 52:6,

52:9, 52:16, 52:21,
52:23, 53:8, 53:12,
53:21, 53:24, 54:7,
54:9, 54:11, 54:16,
54:19, 54:21, 54:25,
55:5, 55:8, 55:11,
55:17, 56:9, 56:18,
56:24, 57:7, 57:24,
58:3, 58:8, 58:11,
58:17, 59:7, 59:10,
59:13, 59:17, 59:20,
59:23, 60:2, 60:7,
60:11, 60:15, 60:17,
60:20, 61:1, 61:16,
61:18, 61:20, 62:4,
62:7, 62:11, 62:16,
62:20, 62:25, 63:5,
63:12, 63:16, 63:22,
64:4, 64:6, 64:9,
64:11, 64:17, 64:21,
64:25, 65:3, 65:6,
65:9, 65:24, 66:2,
66:9, 66:22, 67:11,
67:15, 67:17, 67:23,
68:5, 68:8, 68:13,
68:15, 68:21, 69:1,
69:6, 69:10, 69:12,
69:16, 69:22, 69:25,
70:5, 70:7, 70:9,
70:15, 70:18, 70:21,
70:24, 71:4, 71:8,
71:11, 71:16, 71:18,
71:22, 71:25, 72:2,
72:7, 72:13, 72:15,
72:23, 73:2, 73:5,
73:7, 73:18, 74:4,
74:20, 85:23, 85:25,
98:23, 118:17,
118:25, 119:10,
119:15, 119:24,
120:3, 120:8,
120:22, 121:16,
121:20, 121:24,
122:2, 123:11,
123:18, 124:16,
126:16, 143:2,
143:10, 145:15,
150:7, 152:20,
152:25, 154:9,
154:13, 154:19,
158:20, 158:24,
160:15, 160:20,
160:22, 161:1,
161:9, 161:15,
161:18, 162:11,
162:14, 162:25,
163:15, 163:18,
163:21, 164:1,
164:4, 164:10,
164:18, 165:6,
168:25, 169:2,

172:17, 172:19,
172:21, 174:21,
174:25, 175:3,
175:9, 175:11,
175:14, 175:21,
180:18, 181:2,
181:7, 184:23,
187:10, 187:23,
188:5, 189:19,
192:14, 192:16,
193:24, 194:2,
196:17, 196:24,
197:2, 197:19,
197:22, 197:25,
198:5, 198:10,
198:14, 222:11,
225:23, 228:10,
228:19, 228:25,
229:5, 229:9,
229:13, 229:21,
229:23, 230:1

Court [13] - 17:7, 35:7,
61:9, 62:23, 71:6,
72:10, 72:11, 74:5,
98:25, 222:7, 230:2,
230:12, 230:12

Court's [3] - 143:1,
197:24, 198:13

courtesy [1] - 157:15

courtroom [13] -
35:18, 38:4, 73:17,
74:3, 76:21, 76:23,
82:12, 87:17,
118:24, 119:16,
120:7, 175:18,
228:18

Courtroom [1] - 1:12

courtrooms [1] -
120:14

cover [4] - 12:9, 79:5,
85:5, 85:6

covered [2] - 42:10,
42:11

covers [1] - 196:22

COVID [38] - 5:13, 6:8,
86:15, 99:18,
111:19, 111:20,
111:21, 111:22,
127:7, 127:20,
128:9, 201:5, 201:6,
201:24, 202:2,
202:3, 202:5, 202:7,
202:8, 202:9,
202:10, 202:11,
202:22, 203:20,
203:21, 203:23,
204:3, 204:19,
204:24, 206:3,
215:19, 216:20,
217:22

crashed [1] - 17:25

create [10] - 21:11,
90:13, 90:20, 96:25,
132:1, 148:5, 148:9,
149:4, 212:2

created [8] - 89:4,
89:13, 147:9,
147:10, 148:24,
148:25, 149:1,
186:20

creates [2] - 91:2,
97:15

creating [1] - 90:23

creation [1] - 90:12

credentials [1] - 90:10

credibility [3] - 76:24,
77:5, 104:3

credit [56] - 91:13,
91:16, 92:10, 92:13,
97:8, 97:9, 97:10,
97:11, 97:14, 97:16,
99:25, 105:23,
106:4, 106:6, 106:9,
106:10, 106:13,
106:15, 106:22,
134:11, 134:23,
140:19, 140:20,
141:7, 141:8,
144:20, 159:1,
169:17, 180:1,
180:4, 180:10,
180:12, 180:16,
180:23, 180:24,
181:1, 181:17,
181:20, 181:21,
183:10, 185:9,
185:10, 185:11,
185:25, 214:21,
215:6, 215:9,
215:10, 215:23,
216:3, 216:4,
217:24, 218:4,
219:23, 219:25

Crete [1] - 205:4

crew [1] - 126:7

criminal [4] - 35:25,
36:2, 78:22, 80:25

critical [9] - 14:8,
24:5, 24:8, 24:9,
25:14, 59:2, 85:7,
89:25, 93:7

CRM [2] - 226:22,
226:24

Cross [1] - 198:20

cross [12] - 26:17,
33:6, 33:12, 33:24,
33:25, 34:8, 34:10,
34:20, 34:21, 77:10,
84:7, 228:20

CROSS [1] - 198:23

cross-examination [6]
- 33:12, 33:25, 34:8,
34:21, 77:10, 228:20

CROSS-
EXAMINATION [1] -
198:23

cross-examine [3] -
26:17, 34:10, 84:7

cross-examined [1] -
34:20

crucial [2] - 16:10,
16:13

cruises [1] - 101:21

CSR [1] - 230:11

CTO [5] - 9:18, 26:20,
87:20, 128:10, 159:5

cuff [2] - 29:16, 33:15

cure [1] - 30:6

currency [9] - 92:4,
108:5, 180:2, 180:6,
180:11, 180:21,
183:10, 183:11,
184:18

current [2] - 113:2,
156:11

customer [85] - 11:22,
89:5, 91:1, 91:13,
91:19, 91:25, 92:8,
93:7, 94:12, 94:21,
95:1, 95:7, 95:9,
95:10, 95:14, 95:18,
96:6, 96:10, 96:11,
96:20, 97:10, 97:12,
97:17, 97:18, 97:20,
98:17, 101:23,
102:4, 106:7, 115:2,
116:9, 116:10,
116:21, 129:14,
131:1, 134:3,
136:10, 137:1,
137:2, 138:1, 139:4,
140:25, 141:9,
141:18, 141:19,
141:20, 144:1,
160:5, 165:21,
165:22, 165:24,
166:1, 166:2, 166:3,
166:4, 166:7,
166:18, 169:7,
169:10, 169:12,
169:16, 169:25,
170:5, 170:7,
170:17, 170:20,
170:24, 170:25,
172:23, 211:24,
212:10, 212:22,
212:25, 213:12,
217:14, 217:19,
220:9, 223:18,
226:17, 226:22,

226:23, 227:17,
227:20, 227:23
**customer's** [2] - 97:4,
160:2
**customers** [70] -
75:12, 86:11, 86:18,
87:2, 88:5, 90:1,
91:3, 91:14, 93:8,
93:10, 93:11, 95:8,
95:12, 95:17, 95:21,
95:22, 95:23, 96:3,
96:8, 97:2, 97:6,
97:10, 99:5, 99:11,
100:24, 101:13,
102:1, 104:1, 104:5,
105:13, 107:7,
107:24, 110:22,
114:9, 114:10,
114:11, 114:13,
114:16, 115:4,
115:20, 116:7,
116:8, 116:10,
125:3, 128:16,
130:15, 130:18,
130:24, 137:17,
139:1, 141:13,
141:21, 160:9,
165:23, 166:5,
170:3, 170:4,
170:19, 171:18,
183:9, 185:4,
214:15, 226:25,
228:2
**customers'** [1] - 96:5
**cut** [6] - 8:15, 30:17,
66:2, 67:11, 71:4,
189:8
**cuts** [1] - 66:10
**cyber** [2] - 41:10,
125:21
**Cynthia** [1] - 87:14
**CYNTHIA** [1] - 1:20

**D**

**D-E-S-K** [2] - 172:20,
172:21
**DAC** [4] - 1:3, 88:7,
102:24, 156:10
**DAC's** [1] - 120:25
**daily** [4] - 127:22,
171:6, 171:7, 171:10
**Daley** [1] - 200:20
**Dallas** [1] - 88:12
**damage** [24] - 75:2,
79:12, 79:13, 80:4,
89:20, 91:10, 105:3,
105:5, 105:7,
105:20, 115:6,
126:25, 128:11,

142:3, 142:11,
153:21, 184:24,
221:24, 221:25,
222:17, 222:18,
222:19, 223:23
**damaged** [4] - 99:21,
142:20, 222:24,
223:8
**damages** [9] - 28:23,
31:23, 117:12,
117:15, 117:16,
117:25, 118:15
**Dana** [1] - 219:6
**Dara** [2] - 88:2, 95:20
**dashboard** [1] - 171:5
**data** [56] - 25:24,
25:25, 86:12, 87:23,
89:20, 89:21, 91:13,
91:23, 98:11,
100:20, 105:6,
106:5, 106:7,
114:12, 127:1,
129:6, 138:4,
138:10, 139:10,
139:18, 140:18,
141:4, 142:3, 142:6,
142:7, 144:20,
149:15, 149:24,
151:8, 158:17,
158:25, 159:1,
159:6, 159:8,
165:23, 166:1,
166:3, 172:2, 172:4,
172:13, 190:24,
190:25, 193:14,
193:16, 196:3,
208:9, 212:13,
213:3, 222:19,
222:24, 223:14,
225:1, 226:5
**database** [14] - 142:7,
158:17, 159:2,
162:9, 162:21,
162:23, 176:9,
209:1, 215:23,
216:22, 223:25,
224:17, 224:18
**databases** [3] - 87:21,
135:9, 140:4
**date** [9] - 8:2, 8:4, 8:5,
100:3, 121:5, 135:2,
137:9, 173:6, 192:24
**dated** [2] - 111:14,
157:11
**dates** [1] - 137:3
**daughter** [1] - 54:22
**David** [1] - 87:10
**DAVID** [1] - 1:19
**Davies** [2] - 29:10,
29:12

**day-to-day** [1] - 24:19
**days** [14] - 38:19,
39:18, 39:19, 39:21,
39:22, 53:19, 85:4,
85:5, 85:12, 91:20,
196:15, 203:12,
215:21
**DDX** [2] - 207:18,
209:20
**dead** [1] - 212:16
**deal** [6] - 4:5, 53:3,
53:5, 142:15,
215:25, 229:15
**dealing** [3] - 9:6,
11:17, 20:1
**dealt** [1] - 142:25
**Deanna** [3] - 35:20,
230:6, 230:11
**debate** [1] - 172:12
**Deceptive** [2] - 75:11,
80:5
**decide** [9] - 61:3, 61:4,
61:11, 76:22, 78:3,
79:2, 79:7, 79:9,
79:22
**decided** [2] - 100:5,
113:6
**decision** [4] - 6:25,
81:20, 112:24, 118:5
**decisions** [4] - 37:21,
73:10, 113:8, 206:4
**declaration** [1] - 29:14
**declare** [1] - 167:6
**declining** [1] - 65:16
**dedicate** [1] - 162:3
**dedicated** [2] -
103:21, 174:15
**deductions** [1] - 23:11
**deemed** [1] - 11:10
**deep** [1] - 47:4
**defamation** [3] - 75:7,
79:24, 117:5
**defamatory** [1] - 96:1
**defamed** [1] - 38:17
**defendant** [4] - 6:11,
74:23, 75:4, 157:19
**defendants** [7] - 3:6,
6:9, 8:1, 15:2, 75:4,
109:21, 122:25
**Defendants** [2] - 1:7,
2:10
**defense** [3] - 4:2,
4:10, 149:14
**defenses** [2] - 139:12,
220:20
**defer** [1] - 75:8
**define** [4] - 75:8,
79:12, 79:13, 89:15
**definitely** [3] - 204:10,
206:1, 206:5

**defraud** [2] - 79:15,
105:8
**defrauded** [1] - 75:2
**degree** [3] - 47:22,
48:10, 48:12
**Delaware** [11] - 35:8,
47:15, 47:25, 61:9,
72:22, 75:10, 87:15,
101:8, 101:9,
102:16, 133:18
**DELAWARE** [1] - 1:2
**delayed** [3] - 85:10,
111:23, 140:24
**delays** [1] - 93:10
**delete** [1] - 89:12
**deliberations** [4] -
82:15, 84:20, 84:23,
84:25
**Deliver** [1] - 155:13
**deliver** [1] - 85:2
**delivered** [2] - 155:9,
155:15
**democracy** [1] - 35:12
**demographic** [1] -
102:1
**demonstrates** [1] -
131:6
**demonstratives** [1] -
146:6
**denied** [1] - 114:6
**denies** [2] - 75:5,
75:12
**departed** [1] - 163:3
**department** [7] -
103:13, 128:15,
140:21, 147:11,
147:12, 147:14,
170:7
**deponent** [1] - 17:3
**depose** [2] - 28:2,
28:10
**deposed** [2] - 30:5,
48:19
**deposition** [17] - 6:19,
6:21, 10:10, 16:24,
17:5, 17:6, 22:23,
22:24, 27:25, 28:5,
28:12, 33:1, 41:25,
77:12, 77:16, 77:19
**depositions** [1] -
48:24
**deputy** [1] - 35:18
**describe** [3] - 206:15,
206:17, 206:19
**described** [3] - 40:12,
66:15, 223:7
**describing** [1] -
206:16
**description** [3] - 40:7,
61:22, 184:15

**designated** [1] - 9:23
**designed** [3] - 87:25,
99:3, 165:18
**designee** [1] - 10:25
**designees** [1] - 10:20
**desist** [4] - 104:24,
105:10, 111:12,
119:7
**Desk** [9] - 172:15,
172:16, 172:21,
226:19, 226:22,
227:15, 227:17,
227:21, 228:3
**desk** [5] - 160:1,
160:3, 160:7,
163:16, 165:25
**desktop** [1] - 165:13
**destination** [3] -
131:2, 137:3, 169:20
**destinations** [1] -
125:2
**detail** [2] - 79:6,
122:19
**detailed** [1] - 84:19
**details** [21] - 80:16,
90:19, 96:20, 96:21,
116:9, 116:10,
116:11, 132:16,
133:24, 134:11,
140:19, 140:21,
151:6, 159:1,
169:17, 180:23,
181:17, 181:22,
192:24
**determination** [1] -
118:2
**determine** [11] -
17:20, 37:11,
117:13, 145:1,
146:13, 148:23,
167:17, 167:22,
169:22, 189:13,
190:14
**determined** [2] -
104:9, 150:11
**determining** [1] -
158:8
**develop** [1] - 188:5
**developed** [4] - 80:14,
146:23, 146:24,
214:6
**developing** [1] - 147:1
**device** [1] - 144:18
**devices** [1] - 125:23
**dialysis** [4] - 70:11,
70:13, 71:6, 71:8
**dictionaries** [1] - 82:9
**die** [2] - 65:17, 145:19
**difference** [3] - 5:3,
137:18, 192:25

**differences** [2] -
135:18, 207:8
**different** [29] - 5:5,
6:10, 6:12, 6:13, 9:4,
14:23, 24:7, 29:1,
82:19, 97:14,
102:20, 110:13,
125:1, 127:24,
133:12, 135:3,
135:4, 135:6,
135:15, 149:22,
173:10, 173:13,
173:23, 181:16,
195:7, 195:8,
212:17, 215:10,
222:16
**differently** [3] - 9:11,
217:3, 217:5
**difficult** [2] - 39:24,
97:5
**difficulties** [1] -
207:16
**difficulty** [3] - 40:2,
54:16, 54:17
**digest** [1] - 80:12
**digging** [1] - 86:21
**digit** [2] - 134:20,
190:8
**digital** [3] - 104:13,
193:20, 216:10
**digits** [2] - 181:1,
193:20
**dire** [1] - 25:1
**DIRECT** [1] - 122:10
**direct** [7] - 20:20,
34:18, 66:13, 67:13,
77:9, 104:1, 226:10
**directed** [6] - 21:15,
21:16, 79:10, 79:15,
95:3, 116:6
**direction** [3] - 161:21,
182:23
**directives** [1] - 149:11
**directly** [15] - 19:5,
67:6, 67:19, 67:21,
68:20, 94:6, 94:7,
95:8, 97:17, 102:3,
106:1, 130:16,
217:23, 218:7,
225:12
**director** [1] - 101:2
**directors** [2] - 152:4,
155:10
**disabled** [3] - 46:22,
183:8, 184:1
**disagree** [2] - 32:22,
200:9
**disclose** [3] - 8:3,
31:23, 96:8
**disclosed** [4] - 5:16,

28:23, 98:18, 146:25
**disclosure** [3] - 8:20,
16:17, 16:20
**disclosures** [2] -
31:21, 33:1
**discount** [1] - 166:23
**discover** [1] - 141:8
**discovered** [2] -
166:25, 197:8
**discovery** [3] - 6:21,
16:20, 114:4
**discuss** [6] - 37:7,
79:5, 80:24, 81:9,
81:19, 81:20
**discussed** [3] - 162:4,
199:17, 201:8
**discussing** [2] -
199:21, 203:1
**discussion** [12] -
55:16, 58:10, 66:1,
67:16, 71:3, 71:10,
72:8, 72:14, 119:6,
119:7, 120:5, 164:4
**disparaging** [2] - 80:5,
80:9
**displayed** [1] - 199:11
**disposes** [1] - 8:22
**dispute** [2] - 38:9,
156:11
**disputes** [2] - 75:19,
229:20
**disregard** [2] - 76:18,
80:8
**disregarded** [2] -
76:22, 143:13
**disrupt** [5] - 95:6,
103:11, 103:15,
104:18, 129:16
**disruption** [3] -
103:17, 103:19,
105:16
**distinguish** [1] - 213:7
**distract** [1] - 182:24
**distracted** [2] - 66:5,
173:14
**distributed** [1] -
133:13
**distribution** [2] -
112:21, 152:11
**district** [1] - 73:1
**DISTRICT** [2] - 1:1, 1:2
**District** [4] - 35:7,
35:8, 61:9, 230:12
**divide** [2] - 146:16,
180:11
**divided** [1] - 168:1
**doctor** [1] - 70:13
**document** [5] -
104:12, 121:9,
136:21, 164:21,

176:19
**documents** [13] -
13:21, 13:22, 13:25,
14:1, 14:15, 15:11,
15:15, 40:5, 56:7,
95:15, 103:18, 198:8
**dog** [1] - 62:14
**dollar** [3] - 160:17,
178:21, 180:12
**dollars** [15] - 92:7,
92:22, 130:12,
162:19, 173:7,
173:8, 173:17,
173:20, 177:19,
180:4, 180:6,
180:14, 180:25,
183:12
**done** [20] - 6:18, 6:22,
11:19, 13:15, 14:14,
20:14, 22:15, 26:12,
39:19, 39:20, 53:18,
54:8, 61:22, 71:2,
73:13, 86:25, 92:9,
142:4, 146:15,
159:12
**donoghue** [1] - 161:5
**Donoghue** [12] -
87:10, 104:25,
107:24, 111:8,
116:4, 152:22,
164:2, 164:8,
175:21, 207:24,
209:16, 210:10
**DONOGHUE** [71] -
1:19, 34:3, 34:17,
34:23, 56:7, 56:15,
57:1, 57:12, 66:8,
71:7, 85:20, 85:24,
86:6, 119:3, 119:22,
120:1, 121:25,
122:11, 123:4,
123:19, 123:21,
124:21, 126:21,
143:8, 143:16,
145:14, 145:16,
146:5, 146:7, 150:9,
153:6, 154:21,
159:4, 160:24,
161:16, 161:22,
162:19, 163:12,
163:16, 163:20,
163:23, 164:16,
164:19, 165:8,
169:5, 169:6, 173:2,
174:24, 175:4,
175:7, 175:10,
175:12, 175:22,
175:23, 181:9,
185:6, 187:16,
188:3, 188:10,

188:11, 189:24,
193:7, 194:6,
196:22, 196:25,
197:4, 197:15,
197:20, 198:3,
198:7, 198:11
**Donoghue's** [2] -
102:11, 210:24
**door** [1] - 60:24
**dorm** [1] - 150:5
**double** [1] - 129:11
**doubt** [4] - 57:2,
78:23, 88:14, 152:6
**Dover** [1] - 64:3
**down** [39] - 3:16, 8:25,
11:25, 16:14, 44:14,
50:23, 73:12, 81:2,
92:4, 108:7, 108:21,
110:20, 123:13,
124:17, 124:19,
126:18, 128:22,
138:21, 142:21,
153:18, 153:24,
156:14, 158:7,
182:18, 182:19,
182:20, 183:3,
183:7, 183:22,
186:1, 192:5,
195:15, 195:16,
195:17, 202:6,
214:5, 219:13,
222:5, 230:1
**down-hillers** [1] -
219:13
**downs** [1] - 222:10
**draft** [1] - 218:2
**drafting** [1] - 154:11
**draw** [1] - 31:18
**Drecker** [1] - 35:16
**Drecker-Waxman** [1] -
35:16
**dripping** [1] - 56:13
**drive** [2] - 64:6, 64:9
**drop** [3] - 44:19,
182:6, 191:15
**dropped** [2] - 195:16,
195:17
**DTX** [3] - 176:16,
197:20, 198:2
**dual** [2] - 63:4, 66:20
**Dublin** [5] - 14:11,
14:25, 90:5, 151:25,
180:13
**due** [1] - 127:12
**dummy** [3] - 97:1,
148:5, 148:10
**duration** [2] - 35:21,
39:17
**during** [26] - 35:19,
75:19, 76:19, 80:19,

81:15, 82:25, 83:9,
83:11, 83:19, 84:20,
85:5, 92:16, 114:4,
117:22, 127:7,
127:20, 160:9,
180:8, 192:5,
201:24, 202:2,
202:7, 202:8, 202:9,
202:11, 203:21
**duties** [2] - 35:18,
93:9
**dyslexia** [2] - 54:17,
55:21
**dyslexic** [1] - 54:15

---

**E**

---

**E-commerce** [2] -
125:21, 126:8
**e-mail** [114] - 8:2,
23:10, 23:15, 81:22,
90:13, 90:19, 90:21,
90:24, 91:1, 96:4,
96:17, 96:24, 97:1,
97:3, 97:4, 100:1,
100:20, 106:6,
106:15, 106:22,
107:15, 107:17,
107:20, 109:6,
109:9, 117:1,
119:11, 131:22,
132:3, 132:4, 132:5,
132:6, 132:19,
132:21, 132:23,
133:2, 134:13,
134:14, 134:21,
140:2, 140:19,
141:2, 141:13,
141:14, 143:17,
143:22, 143:25,
147:8, 147:11,
148:5, 148:6, 148:9,
155:14, 159:1,
159:21, 169:13,
170:24, 171:1,
187:18, 187:19,
188:1, 188:12,
188:21, 188:23,
189:4, 189:17,
191:4, 191:7,
192:20, 193:2,
194:23, 209:25,
210:2, 210:12,
210:13, 210:15,
210:20, 210:21,
211:1, 212:6,
212:16, 214:20,
214:21, 219:10,
222:1, 222:17,
222:20, 222:22,

222:23, 223:1, 223:4, 223:6, 223:9, 223:11, 223:13, 223:17, 223:21, 224:6, 224:9, 224:13, 224:17, 224:18, 224:21, 224:22, 224:25, 225:5, 225:8, 225:11, 225:12, 226:10, 226:11, 226:15

**e-mailed** [1] - 112:15
**e-mails** [19] - 23:14, 95:21, 96:1, 96:12, 96:19, 100:19, 103:21, 105:12, 105:24, 106:4, 107:9, 107:23, 112:15, 116:3, 116:6, 116:8, 128:4, 140:20, 141:2
**E-P-O-S** [1] - 125:25
**early** [9] - 62:10, 92:3, 114:23, 114:24, 181:11, 198:17, 198:18, 201:14, 228:11
**ears** [1] - 11:13
**ease** [1] - 160:25
**easier** [4] - 134:1, 148:12, 148:13, 172:3
**easily** [2] - 191:4, 217:18
**easy** [2] - 9:21, 148:5
**economic** [2] - 80:10, 117:15
**economy** [2] - 123:8, 123:9
**ecosystem** [1] - 114:17
**educate** [2] - 104:5, 128:16
**educators** [1] - 63:18
**effect** [3] - 6:4, 158:13, 159:14
**efficiency** [1] - 126:7
**effort** [4] - 108:21, 108:24, 109:1, 114:25
**efforts** [3] - 22:8, 22:9, 22:11
**Egg** [1] - 11:2
**eight** [6] - 35:25, 36:3, 37:23, 40:20, 65:13, 73:12
**eight-year-old** [1] - 65:13
**either** [9] - 13:3, 51:7,

91:15, 110:6, 120:14, 124:10, 165:24, 213:2, 223:21
**elder** [1] - 66:4
**electric** [2] - 64:15, 73:3
**elements** [1] - 104:10
**elevator** [1] - 81:13
**elicit** [1] - 10:24
**elicited** [1] - 161:6
**elsewhere** [1] - 209:17
**embarrassing** [1] - 145:25
**embedded** [1] - 9:14
**emphasize** [2] - 35:8, 37:24
**employee** [3] - 18:5, 69:4, 98:10
**employees** [7] - 17:19, 94:8, 93:4, 99:23, 115:2, 126:1, 126:3
**employer** [2] - 69:8, 69:21
**employment** [2] - 41:23, 45:6
**employs** [1] - 139:14
**empty** [1] - 108:6
**encounter** [1] - 81:12
**encouraged** [2] - 79:10, 79:15
**end** [32] - 29:23, 34:15, 34:19, 47:2, 61:6, 61:11, 61:12, 78:8, 79:4, 80:15, 81:19, 83:8, 89:16, 98:21, 117:12, 118:1, 118:10, 118:12, 144:6, 162:8, 173:12, 181:12, 181:13, 181:14, 181:15, 194:14, 212:17, 216:12, 219:11, 225:1, 228:14
**ended** [8] - 58:10, 65:23, 67:16, 71:10, 72:14, 109:24, 123:3, 184:7
**ending** [1] - 113:21
**engage** [2] - 103:16, 103:17
**engaged** [2] - 75:7, 153:9
**engaging** [1] - 77:4
**engine** [1] - 41:17
**engineer** [1] - 25:20
**engineers** [1] - 11:23
**England** [1] - 102:15
**English** [2] - 40:3,

227:25
**enjoy** [1] - 73:25
**enormous** [1] - 115:10
**ensure** [1] - 91:18
**enter** [7] - 106:15, 106:20, 106:21, 132:3, 138:10, 182:8, 208:1
**entered** [6] - 74:3, 120:7, 134:23, 224:23, 225:5, 225:12
**entering** [1] - 128:9
**enters** [2] - 106:17, 209:24
**entire** [4] - 18:8, 85:10, 96:17, 141:6
**entirely** [1] - 23:12
**entities** [3] - 41:5, 41:6, 137:18
**entitled** [5] - 33:14, 117:14, 117:15, 140:25, 219:2
**entity** [2] - 136:18, 157:16
**entry** [1] - 197:18
**environment** [1] - 115:21
**EPOS** [2] - 125:23, 125:24
**equal** [2] - 160:22, 160:25
**era** [1] - 202:2
**error** [4] - 16:21, 17:21, 18:17, 192:10
**errors** [16] - 16:21, 17:8, 19:4, 19:10, 19:12, 21:23, 21:25, 22:6, 29:25, 30:4, 89:11, 189:17, 192:18, 195:2, 195:11
**especially** [2] - 20:11, 62:10
**ESQ** [15] - 1:16, 1:19, 1:19, 1:20, 1:20, 1:21, 2:3, 2:5, 2:6, 2:6, 2:7, 2:7, 2:8, 2:8, 2:9
**essentially** [8] - 7:21, 7:22, 10:16, 14:12, 129:13, 139:9, 149:13, 176:8
**establish** [1] - 7:6
**established** [2] - 164:7, 202:24
**establishing** [1] - 6:4
**estate** [1] - 135:8
**estimate** [2] - 227:1, 227:6

**estimates** [1] - 166:7
**et** [7] - 1:6, 126:7, 132:17, 139:11, 144:1, 152:7, 213:5
**Etraveli** [37] - 41:3, 88:19, 94:9, 94:15, 96:23, 97:8, 97:13, 97:23, 106:1, 106:24, 107:3, 110:2, 110:3, 110:5, 110:6, 110:7, 110:14, 110:15, 110:18, 110:20, 110:24, 110:25, 111:3, 111:4, 111:5, 111:6, 112:12, 112:13, 112:14, 112:15, 112:18, 113:1, 121:13, 153:17, 222:23
**Etraveli's** [1] - 91:16
**EU** [1] - 140:24
**Euro** [5] - 160:17, 161:10, 183:11, 183:12, 205:11
**euro** [1] - 113:20
**Europe** [15] - 52:1, 62:2, 87:5, 87:7, 102:15, 102:19, 102:20, 110:9, 124:13, 124:23, 125:1, 127:21, 180:3, 215:10, 216:23
**European** [3] - 88:11, 180:13, 180:24
**Euros** [19] - 92:6, 102:22, 102:23, 113:25, 160:3, 160:4, 160:8, 160:20, 170:22, 170:23, 173:7, 173:16, 173:22, 180:5, 180:14, 180:20, 180:25, 183:12
**evaluate** [1] - 169:16
**evening** [2] - 27:21, 228:17
**event** [1] - 59:24
**events** [4] - 5:7, 11:13, 83:22, 103:5
**eventually** [2] - 8:2, 105:18
**everyday** [1] - 77:5
**evidence** [62] - 16:7, 16:11, 27:7, 41:1, 75:15, 76:5, 76:7, 76:10, 76:11, 76:12, 76:16, 76:21, 76:23,

77:8, 77:11, 78:16, 78:18, 82:11, 82:14, 82:17, 82:20, 83:15, 83:16, 83:25, 84:2, 84:3, 84:8, 84:11, 84:12, 84:14, 84:16, 84:18, 88:15, 99:21, 99:22, 100:7, 100:9, 100:13, 100:16, 100:17, 100:21, 104:16, 105:4, 106:8, 108:10, 108:12, 108:13, 108:14, 109:13, 109:15, 109:25, 117:9, 117:19, 118:11, 118:23, 119:2, 143:5, 186:7, 214:14, 222:9
**Evidence** [1] - 11:5
**evident** [1] - 153:3
**EWING** [1] - 2:5
**exact** [8] - 4:8, 5:23, 137:15, 139:3, 140:3, 195:8, 195:9, 196:14
**exactly** [7] - 4:14, 15:12, 16:12, 17:11, 18:12, 54:5, 124:7
**exam** [1] - 34:18
**EXAMINATION** [2] - 122:10, 198:23
**examination** [6] - 33:6, 33:12, 33:25, 34:8, 34:21, 77:10, 228:20
**Examination** [1] - 198:21
**examine** [3] - 26:17, 34:10, 84:7
**examined** [1] - 34:20
**example** [23] - 6:7, 15:13, 19:22, 76:11, 94:21, 106:18, 128:1, 129:5, 129:11, 136:20, 139:21, 139:22, 140:23, 144:18, 148:6, 179:25, 191:17, 204:15, 210:9, 215:4, 216:2, 217:6, 219:9
**examples** [1] - 129:10
**exceed** [1] - 92:22
**Excel** [6] - 17:22, 172:1, 190:25, 191:1, 191:3, 193:14
**except** [2] - 114:18, 228:22
**exception** [5] - 20:11,

27:10, 103:6, 112:22
**exceptions** [3] -
10:15, 10:22
**exchange** [1] - 23:18
**exclude** [2] - 8:19,
15:18
**excluded** [3] - 32:12,
32:15, 33:4
**excluding** [1] - 158:15
**exclusive** [1] - 152:10
**excuse** [8] - 40:16,
55:14, 56:2, 57:7,
67:24, 73:11, 73:13,
126:16
**excused** [10] - 36:6,
37:13, 37:20, 56:16,
58:18, 58:20, 71:12,
73:23, 74:10
**executive** [9] - 11:10,
11:19, 11:24, 12:10,
13:15, 19:23, 20:4,
87:12, 88:7
**executives** [1] - 93:4
**exhibit** [5] - 120:21,
200:2, 200:7, 203:3
**Exhibit** [7] - 121:8,
121:12, 121:13,
121:14, 121:21,
199:5
**Exhibits** [1] - 198:1
**exhibits** [4] - 40:5,
76:8, 84:5, 197:18
**existed** [1] - 101:17
**existence** [1] - 222:1
**existing** [1] - 131:21
**exists** [1] - 215:2
**exited** [4] - 73:17,
118:24, 175:18,
228:18
**expand** [1] - 203:14
**expect** [7] - 34:1, 34:4,
84:2, 97:12, 98:20,
119:25, 176:24
**expectation** [1] -
97:20
**expectations** [1] -
96:5
**expected** [3] - 38:19,
39:18, 85:4
**expecting** [2] - 35:2,
184:6
**expects** [1] - 90:25
**Expedia** [31] - 42:5,
42:19, 42:20, 42:24,
45:15, 45:19, 46:1,
50:25, 51:4, 51:11,
51:14, 51:24, 52:2,
52:18, 54:8, 62:1,
63:11, 65:4, 65:20,
68:17, 68:22, 68:25,

69:24, 69:25, 94:21,
107:14, 117:2,
129:5, 221:1, 221:4,
221:5
**expense** [1] - 98:8
**experience** [40] - 9:19,
39:20, 41:6, 41:19,
41:24, 46:1, 48:2,
49:19, 51:7, 51:10,
52:9, 52:11, 52:16,
53:13, 54:1, 55:8,
57:16, 57:18, 57:20,
57:21, 58:14, 58:15,
59:24, 61:5, 61:12,
63:9, 63:11, 64:20,
65:22, 69:17, 70:2,
70:18, 70:19, 71:23,
74:7, 77:23, 116:18,
142:19, 163:8, 185:5
**experienced** [1] -
119:18
**experiences** [6] -
45:17, 52:19, 63:9,
63:10, 70:3
**expert** [9] - 6:15, 6:16,
6:17, 15:17, 15:20,
77:21, 78:1, 78:2,
98:10
**explain** [14] - 14:15,
40:16, 40:18, 90:1,
90:4, 91:7, 92:5,
93:6, 96:2, 108:18,
127:21, 143:9,
179:21, 180:8
**explained** [3] - 17:5,
22:17, 93:22
**explains** [2] - 22:14,
196:23
**explanation** [1] -
20:21
**explicitly** [2] - 156:16,
156:23
**exposes** [1] - 176:22
**Express** [1] - 50:8
**extensive** [1] - 6:19
**extent** [8] - 4:9, 5:21,
8:21, 10:13, 28:21,
31:11, 59:1, 156:21
**external** [1] - 128:16
**extra** [2] - 85:19, 130:2
**extract** [1] - 138:4
**extremely** [1] - 177:22
**eyes** [3] - 11:13,
121:9, 228:13

---

**F**

---

**face** [1] - 166:15
**Facebook** [1] - 131:25

**facilitate** [3] - 94:9,
99:5, 121:7
**facilitated** [2] - 154:4,
155:2
**facilitates** [2] - 88:20,
101:13
**facility** [3] - 226:19,
227:17, 228:3
**fact** [16] - 11:13, 16:6,
79:23, 80:7, 107:6,
109:16, 110:19,
114:22, 141:18,
144:21, 151:9,
151:11, 205:10,
205:14, 210:18,
214:24
**factory** [7] - 12:1,
12:15, 12:19, 19:21,
19:24, 20:1, 20:5
**facts** [7] - 26:4, 40:17,
75:15, 75:16, 76:5,
76:9, 78:19
**failed** [1] - 217:14
**failing** [1] - 205:11
**fair** [16] - 8:17, 17:15,
30:10, 38:2, 39:25,
40:13, 42:11, 99:1,
162:14, 174:11,
178:6, 178:7,
203:11, 206:17,
206:19, 227:8
**fairer** [2] - 32:10,
32:12
**fairly** [4] - 9:21, 16:8,
54:2, 153:3
**fairs** [1] - 87:8
**fake** [6] - 97:1, 99:24,
100:4, 100:19,
100:20, 106:4, 106:5
**falling** [2] - 10:14,
10:21
**falls** [1] - 66:23
**false** [25] - 79:23,
80:7, 80:9, 96:20,
96:21, 99:23,
100:17, 116:5,
116:9, 116:10,
116:11, 117:4,
117:10, 118:3,
118:4, 140:18,
143:17, 158:25,
159:1, 166:1, 166:3,
224:6, 224:9
**familiar** [8] - 17:10,
75:9, 78:21, 103:1,
136:13, 199:6,
199:8, 225:2
**familiarity** [1] - 66:17
**families** [2] - 101:24,
115:23

**family** [14] - 40:21,
41:8, 56:12, 63:3,
63:23, 64:3, 65:10,
69:21, 81:24, 101:9,
178:19, 179:3,
179:4, 213:25
**famous** [1] - 175:25
**far** [10] - 3:17, 31:21,
53:9, 66:25, 162:6,
221:10, 221:11,
223:13, 227:11,
229:14
**fare** [2] - 129:12,
180:14
**fares** [4] - 126:25,
129:2, 129:11,
141:25
**fast** [5] - 144:16,
151:10, 172:7,
184:12, 228:1
**faster** [3] - 64:9,
123:14, 151:13
**favor** [5] - 10:4, 77:2,
112:25, 118:14,
118:15
**favorable** [5] - 7:1,
47:17, 48:3, 50:17,
50:18
**favorite** [1] - 173:10
**fealty** [1] - 213:10
**feature** [3] - 16:1,
135:23, 208:9
**features** [2] - 13:18,
136:1
**February** [14] - 144:6,
144:24, 145:2,
146:11, 160:6,
164:24, 167:9,
173:12, 173:22,
173:24, 177:13,
178:1, 199:20
**federal** [1] - 64:14
**Federal** [1] - 50:8
**fee** [1] - 177:19
**feed** [1] - 129:8
**feedback** [2] - 126:17,
147:14
**fees** [2] - 176:23,
177:5
**feet** [1] - 201:2
**fellow** [3] - 12:20,
56:18, 82:15
**felt** [2] - 119:15,
175:12
**fence** [1] - 174:14
**few** [12] - 9:24, 22:6,
80:18, 84:24, 99:19,
100:9, 104:25,
106:1, 117:7, 201:6,
202:11, 203:20

