No. 25-1374

# In the United States Court of Appeals for the Third Circuit

---

RYANAIR DAC,

*Plaintiff-Appellant,*

v.

BOOKING HOLDINGS INC., BOOKING.COM B.V., KAYAK SOFTWARE CORPORATION, PRICELINE.COM LLC, and AGODA COMPANY PTE. LTD.,

*Defendants,*

BOOKING.COM B.V.,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Delaware
(No. 1:20-cv-01191) (Hon. William C. Bryson)

---

**BRIEF FOR DEFENDANT-APPELLEE BOOKING.COM B.V.**

---

JOHN HEMANN
KATHLEEN HARTNETT
KRISTINE FORDERER
COOLEY LLP
3 Embarcadero Ctr. St.
20th Floor
San Francisco, CA 94111
(415) 693-2200

MORGAN L. RATNER
RISHABH BHANDARI
SULLIVAN & CROMWELL LLP
1700 New York Avenue, NW
Suite 700
Washington, DC 20006
(202) 956-7500

ORIN S. KERR
LAW OFFICE OF ORIN S. KERR
559 Nathan Abbott Way
Stanford, CA 94305
(650) 498-8125

*Counsel for Defendant-Appellee Booking.com B.V.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit Local Appellate Rule 26.1, Defendant-Appellee Booking.com B.V. makes the following disclosures:

1.      Booking.com B.V. is a wholly owned subsidiary of Booking Holdings Inc., a publicly traded company that has no parent company of its own.

2.      Booking.com B.V. is not aware of any other publicly traded corporation that is not a party to this case that has a financial interest in the outcome of this proceeding.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

STATEMENT OF THE ISSUES ..........................................................5

STATEMENT OF THE CASE ...............................................................6

    A.   Legal Background .....................................................6

    B.   Factual Background ..................................................7

        1.   Booking.com's Services...................................7

        2.   Ryanair's Campaign Against Online Travel Agents ..............................................................10

    C.   Procedural Background .........................................11

SUMMARY OF ARGUMENT.............................................................15

ARGUMENT ........................................................................................19

   I.   This Court Should Affirm On All Counts Because Ryanair Failed To Prove At Least $5,000 In Loss ....................................20

    A.   Under The Statute, "Loss" Must Relate To Efforts To Remediate Technological Harm............................................21

    B.   Ryanair Failed To Prove The Requisite $5,000 In Technological And Remedial Loss.......................................24

   II.   All Counts Fail Because Ryanair Did Not Show Any Access "Without Authorization" Or "Exceeding Authorization".............32

    A.   A Person Acts Without "Authorization" Under The CFAA Only If She Circumvents Technological Barriers........................................................................33

    B.   The District Court Improperly Extended The CFAA To A Circumstance-Based Limit ..........................................42

III.    All Counts Fail Because The CFAA Does Not Hold Booking.com Indirectly Liable For Etraveli's And Etraveli's Vendors' Conduct ............................................................48

    A.    The CFAA Does Not Create A Civil Cause Of Action Premised On Accomplice Liability .......................................49

    B.    Even If The CFAA Implicitly Incorporates Traditional Vicarious Liability, It Does Not Extend To Booking.com's Conduct .....................................................54

IV.    The Court Should At Least Affirm The District Court's Judgment On Counts I And II ........................................58

    A.    The District Court Properly Granted Booking.com Judgment As A Matter Of Law On Count II Because Booking.com Did Not Obtain More Than $5,000 From "The Use Of The Computer" ..................................................58

    B.    The District Court Properly Granted Summary Judgment For Booking.com On Count I Because Booking.com Did Not "Obtain Information" From The myRyanair Website .......................................................60

CONCLUSION ................................................................................63

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Advanced Fluid Sys., Inc.* v. *Huber*,
28 F. Supp. 3d 306 (M.D. Pa. 2014) ..................................................51

*Am. Tel. & Tel. Co.* v. *Winback & Conserve Program, Inc.*,
42 F.3d 1421 (3d Cir. 1994) ...............................................56, 57

*Andrews* v. *Sirius XM Radio Inc.*,
932 F.3d 1253 (9th Cir. 2019) ..........................................................22

*Bond* v. *United States*,
572 U.S. 844 (2014) ...........................................................................38

*Cent. Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ..........................................................52, 53, 56

*City Select Auto Sales Inc.* v. *David Randall Assocs., Inc.*,
885 F.3d 154 (3d Cir. 2018) ..............................................................51

*CommSolvers LLC* v. *Wieland N. Am., Inc.*,
2025 WL 786330 (S.D. Ill. Mar. 12, 2025).....................................51

*Conlan Abu* v. *Dickson*,
107 F.4th 508 (6th Cir. 2024) ...........................................................56

*Corning Glass Works* v. *Brennan*,
417 U.S. 188 (1974).............................................................................34

*Doe* v. *GTE Corp.*,
347 F.3d 655 (7th Cir. 2003)..............................................................51

*Facebook, Inc.* v. *Power Ventures*,
844 F.3d 1058 (9th Cir. 2016) ..........................................45, 46

*FCC* v. *Consumers' Rsch.*,
2025 WL 1773630 (June 27, 2025) ...................................................45

*Fischer* v. *United States*,
603 U.S. 480 (2024)............................................................................21

*hiQ Labs, Inc.* v. *LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ...........................................................54

**Cases—Continued:**

*Jones* v. *United States*,
529 U.S. 848 (2000).................................................................37

*Leocal* v. *Ashcroft*,
543 U.S. 1 (2004)...................................................................38

*Meyer* v. *Holley*,
537 U.S. 280 (2003).................................................54, 55, 56

*QVC, Inc.* v. *Resultly, LLC*,
159 F. Supp. 3d 576 (E.D. Pa. 2016) ..........................57

*Rodriguez* v. *United States*,
480 U.S. 522 (1987)...............................................................54

*Rodriquez* v. *Se. Pa. Transp. Auth.*,
119 F.4th 296 (3d Cir. 2024)...........................................24

*Sackett* v. *EPA*,
598 U.S. 651 (2023)...............................................................38

*Synthes, Inc.* v. *Emerge Med., Inc.*,
2012 WL 4205476 (E.D. Pa. Sep. 19, 2012) ...............51

*Teva Pharms. USA, Inc.* v. *Sandhu*,
291 F. Supp. 3d 659 (E.D. Pa. 2018) ..........................51

*Tourscher* v. *McCullough*,
184 F.3d 236 (3d Cir. 1999) .............................................32

*Tyco Int'l (US) Inc.* v. *Does*,
2003 WL 23374767 (S.D.N.Y. Aug. 29, 2003)..........23

*United States* v. *Bass*,
404 U.S. 336 (1971)...............................................................37

*United States* v. *Hansen*,
599 U.S. 762 (2023)...............................................................55

*United States* v. *Harvey*,
2 F.3d 1318 (3d Cir. 1993) ...............................................32

*United States* v. *Middleton*,
231 F.3d 1207 (9th Cir. 2000)........................................22

**Cases—Continued:**

*United States* v. *Nosal,*
  676 F.3d 854 (9th Cir. 2012) (en banc) ......................................36, 38, 39, 44

*Van Buren* v. *United States,*
  593 U.S. 374 (2021) .............................................................................*passim*

*Wachtel ex rel. Jesse* v. *Guardian Life Ins. Co. of Am.,*
  453 F.3d 179 (3d Cir. 2006) ...........................................................................50

*Walker* v. *Horn,*
  385 F.3d 321 (3d Cir. 2004) ...........................................................................32

*WEC Carolina Energy Sols. LLC* v. *Miller,*
  687 F.3d 199 (4th Cir. 2012) ...................................................................36, 52

*Wooden* v. *United States,*
  595 U.S. 360 (2022) ........................................................................................36

**Statutes:**

8 U.S.C. § 1324(a)(1)(A)(iv) ...............................................................................52

18 U.S.C.

  § 2 ......................................................................................................52, 54, 55

  § 1030(a).............................................................................................1, 50, 51

  § 1030(a)(2).......................................................................................6, 60, 61, 62

  § 1030(a)(2)(C) .............................................................................5, 11, 32, 33

  § 1030(a)(4)................................................................................................*passim*

  § 1030(a)(5)......................................................................................................6

  § 1030(a)(5)(A) ..............................................................................................12

  § 1030(a)(5)(B) ..............................................................................................12

  § 1030(a)(5)(C) ..............................................................................................12

  § 1030(b) ...............................................................................................*passim*

  § 1030(c)(2)(A).................................................................................................6

  § 1030(c)(2)(B)(i).............................................................................................6

  § 1030(c)(4)(A)(i)(I).............................................................................7, 12, 20

  § 1030(e)(11) ...........................................................................................21, 23

**Statutes—Continued:**

18 U.S.C. § 1030(g) ........................................................ 1, 6, 7, 12, 20, 49, 50, 52

Computer Fraud and Abuse Act of 1986, Pub. L. No. 99-474,
100 Stat. 1213 ................................................................................. 1, 6

Fed. R. Civ. P. 50(a)(1) ........................................................................ 24

Former Vice President Protection Act of 2008, Pub. L. 110-326,
122 Stat. 3560 (2008) ......................................................................... 53

**Other Authorities:**

*A Dictionary of Computing* (6th ed. 2008) ........................................... 35

Antonin Scalia & Bryan A. Garner, *Reading Law: The
Interpretation of Legal Texts* (2012) ............................................. 34

*Black's Law Dictionary* (5th ed. 1979) .............................................. 61

Bryan A. Garner, *Garner's Modern American Usage*
(3d ed. 2009) ................................................................................. 61

Felix Frankfurter, *Some Reflections on the Reading of
Statutes*, 47 Colum. L. Rev. 527 (1947) ........................................ 34

H.R. Rep. No. 98-894 (1984) ................................................................. 6

Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and
"Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L.
Rev. 1596 (2003) ........................................................................... 36

Reporters Committee for Freedom of the Press Br., *Van Buren
v. United States*, 593 U.S. 374 (2021) (No. 19-783) ...................... 39

Restatement (Third) of Agency § 7.07(3) ........................................ 56, 57

S. Rep. No. 99-432 (1986) .......................................................... 36, 37, 59, 60

Susan W. Brenner, *State Cybercrime Legislation in the United
States of America: A Survey*, 7 Rich. J.L. & Tech. 28 (2001) .......... 54

U.S. Br., *Van Buren* v. *United States*, 593 U.S. 374 (2021)
(No. 19-783) .................................................................................. 45

## INTRODUCTION

This suit was flawed from start to finish.  Ryanair sued under a federal statute, the Computer Fraud and Abuse Act, that does not apply here. Ryanair picked the wrong defendant, targeting Booking.com instead of the entities it accused of actually violating the Act.  And to cap it off, Ryanair failed to introduce evidence that it had suffered the necessary losses to bring a civil action in the first place.  For any one of those three fundamental shortcomings, this Court should affirm the judgment below and put an end to this misguided suit.