**field** [5] - 77:24, 98:11,
132:24, 170:7,
208:12
**fifth** [1] - 10:8
**fights** [1] - 93:16
**figure** [11] - 18:1, 20:2,
34:14, 99:6, 108:24,
109:2, 113:23,
149:14, 149:15,
213:14, 213:15
**file** [12] - 94:3, 189:5,
189:17, 190:23,
191:6, 191:9,
191:10, 191:15,
191:16, 194:25,
195:2, 195:15
**filed** [5] - 40:22, 47:14,
86:14, 104:9, 112:22
**files** [12] - 103:18,
188:14, 189:8,
190:22, 190:24,
193:11, 193:12,
194:24, 195:21,
196:6, 196:8, 197:7
**filings** [1] - 15:15
**fill** [3] - 127:1, 132:16,
134:11
**final** [5] - 15:25, 26:18,
84:22, 84:24, 85:3
**finally** [9] - 54:19,
76:20, 82:13, 84:15,
98:9, 98:16, 107:1,
109:4, 113:1
**finance** [1] - 140:21
**financial** [5] - 45:1,
56:6, 56:10, 91:10,
113:18
**Fine** [1] - 197:25
**fine** [9] - 7:25, 45:20,
58:16, 63:21, 65:23,
68:14, 68:25,
106:23, 229:14
**fined** [1] - 205:10
**FINGER** [1] - 2:2
**fingers** [1] - 175:13
**finish** [3] - 36:13,
83:22, 85:11
**finished** [2] - 57:9,
60:22
**finishing** [1] - 228:13
**Finland** [3] - 153:11,
153:16
**first** [55] - 3:3, 9:6,
9:15, 9:20, 13:5,
13:10, 24:24, 29:3,
33:18, 35:23, 38:25,
39:16, 46:20, 53:13,
73:20, 73:21, 74:1,
80:19, 84:7, 87:19,
91:12, 92:25, 93:14,

100:25, 108:10, 111:11, 111:15, 120:18, 121:24, 136:4, 136:8, 137:21, 151:18, 152:9, 153:7, 154:24, 156:9, 156:24, 157:10, 159:18, 169:15, 179:21, 182:11, 183:6, 185:1, 189:25, 190:12, 203:4, 203:19, 203:25, 204:16, 219:22, 220:18, 223:5, 227:13

**firsthand** [5] - 66:14, 161:4, 161:14, 162:13, 187:21

**fiscal** [2] - 102:22, 113:21

**five** [20] - 21:12, 28:15, 29:5, 38:19, 39:18, 39:19, 39:20, 39:21, 39:22, 40:9, 44:10, 52:4, 61:17, 80:7, 85:4, 85:5, 85:12, 107:25, 186:12, 227:9

**five-sixty** [1] - 186:12

**fix** [7] - 170:9, 172:10, 172:11, 182:24, 196:16, 216:21, 228:1

**fixed** [2] - 181:22, 181:23

**fixing** [1] - 91:22

**flawed** [1] - 11:22

**fleet** [1] - 125:8

**flew** [3] - 62:3, 66:10, 215:24

**flier** [2] - 66:15, 67:2

**flight** [112] - 21:11, 42:1, 42:3, 42:8, 42:21, 42:23, 46:3, 49:3, 49:24, 49:25, 51:25, 52:2, 52:10, 52:14, 63:6, 63:7, 65:22, 68:15, 87:8, 88:25, 89:9, 90:3, 90:5, 91:6, 92:6, 92:16, 93:10, 94:14, 94:23, 96:9, 98:7, 101:14, 121:2, 121:4, 121:5, 121:12, 125:6, 125:22, 125:23, 130:4, 131:11, 132:14, 133:16, 134:1, 134:3,

134:10, 134:15, 134:22, 134:24, 135:4, 135:25, 136:5, 136:10, 136:17, 137:10, 137:12, 139:10, 139:23, 139:25, 140:22, 140:23, 141:23, 141:24, 144:1, 150:10, 170:13, 172:25, 176:4, 176:9, 177:6, 177:7, 177:20, 178:10, 178:11, 178:12, 178:14, 179:7, 180:11, 180:13, 180:17, 180:19, 190:8, 190:17, 190:18, 204:15, 204:17, 206:9, 208:10, 208:12, 208:16, 210:25, 211:8, 211:12, 211:23, 212:5, 214:22, 216:3, 217:24, 218:9, 218:25, 220:23, 223:18, 225:14, 226:1, 226:11

**flights** [129] - 19:6, 21:12, 42:7, 46:4, 51:15, 52:13, 54:3, 61:25, 62:1, 62:9, 65:21, 67:18, 68:19, 86:9, 86:16, 88:18, 89:2, 89:24, 89:25, 90:4, 90:7, 91:9, 91:14, 92:10, 93:18, 93:24, 94:3, 94:7, 94:10, 94:16, 97:2, 98:13, 98:14, 98:15, 99:9, 99:13, 99:15, 99:16, 101:2, 101:4, 101:20, 102:19, 102:24, 103:4, 103:7, 110:4, 111:16, 111:17, 111:23, 113:24, 114:1, 114:13, 115:13, 115:14, 121:10, 125:2, 125:6, 125:7, 126:25, 127:8, 128:7, 129:23, 129:24, 130:15, 130:24, 131:6, 137:4, 138:11, 138:25, 139:5, 139:7, 139:10, 140:10, 140:13,

141:11, 141:12, 144:2, 144:5, 144:10, 144:22, 146:3, 146:9, 146:12, 146:14, 148:15, 150:21, 152:7, 152:12, 152:13, 152:18, 153:10, 153:21, 154:3, 155:1, 155:18, 158:1, 158:14, 174:4, 177:10, 178:5, 178:23, 179:5, 179:6, 180:20, 199:2, 199:6, 199:7, 199:9, 199:15, 199:22, 200:13, 200:24, 201:7, 201:10, 201:13, 202:3, 202:6, 202:9, 202:11, 202:13, 202:14, 202:21, 204:12, 205:16, 205:25

**flip** [2] - 73:20, 74:1

**flips** [1] - 73:18

**flooded** [3] - 108:3, 108:5, 181:25

**floor** [6] - 12:1, 12:15, 12:20, 19:24, 20:1, 20:5

**flow** [15] - 60:5, 115:5, 115:6, 135:6, 136:2, 177:5, 177:6, 183:19, 206:16, 206:19, 206:21, 207:11, 207:21, 208:7, 209:17

**flown** [6] - 42:2, 62:2, 62:4, 177:10, 178:4, 178:18

**fly** [14] - 32:5, 33:15, 102:19, 110:5, 110:6, 110:7, 124:13, 124:24, 124:25, 125:2, 177:18, 178:15, 178:16, 204:16

**fly-by-night** [3] - 110:5, 110:6, 110:7

**flying** [9] - 14:25, 87:6, 128:7, 169:20, 180:3, 180:12, 208:18, 209:4, 209:11

**focus** [3] - 95:15, 95:18, 148:20

**focused** [7] - 30:8, 95:12, 126:3, 126:4,

161:10, 221:25, 222:18

**focusing** [1] - 23:19

**foley** [2] - 195:6, 195:8

**FOLEY** [2] - 188:23, 189:2

**foleymasey1227@ gmail.com** [1] - 188:22

**follow** [16] - 36:17, 37:17, 40:16, 57:16, 57:17, 58:5, 58:12, 60:25, 67:4, 67:17, 72:5, 72:12, 72:15, 72:16, 73:5, 105:13

**follow-up** [6] - 36:17, 67:4, 67:17, 72:5, 72:15, 72:16

**follow-ups** [1] - 73:5

**following** [10] - 29:7, 41:2, 58:18, 74:10, 84:21, 88:11, 104:21, 107:18, 119:14, 175:19

**follows** [1] - 122:9

**Foods** [1] - 11:1

**fool** [2] - 195:19, 220:21

**fooling** [1] - 129:14

**FOR** [1] - 1:2

**force** [1] - 112:24

**forced** [6] - 91:22, 92:4, 216:21, 217:7, 217:8, 217:10

**FORDERER** [1] - 2:7

**Forderer** [2] - 102:9, 106:19

**Forderer's** [1] - 106:21

**foregoing** [1] - 230:9

**foreman** [1] - 47:22

**forever** [1] - 149:10

**forget** [1] - 141:1

**form** [10] - 31:23, 36:8, 72:9, 77:9, 108:11, 117:17, 133:11, 207:4, 210:19, 216:11

**format** [2] - 172:1, 193:20

**former** [5] - 8:11, 32:13, 69:4, 69:8, 72:12

**forth** [5] - 3:15, 9:19, 11:10, 52:18, 196:21

**forum** [1] - 170:25

**forward** [2] - 132:5, 141:13

**foundation** [6] - 152:24, 154:8,

154:9, 154:10, 161:18, 198:21

**foundational** [1] - 154:16

**Four** [1] - 193:21

**four** [18] - 34:14, 40:6, 50:20, 53:1, 68:6, 80:4, 98:12, 104:2, 104:4, 104:10, 141:16, 142:13, 178:19, 193:21, 203:12, 227:5

**frankly** [1] - 22:18

**fraud** [7] - 79:17, 99:20, 102:14, 104:20, 105:7, 116:20, 127:1

**Fraud** [1] - 74:24, 78:13, 79:8, 79:20, 84:9, 86:14, 89:18, 102:16, 104:19, 104:20, 105:1, 105:2, 105:19

**fraudulent** [1] - 105:4

**FRC** [1] - 10:23

**free** [8] - 58:21, 61:5, 61:6, 63:19, 67:25, 74:13, 81:19, 83:19

**French** [1] - 144:20

**frequent** [4] - 43:15, 66:3, 66:16, 102:2

**frequently** [3] - 20:5, 54:3, 101:24

**Friday** [3] - 56:19, 56:23, 57:9

**friend** [4] - 40:21, 47:14, 211:7, 213:8

**friends** [2] - 81:25, 213:25

**frills** [1] - 87:8

**Frontier** [1] - 62:9

**frustrated** [3] - 123:7, 170:14, 213:13

**frustrating** [2] - 103:9, 141:10

**frustration** [3] - 62:21, 94:25, 95:2

**Fuga** [9] - 9:3, 15:23, 17:18, 19:16, 19:17, 24:15, 30:16, 32:22, 87:14

**FUGA** [35] - 1:19, 9:3, 13:4, 13:9, 13:13, 13:24, 14:10, 14:18, 14:25, 19:18, 20:8, 20:22, 21:4, 21:9, 21:16, 21:19, 21:22, 22:3, 22:11, 22:14, 24:17, 24:22, 24:24, 25:7, 25:16, 26:19,

26:24, 27:9, 27:14, 27:17, 29:9, 29:13, 30:19, 30:24, 32:23
**Fuga's** [1] - 15:21
**fulfill** [2] - 83:14, 91:24
**full** [6] - 39:21, 39:25, 58:25, 127:1, 137:3, 215:21
**function** [2] - 14:12, 17:18
**funny** [1] - 185:1
**furthered** [1] - 79:17
**fuse** [1] - 183:17

**G**

**gallery** [2] - 37:14, 37:17
**game** [3] - 149:11, 149:13, 150:6
**gap** [1] - 31:12
**gaps** [1] - 31:14
**gas** [1] - 73:3
**gate** [1] - 135:25
**gather** [2] - 58:21, 190:24
**GDS** [3] - 112:20, 211:19, 211:22
**general** [9] - 15:12, 96:13, 140:16, 163:14, 163:15, 163:19, 163:22, 164:11, 171:18
**generality** [1] - 164:14
**generally** [7] - 3:23, 17:6, 68:18, 76:3, 100:23, 163:8, 182:17
**generate** [1] - 140:17
**Genius** [1] - 116:21
**gentleman** [4] - 48:6, 49:15, 149:1, 149:2
**gentlemen** [8] - 35:6, 86:7, 99:1, 99:17, 104:16, 107:10, 109:9, 175:16
**Georgia** [1] - 68:11
**Germany** [1] - 141:16
**getaway** [1] - 27:5
**GetID** [7] - 165:25, 166:4, 166:8, 166:13, 166:14, 166:16, 167:20
**Gevaert** [2] - 11:15, 12:25
**GEVAERT** [1] - 11:16
**GIERHART** [4] - 1:20, 120:19, 120:23,

121:23
**Gierhart** [6] - 87:14, 120:18, 200:2, 200:3, 200:5, 200:7
**given** [15] - 24:2, 28:5, 33:10, 36:8, 40:7, 56:9, 56:10, 82:22, 84:13, 84:16, 162:17, 164:21, 187:6, 199:11, 200:19
**glasses** [1] - 203:7
**gleaned** [1] - 102:11
**Global** [1] - 11:2
**glorious** [1] - 52:14
**gmail** [1] - 148:6
**gmail.com** [1] - 189:2
**goal** [1] - 102:5
**Godspeed** [1] - 68:1
**goods** [2] - 80:6, 80:9
**Google** [5] - 90:14, 129:7, 131:25, 221:2, 221:5
**government** [6] - 97:19, 127:13, 202:6, 205:2, 205:3, 205:7
**governments** [2] - 127:22, 128:6
**grandmother** [1] - 63:2
**graph** [4] - 170:23, 171:2, 171:19, 171:22
**graphics** [4] - 133:10, 133:11, 133:15, 135:14
**great** [5] - 18:7, 30:19, 45:20, 47:3, 48:5
**greater** [1] - 164:14
**grew** [1] - 88:10
**ground** [1] - 79:5
**grounds** [1] - 15:18
**group** [10] - 88:7, 96:13, 96:15, 100:24, 103:24, 104:7, 104:9, 104:13, 152:12, 211:8
**Groups** [1] - 102:21
**groups** [1] - 170:17
**grow** [1] - 174:3
**growing** [1] - 174:4
**GSA** [1] - 119:17
**GSDs** [1] - 221:6
**guarantee** [1] - 128:7
**guard** [1] - 120:15
**Guerrero** [12] - 101:1, 101:17, 108:18, 112:2, 112:7, 112:9,

113:4, 113:15, 116:24
**guess** [14] - 4:22, 14:22, 19:22, 34:12, 45:19, 45:22, 46:11, 49:17, 53:24, 62:16, 70:21, 119:25, 133:20, 204:10
**guessing** [5] - 167:11, 174:2, 215:8, 217:20, 225:16
**guest** [1] - 136:7
**guide** [2] - 76:12, 114:12
**guilt** [1] - 223:15
**guy** [4] - 12:16, 12:17, 20:6, 191:18
**guys** [1] - 182:23

**H**

**H-U-R-L-E-Y** [1] - 122:5, 122:14
**habit** [1] - 216:25
**hacker** [2] - 110:5, 110:7
**hair** [3] - 45:7, 123:6, 123:24
**half** [6] - 64:7, 130:11, 178:6, 178:17, 179:9, 198:14
**hall** [1] - 81:12
**hand** [1] - 44:21
**handed** [1] - 162:20
**handle** [5] - 37:8, 142:23, 186:2, 216:20, 216:23
**handled** [1] - 62:23
**handles** [1] - 217:3
**HANNAH** [1] - 2:8
**happy** [3] - 162:7, 188:4, 207:13
**hard** [6] - 115:19, 123:23, 125:24, 127:21, 150:12, 168:8
**harder** [1] - 11:8
**hardship** [3] - 45:1, 56:6, 56:10
**harm** [10] - 79:23, 91:9, 113:17, 113:19, 129:20, 140:15, 146:22, 147:4, 220:25, 224:2
**harmed** [2] - 79:25, 184:16
**harmful** [1] - 116:24
**harms** [4] - 87:1, 142:17, 146:23,

185:7
**harsh** [1] - 57:5
**HARTNETT** [38] - 2:6, 3:7, 6:6, 9:1, 15:6, 16:5, 16:10, 16:16, 16:19, 17:2, 17:15, 17:17, 18:16, 19:1, 22:22, 23:1, 23:3, 23:22, 24:10, 24:14, 26:2, 26:8, 27:23, 28:4, 28:9, 28:11, 28:16, 28:21, 29:2, 29:17, 29:20, 29:22, 30:10, 32:1, 32:6, 32:14, 32:17, 32:24
**Hartnett** [10] - 3:8, 3:13, 5:25, 6:1, 15:4, 16:2, 22:20, 25:4, 29:16, 30:20
**hate** [1] - 229:10
**head** [5] - 17:2, 19:19, 167:10, 168:21, 185:17
**heading** [1] - 125:7
**headphones** [1] - 123:25
**heads** [1] - 195:18
**health** [1] - 65:15
**hear** [77] - 5:25, 13:3, 15:4, 22:20, 29:19, 40:4, 44:20, 75:9, 77:8, 77:11, 77:20, 78:17, 86:9, 86:13, 86:17, 86:20, 87:6, 88:5, 89:2, 89:6, 89:9, 89:11, 89:14, 90:8, 91:12, 91:15, 91:23, 92:1, 92:2, 92:11, 92:14, 92:20, 93:2, 93:13, 93:16, 93:19, 93:25, 94:5, 94:6, 94:12, 94:14, 94:17, 95:5, 95:11, 95:19, 95:25, 96:7, 96:22, 97:7, 97:15, 97:18, 97:22, 98:1, 98:4, 98:6, 98:20, 99:2, 99:21, 99:22, 100:13, 100:17, 101:23, 103:22, 105:25, 106:18, 108:10, 108:16, 108:23, 109:14, 112:1, 114:21, 115:1, 115:3, 115:19, 116:16, 117:18, 229:9
**heard** [19] - 26:7, 40:6, 76:20, 78:22, 82:14, 82:17, 82:20, 88:23,

92:18, 101:11, 104:24, 112:8, 112:10, 114:21, 128:12, 196:18, 229:8, 229:12
**hearing** [2] - 44:17, 83:10
**hearsay** [17] - 9:12, 10:14, 10:21, 14:17, 20:10, 24:16, 26:25, 27:10, 27:11, 27:13, 161:4, 161:13, 161:15, 162:12, 162:16, 163:11, 164:6
**heart** [2] - 64:16, 64:24
**heavily** [7] - 10:2, 10:3, 115:25, 116:1, 186:23
**heavy** [1] - 184:12
**heckle** [1] - 60:25
**height** [1] - 185:2
**held** [5] - 55:16, 66:1, 71:3, 72:8, 120:5
**hello** [1] - 198:25
**help** [10] - 15:22, 25:10, 57:5, 102:5, 125:13, 129:21, 147:4, 169:22, 170:11, 179:24
**helpful** [5] - 29:11, 76:1, 77:22, 82:23, 83:3
**Hemann** [16] - 57:2, 98:23, 118:17, 164:1, 198:21, 202:8, 218:8, 218:13, 220:21, 220:23, 221:9, 221:12, 221:21, 221:22, 222:1
**HEMANN** [64] - 2:6, 33:7, 56:5, 56:17, 56:20, 57:13, 58:11, 58:5, 66:7, 66:12, 67:4, 67:13, 71:6, 72:5, 72:9, 73:6, 85:21, 98:24, 109:25, 119:5, 119:12, 121:18, 142:24, 143:4, 143:15, 152:21, 154:8, 154:10, 154:18, 161:3, 161:13, 162:12, 164:2, 164:6, 165:5, 168:23, 175:1, 187:20, 187:25, 188:9, 197:23,

198:12, 198:22, 198:24, 203:3, 203:5, 203:14, 203:16, 203:24, 204:2, 207:14, 207:19, 209:20, 209:22, 222:7, 222:15, 226:2, 228:7, 229:3, 229:6, 229:12, 229:17, 229:22, 229:25
**hereby** [1] - 230:7
**high** [4] - 78:23, 145:17, 150:4, 183:18
**High** [3] - 211:20, 216:1, 223:19
**higher** [1] - 201:7
**highest** [1] - 35:10
**highlight** [1] - 156:15
**highly** [4] - 26:3, 26:8, 121:9, 189:21
**hillers** [1] - 219:13
**himself** [2] - 18:5, 23:24
**hindsight** [1] - 181:22
**hires** [2] - 94:9, 103:4
**hit** [6] - 54:24, 68:11, 127:7, 127:20, 131:4, 150:15
**hitting** [1] - 184:4
**hmm** [1] - 46:6
**hold** [1] - 188:7
**Holding** [1] - 156:12
**HOLDINGS** [1] - 1:6
**Holdings** [14] - 93:20, 93:22, 93:23, 93:25, 101:7, 101:9, 101:15, 156:5, 156:6, 156:7, 157:6, 157:12, 157:24
**holds** [1] - 21:10
**hole** [1] - 20:9
**holes** [1] - 20:15
**Holland** [3] - 87:13, 156:4, 159:11
**HOLLAND** [1] - 1:18
**home** [2] - 60:25, 80:21
**homegrown** [1] - 87:25
**Honor** [80] - 3:7, 3:11, 6:6, 7:24, 9:3, 15:6, 16:10, 21:4, 22:22, 24:22, 25:7, 26:2, 26:9, 27:15, 27:23, 28:4, 28:16, 29:9, 29:11, 30:19, 32:1, 32:14, 32:23, 34:4, 34:18, 56:20, 57:12,

57:17, 57:19, 58:6, 67:5, 73:6, 85:20, 85:21, 86:6, 98:24, 119:4, 119:5, 119:8, 119:12, 119:22, 120:19, 121:13, 121:18, 121:25, 122:1, 142:24, 143:8, 143:15, 145:14, 152:21, 154:8, 154:18, 160:24, 162:20, 163:12, 164:16, 165:5, 168:23, 169:5, 174:24, 175:2, 175:7, 175:22, 187:22, 188:4, 188:9, 188:10, 197:4, 197:16, 198:3, 198:13, 198:22, 207:17, 222:7, 223:17, 228:8, 229:3, 229:8, 229:18
**Honorable** [1] - 1:11
**hope** [5] - 73:25, 120:10, 224:4, 229:6, 229:9
**hopeful** [1] - 34:13
**hopefully** [1] - 228:12
**hoping** [1] - 184:8
**horrible** [1] - 185:5
**hospital** [1] - 62:19
**hospitality** [1] - 101:12
**Hosted** [1] - 176:17
**hotel** [8] - 42:4, 42:21, 46:3, 47:11, 49:7, 50:1, 63:8, 207:7
**hotels** [7] - 51:11, 52:3, 61:25, 99:9, 101:14, 103:4, 226:11
**Hotels.com** [1] - 49:7
**hour** [10] - 22:5, 28:5, 64:6, 64:8, 118:18, 119:1, 160:4, 184:5, 184:21, 198:15
**hourly** [1] - 163:16
**hours** [9] - 28:6, 34:5, 34:15, 140:24, 141:12, 141:13, 141:15, 184:24
**house** [6] - 65:18, 193:19, 194:17, 194:18, 194:20, 194:21
**Housseau** [1] - 112:16
**HOWARD** [1] - 1:21
**https://Booking.com**

[1] - 153:10
**huge** [3] - 9:25, 127:9, 184:5
**human** [12] - 89:10, 89:14, 133:1, 136:17, 139:1, 139:4, 139:11, 140:5, 144:17, 148:24, 150:1, 221:15
**humans** [1] - 89:11
**Humphries** [1] - 113:12
**hundred** [6] - 44:7, 92:22, 146:17, 150:1, 150:13
**hundreds** [2] - 110:24, 111:7
**HURLEY** [1] - 122:6
**Hurley** [86] - 9:6, 13:10, 14:21, 15:2, 15:19, 15:23, 15:24, 16:8, 17:4, 17:8, 18:7, 19:18, 19:25, 20:22, 22:5, 22:14, 23:16, 23:19, 23:23, 24:11, 25:1, 25:3, 25:19, 26:13, 26:22, 28:10, 28:12, 31:10, 31:14, 31:17, 32:3, 32:25, 33:8, 33:10, 33:13, 33:16, 34:2, 34:8, 34:11, 34:18, 87:19, 89:22, 90:8, 91:7, 91:24, 92:2, 92:11, 92:20, 93:2, 93:4, 93:17, 94:18, 94:24, 109:4, 109:16, 122:1, 122:5, 122:12, 122:14, 122:15, 123:5, 123:11, 123:19, 124:16, 126:22, 145:18, 152:22, 152:23, 154:11, 161:16, 161:23, 164:20, 172:24, 175:24, 176:12, 188:12, 197:15, 198:25, 199:3, 203:6, 203:17, 204:3, 208:10, 223:11, 228:19
**Hurley's** [4] - 9:8, 15:10, 22:23, 31:14
**hurt** [2] - 116:12, 117:23
**husband** [5] - 45:3, 54:23, 65:13, 65:20,

69:4
**hypothetical** [2] - 19:22

## I

**Iain** [1] - 98:9
**icons** [1] - 215:5
**ID** [2] - 100:3, 195:4
**idea** [17] - 34:25, 38:7, 60:7, 191:25, 199:15, 200:15, 201:15, 202:15, 202:16, 202:19, 206:12, 217:9, 217:12, 217:17, 220:10, 227:10, 228:10
**ideas** [1] - 105:9
**identified** [6] - 95:22, 116:7, 154:5, 155:4, 208:25, 209:2
**identifier** [1] - 134:15
**identifies** [3] - 98:2, 193:24, 209:4
**identify** [6] - 87:25, 89:4, 96:10, 142:16, 147:11, 224:8
**Identify** [1] - 121:1
**identifying** [2] - 149:17, 149:21
**identities** [1] - 160:8
**identity** [2] - 96:8, 160:2
**ignore** [1] - 91:8
**ignoring** [2] - 140:14, 141:18
**Ill** [1] - 1:21
**ill** [1] - 65:15
**image** [1] - 166:15
**imagine** [3] - 56:22, 141:10, 217:4
**immediately** [4] - 25:9, 33:24, 150:4, 182:18
**impact** [4] - 95:17, 115:17, 115:18, 130:9
**impacted** [1] - 216:8
**impair** [1] - 40:4
**impartial** [1] - 40:13
**implemented** [6] - 5:13, 147:17, 147:23, 148:15, 150:22, 165:21
**implementing** [1] - 147:1
**importance** [1] - 5:20
**important** [16] - 16:1,

35:9, 35:13, 36:18, 37:16, 39:16, 58:25, 82:10, 83:13, 88:19, 91:24, 93:2, 95:9, 95:13, 103:20, 114:14
**importantly** [4] - 90:7, 96:7, 96:17, 101:14
**impression** [10] - 47:17, 50:16, 54:25, 55:2, 60:8, 60:17, 62:7, 63:8, 68:13, 69:10
**impressions** [3] - 48:24, 70:1, 71:22
**improve** [1] - 170:10
**improved** [1] - 167:3
**improves** [1] - 97:25
**improving** [1] - 87:24
**IN** [2] - 1:1, 1:2
**in-person** [4] - 5:11, 8:14, 159:22, 161:24
**inaccurate** [2] - 201:1, 201:17
**inadequacy** [1] - 31:16
**Inc** [2] - 93:20, 157:12
**INC** [1] - 1:6
**incapable** [1] - 116:21
**inched** [1] - 119:17
**incidences** [1] - 182:4
**incident** [7] - 18:8, 92:1, 92:17, 100:8, 109:3, 179:20, 182:3
**inclined** [2] - 56:11, 57:7
**included** [5] - 30:3, 103:19, 116:7, 121:8, 207:23
**includes** [8] - 13:15, 76:6, 76:7, 81:24, 96:20, 99:25, 100:1
**including** [8] - 23:15, 82:9, 94:1, 121:3, 138:14, 154:4, 155:3, 156:11
**incompetence** [1] - 127:17
**inconvenient** [1] - 35:12
**incorporated** [1] - 101:7
**incorrect** [4] - 91:23, 96:24, 97:8, 98:17
**increase** [1] - 177:20
**increased** [2] - 176:3, 184:4
**increasing** [1] - 184:10
**indeed** [6] - 5:24,

108:13, 136:14, 144:4, 159:7, 166:17
**independent** [1] - 104:3
**index** [1] - 170:2
**indicate** [1] - 75:22
**indicated** [3] - 85:3, 86:3, 118:20
**indicates** [1] - 121:11
**indicating** [1] - 75:22
**indication** [1] - 76:2
**indirect** [1] - 94:11
**individuals** [7] - 13:16, 24:3, 24:19, 41:2, 41:5, 41:7, 82:8
**induced** [2] - 79:10, 79:15
**industry** [2] - 41:11, 139:17
**inferential** [2] - 14:19, 14:20
**infinitesimally** [1] - 115:13
**inflated** [1] - 129:11
**influence** [1] - 69:17
**influenced** [1] - 76:16
**influencing** [2] - 81:7, 129:13
**information** [47] - 10:14, 20:3, 26:16, 30:22, 81:6, 82:23, 83:13, 91:5, 91:14, 91:17, 92:11, 92:13, 94:23, 96:4, 97:9, 97:11, 97:16, 98:17, 99:23, 99:24, 100:2, 100:4, 100:5, 100:22, 105:23, 105:24, 106:2, 106:3, 107:2, 107:4, 107:6, 114:25, 132:17, 134:23, 141:21, 143:17, 144:13, 151:10, 159:23, 166:2, 169:14, 170:12, 191:9, 209:17, 213:6, 223:25, 226:8
**informing** [3] - 93:15, 213:10, 213:17
**inhouse** [1] - 148:22
**initial** [1] - 157:15
**initiatives** [1] - 104:12
**injury** [2] - 48:22, 60:4
**input** [1] - 37:22
**inputs** [1] - 91:1
**inputted** [1] - 90:22
**inquiries** [2] - 170:24, 171:1

**inquiry** [1] - 30:12
**inside** [2] - 187:3, 215:23
**insight** [1] - 151:11
**instance** [4] - 20:11, 183:24, 220:8, 224:8
**instances** [2] - 35:13, 78:15
**instead** [5] - 17:4, 91:15, 149:6, 180:14, 205:24
**instruct** [1] - 75:20
**instructed** [1] - 124:9
**instruction** [1] - 158:23
**instructions** [8] - 74:16, 79:3, 79:4, 80:16, 84:19, 84:21, 84:24, 205:4
**insurance** [1] - 55:4
**integrity** [13] - 5:24, 86:11, 91:13, 95:13, 140:18, 141:4, 142:3, 158:25, 159:6, 159:8, 212:13, 213:3, 222:19
**intelligence** [1] - 145:3
**intended** [5] - 75:21, 76:12, 79:17, 80:10, 157:17
**intent** [3] - 79:15, 105:4, 105:8
**intentionally** [2] - 80:2, 100:22
**interacts** [1] - 162:23
**interested** [1] - 24:1
**interesting** [2] - 111:18, 111:19
**interestingly** [1] - 102:13
**interface** [1] - 135:12
**interfere** [1] - 103:12, 115:8, 115:17
**interfered** [2] - 38:18, 80:2
**interference** [4] - 75:8, 103:16, 104:5, 117:5
**interferes** [1] - 83:4
**interim** [2] - 18:4, 228:21
**intermediaries** [1] - 151:2
**internally** [1] - 109:1
**internet** [3] - 81:22, 82:3, 82:9
**interpret** [1] - 152:23
**interpretation** [2] - 153:1, 153:2

**interpreting** [1] - 154:16
**interrogatories** [1] - 171:25
**interrogatory** [15] - 120:20, 121:1, 146:9, 159:24, 160:10, 163:2, 164:12, 165:19, 165:20, 166:9, 167:11, 170:17, 171:16, 173:4
**Interrogatory** [2] - 120:25, 121:8
**interrupting** [1] - 7:24
**interruptions** [1] - 71:1
**interviewed** [1] - 107:11
**intimidated** [1] - 60:23
**introduce** [1] - 84:13, 84:16, 87:4, 87:10
**introduction** [1] - 84:5
**inventory** [8] - 110:21, 110:24, 111:1, 111:2, 111:6, 111:11
**investigate** [1] - 182:10
**investigation** [2] - 82:6, 213:13
**invests** [2] - 115:25, 116:1
**involve** [2] - 29:23, 104:4
**involved** [21] - 41:12, 59:22, 60:4, 82:8, 107:16, 108:11, 108:12, 144:2, 147:1, 147:13, 158:8, 158:11, 159:5, 165:16, 166:20, 166:21, 182:2, 182:13, 186:8, 222:18, 223:1
**involvement** [4] - 41:21, 48:16, 170:5, 176:13
**involves** [2] - 9:4, 41:14
**involving** [3] - 38:9, 48:20, 48:22
**IOENGINE** [2] - 10:16, 10:25
**IP** [36] - 19:2, 19:7, 19:12, 19:13, 23:4, 23:5, 23:7, 23:8, 23:13, 24:11, 30:14, 92:14, 109:5, 109:6, 188:19, 189:11, 189:12, 189:13,

191:11, 193:5, 193:8, 193:13, 193:17, 193:18, 193:22, 194:10, 194:12, 194:15, 194:16, 194:19, 194:22, 195:3, 195:8, 196:21
**Ireland** [9] - 38:11, 63:3, 63:4, 102:13, 102:15, 102:24, 133:9, 139:24
**Irish** [5] - 41:8, 66:9, 66:20, 67:12, 152:2
**issue** [64] - 3:4, 5:19, 5:24, 7:2, 8:14, 8:23, 8:24, 9:2, 9:6, 9:10, 9:15, 9:17, 11:17, 11:18, 17:6, 17:14, 18:18, 23:25, 26:5, 27:1, 27:21, 28:8, 28:22, 31:25, 48:14, 57:25, 63:21, 78:7, 78:8, 78:10, 78:11, 93:7, 94:8, 96:18, 100:15, 102:14, 104:14, 104:23, 109:20, 113:9, 119:23, 122:24, 126:13, 134:24, 134:25, 141:9, 158:18, 159:2, 159:25, 161:20, 162:17, 182:6, 182:7, 204:22, 212:10, 214:19, 215:16, 215:19, 217:13, 221:2, 224:7, 228:1
**issue's** [1] - 173:1
**issued** [2] - 108:20, 226:14
**issues** [22] - 5:23, 5:24, 7:12, 9:5, 9:7, 9:13, 66:5, 66:14, 67:1, 67:8, 93:5, 95:25, 106:5, 120:4, 126:22, 159:9, 164:8, 169:23, 170:2, 174:15, 222:4, 222:5
**issuing** [2] - 106:3, 138:14
**IT** [4] - 125:20, 147:10, 181:14, 191:25
**it'll** [1] - 119:19
**Italian** [8] - 127:13, 204:23, 205:6, 205:7, 205:8, 205:10, 205:14,

205:18
**Italians** [1] - 205:5
**Italy** [2] - 52:1, 205:3
**items** [1] - 23:20
**itself** [1] - 183:18

**J**

**jail** [1] - 62:24
**James** [1] - 200:20
**January** [6] - 121:3, 200:14, 200:24, 201:5, 204:16, 227:13
**Japan** [1] - 144:19
**Jeff** [1] - 102:9
**JEFFREY** [1] - 2:3
**Jersey** [1] - 133:20
**JESSIE** [1] - 2:8
**JI** [1] - 1:20
**Ji** [2] - 3:11, 87:14
**job** [8] - 41:12, 41:14, 45:2, 72:21, 99:4, 172:4, 213:17, 213:19
**John** [17] - 87:19, 122:1, 122:5, 122:14, 172:24, 176:11, 208:10, 218:8, 218:13, 220:21, 220:22, 221:9, 221:12, 221:21, 221:22, 222:1
**JOHN** [4] - 2:6, 122:5, 122:6, 122:14
**Johnson** [2] - 64:14, 64:25
**join** [1] - 125:10
**joined** [3] - 125:12, 125:13, 127:6
**joint** [1] - 144:15
**judge** [4] - 35:15, 77:16, 89:15
**Judge** [6] - 11:16, 11:20, 37:4, 88:23, 117:6, 194:9
**judgement** [1] - 4:18
**judges** [1] - 76:24
**judgment** [1] - 32:13
**July** [16] - 1:13, 7:9, 7:10, 7:14, 7:21, 8:2, 8:5, 47:2, 47:4, 104:8, 157:11, 170:21, 171:20, 173:10, 173:20, 204:17
**June** [2] - 7:11
**junior** [1] - 26:22

juror [65] - 37:2,
37:14, 37:19, 37:21,
39:6, 39:7, 39:8,
39:9, 39:10, 40:1,
42:12, 42:15, 43:3,
43:5, 43:8, 44:2,
44:8, 44:24, 46:14,
48:2, 49:9, 50:2,
50:19, 51:19, 52:21,
54:9, 54:19, 56:12,
57:4, 57:10, 58:13,
59:5, 59:6, 59:7,
61:15, 61:16, 63:13,
67:18, 68:3, 68:4,
68:5, 69:2, 71:11,
71:14, 71:15, 73:2,
74:11, 74:12
JUROR [145] - 42:16,
42:19, 42:22, 43:2,
43:4, 43:7, 43:9,
43:11, 43:13, 43:15,
43:19, 43:21, 43:23,
44:1, 44:3, 44:10,
44:12, 44:25, 45:3,
45:7, 45:11, 45:14,
45:19, 45:25, 46:4,
46:6, 46:8, 46:13,
46:15, 46:18, 46:21,
47:1, 47:7, 47:11,
47:14, 47:19, 47:21,
47:24, 48:1, 48:5,
48:10, 48:17, 48:22,
49:1, 49:4, 49:6,
49:10, 49:13, 49:21,
49:25, 50:4, 50:8,
50:11, 50:14, 50:18,
50:20, 50:22, 50:24,
51:2, 51:5, 51:9,
51:13, 51:18, 51:20,
51:24, 52:7, 52:12,
52:19, 52:22, 52:24,
53:9, 53:14, 53:23,
54:5, 54:8, 54:10,
54:13, 54:18, 54:20,
54:22, 55:3, 55:6,
55:10, 58:16, 59:9,
59:11, 59:15, 59:18,
59:21, 59:25, 60:3,
60:9, 60:13, 60:16,
60:19, 60:22, 61:17,
61:19, 61:24, 62:6,
62:8, 62:13, 62:18,
62:23, 63:2, 63:10,
63:14, 63:17, 63:25,
64:5, 64:8, 64:10,
64:13, 64:18, 64:23,
65:2, 65:4, 65:8,
65:10, 67:21, 68:6,
68:10, 68:14, 68:16,
68:23, 69:3, 69:8,
69:11, 69:14, 69:19,