Congress enacted the Computer Fraud and Abuse Act of 1986 (CFAA) "[a]fter a series of highly publicized hackings captured the public's attention." *Van Buren* v. *United States*, 593 U.S. 374, 378 (2021) (citation omitted).  As amended, the CFAA subjects to civil and criminal liability anyone who accesses a computer "without authorization, or exceeds authorized access" and causes certain damage.  18 U.S.C. § 1030(a), (g).  The Supreme Court has made clear that the statute calls for a "gates-up-or-down inquiry"—*i.e.*, it asks whether someone can access a computer or certain parts of one, not whether the person has permissible purposes once there.  *Van Buren*, 593 U.S. at 390.

That reading of the statute "makes sense in a scheme aimed at preventing" computer hacking. *Id.* at 392 (citation and quotation marks omitted).

This case should not be a CFAA case at all. Booking.com hires vendors that execute travelers' purchases of Ryanair tickets from Booking.com's website. The vendors visit Ryanair's publicly available website and extract flight information, then use a valid email address to enter a password-protected portion of the Ryanair website and book flights for Booking.com's customers. Those vendors do not "hack" into anything, nor do they circumvent any technological barriers; they simply book flights through the same channels that anybody else can use. Ryanair wants them to stop because it would prefer customers to make purchases through its own website rather than Booking.com's. Ryanair Br. 6. So it sued Booking.com—not the vendors that actually visit Ryanair's website.

The district court mistakenly allowed this suit to proceed. It recognized that Booking.com and its vendors did not violate the CFAA by pulling flight information from the non-password-protected portions of the Ryanair website. But it construed the CFAA capaciously enough to capture the vendors' activity booking flights on the password-protected portion of the Ryanair website. Under the Supreme Court's "gates-up-or-down" analogy, the court viewed

password-protection as a sufficient "gate" to trigger the CFAA—even though Booking.com's vendors do not breach that gate but instead use the same key that Ryanair offers to the public. Compounding that error, the court allowed Ryanair to pursue a theory of accomplice liability based on Booking.com's purported "direction, encouragement, or inducement" of vendors to purchase Ryanair tickets. But that test lacks even the slightest toehold in the statutory text. The CFAA does not create any accomplice liability for civil claims, even though it expressly embraces other kinds of secondary liability. In short, the court gave Ryanair every chance to show a CFAA violation, under the broadest possible constructions of the statutory text.

Even armed with the district court's overly broad readings, Ryanair still could not make the necessary evidentiary showing. At trial, it failed to cobble together evidence sufficient to demonstrate more than $5,000 in loss in a one-year period—the CFAA's threshold for a civil claim. That should be unsurprising: businesses are not usually harmed by the collection and use of information that they make freely available to anyone willing to provide a username and password. So Ryanair never could quite connect the dots on the technological harms that it had supposedly suffered. It nevertheless secured a favorable jury verdict, accompanied by an inexplicable finding that it had

suffered a round (and suspiciously familiar) $5,000 in loss.  The district court then carefully reviewed Ryanair's threadbare submissions on loss and correctly granted Booking.com judgment as a matter of law.  After surveying each category of Ryanair's supposed harms over 18 pages of analysis, the court concluded that Ryanair had introduced evidence supporting, at most, "only $2,457.72" in non-speculative loss—less than half the statutory minimum.  J.A. 428.[1]

This Court should affirm the district court's judgment on one of several independent grounds.  It can focus on the evidence, and affirm the district court's well-reasoned conclusion that Ryanair did not carry its burden to prove the necessary $5,000 in loss.  Or the Court can focus on the law and affirm the judgment below on antecedent legal grounds.  For one, this suit is not cognizable under the CFAA because neither Booking.com nor its vendors breached any technological barriers in accessing any part of Ryanair's website.  For another, Booking.com cannot be held civilly liable under the CFAA for the actions of vendors that are neither its co-conspirators nor its agents.  This Court can resolve this case on either of those antecedent legal

---

[1]  Joint appendix citations refer to trial testimony unless otherwise noted or indicated by context.

grounds before even reaching Ryanair's case-specific evidentiary failures. Either way, it should affirm.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly found that Ryanair failed to prove at least $5,000 in cognizable "loss" for any one-year period.  J.A. 410-429.

2.     Whether this Court should affirm the district court's judgment on the alternative ground that Ryanair failed to show access "without authorization" or "exceeding authorization," within the meaning of the CFAA. J.A. 33-48.

3.     Whether this Court should affirm the district court's judgment on the alternative ground that Booking.com cannot be held liable under the CFAA for its independent vendors' actions.  J.A. 7-14, 62-67.

4.     Whether the district court correctly granted judgment as a matter of law on Ryanair's claim under Section 1030(a)(4) that Booking.com obtained $5,000 from "the use of [Ryanair's] computer."  J.A. 436-439.

5.     Whether the district court correctly granted summary judgment to Booking.com on Ryanair's claim under Section 1030(a)(2)(C) that

Booking.com "obtain[ed] . . . information" from a protected computer.  J.A. 41-47, 69.

## STATEMENT OF THE CASE

### A.    Legal Background

In the 1980s, computers emerged as an essential part of daily life.  As the digital storage of sensitive information expanded, Congress grew concerned about "the activities of so-called 'hackers'" who would break into computer systems.  H.R. Rep. No. 98-894, at 10 (1984).  Congress enacted the Computer Fraud and Abuse Act of 1986 (CFAA), Pub. L. No. 99-474, 100 Stat. 1213, to combat the rise of such cyber-hacking crimes.  Among other things, the CFAA prohibits knowingly or intentionally accessing a computer "without authorization," or "exceeding authorized access," to obtain information, commit fraud, or cause damage.  18 U.S.C. § 1030(a)(2), (4), (5).  The statute also prohibits conspiring or attempting to commit those offenses.  *Id.* § 1030(b).

Most CFAA violations are punishable by a fine or imprisonment of up to one year, or both.  18 U.S.C. § 1030(c)(2)(A).  If "the offense was committed for purposes of commercial advantage or private financial gain," however, it becomes a felony punishable by imprisonment for up to five years.  *Id.* § 1030(c)(2)(B)(i).  In 1994, Congress added a private civil cause of action.  *Id.*

§ 1030(g).  To bring a civil suit, as relevant here, a person must show at least $5,000 of "loss" in a one-year period.  *Id.* § 1030(c)(4)(A)(i)(I).

## B.    Factual Background

### 1.    *Booking.com's Services*

Booking.com is a travel agent for the modern age.  It operates a website that allows customers to book accommodations and other travel services around the world.  J.A. 28-29, 828, 1164.  In September 2019, Booking.com expanded its operations to include flight sales, allowing customers to seamlessly integrate every aspect of their travel itinerary on one platform. J.A. 680.

To offer those flights, Booking.com entered into a series of contracts with Etraveli Group—an independent Swedish company.  J.A. 240, 848-856. Under this arrangement, Etraveli was solely responsible for sourcing flights. J.A. 241, 686-687.  Etraveli then worked with other vendors to aggregate flight information for more than 500 airlines.  J.A. 240, 822, 861.  Some of these vendors gather flight information using screen-scraping—a common technique that uses computers to quickly obtain publicly available information from websites.  J.A. 803, 816, 822.  Some airlines dislike screen-scraping because they want to direct customers to their own webpages; others,

including many low-cost airlines, welcome such scraping so that their flights can reach more customers.  J.A. 242, 259-260.

Booking.com does not control the vendors that engage in such screen-scraping.  In particular, Booking.com's agreement with Etraveli required Etraveli to provide Booking.com with flight information; Booking.com had no control over *how* Etraveli or its suppliers obtained that information.  *See* J.A. 240-241, 1826, 1830-1836.  Etraveli likewise decided *which* flight and airline information it provided, although Booking.com could request that Etraveli exclude certain flights that would, for example, violate applicable sanctions laws.  J.A. 800-802, 862.  Finally, Etraveli set flight prices.  J.A. 858-860, 1834.  In short, Etraveli permitted Booking.com to display Etraveli's inventory on Booking.com's website.  J.A. 794, 1835-1838.

██████████████████████████████████████████

████████████████████████████████  J.A. 1830-1831.  The system worked like this:  When a customer wants to purchase a ticket, he browses the flights aggregated by Etraveli and displayed by Booking.com.  J.A. 807.  Upon selecting a flight, he enters contact and payment information on Booking.com's website.  J.A. 807-809.  Booking.com then sends Etraveli the passenger information required to complete the booking—like the customer's

name and passport information.  J.A. 808-810, 812-813.  It keeps confidential other information not required to complete the booking—like payment and contact information—to protect its customers' privacy.  J.A. 812-813, 961. When Etraveli receives information from Booking.com, it sends a ticketing request to its third-party suppliers, who complete the booking.  J.A. 850-851, 854-858.  The customer remains on the Booking.com webpage (or mobile app) throughout this process, which happens very quickly.  J.A. 850-853.  Once the reservation is made, Etraveli receives the flight confirmation from its suppliers and sends it to Booking.com, which passes it on to the customer.  J.A. 776, 855.

Any purchase contract for a flight is only between the customer and Etraveli (or one of its subsidiaries).  J.A. 854, 1830-1831.  Booking.com and its customer-service agents, however, remain available to assist customers during their trips.  Contrary to Ryanair's baseless insinuations that Booking.com's model compromises the customer-service experience, Ryanair has not pointed to a single instance where a Booking.com customer failed to receive information or a refund from Ryanair.  J.A. 347.

### 2.    *Ryanair's Campaign Against Online Travel Agents*

Ryanair DAC is a low-cost carrier operating in Europe and Northern Africa.  For a few years, Etraveli sold Ryanair flights on Booking.com's website.[2]  J.A. 827-829.  Although customers can conveniently purchase and compare tickets on Booking.com's website, J.A. 851-852, Ryanair contends that Booking.com's business model frustrates its bottom line.  In Ryanair's view, online travel agents interfere with its sale of ancillary services—such as baggage fees and seat selection—to its customers.  J.A. 260.