69:23, 70:3, 70:6,
70:8, 70:11, 70:16,
70:19, 70:23, 71:17,
71:19, 71:24, 72:1,
72:20, 72:25, 73:3
juror's [1] - 39:1
jurors [28] - 35:24,
36:1, 36:4, 36:5,
37:15, 38:4, 39:5,
42:13, 44:20, 58:13,
58:18, 58:19, 58:24,
60:23, 61:4, 61:10,
67:24, 68:2, 70:25,
72:16, 72:17, 73:23,
74:10, 74:16, 80:19,
112:18, 118:7, 119:16
jury [68] - 3:2, 25:2,
34:7, 34:12, 35:2,
35:6, 35:9, 35:10,
35:19, 35:20, 36:3,
36:10, 36:15, 36:19,
36:22, 37:12, 37:23,
38:8, 38:24, 39:5,
41:20, 45:9, 49:11,
49:19, 50:11, 50:14,
56:24, 57:3, 59:2,
59:3, 66:19, 68:9,
68:10, 73:9, 73:12,
73:14, 73:16, 74:2,
74:5, 74:6, 74:8,
74:14, 74:18, 74:19,
74:21, 77:22, 80:25,
83:7, 83:11, 83:19,
84:23, 85:1, 85:8,
86:7, 118:18,
118:22, 118:24,
120:7, 143:12,
160:16, 175:16,
175:18, 189:19,
189:22, 200:23,
228:11, 228:18
JURY [2] - 1:9, 1:11
justice [1] - 35:14

**K**

Kaminski [2] - 87:11,
87:12
KASNER [1] - 2:7
KATHLEEN [1] - 2:6
Kathleen [1] - 3:7
KAYAK [25] - 3:4, 3:5,
4:7, 4:11, 4:15, 5:22,
6:13, 8:22, 41:3,
42:5, 42:9, 45:15,
50:25, 51:5, 51:6,
51:10, 51:24, 52:2,
52:8, 52:17, 54:4,
56:21, 56:22, 68:24
KAYAK's [3] - 3:18,

4:16, 4:20
keep [15] - 32:10,
80:13, 82:14, 82:24,
83:13, 83:17, 112:6,
115:20, 125:22,
147:11, 153:25,
182:16, 228:15
keeping [3] - 83:6,
120:13, 126:5
keeps [2] - 170:11,
220:5
kept [3] - 127:17,
155:18, 158:1
KERR [1] - 2:9
key [5] - 17:6, 88:23,
102:1, 183:16,
195:24
kick [1] - 213:13
kicked [1] - 184:1
kids [3] - 53:2, 208:11,
208:13
kill [1] - 197:10
kills [1] - 197:12
kind [14] - 4:14, 6:2,
11:24, 12:2, 15:17,
20:19, 25:20, 27:10,
40:12, 57:9, 135:25,
144:20, 170:2,
229:13
Kiwi [4] - 107:14,
223:2, 223:4, 223:13
KNIGHT [1] - 1:18
Knight [3] - 87:13,
156:4, 159:11
knowing [4] - 7:2,
57:5, 100:23, 222:25
knowingly [2] - 79:14,
80:8
knowledge [49] - 9:10,
9:12, 9:16, 9:18,
9:22, 10:6, 10:13,
11:11, 11:24, 12:2,
12:7, 12:9, 12:25,
13:10, 13:14, 13:17,
14:24, 15:13, 15:16,
15:19, 16:9, 24:12,
66:14, 76:25, 77:21,
112:24, 139:17,
154:12, 161:4,
161:14, 161:23,
162:1, 162:13,
163:14, 163:15,
163:19, 163:22,
164:8, 164:10,
164:11, 164:22,
187:21, 188:2,
188:6, 196:19,
201:12, 201:18
knowledgeable [3] -
19:20, 20:22, 24:20

known [7] - 26:4,
74:24, 75:6, 87:5,
87:7, 139:6, 181:23
knows [9] - 90:24,
109:25, 160:18,
162:16, 163:4,
163:18, 163:21,
200:16, 200:17
Kraft [1] - 11:1
KRATZ [1] - 1:16
Kristine [1] - 102:8
KRISTINE [1] - 2:7

**L**

lab [1] - 72:25
Labs [2] - 17:2, 19:19
lack [5] - 143:5, 161:4,
161:14, 162:13,
187:21
ladies [8] - 35:6, 86:7,
98:25, 99:17,
104:16, 107:9,
109:9, 175:16
lady [1] - 66:9
LAGOY [1] - 2:8
lamp [1] - 167:5
language [6] - 40:3,
89:17, 96:12, 96:15,
153:3, 227:25
laptop [1] - 125:21
laptops [1] - 126:5
large [6] - 22:9, 30:3,
69:5, 102:18, 110:8,
110:9, 190:24,
202:18, 211:8
largely [1] - 51:22
largest [4] - 87:5,
88:10, 88:16, 102:18
last [20] - 15:21,
16:19, 50:13, 69:6,
102:21, 125:5,
126:8, 130:11,
143:12, 146:15,
152:8, 153:18,
154:24, 157:7,
157:8, 175:25,
214:8, 225:14,
229:7, 229:19
late [4] - 8:16, 8:19,
85:10, 141:15
latest [1] - 72:21
latter [1] - 8:11
laughing [1] - 145:19
launch [1] - 103:9
law [14] - 9:25, 10:2,
13:9, 14:19, 15:7,
40:16, 40:17, 40:18,
53:20, 74:24, 75:16,

91:21, 94:10
lawsuit [10] - 40:22,
47:15, 48:16, 55:1,
69:4, 94:4, 104:8,
104:17, 157:20
lawsuits [1] - 105:11
lawyer [8] - 81:11,
87:15, 89:17,
111:12, 114:8,
152:1, 152:2, 176:1
lawyers [18] - 37:11,
37:20, 55:11, 58:11,
61:9, 65:6, 65:25,
73:10, 76:9, 76:11,
76:13, 82:18, 83:10,
83:23, 84:1, 104:22,
105:11, 199:19
layman's [1] - 130:2
LAYTON [1] - 2:2
lazy [1] - 22:18
LCC [2] - 112:20,
113:2
LCCs [1] - 112:19
lead [1] - 208:20
leading [3] - 10:7,
10:18, 15:24
leads [1] - 78:19
learn [5] - 86:22,
106:8, 107:3,
107:25, 118:7
learning [1] - 149:23
least [11] - 4:4, 7:13,
18:14, 31:22, 63:8,
87:18, 92:19, 97:23,
159:25, 186:9,
189:22
leave [2] - 26:11, 83:7
leaves [2] - 97:5,
194:15
leaving [1] - 135:25,
182:10, 228:11
lectern [1] - 3:15
led [3] - 103:23,
103:24, 104:13
Lee [1] - 151:24
left [2] - 12:18, 117:16
leg [6] - 178:11,
178:14, 178:18,
178:25, 179:1, 179:2
legal [11] - 9:8, 41:18,
41:22, 75:20, 79:3,
84:19, 104:11,
112:24, 138:14,
147:12, 156:10
legitimate [3] -
190:14, 191:19,
191:21
legs [4] - 178:10,
178:13, 178:15,
178:18

**length** [1] - 110:17
**lengthy** [1] - 64:6
**less** [3] - 39:21, 135:8, 184:6
**letter** [35] - 93:15, 93:19, 93:22, 94:1, 94:2, 111:12, 111:14, 111:18, 111:19, 112:10, 151:21, 151:24, 152:5, 152:22, 153:2, 153:3, 154:12, 155:9, 155:13, 155:15, 155:22, 155:23, 156:4, 157:4, 157:6, 157:7, 157:8, 157:11, 157:12, 157:16, 157:17, 158:3, 190:1
**letters** [7] - 93:14, 104:24, 104:25, 105:10, 119:7, 151:15, 151:20
**level** [5] - 26:22, 116:21, 150:2, 164:14, 226:25
**liable** [2] - 75:11, 117:14
**license** [3] - 27:5, 27:6, 30:2
**lie** [1] - 100:21
**life** [2] - 77:5, 88:10
**light** [7] - 78:19, 154:1, 154:17, 154:22, 154:23, 154:25, 167:1
**likelihood** [2] - 7:14, 55:25
**likely** [5] - 20:14, 78:20, 89:4, 95:23, 228:14
**limine** [3] - 143:1, 143:3, 143:5
**limited** [8] - 11:6, 16:7, 23:24, 31:22, 65:16, 121:3
**limits** [2] - 16:4, 124:18
**line** [10] - 5:5, 12:18, 17:23, 23:3, 66:23, 142:24, 187:20, 188:7, 193:14, 196:20
**lingering** [1] - 71:22
**link** [10] - 17:7, 18:8, 23:9, 28:7, 90:22, 109:12, 132:6, 133:3, 136:8, 188:18
**linkage** [1] - 188:1

**linked** [11] - 23:8, 23:9, 32:19, 186:19, 186:21, 188:15, 189:10, 191:5, 193:6, 193:8, 193:16
**linking** [1] - 25:14
**links** [1] - 113:12
**list** [21] - 27:2, 29:25, 30:1, 31:3, 44:15, 44:23, 50:23, 58:6, 58:7, 65:25, 72:10, 72:11, 111:3, 113:6, 147:7, 147:15, 170:8, 186:24, 218:17
**listed** [3] - 72:17, 207:8, 215:4
**listen** [3] - 82:1, 82:5, 118:8
**listing** [2] - 111:10, 199:2
**lists** [1] - 31:6
**literally** [2] - 19:20, 189:8
**litigation** [1] - 109:1
**live** [7] - 64:3, 77:9, 77:16, 87:18, 151:9, 151:13, 159:16
**lived** [2] - 62:2, 66:15
**lives** [2] - 65:17, 101:3
**LLP** [1] - 2:5
**loads** [2] - 148:10
**local** [4] - 69:5, 69:9, 183:13, 214:3
**locate** [1] - 133:14
**located** [3] - 102:13, 102:24, 133:11
**location** [1] - 193:19
**locked** [1] - 182:20
**log** [41] - 16:21, 17:8, 17:13, 17:21, 18:17, 90:8, 90:11, 106:14, 106:20, 131:17, 131:18, 131:19, 131:20, 131:22, 131:24, 132:9, 132:12, 133:25, 134:4, 136:2, 136:9, 189:8, 189:17, 190:22, 190:23, 191:6, 191:9, 191:10, 191:21, 192:2, 193:11, 193:12, 194:23, 194:25, 195:1, 195:21, 196:6, 196:8, 197:7, 209:24, 211:25
**log-in** [3] - 106:14, 131:18, 131:19

**logged** [3] - 91:4, 132:15, 195:2
**logging** [1] - 136:11
**logic** [1] - 210:25
**logical** [1] - 108:17
**login** [2] - 90:10, 90:11
**logs** [9] - 147:12, 169:12, 186:19, 187:1, 187:3, 188:20, 192:2, 192:11
**look** [34] - 12:1, 13:25, 14:4, 14:5, 15:11, 20:12, 20:13, 26:10, 27:20, 27:21, 30:8, 30:21, 31:5, 31:10, 31:18, 33:8, 68:19, 81:7, 82:7, 82:19, 89:14, 110:16, 135:12, 146:19, 153:25, 165:13, 165:14, 171:25, 172:1, 172:9, 177:12, 189:11, 190:11, 195:22
**looked** [20] - 10:1, 13:22, 13:25, 24:4, 30:23, 52:25, 54:6, 54:7, 103:16, 109:14, 112:10, 113:10, 149:8, 157:13, 188:14, 188:15, 192:21, 195:3, 195:21, 199:2
**looking** [9] - 3:5, 9:24, 14:13, 18:1, 27:1, 57:10, 177:13, 200:1, 200:7
**looks** [5] - 3:17, 82:19, 90:11, 181:3, 203:12
**loose** [1] - 66:3
**Lopata** [5] - 98:9, 98:10, 225:3, 225:5, 225:11
**lose** [1] - 113:19
**loses** [1] - 78:10
**losing** [4] - 114:1, 114:5, 114:6, 126:18
**loss** [25] - 3:4, 3:19, 3:23, 6:4, 6:14, 6:17, 7:6, 8:3, 8:9, 8:22, 75:2, 79:13, 80:11, 89:14, 89:15, 92:19, 98:7, 105:3, 105:6, 105:19, 105:20, 114:20, 115:5, 162:20
**losses** [8] - 3:22, 4:15, 5:20, 5:21, 5:22,

91:11, 91:12, 92:21
**lost** [15] - 28:18, 28:19, 28:23, 28:25, 29:4, 31:21, 31:24, 33:2, 113:13, 130:11, 141:16, 184:18, 189:20, 200:10, 223:18
**loudly** [1] - 183:2
**love** [1] - 89:17
**low** [6] - 87:5, 87:7, 112:19, 178:8, 178:9, 229:13
**low-cost** [1] - 112:19
**lower** [2] - 173:25, 174:1
**luck** [1] - 73:24
**Lufthansa** [3] - 110:11, 217:6
**Lukasz** [4] - 87:22, 97:24, 149:2, 200:20
**lunch** [13] - 15:3, 20:14, 25:2, 34:13, 38:21, 86:2, 86:3, 86:4, 118:18, 118:19, 118:20, 119:2
**luncheon** [1] - 119:13
**lunches** [1] - 38:22

## M

**machine** [2] - 149:23, 191:18
**mail** [115] - 8:2, 23:10, 23:15, 81:22, 90:13, 90:19, 90:21, 90:24, 91:1, 96:4, 96:17, 96:24, 97:1, 97:3, 97:4, 100:1, 100:20, 106:6, 106:15, 106:22, 107:15, 107:17, 107:20, 109:6, 109:9, 117:1, 119:11, 131:22, 132:3, 132:4, 132:5, 132:6, 132:19, 132:21, 132:23, 133:2, 134:13, 134:14, 134:21, 140:2, 140:19, 141:2, 141:13, 141:14, 143:17, 143:22, 143:25, 147:8, 147:11, 148:5, 148:6, 148:9, 155:14, 159:1, 159:21, 169:13, 170:24, 171:1, 187:18, 187:19,

188:1, 188:12, 188:21, 188:23, 189:4, 189:17, 191:4, 191:7, 192:20, 193:2, 194:23, 209:25, 210:2, 210:12, 210:13, 210:15, 210:20, 210:21, 211:1, 212:6, 212:16, 214:20, 214:21, 219:10, 222:1, 222:17, 222:20, 222:22, 222:23, 223:1, 223:4, 223:6, 223:9, 223:11, 223:13, 223:17, 223:21, 224:6, 224:9, 224:13, 224:17, 224:18, 224:21, 224:22, 224:25, 225:5, 225:8, 225:11, 225:12, 226:10, 226:11, 226:15
**mailed** [1] - 112:15
**mails** [19] - 23:14, 95:21, 96:1, 96:12, 96:19, 100:19, 103:21, 105:12, 105:24, 106:4, 107:9, 107:23, 112:15, 116:3, 116:6, 116:8, 128:4, 140:20, 141:2
**main** [2] - 44:5, 95:15
**Main** [1] - 211:11
**maintained** [2] - 147:9, 147:15
**maintaining** [2] - 87:24, 165:16
**maintains** [3] - 97:25, 130:22, 130:23, 149:3, 162:23
**maintenance** [3] - 125:21, 126:5, 127:5
**majority** [1] - 112:18
**malicious** [1] - 223:22
**maliciously** [1] - 224:2
**man** [1] - 179:25
**manage** [2] - 126:1, 176:15
**managed** [1] - 150:21
**management** [3] - 172:16, 172:22, 226:23
**manager** [2] - 12:15, 12:19
**manages** [1] - 149:3

**mandated** [1] - 140:24
**mandatory** [1] - 136:7
**manifest** [1] - 220:23
**manner** [2] - 77:3, 87:1
**MAO** [13] - 1:20, 3:11, 3:22, 4:6, 4:15, 4:25, 5:6, 5:9, 5:16, 5:21, 7:24, 8:1, 8:12
**Mao** [4] - 3:11, 3:14, 3:17, 87:14
**March** [14] - 144:6, 144:24, 145:2, 146:11, 160:5, 164:24, 167:9, 173:11, 173:21, 173:23, 177:12, 177:25, 199:20, 199:21
**Marcus** [1] - 101:1
**market** [4] - 111:24, 141:24, 149:8, 149:10
**marketing** [11] - 88:2, 95:3, 103:13, 103:24, 104:7, 104:9, 104:13, 104:17, 104:22, 128:15, 147:13
**masey** [4] - 195:7, 195:8, 195:11, 195:12
**MASEY** [1] - 188:23
**maseyfoley** [1] - 189:18
**MASS** [1] - 188:25
**match** [13] - 14:5, 31:1, 142:7, 159:17, 165:14, 166:15, 176:11, 180:11, 195:3, 219:10, 224:18, 224:25
**matches** [1] - 169:14
**matching** [1] - 30:2
**material** [2] - 6:4, 113:22
**materials** [3] - 24:4, 82:9, 141:8
**math** [4] - 145:10, 145:18, 174:20, 179:12
**matter** [9] - 12:24, 13:4, 37:7, 77:22, 92:24, 143:24, 157:15, 164:11, 218:5
**matters** [5] - 3:2, 10:12, 77:25, 141:4, 156:10
**maximum** [1] - 52:4

**mean** [17] - 20:11, 22:4, 32:17, 38:2, 39:19, 82:2, 137:25, 138:8, 138:18, 150:13, 152:15, 154:7, 155:6, 157:1, 187:17, 206:23, 222:20
**meaning** [2] - 92:12, 158:1
**means** [13] - 78:17, 79:17, 80:3, 85:7, 91:18, 130:2, 138:1, 138:19, 140:21, 152:16, 152:23, 154:14, 212:14
**meant** [4] - 67:11, 99:3, 99:7, 183:9
**meantime** [1] - 161:19
**mechanics** [2] - 18:13, 229:1
**mechanism** [2] - 3:25, 183:20
**media** [4] - 82:3, 105:10, 113:12, 131:24
**medical** [1] - 39:16
**medication** [1] - 54:14
**meet** [10] - 65:25, 86:8, 87:18, 87:19, 87:22, 88:2, 88:13, 96:5, 98:9, 177:17
**meeting** [1] - 171:12
**meetings** [3] - 148:12, 162:2, 170:8
**meets** [1] - 13:19
**member** [5] - 40:21, 41:8, 48:18, 63:23, 81:11
**members** [5] - 74:18, 74:20, 118:18, 200:19, 228:11
**memory** [3] - 76:25, 167:14, 188:21
**mention** [4] - 57:15, 100:12, 143:12, 148:20
**mentioned** [12] - 51:16, 54:4, 89:3, 95:19, 97:24, 100:9, 101:19, 117:7, 159:22, 165:9, 199:19, 204:22
**mentioning** [1] - 27:14
**merely** [2] - 7:18, 76:11
**merger** [1] - 101:10
**merits** [1] - 82:16
**MESS** [1] - 188:25
**message** [2] - 167:4,

182:7
**messages** [1] - 108:7
**MESSY** [1] - 189:2
**metal** [1] - 49:15
**metasearch** [1] - 41:17
**method** [4] - 214:21, 214:24, 215:2, 215:17
**Michael** [3] - 35:17, 41:4, 88:6
**microphone** [3] - 44:18, 123:20, 126:19
**Microsoft** [1] - 191:1
**midafternoon** [1] - 38:23
**midday** [1] - 38:21
**middle** [3] - 179:25, 187:9, 187:11
**middleman** [2] - 88:20, 91:16
**midmorning** [1] - 38:23
**might** [21] - 5:7, 42:22, 59:15, 59:18, 61:2, 68:18, 68:23, 80:22, 81:4, 95:17, 97:12, 150:15, 160:15, 194:16, 204:15, 212:25, 218:14, 222:13, 229:17, 229:18
**Mike** [1] - 58:8
**Miller** [1] - 219:6
**million** [25] - 117:20, 117:21, 124:14, 124:24, 125:5, 125:7, 127:8, 144:7, 145:11, 145:22, 145:24, 146:4, 146:16, 170:22, 173:6, 173:9, 173:16, 173:19, 173:22, 174:6, 174:10, 174:12, 174:16, 205:11, 227:9
**millions** [1] - 113:25
**milton** [1] - 64:5
**mimic** [2] - 89:10, 139:10
**mind** [6] - 79:1, 82:13, 82:14, 203:22
**minds** [1] - 206:2
**mine** [1] - 10:15
**minimum** [3] - 36:4, 83:17, 162:6
**minimums** [2] - 176:24, 177:17

**minute** [5] - 175:17, 195:13, 199:17, 207:12, 221:4
**minutes** [15] - 25:2, 28:15, 29:5, 73:9, 73:16, 74:2, 99:19, 100:9, 106:1, 117:7, 159:25, 160:4, 163:13, 163:21, 175:15
**misbehaving** [1] - 95:4
**misconduct** [2] - 108:14, 108:15
**misleading** [1] - 80:7
**missed** [1] - 50:13
**missing** [9] - 15:22, 16:1, 16:8, 24:9, 31:4, 206:21, 206:25, 207:2, 207:10
**mission** [2] - 89:23, 90:1
**mistake** [1] - 17:12
**mistakes** [2] - 133:1, 206:4
**mistyping** [1] - 91:2
**misunderstanding** [1] - 13:24
**misuse** [2] - 220:25
**mobile** [9] - 130:17, 135:22, 136:2, 136:7, 144:3, 144:18, 165:12, 165:13
**mode** [1] - 193:18
**model** [4] - 88:11, 101:22, 103:5, 103:15
**moderately** [1] - 172:25
**modifications** [1] - 170:13
**moment** [4] - 72:6, 151:12, 201:4, 226:16
**momentarily** [1] - 85:13
**moments** [1] - 104:25
**Monday** [3] - 47:5, 47:6, 47:8
**Monex** [55] - 9:5, 18:8, 20:1, 20:18, 22:2, 28:8, 28:21, 28:23, 29:4, 31:24, 32:16, 33:2, 92:1, 92:4, 92:17, 100:8, 100:14, 107:25, 108:1, 108:7, 109:2, 109:20, 122:24,

123:8, 124:2, 179:17, 179:19, 179:21, 180:1, 180:7, 180:10, 180:15, 181:2, 181:12, 181:15, 181:17, 182:3, 182:7, 182:13, 183:3, 183:8, 183:18, 184:16, 184:21, 185:7, 185:24, 192:2, 192:5, 194:24, 196:5, 196:11, 196:16, 197:14
**money** [24] - 53:10, 53:15, 60:5, 60:6, 91:22, 93:11, 113:19, 114:1, 114:2, 114:5, 114:6, 114:22, 115:2, 115:3, 115:16, 127:15, 127:16, 129:23, 162:18, 206:5, 216:17, 217:25, 220:3, 220:5
**monitor** [3] - 142:15, 144:14, 182:9
**monitoring** [3] - 144:2, 182:5, 195:25
**monitors** [3] - 148:22, 149:22, 158:12
**month** [3] - 167:20, 170:22, 170:24
**monthly** [3] - 171:12, 176:23
**months** [4] - 15:3, 111:15, 111:20, 174:2
**Mooney** [1] - 149:1
**MOONEY** [1] - 149:2
**morning** [10] - 3:1, 34:20, 47:8, 86:7, 120:9, 122:20, 187:1, 187:24, 188:15, 189:5
**mortar** [1] - 212:19
**mortars** [2] - 211:20, 212:15
**most** [9] - 7:1, 19:20, 20:20, 20:22, 20:23, 24:20, 88:18, 111:18
**mostly** [2] - 90:1, 101:14
**mother** [1] - 65:15
**motion** [2] - 143:3, 143:5
**motions** [1] - 143:1
**mouse** [3] - 139:11, 149:12, 149:13,

150:6, 150:7, 150:8, 184:9
**mouth** [1] - 214:5
**move** [9] - 49:8, 55:14, 121:14, 123:19, 141:10, 141:13, 143:13, 157:5, 177:1
**moved** [1] - 15:18
**moving** [5] - 7:18, 27:10, 65:18, 152:9, 187:25
**MOYER** [1] - 2:3
**Moyer** [1] - 102:9
**MR** [179] - 3:11, 3:22, 4:6, 4:15, 4:25, 5:6, 5:9, 5:16, 5:21, 7:24, 8:1, 8:12, 9:3, 13:4, 13:9, 13:13, 13:24, 14:10, 14:18, 14:25, 19:18, 20:8, 20:22, 21:4, 21:9, 21:16, 21:19, 21:22, 22:3, 22:11, 22:14, 24:17, 24:22, 24:24, 25:7, 25:16, 26:19, 26:24, 27:9, 27:14, 27:17, 29:9, 29:13, 30:19, 30:24, 32:23, 33:7, 34:3, 34:17, 34:23, 56:5, 56:7, 56:15, 56:17, 56:20, 57:1, 57:12, 57:13, 58:1, 58:5, 66:7, 66:8, 66:12, 67:4, 67:13, 71:6, 71:7, 72:5, 72:9, 73:6, 85:20, 85:21, 85:24, 86:6, 98:24, 109:25, 119:3, 119:5, 119:12, 119:22, 120:1, 121:18, 121:25, 122:11, 123:4, 123:19, 123:21, 124:21, 126:21, 142:24, 143:4, 143:8, 143:15, 143:16, 145:14, 145:16, 146:5, 146:7, 150:9, 152:21, 153:6, 154:8, 154:10, 154:18, 154:21, 159:4, 160:24, 161:3, 161:13, 161:16, 161:22, 162:12, 162:19, 163:12, 163:16, 163:20, 163:23, 164:2, 164:6, 164:16, 164:19,

165:5, 165:8, 168:23, 169:5, 169:6, 173:2, 174:24, 175:1, 175:4, 175:7, 175:10, 175:12, 175:22, 175:23, 181:9, 185:6, 187:16, 187:20, 187:25, 188:3, 188:9, 188:10, 188:11, 189:24, 193:7, 194:6, 196:22, 196:25, 197:4, 197:15, 197:20, 197:23, 198:3, 198:7, 198:11, 198:12, 198:22, 198:24, 203:3, 203:5, 203:14, 203:16, 203:24, 204:2, 207:14, 207:19, 209:20, 209:22, 222:7, 222:15, 226:2, 228:7, 229:3, 229:6, 229:12, 229:17, 229:22, 229:25
**MS** [40] - 3:7, 6:6, 9:1, 15:6, 16:5, 16:10, 16:16, 16:19, 17:2, 17:15, 17:17, 18:16, 19:1, 22:22, 23:1, 23:3, 23:22, 24:10, 24:14, 26:2, 26:8, 27:23, 28:4, 28:9, 28:11, 28:16, 28:21, 29:2, 29:17, 29:20, 29:22, 30:10, 32:1, 32:6, 32:14, 32:17, 32:24, 120:19, 120:23, 121:23
**multiple** [11] - 62:5, 166:5, 166:25, 167:2, 167:25, 192:22, 194:13, 194:18, 208:21
**multiplied** [2] - 3:24, 178:5
**multiply** [3] - 146:16, 178:3, 179:9
**multiplying** [1] - 168:14
**murder** [5] - 47:22, 48:10, 48:13, 50:12, 50:15
**murders** [1] - 48:14
**must** [10] - 76:19, 76:21, 78:8, 78:15,

79:9, 81:23, 82:7, 128:2, 141:1, 195:18
**Myer** [1] - 87:15
**MYER** [1] - 1:16
**MyRyanair** [1] - 132:18
**myRyanair** [60] - 4:17, 7:12, 7:13, 7:15, 20:24, 21:6, 21:7, 21:9, 21:11, 21:12, 21:23, 22:17, 23:10, 90:9, 90:17, 90:21, 91:4, 92:15, 96:24, 96:25, 97:3, 132:13, 132:21, 132:24, 133:2, 133:5, 133:21, 133:22, 134:4, 134:6, 135:9, 136:3, 136:11, 143:21, 146:24, 147:4, 147:17, 147:22, 148:3, 148:15, 186:20, 187:17, 187:18, 188:16, 188:17, 189:10, 189:11, 191:7, 192:7, 194:23, 208:10, 208:14, 208:15, 210:9, 211:6, 211:8, 211:25, 212:2, 219:10

## N

**Naima** [1] - 35:16
**name** [18] - 35:15, 100:2, 106:21, 121:6, 122:3, 122:13, 132:16, 134:18, 194:3, 195:7, 208:2, 209:16, 209:24, 217:2, 218:8, 219:5, 221:11, 221:12
**named** [1] - 112:15
**names** [2] - 181:16, 208:14
**Namo** [1] - 200:21
**Naples** [2] - 52:1, 52:13
**narrow** [2] - 73:12, 222:21
**natural** [1] - 80:21
**nature** [11] - 33:10, 34:14, 45:23, 48:9, 49:19, 58:14, 59:23, 120:12, 163:4, 197:8, 212:18
**Navitaire** [9] - 41:3,

176:6, 176:13, 176:17, 176:22, 177:21, 177:23, 177:25, 178:21
**nearby** [1] - 133:19
**necessarily** [3] - 21:21, 31:12, 39:19
**necessary** [9] - 83:9, 83:14, 92:10, 96:2, 138:13, 154:13, 181:3, 181:4, 198:16
**need** [23] - 3:2, 36:21, 55:12, 59:15, 59:18, 62:10, 72:3, 72:4, 73:18, 80:23, 100:2, 106:9, 106:13, 118:25, 119:5, 170:18, 172:10, 175:11, 189:22, 190:13, 196:17, 209:9, 229:2
**needed** [5] - 36:5, 43:16, 170:21, 181:19, 210:21
**needing** [2] - 71:4, 148:2
**needs** [11] - 57:6, 66:3, 67:9, 85:8, 85:16, 86:10, 92:18, 96:3, 99:10, 154:16, 172:23
**negative** [14] - 41:4, 41:6, 49:20, 51:7, 52:11, 53:20, 59:25, 60:1, 60:2, 60:7, 60:19, 70:1, 103:14, 104:6
**negligent** [1] - 12:12
**negotiate** [1] - 176:14
**nervous** [1] - 123:17
**Netflix** [3] - 191:17, 191:20
**neutral** [4] - 47:19, 48:3, 52:11, 64:19
**never** [20] - 27:24, 30:5, 32:2, 48:7, 52:19, 53:4, 60:9, 60:11, 61:11, 61:25, 62:1, 62:19, 70:19, 81:3, 108:13, 115:24, 116:17, 150:1, 156:24, 208:16
**New** [9] - 50:11, 50:14, 133:20, 177:6, 178:15, 178:16, 195:25, 196:4, 202:6
**new** [10] - 6:20, 8:3, 8:9, 33:16, 49:16, 58:19, 70:25, 98:6,

111:24, 128:1
**newspaper** [1] - 82:3
**next** [22] - 20:6, 34:9, 45:21, 48:14, 63:1, 73:9, 73:21, 84:3, 99:16, 117:3, 131:8, 131:9, 131:11, 131:15, 131:16, 132:14, 134:10, 197:9, 197:11, 204:16, 204:17, 209:21
**nice** [2] - 86:7, 198:25
**night** [6] - 7:22, 110:5, 110:6, 110:7, 145:4, 229:20
**nightmare** [1] - 145:17
**nine** [4] - 40:23, 178:5, 178:17, 179:9
**nobody** [4] - 34:25, 61:7, 109:25, 139:24
**noncommercial** [1] - 137:22
**none** [7] - 19:11, 22:12, 30:13, 100:4, 131:25, 202:17, 227:7
**normal** [1] - 15:16
**normally** [5] - 38:19, 56:10, 178:14, 181:19, 192:10
**north** [1] - 125:1
**northwestern** [1] - 102:21
**notable** [1] - 88:18
**note** [3] - 19:18, 32:25, 47:9
**notebook** [2] - 82:25, 83:7
**notebooks** [3] - 82:22, 82:23, 83:6
**notes** [5] - 82:24, 82:25, 83:2, 83:3, 83:7
**nothing** [11] - 7:5, 19:15, 23:14, 75:21, 92:12, 106:24, 109:10, 109:11, 110:19, 123:18, 155:17
**notice** [3] - 7:23, 74:4, 138:14
**noticed** [2] - 28:11, 143:22
**notifications** [1] - 210:24
**notified** [1] - 213:12
**notify** [1] - 212:9
**noting** [1] - 113:1
**notion** [1] - 83:21

**notorious** [1] - 229:10
**notwithstanding** [1] - 9:9
**November** [4] - 93:14, 111:14, 111:22, 151:19
**nowhere** [1] - 210:18
**null** [12] - 92:11, 92:12, 100:11, 108:6, 109:8, 109:10, 181:21, 181:25, 185:11, 187:14, 192:18, 197:8
**Number** [3] - 120:25, 121:1, 121:8
**number** [169] - 6:3, 7:18, 12:4, 27:2, 27:5, 27:6, 27:22, 36:8, 36:13, 36:20, 37:14, 39:6, 39:7, 39:8, 39:9, 39:10, 42:15, 42:16, 43:3, 43:5, 43:8, 43:13, 44:2, 44:3, 44:9, 44:15, 44:23, 44:24, 46:14, 46:18, 46:19, 46:20, 46:22, 47:10, 47:13, 48:15, 49:9, 50:3, 50:4, 50:5, 50:6, 50:19, 51:12, 51:19, 52:21, 53:9, 54:9, 54:19, 54:20, 55:18, 55:19, 55:21, 55:23, 56:14, 56:16, 57:17, 58:13, 59:5, 59:6, 59:7, 59:11, 59:12, 59:14, 59:15, 59:21, 60:12, 60:13, 61:15, 61:16, 62:25, 63:13, 63:14, 67:18, 67:24, 68:3, 68:4, 68:5, 69:2, 70:7, 70:16, 71:11, 71:15, 71:17, 72:18, 72:24, 74:11, 74:12, 86:16, 88:24, 92:21, 99:8, 100:3, 101:11, 106:22, 108:2, 113:23, 121:10, 124:14, 124:15, 124:24, 134:19, 135:1, 145:1, 145:8, 146:16, 162:5, 162:7, 163:1, 163:3, 163:13, 167:14, 167:24, 169:20, 174:6, 175:6, 178:2, 178:3, 179:8, 185:17, 188:18,

190:1, 190:13, 194:3, 194:4, 194:17, 199:6, 199:9, 199:10, 200:12, 200:20, 200:25, 201:1, 201:4, 201:8, 201:16, 201:17, 202:18, 202:20, 202:21, 202:22, 202:25, 205:2, 205:8, 207:15, 219:14, 227:8
**numbers** [39] - 5:5, 5:17, 8:13, 14:4, 14:5, 14:13, 15:2, 22:9, 46:17, 58:20, 72:12, 80:13, 106:13, 117:18, 146:21, 162:15, 164:12, 171:6, 171:7, 171:19, 172:6, 174:3, 174:4, 181:20, 195:15, 200:9, 200:12, 201:19, 201:20, 202:12, 203:8, 203:13, 203:18, 203:20, 203:22, 204:17, 207:17, 227:13
**numerous** [2] - 67:2, 103:19

# O

**O'Callaghan** [1] - 16:25
**O'Leary** [4] - 41:4, 88:6, 88:9
**oath** [1] - 39:1
**object** [6] - 32:2, 142:24, 152:21, 161:13, 162:12, 187:20
**objecting** [1] - 113:2
**objection** [24] - 23:6, 66:7, 66:8, 71:7, 76:17, 121:17, 121:18, 143:13, 152:20, 154:8, 161:2, 161:3, 162:11, 163:9, 164:9, 165:5, 165:7, 188:7, 196:18, 197:3, 197:22, 197:23
**Objections** [1] - 120:24
**objections** [4] - 34:4,

76:14, 76:15
**objective** [2] - 103:25, 165:22
**obligation** [3] - 96:6, 118:2, 220:22
**obligations** [1] - 91:25
**observation** [1] - 11:12
**observed** [3] - 183:25, 184:2, 187:24
**observing** [2] - 182:2, 182:11
**obtain** [1] - 150:21
**obtained** [1] - 79:18
**obtains** [1] - 98:13
**obvious** [1] - 184:12
**obviously** [4] - 4:17, 32:11, 63:6, 162:15
**Obviously** [1] - 181:19
**occasions** [1] - 62:5
**occupations** [2] - 72:10, 72:12
**occurred** [1] - 3:18
**October** [4] - 25:18, 27:18, 92:3, 181:11
**OF** [2] - 1:2, 1:9
**offender** [1] - 44:19
**offensive** [1] - 69:15
**offer** [6] - 10:20, 103:4, 103:7, 180:14, 207:7
**offering** [3] - 111:16, 154:2, 155:1
**offers** [2] - 103:8, 141:25
**office** [2] - 19:24, 211:4
**officer** [13] - 12:10, 87:20, 88:3, 88:7, 122:18, 125:13, 125:17, 125:18, 147:20, 158:7, 160:13, 163:9, 172:5
**Official** [1] - 230:12
**offline** [1] - 108:9
**often** [8] - 42:6, 53:5, 53:7, 89:10, 105:15, 115:24, 150:10, 166:1
**old** [5] - 4:8, 15:3, 25:10, 65:13, 211:1
**OLIVER** [1] - 1:21
**Oliver** [1] - 87:14
**once** [16] - 65:5, 68:24, 71:1, 73:13, 90:7, 90:16, 101:25, 115:22, 134:23, 159:19, 189:12, 189:16, 191:21, 206:10, 216:11