Ryanair has taken several steps to prevent online travel agents from using its platform.  First, its terms of service prohibit commercial bookings on its website.  J.A. 266-269.  Second, a password-protected portion of its website, called myRyanair, requires users to create an account before booking tickets.  J.A. 261, 266.  Third, Ryanair created Shield, a program that attempts to detect automated computer programs trying to access its website.  J.A. 278.  ████████████████████████████████████████████████  J.A. 1774.  Instead, it assesses user activity on the website and bans the user's IP address if it determines that the user is likely an automated program.  J.A. 279-280,

---

[2]  Ryanair flights are not currently available on Booking.com because Etraveli removed those flights during this litigation.  J.A. 835.

1773.  Ryanair runs two versions of Shield that are relevant to this case—an abbreviated version when a user submits a payment and a full algorithm after the purchase is complete.  J.A. 694-702.  Fourth, Ryanair sues online travel agents, including Booking.com in this case, and sends emails discouraging customers from using their services.  J.A. 655, 953-954.

## C.    Procedural Background

1.    This lawsuit is one of "many, many, many lawsuits" that Ryanair has filed as part of its campaign against online travel agencies.  J.A. 655, 1630.  In September 2020, Ryanair sued Booking.com, Booking Holdings Inc. (Booking.com's parent company), and three other subsidiaries of Booking Holdings Inc.  Ryanair alleged five CFAA violations:

- A violation of Section 1030(a)(2)(C) for "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] . . . information from any protected computer" (Count I);

- A violation of Section 1030(a)(4) for "knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value,

unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period" (Count II);

- A violation of Section 1030(a)(5)(A) for "intentionally caus[ing] damage" to a protected computer (Count III);

- A violation of Section 1030(a)(5)(B) or (C) for "intentionally access[ing] a protected computer without authorization, and as a result of such conduct" either "recklessly caus[ing] damage" or "caus[ing] damage and loss" (Count IV);

- A violation of Section 1030(b) for conspiring to commit the above offenses (Count V).

J.A. 508-561.  To prevail on any of these claims, Ryanair needed to show that it suffered "loss" caused by the alleged violation "aggregating at least $5,000 in value" in a one-year period.  18 U.S.C. § 1030(c)(4)(A)(i)(I), (g); *see, e.g.*, J.A. 410-411.

2.    At the motion-to-dismiss stage, the district court dismissed Count III because Ryanair had not plausibly alleged that the defendants intended to damage Ryanair's computers.  J.A. 15-16.  The court also rejected Booking.com's argument that all of Ryanair's claims failed as a matter of law

because Ryanair did not allege that Booking.com itself, rather than its vendors, had violated the CFAA. J.A. 7-14. Instead, the court held that Booking.com could be liable for Etraveli's alleged violations if Booking.com "direct[ed], encourage[d], or induce[d]" Etraveli's or Etraveli's vendors' access to Ryanair's website. J.A. 13. The court did not purport to derive this novel theory of secondary liability from the CFAA's text. And in a later opinion, it reiterated that Booking.com could be held liable for Etraveli's or Etraveli's vendors' conduct, even though those vendors did not act as Booking.com's agents or employees. J.A. 62-67.

On cross-motions for summary judgment, the district court reached three other legal conclusions relevant on this appeal. First, the court announced a generous standard for loss, under which the costs of an investigation following a CFAA violation count as a statutory "loss" even if the violation did not result in any actual damage to a computer system or data. J.A. 53. At the same time, the court recognized that Ryanair was not entitled to recover for "costs of an investigation that is directed at business harms," or the cost of prophylactic measures that Ryanair took to "make its system more secure than it was before." J.A. 55 (citation omitted). Under these principles,

the district court prevented Ryanair from counting employee salaries related to improving the Shield program as "loss." J.A. 56.

Second, the district court rejected Booking.com's argument that the CFAA does not apply at all because anyone with an email address can make an account to access myRyanair, the password-protected portion of Ryanair's website. The court held that Booking.com acted "without authorization" under the CFAA if, after receiving a cease-and-desist notice from Ryanair, its vendors accessed myRyanair. J.A. 47. The court recognized, however, that Booking.com and its vendors did not violate the CFAA by accessing the non-password-protected portions of the Ryanair website. J.A. 40.

Third, the district court granted summary judgment for Booking.com on Count I because Booking.com did not obtain any information from the password-protected portion of the website. J.A. 46-47, 69.

3.    The district court held a four-day jury trial on the remaining claims. The jury found for Booking.com on the conspiracy claim (Count V) but found for Ryanair on the fraud claim (Count II) and the damage claim (Count IV). J.A. 1283-1284. It awarded precisely $5,000—the minimum statutory "loss" that Ryanair had to prove to maintain a civil cause of action—as the "actual economic harm" suffered by Ryanair. J.A. 1285. The jury reached this

conclusion even though Ryanair nowhere introduced evidence adding up to $5,000 exactly.  *See* J.A. 412-429; *see also* Ryanair Br. 20-43.

After the verdict, Booking.com renewed its earlier motions for judgment as a matter of law.  Dkt. No. 466-467.  Booking.com pointed out that the jury's award was inconsistent with the evidence presented and that Ryanair's trial evidence supported, at most, an award of $2,457.72.  Dkt. No. 467, at 12.  The district court agreed and granted judgment to Booking.com on Counts II and IV because Ryanair did not prove $5,000 in loss.  J.A. 428.  On Count II, the court also held that Ryanair failed to prove that Booking.com obtained at least $5,000 in value from its alleged CFAA violation.  J.A. 439.

## SUMMARY OF ARGUMENT

I.    The district court correctly concluded that no reasonable jury could have found for Ryanair because Ryanair did not meet its burden of proving the requisite $5,000 in loss.  Because the $5,000 threshold is an element of every civil CFAA count, that is enough to affirm the judgment below.

The Supreme Court has made clear that a private plaintiff's loss is cognizable under the CFAA only if it (1) relates to technological harm and (2) remedies that harm.  As the Court explained in *Van Buren* v. *United*

*States*, the statutory terms "loss" and "damage" "focus on technological harms . . . of the type unauthorized users cause to computer systems and data." 593 U.S. 374, 392 (2021). The statute's objective is to restore the plaintiff's computer to its baseline functionality before the defendant's intrusion; further prophylactic measures are not recoverable.

As the district court meticulously explained, Ryanair failed to prove the statutorily required $5,000 in loss. Ryanair points to four putative buckets of costs, but—individually or in combination—they do not reach the statutory threshold.

First, Ryanair contends that the costs of running Shield, its internal screening device for online travel agencies, should suffice. As the district court recognized, however, Ryanair never gave the jury enough information to calculate its Shield costs attributable to Booking.com for any one-year period. To calculate those costs, the jury at least needed to know both the cost to run Shield and Booking.com's share of online-travel-agency bookings. Ryanair inexplicably failed to provide the jury with both inputs for *any* single one-year period, leaving the jury to mix and match variables without justification. To make matters worse, Ryanair also failed to disentangle the costs attributable

to responding to Booking.com's vendors' putative incursions from the costs of Shield's prophylactic features.

Second, Ryanair tries to meet the loss threshold by invoking the fees it pays Navitaire, its flight-reservation vendor.  But those expenses are regular business costs that Ryanair must pay for *every* Ryanair passenger— irrespective of how the passenger bought his ticket.  As the district court noted, Navitaire fees are indistinguishable from other costs, like jet fuel and maintenance costs, that accompany every new passenger.  Those fees are thus not attributable to any CFAA violation.

Third, Ryanair points to costs of online verification—a process Ryanair customers go through if they book via an online travel agent.  But those costs are not borne by Ryanair because its passengers pay them.  Ryanair cannot use a cost that it does not bear to prop up its CFAA calculations.

Fourth, Ryanair offers its customer-service costs.  Again, those costs are not attributable to the supposed CFAA violation.  Ryanair introduced no evidence that its customer-service costs for someone who bought a ticket through Booking.com differ from its costs for customers who book their flights any other way.

II.     Ryanair's claims fail for independent, antecedent reasons too.  The plain text of the CFAA, combined with the Supreme Court's reasoning in *Van Buren*, make clear that Booking.com and its vendors never accessed Ryanair's computers "without authorization" or by "exceed[ing] authorization."  The statutory term "authorization" is keyed to a defendant's technological capability to enter the restricted space.  Neither Booking.com nor its vendors breached any technological barriers to enter any part of Ryanair's website.  The vendors simply used valid email addresses to enter a password-protected area of the website, like any other member of the public is invited to do.  Terms of service or cease-and-desist letters cannot substitute for the code-based restrictions that the statute cares about.

III.    This Court can also affirm by rejecting the district court's sweeping theory of civil accomplice liability.  The district court held that Booking.com could be liable if it "direct[ed], encourage[d], or induce[d]" Etraveli's or Etraveli's vendors' access to Ryanair's website.  That interpretation has no grounding in the CFAA or in background principles of common law.  The statute expressly includes other forms of secondary liability, but not accomplice liability.  And while some statutes implicitly incorporate

principles of respondeat superior, Ryanair never established that the respondeat superior test is satisfied here.

IV.   If the Court agrees with Booking.com on any of the above arguments, it need not go further.  But if it disagrees on each, the Court should at least affirm the district court's judgment on Counts I and II.

A.   Ryanair contends that Count II should be revived because Booking.com accessed its website "with the intent to defraud" and obtained more than $5,000.  That is wrong because Booking.com did not take anything of value from Ryanair; its vendors engaged in fair-market arm's-length transactions when buying tickets.

B.   Ryanair also argues that the district court erred in granting summary judgment on Count I because Booking.com "obtain[ed] information" by accessing myRyanair.  This argument also fails because the relevant information on that part of the website is created by the user in real time and is thus not "obtain[ed]" by him through the supposedly unauthorized access.

## ARGUMENT

This Court can dispose of the entire appeal in any one of three ways. First, the district court correctly concluded that Ryanair failed to show $5,000 in "loss," a requirement for all its claims.  Second, Ryanair did not prove that

Booking.com or its vendors accessed any portion of the Ryanair website "without authorization" or by "exceeding authorization," as the Supreme Court has construed those terms. Third, Booking.com did not directly engage in any of the relevant activity on the Ryanair website, and the CFAA does not establish civil accomplice liability. In addition to those three dispositive flaws in Ryanair's appeal, Counts I and II also fail because Ryanair did not establish their specific additional elements.