**one** [177] - 3:3, 3:18, 3:20, 5:9, 6:24, 7:4, 7:6, 7:18, 10:7, 10:14, 10:15, 10:18, 10:21, 11:18, 14:23, 16:16, 18:11, 18:12, 18:13, 18:23, 18:24, 19:12, 20:14, 20:17, 20:21, 20:24, 20:25, 21:1, 21:5, 21:6, 21:13, 22:19, 24:3, 25:14, 26:25, 27:1, 27:22, 28:5, 29:22, 30:2, 30:8, 30:14, 30:16, 30:17, 30:21, 30:25, 31:1, 31:4, 31:5, 31:11, 31:18, 32:19, 35:10, 36:11, 42:13, 42:16, 43:1, 43:18, 43:19, 45:4, 45:19, 45:20, 46:17, 47:6, 47:7, 48:14, 52:13, 55:12, 55:23, 56:2, 56:7, 56:9, 56:11, 57:19, 58:12, 63:11, 64:2, 67:4, 67:8, 67:9, 67:17, 71:14, 71:17, 72:2, 72:5, 72:6, 72:16, 76:2, 77:2, 77:10, 78:25, 79:22, 81:12, 84:6, 85:3, 87:8, 88:16, 90:2, 90:15, 92:14, 92:16, 92:19, 96:8, 96:14, 99:10, 100:16, 103:6, 103:20, 104:2, 107:21, 108:2, 113:11, 116:25, 117:13, 117:14, 117:20, 119:5, 124:14, 124:15, 124:24, 130:5, 130:16, 130:18, 139:23, 140:15, 144:23, 146:24, 150:16, 151:18, 157:4, 163:10, 166:24, 168:16, 168:21, 175:24, 176:1, 177:7, 178:11, 178:14, 178:21, 178:23, 178:25, 179:7, 184:5, 186:25, 189:7, 190:16, 192:20, 193:4, 194:9, 194:12, 194:14, 194:16, 194:19, 195:24, 199:11, 199:12,

205:7, 205:8, 209:21, 218:22, 224:8
**One** [1] - 179:2
**one-way** [2] - 87:8, 178:23
**one-year** [5] - 3:18, 7:6, 92:19, 117:20, 144:23
**ones** [5] - 55:21, 58:3, 70:25, 126:24, 198:4
**online** [61] - 5:11, 8:14, 38:11, 38:12, 38:13, 41:16, 42:4, 42:6, 51:14, 52:17, 53:1, 67:20, 68:18, 68:20, 70:1, 86:21, 86:24, 88:1, 88:24, 92:2, 94:18, 94:25, 95:4, 95:6, 95:16, 95:23, 96:13, 98:2, 99:4, 99:5, 100:23, 103:2, 103:10, 126:14, 126:23, 127:4, 129:16, 139:6, 142:2, 144:10, 144:23, 145:1, 146:22, 147:4, 152:11, 152:13, 158:13, 159:16, 164:22, 165:9, 165:17, 165:24, 167:8, 167:18, 174:13, 176:4, 215:20, 216:10, 219:8
**open** [4] - 9:14, 82:14, 136:4, 221:6
**opened** [1] - 190:25
**opening** [5] - 34:13, 83:24, 85:14, 86:1
**operate** [2] - 89:12, 133:7, 149:17, 149:20
**operated** [2] - 154:3, 155:2
**operating** [1] - 158:9
**operation** [3] - 125:22, 126:6, 158:14
**operations** [1] - 160:13
**opinion** [4] - 4:18, 77:24, 78:2, 129:13
**opinions** [1] - 41:4
**opportunity** [5] - 27:25, 28:1, 37:21, 84:13, 84:16
**opposed** [8] - 3:21, 4:7, 8:9, 96:14, 135:5, 135:16,

142:21, 194:20
**opposing** [1] - 119:23
**option** [5] - 114:19,
159:20, 165:12,
180:4, 183:13
**options** [2] - 103:17,
207:6
**ordeal** [1] - 22:16
**order** [12] - 12:1, 29:3,
35:23, 38:25, 99:10,
108:7, 115:16,
154:14, 207:11,
207:21, 208:7,
214:21
**ordinary** [1] - 39:20
**organization** [1] -
10:24
**origin** [3] - 131:3,
137:3, 169:20
**original** [1] - 37:13
**originally** [1] - 149:1
**originated** [1] - 121:4
**ORIN** [1] - 2:9
**OTA** [60] - 67:7, 86:21,
88:24, 89:4, 95:4,
96:3, 96:10, 96:11,
96:14, 98:7, 103:14,
103:15, 103:16,
103:17, 103:19,
103:21, 104:5,
104:6, 105:16,
110:12, 114:9,
114:13, 115:12,
116:10, 117:20,
142:18, 145:5,
146:14, 149:18,
149:21, 150:11,
150:15, 150:17,
159:12, 159:14,
159:25, 160:1,
160:5, 160:6, 160:8,
163:13, 165:25,
169:11, 170:3,
170:6, 170:21,
171:13, 171:18,
172:8, 177:20,
201:20, 206:9,
217:16, 218:6,
218:14, 218:15,
220:10, 220:11,
222:25
**OTA's** [1] - 220:25
**OTAs** [57] - 3:24,
86:24, 91:7, 92:9,
94:20, 96:14, 96:15,
96:19, 97:21, 98:5,
100:10, 100:12,
103:12, 104:2,
104:18, 107:8,
107:18, 107:19,

107:21, 108:12,
112:4, 112:6,
112:22, 113:25,
114:1, 115:8,
115:17, 116:5,
116:6, 126:15,
127:16, 128:12,
128:17, 129:4,
129:9, 139:6, 139:7,
139:15, 140:12,
140:16, 142:11,
147:7, 147:22,
148:2, 148:9,
149:10, 149:14,
150:6, 165:23,
169:18, 169:24,
170:19, 170:25,
196:2, 215:19
**otherwise** [2] - 80:1,
96:5
**ought** [1] - 32:11
**outages** [2] - 29:4,
142:21
**outcome** [1] - 17:13
**outliers** [1] - 10:3
**outline** [1] - 80:17
**outside** [5] - 10:13,
60:25, 76:21, 81:6,
198:18
**overages** [1] - 186:1
**overall** [1] - 146:14
**overcome** [1] - 98:6
**overdo** [1] - 120:10
**overexplaining** [1] -
196:4
**overnight** [2] - 33:15,
226:6
**overruled** [3] - 153:5,
154:20, 197:3
**overview** [1] - 98:19
**overwhelm** [1] -
192:23
**overwhelmed** [4] -
92:3, 181:18,
192:23, 192:25
**overwhelming** [1] -
100:10
**owed** [2] - 53:10,
53:15
**own** [21] - 10:13,
10:24, 11:12, 15:9,
22:23, 25:23, 26:17,
53:20, 75:5, 75:24,
82:7, 106:23, 111:7,
114:9, 114:16,
115:1, 115:2, 115:4,
149:6, 149:12,
164:22
**owned** [6] - 88:9,
101:6, 104:5,

114:10, 133:8
**owner** [1] - 49:16
**owners** [1] - 62:14
**owns** [1] - 210:9
**oxygen** [1] - 65:17
**Oy** [2] - 153:11,
153:16

**P**

**P.A** [1] - 2:2
**p.m** [1] - 230:2
**package** [1] - 102:4
**packages** [1] - 101:20
**page** [24] - 23:2,
104:12, 131:5,
131:7, 131:11,
131:16, 131:18,
131:19, 132:15,
133:10, 133:14,
135:8, 135:14,
136:8, 152:9,
152:10, 154:1,
154:25, 177:1,
180:9, 180:16,
180:19, 203:4,
203:25
**pages** [5] - 82:24,
131:13, 133:7,
191:21, 214:19
**paid** [4] - 58:16,
180:20, 183:12,
185:14
**pandemic** [1] - 205:19
**panel** [7] - 12:12,
12:18, 35:6, 35:24,
39:3, 73:17, 74:3
**panic** [1] - 174:19
**paragraph** [9] -
137:20, 152:9,
152:19, 153:8,
153:18, 154:1,
154:25, 156:15,
157:10
**parent** [4] - 88:8,
93:21, 104:14, 156:8
**parental** [1] - 26:11
**parents** [2] - 62:15,
62:20
**Parkinson's** [2] - 44:6,
55:20
**part** [19] - 4:11, 6:14,
13:15, 36:3, 38:1,
41:1, 59:2, 73:11,
98:17, 104:7,
104:12, 104:17,
104:21, 105:1,
109:14, 163:8,
164:4, 194:24, 222:3

**partially** [1] - 46:21
**participants** [1] - 74:9
**participate** [1] - 59:1
**participated** [2] -
154:11, 154:17
**participating** [2] -
58:23, 71:13
**participation** [4] -
59:4, 67:25, 69:18,
163:23
**particular** [16] - 6:3,
12:5, 23:20, 37:3,
37:8, 38:10, 39:14,
76:18, 77:24, 78:7,
78:10, 81:11, 137:6,
193:25, 208:8
**particularly** [3] -
60:21, 69:12, 115:21
**parties** [15] - 39:24,
40:10, 40:13, 61:23,
74:25, 75:19, 79:20,
84:6, 84:21, 85:17,
88:17, 143:1,
152:13, 179:24,
222:9
**partner** [5] - 97:13,
110:3, 176:5,
223:23, 223:24
**partners** [5] - 94:9,
94:15, 96:23, 97:8,
97:23
**parts** [1] - 149:22
**party** [25] - 10:9,
19:14, 23:13, 41:21,
48:16, 78:7, 78:9,
78:10, 78:15, 78:17,
78:20, 79:10, 79:16,
84:6, 88:8, 109:21,
109:23, 117:13,
117:14, 122:25,
123:2, 123:9, 124:4,
166:14, 195:25
**party's** [1] - 8:6
**pass** [2] - 9:22, 190:10
**passed** [2] - 18:6,
127:16
**passenger** [59] -
18:16, 90:25, 106:9,
106:10, 106:15,
106:21, 107:2,
107:9, 121:6,
129:14, 130:5,
130:6, 134:18,
159:12, 159:20,
160:1, 163:13,
166:24, 166:25,
170:12, 174:3,
176:8, 206:11,
208:2, 208:4, 208:6,
208:7, 208:17,

208:20, 208:24,
209:4, 209:16,
210:5, 210:10,
210:10, 211:9,
211:12, 212:15,
213:5, 216:8,
216:14, 216:15,
216:17, 217:7,
217:11, 217:23,
218:5, 218:6, 218:7,
218:9, 218:24,
220:23, 220:24,
221:11, 221:20,
224:15
**passenger's** [7] -
106:15, 107:4,
210:2, 210:12,
210:15, 210:20,
214:20
**passengers** [33] -
106:11, 106:12,
107:12, 107:13,
114:23, 124:14,
124:24, 127:9,
127:11, 127:16,
127:25, 128:3,
128:8, 128:17,
129:6, 129:10,
129:24, 131:4,
140:22, 160:6,
164:23, 165:11,
167:5, 167:8,
169:20, 202:7,
205:19, 205:23,
208:22, 214:4,
218:12, 218:13,
224:3
**passing** [1] - 6:16
**passport** [7] - 159:16,
159:19, 165:14,
166:15, 167:2,
167:6, 219:14
**password** [8] - 90:13,
90:18, 131:22,
132:7, 132:24,
147:6, 159:21
**past** [6] - 56:22, 68:17,
142:19, 149:15,
169:23, 227:9
**paste** [1] - 189:8
**patent** [2] - 64:22,
64:23
**path** [1] - 144:21
**paths** [1] - 125:23
**patience** [1] - 229:18
**patient** [2] - 70:12,
83:12
**patrol** [1] - 48:18
**Paul** [1] - 149:1
**pause** [1] - 191:13

**pay** [19] - 36:19, 53:3, 108:19, 112:20, 131:17, 136:8, 162:4, 162:6, 167:2, 176:5, 177:22, 178:17, 178:21, 180:5, 205:4, 205:20, 218:2
**paying** [3] - 170:1, 205:24, 219:24
**payment** [22] - 91:5, 96:4, 96:21, 100:20, 108:4, 116:11, 131:16, 166:1, 180:9, 184:25, 214:21, 214:24, 215:2, 215:13, 215:17, 218:3, 218:4, 218:10, 219:20, 219:22, 220:2, 220:3
**payments** [2] - 108:4, 214:20
**Paypal** [1] - 131:25
**pays** [2] - 177:9, 216:3
**PC** [1] - 191:24
**Pennsylvania** [1] - 60:14
**people** [27] - 11:14, 13:22, 16:24, 17:13, 18:1, 23:20, 28:2, 60:24, 62:24, 73:13, 80:19, 83:3, 87:7, 102:6, 105:15, 115:21, 116:25, 118:8, 120:8, 130:1, 133:1, 162:3, 162:18, 178:18, 213:25, 215:11, 227:21
**per** [27] - 130:4, 130:5, 130:6, 144:11, 159:25, 160:3, 160:4, 163:13, 166:4, 166:7, 166:18, 166:24, 167:2, 168:1, 170:22, 170:23, 173:17, 177:9, 177:17, 178:18, 179:6, 179:7, 185:14, 194:12, 227:6
**percent** [39] - 44:7, 86:23, 102:23, 113:23, 126:4, 126:6, 126:8, 130:8, 144:12, 144:25, 145:7, 145:11, 146:18, 150:1,

150:15, 167:15, 168:13, 168:15, 168:21, 174:5, 174:8, 174:18, 177:17, 177:19, 186:4, 186:12, 201:3, 201:7, 202:25, 203:10, 203:18, 203:22, 204:5, 204:6, 204:7, 204:10, 206:5
**percentage** [12] - 115:11, 115:13, 144:22, 146:13, 170:25, 171:13, 174:3, 174:12, 174:16, 204:13
**peremptory** [2] - 57:24, 66:23
**peremptory-type** [1] - 57:24
**perfectly** [1] - 106:23
**perform** [1] - 89:8
**performance** [5] - 93:9, 146:15, 204:9, 222:4, 222:5
**perhaps** [2] - 8:15, 10:7
**period** [44] - 3:19, 3:21, 4:3, 4:5, 4:19, 5:1, 5:2, 6:14, 6:17, 6:20, 6:21, 7:2, 7:4, 7:6, 8:8, 8:10, 8:20, 16:20, 31:24, 92:19, 117:20, 117:22, 144:23, 146:11, 160:9, 164:24, 167:9, 173:10, 173:13, 173:20, 173:22, 173:23, 177:25, 184:19, 184:21, 186:9, 187:15, 192:5, 199:19, 199:21, 199:24, 203:12, 206:4
**permission** [3] - 86:9, 86:25, 91:9
**permit** [1] - 153:4
**permits** [1] - 10:9
**permitted** [2] - 77:24, 137:21
**person** [46] - 5:11, 8:14, 9:18, 11:9, 14:10, 27:6, 29:13, 54:23, 55:19, 55:20, 67:6, 77:15, 77:19, 77:23, 77:25, 78:6, 80:23, 106:16, 107:4, 131:11,

159:22, 161:24, 163:7, 164:23, 169:21, 177:6, 180:9, 209:3, 209:11, 209:12, 209:23, 210:8, 210:22, 211:3, 213:16, 213:18, 214:25, 215:12, 215:13, 215:24, 218:23, 218:24, 219:2, 219:5, 219:7, 222:2
**person's** [2] - 11:12, 77:4
**personal** [30] - 9:10, 9:12, 9:16, 9:17, 9:22, 10:6, 10:13, 11:11, 12:2, 12:7, 12:9, 12:25, 13:10, 13:14, 13:17, 14:24, 15:19, 16:9, 24:12, 36:24, 133:24, 161:23, 164:7, 164:10, 164:22, 188:2, 188:6, 196:19, 201:12
**personally** [6] - 41:22, 171:14, 172:13, 182:2, 189:3, 226:6
**persons** [1] - 37:19
**perspective** [5] - 126:10, 127:5, 127:18, 150:16, 186:4
**persuade** [1] - 78:8
**persuaded** [1] - 78:9
**pertinence** [1] - 5:19
**Phillip** [1] - 151:24
**phone** [4] - 144:18, 165:12, 165:13, 171:1
**phones** [2] - 81:22, 125:23
**photograph** [1] - 159:17
**phrase** [1] - 133:21
**physical** [2] - 60:4, 149:25
**physically** [1] - 149:25
**pick** [3] - 4:19, 136:5, 204:17
**picking** [1] - 7:3
**picture** [1] - 27:12
**piece** [5] - 16:7, 16:10, 31:4, 176:11, 193:16
**pile** [1] - 49:15
**pillar** [1] - 104:2
**pillars** [2] - 104:2, 104:11

**pilots** [1] - 125:23
**pinkfluffyclothes@ gmail.com** [1] - 148:7
**pirates** [5] - 95:4, 128:12, 129:4, 129:9
**place** [18] - 7:18, 31:10, 31:25, 63:23, 77:17, 129:21, 134:2, 148:8, 149:14, 156:24, 189:16, 208:1, 208:24, 209:3, 211:19, 211:20, 211:22, 228:8
**places** [2] - 115:23, 195:24
**Plaintiff** [4] - 1:4, 1:22, 120:25, 122:8
**plaintiff** [1] - 88:9
**Plaintiff's** [2] - 198:1, 199:5
**plaintiff's** [2] - 100:8, 114:8
**plaintiffs** [3] - 3:10, 6:25, 33:9
**Plaintiffs'** [1] - 121:21
**plan** [9] - 33:9, 104:8, 104:10, 104:13, 104:18, 104:22, 160:24
**plane** [6] - 12:13, 17:25, 18:2, 18:3, 106:7, 106:19
**planes** [1] - 125:8
**planned** [3] - 44:4, 55:20, 205:16
**planning** [2] - 65:13, 142:1
**plate** [2] - 27:5, 30:2
**platform** [2] - 99:6, 112:7
**play** [4] - 5:23, 122:21, 221:1, 221:3
**played** [3] - 109:18, 122:22, 163:24
**players** [1] - 88:15
**pleasant** [3] - 52:11, 53:4, 69:11
**pleasure** [2] - 68:17, 198:13
**pled** [1] - 48:6
**plug** [1] - 183:17
**plus** [1] - 8:7
**PNR** [82] - 14:3, 16:21, 16:25, 17:7, 18:4, 18:6, 18:17, 19:3, 19:8, 19:11, 20:14, 20:17, 20:21, 20:24, 20:25, 21:5, 21:16,

23:8, 24:11, 24:17, 24:18, 25:5, 25:7, 25:23, 26:4, 27:22, 30:1, 30:8, 31:5, 31:11, 31:18, 32:3, 32:18, 121:6, 134:14, 134:17, 140:3, 186:18, 186:21, 186:25, 187:3, 187:6, 187:13, 188:13, 188:15, 189:3, 189:6, 189:7, 189:9, 189:10, 190:1, 190:20, 191:2, 191:3, 191:5, 191:6, 192:2, 192:7, 192:13, 192:14, 192:19, 193:3, 193:15, 193:16, 195:1, 195:3, 199:12, 199:14, 206:10, 218:8, 219:6, 221:20, 226:13
**PNRs** [23] - 14:6, 19:21, 20:3, 20:12, 20:13, 21:10, 21:12, 22:16, 24:4, 25:8, 25:10, 25:11, 25:14, 25:17, 25:18, 25:20, 25:22, 186:24, 190:16, 192:1, 199:12, 200:20, 218:17
**Poconos** [1] - 48:18
**point** [36] - 6:24, 13:5, 13:10, 13:13, 15:10, 15:21, 17:12, 17:17, 23:22, 25:12, 26:17, 32:11, 44:20, 48:6, 57:2, 80:14, 84:18, 85:9, 97:12, 111:17, 112:3, 144:21, 152:25, 153:5, 160:16, 181:12, 181:13, 181:14, 181:16, 189:15, 190:25, 194:14, 198:16, 206:7, 209:24, 229:13
**pointed** [4] - 6:7, 15:8, 25:5, 58:11
**points** [6] - 29:23, 76:1, 76:13, 144:21, 178:20, 189:15
**Poland** [2] - 139:24
**Polisham** [1] - 15:14
**politely** [1] - 81:9
**POLLACK** [1] - 2:8

**poor** [3] - 212:24, 213:9, 213:19
**poorly** [2] - 140:17, 169:24
**populate** [2] - 132:18, 132:23
**populated** [1] - 132:20
**populates** [1] - 90:19
**portion** [9] - 90:17, 90:18, 91:4, 113:22, 132:11, 132:24, 133:6, 186:3
**position** [9] - 4:2, 9:18, 14:12, 15:11, 33:23, 45:9, 97:5, 118:1, 125:12
**positions** [2] - 8:6, 72:18
**positive** [5] - 49:19, 49:22, 51:7, 52:24, 70:1
**Posner** [2] - 11:16, 11:20
**possessed** [1] - 224:22
**possesses** [1] - 224:22
**possible** [9] - 23:12, 23:16, 44:6, 85:11, 99:8, 175:8, 194:18, 213:18, 228:1
**possibly** [1] - 12:23
**post** [3] - 82:3, 217:22
**post-COVID** [1] - 217:22
**postponed** [1] - 34:8
**pot** [4] - 3:23, 4:8, 5:9
**potential** [3] - 5:20, 26:25, 36:5
**potentially** [4] - 6:12, 31:15, 63:25, 74:25
**pots** [1] - 4:7
**power** [1] - 73:4
**PowerPoint** [3] - 206:17, 207:23, 209:7
**PR** [1] - 128:15
**practical** [1] - 106:17
**practice** [8] - 113:3, 205:23, 206:1, 206:7, 206:8, 213:24, 215:18, 217:1
**Practices** [2] - 75:11, 80:5
**practices** [1] - 128:17
**pre** [7] - 4:17, 7:12, 90:19, 132:18, 132:19, 132:23, 204:3

**precedes** [1] - 111:19
**precluded** [1] - 7:5
**preexisting** [1] - 90:14
**prefer** [1] - 53:4
**prejudicial** [4] - 3:19, 26:3, 27:24, 28:17
**preliminary** [2] - 74:15, 83:23
**prep** [1] - 33:15
**prepared** [4] - 4:2, 4:4, 4:9, 5:19
**preparing** [1] - 3:20
**preponderance** [1] - 78:16
**prepopulated** [1] - 208:14
**preschool** [1] - 72:20
**present** [7] - 84:10, 84:12, 84:21, 118:11, 121:3, 172:7, 230:8
**presentation** [3] - 102:12, 207:24, 209:8
**presented** [8] - 76:23, 77:11, 82:11, 83:15, 84:3, 84:8, 172:3, 201:16
**presenting** [2] - 6:11, 102:9
**pressed** [1] - 197:10
**pressure** [8] - 182:20, 183:8, 183:17, 183:18, 183:25, 196:5, 227:25
**presumably** [4] - 5:18, 7:10, 24:3, 31:2
**pretending** [2] - 129:3, 139:11
**pretrial** [1] - 29:3
**pretty** [8] - 10:8, 14:7, 27:7, 57:22, 64:6, 65:20, 86:2, 160:22
**prevent** [3] - 40:12, 146:23, 147:4
**prevents** [1] - 6:21
**previous** [3] - 8:10, 8:20, 204:9
**previously** [1] - 146:25
**price** [7] - 92:6, 124:15, 124:25, 129:11, 177:9, 183:12, 205:20
**Priceline** [4] - 42:5, 43:23, 51:13, 101:10
**prices** [1] - 53:5
**pricing** [2] - 137:4, 139:10
**principles** [3] - 75:20,

84:20, 97:20
**private** [1] - 137:22
**privately** [2] - 37:5, 37:11
**privileges** [1] - 35:11
**PRN** [1] - 15:20
**problem** [48] - 12:3, 13:19, 17:6, 25:4, 26:21, 26:22, 30:21, 31:15, 33:22, 35:1, 54:13, 86:21, 97:15, 127:3, 127:19, 128:10, 129:14, 140:18, 140:22, 140:23, 149:9, 154:16, 161:10, 162:16, 165:7, 166:22, 169:15, 172:11, 172:25, 173:16, 190:15, 195:22, 206:12, 212:5, 212:13, 212:22, 212:25, 213:3, 213:4, 214:11, 216:21, 219:24, 220:9, 220:24, 222:12, 226:7, 229:14
**problems** [11] - 14:6, 52:15, 52:20, 91:3, 127:2, 140:16, 201:21, 213:10, 222:6, 229:3, 229:22
**proceed** [7] - 8:20, 86:1, 123:11, 175:21, 198:12, 198:14, 198:15
**proceeding** [1] - 41:22
**proceedings** [7] - 29:8, 104:14, 104:23, 119:14, 138:14, 175:20, 230:9
**process** [56] - 4:14, 14:8, 36:3, 36:7, 38:1, 38:3, 38:9, 38:10, 38:24, 47:17, 48:4, 48:25, 50:17, 55:1, 55:2, 55:15, 58:24, 59:1, 59:3, 60:18, 62:17, 62:22, 63:3, 68:13, 71:1, 71:13, 73:11, 74:8, 74:9, 98:18, 99:24, 106:14, 108:4, 134:10, 135:20, 141:6, 141:22, 142:5, 147:16, 148:7, 163:23, 163:24, 165:21,

165:24, 166:3, 166:6, 187:13, 189:23, 197:10, 201:22, 215:25, 216:23, 219:14, 220:25, 223:7
**processes** [2] - 66:17, 149:24
**processing** [1] - 206:13
**produce** [1] - 78:18
**Producers** [1] - 11:2
**product** [3] - 11:21, 12:1, 163:6
**products** [2] - 40:9, 47:10
**Professional** [2] - 230:6, 230:8
**profit** [4] - 28:23, 113:21, 130:4
**profitability** [1] - 130:10
**profitable** [1] - 130:13
**profited** [4] - 117:17, 117:21, 117:23
**profits** [7] - 28:18, 28:19, 29:1, 29:4, 31:21, 33:2, 102:22
**program** [4] - 87:24, 87:25, 89:4, 165:17
**programming** [1] - 41:15
**progress** [1] - 228:13
**prohibited** [1] - 138:6
**project** [5] - 15:17, 29:25, 30:1, 30:3, 162:2
**promise** [3] - 61:3, 61:8, 215:21
**promised** [1] - 228:11
**promote** [2] - 103:14, 104:6
**promoted** [5] - 105:9, 105:10, 105:11, 105:12
**prompted** [1] - 209:24
**promptly** [1] - 7:17
**proof** [12] - 31:13, 31:16, 78:5, 78:7, 78:18, 78:22, 78:23, 78:25, 105:3, 105:19
**proponent** [2] - 10:5, 11:7
**proposed** [1] - 29:3
**prospect** [1] - 228:14
**prospective** [1] - 80:3
**PROSPECTIVE** [145] - 42:16, 42:19, 42:22, 43:2, 43:4, 43:7, 43:9, 43:11, 43:13,

43:15, 43:19, 43:21, 43:23, 44:1, 44:3, 44:10, 44:12, 44:25, 45:3, 45:7, 45:11, 45:14, 45:19, 45:25, 46:4, 46:6, 46:8, 46:13, 46:15, 46:18, 46:21, 47:1, 47:7, 47:11, 47:14, 47:19, 47:21, 47:24, 48:1, 48:5, 48:10, 48:17, 48:22, 49:1, 49:4, 49:6, 49:10, 49:13, 49:21, 49:25, 50:4, 50:8, 50:11, 50:14, 50:18, 50:20, 50:22, 50:24, 51:2, 51:5, 51:9, 51:13, 51:18, 51:20, 51:24, 52:7, 52:12, 52:19, 52:22, 52:24, 53:9, 53:14, 53:23, 54:5, 54:8, 54:10, 54:13, 54:18, 54:20, 54:22, 55:3, 55:6, 55:10, 58:16, 59:9, 59:11, 59:15, 60:3, 60:9, 60:13, 60:16, 60:19, 60:22, 61:17, 61:19, 61:24, 62:6, 62:8, 62:13, 62:18, 62:23, 63:2, 63:10, 63:14, 63:17, 63:25, 64:5, 64:8, 64:10, 64:13, 64:18, 64:23, 65:2, 65:4, 65:8, 65:10, 67:21, 68:6, 68:10, 68:14, 68:16, 68:23, 69:3, 69:8, 69:11, 69:14, 69:19, 69:23, 70:3, 70:6, 70:8, 70:11, 70:16, 70:19, 70:23, 71:17, 71:19, 71:24, 72:1, 72:20, 72:25, 73:3
**protect** [6] - 86:10, 129:21, 149:5, 183:9, 183:23, 184:3
**protected** [2] - 75:1, 132:24
**protecting** [2] - 86:11, 95:12
**protection** [1] - 90:18
**protections** [2] - 25:21, 134:1
**protective** [1] - 108:8
**protects** [2] - 133:24, 147:6
**prove** [13] - 4:22, 4:25,

14:9, 14:10, 78:15, 92:18, 100:21, 100:22, 110:1, 172:10, 215:20, 216:9, 216:14
**proves** [1] - 20:17
**provide** [19] - 21:17, 26:16, 27:22, 96:20, 96:23, 97:8, 99:3, 99:14, 105:22, 105:23, 105:24, 166:14, 170:18, 176:24, 179:24, 180:2, 205:11, 227:1
**provided** [19] - 10:22, 14:3, 14:11, 23:8, 38:22, 86:4, 99:23, 100:2, 100:4, 100:19, 113:11, 156:24, 157:16, 165:23, 170:20, 190:17, 210:20, 219:22, 224:14
**provides** [7] - 98:17, 99:2, 105:24, 107:3, 173:6, 180:15, 181:15
**providing** [8] - 8:9, 106:2, 106:3, 116:21, 214:7, 223:3, 223:6
**proving** [2] - 78:12, 78:14
**provisions** [1] - 138:20
**pry** [1] - 36:24
**PSS** [2] - 176:5, 176:7
**PTX** [9] - 121:14, 157:5, 197:20, 198:1, 198:2, 199:1
**public** [3] - 15:15, 37:2, 118:9
**published** [1] - 79:22
**pull** [6] - 110:20, 136:20, 157:5, 157:10, 176:16
**pulled** [2] - 162:21, 172:23
**Pump** [2] - 10:8, 10:19
**punctuality** [1] - 228:15
**punished** [1] - 118:3
**punitive** [2] - 117:25, 118:15
**purchase** [26] - 47:10, 89:9, 91:5, 91:14, 92:16, 94:13, 97:2, 98:15, 98:18, 110:4, 132:14, 134:3, 134:10, 135:4,

136:10, 137:10, 137:12, 138:24, 139:5, 139:7, 150:10, 190:9, 206:16, 206:19, 206:21, 220:15
**purchased** [8] - 40:9, 86:24, 95:23, 144:10, 144:23, 169:25, 190:17, 225:6
**purchases** [7] - 89:5, 96:9, 98:2, 98:7, 150:18, 151:2, 177:20
**purchasing** [3] - 88:20, 94:11, 158:14
**pure** [1] - 109:12
**purported** [1] - 153:19
**purpose** [4] - 15:1, 36:24, 91:2, 102:5
**purposely** [1] - 169:23
**purposes** [6] - 9:11, 11:5, 32:16, 89:18, 137:22, 138:5
**push** [1] - 6:22
**put** [32] - 4:21, 12:14, 12:16, 12:17, 20:6, 28:12, 33:23, 78:25, 90:10, 90:12, 91:5, 97:10, 102:4, 102:6, 117:25, 132:17, 145:10, 146:5, 149:14, 163:1, 186:18, 189:8, 190:13, 191:18, 192:24, 203:3, 207:14, 209:16, 209:17, 214:18, 219:8, 223:5
**puts** [4] - 10:8, 101:19, 101:20, 191:1
**putting** [6] - 12:12, 16:23, 164:20, 211:1, 217:7, 223:25

**Q**

**QR** [1] - 176:10
**qualify** [1] - 223:10
**qualitative** [1] - 5:3
**quality** [2] - 73:1, 77:17
**qualms** [1] - 37:8
**quarter** [1] - 146:4
**query** [1] - 165:3
**questionable** [1] - 223:14

**questioned** [1] - 12:11
**questioning** [3] - 84:4, 142:25, 187:21
**questionnaire** [2] - 36:11, 39:12
**questions** [25] - 36:8, 36:11, 36:12, 36:14, 36:16, 36:17, 36:20, 36:24, 37:10, 37:16, 37:17, 39:13, 39:14, 56:4, 58:12, 59:8, 75:24, 76:6, 76:14, 161:17, 169:19, 169:21, 170:6, 197:17
**quickly** [6] - 33:7, 72:7, 123:14, 206:2, 219:12, 229:20
**Quinn** [1] - 195:7
**quite** [6] - 16:7, 26:24, 30:15, 173:21, 184:12, 229:19
**quiz** [1] - 193:18
**quote** [1] - 138:5

**R**

**race** [2] - 184:14, 197:11
**radio** [1] - 82:4
**raise** [5] - 33:17, 44:20, 76:13, 119:9, 160:16
**raised** [2] - 127:18, 182:7
**ran** [3] - 162:8, 165:2, 195:15
**random** [1] - 212:16
**randomly** [1] - 36:9
**rang** [1] - 172:24
**rarely** [1] - 169:18
**rate** [4] - 150:15, 162:4, 163:17, 181:4
**rather** [4] - 114:18, 162:14, 189:21, 205:19
**raw** [2] - 172:2, 172:4
**re** [2] - 154:19, 194:8
**re-ask** [1] - 154:19
**re-asking** [1] - 194:8
**reached** [5] - 56:21, 64:1, 119:17, 221:4, 221:5
**reaching** [1] - 75:17
**react** [1] - 89:19
**reaction** [1] - 185:1
**read** [30] - 10:17, 20:19, 22:24, 36:10, 36:11, 37:18, 40:5,

82:1, 82:4, 120:20, 131:5, 137:5, 138:16, 140:20, 146:8, 152:8, 152:22, 153:1, 153:8, 159:24, 161:12, 165:19, 170:16, 173:16, 173:19, 193:11, 193:12, 197:5, 197:6
**reading** [7] - 36:14, 40:2, 54:17, 154:23, 154:24, 171:16, 191:10
**ready** [9] - 74:21, 84:22, 85:8, 85:18, 85:20, 85:21, 85:23, 119:1, 119:20
**real** [16] - 55:25, 60:4, 90:25, 106:5, 106:6, 135:8, 185:3, 187:7, 192:24, 220:2, 220:3, 223:1, 223:3, 223:6, 223:9
**reality** [1] - 134:19
**realize** [2] - 93:1, 127:3
**realized** [1] - 86:20
**really** [19] - 6:2, 7:16, 8:8, 8:17, 9:7, 20:16, 24:6, 30:21, 59:3, 86:15, 89:16, 114:25, 115:19, 124:16, 146:1, 150:13, 185:5, 225:18, 226:24
**realtime** [1] - 213:15
**realtor** [1] - 55:6
**reason** [18] - 12:24, 13:21, 35:3, 36:6, 39:17, 74:6, 81:2, 108:17, 120:13, 141:4, 142:14, 156:19, 183:6, 201:3, 205:19, 220:6, 224:5
**reasonable** [3] - 78:23, 89:19, 174:10
**reasons** [5] - 140:14, 142:9, 142:10, 142:11, 142:13
**reassure** [1] - 61:1
**rebooking** [1] - 202:11
**rebuttal** [2] - 84:14, 84:16
**recalled** [1] - 27:20
**receive** [9] - 91:13, 134:12, 140:2, 143:17, 167:20, 213:11, 214:15,

217:14, 217:25
**received** [6] - 72:9, 76:8, 143:22, 171:17, 189:17, 195:2
**receives** [1] - 220:2
**recent** [1] - 101:15
**recently** [3] - 70:17, 153:8, 159:16
**recess** [3] - 29:7, 119:13, 175:19
**reckless** [1] - 80:8
**recklessly** [1] - 79:12
**recognize** [7] - 136:21, 151:21, 155:23, 166:9, 171:2, 176:19, 177:2
**recognizing** [1] - 184:11
**recommendation** [2] - 149:25, 151:7
**Record** [1] - 197:6
**record** [11] - 10:17, 32:2, 32:25, 76:8, 120:6, 121:6, 122:4, 122:13, 134:18, 161:12, 194:25
**recorded** [1] - 77:13
**recording** [1] - 77:18
**records** [1] - 190:21
**recurring** [1] - 147:12
**redacted** [3] - 186:23, 189:5
**redirect** [1] - 34:10
**Redirect** [1] - 197:16
**reduce** [1] - 141:25
**reduces** [1] - 177:18
**refer** [4] - 84:9, 92:11, 205:6, 208:5
**reference** [6] - 82:9, 100:10, 134:25, 137:9, 188:18, 189:15
**referenced** [1] - 121:15
**referred** [3] - 53:22, 77:21, 77:25
**referring** [2] - 95:3, 96:13
**refers** [2] - 89:9, 153:13
**reflect** [2] - 37:25, 200:12
**reframe** [1] - 222:11
**refund** [30] - 91:19, 93:11, 93:12, 97:15, 97:17, 97:18, 127:8, 127:14, 140:25, 141:6, 141:7, 141:22, 201:21,