## I. THIS COURT SHOULD AFFIRM ON ALL COUNTS BECAUSE RYANAIR FAILED TO PROVE AT LEAST $5,000 IN LOSS.

To prevail on any of its claims, Ryanair must show that it "suffer[ed] . . . loss by reason of a violation of the CFAA" and that such loss "during any 1-year period" "aggregat[ed] at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I), (g). Ryanair failed to clear that hurdle, offering evidence of, at most, $2,457.72 of loss during the one-year period from March 1, 2022, to February 28, 2023. J.A. 411, 428. The jury verdict underscores Ryanair's failure: neither party offered evidence supporting the jury's suspiciously round award of $5,000, precisely the statutory minimum. J.A. 1285. The district court thus properly granted Booking.com's motion for judgment as a matter of law.

### A.    Under The Statute, "Loss" Must Relate To Efforts To Remediate Technological Harm.

Although Ryanair mostly skips over the relevant legal standard, it is a critical starting point. The CFAA's definition of "loss" is limited in two important respects. First, the "loss" must be remedial—meaning that it applies only to the costs of restoring a plaintiff's computer system to its state before the defendant's intrusion. Second, "loss" encompasses only harm to a technological component of the computer system, rather than all the economic harms that may flow from a defendant's violation of the CFAA.

For starters, the CFAA's text makes both points clear. As relevant here, the statute allows a plaintiff to seek "any reasonable cost to any victim," as illustrated by three enumerated examples: "the cost of responding to an offense, conducting a damage assessment, and restoring the data, program system, or information to its condition prior to the offense." 18 U.S.C. § 1030(e)(11). Under the *noscitur a sociis* canon, "broad language" (like "reasonable cost") can be "limit[ed]" by the "narrower terms" that surround it. *Fischer* v. *United States*, 603 U.S. 480, 490 (2024) (citation and quotation marks omitted). Here, the specific statutory examples are all both technological and remedial in nature. As the Ninth Circuit has recognized, they involve the direct "harms caused by computer intrusions" rather than

"general injuries unrelated to the hacking itself." *Andrews* v. *Sirius XM Radio Inc.*, 932 F.3d 1253, 1263 (9th Cir. 2019). And each example identifies an act ("responding," "assessing," and "restoring") that a plaintiff is forced to take to understand and undo the defendant's misconduct.

The Supreme Court confirmed in *Van Buren* that "loss" refers exclusively to the costs of remediating technological harm. After acknowledging the CFAA's origin as a statute designed to "address cybercrimes," the Court explained that the statutory definitions of "damage" and "loss" clarify that those terms "focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." *Van Buren*, 593 U.S. at 378, 392. The Court reasoned that "[l]imiting 'damage' and 'loss' in this way makes sense in a scheme aimed at preventing the typical consequences of hacking." *Id.* at 392 (citation and quotation marks omitted).

As a consequence of the statute's focus on remediating technological harms, "loss" excludes costs associated with prophylactic measures designed to "make [the] system more secure than it was before." J.A. 55 (citing *United States* v. *Middleton*, 231 F.3d 1207, 1213 (9th Cir. 2000)). Prophylactic measures anticipate *future* harms, so the costs of implementing them do not

22

"respond[]," "assess[]," or "restor[e]."   18 U.S.C. § 1030(e)(11).   For that reason, courts have consistently excluded prophylactic costs from "loss" calculations under the CFAA.  *See, e.g.*, *Tyco Int'l (US) Inc.* v. *Does*, 2003 WL 23374767, at *3 (S.D.N.Y. Aug. 29, 2003) (explaining that "damages awarded by courts under the Act have generally been limited to those costs necessary to assess the damage caused to the plaintiff's computer system or to resecure the system").   Were it otherwise, a statute "aimed at preventing the typical *consequences* of hacking," *Van Buren*, 593 U.S. at 392 (emphasis added) (citation and quotation marks omitted), would become a freewheeling reimbursement program for companies looking to upgrade their cybersecurity operations on someone else's dime.

Ryanair does not openly dispute these limitations.   Indeed, it initially agrees that "reasonable costs" count as "loss" only if the costs flow from technological harms.   Ryanair Br. 19.   But in hopes of reaching the $5,000 threshold that it otherwise cannot meet, Ryanair falls back on prophylactic or non-technological costs at every turn.   *See id.* at 20-38 (post-booking Shield costs); *id.* at 38-42 (incidental flight-tracking costs); *id.* at 42-43, 48-51 (online identity-verification costs and customer-service costs).   These costs cannot count under any fair reading of the CFAA's text, case law, and Ryanair's own

rule statement.  Each category discussed below must be limited not just to the amounts that Ryanair's evidence supports but to the costs that the CFAA recognizes.

**B.    Ryanair Failed To Prove The Requisite $5,000 In Technological And Remedial Loss.**

Applying the proper legal standard for loss, no "reasonable jury" would have "a legally sufficient evidentiary basis to find for" Ryanair.  Fed. R. Civ. P. 50(a)(1).  The district court therefore correctly ruled that Ryanair failed to prove a viable CFAA claim as a matter of law.  Ryanair offers four classes of alleged "loss" to contest this conclusion:  (i) Shield, its automation blocker; (ii) Navitaire, its flight-reservation system; (iii) online customer verification; and (iv) customer service.  Each is fatally flawed, as the district court carefully explained, *see* J.A. 410-429, and as Ryanair's acknowledgment that its evidence was "not perfect" underscores, Ryanair Br. 2.    Whether alone or in combination, the record lacks the "minimum quantum of evidence from which a jury might reasonably" reach the statutory $5,000 threshold.  *Rodriquez* v. *Se. Pa. Transp. Auth.*, 119 F.4th 296, 298 (3d Cir. 2024) (citation and quotation marks omitted).

1.    *Shield*.  Ryanair first invokes the costs of running Shield, a computer program that detects and blocks online travel agents that try to

access the Ryanair website. Ryanair Br. 20. No reasonable jury could have relied on Ryanair's presentation of Shield-related costs to find $5,000 in loss over a single one-year period because Ryanair (1) failed to provide evidence for all the variables needed to calculate its Shield losses, and (2) failed to disaggregate Shield costs that do not count as losses.

First, even assuming that all Shield costs count as losses, Ryanair did not provide the jury with the evidence it needed to calculate those costs. According to Ryanair, Booking.com's share of Ryanair's Shield-related costs can be calculated by multiplying (a) Ryanair's total Shield costs and (b) the percentage of Ryanair's online-travel-agent bookings made through Booking.com. Ryanair Br. 29-30. But Ryanair failed to present the jury with sufficient data to run that equation over any single one-year period. Instead, it skipped over a different input for each one-year period in which it tried to claim a CFAA violation. For the period from March 1, 2022, to February 28, 2023, Ryanair omitted evidence of total Shield costs for half the year. *See* J.A. 728. And for the period from August 30, 2022, to August 29, 2023, Ryanair omitted the percentage of its online-travel-agent flights that were booked through Booking.com's website. Ryanair Br. 34 (acknowledging that its witness "did not testify as to what Booking's share of total online-travel-agent

bookings would have been from August 30, 2022 to August 29, 2023"). The district court correctly recognized that these gaps were fatal because Ryanair could not mix and match data across different time periods. *See* J.A. 424-425, 829. And without the two central inputs to multiply, jurors could not reasonably approximate the Shield costs attributable to Booking.com.

Ryanair contends that the jury could infer the missing data from one period using data from another. Ryanair Br. 25-27. But the jury could not rationally draw those inferences here based on the limited evidence presented. Ryanair asserts that for the March 2022-February 2023 year, the jury could borrow the total Shield-cost figure for the August 2022-August 2023 year. *Id.* at 28-30. But the jury could not make this leap because the record evidence suggested that the total Shield costs were not constant. Instead, they were higher during the latter period (for which Ryanair offered data) than during the former period (for which it did not)—including because of an uptick in Ryanair flights sold through Booking.com's website. *See* J.A. 710, 706-707, 829. Making matters worse, Ryanair used different servers in the latter period, and its witness did not know what server was used for half of the earlier period. J.A. 708-709, 728. Those fluctuations matter because Ryanair's mixed-and-matched calculations using the higher Shield costs from the latter period

still barely cleared the $5,000 hurdle, by a mere $361.67.  Ryanair Br. 30, 34.

So if the total Shield costs were lower in the earlier period—by even 10%—the

loss calculated under Ryanair's own formula would drop below the statutory

minimum.

For similar reasons, the jury could not borrow the percentage of

Ryanair bookings purportedly attributable to Booking.com from the first

period and assume that it remained steady for the second.  Booking.com first

began booking Ryanair flights in September 2019, and was in a period of

growth.  J.A. 827-830.  There was no basis for the jury to assume that its 2022

share of Ryanair flights was the same as its 2023 one, particularly given

pandemic-era uncertainties for the travel industry.

In sum, a jury could have reasonably approximated Shield costs

attributable to Booking.com only if it knew *both* the total Shield costs *and* the

percentage of Ryanair online-travel-agent bookings that were made through

Booking.com, for the same one-year period.  Anything else would not be

"rely[ing] slightly on projections," as Ryanair characterizes it, Ryanair Br. 3;

it would be pure speculation.  The district court thus correctly held that the

"non-speculative evidence" introduced "supports, at most, a finding of

$2,457.72 in Shield hosting costs that are attributable to Booking.com for the

period of March 1, 2022, to February 28, 2023." J.A. 426. That is less than half what is needed for a CFAA claim.

Second, even if the Shield evidence could be mixed and matched from one year to the next, much of what Ryanair presented to the jury about Shield fails to qualify as a technological loss for CFAA purposes. Shield provides both pre- and post-booking protection for myRyanair, and Ryanair offered the jury the aggregate costs of both parts of the Shield program. But as Ryanair's own witness explained at trial, Shield's post-booking function runs "purely in order to improve the operation of Shield for the next time," and it "doesn't do anything about the booking that already went through." J.A. 732. Thus, Ryanair's Shield costs impermissibly included costs that relate to improving its computer-service protections for future use—which do not count as "loss" under the CFAA. *See* pp. 21-24, *supra*. Ryanair's failure to disaggregate remedial from prophylactic Shield costs categorically prevented the jury from relying on any Shield costs to find $5,000 of "loss."