202:7, 215:16, 215:20, 215:21, 216:4, 216:7, 216:12, 216:17, 216:23, 217:13, 217:14, 218:10, 218:12, 219:2, 219:7, 219:11, 219:16
**refunded** [7] - 127:12, 127:15, 204:13, 204:14, 206:5, 220:6
**refunds** [20] - 6:8, 86:18, 91:21, 106:10, 106:11, 106:12, 106:13, 111:23, 140:15, 171:18, 204:19, 205:11, 206:13, 213:5, 214:7, 216:20, 217:3, 217:7, 217:11, 219:18
**regard** [5] - 7:21, 57:14, 82:10, 100:14, 229:11
**regarding** [10] - 37:21, 56:21, 64:24, 84:8, 84:12, 84:24, 102:10, 143:6, 214:19, 226:17
**regardless** [2] - 185:10, 185:12
**Registered** [2] - 230:6, 230:7
**registered** [1] - 144:19
**regular** [6] - 110:17, 115:22, 137:17, 138:1, 148:11, 169:12
**regulation** [1] - 97:19
**regulations** [2] - 140:23, 141:24
**regulator** [1] - 65:17
**relatable** [1] - 18:23
**relate** [1] - 41:1
**related** [16] - 16:22, 18:14, 18:19, 18:25, 19:10, 24:11, 25:6, 30:25, 40:25, 51:22, 61:21, 82:2, 170:25, 192:2, 202:3, 204:23
**relates** [1] - 112:25
**relating** [1] - 23:15
**relation** [1] - 138:15
**relations** [1] - 79:25
**relationship** [7] - 20:17, 87:1, 93:8, 95:7, 95:9, 95:14, 141:17

**relationships** [3] - 80:3, 94:21, 95:1
**relevant** [2] - 14:15, 19:23
**Relic** [2] - 195:25, 196:4
**relied** [2] - 17:8, 17:9
**relies** [1] - 24:18
**rely** [4] - 17:4, 27:3, 78:4, 216:22
**remarks** [1] - 83:23
**remedy** [2] - 31:1, 31:2
**remember** [6] - 52:25, 53:16, 54:5, 64:12, 86:16, 199:8
**remotely** [1] - 77:19
**remove** [1] - 152:6
**removes** [1] - 183:18
**render** [1] - 40:18
**renders** [1] - 16:12
**rent** [1] - 133:8
**rental** [2] - 51:11, 207:6
**rentals** [2] - 99:9, 101:21
**rented** [1] - 42:4
**repeat** [1] - 158:20
**repeated** [1] - 92:9
**repeatedly** [1] - 33:1
**repeating** [1] - 105:21
**replaced** [1] - 58:18
**replacement** [1] - 37:15
**replacements** [1] - 37:14
**report** [11] - 82:4, 82:5, 151:7, 162:8, 162:20, 162:21, 165:2, 182:11, 182:17, 182:18, 182:22
**reported** [2] - 107:17, 230:8
**reporter** [6] - 16:3, 35:21, 44:16, 123:12, 124:17, 154:23
**Reporter** [3] - 230:7, 230:8, 230:12
**reporter's** [1] - 175:13
**reports** [2] - 145:4, 165:4
**represent** [3] - 101:3, 146:10, 156:10
**representations** [1] - 80:7
**representative** [2] - 10:12, 37:6
**represented** [3] -

101:1, 146:2, 200:23
**representing** [1] - 102:7
**reputation** [10] - 79:24, 115:19, 116:2, 116:13, 116:14, 116:24, 214:1, 214:6, 214:10, 214:17
**reputational** [1] - 184:24
**request** [2] - 19:9, 19:10, 72:5
**requests** [6] - 92:10, 181:18, 181:25, 186:20, 187:14, 189:18
**require** [3] - 106:14, 108:8, 214:20
**required** [9] - 40:18, 77:5, 78:1, 79:7, 83:2, 86:19, 91:20, 97:18, 210:16
**requirement** [2] - 9:17, 20:10
**requires** [3] - 105:3, 106:16, 210:19
**requiring** [1] - 217:22
**reschedule** [1] - 141:11
**research** [2] - 82:6, 113:10
**resell** [1] - 126:25
**reservation** [1] - 52:5, 109:8, 116:18, 209:4, 210:6, 210:7, 211:5, 211:9, 213:17, 215:12, 225:15
**reservations** [8] - 19:14, 47:12, 49:7, 52:3, 145:5, 200:8, 202:1, 225:19
**reserve** [1] - 138:19
**reserved** [1] - 42:3
**reserves** [1] - 138:12
**resident** [1] - 41:9
**residual** [3] - 20:10, 27:10, 27:11
**resold** [1] - 129:12
**resolve** [1] - 229:15
**resolved** [4] - 25:9, 25:17, 173:1, 188:8
**respect** [15] - 3:5, 5:17, 6:19, 9:8, 32:18, 61:22, 74:6, 78:8, 79:8, 79:21, 94:20, 94:25, 95:16, 164:12, 169:11
**respective** [1] -

160:17
**respects** [1] - 118:14
**respond** [2] - 37:2, 89:19
**responded** [4] - 23:16, 93:25, 157:6, 163:2
**responding** [2] - 23:22, 84:14
**responds** [1] - 157:11
**response** [23] - 8:18, 19:17, 63:7, 76:6, 121:7, 121:15, 123:8, 123:9, 146:9, 157:9, 157:24, 159:24, 160:10, 163:1, 164:13, 165:19, 165:20, 166:9, 170:6, 170:17, 171:17, 173:4, 185:4
**responses** [1] - 44:17
**Responses** [1] - 120:24
**responsibilities** [2] - 35:11, 125:19
**responsibility** [6] - 83:15, 109:20, 115:10, 118:1, 122:24, 212:9
**responsible** [12] - 20:18, 22:1, 35:19, 75:17, 109:2, 125:20, 186:9, 186:11, 186:16, 203:9, 210:23, 211:2
**responsibly** [1] - 112:11
**rest** [5] - 30:11, 45:20, 73:23, 73:25, 87:11
**restore** [1] - 159:8
**restoring** [1] - 159:5
**restriction** [1] - 7:3
**restroom** [1] - 120:1
**result** [10] - 47:16, 75:3, 79:11, 80:10, 85:11, 162:22, 202:3, 202:22, 204:18, 204:24
**resulted** [2] - 20:15, 22:9
**resulting** [1] - 105:6
**retire** [1] - 84:22
**retired** [3] - 50:9, 72:11, 72:17
**retirement** [1] - 72:19
**retries** [1] - 167:25
**return** [4] - 85:1, 118:13, 137:3, 217:25
**returned** [1] - 81:18

**revenue** [2] - 31:24, 33:2
**revenues** [1] - 102:21
**reverse** [1] - 25:20
**review** [4] - 26:15, 171:9, 171:10, 172:13
**reviewed** [2] - 29:13, 171:12
**revoked** [1] - 157:3
**revokes** [1] - 156:23
**rewind** [1] - 14:3
**RICHARDS** [1] - 2:2
**rights** [2] - 38:15, 153:22
**rigorous** [1] - 33:6
**ring** [1] - 174:14
**ringing** [1] - 170:9
**rings** [2] - 169:12, 172:23
**risk** [2] - 168:6, 196:3
**River** [1] - 10:11
**road** [2] - 13:19, 81:2
**roadmap** [1] - 84:1
**roam** [1] - 196:14
**robber** [1] - 27:8
**robot** [1] - 89:6
**robots** [1] - 181:12
**rocky** [1] - 65:23
**role** [8] - 74:16, 74:18, 75:14, 75:17, 125:14, 125:18, 163:25, 182:15
**Romania** [1] - 227:25
**room** [12] - 20:1, 42:4, 42:21, 63:8, 73:9, 73:16, 83:7, 84:23, 85:2, 85:8, 118:22, 167:1
**rooms** [2] - 50:1, 194:20
**rosters** [1] - 126:7
**rotates** [1] - 135:24
**rough** [1] - 227:1
**roughly** [7] - 126:2, 130:6, 144:12, 160:17, 160:18, 167:12, 174:3
**round** [1] - 178:23
**roundtrip** [1] - 179:3
**routinely** [2] - 100:4, 110:14
**row** [2] - 193:15, 193:16
**rows** [1] - 193:15
**RPR** [1] - 230:11
**rub** [1] - 172:12
**rubber** [1] - 13:19
**rule** [5] - 61:8, 61:14, 75:19, 76:15, 128:5

**Rule** [3] - 10:9, 11:4, 11:5
**ruled** [1] - 197:24
**rules** [10] - 83:16, 127:22, 127:25, 128:1, 128:3, 128:9, 136:16, 221:1, 221:3
**ruling** [2] - 33:11, 76:17
**rulings** [1] - 76:15
**run** [3] - 34:19, 165:3, 176:25
**running** [1] - 165:6
**runs** [2] - 145:4, 217:4
**Ruth** [1] - 87:11
**RYANAIR** [1] - 1:3
**Ryanair** [386] - 16:23, 17:2, 19:19, 25:22, 25:23, 25:24, 26:15, 31:13, 38:11, 38:13, 38:17, 41:2, 42:1, 42:2, 49:3, 51:25, 52:10, 62:2, 62:4, 62:7, 63:6, 66:10, 66:15, 67:6, 67:14, 67:19, 67:22, 74:23, 75:2, 75:6, 75:7, 75:12, 78:12, 79:11, 79:22, 79:25, 80:2, 80:4, 80:8, 84:7, 84:8, 84:13, 85:20, 86:5, 86:8, 86:9, 86:14, 86:17, 86:20, 86:22, 87:4, 87:8, 87:12, 87:18, 87:23, 88:1, 88:3, 88:7, 88:9, 88:10, 88:18, 88:20, 89:2, 89:4, 89:23, 90:20, 90:24, 90:25, 91:1, 91:3, 91:6, 91:9, 91:13, 91:15, 91:18, 91:20, 91:21, 91:24, 92:3, 92:4, 92:6, 92:7, 92:18, 92:21, 92:25, 93:3, 93:7, 93:13, 93:15, 93:16, 93:17, 93:19, 93:23, 94:1, 94:3, 94:13, 94:15, 94:17, 94:20, 94:22, 95:5, 95:7, 95:8, 95:21, 95:22, 96:3, 96:5, 96:9, 96:11, 96:20, 96:24, 97:5, 97:16, 97:17, 98:8, 98:10, 98:13, 98:14, 98:16, 98:17, 98:18, 99:12, 99:24, 100:5, 100:17, 100:18, 100:22, 102:12,

102:18, 102:21, 102:24, 102:25, 103:2, 103:3, 103:6, 103:7, 103:9, 103:13, 104:1, 105:9, 105:23, 106:1, 106:2, 106:3, 106:5, 106:9, 106:13, 106:14, 106:16, 106:20, 106:25, 107:6, 107:7, 107:15, 107:16, 107:20, 108:4, 108:8, 108:23, 109:1, 110:18, 110:19, 111:1, 111:2, 111:4, 111:5, 111:9, 111:10, 111:17, 111:24, 112:4, 112:5, 112:6, 112:21, 113:6, 113:13, 113:17, 113:18, 113:19, 114:5, 114:6, 114:9, 114:11, 114:12, 114:16, 114:17, 114:18, 114:19, 114:21, 115:1, 115:3, 115:6, 115:12, 115:15, 115:16, 115:18, 115:25, 116:7, 116:10, 117:8, 117:9, 117:15, 117:17, 117:22, 118:2, 118:14, 118:15, 119:6, 120:25, 121:2, 121:11, 122:16, 122:17, 122:19, 124:11, 125:3, 125:10, 125:15, 125:17, 125:20, 126:13, 126:22, 127:4, 128:14, 129:9, 129:23, 129:25, 130:4, 130:15, 130:19, 130:24, 130:25, 131:21, 132:8, 132:23, 134:3, 134:24, 135:3, 135:4, 136:10, 136:25, 137:10, 137:16, 138:12, 138:22, 138:24, 138:25, 139:5, 139:7, 139:14, 139:25, 140:10, 140:12, 140:23,

141:5, 141:21, 142:17, 143:17, 143:24, 144:3, 144:5, 144:13, 144:22, 146:12, 146:22, 148:14, 149:4, 149:17, 150:21, 151:15, 152:5, 152:10, 152:11, 152:12, 153:10, 153:20, 153:21, 154:3, 155:1, 155:18, 156:10, 156:11, 156:16, 156:23, 158:1, 158:3, 158:8, 158:14, 159:8, 160:7, 160:8, 164:23, 165:20, 165:21, 165:23, 166:3, 166:4, 166:6, 167:9, 169:10, 169:12, 169:13, 170:16, 170:18, 170:23, 171:17, 176:4, 177:9, 181:10, 182:4, 183:2, 183:22, 184:16, 185:7, 190:18, 195:6, 199:8, 199:16, 199:23, 200:8, 200:13, 200:18, 201:11, 201:14, 205:11, 205:15, 205:18, 205:23, 206:8, 206:13, 207:14, 207:21, 208:6, 208:16, 208:25, 210:19, 211:4, 211:12, 211:23, 212:4, 212:5, 214:16, 216:19, 217:8, 217:11, 217:15, 218:7, 219:17, 219:22, 220:2, 220:5, 220:8, 220:16, 220:17, 220:19, 221:20, 222:23, 224:14, 224:15, 224:18, 224:22, 225:9, 225:11, 225:15, 225:19, 226:1
**Ryanair's** [69] - 15:9, 17:8, 25:23, 38:14, 75:1, 79:8, 79:16, 86:11, 87:1, 87:13, 87:19, 87:21, 87:24, 88:4, 89:3, 89:19,

89:24, 90:2, 91:8, 91:9, 91:10, 93:7, 93:9, 94:7, 94:20, 94:21, 94:23, 95:1, 95:3, 95:6, 95:7, 95:9, 95:11, 95:12, 95:13, 95:15, 95:17, 95:18, 95:20, 105:16, 106:22, 107:1, 112:25, 115:14, 116:13, 124:11, 125:8, 130:9, 136:13, 140:6, 142:3, 142:12, 153:21, 156:18, 156:22, 159:6, 159:24, 160:1, 160:3, 162:23, 165:20, 166:2, 177:21, 186:3, 213:2, 221:19

---

## S

**safe** [1] - 133:4
**safer** [1] - 164:15
**safety** [7] - 128:6, 140:22, 141:24, 183:20, 184:1, 223:5
**salary** [3] - 160:2, 162:7, 163:16
**sale** [6] - 89:25, 94:9, 153:9, 153:20, 154:2, 155:1
**sales** [7] - 86:10, 86:24, 88:1, 117:20, 117:22, 142:1, 176:4
**salon** [2] - 45:7, 56:6
**sat** [2] - 81:5, 162:2
**satisfaction** [1] - 62:21
**satisfactory** [1] - 34:7
**save** [1] - 154:22
**saves** [1] - 191:16
**saw** [19] - 14:14, 18:4, 23:20, 27:4, 100:10, 112:9, 123:24, 148:19, 157:25, 171:25, 183:12, 186:19, 186:23, 188:16, 188:19, 190:16, 199:10, 224:12, 225:1
**scamming** [1] - 214:4
**scare** [1] - 229:8
**scene** [2] - 26:23, 172:8
**scenes** [1] - 140:4
**schedule** [1] - 65:14

**schedules** [2] - 125:22, 126:7
**school** [2] - 145:17, 150:4
**Scientific** [1] - 65:1
**scientist** [1] - 87:23
**scope** [1] - 86:20
**scoring** [1] - 199:12
**scramble** [2] - 8:18, 229:19
**scrambling** [1] - 206:3
**scrap** [1] - 49:15
**scrape** [2] - 152:7, 152:17
**scraped** [1] - 112:23
**scraper** [4] - 97:22, 97:24, 128:24, 138:10
**scrapers** [1] - 128:23
**scrapes** [1] - 140:6
**scraping** [10] - 41:13, 112:20, 112:25, 113:14, 113:18, 126:11, 138:5, 153:19, 155:7
**scrapping** [1] - 49:16
**screen** [19] - 97:21, 97:23, 112:19, 112:23, 112:25, 113:14, 113:17, 135:7, 135:13, 135:16, 136:4, 138:5, 146:10, 148:18, 172:24, 206:24, 206:25, 207:5, 209:7
**screen-scraped** [1] - 112:23
**screens** [3] - 135:8, 208:21, 209:9
**screenshot** [8] - 171:5, 207:3, 207:15, 207:20, 207:23, 208:1, 208:17
**screenshots** [1] - 207:8
**script** [1] - 140:17
**scripts** [1] - 169:24
**scroll** [6] - 135:8, 137:8, 153:24, 156:14, 157:22, 203:15
**search** [4] - 41:16, 138:10, 139:22, 191:2
**searched** [2] - 189:9, 191:2
**seat** [1] - 131:14
**seated** [3] - 36:22,

37:12, 74:20
**second** [18] - 9:17,
11:8, 13:13, 47:22,
48:10, 48:12, 82:1,
130:17, 138:3,
146:25, 152:19,
153:7, 192:23,
195:1, 220:21,
221:18, 221:19,
227:25
**second-degree** [2] -
48:10, 48:12
**secretary** [5] - 213:8,
213:9, 213:22,
223:20, 223:24
**sector** [2] - 177:5
**sectors** [2] - 125:5,
125:6
**secure** [2] - 65:12,
148:4
**security** [5] - 41:10,
98:11, 125:21,
126:5, 138:21
**see** [110] - 4:3, 7:9,
12:8, 14:21, 15:2,
16:25, 17:3, 17:20,
17:21, 19:21, 20:8,
24:18, 25:19, 28:13,
29:5, 31:19, 32:12,
32:20, 35:2, 42:13,
43:17, 45:8, 45:12,
45:21, 46:25, 48:14,
48:15, 49:2, 49:18,
52:3, 53:21, 55:11,
59:20, 61:15, 63:12,
64:11, 65:6, 68:19,
70:24, 71:2, 85:15,
95:14, 96:12, 96:19,
97:21, 103:14,
103:19, 105:8,
105:22, 111:13,
112:15, 112:16,
114:14, 115:11,
116:3, 116:12,
116:13, 116:14,
117:8, 118:22,
119:17, 119:20,
126:13, 135:13,
136:4, 137:12,
137:23, 138:6,
139:18, 140:10,
142:6, 144:18,
145:19, 146:11,
152:13, 153:11,
153:22, 154:5,
154:15, 155:4,
156:9, 156:16,
157:10, 157:23,
161:17, 161:18,
163:10, 164:18,

167:11, 170:1,
170:8, 171:20,
174:20, 176:17,
180:10, 180:23,
190:8, 190:10,
190:20, 191:4,
192:10, 195:4,
196:25, 198:25,
203:6, 203:8,
207:13, 208:15,
215:5
**seeing** [3] - 25:17,
30:17, 32:10
**seeking** [1] - 7:5
**seem** [2] - 23:17,
153:4
**segment** [12] - 92:16,
130:5, 177:7, 177:9,
177:18, 177:22,
178:4, 178:9,
178:12, 178:14,
178:25, 179:1
**segments** [6] - 177:8,
178:17, 178:20,
178:24, 179:5, 179:6
**select** [12] - 35:23,
35:25, 73:12, 90:3,
90:4, 131:2, 131:3,
131:10, 132:16,
137:2, 208:13
**selected** [12] - 35:20,
36:9, 37:24, 38:1,
38:4, 40:1, 47:21,
48:7, 80:25, 90:7,
131:6, 131:11
**selecting** [2] - 59:3,
207:4
**selection** [5] - 3:3,
34:13, 36:4, 38:9,
38:24
**selections** [1] - 83:12
**sell** [15] - 88:18, 91:8,
93:16, 93:23, 94:2,
94:7, 94:15, 129:24,
129:25, 130:1,
130:15, 130:16,
130:24, 152:13,
152:17
**seller** [2] - 55:7,
112:14
**selling** [10] - 93:17,
116:20, 129:22,
130:9, 140:13,
154:2, 155:1, 155:7,
155:18, 158:1
**sells** [5] - 86:8, 88:25,
98:13, 144:3, 152:11
**send** [11] - 66:25,
103:21, 117:1,
129:6, 132:3, 132:7,

141:2, 151:15,
152:5, 181:2, 219:6
**sending** [3] - 94:1,
100:11, 154:11
**sends** [2] - 90:21,
212:6
**senior** [2] - 26:11,
26:19, 26:21, 26:24,
101:2
**sense** [2] - 10:6, 34:23
**sent** [11] - 92:9, 93:13,
93:15, 93:19, 95:22,
100:22, 105:12,
151:18, 154:12,
169:25, 184:3
**sentence** [8] - 137:21,
138:3, 138:12,
152:8, 153:7,
154:14, 154:24,
156:9
**sentiment** [2] -
103:14, 104:6
**separate** [4] - 6:9,
6:11, 18:18
**separately** [1] -
114:23
**September** [2] -
101:16, 125:11
**sequence** [1] - 83:22
**sequential** [3] - 73:21,
73:22, 74:1
**series** [4] - 93:14,
95:21, 96:25, 136:16
**serious** [1] - 7:11
**seriously** [4] - 27:1,
74:8, 112:12, 205:15
**serve** [4] - 36:5, 48:7,
63:23, 141:21
**served** [2] - 60:14,
64:13
**server** [1] - 181:15
**servers** [2] - 139:9,
142:23
**serves** [1] - 188:21
**service** [37] - 35:9,
35:10, 41:20, 45:10,
49:12, 68:9, 71:12,
73:24, 74:13, 97:20,
115:2, 116:15,
116:20, 118:9,
133:12, 169:7,
169:10, 169:16,
170:5, 170:7,
170:17, 170:18,
170:20, 170:21,
170:24, 171:1,
176:8, 176:23,
180:7, 180:15,
181:8, 181:15,
183:8, 213:12,

227:24
**serviceman** [1] - 73:4
**services** [9] - 40:10,
47:10, 53:1, 80:6,
80:10, 89:1, 108:9,
179:24, 180:10
**Services** [1] - 176:17
**serving** [3] - 15:20,
35:21, 54:14
**session** [10] - 100:11,
108:6, 109:8,
109:10, 189:14,
191:11, 193:5,
193:9, 195:4, 195:9
**session's** [1] - 191:22
**set** [5] - 8:5, 85:12,
131:25, 162:2, 218:3
**sets** [1] - 175:25
**setting** [3] - 77:18,
163:24, 165:16
**settled** [5] - 8:2, 8:4,
54:24, 55:2, 71:20
**setup** [1] - 112:19
**seven** [7] - 40:15,
46:15, 62:18, 91:20,
215:21
**several** [11] - 9:4,
48:19, 79:3, 79:7,
88:17, 93:4, 112:22,
120:8, 169:22,
222:5, 222:6
**shame** [1] - 116:18
**shape** [3] - 108:11,
117:17, 228:16
**share** [3] - 168:11,
177:23, 177:25
**shared** [1] - 186:24
**sharing** [1] - 194:14
**Sheridan** [4] - 17:9,
18:4, 18:6
**Shield** [37] - 87:24,
89:3, 89:14, 95:22,
97:25, 98:1, 98:5,
146:25, 148:20,
148:21, 148:22,
148:25, 149:4,
149:20, 149:22,
150:10, 150:17,
150:22, 151:6,
151:8, 151:9, 184:2,
184:3, 184:7, 184:8,
184:9, 184:10,
184:11, 184:13,
188:19, 190:22,
196:2, 196:3, 196:6,
196:9, 196:12, 197:9
**shining** [1] - 167:2
**shock** [1] - 115:10
**short** [4] - 38:22,
83:17, 119:7, 175:8

**shortage** [1] - 60:5
**shortened** [2] - 207:1,
207:9
**shorthand** [1] - 230:9
**shortly** [4] - 88:14,
101:16, 104:8,
134:13
**show** [14] - 13:21,
30:13, 73:15, 84:2,
90:16, 104:16,
105:5, 105:6, 105:7,
109:13, 148:18,
203:22, 208:17,
224:13
**showed** [10] - 104:25,
111:8, 111:11,
122:20, 146:9,
178:2, 200:2, 200:7,
207:5
**showing** [5] - 31:1,
121:9, 187:19,
203:11, 203:19
**shown** [3] - 99:16,
189:5, 200:9
**shows** [3] - 31:2,
72:10, 90:9, 117:9,
131:6, 170:23,
171:19, 191:6,
207:20, 208:1
**shut** [5] - 92:4,
183:22, 192:5,
202:6, 214:5
**shutdowns** [1] - 202:4
**Sid** [1] - 200:21
**side** [20] - 3:19, 7:20,
8:17, 10:3, 12:12,
14:14, 37:6, 37:20,
55:13, 66:23, 73:12,
77:2, 77:10, 83:23,
99:14, 123:14,
148:9, 197:12,
221:14
**side-by-side** [1] -
99:14
**sidebar** [8] - 55:16,
58:10, 66:1, 67:16,
71:3, 71:10, 72:8,
72:14
**sides** [1] - 82:21
**sign** [4] - 90:9, 114:23,
167:19, 167:20
**signal** [1] - 194:2
**significance** [3] -
15:22, 16:15, 77:17
**significant** [2] - 5:14,
113:22
**silly** [1] - 191:25
**similar** [3] - 135:6,
190:7, 214:19
**similarly** [1] - 22:9

simple [4] - 30:2,
111:2, 150:6, 191:2
simply [7] - 9:22, 9:23,
72:11, 75:18, 78:2,
100:5, 105:21
SIMPSON [1] - 2:8
sincerely [1] - 20:12
Singapore [1] -
110:10
single [18] - 15:1,
24:19, 92:16, 92:22,
167:20, 176:6,
180:9, 180:15,
180:17, 180:19,
182:5, 190:3, 190:5,
190:23, 191:20,
194:10, 196:7,
197:12
sister [1] - 101:11
sit [11] - 8:24, 35:24,
36:10, 39:5, 55:24,
56:12, 118:8, 130:3,
131:14, 182:8,
198:18
site [1] - 96:11
sitting [7] - 35:16,
35:17, 36:15, 48:12,
58:24, 102:8, 198:19
situated [1] - 65:19
situation [13] - 5:15,
15:10, 19:23, 19:25,
31:8, 33:17, 39:24,
54:12, 131:9,
192:18, 196:4,
212:4, 218:13
situations [1] - 213:2
six [5] - 40:11, 134:20,
178:20, 190:1, 190:8
six-digit [1] - 190:8
sixty [1] - 186:12
size [2] - 127:3,
135:18
sized [1] - 189:25
ski [2] - 48:18, 48:20
skiers [1] - 48:22
skill [1] - 182:25
skilled [1] - 189:21
skip [1] - 209:7
Skiplagged [1] - 68:19
Skyscanner [1] -
110:12
Slightly [1] - 202:5
slightly [6] - 117:19,
164:25, 166:7,
173:25, 178:3,
222:16
slip [1] - 167:21
sloppy [1] - 22:18
slow [4] - 124:17,
124:19, 185:4,

222:10
slow-downs [1] -
222:10
slowdown [1] - 222:4
slowdowns [2] -
142:21, 143:6
slowly [6] - 16:3,
16:18, 89:12,
123:12, 123:15,
183:2
slows [1] - 222:5
small [4] - 115:13,
202:12, 202:18,
203:11
smaller [2] - 135:7,
135:15
smart [1] - 148:18
smoking [1] - 175:13
smoothly [1] - 46:5
sneak [1] - 60:24
snippet [1] - 203:11
social [2] - 82:3,
131:24
software [14] - 87:25,
89:4, 89:7, 95:23,
97:22, 97:24, 97:25,
98:5, 138:4, 149:6,
166:15, 196:1, 196:9
sold [10] - 55:7, 89:2,
121:2, 121:4,
121:10, 125:5,
125:6, 144:5,
146:12, 148:14
sole [1] - 76:24
solely [2] - 76:22,
82:11
solicitor [2] - 151:24,
152:1
solution [5] - 148:4,
148:11, 149:10,
149:12, 211:19
solvable [1] - 229:16
solve [2] - 25:4, 30:21
solved [1] - 33:22
solving [2] - 229:3,
229:22
someone [18] - 13:22,
15:10, 25:23, 26:14,
26:15, 26:19, 26:22,
30:5, 38:3, 53:10,
67:1, 80:21, 81:4,
101:23, 149:7,
210:8, 213:12,
219:12
someplace [1] - 190:9
sometimes [9] - 37:1,
82:18, 95:2, 127:16,
147:13, 147:14,
150:2, 182:9, 182:25
somewhat [3] - 14:20,

31:22, 54:14
somewhere [3] -
102:15, 133:18,
208:18
soon [2] - 35:2,
119:24
sophisticated [1] -
102:2
sophistication [1] -
226:25
Sorry [2] - 173:18,
191:15
sorry [62] - 7:24, 21:4,
23:3, 29:15, 51:1,
59:17, 65:7, 69:6,
70:7, 71:1, 121:19,
123:6, 123:23,
123:24, 124:4,
125:24, 136:6,
141:22, 142:10,
142:13, 142:16,
145:22, 145:25,
149:19, 152:2,
156:4, 158:20,
158:22, 162:2,
167:19, 168:16,
168:21, 172:6,
172:16, 173:14,
178:14, 178:24,
181:14, 183:6,
185:22, 189:2,
192:12, 194:14,
196:4, 197:5, 200:4,
200:6, 200:10,
200:15, 201:19,
203:19, 209:1,
214:2, 214:12,
215:3, 218:21,
218:22, 221:18,
223:10, 227:10
sort [6] - 12:7, 53:17,
84:1, 108:14,
195:19, 215:13
sorts [1] - 110:13
sound [5] - 103:1,
144:8, 144:9, 146:3,
179:13
sounded [1] - 8:6
sounding [1] - 104:3
sounds [3] - 126:19,
205:13, 217:21
source [2] - 188:20,
197:11
sourced [1] - 121:13
sources [2] - 195:24,
196:2
Southwest [1] - 88:11
Spain [1] - 101:3
SPEAKER [2] -
109:19, 122:23

special [6] - 48:4,
77:23, 128:21,
156:1, 206:4, 209:10
specific [10] - 20:9,
27:21, 96:14, 143:2,
162:15, 163:1,
163:6, 163:7,
164:11, 193:19
specifically [1] - 95:21
specifics [1] - 201:20
speculating [1] -
227:10
speculation [2] -
108:12, 109:13
speculative [5] - 19:1,
22:25, 24:7, 30:15,
33:3
speed [2] - 26:15,
133:14
spell [4] - 122:3,
122:12, 125:25,
172:17
spelling [1] - 89:11
spend [3] - 91:22,
114:22, 115:16
spending [1] - 169:4
spent [6] - 9:24,
64:16, 115:1, 115:3,
160:5, 168:1
spoken [1] - 12:16
spot [1] - 145:10
spouse [4] - 213:8,
213:9, 213:22,
223:20
spreadsheet [8] -
14:6, 14:13, 17:22,
30:3, 164:21, 172:1,
191:3, 193:15
square [1] - 163:10
SRG [2] - 153:11,
153:16
staff [3] - 162:5,
170:18, 170:20
stage [2] - 182:20,
184:5
stages [1] - 201:14
stand [4] - 77:3,
83:18, 101:18, 146:8
stand-alone [1] -
101:18
standard [3] - 13:6,
38:3, 97:19
standing [1] - 20:5
stands [2] - 9:11, 74:5
start [18] - 3:12, 3:14,
8:16, 68:8, 72:3,
81:2, 82:15, 85:7,
86:4, 124:19,
130:19, 142:8,
166:23, 172:24,

185:1, 199:1,
201:10, 223:25
started [6] - 101:16,
101:17, 111:15,
111:20, 127:10,
159:18
starter [1] - 176:23
starting [2] - 7:10,
183:25
starts [2] - 81:8, 86:15
state [9] - 47:15,
47:23, 47:24, 77:24,
122:3, 122:12,
123:6, 123:24,
127:12
statement [2] - 80:9,
163:6
statements [17] -
34:13, 75:12, 76:10,
79:23, 83:24, 83:25,
85:15, 85:17, 86:1,
96:18, 97:21,
100:17, 117:4,
117:9, 118:3, 118:4
states [2] - 121:1,
156:17
States [5] - 35:7,
104:15, 104:23,
133:16, 133:17
STATES [1] - 1:1
static [2] - 126:19,
149:10
stationed [1] - 52:1
status [4] - 9:15, 11:4,
11:5, 141:23
statute [5] - 53:17,
104:20, 104:21,
104:22, 105:2
stay [2] - 56:19, 145:5
stays [1] - 101:20
stealing [1] - 129:13
Stenotype [1] - 230:9
stents [2] - 64:16,
64:24
step [9] - 14:8, 16:16,
108:2, 189:20,
189:21, 189:23,
230:1
steps [10] - 15:24,
25:14, 111:9,
206:21, 206:25,
207:2, 213:7,
213:11, 213:15,
218:15
Sterlings [1] - 180:24
still [10] - 20:16,
118:8, 130:13,
136:7, 191:21,
210:7, 221:12,
228:13, 229:23

stipulate [2] - 168:23, 175:1
stipulation [1] - 174:25
stipulations [1] - 169:3
Stocki [7] - 20:13, 25:19, 87:22, 92:21, 97:24, 149:2
stop [18] - 27:14, 86:10, 89:5, 95:6, 111:10, 111:13, 126:11, 147:7, 151:13, 155:7, 162:3, 170:9, 179:12, 184:8, 195:13, 215:18, 228:9
stoppages [1] - 143:6
stopped [3] - 111:1, 181:25, 184:13
stopping [5] - 98:7, 143:8, 149:18, 149:21, 184:13
stops [1] - 98:2
store [1] - 133:23
stores [1] - 176:9
story [1] - 86:15
straightforward [1] - 11:3
strategic [1] - 6:25
strategy [6] - 103:23, 103:25, 105:14, 105:15, 105:17
Street [4] - 211:11, 211:20, 216:2, 223:19
street [3] - 193:23, 194:17, 214:3
stress [1] - 57:3
stressful [1] - 55:3
stretch [1] - 83:18
stricken [1] - 158:15
strike [8] - 53:13, 55:8, 56:1, 66:12, 143:11, 161:15, 161:19, 222:8
Strike [1] - 161:19
striking [3] - 57:14, 58:3, 73:21
structures [2] - 6:9, 6:10
struggles [1] - 151:9
struggling [1] - 158:22
students [1] - 150:5
studies [2] - 107:11, 107:17
stuff [2] - 20:19, 203:2
subconsciously [1] -

44:21
subject [14] - 6:15, 13:18, 33:6, 36:17, 77:22, 143:2, 143:4, 143:11, 163:11, 164:11, 197:16, 222:8, 228:22
submitted [4] - 132:22, 142:8, 214:25, 224:19
subordinate [1] - 17:9
subordinates [1] - 30:23
subsidiaries [3] - 156:12, 156:17, 156:21
subsidiary [1] - 153:17
substance [1] - 229:1
substitute [1] - 68:2
successful [2] - 140:2, 192:21
successfully [6] - 116:19, 176:25, 192:13, 192:15, 192:16, 221:13
succinct [2] - 20:20, 20:23
suddenly [4] - 81:6, 110:25, 127:7, 181:18
sue [1] - 138:19
sued [12] - 38:12, 40:20, 40:22, 53:10, 54:23, 55:7, 59:21, 62:12, 62:14, 158:4
suffer [1] - 39:23
suffered [1] - 92:21
suggest [2] - 55:22, 75:18
suing [1] - 68:12
suit [1] - 158:5
sum [1] - 118:12
summary [3] - 4:17, 38:7, 171:6
summon [2] - 39:5, 68:1
supervising [1] - 13:16
supervisor [2] - 11:10, 72:25
supervisors [1] - 13:16
Supplemental [1] - 120:24
supplied [1] - 222:2
supplier [1] - 113:3
support [2] - 84:17, 171:18
supports [1] - 15:9

suppose [1] - 12:10
supposed [3] - 53:18, 81:15, 131:19
supposedly [2] - 114:24, 124:2
surprise [3] - 112:1, 112:7, 222:14
surprised [3] - 4:3, 7:9, 123:24
suspect [1] - 33:20
suspected [1] - 96:3
suspend [1] - 33:25
Sussex [1] - 64:3
sustain [1] - 165:7
sustained [2] - 143:13, 163:9
sway [1] - 66:18
swear [2] - 74:17, 209:1
sweater [2] - 120:12, 120:15
Swedish [2] - 110:8, 110:9
switch [5] - 3:17, 6:20, 97:14, 183:7, 183:16
sworn [5] - 39:3, 74:19, 74:21, 77:13, 122:8
sync [1] - 167:14
system [21] - 35:13, 74:7, 90:2, 91:10, 92:5, 106:12, 108:4, 108:7, 108:21, 121:11, 138:4, 158:9, 172:16, 172:22, 176:8, 181:25, 183:16, 210:19, 218:14, 226:23
systems [7] - 98:11, 125:22, 147:2, 147:3, 158:12, 183:23, 220:21