Finally, this same disaggregation problem reappears in Ryanair's separate argument that Shield-related employee salaries count as "loss." Ryanair Br. 48-51. The district court correctly held at summary judgment that the Shield-related employee salaries could not count toward the statutory

threshold if those employees' functions "related to developing and *improving* Shield." J.A. 56 (emphasis added). And on appeal, Ryanair concedes that its employees "spent a portion of their time analyzing data to support the continuous improvement of Shield." Ryanair Br. 49. But Ryanair has not made any effort to disentangle and deduct the costs traceable to the employees' work of improving Shield's blocking functionality, as distinct from any remedial Shield-related work. Because it is Ryanair's burden to prove remedial costs only, it cannot meet that burden by pointing to general salary costs alone.

2.    *Navitaire.* Ryanair next invokes the fees that it paid Navitaire, a company that tracks which Ryanair flights belong to which fliers. Ryanair Br. 38-42. For its services, Navitaire receives a small fee (ranging from 9.5 to 11.5 cents) for each leg of each flight booked by a Ryanair customer. J.A. 307. The district court correctly concluded that these fees cannot contribute to Ryanair's "loss." J.A. 426-428.

Navitaire costs cannot count as technological losses under the CFAA because they are costs that Ryanair must incur in its ordinary course of business, much like paying for flight crews or plane maintenance. Ryanair's fees to Navitaire do not change, whether or not the customer booked her flight

through Booking.com.  J.A. 637-639.  In short, these costs bear no relation to Booking.com's purported CFAA violation.  As the district court noted, if the Navitaire fees count as a "loss" under the CFAA, then so too should the free peanuts and pretzels that airlines give passengers, if those passengers booked through Booking.com.  J.A. 428.  Such an expansive interpretation of loss cannot be squared with the Supreme Court's teaching in *Van Buren* that the CFAA's definitions of "loss" and "damage" are keyed to "technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data."  593 U.S. at 392.

3.    *Online Verification*.    Ryanair falls back on online "data verification costs" applied to customers suspected of booking tickets through online travel agencies.  Ryanair Br. 42.  But verification costs cannot sustain the jury's loss finding because Ryanair does not pay those costs.  Sometimes, when Ryanair suspects that a travel agent like Booking.com helped a customer book a flight, Ryanair directs that passenger to an online identification-verification process.  J.A. 289.  This process costs $0.59 per passenger.  J.A. 296.  But it costs Ryanair *nothing* because it passes these fees onto the passenger.  J.A. 416.  A Ryanair witness unequivocally testified at trial that "customers who paid for their online verification covered Ryanair's 'costs of

running the technology.'" *Id.* (quoting J.A. 1050). The district court thus properly concluded that no reasonable jury could have found that these verification fees counted as a loss for Ryanair. *Id.*

4. *Customer Service*. Ryanair's final effort hinges on customer-service costs. Ryanair Br. 42. But these also cannot prop up the jury's verdict because Ryanair made no effort to compare its customer-service costs attributable to customers who bought tickets through Booking.com from its customer-service costs attributable to customers who did not. Ryanair certainly did not prove that customer-service costs increased *because* those customers bought tickets through Booking.com.

Ryanair maintains multiple customer-service channels for travelers who need information or assistance regarding their flights. And its customer-service agents help passengers with a variety of requests, most of which have nothing to do with Booking.com. Without more information, the jury could not have determined the fraction of customer-service costs that Ryanair dedicated to assisting customers whose problems or difficulties could be linked to buying Ryanair tickets through Booking.com rather than some other medium. The district court thus correctly held that the jury could only speculate about which

customer-service costs should count as a loss attributable to Booking.com's supposed CFAA violation.  J.A. 421.

## II. ALL COUNTS FAIL BECAUSE RYANAIR DID NOT SHOW ANY ACCESS "WITHOUT AUTHORIZATION" OR "EXCEEDING AUTHORIZATION."

Ryanair's failure to establish the statutorily required loss at trial is enough to affirm.  But this case should have ended long before trial.  This Court can affirm the district court's judgment for Booking.com on any ground supported by the record.  *See Tourscher* v. *McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).[3]  Here, it should affirm on the antecedent ground that Ryanair never pleaded a viable CFAA claim because the CFAA does not prohibit a party from entering a password-protected website through the technologically prescribed means.  A person violates the CFAA only if he accesses a computer "without authorization" or "exceeds authorized access."    18 U.S.C.

---

[3] Ryanair suggests that Booking.com cannot challenge the CFAA's applicability because Booking.com did not cross-appeal.  Ryanair Br. 18 n.4. That is wrong.  A cross-appeal is proper only where the appellee seeks a judgment "more favorable than that already imposed."  *United States* v. *Harvey*, 2 F.3d 1318, 1326 (3d Cir. 1993).  The district court entered judgment for Booking.com on all counts, and Booking.com seeks to preserve that judgment rather than to expand it.  Because Booking.com's CFAA arguments represent "an alternative way of affirming the district court's decision," a cross-appeal was unnecessary (and in fact impermissible).  *Walker* v. *Horn*, 385 F.3d 321, 328 n.19 (3d Cir. 2004).

§ 1030(a)(2)(C).  The statute's text, structure, and history—and the Supreme Court's critical decision in *Van Buren*—make clear that the relevant "authorization" is best understood as technological.  Ryanair never alleged or proved that Booking.com or its vendors circumvented any technological barriers in accessing the parts of Ryanair's website open to any member of the general public who signs up for a free password and username.  J.A. 46-47.  The district court was wrong to turn a potential violation of a website's terms of use or a cease-and-desist letter into a federal offense.

### A.    A Person Acts Without "Authorization" Under The CFAA Only If She Circumvents Technological Barriers.

1.    A defendant violates the CFAA only if she "accesses a computer without authorization" or by "exceed[ing] authorized access."  18 U.S.C. § 1030(a)(2)(C).[4]  Liability thus turns on the meaning of "authorization" and "access."  Because the CFAA is a technical statute that deals with the complex

---

[4] The district court concluded that Etraveli or its vendors were acting "without authorization" rather than "exceed[ing] authorized access."  J.A. 33-36.  Although the "exceeds authorized access" prong is more appropriate in this context because the district court agreed that the vendors had technological authorization to access at least some of Ryanair's computer system, *see id.*, the Supreme Court's gates-up-or-gates-down framework applies equally to both prongs.  *See Van Buren*, 593 U.S. at 389-391.

world of cyber-hacking and digital crimes, those terms refer to code-based or technological limitations.

It is well settled that statutes "addressed to specialists . . . must be read by judges with the minds of the specialists." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 536 (1947). For that reason, courts recognize that "where Congress has used technical words or terms of art, it [is] proper to explain them by reference to the art or science to which they [are] appropriate." *Corning Glass Works* v. *Brennan*, 417 U.S. 188, 201 (1974) (citation and quotation marks omitted) (alterations in original); *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012) (courts take note of terms that carry "technical meaning[s]"). The Supreme Court took this exact approach when it construed the same statutory terms in *Van Buren*. There, the Court recognized that "a specialized meaning" of the CFAA's text "is to be expected" given that Congress enacted the statute to "address[] a . . . technical subject." *Van Buren*, 593 U.S. at 388 n.7 (citation omitted).

In *Van Buren*, the Supreme Court thus concluded that "access" and "authorization" must be understood as technical terms. In the computing context, "authorization" means the "process by which users, having completed

an . . . authentication stage, gain or are denied access to particular resources based on their entitlement." *Van Buren*, 593 U.S. at 390 n.9 (quoting *A Dictionary of Computing* 30 (6th ed. 2008)). The Court recognized that the term "access" likewise carries a "'well established' meaning in the 'computational sense'" that "references the act of entering a computer 'system itself' or a particular 'part of a computer system.'" *Id.* at 388 & n.6 (collecting dictionary definitions).

Putting these pieces together, the operative statutory question is whether the defendant entered the relevant digital area through the prescribed technological means. *See Van Buren*, 593 U.S. at 388 ("exceed[ing] authorized access" refers to "the act of entering a part of the system to which a computer user lacks access privileges"). A law-firm associate has "authorized access" to enter the part of his firm's intranet that hosts his performance reviews if he can pull up that part of the intranet without encountering any technological barriers—even if he has violated the firm's handbook instructing associates to not rifle through personnel files. By contrast, if the associate hacks into the firm's servers to access those reviews, his access becomes "unauthorized" in the statutory sense.

2.    The CFAA's focus on defendants who breach code-based limitations reflects the broader context against which the statute was enacted. *See Wooden* v. *United States*, 595 U.S. 360, 373 n.5 (2022) (courts need not "blind" themselves to the circumstances surrounding a provision's enactment). Congress designed the CFAA as a specialized law for dealing with digital crimes because traditional tort and criminal laws proved an "uncomfortable fit" for digital misconduct. Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. Rev. 1596, 1613 (2003). In particular, the CFAA was enacted to punish digital hacking—that is, when a person breaks into a computer system and compromises devices or networks. *See Van Buren*, 593 U.S. at 378; *see also, e.g.*, *WEC Carolina Energy Sols. LLC* v. *Miller*, 687 F.3d 199, 201 (4th Cir. 2012). And the prototypical "hacker" infiltrates a computer system with code.

The legislative history underscores Congress's focus on technological breaking-and-entering. As Congress saw it, the intentional act of "trespassing into someone else's computer files" involves "obtain[ing] at the very least information as to how to *break into that computer system*." *United States* v. *Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (en banc) (emphasis added) (quoting S. Rep. No. 99-432, at 9 (1986)). The Senate Committee Report accompanying

the CFAA's 1986 amendment offers examples that illustrate the statute's focus on digital hacking. One such example concerned "a group of adolescents" who "broke into the computer system" at a cancer hospital to access patient records and "had at their fingertips the ability to alter the radiation treatment levels that each patient received." S. Rep. No. 99-432, at 2-3. Nobody would say, by contrast, that a Phillies fan similarly "breaks into" a Mets' fan forum by lying about her allegiances to create an account.

3.    Substantive canons, including the rule of lenity and the federalism canon, also counsel in favor of limiting the statute to code-based violations. The rule of lenity is rooted in the twin principles that only Congress can fashion federal criminal law and that citizens must have fair notice of the scope of those laws. *See United States* v. *Bass*, 404 U.S. 336, 347-348 (1971). Thus, "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Jones* v. *United States*, 529 U.S. 848, 858 (2000) (citation and quotation marks omitted). Even if the CFAA were ambiguous about the type of "authorization" implicated, the rule of lenity would apply with full force

because the same statutory text establishes both criminal and civil liability. *See Leocal* v. *Ashcroft*, 543 U.S. 1, 11 n.8 (2004).