**T**

tab [2] - 226:10, 226:11
table [3] - 102:8, 177:2, 177:5
tablet [1] - 135:16
tablets [1] - 81:22
tag [4] - 145:4, 159:12, 172:9, 219:11
tagged [2] - 145:5, 218:14
tags [2] - 145:6, 162:9
tamp [1] - 126:18
task [1] - 127:9

tasks [2] - 89:8, 150:6
teacher [2] - 72:20, 145:19
teachers [1] - 72:21
teaching [1] - 72:21
team [22] - 87:4, 87:11, 87:13, 88:13, 95:3, 119:6, 126:4, 128:18, 129:16, 130:21, 130:23, 145:3, 147:3, 147:15, 158:12, 162:8, 165:2, 165:4, 174:14, 182:4, 182:10, 200:19
teams [1] - 81:12
tech [1] - 104:11
technical [6] - 77:22, 77:25, 119:23, 120:3, 140:15, 207:16
technically [2] - 134:18, 135:9
technological [2] - 89:15, 92:19
technology [14] - 81:22, 87:20, 115:4, 121:6, 122:18, 125:13, 125:16, 125:18, 128:18, 129:16, 147:20, 158:7, 163:8, 172:5
Tedarea [1] - 10:19
telephone [1] - 135:15
television [1] - 82:4
temperature [1] - 120:9
temporary [1] - 223:1
ten [14] - 40:24, 50:12, 159:25, 160:4, 160:20, 163:13, 163:21, 174:8, 175:15, 175:17, 179:5, 179:6
ten-minute [1] - 175:17
tend [2] - 120:14, 153:4
tenuous [1] - 18:8
term [6] - 78:17, 89:16, 128:14, 128:15, 139:1, 181:14
terminology [1] - 128:23
terms [26] - 5:6, 27:12, 34:1, 57:1, 75:8, 88:23, 91:8, 97:5, 99:9, 105:5, 114:15, 128:19, 130:2,

131:5, 136:13, 136:24, 136:25, 137:6, 137:11, 149:17, 149:21, 164:21, 191:25, 207:4, 213:9, 221:8
terrible [1] - 45:25
test [19] - 27:25, 30:11, 127:24, 139:18, 139:20, 139:21, 140:10, 142:4, 143:23, 148:1, 148:19, 151:5, 155:21, 224:12, 224:13, 224:19, 224:24, 227:16, 229:17
tested [3] - 225:16, 225:20, 225:21
testified [6] - 17:18, 33:1, 113:15, 122:8, 201:21, 217:8
testifies [1] - 84:5
testify [24] - 10:12, 12:13, 12:21, 15:24, 20:7, 23:19, 24:5, 24:21, 24:23, 25:5, 26:14, 31:11, 31:17, 32:18, 32:20, 77:15, 86:10, 89:22, 101:4, 103:22, 109:16, 112:9, 113:11, 227:23
testifying [2] - 164:2, 199:8
testimony [40] - 6:15, 9:9, 10:5, 10:10, 10:20, 10:24, 13:18, 24:2, 26:16, 30:5, 30:9, 31:14, 31:15, 31:19, 33:3, 33:16, 33:19, 33:21, 34:15, 48:24, 76:3, 76:6, 77:1, 77:7, 77:9, 77:12, 77:13, 77:16, 77:17, 77:20, 83:1, 86:5, 87:3, 95:15, 98:19, 112:16, 179:17, 217:21, 228:22, 228:23
testing [1] - 142:6
tests [1] - 128:2
Texas [1] - 88:12
text [2] - 182:7, 190:24
thankfully [1] - 17:24
THE [387] - 1:1, 1:2, 3:1, 3:9, 3:12, 3:25, 4:13, 4:21, 5:3, 5:7, 5:14, 5:18, 5:25, 7:8, 7:25, 8:4, 8:16, 9:2,

9:4, 13:7, 13:11,
13:17, 14:7, 14:16,
14:22, 15:4, 15:21,
16:6, 16:12, 16:18,
17:1, 17:10, 17:16,
18:10, 18:20, 19:16,
20:4, 20:16, 21:2,
21:8, 21:13, 21:18,
21:20, 21:25, 22:7,
22:12, 22:20, 22:24,
23:2, 23:17, 23:25,
24:13, 24:15, 24:21,
24:23, 24:25, 25:13,
26:6, 26:18, 26:21,
27:4, 27:11, 27:16,
28:2, 28:7, 28:10,
28:13, 28:19, 28:25,
29:5, 29:12, 29:15,
29:18, 29:21, 30:7,
30:16, 30:20, 31:7,
32:4, 32:8, 32:16,
32:20, 33:5, 33:18,
34:6, 34:21, 34:25,
39:4, 39:6, 39:11,
42:17, 42:20, 42:25,
43:3, 43:5, 43:8,
43:10, 43:12, 43:14,
43:17, 43:20, 43:22,
43:24, 44:2, 44:8,
44:11, 44:14, 45:2,
45:5, 45:8, 45:12,
45:16, 45:21, 46:2,
46:5, 46:7, 46:10,
46:14, 46:16, 46:20,
46:25, 47:3, 47:9,
47:13, 47:16, 47:20,
47:23, 47:25, 48:2,
48:8, 48:12, 48:21,
48:23, 49:2, 49:5,
49:8, 49:11, 49:18,
49:23, 50:2, 50:6,
50:10, 50:13, 50:16,
50:19, 50:21, 50:23,
51:1, 51:4, 51:6,
51:12, 51:16, 51:19,
51:22, 52:6, 52:9,
52:16, 52:21, 52:23,
53:8, 53:12, 53:21,
53:24, 54:7, 54:9,
54:11, 54:16, 54:19,
54:21, 54:25, 55:5,
55:8, 55:11, 55:17,
56:9, 56:18, 56:24,
57:7, 57:24, 58:3,
58:8, 58:11, 58:17,
59:5, 59:7, 59:10,
59:13, 59:17, 59:20,
59:23, 60:2, 60:7,
60:11, 60:15, 60:17,
60:20, 61:1, 61:16,
61:18, 61:20, 62:4,

62:7, 62:11, 62:16,
62:20, 62:25, 63:5,
63:12, 63:16, 63:22,
64:4, 64:6, 64:9,
64:11, 64:17, 64:21,
64:25, 65:3, 65:6,
65:9, 65:24, 66:2,
66:9, 66:22, 67:8,
67:11, 67:15, 67:17,
67:23, 68:3, 68:5,
68:8, 68:13, 68:15,
68:21, 69:1, 69:6,
69:10, 69:12, 69:16,
69:22, 69:25, 70:5,
70:7, 70:9, 70:15,
70:18, 70:21, 70:24,
71:4, 71:8, 71:11,
71:15, 71:16, 71:18,
71:22, 71:25, 72:2,
72:7, 72:13, 72:15,
72:23, 73:2, 73:5,
73:7, 73:18, 74:4,
74:20, 85:23, 85:25,
98:23, 109:22,
118:17, 118:25,
119:10, 119:15,
119:24, 120:3,
120:8, 120:22,
121:16, 121:20,
121:24, 122:2,
122:3, 122:5, 123:1,
123:11, 123:16,
123:18, 124:16,
124:19, 126:16,
143:2, 143:10,
145:15, 150:7,
150:8, 152:20,
152:25, 154:9,
154:13, 154:19,
158:20, 158:22,
158:25, 160:15,
160:19, 160:20,
160:21, 160:22,
160:23, 161:1,
161:9, 161:15,
161:18, 162:11,
162:14, 162:25,
163:15, 163:18,
163:21, 164:1,
164:4, 164:10,
164:18, 165:6,
168:25, 169:1,
169:2, 172:17,
172:18, 172:19,
172:20, 172:21,
172:22, 174:21,
174:25, 175:3,
175:9, 175:11,
175:14, 175:21,
180:18, 180:22,
181:2, 181:6, 181:7,

181:8, 184:23,
184:24, 187:10,
187:11, 187:23,
188:5, 189:19,
192:14, 192:15,
192:16, 192:17,
193:24, 194:1,
194:2, 194:5,
196:17, 196:24,
197:2, 197:7,
197:19, 197:22,
197:25, 198:5,
198:10, 198:14,
222:11, 225:23,
225:24, 228:10,
228:19, 228:24,
228:25, 229:5,
229:9, 229:13,
229:21, 229:23,
230:1
**themselves** [5] -
109:21, 122:25,
124:9, 127:17,
165:12
**theoretical** [1] -
223:22
**theoretically** [1] -
193:4
**theory** [8] - 19:2, 24:5,
24:6, 30:14, 30:24,
109:5, 194:13
**thereafter** [1] - 216:4
**therefore** [5] - 12:21,
21:20, 91:21, 160:7,
162:17
**Thereupon** [7] -
55:16, 66:1, 71:3,
72:8, 120:5, 121:21,
198:1
**they've** [3] - 26:4,
37:22, 115:24
**thinking** [4] - 56:12,
57:8, 120:3, 201:2
**thinks** [1] - 38:2
**Third** [2] - 15:14,
120:24
**third** [19] - 19:13,
23:13, 74:25, 79:10,
79:15, 79:19, 82:6,
109:20, 109:23,
122:25, 123:2,
123:9, 124:4,
138:12, 152:13,
166:14, 179:24,
195:25
**third-party** [2] - 23:13,
195:25
**thousand** [2] - 92:22,
201:7
**thousandths** [1] -

186:12
**three** [26] - 7:19,
16:24, 17:13, 23:14,
23:20, 24:3, 26:10,
28:2, 40:2, 55:17,
55:18, 59:9, 63:14,
68:1, 72:10, 72:16,
72:17, 73:13, 80:1,
87:18, 140:24,
154:25, 174:2,
179:4, 203:12, 227:5
**throughout** [3] - 26:5,
86:13, 182:13
**Thursday** [1] - 70:12
**ticket** [15] - 106:5,
106:17, 106:19,
107:5, 110:13,
134:24, 135:1,
172:16, 172:22,
190:9, 216:15,
219:24, 220:15,
220:16, 225:6
**tickets** [19] - 38:11,
38:13, 38:14, 67:6,
88:20, 99:25, 106:4,
106:25, 107:12,
108:19, 108:20,
110:18, 111:1,
114:19, 171:17,
171:19, 172:7,
205:20
**tie** [1] - 22:18
**tied** [3] - 19:12, 22:12,
209:1
**ties** [1] - 27:6
**timeline** [3] - 111:8,
111:9, 111:11
**timely** [1] - 93:12
**timing** [3] - 33:7, 34:1,
57:1
**tinkering** [1] - 8:16
**tiny** [1] - 115:11
**tip** [1] - 102:20
**title** [2] - 153:19,
176:16
**today** [25] - 24:22,
24:23, 26:4, 27:20,
32:3, 32:5, 33:9,
33:10, 33:13, 33:22,
36:25, 40:7, 64:8,
65:12, 65:19, 79:5,
87:11, 124:7,
126:10, 158:5,
190:16, 198:18,
225:1, 228:12,
228:15
**together** [8] - 66:20,
101:19, 101:20,
102:4, 102:6, 102:9,
102:11, 211:7

**token** [8] - 92:12,
189:14, 191:11,
191:24, 193:9,
195:4, 195:9, 220:19
**tokens** [4] - 100:11,
108:6, 109:9, 109:10
**tomorrow** [8] - 27:20,
33:25, 34:9, 34:10,
34:20, 71:9, 228:13,
228:20
**tonight** [1] - 229:19
**took** [6] - 3:23, 7:19,
52:10, 55:4, 112:12,
116:25
**tool** [2] - 146:25,
148:22
**tools** [6] - 81:23,
129:20, 144:14,
146:22, 146:24
**top** [4] - 152:10,
155:13, 167:10,
203:24
**topic** [6] - 6:16, 22:23,
119:6, 141:16,
160:13, 228:8
**tortious** [1] - 75:8
**total** [12] - 3:23, 4:7,
4:8, 5:9, 22:5,
115:14, 170:19,
170:25, 199:11,
200:20, 227:8
**touch** [1] - 217:23
**touches** [1] - 143:10
**TOUHEY** [1] - 1:16
**Touhey** [1] - 87:15
**towards** [3] - 125:7,
153:24, 156:15
**track** [4] - 80:13,
142:15, 173:1,
227:17
**tracking** [1] - 226:25
**tracks** [1] - 196:1
**Trade** [2] - 75:11, 80:5
**trade** [1] - 75:11
**traffic** [13] - 140:17,
142:15, 142:18,
142:22, 144:14,
148:23, 148:24,
150:3, 184:6,
184:11, 184:14,
185:3, 187:3
**train** [1] - 189:20
**training** [3] - 41:18,
63:20, 77:23
**transaction** [2] -
121:7, 196:7
**transactions** [1] -
196:1
**TRANSCRIPT** [1] - 1:9
**translated** [1] - 18:3

**transportation** [1] - 52:15

**travel** [74] - 38:10, 38:12, 38:13, 40:24, 40:25, 42:4, 42:6, 52:17, 67:14, 67:20, 68:16, 70:1, 86:21, 86:24, 88:1, 88:16, 88:24, 89:1, 92:2, 94:18, 94:25, 95:4, 95:6, 95:16, 95:24, 96:13, 98:2, 99:4, 99:5, 99:10, 100:23, 101:12, 101:13, 101:25, 103:2, 103:10, 103:11, 112:3, 116:10, 121:5, 126:14, 126:23, 127:4, 129:17, 129:18, 131:3, 139:6, 142:2, 144:11, 144:23, 145:2, 146:22, 147:5, 158:13, 164:22, 174:13, 176:4, 211:11, 212:6, 212:9, 212:10, 212:19, 212:21, 212:24, 213:3, 213:20, 214:3, 216:1, 216:2, 221:6, 223:19, 223:24

**Travel** [1] - 135:23

**travel-related** [1] - 40:25

**traveler** [1] - 19:9

**travelers** [3] - 102:2, 102:3, 115:22

**Travelfusion** [2] - 41:3, 110:12

**traveling** [3] - 115:22, 132:17, 208:13

**travels** [1] - 101:23

**treat** [3] - 160:25, 173:7, 206:11

**treated** [1] - 44:5

**TRIAL** [2] - 1:9, 1:11

**trial** [51] - 7:9, 10:10, 10:21, 26:14, 28:1, 28:22, 32:15, 35:19, 35:22, 36:2, 39:18, 47:22, 59:3, 60:11, 64:16, 74:22, 75:10, 75:14, 75:20, 76:19, 77:14, 77:15, 78:9, 79:4, 80:15, 80:19, 81:12, 81:15, 82:25, 83:1, 83:9, 83:22, 85:10, 85:12, 86:13,

87:13, 89:16, 96:22, 98:21, 100:15, 101:1, 102:10, 103:21, 103:23, 105:22, 106:9, 106:18, 113:24, 117:19, 229:7

**trials** [1] - 29:16

**tried** [2] - 4:25, 220:20

**tries** [2] - 159:13, 167:2

**trip** [4] - 178:23, 179:3, 183:7, 183:16

**trips** [1] - 62:1

**trouble** [7] - 44:17, 61:10, 86:18, 127:14, 128:5, 213:4, 214:4

**troubling** [1] - 162:25

**true** [13] - 78:20, 94:8, 96:15, 96:16, 100:20, 107:23, 107:24, 116:12, 160:12, 161:6, 161:8, 190:6, 224:25

**trust** [7] - 93:8, 115:25, 116:1, 176:1, 203:12, 213:20, 213:22

**truth** [1] - 80:9

**truthfulness** [2] - 160:10, 173:3

**try** [21] - 6:22, 8:18, 38:19, 44:18, 81:16, 82:10, 85:4, 111:9, 126:20, 148:11, 148:23, 149:19, 161:20, 163:5, 163:10, 164:18, 167:2, 168:7, 168:14, 182:23, 184:25

**trying** [19] - 20:2, 57:4, 80:13, 83:13, 98:5, 114:22, 150:5, 167:7, 167:16, 170:10, 174:25, 182:16, 182:23, 184:2, 184:9, 201:2, 207:3, 224:2, 228:1

**Tuesday** [1] - 70:12

**tune** [1] - 127:9

**Turkish** [1] - 110:11

**turn** [4] - 17:8, 85:14, 120:10, 215:22

**turned** [6] - 7:14, 184:8, 184:21, 188:17, 196:13, 197:13

**turning** [3] - 22:23,

153:7, 184:7

**turns** [2] - 127:15, 183:18

**tweak** [1] - 218:2

**twice** [6] - 46:10, 65:5, 102:1, 115:22, 168:10

**two** [65] - 3:1, 3:23, 5:4, 5:10, 6:8, 6:9, 8:15, 9:7, 9:13, 17:19, 18:1, 18:3, 26:9, 28:5, 34:5, 39:23, 43:9, 43:11, 43:24, 44:3, 46:8, 50:4, 55:18, 59:11, 63:19, 66:2, 69:3, 70:13, 79:24, 85:17, 104:12, 130:16, 140:14, 141:12, 141:13, 141:15, 146:24, 160:4, 177:8, 178:10, 178:12, 178:15, 178:16, 178:23, 178:24, 184:21, 184:24, 188:18, 189:15, 195:24, 196:2, 196:14, 196:15, 200:19, 208:13, 211:1, 214:19, 225:16, 225:21, 225:22, 226:3, 226:4, 226:9

**two-hour** [2] - 28:5, 184:21

**two-year-old** [1] - 211:1

**type** [5] - 12:25, 22:15, 52:4, 57:24, 102:4

**types** [3] - 5:10, 6:13, 215:10

**typical** [2] - 90:11, 101:22

**typically** [7] - 21:10, 22:6, 22:15, 77:14, 89:8, 92:7, 195:22

**typing** [1] - 172:24

**typos** [1] - 133:2

## U

**U.S** [5] - 125:3, 125:6, 127:21, 180:12, 183:12

**u.S** [1] - 230:12

**U.S.D.C.J** [1] - 1:12

**UATP** [1] - 215:7

**UI** [2] - 135:6, 135:11

**UK** [1] - 128:1

**ultimately** [3] - 11:13, 109:8, 196:16

**unable** [1] - 40:16

**unanimous** [1] - 85:1

**unauthorized** [1] - 138:15

**uncertainty** [1] - 150:2

**uncomfortable** [1] - 120:17

**unconsciously** [1] - 44:22

**under** [11] - 78:13, 79:8, 91:21, 167:5, 174:21, 181:12, 182:20, 183:17, 183:24, 196:5, 227:24

**underlying** [2] - 8:12, 24:4

**understandably** [1] - 113:5

**understood** [7] - 16:5, 18:21, 23:18, 32:6, 32:17, 34:24, 179:7

**unequivocally** [1] - 156:17

**unexpected** [1] - 86:17

**unfair** [2] - 75:7, 205:15

**unfairly** [1] - 80:1

**unfavorable** [3] - 47:18, 48:3, 50:17

**unfortunate** [1] - 32:8

**unfortunately** [6] - 21:2, 56:25, 135:7, 148:4, 161:10, 162:5

**unfriendly** [1] - 81:14

**unilateral** [1] - 8:7

**Union** [2] - 10:8, 10:18

**unique** [8] - 74:7, 134:15, 134:20, 190:3, 190:5, 191:11, 193:21, 194:4

**UNITED** [1] - 1:1

**United** [6] - 11:2, 35:7, 104:15, 104:23, 133:16, 133:17

**University** [1] - 72:22

**unlawfully** [3] - 38:17, 38:18, 80:1

**unless** [4] - 8:25, 11:6, 137:12, 220:5

**unpleasant** [1] - 69:13

**unquote** [1] - 138:5

**unsatisfactory** [1] - 31:7

**untagged** [1] - 162:10

**unusual** [2] - 66:17,

66:18

**up** [77] - 3:16, 7:9, 8:18, 9:7, 14:6, 15:24, 16:23, 19:24, 26:15, 28:12, 31:1, 31:2, 34:22, 36:17, 37:2, 37:5, 44:18, 48:6, 55:11, 57:16, 57:17, 58:5, 58:12, 64:12, 65:23, 67:4, 67:17, 72:5, 72:12, 72:15, 72:16, 76:18, 78:3, 82:7, 82:13, 90:9, 98:21, 104:7, 104:22, 105:20, 108:25, 113:9, 115:19, 118:12, 119:18, 120:10, 132:1, 133:14, 136:20, 137:20, 146:5, 146:8, 146:10, 149:24, 155:22, 157:5, 157:10, 162:3, 163:24, 165:6, 165:16, 172:8, 172:23, 176:16, 177:1, 184:7, 188:15, 195:3, 195:11, 195:16, 196:12, 203:2, 203:3, 207:14, 207:20, 214:18, 228:15

**upcoming** [1] - 66:20

**update** [4] - 98:4, 159:21, 182:21, 182:22

**updates** [1] - 214:15

**upgrade** [1] - 165:11

**upgraded** [1] - 197:9

**ups** [1] - 73:5

**upset** [1] - 69:21

**useful** [1] - 160:15

**usefully** [1] - 25:25

**user** [8] - 66:16, 106:16, 129:3, 133:5, 135:12, 214:25, 215:12, 215:17

**uses** [2] - 110:4, 216:2

## V

**vacation** [3] - 44:4, 55:20, 101:25

**vaccination** [1] - 127:23

**vague** [1] - 20:19

**validate** [2] - 159:19,

180:1
**validated** [1] - 159:20
**validating** [1] - 121:12
**validation** [1] - 185:15
**validations** [1] - 185:16
**valuable** [1] - 93:1
**value** [2] - 79:18, 126:19
**values** [2] - 160:17, 160:18
**valve** [1] - 184:1
**varies** [2] - 144:12, 150:12
**variety** [1] - 66:4
**various** [4] - 76:13, 103:16, 114:15, 202:3
**vast** [1] - 112:18
**vendor** [8] - 19:5, 21:14, 25:21, 105:25, 106:1, 110:3, 112:14
**vendors** [4] - 18:15, 18:24, 98:15, 99:23
**venire** [3] - 39:3, 73:17, 74:3
**verbal** [1] - 182:21
**verdict** [9] - 40:18, 75:17, 75:18, 75:23, 81:18, 84:25, 85:1, 85:2, 118:13
**verification** [17] - 5:12, 8:14, 159:22, 161:24, 163:24, 165:9, 165:17, 165:21, 165:24, 166:2, 166:5, 166:6, 166:8, 167:8, 216:10, 219:9, 219:14
**verifications** [2] - 167:18, 167:23
**verified** [5] - 148:3, 159:17, 160:6, 164:23, 166:11
**verify** [6] - 114:22, 114:24, 159:15, 160:1, 160:8, 165:15
**verifying** [1] - 160:5
**version** [2] - 186:23, 216:10
**versus** [3] - 7:13, 18:2, 193:20
**via** [4] - 131:24, 153:10, 170:24, 171:1
**video** [11] - 29:10, 29:18, 30:5, 88:6, 109:18, 109:24,

112:16, 122:20, 122:22, 123:3, 123:5
**view** [7] - 10:4, 11:18, 18:5, 26:3, 32:3, 76:2, 220:15
**viewed** [1] - 17:13
**views** [1] - 41:4
**violated** [5] - 4:17, 4:20, 74:24, 80:5, 84:11
**violates** [1] - 38:14
**violation** [2] - 75:10, 79:20
**virtual** [5] - 97:9, 97:14, 182:8, 219:23, 219:25
**virtue** [2] - 9:18, 9:19
**voice** [1] - 44:19
**void** [1] - 181:21
**voir** [1] - 24:25
**Volume** [1] - 1:7
**volume** [3] - 166:23, 170:23, 171:17
**volumes** [1] - 181:18
**volunteer** [1] - 48:18
**voucher** [1] - 206:7
**vouchers** [2] - 205:19, 205:24
**vs** [1] - 1:5

## W

**wage** [1] - 162:6
**wages** [1] - 162:18
**wait** [1] - 195:13
**waiting** [4] - 60:24, 118:21, 198:19
**walk** [3] - 16:14, 83:18, 117:2
**walked** [1] - 223:10
**wants** [9] - 26:14, 95:7, 102:4, 102:25, 103:2, 103:3, 103:7, 160:18, 114:9
**war** [1] - 20:1
**warm** [1] - 120:14
**warn** [1] - 126:5
**warner** [1] - 230:6
**Warner** [3] - 35:20, 161:11, 230:11
**warning** [4] - 137:18, 151:15, 182:8, 182:11
**warnings** [2] - 127:13, 170:11
**watch** [3] - 65:12, 82:5, 182:9
**water** [2] - 73:1
**waxman** [1] - 119:11

**Waxman** [1] - 35:16
**ways** [5] - 103:17, 130:16, 141:20, 142:13, 142:17
**web** [5] - 41:13, 126:4, 133:7, 133:14
**website** [120] - 86:12, 87:22, 88:1, 88:21, 88:25, 89:10, 89:25, 90:4, 90:9, 90:17, 90:18, 91:4, 92:3, 94:7, 94:10, 94:13, 94:16, 95:13, 98:14, 98:16, 101:25, 103:7, 106:20, 111:10, 121:2, 121:10, 125:21, 126:9, 126:12, 127:1, 127:5, 128:11, 128:22, 129:1, 129:7, 129:19, 129:20, 129:22, 130:16, 130:19, 130:20, 130:21, 130:23, 130:25, 131:1, 132:11, 132:25, 133:6, 135:5, 135:19, 136:17, 137:11, 137:22, 138:4, 138:15, 138:22, 138:25, 139:5, 139:13, 139:14, 139:22, 140:1, 140:5, 140:7, 140:11, 140:16, 142:12, 142:18, 142:20, 144:3, 148:23, 149:5, 149:23, 152:10, 152:17, 153:10, 153:14, 153:20, 154:5, 155:3, 155:8, 156:18, 156:22, 157:3, 158:15, 159:13, 170:9, 170:11, 172:11, 176:3, 179:23, 180:5, 181:11, 182:6, 182:17, 182:19, 182:20, 183:3, 183:9, 183:23, 183:24, 184:25, 195:23, 211:25, 215:2, 215:4, 221:1, 221:10, 221:19, 221:23, 221:24, 221:25, 222:4, 222:18, 223:7, 225:25, 228:2

**websites** [4] - 42:7, 92:23, 154:3, 155:2
**Wednesday** [2] - 3:18, 67:10
**week** [19] - 21:5, 44:4, 46:23, 53:6, 55:24, 55:25, 58:25, 62:3, 64:2, 64:16, 65:14, 70:14, 90:6, 92:24, 93:5, 98:20, 225:16, 228:14
**week-long** [1] - 64:2
**weekend** [1] - 162:7
**weekly** [2] - 66:15, 171:10
**weeks** [7] - 7:19, 224:12, 225:17, 225:21, 225:22, 226:3, 226:4
**weight** [1] - 57:10
**weighted** [2] - 10:2, 10:3
**welcome** [8] - 8:24, 35:6, 112:19, 136:17, 136:18, 138:2, 169:3
**well-known** [1] - 87:7
**Westlaw** [1] - 11:2
**whereas** [1] - 196:6
**whereby** [1] - 121:11
**White** [2] - 203:14, 214:18
**white** [2] - 218:21, 219:21
**whole** [10] - 5:19, 6:20, 7:12, 11:1, 30:11, 59:2, 125:14, 195:12, 210:18, 210:19
**widely** [1] - 87:5
**widespread** [1] - 86:18
**widest** [1] - 99:8
**wife** [14] - 46:21, 50:24, 51:2, 51:9, 56:18, 57:4, 57:21, 63:18, 63:19, 70:11, 71:4, 179:4, 208:11, 208:12
**William** [2] - 1:11, 35:15
**WILLIAM** [1] - 1:21
**willing** [1] - 229:15
**Wilmington** [2] - 64:19, 87:15
**wise** [1] - 120:11
**wish** [3] - 73:10, 119:19, 215:13
**wishes** [1] - 10:24
**WITNESS** [27] -

109:22, 122:5, 123:1, 123:16, 124:19, 150:8, 158:22, 158:25, 160:19, 160:21, 160:23, 169:1, 172:18, 172:20, 172:22, 180:22, 181:6, 181:8, 184:24, 187:11, 192:15, 192:17, 194:1, 194:5, 197:7, 225:24, 228:24
**witness** [40] - 9:11, 9:13, 9:16, 9:22, 9:23, 10:4, 10:6, 11:5, 11:6, 12:21, 13:6, 15:17, 15:20, 18:7, 19:19, 20:13, 24:24, 26:4, 26:11, 27:7, 29:18, 33:19, 34:9, 41:24, 48:19, 55:7, 77:2, 77:3, 77:6, 77:13, 77:14, 77:18, 78:1, 78:3, 84:5, 84:7, 120:18, 121:24, 122:7, 164:7
**witness's** [6] - 10:10, 76:3, 76:24, 76:25, 77:1, 77:3
**witnesses** [12] - 14:24, 26:10, 75:24, 76:6, 77:9, 77:20, 77:21, 84:4, 86:9, 87:18, 94:6, 106:23
**woman** [1] - 66:4
**won** [1] - 53:15
**wonder** [1] - 72:11
**wondering** [1] - 25:3
**word** [7] - 26:18, 78:6, 116:4, 202:23, 208:4, 214:3, 214:5
**words** [10] - 17:14, 80:18, 116:5, 125:24, 128:19, 128:21, 128:25, 140:14, 159:14, 175:25
**worker** [1] - 56:6
**works** [9] - 15:13, 83:5, 87:23, 88:17, 98:1, 106:12, 133:3, 193:14, 208:9
**world** [6] - 19:8, 105:12, 133:13, 147:11, 194:13, 219:13
**worry** [2] - 80:13, 184:1
**worse** [2] - 117:16,

170:12
**worst** [2] - 44:19, 182:18
**worth** [1] - 113:1
**worthy** [1] - 57:23
**wrap** [1] - 98:21
**write** [2] - 136:16, 190:24
**writing** [1] - 40:3
**written** [3] - 139:9, 140:17, 169:24
**wrongful** [1] - 80:3
**wrote** [2] - 11:16, 127:13
**WSFS** [1] - 69:9
**www.ryanair.com** [1] - 131:1
**Wyatt** [3] - 203:25, 207:14, 209:20

## Y

**year** [41] - 3:4, 3:18, 4:13, 6:18, 6:20, 7:6, 8:13, 10:19, 46:9, 46:10, 62:2, 65:13, 92:19, 92:22, 102:1, 102:22, 113:21, 115:23, 117:20, 124:14, 124:23, 125:4, 125:5, 125:6, 130:11, 141:12, 144:23, 147:19, 160:3, 167:15, 168:1, 170:23, 173:17, 174:4, 177:13, 200:11, 202:25, 203:1, 211:1, 227:6
**years** [24] - 5:4, 49:13, 49:16, 50:9, 50:12, 50:15, 53:16, 64:14, 64:19, 65:21, 68:11, 68:24, 71:20, 73:4, 98:12, 112:3, 113:9, 116:19, 116:22, 177:14, 177:16, 227:5, 227:9
**yeses** [5] - 43:5, 44:10, 46:15, 68:5, 68:6
**yesterday** [1] - 65:16
**York** [4] - 177:7, 178:15, 178:16, 202:6
**yourself** [4] - 113:17, 165:15, 178:19, 228:4
**yourselves** [1] - 82:16

## Z

**Z-E-N** [1] - 172:18
**Zen** [9] - 172:15, 172:16, 172:21, 226:19, 226:22, 227:15, 227:17, 227:21, 228:3
**ZEN** [1] - 172:19
**zero** [6] - 43:4, 43:7, 43:10, 92:12, 100:9, 227:11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RYANAIR DAC, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 20-1191-WCB |
| | § | |
| v. | § | |
| | § | |
| BOOKING.COM B.V., | § | |
| | § | |
| *Defendant*. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

After a four-day trial, the jury returned a verdict against Defendant Booking.com B.V. ("Booking.com") on Count II and Count IV of the Amended Complaint filed by Plaintiff Ryanair DAC ("Ryanair"). Following the entry of judgment on the jury's verdict, Booking.com filed a renewed motion for judgment as a matter of law or in the alternative for a new trial. Dkt. No. 466. Ryanair filed a motion for a permanent injunction. Dkt. No. 483. For the reasons explained below, Booking.com's renewed motion for judgment as a matter of law is granted. Ryanair's motion for a permanent injunction is denied as moot.

## I.    BACKGROUND

Ryanair is an Irish airline company based in Dublin that offers low-fare flights in Europe and North Africa. On September 4, 2020, Ryanair filed this action against five defendants: Booking.com, Priceline.com LLC ("Priceline"), Agoda Company Pte. Ltd. ("Agoda"), Kayak Software Corporation ("KAYAK"), and Booking Holdings, Inc. ("Booking Holdings"). Dkt. No. 1. The case was initially assigned to Judge Stark, but later re-assigned to me.

All five defendants are online travel agents ("OTAs"), which sell airline tickets to customers over the Internet. In its complaint, Ryanair alleged that each of the defendants, either

Appx396

directly or through their vendors, violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by using Ryanair's website without authorization or in excess of their authorized access. Ryanair characterized the defendants' unauthorized use as "screen scraping," i.e., using an "automated system or software . . . to extract any data from [Ryanair's] website for commercial purposes," such as selling Ryanair flights on websites other than Ryanair's. *Id.* ¶ 49. According to the complaint, Ryanair "developed a program called Shield that blocks unauthorized third parties such as the Defendants from scraping the Ryanair Website and selling Ryanair inventory" on their own websites. *Id.* ¶ 95. According to Ryanair's allegations, the defendants circumvented the Shield program and continued to sell Ryanair flights, even after Ryanair sent cease-and-desist letters to the defendants directing them to stop their screen-scraping activities. *Id.* ¶¶ 97–110.

Booking Holdings, KAYAK, and Priceline are Delaware citizens; Agoda is a Singaporean private limited company with its principal place of business in Singapore; and Booking.com is a Dutch company with its principal place of business in Amsterdam. *Id.* ¶¶ 4–11. During the time that Judge Stark was presiding over this case, the defendants filed a motion to dismiss, asserting the doctrine of *forum non conveniens* and also arguing that Ryanair seeks impermissible extraterritorial application of the CFAA. *See* Dkt. No. 17. Judge Stark rejected both arguments and denied the motion. Dkt. No. 42. Regarding the defendants' argument on extraterritoriality, Judge Stark held that "Congress indicated a clear intent for the CFAA to apply extraterritorially." *Id.* at 16. In March 2022, this case was re-assigned to me.

On July 22, 2022, Ryanair filed an Amended Complaint asserting five counts under the CFAA. Dkt. No. 76. Specifically, Ryanair alleged that all defendants violated:

2

- Section 1030(a)(2)(C), which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected computer." (Count I).

- Section 1030(a)(4), which prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." (Count II).

- Section 1030(a)(5)(A), which prohibits "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." (Count III).

- Section 1030(a)(5)(B), which prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage"; and section 1030(a)(5)(C), which prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss." (Count IV).

- Section 1030(b), which prohibits conspiring or attempting to commit a violation of any of the other provisions of section 1030(a). (Count V).

The Amended Complaint additionally alleged that "[t]o book a Ryanair itinerary, a person must create a myRyanair account and be accepted by Ryanair," and that "Ryanair implemented the myRyanair procedure to, in part, stop unauthorized persons and entities from accessing the Ryanair Website." *Id*. ¶¶ 93, 96.

3

On the defendants' motion to dismiss the Amended Complaint for failure to state a claim, I dismissed Count III but denied the motion as to the remaining counts. Dkt. No. 105. I rejected the defendants' argument that Ryanair may not rely on a theory of vicarious or indirect liability under the CFAA, as well as their argument that Ryanair had not adequately alleged such liability. *See id*. at 7–14. I held that Ryanair "adequately plead[ed] vicarious, or indirect, liability on a 'direct, encourage, or induce' theory" by alleging that the defendants contracted with third parties (including Etraveli, a vendor partnered with Booking.com to offer flights) to access Ryanair's website without authorization on the defendants' behalf. *Id*. at 12–13. The defendants then filed an answer, asserting five counterclaims: (1) tortious interference with business relations; (2) unfair competition; (3) defamation; (4) trade libel; and (5) deceptive trade practices. Dkt. No. 111.

On cross-motions for summary judgment, I addressed the meaning of the term "without authorization" under the CFAA. I held that because "any user can access any page on Ryanair's website without any prior authorization (except for the final payment page of the myRyanair portion of the website) . . . the defendants' access to the Ryanair website is not 'without authorization' as that term is used in the CFAA." Dkt. No. 399 at 13. But because "the payment page of the myRyanair portion of the Ryanair website . . . uses an authorization scheme that permits some users to create accounts but blocks others," I held that "if the defendants accessed the password-protected portion . . . after Ryanair issued cease-and-desist letters to them, they could be found liable for accessing myRyanair 'without authorization' within the meaning of 18 U.S.C. § 1030(a)." *Id*. at 19–20.

Although genuine issues "remain[ed] as to whether the defendants have accessed the password-protected portion of Ryanair's website, either directly or vicariously," it was undisputed that there is no information on the payment page of the myRyanair portion of the website "other

4

Appx399

than the information input by the user, such as credit card numbers or the like." *Id*. at 20. The defendants therefore could not be held liable under section 1030(a)(2)(C), which requires "not only a showing of unlawful access, but also a showing that the unlawful access resulted in obtaining information from a protected computer." *Id*. I therefore granted summary judgment to the defendants on Count I and also on Count V, to the extent that count relied on the offense set forth in Count I as the offense underlying the conspiracy. *Id*. at 20–21. I denied summary judgment as to Ryanair's remaining claims, and I denied summary judgment as to the defendants' counterclaims on the ground that the defendants had raised genuine issues of material fact with regard to those counterclaims.

On June 26, 2024, less than a month before trial, Ryanair dismissed its claims against Booking Holdings, Priceline, and Agoda. Dkt. No. 403. A jury trial was held from July 15, 2024, to July 18, 2024.[1] *See* Dkt. Nos. 500–503. On July 17, 2024, in the course of trial, the parties filed a stipulation of dismissal of all claims against KAYAK.[2] Dkt. No. 446. On July 18, 2024, before the jury began deliberating, the parties also stipulated to dismiss the trade libel counterclaim asserted by the sole remaining defendant, Booking.com. Dkt. No. 455.