Any lingering ambiguity is likewise resolved by the principle that courts should read federal statutes narrowly when they impinge on core state interests. The Supreme Court has repeatedly explained that Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Sackett* v. *EPA*, 598 U.S. 651, 679 (2023) (citation and quotation marks omitted); *cf. Bond* v. *United States*, 572 U.S. 844, 859-860 (2014) (invoking federalism canon to reject an "improbably broad" construction of a criminal statute). Although the federal government has clearly taken aim at certain computer crimes, a too-broad reading of the CFAA's terms would greatly expand the federal government's role in policing "millions of unsuspecting individuals." *Nosal*, 676 F.3d at 859, 861.

Under Ryanair's contrary view, a prosecutor could make out a federal case any time an individual violates a website's terms of service, as long as he entered a password somewhere along the way. That is hardly a limit at all in the modern world, where many near-ubiquitous websites—from ESPN and Facebook to Amazon and LinkedIn—require users to create passwords to access at least some content, and many individuals ignore clickwrap terms

governing those websites.  *See Nosal*, 676 F.3d at 859, 861.  Indeed, companies that rely on common automation tools to pull information from public websites might all be guilty of felonies.  Journalists and scholars would likewise be chilled from using these tools to inform and educate the public.  *See, e.g.*, Reporters Committee for Freedom of the Press Br. 13-16, *Van Buren* v. *United States*, 593 U.S. 374 (2021) (No. 19-783) (explaining how data journalism relies on screen-scraping techniques to inform the public).

4.    The Supreme Court's *Van Buren* decision confirms the CFAA's cabined scope.  In *Van Buren*, the Court credited each of the arguments above in explaining that the CFAA is focused on the circumvention of technological barriers.  593 U.S. at 388-389, 393-394.  As the Court observed, the CFAA "contemplates a 'specific type of authorization—that is, authentication,' which turns on whether a user's credentials allow him to proceed past a computer's access gate, rather than on other, scope-based restrictions."  *Id.* at 390 n.9 (citation omitted).

To operationalize the CFAA's prohibition on obtaining information without "authorized access" or by "exceed[ing] authorized access," the Supreme Court introduced the metaphorical "gates-up-or-down inquiry."  *Van Buren*, 593 U.S. at 390.  Under this framing, a defendant violates the CFAA

only if he "lacks access privileges" to the part of the computer entered. *Id.* at 388. The Court rejected the alternative view, proffered by the government and the dissent, that "circumstance-based limit[s]," such as "private agreement[s]," could render the defendant's access unlawful. *Id.* at 383. The Court explained that a test focused on "circumstance-based limit[s]"—*i.e.*, non-code-based restrictions—"would inject arbitrariness into the assessment of criminal liability" by conditioning the statute's applicability on "fine distinction[s] controlled by the drafting practices of private parties." *Id.* at 395-396. Every webmaster or employer would be able to rewrite federal criminal law by modifying the terms of clickwrap contracts or employee handbooks. As the Court noted, an interpretation that produces such significant notice problems "is hard to sell as the most plausible." *Id.* at 396.

The facts of *Van Buren* illustrate how the gates-up-or-down framework operates. There, the defendant police officer had access to the police department's license-plate database only for law-enforcement purposes; he knew from his training and employee handbook that he could not access this database for personal use. 593 U.S. at 380. When he nonetheless accessed the database for personal use, the government charged him with violating the CFAA. *Id.* In reversing his conviction, the Supreme Court determined that

the operative question was whether he had "obtain[ed] information located in particular areas of the computer . . . that are off limits to him" as a technological matter. *Id.* at 395-396. And because the officer had a password—*i.e.*, the technological key—to enter the database, the Court concluded that he did not violate the CFAA, even though he did not have permission to use the database for his purposes.

Although *Van Buren* purported to reserve the question whether contract-based limits might be different, *see* 593 U.S. at 390 n.8, the logic of the opinion makes clear that the answer is no. A "gate" may be "down" when a user must enter some credential, such as a password, to gain access. But the gate goes "up" when the defendant uses the credential that the system operator has provided to access the computer. That is why Van Buren did not violate the statute by accessing the password-protected database, despite his employer's prohibition on doing so for personal use. And nothing in the Court's reasoning—much less the CFAA's text—supplies a basis for treating a contract-based prohibition differently from the limit in Van Buren's employment agreement. No matter the precise nature of the prohibited use, CFAA liability is triggered only when the defendant breaches the gate, rather than using the technologically approved key. Ryanair offered no answer to

this analysis below, and its opening brief makes only a single fleeting reference to *Van Buren*. Ryanair Br. 19.

## B. The District Court Improperly Extended The CFAA To A Circumstance-Based Limit.

Below, Ryanair proposed three reasons why the CFAA is at play here, and the district court agreed with some combination of them. *See* J.A. 43. First, Ryanair noted that myRyanair is a password-protected part of its website. Dkt. No. 348, at 23-25. Second, Ryanair asserted that Booking.com's vendors continued to access the website after Booking.com received a cease-and-desist letter. Dkt. No. 94, at 25-26. Third, Ryanair contended that Shield is a digital gate because it blocks suspected online travel agencies from accessing the website. Dkt. No. 348, at 21-23. None of these purported obstacles triggers CFAA liability because none represents a technological gate that Booking.com or its vendors breached.

1.    To start, the mere presence of a password protection does not trigger CFAA liability. Even if password protection is a technological "gate," the statutory inquiry is keyed to the specific question of whether the defendant breached that gate—not whether a gate was put up at all. J.A. 34. Here, that inquiry is straightforward: Ryanair freely gives the key to *anyone* who wishes to create a free account using an email address, password, and username. For

42

that reason, as the district court recognized, Etraveli and its suppliers plainly possessed the technological capability to enter myRyanair when they created such accounts.  *See* J.A. 47 n.8.  Nor has Ryanair offered any evidence that Booking.com or its vendors circumvented technological guardrails or otherwise broke down any "gate."  Instead, the record shows that Etraveli's suppliers booked Ryanair flights only through the technologically prescribed means; if they could not enter myRyanair or book a flight, they simply abandoned the effort.  *See, e.g.*, J.A. 778, 780, 787, 1811.  Etraveli and its suppliers thus entered myRyanair with the relevant authorization under the CFAA:  Ryanair's provision to the general public of the technological pathway to access myRyanair.

2.    For similar reasons, it is immaterial for purposes of the CFAA that Ryanair sent Booking.com a cease-and-desist letter and its vendors accessed the myRyanair part of the website thereafter.  The district court's conclusion to the contrary, *see* J.A. 43, relies on outdated out-of-circuit precedent and cannot be reconciled with the Supreme Court's decision in *Van Buren*.

In *Van Buren*, the Supreme Court made clear that circumstance-based restrictions such as employee handbooks cannot trigger liability under the

CFAA. The Court reasoned that such an interpretation "would attach criminal penalties to a breathtaking amount of commonplace computer activity." 593 U.S. at 394. After all, if circumstance-based limits could define the bounds of the CFAA, then a defendant who fails to comply with "the vagaries of private policies that are lengthy, opaque, subject to change and seldom read" could be on the hook for crippling criminal and civil liability. *Nosal*, 676 F.3d at 860.

The district court's position—that an individual violates the CFAA whenever he accesses a password-protected website in contravention of a circumstance-based limit—effectively repackages the circumstance-based test that *Van Buren* squarely rejected. The only distinction is that the district court required the additional showing that the defendant's conduct took place within a gated community—*i.e.*, at some point downstream of entering a password. But that misses the point. The Supreme Court did not care about the existence of a technological gate in the abstract; it cared about whether that gate had been *breached*. A defendant who uses a valid password as a key does not breach the gate, even if he knows that what he does inside is not permitted as a matter of a private contract, an employment agreement, click-wrapped terms of service, a cease-and-desist letter, or any other non-technological restriction. Combining an irrelevant password requirement with

44

a statutorily insufficient cease-and-desist letter does not add up to a CFAA violation.  *Cf. FCC* v. *Consumers' Rsch.*, 2025 WL 1773630, at *18 (June 27, 2025) ("Two wrong claims do not make one that is right.") (citation omitted).

Indeed, *Van Buren* itself would have come out differently under the district court's reasoning.  There, the defendant police officer could access the law-enforcement database only after entering his unique "username and password," which he received after "complet[ing] training on the limits of his authorization to access" the database.  U.S. Br. 6-7, *Van Buren* v. *United States*, 593 U.S. 374 (2021) (No. 19-783).  If the initial use of a password, combined with a subsequent circumstance-based limit, is enough to trigger CFAA liability, then Van Buren's conviction should have stood.

In reaching the contrary result, the district court primarily relied on the Ninth Circuit's pre-*Van Buren* decision in *Facebook, Inc.* v. *Power Ventures*, 844 F.3d 1058 (9th Cir. 2016).  That is also the only case that Ryanair cites on this question on appeal.  Ryanair Br. 50.  In that case, Power Ventures, a social media company, contracted with Facebook's users to send automated messages promoting Power Ventures's platform from the contracting users' personal Facebook pages to other Facebook users, and continued doing so after receiving a cease-and-desist letter.  *Power Ventures*, 844 F.3d at 1063.

The Ninth Circuit concluded that Power Ventures had violated the CFAA, relying on earlier circuit precedent holding that a defendant violates the CFAA when the plaintiff's "permission has been revoked explicitly." *Id.* at 1067.

*Power Ventures* is no longer good law, or at least should not be outside the Ninth Circuit. It predates *Van Buren*, which expressly rejected a theory of liability under the CFAA that is keyed to whether the defendant has infringed a "circumstance-based access restriction[]" such as a computer-use policy or a website operator's terms of service. *Van Buren*, 593 U.S. at 394. Neither Ryanair nor the district court supplied a principled reason for why a defendant's violation of a cease-and-desist letter, as in *Power Ventures*, can give rise to CFAA liability but a defendant's violation of an employment agreement, as in *Van Buren*, cannot similarly trigger liability. In both contexts, the defendant is knowingly disregarding a circumstance-based restriction that conditions the scope of his access to the computer system. *Power Ventures* is wrong, and this Court should not follow it.

3.    Ryanair's last-ditch argument is that its Shield program represents a technological gate under the CFAA. Dkt. No. 94, at 25-26. The district court rejected that argument because it correctly recognized that the

statute's focus on intrusion "without authorization" into a website presupposes that the website has been protected through "some sort of authentication mechanism." J.A. 34. And under that framing, the court explained that Shield is not an authentication mechanism—*i.e.*, a gate—because it functions only as a "selective[] ban[]" on "users that are perceived as not complying with the terms of use for the Ryanair website." J.A. 40. In that way, Shield operates like a bouncer who kicks rowdy customers out of the bar, even though the general public can still enter without impediment.