The jury returned a verdict in Ryanair's favor on Count II (accessing a protected computer with intent to defraud) and Count IV (accessing a protected computer without authorization and recklessly causing damage or causing damage and loss) of the Amended Complaint. Dkt. No. 457 at 2–3. The jury awarded $5,000 to Ryanair as the amount of "actual economic harm caused by Booking.com violating the [CFAA]." *Id*. at 4.

---

[1] References to the trial transcript will include the trial day ("TD1" through "TD4") and the page and line numbers of the transcript for that day. The trial transcripts can be found in docket entries 500 through 503.

[2] I approved the joint stipulation and dismissed the claims against KAYAK with prejudice on July 18, 2024. Dkt. No. 451.

The jury, however, found that Ryanair did not "prove by a preponderance of the evidence that Booking.com entered into a conspiracy with Etraveli to intentionally access the myRyanair portion of Ryanair's website in violation of the [CFAA]," as required to establish liability under Count V. *Id*. at 3. The jury also found that Booking.com did not prove defamation, unfair competition, tortious interference with business relations, and deceptive trade practices by a preponderance of the evidence. *Id*. at 5.

Booking.com filed a renewed motion for judgment as a matter of law and in the alternative, a motion for a new trial, Dkt. No. 466, and Ryanair filed a motion for permanent injunction, Dkt. No. 483. I held an oral argument on both motions, after which the parties filed supplemental letter briefs at my request.[3] *See* Dkt. Nos. 505–510, 515.

## II.    LEGAL STANDARD

Judgment as a matter of law under Federal Rule of Civil Procedure 50(b) may be granted "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (quoting *Powell v. J.T. Posey Co.*, 766 F.2d 131, 133–34 (3d Cir. 1985)) (internal quotation marks omitted). "Although judgment as a matter of law should be granted sparingly, more than a scintilla of evidence is needed to sustain a verdict." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004).

In assessing the sufficiency of the evidence, the "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Credibility

_____

[3] The page numbers cited for the parties' briefs correspond to the page numbers at the bottom of the document, not those of the CM/ECF header.

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id*. (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). In addition, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 151.

## III.   DISCUSSION

Booking.com raises four issues in its renewed motion for judgment as a matter of law ("JMOL"). It contends (1) that it was improper to apply the CFAA to Booking.com in this case because the CFAA, at least as applied to the facts of this case, should not be given extraterritorial application; (2) that Ryanair failed to prove that it suffered a loss of at least $5,000 in any one-year period, as is required to establish civil liability under the CFAA under the statutory provisions invoked by Ryanair in this case; (3) that Ryanair did not prove that Booking.com caused damage to Ryanair as a result of intentionally accessing a protected Ryanair computer without authorization; and (4) that the evidence did not support the jury's verdict that that Booking.com, acting with fraudulent intent, induced a third party to access the myRyanair portion of Ryanair's website and thereby obtained something of value—the use of the myRyanair portion of Ryanair's website, which had a value of $5,000 or more in a one-year period. Booking.com's contentions are each addressed below.

### A.   Extraterritorial Application of the CFAA

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417 (2023) (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010)) (internal quotation marks omitted). This principle is referred to as the "presumption against extraterritoriality." *Id*.

7

Appx402

"Applying the presumption against extraterritoriality involves a two-step framework." *Id.* (quoting *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 337 (2016)) (internal quotation marks omitted). "At step one, we determine whether a provision is extraterritorial, and that determination turns on whether Congress has affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct." *Id.* at 417–18 (quoting *RJR Nabisco*, 579 U.S. at 335, 337) (internal quotation marks omitted). "If Congress has provided an unmistakable instruction that the provision is extraterritorial, then claims alleging exclusively foreign conduct may proceed, subject to the limits Congress has (or has not) imposed on the statute's foreign application." *Id.* at 418 (quoting *RJR Nabisco*, 579 U.S. at 337–338) (internal quotation marks omitted).

"If a provision is not extraterritorial, we move to step two, which resolves whether the suit seeks a (permissible) domestic or (impermissible) foreign application of the provision." *Id.* "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *RJR Nabisco*, 579 U.S. at 337. "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *Abitron*, 600 U.S. at 418 (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413–14) (2018)) (internal quotation marks omitted). Thus, if the analysis ends at step one, there is no need to consider whether the conduct relevant to the statute's focus occurred in the United States. *See RJR Nabisco*, 579 U.S. at 342 ("[O]nly at the second step of the inquiry do we consider a statute's 'focus.'").

8

Courts have concluded at the first step of this framework that "the text of the CFAA provides a clear indication of extraterritorial application," citing the definition of a "protected computer" under the CFAA. *See In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 448 (N.D. Cal. 2018); *United States v. Gasperini*, 729 F. App'x 112, 114 (2d Cir. July 2, 2018) ("There is a strong argument that § 1030(a)(2) applies extraterritorially."); *Ryanair DAC v. Expedia Inc.*, No. C17-1789, 2018 WL 3727599, at *2 (W.D. Wash. Aug. 6, 2018) ("The CFAA gives a clear, affirmative indication that its civil provision applies extraterritorially, and the presumption against extraterritoriality has accordingly been rebutted.") (cleaned up); *United States v. Ivanov*, 175 F. Supp. 2d 367, 375 (D. Conn. 2001) ("Congress has the power to apply its statutes extraterritorially, and in the case of [the CFAA], it has clearly manifested its intention to do so.").[4] That is, courts have held that the CFAA definition of a "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States," 18 U.S.C. § 1030(e)(2)(B), is "as clear an indication as possible short of saying 'this law applies abroad.'" *In re Apple*, 347 F. Supp. 3d at 448 (quoting *Expedia*, 2018 WL 3727599, at *2). In *Ivanov*, the district court also cited the CFAA's definition of a "governmental entity" as "the Government of the United States, any State or political subdivision of the United States, any foreign country, and any state, province,

---

[4] In its supplemental briefing, Booking.com cites *In re Apple* to argue that whether the CFAA applies extraterritorially depends "on the facts of [each] case." *See* Dkt. No. 515 at 2 (emphasis removed). Booking.com then distinguishes *In re Apple*, *Ivanov*, *Gasperini*, and *Expedia* as cases in which either the defendant or the victim was a domestic entity. *See id*. However, none of those cases held that it was necessary for the defendant or the victim to be a domestic entity in order for the CFAA to apply extraterritorially. The courts' analysis of whether Congress provided a clear indication of extraterritorial application turned solely on the language of the CFAA (and any supporting legislative history).

9

municipality, or other political subdivision of a foreign country" as supportive of the conclusion that Congress intended for the statute to apply extraterritorially. *See* 175 F. Supp. 2d at 374 (referring to 18 U.S.C. § 1030(e)(9)).

In this case, when all the originally named defendants raised arguments about extraterritoriality, Judge Stark held that the CFAA applied extraterritorially. Dkt. No. 42 at 15. Consistent with the case law cited above, Judge Stark held that the definition of a "protected computer" as including "computers located outside the United States" was "clear, affirmative indication" that the CFAA applies extraterritorially.[5] *Id.* And by resolving the extraterritoriality issue at step one, Judge Stark did not need to engage in the analysis at step two. *See id.*

Booking.com now raises new arguments about extraterritoriality as a basis for seeking judgment as a matter of law. In its opening brief, Booking.com argues that "Ryanair's case at trial was reduced to a dispute between two European companies over flights solely offered in Europe and North Africa, booked exclusively through a European third-party vendor that was not a party to the litigation . . . pursuant to a contract governed by Netherlands law." Dkt. No. 467 at 6 (internal citations omitted). According to Booking.com, the evidence at trial as involved "an alleged foreign perpetrator (Booking.com), an alleged foreign victim (Ryanair), alleged unlawful access and computer harm abroad (Ryanair computers in Europe that host Ryanair's website), and an alleged foreign instrumentality (Etraveli)." *Id.* at 10. Booking.com thus argues that it is entitled

---

[5] In a footnote addressing the defendants' assertion that Ryanair "seeks to apply the CFAA . . . to alleged conduct by foreign actors to a foreign website causing foreign harm," Judge Stark held that the defendants did not accurately characterize Ryanair's allegations. Dkt. No. 42 at 16 n.12. Judge Stark pointed out that "Ryanair charges that three Delaware companies, along with two foreign companies in the same corporate family, engaged in conduct that violates the CFAA – some of which conduct (e.g., using data obtained by screen scraping) may have occurred in the United States for websites that are accessible in the United States." *Id.* However, Judge Stark did not rely on the allegation of possible domestic conduct as the basis for finding clear, affirmative indication of extraterritorial application of the CFAA at step one. *See id.*

to judgment as a matter of law because Ryanair "failed to make a showing a trial supporting the extraterritorial application of the CFAA." *Id*. at 4.

In response, Ryanair first argues that "Booking.com's extraterritoriality argument is not properly raised in a motion under Rule 50(b) or 59, where the issue was not presented to the jury at trial and the motion merely seeks to relitigate pure issues of law." Dkt. No. 489 at 3. It is well settled that a court can reconsider a purely legal issue—on summary judgment or otherwise—in addressing a Rule 50(b) motion, as long as the issue was timely raised in a Rule 50(a) motion. Rule 50(b) specifically provides that if a court "does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Thus, purely legal questions, including questions previously addressed at summary judgment, can be raised in a Rule 50(b) motion as long as they have been raised in a Rule 50(a) motion at trial. *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1085 n.9 (9th Cir. 2009); *K&T Enters., Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 175 (6th Cir. 1996); *Chesapeake Paper Prods. Co. v. Stone & Webster Eng'g Prods. Co.*, 51 F.3d 1229, 1236 (4th Cir. 1995); *ART+COM Innovationpool GmbH v. Google Inc.*, No. 1:14-cv-217, 2016 WL 10033420 (D. Del. Sept. 9, 2016) (Dyk, Circuit Judge, sitting by designation); 9 James Wm. Moore, Moore's Federal Practice §50.05[3] (3d ed. 2024) ("[J]udgment as a matter of law may be granted on purely legal issues when unrelated to the sufficiency of the evidence."). The extraterritoriality issue as it pertains to Booking.com was raised by Booking.com in its Rule 50(a) motion and therefore was properly raised in Booking.com's Rule 50(b) motion.[6]

---

[6] In support of its argument that "'[p]ure questions of law unrelated to the sufficiency of the trial evidence' are not appropriate in a Rule 50(a) or (b) motion," Ryanair cites *Lawson v. Sun*

On the merits of the extraterritoriality issue, Ryanair responds that Booking.com's arguments "go to whether Ryanair's claims are a domestic application of the CFAA, which is Step 2 of the extraterritoriality analysis," and that the court need not consider that step "because Congress expressly indicated that the CFAA does apply extraterritorially as long as 'a [protected] computer located outside the United States . . . is used in a manner that affects interstate or foreign commerce or communication of the United States.'" Dkt. 489 at 8 (quoting 18 U.S.C. § 1030(e)(2)(B)).  Ryanair asserts that its "website—*i.e.*, the protected computer in question— clearly affects interstate or foreign commerce of the United States because the evidence shows that Ryanair has sold a large number of flights to United States customers through its website." *Id.* at 7.

Booking.com replies that "the evidence at trial fails to support application of the CFAA in this case either under Step 1 (authorized extraterritorial application) or Step 2 (permissible domestic application)."  Dkt. No. 496 at 6.  Regarding the evidence of Ryanair flights sold to United States customers, Booking.com argues that Ryanair has not connected those numbers "to

---

*Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). Dkt. No. 489 at 4.  *Lawson* does not support Ryanair's position.  While addressing arguments about waiver, the Seventh Circuit held in *Lawson* that "although a Rule 50 motion ordinarily is required to preserve a challenge to the sufficiency of the trial evidence, questions of contract interpretation are different," and that because "[t]hey involve pure questions of law unrelated to the sufficiency of the trial evidence, . . . it's not necessary for summary-judgment losers to relitigate purely legal issues of contract interpretation in a motion under Rule 50(a) or (b)."  791 F.3d at 761 (internal citations omitted).  That a pure question of law need not be argued again in a Rule 50 motion to preserve that legal issue for appeal, a proposition that is clearly correct, *see Dupree v. Younger*, 598 U.S 729, 736 (2023), does not mean that it is improper to raise such an argument in a Rule 50 motion.  That is particularly true in this instance where Booking.com argues that the question of extraterritoriality is factual in nature and where Booking.com's argument is based in part on the fact that immediately before and during trial, all the U.S.-based defendants were dismissed from the case.  In that setting, Booking.com would have risked waiving the issue if it had not raised the matter in Rule 50(a) and Rule 50(b) motions.  *See Ortiz v. Jordan*, 562 U.S. 180, 185 (2011); *Kars 4 Kids Inc. v. America Can!*, 8 F.4th 209, 216 n.3 (3d Cir. 2021) (*quoting Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 186–87 (3d Cir. 2015)).

12

the conduct and harms claimed in this case, or even to Booking.com," and that "[i]n fact, Ryanair has not connected a *single* Ryanair flight sold to a U.S. customer to any alleged Loss." *Id.* at 6–7 (emphasis in original).

Booking.com has provided no justification for departing from Judge Stark's conclusion on the first motion to dismiss that the text of the CFAA provides clear, affirmative indication of its extraterritorial application. The CFAA's definition of a "protected computer" does not simply refer to "foreign commerce," which would be insufficient by itself to rebut the presumption against extraterritoriality. *See In re Apple*, 347 F. Supp. 3d at 449; *see also Abitron*, 600 U.S. at 420 ("When applying the presumption, we have repeatedly held that even statutes . . . that expressly refer to '*foreign* commerce' when defining 'commerce' are not extraterritorial.") (quoting *Morrison*, 561 U.S. at 262–63) (internal quotation marks omitted) (emphasis in original). Instead, the definition expressly includes computers "located outside of the United States," similar to language found in provisions of the RICO statute and the Securities Exchange Act that have been held to apply extraterritorially. *See RJR Nabisco*, 579 U.S. at 338 (finding extraterritorial application based on statutory language referring to offenses that "tak[e] place outside of the United States" and conduct that "occurred outside the United States") (quoting 18 U.S.C. § 1957(d)(2) and § 1203(b)); *Morrison*, 561 U.S. at 264–65 (finding a "clear statement of extraterritorial effect" in section 30(a) of the Securities Exchange Act, which refers to "an exchange not within or subject to the jurisdiction of the United States"). "While the presumption [against extraterritoriality] can be overcome only by a clear indication of extraterritorial effect, an express statement of extraterritoriality is not essential." *RJR Nabisco*, 579 U.S. at 340.

Booking.com notes that by the time this case was submitted to the jury, all the U.S.-based defendants had been dismissed from the case, and the action at that point involved only a non-U.S.

plaintiff suing a non-U.S. defendant over conduct affecting a computer based outside the U.S. Under those circumstances, Booking.com argues, this action should not be subject to the CFAA even if the CFAA is ordinarily given extraterritorial application.

The question whether a particular extraterritorial statute applies to particular foreign activities depends on the limits that Congress has imposed on the statute's foreign application. *Abitron*, 600 U.S. at 418. In the case of the CFAA, the limit on extraterritoriality is found also in the definition of a "protected computer," which includes a computer located outside the United States that is used in a manner that "affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2)(B). In other words, the CFAA does not apply extraterritorially in all cases involving a computer "located outside the United States." It applies only if the computer in question is one whose use affects interstate or foreign commerce or communication.

There was evidence at trial that the Ryanair website—the computer at issue in this case— was used in a way that affects interstate or foreign commerce or communication of the United States. The Chief Technology Officer of Ryanair, John Hurley, testified that there were about five million Ryanair flights sold to U.S. customers in 2023, and that the figure for 2024 was heading towards 2 million flights by July 2024.[7] *See* TD1 at 125:3–7. Booking.com's argument that Mr. Hurley's testimony is insufficient to establish extraterritoriality in this case, *see* Dkt. No. 515 at 2, fails.

Booking.com objects that Mr. Hurley's testimony is not specific to flight reservations made by Booking.com. *See id.* ("Ryanair never introduced into evidence a single flight reservation made

---

[7] Booking.com incorrectly characterizes Mr. Hurley's testimony as stating that Ryanair sold 5 million flights to U.S. customers from July 2023 to July 2024. *See* Dkt. No. 515 at 2 n.4.

by Booking.com for a U.S.-based customer, inside or outside the Loss period."). But nothing in the plain language of the CFAA makes the definition of a "protected computer" turn on the defendant's conduct. Indeed, the court held in *In re Apple* that "[w]hile [the defendant] rightly points out that the computer must be 'used in a manner that affects interstate or foreign commerce or communication of the United States,' Plaintiffs satisfy this element with the allegation that their devices 'are used in interstate commerce and/or communication.'" 347 F. Supp. 3d at 449 (internal citations omitted). The court did not require the plaintiffs to allege that the effect on interstate commerce or communication stemmed from the defendant's conduct.

Accordingly, the CFAA applies extraterritorially, and Ryanair's claims fall within the scope of extraterritoriality that Congress established. Moreover, the evidence supports Ryanair's contention that the statutory requirement that the protected computer affected interstate or foreign commerce of the United States.[8] I therefore reject Booking.com's argument that JMOL should be granted based on Ryanair's failure to prove that the CFAA should be applied extraterritorially in this case.

### B. Proof of $5,000 or More of Loss in a One-Year Period Attributable to Booking.com

The CFAA provides that a civil action for a violation of its provisions "may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of the subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g). The parties agree that the only relevant factor in this case is the first factor, which requires "loss to 1 or more persons during any 1-year period . . .

---

[8] Booking.com asserts in a footnote in its opening brief that "the Foreign Commerce Clause provides a constitutional safeguard as well, disallowing the application of federal statutes to circumstances with an insufficient connection to the United States." Dkt. No. 467 at 9 n.8. As Ryanair points out, however, "Booking.com failed to raise this argument in its Rule 50(a) motion and may not raise it now." Dkt. 489 at 9; *see also* Dkt. No. 448 (Booking.com's 50(a) motion for judgment as a matter of law).

aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I); *see also* Dkt. No. 399 at

21. Thus, Booking.com cannot be held civilly liable for violating *any* provision of the CFAA

absent a "loss" of at least $5,000 in a one-year period, attributable to Booking.com.

      The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of

responding to an offense, conducting a damage assessment, and restoring the data, program,

system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or

other consequential damages incurred because of interruption of service." 18 U.S.C.

§ 1030(e)(11). That definition of loss "focus[es] on technological harms." *Van Buren v. United

States*, 593 U.S. 374, 392 (2021).

      After being provided the CFAA definition of "loss," the jury was instructed that "the cost

of responding to an offense may be considered a loss even if no actual technological harm has

occurred, as long as the response is directed at technological harm, such as preventing an

impending unauthorized access or investigating the method by which an offender accessed the

computer, rather than business or other harms, such as investigating how the offender used the

access for commercial gain." Dkt. No. 453 at 5. The jury was further instructed that they "should

not offset any losses by any profits Ryanair may have received as a result of Booking.com's

actions," and that "[l]osses do not include any costs that are not borne by Ryanair." *Id.*

      The one-year period for which Ryanair sought to establish loss at trial was the period from

March 1, 2022, to February 28, 2023. *See* TD4 at 885:6–9 (Ryanair's closing argument that it

established "technological losses of at least $5,000" from "March 1, 2022, to February 28th of

2023"). Ryanair claimed approximately $177,000 in total losses attributable to Booking.com

during that period, based on four categories of costs: (1) the cost of online verification ($9,912);

(2) the cost of customer service agents ($112,000); (3) the cost of hosting Shield ($5,361.67); and

(4) the cost of payments made to Navitaire, a passenger service system company ($49,234). *See* TD4 at 885:5–13.[9]  To calculate each category of loss, Ryanair relied on Mr. Hurley's testimony that: (1) Ryanair sold 78,300,879 flights between the beginning of March 2022 and the end of February 2023; (2) twenty-three percent of those flights were booked through OTAs (i.e., 18,416,864 flights); and (3) 2.8% of OTA bookings were made by Booking.com (i.e., 518,826 flights).[10]  *See* TD1 at 144:2–146:20.

The jury found that Ryanair "prove[d] by a preponderance of the evidence that Booking.com's violation of the CFAA caused Loss to Ryanair totaling at least $5,000 during a one-year period." Dkt. No. 457 at 2.  Booking.com argues that because the evidence of loss that was introduced at trial was "entirely speculative, and by any reasonable calculation totaled—at most—$2,457.72, Ryanair failed to establish the required $5,000 of Loss, and judgment as a matter of law is required for Booking.com." Dkt. No. 467 at 11.  I address below the sufficiency of the evidence for each category of loss claimed by Ryanair.

### 1.  Online Verification Costs

At summary judgment, Ryanair argued that OTAs provided "corrupted data" in the form of "fake" customer information (such as customer email addresses and payment methods) and that

---

[9]  Ryanair's counsel used rounded figures at closing argument.  The dollar amounts in parentheses are based on testimony at trial.

[10]  Booking.com does not contest that it sold 518,826 Ryanair flights between March 1, 2022, and February 28, 2023. *See* Dkt. No. 467 at 13.  However, Booking.com argues that Ryanair "failed to introduce reliable evidence to establish the number of total Ryanair OTA bookings during the [loss] period . . . from which any percentage attributed to Booking.com could be derived." *Id.*  But that argument merely challenges the credibility of Mr. Hurley, who testified that twenty-three percent of Ryanair flights were purchased by OTAs from March 1, 2022, to February 28, 2023, a percentage he determined from counting the number of reservations that were tagged as made by an OTA. *See* TD1 at 144:22–145:9 ("Our intelligence team runs reports every night and they will tag all the reservations that were made by an OTA and they stay tagged and we count the tags.").  A motion for judgment as a matter of law does not allow the court to make credibility determinations. *See Reeves*, 530 U.S. at 150.

17

the costs of verification procedures adopted to restore data integrity qualified as a loss under the CFAA. *See* Dkt. No. 399 at 31. Among the "costly customer verification procedures" that Ryanair identified were an online verification procedure and the use of customer service agents.[11] *Id.*

Several witnesses at trial testified about the nature of customer information transmitted to the Ryanair database when a customer purchases a flight through Booking.com. Mr. Hurley, whose team built and maintains the Ryanair's website, testified that "OTAs like Booking.com" create problems with "data integrity, because they give [Ryanair] false e-mail addresses [and] the wrong credit card details."[12] TD1 at 140:12–19; *id.* at 158:25–159:3 ("The data integrity, so the false e-mail addresses and the false credit card details, the data we have in the database is not accurate. That is the issue we have."). Mr. Hurley testified that receiving "false" email addresses or payment methods interfered with processing refunds and communicating with passengers, which was sometimes necessary to meet flight safety regulations. *Id.* at 141:4–142:1.

Dana Brady, Ryanair's Chief Marketing Officer, testified that Ryanair regarded as "fake" any information that Ryanair did not believe belonged to the customer. TD3 at 714:16–25. Mr. Brady further testified that he knew OTAs provided "fake" customer information to Ryanair based on "customer feedback, thousands of customers calling our call center," as well as through

---

[11] Other procedures that Ryanair identified at summary judgment were "an in-person customer verification procedure" and the use of "digital employees." Dkt. No. 399 at 31. Ryanair, however, introduced no evidence regarding such digital employees at trial. And Mr. Hurley's testimony about in-person verification costs was excluded following objections that Mr. Hurley's testimony was hearsay and was not based on first-hand knowledge. *See* TD1 at 159:22–165:7. Ryanair's loss calculation in its closing argument and post-trial briefing does not include the cost of digital employees or in-person verification.

[12] Mr. Hurley's testimony that OTA traffic also caused "slowdowns" to the website was stricken from the record by agreement of the parties. *See* TD1 at 142:17–143:14; *id.* at 221:25–222:14; Dkt. No. 423 at 15 ("Neither side will introduce evidence or argument at trial about outages, spikes, or slowdowns on the Ryanair website, with the exception of the October 2023 Monex incident, about which the Parties continue to disagree.").

test bookings Ryanair made on OTA websites. *Id*. at 715:5–19. According to Mr. Brady, Ryanair started conducting test bookings "roughly every six weeks" from mid-2020 onwards, and Booking.com was sometimes included in the test bookings, although not always. *Id*. at 715:20–716:10. The test bookings revealed that "[in] many instances . . . the e-mail address or the contact information isn't the customer's," and "nearly in all cases [Ryanair] never get[s] the accurate customer payment details." *Id*. at 716:23–717:3. That is, the information Ryanair received did not match the information Ryanair entered on the OTA websites for the test bookings. When asked whether those discoveries were "regarding Booking.com or all of [Ryanair's] OTA testing," Mr. Brady replied, "I would put Booking.com in that." *Id*. at 717:5–7.

Iain Lopata, Ryanair's expert in computer systems and data security, testified that when he made ten test bookings on Booking.com's website between the end of June and the beginning of July 2023, *see* TD2 at 375:11–25, none of the email addresses and payment methods Ryanair received matched what he entered on Booking.com's website as the customer. Whereas all email addresses he provided to Booking.com ended with the domain "fair-opinion.com," none of the emails that Ryanair received as the customer's email ended in that domain.[13] *Id*. at 380:10–14; *see also* PTX 55. In addition, none of the payment methods that Ryanair received matched the American Express credit card numbers that Mr. Lopata used to book the flights. *See* TD2 at

---

[13]   Nevertheless, Mr. Lopata received Ryanair's flight confirmation for all Booking.com test bookings at the fair-opinion.com email addresses that he used. *See* TD2 at 402:8–23. That is, for the test bookings that Mr. Lopata conducted, the fact that Ryanair received an email address that did not belong to the customer did not prevent Ryanair from communicating with the customer.

383:11–18; PTX 55.[14]  The test bookings that Mr. Lopata made directly on Ryanair's website did not lead to such discrepancies in customer email address or payment methods.  *See* PTX 55.

Mr. Hurley explained that to restore data integrity, Ryanair required OTA customers to verify their identity and contact information.  TD1 at 159:8–21.  Mr. Hurley was involved in building and designing the online verification procedure, for which Ryanair contracted with a third party named GetID "to provide software to match your face with your passport image."  *Id*. at 165:9–166:15.  Mr. Hurley testified that GetID charges Ryanair $0.25 per customer verification attempt and that for many customers the verification process requires multiple verification attempts.  *Id*. at 166:18–167:7.  Mr. Hurley thus calculated that it costs an average of $0.59 per customer to complete the online verification procedure.  *Id*.

According to Mr. Hurley, Ryanair had "roughly . . . 600,000" passengers who completed online verifications between March 2022 and February 2023.  *Id*. at 167:8–16.  To calculate the online verification costs for those 600,000 passengers, Mr. Hurley multiplied 600,000 by $0.59, which equals $354,000.  *Id*. at 167:22–168:10.  To calculate the portion attributable to Booking.com, Mr. Hurley multiplied $354,000 by 0.028, based on his testimony that Booking.com was accountable for 2.8% of Ryanair flights purchased through OTAs from March 1, 2022, to February 28, 2023.  *Id*. at 168:11–24.  Mr. Hurley thus calculated online verification costs attributable to Booking.com to be $9,912.  *Id*.

---

[14]  PTX 55 shows that for the passenger "Emma Robertson," for example, Mr. Lopata used an American Express card ending in 6053 when purchasing the flight on Booking.com's website. *See* PTX 55 at 8.  Ryanair, however, received information of a credit card ending in 3980 for "Emma Robertson."  *See id*. at 13.  The credit card information also did not match for the nine other test bookings Mr. Lopata made on Booking.com's website. *See* PTX 55 (test bookings for "Bruno Chapman," "Mikayla Hartley," "Billie Merrill," "Brittney Ramirez," "Rebekah Rubio," "Tomos Slater," "Enzo Soto," "Steven Waters," and "Anya Wilkerson").

Those online verification costs, however, were not borne by Ryanair, because Ryanair charged the customers for the GetID fees. Ryanair's emails to OTA customers stated that customers would be charged for the cost of online verification. *See* DTX 240 (Ryanair email to OTA customer stating that the online verification service is "provided . . . for a fee of €0.35"); DTX 245 (same). Mr. Brady also testified that customers who paid for their online verification covered Ryanair's "costs of running the technology." TD3 at 642:2–19. Indeed, Ryanair's emails to customers stressed that the online verification fee was charged to "cover the verification checks" and that "Ryanair does not benefit from this transaction commercially." DTX 240; DTX 245.

Booking.com argues that the online verification costs do not qualify as a loss because they were "***entirely passed through to the customer*** who completes the verification." Dkt. No. 467 at 15 (emphasis in original). In response, Ryanair does not dispute that "[l]osses do not include any costs that are not borne by Ryanair," as the jury was instructed. Dkt. No. 453 at 5 (final jury instruction); *see* Dkt. No. 489 at 13. Instead, Ryanair argues that "profits are not counted *against losses*" and that "[w]hether Ryanair's online verification charge is a profit or a pass-through is a question of fact for the jury." Dkt. No. 489 at 13 (emphasis in original). While that is true, Ryanair does not point to any evidence from which the jury could conclude that Ryanair's online verification process could have resulted in a loss for Ryanair in light of the undisputed evidence that those costs were passed on to the customers.

Accordingly, no reasonable jury could have concluded that the $9,912 that Ryanair claimed as online verification costs attributable to Booking.com qualified as a loss.

## 2. Customer Service Agent Costs

Ryanair employs customer service agents who respond to customer inquiries on the telephone and online. *See* TD2 at 275:24–276:2. Mr. Hurley testified that "most customers" do

not contact customer service agents because it is when "things go wrong" that customers reach out to Ryanair. *Id*. at 276:8–10. When asked to describe the "kinds of things . . . passengers complain about . . . when they call customer service," Mr. Hurley listed issues such as adding ancillaries, flight changes, or delays caused by weather. *Id*. at 277:15–278:3. Mr. Hurley acknowledged that those complaints were made by customers who booked directly through Ryanair as well as customers who booked through OTAs. *Id*. at 278:4–6.

Mr. Hurley testified that Ryanair keeps track of inquiries made by OTA customers and counts the number of those inquiries (or "tickets") each month. TD1 at 171:16–172:12. Mr. Hurley explained that the inquiries are tagged as relating to "OTAs generally" rather than to a particular OTA and that he had "no idea" what percentage of the inquiries related specifically to Booking.com. TD2 at 276:11–20. According to Mr. Hurley, Ryanair "[has] a lot more complaints from OTA customers than [it] [does] with other customers," and the issue "keeps coming back to the passenger is not told the right information, or worse they were not told about the flight change, modifications or something, and they're frustrated and angry." TD1 at 170:2–14. Mr. Hurley, however, did not provide any numbers about the breakdown of issues raised in OTA customers' inquiries or which particular OTAs were responsible for generating greater or lesser shares of customer complaints.

Mr. Hurley also testified that from August of 2022 to July of 2023, Ryanair paid approximately €384,000 per month, or €4.6 million per year (which the parties stipulated was equal to roughly $4.6 million) in salaries to customer service agents who addressed OTA customers' inquiries. *See id*. at 170:16–173:5 (Ryanair's counsel reading aloud an interrogatory response and Mr. Hurley testifying that he attested to the truthfulness of the interrogatory response

from personal knowledge).[15]   When asked whether the salaries paid to those agents would be different for the claimed period of loss—March 1, 2022, to February 28, 2023—Mr. Hurley testified that the figure would be about $4 million. *See id*. at 173:6–174:11.  Mr. Hurley explained that Ryanair would have paid less in salaries earlier in that year because the number of passengers was "growing in that year." *Id*. at 174:2–5.  Mr. Hurley thus assumed that salaries paid to customer service agents correlated to the number of passengers.  Mr. Hurley attributed all $4 million in the salaries paid to customer service agents to costs attributable to OTAs and $112,000 specifically to Booking.com, a number obtained by multiplying $4 million by 0.028 to account for Booking.com's share of the total number of Ryanair flights booked through OTAs. *Id*. at 174:12–175:2.

Booking.com argues that Ryanair has not proved $112,000 in loss from the cost of customer service agents because Ryanair has not "not limit[ed] claimed costs to customer service inquiries related to 'data integrity'—as opposed to the plethora of other potential issues experienced by Ryanair passengers who happened to book through OTAs (such as changing flights or adding ancillaries)."  Dkt. No. 467 at 16; *see also* Dkt. No. 496 at 9 ("Ryanair failed to present evidence allowing the jury to reasonably conclude that Ryanair's claimed customer service costs were connected with restoring 'data integrity' for unauthorized bookings, rather than addressing other customer service issues that have nothing to do with data integrity (such as a late flight, a lost bag, or a complaint about Ryanair.")).  Ryanair responds in a single sentence that "customer service costs . . . are still fairly counted as losses since they resulted from technological harm to

---

[15]  Booking.com argues that Mr. Hurley identified no basis for claiming €384,000 as the monthly salary of customer service agents, *see* Dkt. No. 467 at 16, but that argument merely challenges Mr. Hurley's credibility.  Again, the court may not make credibility determinations on a motion for judgment as a matter of law.

data that should not have been in Ryanair's system in the first place." Dkt. No. 489 at 14.  Ryanair cites the court's summary judgment order for support, but without any explanation for doing so. It is thus unclear what connection Ryanair is asserting between the $112,000 of customer service costs and technological harm.

In the portion of the summary judgment order that Ryanair cites, I ruled that "the question whether the OTA bookings affect the integrity of Ryanair's data turns on whether the bookings were unauthorized" and that "[i]f Ryanair is correct in its theory of the case, the unauthorized bookings affect Ryanair's data integrity because such bookings input information into Ryanair's database that never should have been there in the first place."  Dkt. No. 399 at 32.  As made clear by the preceding paragraphs, the discussion of data integrity in the summary judgment order was directed to Ryanair's argument on summary judgment that OTAs provide "fake" data and thus impair Ryanair's data integrity.  *See* Dkt. No. 399 at 31–32; Dkt. No. 348 at 12 ("Data integrity refers to the accuracy, consistency, and reliability of data throughout its lifecycle. . . . Therefore, e-mail methods and payment methods that do not belong to the end customer . . . damage the integrity of Ryanair's database").  The order did not hold that the addition of accurate information, by itself, impairs data integrity and causes a "loss," because that was not Ryanair's theory of the case.  Nor do I take that to be Ryanair's argument now—particularly since Ryanair still maintains that Booking.com provides "fake" data.[16]

As explained earlier, Ryanair offered evidence at trial that showed that the payment methods and customer email addresses provided by Booking.com were not those of the customers. *See supra*, section III.B.1.  The addition of inaccurate and less useable information impairs data

---

[16]  Even assuming that data integrity could be impaired by the addition of accurate data, Ryanair does not explain how that proposition then supports a finding of a "loss" of $112,000.

integrity and constitutes technological harm.[17]  Ryanair, however, failed to present evidence from which a reasonable jury could find that $112,000 in customer service agent salaries was directed at issues related to the incorrect payment methods and customer email addresses that Booking.com provided.

At most, Ryanair presented evidence that because of incorrect payment methods that were provided to Ryanair, some OTA customers did not receive refunds.  Based on that evidence, the jury could infer that those customers would have contacted Ryanair's customer service.  Mr. Brady testified that there were instances in which Ryanair "paid refunds back to payment cards that belonged to OTAs, and then that money never got to the customer."  TD3 at 659:19–22.  And because of "the difficulties [Ryanair] had with not getting money back to customers," Ryanair changed its policy to require customers suspected of having booked through OTAs to verify their payment information before the refund could be processed, unlike the procedure followed with customers who booked directly on Ryanair's website.  *Id*. at 666:1–19.  When asked whether Ryanair had difficulties refunding Booking.com customers, Mr. Brady replied that he had read two chat script conversations between customer service agents and customers that showed "some difficulties there."  *Id*. at 656:6–14.

But testimony about two chat script conversations is not sufficient to allow a jury to find that Ryanair paid $112,000 in customer service agent salaries to respond to the entry of incorrect

---

[17]  Booking.com argues that impaired data integrity "does not mean additional, unwanted data, but 'some **diminution** in the completeness or useability of data or information on a computer system.'"  Dkt. No. 467 at 13 n.14 (quoting *Worldspan, L.P. v. Orbitz, LLC*, No. 05 C 5386, 2006 WL 1069128, at *5 (N.D. Ill. Apr. 19, 2006)).  Ryanair responds that "[t]hat is exactly what Ryanair's trial evidence showed: John Hurley, Iain Lopata, and Dara Brady all testified that Booking.com diminished the useability of Ryanair's data and computer system."  Dkt. No. 489 at 19 n.9.  Although Booking.com added data to Ryanair's database rather than altering what was already there, the fact that Booking.com added inaccurate and less useable data had the same effect of impairing data integrity.

payment methods by Booking.com. Beyond that, Ryanair makes no argument that a smaller portion of the $112,000 was directed at technological harm. *See* Dkt. No. 489 at 14. Indeed, there is no evidence of the relative frequencies of different types of complaints and how much time a customer service agent spent on a particular type of complaint such that a jury might reasonably be able to apportion the customer service agents' salaries to specific issues.

Accordingly, I conclude that no reasonable jury could have found that the $112,000 that Ryanair claimed as customer service agent costs attributable to Booking.com qualified as a loss.

### 3.  Shield Hosting Costs

Lukasz Stocki, a Ryanair data scientist responsible for the administration of Shield, testified at trial about how Shield works and what it costs Ryanair to run the program. Mr. Stocki explained that Shield is "active from the beginning . . . [of] when the user is starting using the Ryanair website to the end of . . . payment making" on the myRyanair portion of the website. TD2 at 328:1–14. During the period from March 1, 2022, to February 28, 2023, Shield was capable of blocking the use of automated "bots" to obtain information from Ryanair's website and purchase tickets at four end points: (1) "the availability end point"; (2) "the flights end point"; (3) "the seats end point"; and (4) "the payments end point." *See id.* at 345:22–349:20. Only the payment end point "occur[red] after the myRyanair login" page, i.e., on the portion of the website that required the customer to log in to gain access. *Id*. at 349:21–23.