Nor does Ryanair argue that Booking.com or Etraveli "hacked" or "broke into" Ryanair's website by attempting to circumvent or disable Shield. ███████████████████████████████████████████████████ ███████████████████████████████████████████████ J.A. 1811. ████████████████████████████████████████ ███████████████████████████████████████████████ ███████████ J.A. 1643. Again, it does not matter if Ryanair *operates* Shield, so long as Booking.com and its vendors adhere to any technological ban that Shield imposes.

\* \* \*

At bottom, Ryanair has offered no evidence that Booking.com or any vendor circumvented technological guardrails or otherwise broke through any "gate." They simply accessed Ryanair's systems using the same "key"—a valid email address—that Ryanair has fashioned and prominently offered for the public to use. That is not a federal offense under the CFAA, backed up by the threat of a felony conviction and five years in prison.

## III.  ALL COUNTS FAIL BECAUSE THE CFAA DOES NOT HOLD BOOKING.COM INDIRECTLY LIABLE FOR ETRAVELI'S AND ETRAVELI'S VENDORS' CONDUCT.

Alternatively, this Court should affirm the judgment below because the CFAA does not permit the sort of freewheeling accomplice liability necessary to hold Booking.com liable for the actions of Etraveli's vendors. Ryanair offered no evidence that Booking.com directly violated the CFAA, as the district court acknowledged. J.A. 61-62. Nor did Ryanair offer any evidence that the vendors accessing its site were Booking.com's *agents*. The court nevertheless allowed Ryanair's claims to proceed on the theory that Booking.com could be held liable if it "direct[ed], encourage[d], or induce[d]" vendors to purchase Ryanair tickets, even though Booking.com had no control over the manner in which the vendors obtained those tickets. J.A. 64, 1833-

1836.  In other words, the district court construed the CFAA to include a broad accomplice theory of liability.

That cannot be correct.  The CFAA creates a civil action against only "the violator" of the statute and says nothing about any form of accomplice liability.  18 U.S.C. § 1030(g).  Even if the statute implicitly incorporated some form of secondary liability, it would at most pick up traditional vicarious-liability concepts, under which principals may be held liable for the actions of their agents.  The district court's broader "direct, encourage, or induce" test has no basis in the text of the CFAA, lacks grounding in the common law, and risks sweeping in a range of innocent conduct.[5]

## A.    The CFAA Does Not Create A Civil Cause Of Action Premised On Accomplice Liability.

The CFAA includes an express private right of action:  "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."   18 U.S.C. § 1030(g).   Nothing in Section 1030(g)—or the rest of Section 1030—allows a civil plaintiff to sue non-

---

[5]  The district court adopted its "direct, encourage, or induce" test—over Booking.com's objection—in its motion-to-dismiss opinion.   J.A. 7-14. Booking.com preserved its objections in its summary-judgment briefing.  Dkt. No. 335, at 18 n.14.

violators under a theory of accomplice liability.  And the CFAA's structure and history confirm that the statute does not implicitly incorporate such liability. Instead, a civil suit for violating the CFAA lies only against an individual who personally violates the statute or conspires to do so.

a.    The CFAA's limited private right of action must be brought "against *the violator*" of the Act's substantive provisions.  18 U.S.C. § 1030(g) (emphasis added).    The use of the definite article "the" "connotes comprehensiveness and specificity."  *Wachtel ex rel. Jesse* v. *Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 185 (3d Cir. 2006).  Coupled with the singular term "violator," that definite article indicates that Section 1030(g) contemplates a particular "violator."   Section 1030(g) does not specify who qualifies as "the violator."   That comes from the CFAA's substantive provisions, which cover:  (1) "[w]hoever" commits one of the seven prohibited acts specified in Section 1030(a); (2) "[w]hoever . . . attempts to commit" one of those acts, 18 U.S.C. § 1030(b); and (3) "[w]hoever conspires to commit" one of those acts, *id.*  That is the complete set of defendants—violators, attempted violators, and co-conspirators.    There is no provision for "directing, encouraging, or inducing" a violation of the CFAA.

A few district courts have tried to read accomplice liability into the statutory text. These courts have noted that Section 1030(a) uses the term "access," and that "no modifying term suggesting the need for 'personal access' is included." *Synthes, Inc.* v. *Emerge Med., Inc.*, 2012 WL 4205476, at *17 (E.D. Pa. Sep. 19, 2012); *see Teva Pharms. USA, Inc.* v. *Sandhu*, 291 F. Supp. 3d 659, 671 (E.D. Pa. 2018); *Advanced Fluid Sys., Inc.* v. *Huber*, 28 F. Supp. 3d 306, 327 (M.D. Pa. 2014). That reasoning is backward. The unmodified verb "access" means that "the defendant has to do something with the computer before CFAA liability attaches." *CommSolvers LLC* v. *Wieland N. Am., Inc.*, 2025 WL 786330, at *17 (S.D. Ill. Mar. 12, 2025). And even if the term "access" could be applied to either the actor or an accomplice, the term "the violator" is not so flexible.

The absence of any express textual support for accomplice liability should be the end of the matter. "Normally federal courts refrain from creating secondary liability that is not specified by statute." *Doe* v. *GTE Corp.*, 347 F.3d 655, 658 (7th Cir. 2003); *see City Select Auto Sales Inc.* v. *David Randall Assocs., Inc.*, 885 F.3d 154, 161 (3d Cir. 2018) (cautioning courts against inferring secondary liability in the face of "statutory silence"). That is because Congress knows how to create secondary liability when it wants. For

example, 8 U.S.C. § 1324(a)(1)(A)(iv) makes it a crime to "encourag[e] or induc[e] an alien to come to, enter, or reside in the United States" unlawfully. Congress has also enacted 18 U.S.C. § 2, "a general aiding and abetting statute applicable to all federal criminal offenses." *Cent. Bank of Denver, N.A.* v. *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994). In the civil context, Congress "has taken a statute-by-statute approach" and has had "little trouble" indicating when it wishes to create secondary liability. *Id.* at 182, 184 (citation omitted).

b.      Statutory history and structure confirm Section 1030(g)'s limited scope. The CFAA originated as part of "a campaign against computer crime." *WEC Carolina Energy Sols.*, 687 F.3d at 201. Although Congress added a civil cause of action in 1994, the statute "remains primarily a criminal statute designed to combat hacking." *Id.* Because Congress conceived of this primarily as a criminal statute, it would have seen no pressing need to incorporate accomplice liability. Under 18 U.S.C. § 2, the general aiding-and-abetting provision applicable to all criminal offenses, anyone who knowingly "aids, abets, counsels, commands, induces, or procures" a criminal violation of the CFAA is criminally liable. On the criminal side, Congress already had a default regime of accomplice liability.

To be sure, Congress could have added civil accomplice liability when it amended the statute to include a private right of action, but it did not. That omission was not a mere oversight. More than a decade after Congress expanded the CFAA to create civil liability, it amended Section 1030(b) to prohibit conspiracies—but again, said nothing about accomplice liability. *See* Former Vice President Protection Act of 2008, Pub. L. 110-326, § 206, 122 Stat. 3560 (2008). "The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere." *Cent. Bank of Denver*, 511 U.S. at 184.

That deliberate choice is particularly telling here. After all, Ryanair unsuccessfully pursued a conspiracy claim, distinct from its claims that Booking.com was liable under the direct/encourage/induce test. *See, e.g.*, J.A. 25-26, 72-76. The district court applied a separate legal standard governing the conspiracy claim, requiring "knowing[] agree[ment]" with other parties to "commit an act that violated the CFAA." J.A. 1270. And the jury found that Ryanair *failed to prove* that claim. J.A. 1284. The jury found for Ryanair only on a direct/encourage/induce theory that Congress never enacted.

c.    Without any footing in the text, the district court crafted and imposed a theory of accomplice liability under the CFAA. The court did so out

of misguided concerns that bad actors could otherwise circumvent the CFAA by enlisting the help of a third party. *See, e.g.*, J.A. 7, 9-10, 66.

Those concerns are misplaced. Civil suits under the CFAA are not the only mechanism for punishing culpable conduct. Criminal prosecution under the CFAA remains available, including on an aiding-and-abetting theory. *See* 18 U.S.C. § 2. State tort law may also deter such conduct. *See hiQ Labs, Inc.* v. *LinkedIn Corp.*, 31 F.4th 1180, 1201-1202 (9th Cir. 2022). Moreover, numerous other laws govern online conduct. *See generally* Susan W. Brenner, *State Cybercrime Legislation in the United States of America: A Survey*, 7 Rich. J.L. & Tech. 28 (2001) (surveying state cybercrime legislation). And ultimately, even if some perceived wrongdoer might escape civil liability, "no legislation pursues its purposes at all costs." *Rodriguez* v. *United States*, 480 U.S. 522, 525-526 (1987).

### B. Even If The CFAA Implicitly Incorporates Traditional Vicarious Liability, It Does Not Cover Booking.com's Conduct.

Even if the CFAA could be construed to implicitly incorporate some additional form of secondary liability, that liability would be limited to settled common law rules of vicarious liability. *See Meyer* v. *Holley*, 537 U.S. 280, 286 (2003). And the common law provides no support for the district court's

"direct, encourage, or induce" test. At most, under the common law doctrine of respondeat superior, principals can be held liable for the conduct of their agents. But that doctrine cannot help Ryanair, which failed to establish the agency relationship necessary to hold Booking.com liable for Etraveli's or Etraveli's vendors' actions.

1.    The Supreme Court's decision in *Meyer* provides helpful instruction about the extent to which secondary liability can be inferred from a statute: "Congress' silence, while permitting an inference that Congress intended to apply *ordinary* background tort principles, cannot show that it intended to apply an unusual modification of those rules." 537 U.S. at 286. Courts should therefore be reluctant to "extend[] traditional vicarious liability rules" in the absence of some textual indication to the contrary. *Id.*

The district court's "direct, encourage, induce" test is not an "ordinary tort-related vicarious liability rule[]." *Meyer*, 537 U.S. at 285. The court described its test as "an inducement theory," J.A. 10—a concept akin to criminal aiding-and-abetting liability, *see United States* v. *Hansen*, 599 U.S. 762, 771 (2023); *see also* 18 U.S.C. § 2 (creating criminal aiding-and-abetting liability for one who "counsels, commands, [or] induces" another to commit a crime). Although *criminal* aiding and abetting has a long historical pedigree,

"aiding and abetting liability is not a well-settled mechanism for imposing *civil* liability." *Am. Tel. & Tel. Co.* v. *Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1430 (3d Cir. 1994) (emphasis added); *see Cent. Bank of Denver*, 511 U.S. at 181-182.