According to Mr. Stocki, Shield performed two algorithms at the payment end point designed to detect bots, first before the payment was processed and then after the payment was processed. *Id*. at 349:24–350:4. Shield could not block every payment by a bot because the first algorithm had to "run very fast" to ensure that the "user is not waiting too long to make a payment." *Id*. at 334:15–22. Shield would then run a more complex algorithm after the payment was

26

Appx421

processed to further analyze the data for bots.  *Id*. at 334:25–335:8; *see also id*. at 351:5–15.  If the "post booking analysis show[ed] that [the purchaser] was a bot," Ryanair would "update the block list" used to bar bots from Ryanair's website.  *Id*. at 335:10–13; *see also id*. at 365:8–10 ("So we learn from our mistakes, and we use this information to improve our solution.").  Mr. Stocki testified that "over 99 percent" of the purchases blocked by Shield were attempted purchases by bots controlled by OTAs.  *Id*. at 333:6–8.

Running Shield required hosting the program on a server.  Mr. Stocki explained that "more users on the [Ryanair] website" would lead to "more data and more activity," which in turn would increase the hosting costs.  *Id*. at 339:15–340:4.  Mr. Stocki also explained that some end points contributed to more of the hosting costs because they involved "more data" and a "much more advanced algorithm," resulting in "more computation" overall.  *Id*. at 352:25–353:13.  Mr. Stocki thus allocated "about 50 percent" of Shield's total hosting cost to the first algorithm of the payment end point and "about 20 to 30 percent" of Shield's total hosting cost to "the post booking analysis." *Id*. at 340:8–24.  Mr. Stocki then added those percentages and allocated "about 80 percent" of Shield's total hosting cost "to the entire portion that comes after myRyanair."  *Id*. at 341:3–6. When asked what percentage of the Shield hosting costs associated with the entire payment end point was attributable to Booking.com, Mr. Stocki replied, "Depends how many bookings they made.  It's the same percent of the bookings they made."  *Id*. at 343:23–24.  That percentage, according to Mr. Hurley, was 2.8% of all the bookings made by OTAs.

At summary judgment, I determined that "[t]o the extent that . . . Shield prevents unauthorized bookings at the payment page after account creation, any portion of those costs allocable to each defendant may qualify as losses under the CFAA."  Dkt. No. 399 at 28. Booking.com argues that, accepting the allocation of eighty percent of the Shield costs to the

27

myRyanair portion of Ryanair's website and accepting the attribution of 2.8% of those costs to Booking.com,[18] Ryanair was able to establish only $2,457.72 of Shield hosting costs as constituting a "loss." Dkt. No. 467 at 18. Booking.com contends that because "Ryanair introduced **no** evidence of the hosting costs . . . from March 2022, the start of the Loss period[,] to August 28, 2022," the jury could not have found any loss based on Shield hosting costs for that half of the critical year, the beginning of March 2022 to the end of February 2023. *Id*. at 19 (emphasis in original).

Booking.com's argument is based on the gaps in Mr. Stocki's testimony regarding the servers that Ryanair used. Mr. Stocki testified that from August 29, 2022, to August 29, 2023, Shield was hosted on two different Amazon servers, Legacy and CTRL-TWR. TD2 at 341:12– 342:4. Legacy was "an old kind of account" that Ryanair used before "updgrad[ing]" to CTRL- TWR in October 2022. *Id*. at 342:9–11. According to Mr. Stocki, Ryanair paid $20,629.43 for the use of Legacy from August 29, 2022, to October 2022, and $218,730.94 for the use of CTRL- TWR from October 2022 to August 29, 2023.[19] *Id*. at 341:17–20. Dividing those payments by the number of days the servers were in use, Mr. Stocki testified that the average daily cost of the

---

[18] Booking.com argues that Ryanair may claim only fifty, not eighty, percent of the Shield hosting cost in its calculation of loss, because post-booking analysis at the payment end point does not prevent unauthorized bookings at the payment page. *See* Dkt. No. 467 at 18 n.16. That argument is unpersuasive. The jury was instructed that "loss" includes "the cost of responding to an offense," where the response was "directed at technological harm, such as preventing an impending unauthorized access or investigating the method by which an offender accessed the computer." Dkt. No. 453 at 4–5. The jury could reasonably have found that the post-booking analysis was directed at investigating the method by which an offender accessed the computer, because Mr. Stocki testified that Ryanair would use the post-booking analysis to detect more bots and improve Shield's system of detecting and blocking bot activities. Thus, the jury could reasonably have found that the post-payment analysis is directly related to Shield's ability to prevent unauthorized bookings at the payment page in subsequent attempts.

[19] Mr. Stocki did not identify the date in October when Ryanair started using CTRL-TWR. Booking.com, however, assumes that CTRL-TWR was used starting on October 1, 2022, which Ryanair does not contest. *See* Dkt. No. 467 at 19 n.19; Dkt. No. 489 at 17–18.

28

Legacy server was "about 590" dollars and that the average daily cost of the CTRL-TWR server was $597.63.[20]  *Id*. at 358:1–360:22.  Mr. Stocki, however, "[didn't] know exactly" what server was used to host Shield from March 1, 2022, to August 28, 2022, and "[didn't] remember" what the hosting costs were for that same period.  *Id*. at 361:6–17.

Ryanair does not dispute that its Shield hosting cost data covers only the period from August 29, 2022, to August 29, 2023, and thus leaves out the period from March 1, 2022, to August 28, 2022.  *See* Dkt. No. 489 at 17 ("The fact that the data did not cover the full period [of loss] does not harm the jury's finding.").  With respect to that period, Ryanair argues that the jury could make "reasonable projections" based on the evidence of the Shield hosting costs from August 29, 2022, to August 29, 2023.  *Id*. at 16.  Specifically, Ryanair asserts that it is reasonable to "calculate the average daily Shield cost for the March 1, 2022, to February 28, 2023 [period] by using all of Ryanair's Shield cost data from August 29, 2022 to August 29, 2023 (as opposed to using only the data from August 29, 2022 to February 28, 2023)."  Dkt. No. 508-1 at 2.  According to Ryanair, "[f]ailing to look at an entire year's worth of data would skew the average cost because it would fail to take into consideration the natural peaks and troughs caused by busy and quiet periods in the travel industry."  *Id*.  Ryanair argues that "it would be unreasonable to calculate Ryanair's total Shield cost without including Ryanair's busy summer months in the average cost."  *Id*.

Ryanair's argument fails for two reasons.  First, Ryanair cites no evidence at trial about the "busy summer months" or "natural peaks and troughs" in the travel industry—Ryanair thus suggests that the jury would have accounted for such variations purely as a matter of common sense.  Second, unrebutted evidence at trial established that the daily number of Ryanair flights

---

[20]  Booking.com, however, uses $597.68 as the average daily cost of CTRL-TWR in its calculations, as explained below.  That difference does not materially affect Booking.com's calculations.

sold by Booking.com increased significantly from 2022 to 2023. Marcos Guerrero, Senior Director of Flights at Booking.com, testified that the number of Ryanair flights sold by Booking.com "continually increased through 2023." TD2 at 462:14–18. That testimony is consistent with the table documenting Ryanair flights sold each day by Booking.com (which also forms the basis for Ryanair's calculation that Booking.com sold 518,249 Ryanair flights from March 1, 2022, to February 28, 2023). *See* PTX 34. For example, from March 1, 2022, to August 28, 2022, Booking.com did not sell more than 1,500 Ryanair flights on any single day. *See* PTX 34 at 19–23. From March 1, 2023, to August 28, 2023, however, Booking.com regularly sold more than 2,000 Ryanair flights per day, sometimes more than 2,800. *See id*. at 28–32. In light of Mr. Stocki's testimony that Shield hosting costs increase with more activities on Ryanair's website (e.g., more flights purchased on the website), the jury could not conclude with any confidence that hosting costs from March 1, 2022, to August 28, 2022, were the same as the costs from March 1, 2023, to August 28, 2023.[21] Any such conclusion would be speculative and not based on any evidence introduced at trial.[22]

---

[21] Booking.com also sold more Ryanair flights from August 29, 2022, to February 28, 2023, compared to sales from March 1, 2022, to August 28, 2022. *See* PTX 34 at 19–28. Thus, the jury could not use evidence of the Shield hosting costs from August 29, 2022, to February 28, 2023, to extrapolate the costs from March 1, 2022, to August 28, 2022, either. Even if the sale of Ryanair flights by other OTAs did not increase as it did for Booking.com, the evidence of the increase for Booking.com makes such extrapolations inappropriate, particularly since any loss that qualifies as a loss for purposes of the CFAA must be a loss that is specifically attributed to Booking.com.

[22] Booking.com argues that, even assuming extrapolation was allowed, the jury could have found only $4,886.22 in Shield hosting costs. *See* Dkt. No. 467 at 20. Booking.com's calculation of $4,886.22 uses an average daily cost of $597.68 (the average daily cost of CTRL-TWR) multiplied by 365 days. *See id*. at 20 n.20. That calculation, if anything, overestimates what the Shield hosting costs would be if extrapolation was allowed, because it ignores the lower average daily cost of the Legacy server ($590), which was used between August 29, 2022, and October 1, 2022. Using $590 as the average daily cost from March 1, 2022, to October 1, 2022, results in an estimated Shield hosting cost attributable to Booking.com of $4,849.64.

Without including the impermissible extrapolation that Ryanair proposes, Booking.com's method for calculating $2,457.72 as the Shield hosting costs for the subject one-year period proceeds as follows. First, the cost of each server is calculated by using an average daily cost of $590 for Legacy from August 29, 2022, to October 1, 2022 ($590 x 33 days) and an average daily cost of $597.68 for CTRL-TWR from October 1, 2022, to February 28, 2023 ($597.68 x 151 days). *See* Dkt. No. 467 at 19 n.19. Second, the costs of the two servers are added, yielding a total cost of hosting Shield from August 29, 2022, to February 28, 2023 ($19,470 + $90,249.68 = $109,719.68). *Id*. Third, the total hosting cost is multiplied by 0.8 to account for Mr. Stocki's allocation of eighty percent of costs to the portion that come after myRyanair, and further multiplied by 0.028 to account for Mr. Hurley's testimony that flights booked by Booking.com made up 2.8% of all OTA bookings from March 1, 2022, to February 28, 2023 (($109,719.68 x 0.8) x 0.028 = $2,457.72). *Id*. That calculation is supported by the evidence.

Accordingly, the non-speculative evidence supports, at most, a finding of $2,457.72 in Shield hosting costs that are attributable to Booking.com for the period of March 1, 2022, to February 28, 2023.

### 4. Navitaire Costs

Navitaire is the passenger service system partner that Ryanair uses, which is essentially a "backing database that stores all of [Ryanair's] flight bookings." TD1 at 176:5–9. Mr. Hurley testified that OTA bookings of Ryanair flights increased Ryanair's Navitaire costs because Ryanair paid Navitaire a fee per flight leg. *Id*. at 177:20–22. Ryanair initially paid 11.5 cents per flight, but the fee dropped to 9.5 cents per flight when a particular threshold was reached. *See* TD2 at 271:23–272:4. The evidence showed that there was "no special fee" for OTA bookings and that Ryanair paid Navitaire "at the exact same rate" for flights booked directly on Ryanair's website as

31

flights booked through OTAs.  *Id.* at 272:5–15.  Mr. Hurley testified that Navitaire costs associated with the 518,249 Ryanair flights booked through Booking.com from March 1, 2022, to February 28, 2023, was around $49,234, which he calculated by multiplying 518,249 by 9.5 cents.  TD1 at 177:23–179:15.

Booking.com argues that Navitaire costs do not constitute a loss under the CFAA because "Navitaire costs are borne by Ryanair for each and every passenger, regardless of whether a passenger books through an OTA or directly on Ryanair.com," and "Navitaire costs are a cost of doing business for any Ryanair passenger—just like jet fuel and cleaning the plane."  Dkt. No. 467 at 17.  Ryanair responds by citing the testimony of Basil Imburgia, Booking.com's accounting damages and loss expert, *see* Dkt. No. 489 at 15, in which he testified that Ryanair would not have paid Navitaire fees for the 518,249 flights booked through Booking.com if "Booking.com didn't make those bookings and Ryanair didn't make those bookings and nobody else made those bookings," TD3 at 807:18–808:2.  Ryanair does not dispute that Navitaire fee per flight leg was the same regardless of how the Ryanair flight was purchased.  *See* Dkt. No. 489 at 15.

As with each category of loss discussed above, Navitaire costs must be directed at a technological harm to constitute loss.  The fact that Ryanair paid Navitaire fees for flights purchased through Booking.com does not itself establish loss.  At summary judgment, I held that "Ryanair may not include the costs of Navitaire [as loss] . . . because those costs are not related to responding to violations [of the CFAA], unless the facts developed at trial show that the bot traffic attributable to the defendants has materially increased the cost of Ryanair's server infrastructure."[23]  Dkt. No. 399 at 30.  In other words, to count as loss, Navitaire costs must result

_____

[23]  Citing the summary judgment order, Booking.com argues that the increase of $49,000 in Navitaire costs was *de minimis*, not material, and therefore does not qualify as a loss.  *See* Dkt.

from the fact that a flight was purchased through Booking.com (a source of technological harm, according to Ryanair) and not directly through Ryanair.

Given the undisputed fact that Navitaire charges Ryanair 9.5 cents per flight no matter how the flight is booked, no reasonable jury could find that any part of the Navitaire costs was directed at technological harm. Rather, Navitaire costs are costs that exist simply because a flight has been purchased, independent of the manner in which that flight has been purchased or the technological harm caused by that process. For instance, if Ryanair provided free snacks to each passenger on a flight and Ryanair paid a fixed cost for each additional snack, the cost of snacks given to Booking.com customers would not be a cost of a response directed at the technological harm caused by Booking.com. Accordingly, no reasonable jury could conclude that the $49,234 that Ryanair claimed as Navitaire costs attributable to Booking.com qualified as a loss.

In sum, the only costs that Ryanair proved as contributing to a CFAA "loss" were the Shield hosting costs attributable to Booking.com, which amounted, at most, to only $2,457.72 during the one-year period in question at trial. Ryanair therefore did not meet its burden of proving at least $5,000 of loss attributable to Booking.com, which is a prerequisite to any finding of civil liability under the CFAA. Booking.com's motion for judgment as a matter of law is therefore granted.

Because of the failure of proof as to the "loss" issue, which is a necessary element of both of Counts II and IV, on which the jury based its verdict against Booking.com, my ruling on the "loss" issue requires that the jury's verdict be overturned and judgment as a matter of law be entered in favor of Booking.com. Nonetheless, I discuss below the remaining issues raised by

---

No. 467 at 17. Contrary to Booking.com's suggestion, I did not rule that a monetary threshold had to be met in order for Navitaire costs to count toward loss, nor did I suggest more generally that minimal costs do not qualify as contributing to the quantification of loss.

Booking.com in its JMOL motion in the interest of completeness, in the event that there is further review of my decision.

Although I find in favor of Ryanair on the "proof of damage" issue addressed in section III-C below, that resolution does not rescue Ryanair's claim under Count IV, because of the failure of Ryanair's proof with regard to the "loss" requirement applicable to that count. And as for my decision in favor of Booking.com on the "fraudulent intent" issue addressed in section III-D below, that resolution does not alter the disposition of Count II, but merely provides an additional reason why judgment as a matter of law must be granted to Booking.com on that Count.

### C. Proof of Damage

As relevant to Count IV, section 1030(a)(5)(B) of the CFAA prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage," and section 1030(a)(5)(C) prohibits "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, causing damage and loss." Thus, proof of "damage" is required under either of those sections.

The jury was instructed that "damage" under the CFAA means "any impairment to the integrity or availability of data, a program, a system, or information." Dkt. No. 453 at 7; *see also* 18 U.S.C. § 1030(e)(8). The jury was further instructed that "[t]he term 'damage' focuses on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." Dkt. No. 453 at 7. The jury found by a preponderance of the evidence that "Booking.com intentionally directed, encouraged, or induced Etraveli to access the myRyanair portion of Ryanair's website without authorization," and that Etraveli's unauthorized access "recklessly caused Damage to a protected computer," in addition to "caus[ing] both Damage to a protected computer and Loss." Dkt. No. 457 at 2.

34

Central to the parties' arguments about damage is an event that occurred in early October of 2023, referred to as the "Monex attack" or the "Monex incident." Mr. Hurley testified at trial that "every single time a person goes through the payment page [on myRyanair], [Ryanair] go[es] through Monex" to provide currency conversion service for the customer. TD1 at 180:8–10. That is, credit card details are sent to Monex, which then "looks at it and says, 'No conversion necessary or conversion necessary, and here's the conversion rate,' and gives it back to [Ryanair]." *Id*. at 181:2–6. Mr. Hurley further testified from personal knowledge that in early October of 2023, the Monex end point on Ryanair's website was flooded with "null and void" requests made with "blank credit card details," *id*. at 181:14–182:1, with the volume reaching "60,000 calls an hour at one stage," *id*. at 184:5. According to Mr. Hurley, Ryanair had to disable Monex for two hours, which meant that it lost currency conversion for that time period. *Id*. at 184:16–22. Ryanair also turned off Shield, "hoping if we turned the Shield off, the attackers would stop trying to attack Shield in the cat and mouse and go away." *Id*. at 184:7–9. Mr. Hurley testified that that "Booking.com was responsible for at least 5,000 of those attacks." *Id*. at 186:7–10.

Booking.com asserts that Ryanair's only basis for establishing damage at trial was the Monex incident and that the Monex incident cannot establish damage for two reasons. Dkt. No. 467 at 21. First, Booking.com argues that "the Monex incident cannot support Ryanair's CFAA civil claim because the Monex incident occurred in October 2023, ***after*** the period in which Ryanair otherwise claims to have experienced its $5,000 or more of Loss (March 2022–April 2023)." *Id*. (emphasis in original). Second, Booking.com argues that "Ryanair wholly failed to show that the 'Monex attack' could be attributed to Booking.com or that it damaged Ryanair's computers in any respect." *Id*. at 22.

35

Ryanair responds that the Monex incident is not the only basis upon which the jury could have found damage under the CFAA. Ryanair argues that the jury could have found "impairment to the availability of Ryanair's data and system" through testimony that "Booking.com indirectly sends Ryanair payment information and myRyanair email addresses that do not match the details input by the Booking.com customer, which in turn impairs the ability of Ryanair to use that data and its website." Dkt. No. 489 at 20. Regarding the Monex incident itself, Ryanair argues that there is no requirement for damage to be established in the same period as loss, and that there was sufficient evidence at trial for the "jury to reasonably conclude that Booking.com was responsible for the Monex attack." *Id*.

As an initial matter, I agree with Ryanair that the jury was not limited to the Monex incident in finding damage. As explained in section III.B., *supra*, there was sufficient evidence for the jury to find that Booking.com provided customer information that did not belong to the customer, which impaired Ryanair's data integrity. Even if Ryanair had to establish damage based on the Monex incident alone, however, there was sufficient evidence for the jury to find damage.

First, contrary to Booking.com's argument, the CFAA does not require that the "damage" that is required for proof of a violation of section 1030(a)(5)(B) or (C) must occur during the same one-year period as the "loss" that is required to maintain a civil action under the statute when the civil action is predicated, as in this case, on conduct violating the "loss" provision of section 1030(c)(4)(A)(i)(I). The relevant provisions of the statute that require proof of damage make no reference to a one-year time period, unlike the provisions related to loss. *Compare* 18 U.S.C. §§ 1030(a)(5)(B) and 1030(a)(5)(C) *with* 18 U.S.C. § 1030(c)(4)(A)(i)(I).

Booking.com characterizes section 1030(g) as requiring "by its plain terms" that "Damage and Loss have occurred during the same year," and that Ryanair's argument to the contrary is

36

"simply wrong." Dkt. No. 496 at 14. But Booking.com's reading of the statute is unsupported by the text, and Booking.com cites no case law or other support for its argument that the "damage" and "loss" must occur during the same one-year period. Nor does Booking.com offer an analysis of the statutory text that supports its "plain terms" assertion. Although I conclude that the statutory text is plain, it is not plain in a way that supports Booking.com's argument. Quite the opposite is the case, as shown below.

Section 1030(g) provides that a civil action for a violation of the CFAA "may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." Subclause (I), the only relevant factor in this action, requires loss in a one-year period of at least $5,000 in value. 18 U.S.C. § 1030(c)(4)(A)(i)(I). No such restriction is placed on the proof of the "damage" necessary to support a violation of section 1030(a)(5)(B) or section 1030(a)(5)(C). And there is nothing about the language of section 1030(g) or subclause (I)—let alone its "plain terms"—that requires damage to be proved with reference to the same one-year period as loss, or any other time period. It is true that both damage and loss must be proved to establish a violation of section 1030(a)(5)(B) or (C), but the loss must be shown to be at least $5,000 in a one-year period, while the damage is not confined to a particular period or required to be in a particular amount. Thus, the fact that the Monex incident occurred outside the claimed period of loss (March 1, 2022, to February 28, 2023) does not by itself establish that Ryanair failed to prove "damage" for purposes of satisfying the requirements of sections 1030(a)(5)(B) and 1030(a)(5)(C).

There was also sufficient evidence for the jury to reasonably find that Booking.com was responsible—at least in part—for the Monex incident, and that the Monex incident impaired the integrity or availability of Ryanair's computer system. According to Booking.com, "the only harm

Appx432

claimed by Ryanair at trial related to Monex was $13,000 of chargebacks by MasterCard for all of October 2023 (none of which can be attributed to a Booking.com booking), and two hours of sporadically inoperable currency conversion services, during which time Mr. Hurley testified Ryanair flights *could still be booked*." Dkt. No. 467 at 22–23 (emphasis in original). Booking.com argues that "[t]his is not Damage, let alone due to Booking.com." *Id*. at 23. I disagree.

The definition of "damage" under the CFAA does not require a specific quantum of impairment to the integrity or availability of data, a program, a system, or information, and Booking.com cites no case law to the contrary. *See id*. at 22–23. Even if flights could still be booked, Mr. Hurley testified that a feature of the payment page on the myRyanair portion of the website was unavailable for two hours. That Monex is a third party does not change the fact that Ryanair ordinarily uses Monex for every single payment made through myRyanair, so that the service that Monex provides is a feature of the myRyanair payment page. Indeed, if the Monex end point was not a part of myRyanair, Ryanair would not have had the ability to turn off Monex's services for two hours. *See* TD1 at 183:16–19 (Mr. Hurley's testimony that Ryanair has "a key system, if it's under pressure it's like a fuse on the plug, if the pressure gets too high it turns itself off and removes Monex from the flow"). Mr. Hurley also testified that Ryanair had to turn off Shield during the Monex incident, which was likewise evidence of impaired availability of a feature that Ryanair has built into its website. Accordingly, there was sufficient evidence to support a finding by the jury that the Monex incident caused damage to Ryanair's computers.

The remaining question is whether there was sufficient evidence for the jury to reasonably find that Booking.com was responsible, at least in part, for the Monex incident. Booking.com argues that Mr. Hurley's testimony about Booking.com's responsibility for 5,000 of the null requests was based on a "tenuous theory" that ignored the possibility that a party other than

Booking.com was responsible for those requests. Dkt. No. 467 at 22. Mr. Hurley's testimony, however, was subject to rigorous cross-examination on these issues; crediting Mr. Hurley's testimony, the jury could reasonably find by a preponderance of the evidence that Booking.com was responsible for at least 5,000 null requests.

In both his direct and cross examination, Mr. Hurley retraced his steps for concluding that Booking.com was responsible for at least 5,000 null requests. In doing so, Mr. Hurley referred to two different log files produced by Shield related to the Monex incident—one for Ryanair flights that were successfully purchased ("success log") and one for failed attempts at payment ("error log"). *See* PTX 153, PTX 154. The success log contained columns for a six-digit passenger name record ("PNR"), an email address used for myRyanair, an IP address, a string of letters and numbers known as a "session token," and a count of the number of attempts made. *See* PTX 154. The error log contained columns for the session token, the number of attempts made, the email address used for myRyanair, and the IP address. *See* PTX 153.

First, Mr. Hurley identified a PNR in the success log ("BK23MT") that belonged to a flight purchased through Booking.com.[24] That PNR was associated with the email address viviap.hhaley@gmail.com and the IP address 94.63.121.70. *See* TD2 at 241:21–242:13; PTX 154 at 1. Mr. Hurley then found that same IP address (94.63.121.70) in the error log, associated with the email address foleymessay1217@gmail.com. *See* TD2 at 252:11–252:20; PTX 153 at 90. The email address foleymessay1217@gmail.com "connected through lots of other sessions through lots of other different IP addresses," to make failed attempts at payment. TD2 at 249:8–11; *see, e.g.*, PTX 153 at 111, 135, 138, 151, 160, 168, 175, 194, 206. Mr. Hurley counted the failed

---

[24] Booking.com provided the PNR and therefore does not contest that the PNR corresponded to a flight purchased through Booking.com. *See* TD1 at 187:6–9 (Mr. Hurley's testimony that Booking.com provided the PNR).

attempts made by foleymessay1217@gmail.com and testified that there were more than 5,000 attempts in total. *See* TD1 at 195:10–17; TD2 at 254:16–17.

In short, Mr. Hurley concluded that Booking.com was responsible for at least 5,000 failed attempts at payment during the Monex incident because more than 5,000 attempts were made by foleymessay1217@gmail.com, which at one point used the same IP address associated with the Booking.com flight purchase for viviap.hhaley@gmail.com. Mr. Hurley testified that where "the IP addresses match, I would assume it's the same party, yes, same company." TD2 at 246:14–16. The jury was free to credit Mr. Hurley's testimony and find that the use of the same IP address created an inference that Booking.com was responsible for the failed attempts at payment that Mr. Hurley identified.

Booking.com argues that Mr. Hurley ignored the fact that another flight was booked from the same IP address (94.63.121.70) that, according to Booking.com, "was indisputably not made through Booking.com." Dkt. No. 467 at 22. Booking.com refers to the flight purchased for the email address dianqfarms.strong@gmail.com. *See* PTX 154 at 3. However, there was no evidence at trial that the flight purchased for dianqfarms.strong@gmail.com was *not* made through Booking.com—Mr. Hurley testified that he had "no idea" whether the PNR for dianqfarms.strong@gmail.com ("JMS7QN") belonged to Booking.com, TD2 at 244:13–17. Mr. Hurley's lack of knowledge as to whether that booking was made through Booking.com is not evidence that it was not; rather, it is an instance in which "absence of evidence is not evidence of absence." *Chambers v. Sec'y Pa. Dept. of Corrections*, 442 F. App'x 650, 656 (3d Cir. 2011). As for Booking.com's argument that Mr. Hurley's testimony accounts for only a "tiny fraction of Ryanair's claimed 'errors' (*i.e.*, the cause of the incident)," Booking.com does not explain why the

40

5,000 failed attempts are insufficient as a matter of law to establish causation of damage. *See* Dkt. No. 467 at 22.

Thus, even if it relied on the evidence of the Monex incident alone, the jury could reasonably have found damage to Ryanair's computers, which was attributable at least in part to Booking.com.

### D. Proof of Fraud

As relevant for Count II, section 1030(a)(4) prohibits "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." At the conclusion of its opening brief in support of judgment as a matter of law, Booking.com argues that there was no evidence presented at trial that the value of the use of the myRyanair portion of Ryanair's website was $5,000 or more in any one-year period.

The jury was instructed that "[t]o act with an 'intent to defraud' means to act knowingly and with the intention or the purpose to deceive or to cheat," and that "[i]n considering whether Booking.com acted with an intent to defraud, [it] may consider, among other things, whether Booking.com acted with a desire or purpose to bring about some gain or benefit to itself or someone else or with a desire or purpose to cause some loss to someone." Dkt. 453 at 8. The jury was further instructed that "Ryanair must prove either that Booking.com obtained something of value other than the use of the Ryanair website, such as a document accessible only on the myRyanair portion of the website, or that the use of the Ryanair website itself was valued at more than $5,000." *Id.*

41

The jury found by a preponderance of the evidence that "Booking.com knowingly and with an intent to defraud, directed, encouraged, or induced a third party to access the myRyanair portion of Ryanair's website without authorization and by means of such conduct furthered the intended fraud and obtained something of value for Booking.com." Dkt. 457 at 3. The jury also found that "the object of the fraud and the thing of value obtained by Booking.com [was] only the use of the myRyanair portion of Ryanair's website," and that "the value of the use of the myRyanair portion of Ryanair's website was $5,000 or more in a one-year period." *Id.*

Booking.com raises two separate grounds for seeking judgment as a matter of law on Count II. First, Booking.com argues that "intent to defraud" requires an intent to "harm" and that Ryanair did not "present evidence that Booking.com intended to cause 'harm' to Ryanair, or that it would be in Booking.com's best interest to do so." Dkt. No. 467 at 23–24. Second, Booking.com argues that "there was no evidence presented at trial to sustain a conclusion 'that the value of the use of the myRyanair portion of Ryanair's website was $5,000 or more in a one-year period.'" *Id.* at 24. Booking.com follows this assertion by arguing that "Ryanair fell far short of the $5,000 Loss threshold, and the jury's award of ***exactly*** $5,000 in economic damages . . . only confirms that its valuation of harm was disconnected from the evidence at trial." *Id.* at 24–25 (emphasis in original).

Regarding the value of Booking.com's use of myRyanair, Ryanair points out that "[t]he value Booking.com gains from accessing the website and Ryanair's cost to investigate and address the harm caused by Booking.com's access are not linked in any way." Dkt. No. 489 at 24. Ryanair then argues that there is "clear trial evidence from which the jury could conclude that Booking.com has gained at least $5,000 in value from accessing the Ryanair website." *Id.* Ryanair does not elaborate on that argument but merely cites (1) the admission of PTX 34 into the record (which lists the daily number of Ryanair flights sold by Booking.com), *see* TD1 at 120:19–121:22; (2)

42

Mr. Hurley's testimony that Ryanair made a profit of around $10 per passenger per flight, of which $2.30 came from selling ancillaries such as allowing passengers to check extra baggage and granting seat preferences), *see id*. at 129:22–130:8; and (3) Mr. Hurley's testimony that Booking.com's sale of Ryanair flights constituted 2.8% of all OTA sales of Ryanair flights from March 1, 2022, to February 28, 2023, *see id*. at 146:7–19. Ryanair also cites the summary judgment order in which I ruled that "Ryanair may still be able to show that the defendants have acted with the intent to deceive Ryanair by using false information to obtain something of value: to wit, profitable flight bookings that the defendants would not be able to obtain otherwise." *See* Dkt. No. 399 at 45.

Ryanair is correct that the value Booking.com gained from its unauthorized use of the myRyanair portion of the Ryanair website is completely unrelated to the asserted loss suffered by Ryanair as a result of Booking.com's activities. Nevertheless, Ryanair does not cite—and I have not found—any evidence that supports finding that Booking.com gained at least $5,000 of value through its use of the myRyanair portion of the Ryanair website.

Ryanair asserts, in essence, that Booking.com made a profit on each Ryanair flight it sold and that the profits on those sales were in excess of $5,000. In support of that proposition, Ryanair cites evidence that Ryanair made a profit on each flight it sold. But that is a non-sequitur. Ryanair cites no evidence to support an inference that Booking.com made the same profits as Ryanair. Ryanair's profits come from selling tickets and ancillaries for more than it costs Ryanair to operate. But since Booking.com has to pay Ryanair, the carrier that is actually providing the flight services, for the flights and ancillaries that it sells, Booking.com's profits have no relationship to Ryanair's. Indeed, Mr. Guerrero testified that Booking.com lost "a very large amount of money ever since

43

we started, and as a matter of fact, every Ryanair flight we sell loses money as well."  TD2 at 463:12–15.

Because there was no evidence from which a reasonable jury could find that Booking.com obtained at least $5,000 in value from the use of myRyanair, the judgment in favor of Ryanair under Count II must be overturned.  It is therefore unnecessary to address Booking.com's argument that the judgment under Count II must be overturned for the additional reason that the record does not contain sufficient evidence to establish that Booking.com had the intent to defraud Ryanair.

## IV.    CONDITIONAL MOTION FOR A NEW TRIAL

Booking.com points out that under Rule 50(c)(1) of the Federal Rules of Civil Procedure, if a court grants a renewed motion for judgment as a matter of law, "it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed."  Pursuant to that rule, Booking.com has moved the court to conditionally grant Booking.com's motion for a new trial on the grounds that "the verdict is contrary to the evidence, a miscarriage of justice would result if the jury's verdict were left to stand, and the jury's verdict resulted from confusion."  Dkt. No. 467 at 25 (cleaned up).

This is not the conventional case in which a conditional motion for a new trial is granted.  The ordinary case in which a conditional new trial motion is granted is one in which the district court grants a JMOL motion on the ground of insufficient evidence to support the verdict and in the alternative grants a motion for a new trial in the event that the JMOL is overturned on appeal.  In that setting, the court's conditional new trial order is based on the court's conclusion that even if the evidence was legally sufficient to support the jury's verdict, the weight of the evidence was so strongly against the jury's verdict that the interests of justice require a new trial to be granted.  *See, e.g., Personal Audio, LLC v. Google LLC*, 690 F. Supp. 3d 422, 436 (D. Del. 2023).  This

44

case, by contrast, is one in which a judgment as to the sufficiency of the evidence on various issues depends on the resolution of legal arguments as to the requirements of the governing statute.

For that reason, Booking.com's entitlement to a new trial, in the event the judgment in its favor is overturned, depends on the legal reasons given by the reviewing court for overturning the judgment. For example, if the reviewing court should disagree with my analysis of the "loss" issue in a way that undermines the judgment but does not necessarily compel the re-entry of judgment in favor of Ryanair, a new trial may be required. In other circumstances, vacatur or reversal may require further proceedings before this court, but would not necessarily require a new trial. I will therefore postpone ruling on whether a new trial should be granted pending the outcome of any appellate proceedings that may be instituted in this case.

## V.    CONCLUSION

The motion for judgment as a matter of law filed by Booking.com with respect to Counts II and IV of Ryanair's Amended Complaint is granted. Whether Booking.com's conditional motion for a new trial is granted, in the event the judgment is vacated or reversed, will depend on the ground or grounds invoked by a reviewing court to support such a vacatur or reversal.

Booking.com is directed to prepare a proposed amended judgment within seven days of the date of this order.


IT IS SO ORDERED.

SIGNED this 22nd day of January 2025.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE

45

Appx440

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RYANAIR DAC, <br><br>           Plaintiff, <br><br>     v. <br><br> BOOKING HOLDINGS INC., <br> BOOKING.COM B.V., KAYAK SOFTWARE <br> CORPORATION, PRICELINE.COM LLC, <br> and AGODA COMPANY PTE. LTD, <br><br>           Defendants. | C.A. No. 20-01191-WCB |

<u>**AMENDED JUDGMENT**</u>

This action was tried to a jury, with the undersigned presiding, and the jury returned a verdict on the legal claims submitted to it. Judgment was entered on the verdict on July 25, 2024. D.I. 460. On January 22, 2025, the Court granted judgment as a matter of law to Booking.com B.V. pursuant to Federal Rule of Civil Procedure 50(b). In consideration thereof, amended judgment is entered as follows:

1. The defendant is found not to have violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. Judgment is hereby entered for defendant on all claims under the CFAA.

2. The jury found that the plaintiff is not liable to the defendant on any of the defendant's counterclaims. The judgment previously entered for the plaintiff on the defendant's counterclaims remains.

3. The parties shall meet and confer on a schedule for letter briefs regarding taxable

costs, if any, and shall submit a proposed stipulated briefing schedule to the Court no later than

February 13, 2025.

IT IS SO ORDERED.

SIGNED this 31st day of January, 2025.

William C. Bryson
United States Circuit Judge

2

Appx442

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---

| | | |
|---|---|---|
| RYANAIR DAC, | : | |
| | : | C.A. No. 1:20-cv-01191-WCB |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| BOOKING HOLDINGS INC., | : | |
| BOOKING.COM B.V., KAYAK SOFTWARE | : | |
| CORPORATION, PRICELINE.COM LLC, | : | |
| and AGODA COMPANY PTE. LTD., | : | |
| | : | |
| *Defendants.* | : | |

---

## NOTICE OF APPEAL

Plaintiff, Ryanair DAC, appeals to the United States Court of Appeals for the Third Circuit
from the Final Judgment entered on the verdict on July 25, 2024 (D.I. 460) and from the Amended
Judgment on January 31, 2025 (D.I. 518), as well as all interlocutory and other orders and rulings
in this action.

1

Appx443

Dated: February 28, 2025

Respectfully submitted,

**KRATZ & BARRY LLP**

*/s/ R Touhey Myer*
R Touhey Myer (#5939)
800 N. West Street
Wilmington, DE 19801
(302) 527-9378
tmyer@kratzandbarry.com

*Of Counsel:*

**HOLLAND & KNIGHT LLP**

R. David Donoghue *(pro hac vice)*
Anthony J. Fuga *(pro hac vice)*
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
(312) 263-3600
david.donoghue@hklaw.com
anthony.fuga@hklaw.com

Cynthia A. Gierhart *(pro hac vice)*
800 17th Street NW, Suite 1100
Washington, DC 20011
(202) 569-5416
cindy.gierhart@hklaw.com

Ji Mao *(pro hac vice)*
31 West 52nd Street, 12th Floor
New York, NY 10019
(212) 513-3200
ji.mao@hklaw.com

William Howard Oliver III *(pro hac vice)*
10 St. James Avenue, 11th Floor
Boston, MA 02116
(617) 573-5863
william.oliver@hklaw.com

*Attorneys for Plaintiff,*
*Ryanair DAC*

Appx444