By contrast, the CFAA could be read to allow for traditional vicarious liability on the theory of respondeat superior. As *Meyer* observed, "traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." 537 U.S. at 285. An "employee" is "an agent whose principal controls or has the right to control the manner and means of the agent's performance of work." Restatement (Third) of Agency § 7.07(3); *see Am. Tel. & Tel. Co.*, 42 F.3d at 1434-1435. Applying *Meyer*, the Sixth Circuit thus recently held that a group of companies owned by the same person could be held "vicariously liable for any completed [CFAA] offenses of their agent," an IT administrator at one of the companies. *Conlan Abu* v. *Dickson*, 107 F.4th 508, 514 (6th Cir. 2024).

2.    Booking.com cannot similarly be held liable under a theory of respondeat superior because Ryanair introduced no evidence suggesting that Booking.com has "the right to control the time, manner, and method" by which

various vendors purchased Ryanair flights for Booking.com users. *Am. Tel. & Tel. Co.*, 42 F.3d at 1435; *see* Restatement (Third) of Agency § 7.07(3)(a). Ryanair did not even attempt to show that Booking.com had control over the "*manner* in which" these bookings were "conducted"—through scraping or otherwise. *QVC, Inc.* v. *Resultly, LLC*, 159 F. Supp. 3d 576, 591 (E.D. Pa. 2016) (citation omitted). To the contrary, the record establishes that Etraveli and its vendors control the process of completing a customer's booking request. J.A. 1807 (█████████████████████████); J.A. 1794-1795 (███████████████████████████); J.A. 1826 (█████████████████████████████████████████████████████████ ████████████████████). As Booking.com's agreement with Etraveli explains, ████████████████████████████████████████████████ ████████████████████████ J.A. 1831.

Given the evidence establishing that Etraveli could independently determine whether to offer Ryanair flights and how to book tickets, Ryanair cannot show that Etraveli was acting as Booking.com's agent—let alone that Etraveli's individual vendors were. That is why the district court did not apply traditional vicarious-liability principles here. Instead, it allowed this case to move forward *only* by first creating a broad form of accomplice liability with

no textual justification and no firm roots in the common law. That was error, and this Court can affirm on that independent ground as well.

## IV. THE COURT SHOULD AT LEAST AFFIRM THE DISTRICT COURT'S JUDGMENT ON COUNTS I AND II.

If this Court agrees with Booking.com on *any one* of Part I, II, or III, it need go no further; each of those arguments resolves the whole case in Booking.com's favor. But in the event this Court disagrees, it should at least reject Ryanair's attempts to resuscitate Counts I and II of its complaint. First, Ryanair contends that the district court erred in granting judgment as a matter of law for Booking.com on Count II on the ground that Booking.com did not obtain any value in excess of $5,000. Ryanair Br. 43-48. Second, Ryanair contends that the district court erroneously granted summary judgment for Booking.com on Count I on the ground that Booking.com did not "obtain[] information" upon accessing myRyanair. *Id.* at 51-54. The district court properly ruled for Booking.com on both counts, and this Court should at least affirm that portion of the judgment.

### A. The District Court Properly Granted Booking.com Judgment As A Matter Of Law On Count II Because Booking.com Did Not Obtain More Than $5,000 From "The Use Of The Computer."

Ryanair contends that Booking.com violated Section 1030(a)(4) by

"knowingly" accessing a protected computer without authorization and "with the intent to defraud."   Ryanair Br. 43-48.   This argument fails because Section 1030(a)(4) excludes instances where "the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period."   The district court correctly ruled for Booking.com because Booking.com did not "obtain[]" anything other than "the use" of Ryanair's computer (as the jury found, *see* J.A. 1284), and Booking.com obtained no value from that use.

Ryanair acknowledges the jury's finding that Booking.com obtained only "the use of the computer."   Ryanair Br. 44.   It nevertheless argues that the value of the Ryanair tickets that Booking.com's vendors requested should count toward the $5,000 value obtained from such computer use.   *Id.* at 44-45. That argument is a non-starter.   Section 1030(a)(4)'s reference to "only [] the use of the computer" most naturally means computer *time*.   The CFAA was enacted an era when even "[m]ere trespasses onto someone else's computer system" represented the theft of a valuable resource that "the system provider" could otherwise have made "available for a fee to an authorized user."   S. Rep. No. 99-432, at 10 (1986).   But Congress believed that the distinction between "acts of fraud" and "simple trespass" would be "wiped out"

if the law treated "every trespass as an attempt to defraud a service provider of computer time." *Id.* To preserve this divide, Section 1030(a)(4) requires that the defendant have used $5,000 worth of computer time—a virtually obsolete threshold that Ryanair did not meet in this case.

In any event, even if "the use of a computer" were a broader concept than computer time itself, Ryanair's effort to shoehorn the tickets that Etraveli purchased into such "use" would still fail. Ryanair ignores the requirement that the "thing obtained" must also be "the object of the fraud." 18 U.S.C. § 1030(a)(4). That requirement is not met here because Etraveli obtained these tickets at the prices Ryanair set in an open exchange. Etraveli pays Ryanair for the tickets it books, and Ryanair issues the tickets. J.A. 1840. The process by which Ryanair issues its tickets to Etraveli is no different from how Ryanair issues 200 million other tickets every year. Even if Booking.com gains something incidental from selling the tickets on its website, Ryanair never attempted to measure or prove *that* gain, much less that this practice constitutes the use of Ryanair's computers or amounts to fraud.

### B.    The District Court Properly Granted Summary Judgment For Booking.com On Count I Because Booking.com Did Not "Obtain Information" From The myRyanair Website.

Ryanair argues that Booking.com violated Section 1030(a)(2) because

Etraveli "obtain[ed] information" by accessing myRyanair.  Ryanair Br. 51-54.  This final argument fails because the only information unique to myRyanair is information that Booking.com itself generates.  Thus, the district court properly granted summary judgment for Booking.com on this count.

Section 1030(a)(2) applies when a user accesses a computer without authorization and "thereby *obtains* . . . information *from*" his unauthorized access.  18 U.S.C. § 1030(a)(2) (emphases added).  The "obtain . . . from" requirement means that a defendant violates the CFAA only if she acquires information from a protected location for which she lacks authorization.  If she creates the information herself, she has not *obtained* the information *from* the protected location by means of her unauthorized access.

That follows from standard dictionary definitions.  "Obtain" means "to get" or to "acquire."  Bryan A. Garner, *Garner's Modern American Usage* 74 (3d ed. 2009).  The preposition "from" connects the acquisition of information to its existence in the computer at the time of access.  The adverb "thereby" further limits the provision's reach by requiring but-for causation.  *See Black's Law Dictionary* 1325 (5th ed. 1979) (defining "[t]hereby" as "[b]y that means" or "in consequence of that").  Both common sense and the CFAA's origin as an

anti-hacking law confirm that a defendant does not violate the statute by generating the very information he is accused of obtaining from the plaintiff.

Booking.com did not violate Section 1030(a)(2) because neither it nor its vendors obtained any information from myRyanair by means of their supposedly unauthorized access. The flight information that was screen-scraped appears on the fully open part of Ryanair's website. The myRyanair part of the website, by contrast, allows users to enter *their* information to book flights. Thus, the district court correctly concluded that Booking.com's vendors did not acquire Ryanair's information from accessing myRyanair. Indeed, Booking.com is unaware of any case in which a court has found that a defendant violated Section 1030(a)(2) by generating new information after a supposedly unauthorized access.

Ryanair resists this conclusion by pointing to two pieces of data unique to myRyanair: a six-digit confirmation code and a signal whether ticketing has succeeded. Ryanair Br. 52. But that is not what this suit is about. Ryanair has not sued or sought to recover damages because Booking.com generated confirmation codes. It has sued because Booking.com's vendors *booked flights* or *shared flight information*. *See id.* at 7-10. In any event, as Ryanair concedes, both the signal and the confirmation code are generated by

Etraveli's ticketing request to Ryanair—meaning that this information exists only by virtue of Etraveli's ticketing request. *Id.* at 52. Ordinary speakers would not say that a defendant who *produces* new information upon accessing a computer has "obtain[ed]" information from it. The district court thus correctly granted summary judgment for Booking.com on this count.

## CONCLUSION

For the foregoing reasons, the judgment of the district court for Booking.com should be affirmed.

Respectfully submitted,

*s/ Morgan L. Ratner*

| | |
|---|---|
| JOHN HEMANN | MORGAN L. RATNER |
| KATHLEEN HARTNETT | RISHABH BHANDARI |
| KRISTINE FORDERER | SULLIVAN & CROMWELL LLP |
| COOLEY LLP | 1700 New York Avenue, NW |
| 3 Embarcadero Ctr. St. | Suite 700 |
| 20th Floor | Washington, DC 20006 |
| San Francisco, CA 94111 | (202) 956-7500 |
| (415) 693-2200 | |
| | ORIN S. KERR |
| | LAW OFFICE OF ORIN S. KERR |
| | 559 Nathan Abbott Way |
| | Stanford, CA 94305 |
| | (650) 498-8125 |

*Counsel for Defendant-Appellee Booking.com B.V.*

JULY 11, 2025

63

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Local Appellate Rules 28.3(d) and 46.1(e), I, Morgan L. Ratner, hereby certify that I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

*s/ Morgan L. Ratner*
MORGAN L. RATNER

JULY 11, 2025

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with Federal Rule of Appellate Procedure 32(a) because it contains 12,918 words and because it was prepared in 14-point font using a proportionally spaced typeface.

2.      The brief complies with the electronic filing requirements of Third Circuit Local Appellate Rule 31.1(c) because the text of the electronic brief is identical to the text in the paper copies and because Microsoft Defender Antivirus Version 1.431.544.0 was run on the file containing the electronic brief and no viruses were detected.

*s/ Morgan L. Ratner*
MORGAN L. RATNER

JULY 11, 2025

## CERTIFICATE OF SERVICE

I certify that on July 11, 2025, the foregoing brief was filed electronically with the Clerk of Court using the Court's CM/ECF system.  I further certify that all parties required to be served have been served.

*s/ Morgan L. Ratner*
MORGAN L. RATNER

JULY 11, 2025